| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 50

1  that she would have been responsible for in her
2  history with Mellon.
3  Q. And do you know if the criticism was accurate
4  criticism?
5  A. Not always.
6  Q. When you say, "Not always," meaning not always
7  accurate criticism?
8  A. Of Linda Squier's?
9  Q. That's what I mean.
10     When you say not always accurate
11 criticism, why do you say that?
12 A. Brendan Gilmore was a brusque, arrogant
13 manager. I recollect Linda Squier's rapport with the
14 trust clients to be professional. I felt when Brendan
15 Gilmore criticized her, it was completely unwarranted.
16 Q. Did Linda Squier discuss with you that she felt
17 that Brendan Gilmore's criticisms of her were
18 unwarranted?
19 A. Yes.
20 Q. Would that be what she would say, words to that
21 effect?
22 A. Yes.
23 Q. Did Linda Squier ever tell you that she felt
24 that she was being treated by Mr. Gilmore in that

Page 51

1  fashion, unprofessional criticism, brusque, because of
2  her age?
3  A. Specifically I don't recall that she used the
4  word "age."
5  Q. What did she use?
6  A. Used in?
7  Q. When she didn't use the specific "I think I'm
8  being treated this way because of my age," I gather
9  she never said that, did she say things that made you
10 believe that age was the reason?
11 A. To the best of my memory, Linda would talk
12 about, she would talk about the length of time that
13 she had served her trust clients in Mellon.
14 Q. In fact, in terms of she held the position for
15 a while and knew her job, so to speak?
16 A. Yes.
17 Q. You said that you had, I guess you had actually
18 seen Gilmore brusquely criticizing Linda and you said
19 you also had heard it?
20 A. Yes.
21 Q. The same thing, brusque criticism?
22 A. Yes.
23 Q. When you say you heard it, is your office next
24 to hers or is it in the hallway? How is it that you

Page 52

1  heard it?
2  A. At the time I reported to Linda Squier as a
3  trust officer she sat two desks away from me. I had
4  to hear whatever he said to her, whether at her desk
5  or behind a closed door because their voices would be
6  raised.
7     Correction: His voice would be raised.
8  Q. He would be speaking in a loud manner?
9  A. Brendan Gilmore would be speaking in a loud
10 manner? Yes.
11 Q. And so as a result you could hear what he was
12 saying to her?
13 A. Substantively, yes.
14 Q. And what you heard was criticism of the
15 performance?
16 A. Yes.
17 Q. I take it that you never performed a
18 performance review of Linda Squier?
19 A. That's correct.
20 Q. Did you ever hear Brendan Gilmore speak
21 brusquely to employees who were 40 and younger?
22 A. As I remember, the 40 and younger people that
23 were in the Philadelphia office, no.
24 Q. So those folks you wouldn't know about because

Page 53

1  you weren't in the Philadelphia office?
2  A. That's correct. Yes.
3  Q. Were there any individuals 40 and younger who
4  left Brendan's team at any point that you were there?
5  A. As I recall, I don't know the exact age of Ray
6  Masucci and Scott Gilliland, but they had left the
7  Gilmore team.
8  Q. Do you know why Masucci left?
9  A. No.
10 Q. And you had said Scott?
11 A. Gilliland.
12 Q. Gilliland. Do you know why he left?
13 A. No.
14     MR. LaROSA: Ms. Blozis, we have been
15 going for over 90 minutes. Would you like to take a
16 break?
17     THE WITNESS: I would like to take a rest
18 room break.
19     MR. LaROSA: Can we take a five-minute
20 break?
21     MS. WILSON: Sure.
22     (A brief recess was taken.)
23     MS. WILSON: Can you mark this as Blozis
24 2, please?

14 (Pages 50 to 53)

Page 54

1    (Blozis Deposition Exhibit No. 2 was
2  marked for identification.)
3  BY MS. WILSON:
4    Q. If you will look at what's been marked as
5  Blozis 2 and for the record, since it's a number of
6  documents, it's P3, P4, P5 and P6 Bates stamped.
7    A. (Reviewing document).
8    Q. Ready?
9    A. May I take a few more moments to scan this?
10   Q. Sure. Let me know when you're ready.
11   A. (Reviewing document) I'm ready.
12   Q. Great. Ms. Blozis, if you would look at the
13  first page of Blozis 2 Bates stamped P3, the title is
14  Portfolio Administrator Position, Philadelphia Private
15  Wealth Management.
16       Do you see where I am?
17   A. Yes.
18   Q. Do you recognize this document?
19   A. To the best of my memory, yes.
20   Q. On the left-hand side of the upper part, it
21  says, "Current as of 2003"?
22   A. Yes.
23   Q. Is that your writing?
24   A. I would have to say it looks like my

Page 55

1  handwriting.
2    Q. I gather from that that this job summary was in
3  effect as of 2003?
4    A. Yes.
5    Q. And this would be a job summary of what your
6  job responsibilities were with respect to the
7  portfolio administrator position?
8    A. Yes.
9    Q. And was this something that human resources
10  gave to you?
11   A. To the best of my memory, no.
12   Q. Who gave it to you?
13   A. As I recall, it would have been my supervising
14  officer at that time.
15   Q. In 2003 would that have been Landis?
16   A. Yes.
17   Q. Do you remember when in 2003 he gave it to you?
18   A. No.
19   Q. Do you know why he gave P3 to you?
20   A. No.
21   Q. Do you know if he -- I guess in 2003 Maria
22  Dunlop was on board?
23   A. Yes.
24   Q. Do you know if she got the same document, P3?

Page 56

1    A. No.
2    Q. You don't know?
3    A. I don't recall at this time.
4    Q. When you believe Landis gave you what's been
5  Bates as P3, did you and he have any discussion about
6  the document?
7    A. I don't recall at this time.
8    Q. Did you read it?
9    A. Yes.
10   Q. And did you take it to be what your
11  responsibilities were?
12   A. Yes.
13   Q. Looking at P4, do you recognize that document?
14   A. Recognize it how?
15   Q. Do you know what it is?
16   A. It looks like a sheet that states LB's, meaning
17  Linda Blozis's current work as of 3-30-01.
18   Q. Do you know who put P4 together?
19   A. To my recollection, it was probably me.
20   Q. And why did you put P4 together?
21   A. I'm not sure at this time.
22   Q. Do you know if you gave P4 to your supervising
23  officer?
24   A. Supervising officer?

Page 57

1    Q. In the 2001 time frame it would have been
2  Gilmore.
3    A. As I recall now, it would either have been --
4  I'm sorry. You said Gilmore.
5    Q. Who was it in 2001?
6    A. As I recall, it could have been Bill Becker or
7  Greg Landis.
8    Q. All right. Would P4 have been something that
9  you would have given to keep them apprised of what you
10  were working on?
11   A. Yes.
12   Q. Do you know whether Becker or Landis asked you
13  to put P4 together?
14   A. I'm not sure at this time.
15   Q. Looking at what's been Bates as P5.
16   A. Yes.
17   Q. Do you recognize that document? You might want
18  to look at P6 because I'm not sure both of those pages
19  go together.
20   A. Your question is?
21   Q. The first question is: Does P5 and P6 go
22  together?
23   A. At this time I can't recall exactly.
24   Q. Looking at P5, do you recognize P5?

15 (Pages 54 to 57)

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1    C.A. # 05-891 (SLR)    July 26, 2006

Page 58

1   A. I would have to say yes.
2   Q. Is that your handwriting to the right?
3   A. It appears to be my handwriting at this time.
4   Q. Is that "specific to Linda Blozis"?
5   A. That's what it says.
6   Q. Do you know why you wrote that on there?
7   A. I don't recall at this time.
8   Q. Looking down at the bottom of P5 there seems to
9   be some handwriting down there?
10  A. Yes.
11  Q. Is that yours?
12  A. At this time I'm not sure.
13  Q. You're not sure whether it is or not?
14  A. The handwriting in the lower left, whether
15  that's mine or not?
16  Q. Right.
17  A. Yes.
18  Q. Looking at P6, do you recognize what P6 is?
19  A. Yes.
20  Q. And what is that?
21  A. As it states, general miscellaneous duties
22  list.
23  Q. And would that have been -- I'm just looking at
24  the bottom. It says, "Revised 1/00."

Page 59

1       Do you see where I am?
2   A. Yes, I do.
3   Q. Did you type that in?
4   A. I can't say at this time that I typed that in.
5   Q. It has the initials BB/LB. Is that Becker and
6   you?
7   A. Yes.
8   Q. And then underneath it there's some
9   handwriting. Is that Becker's BB? It looks like some
10  initials.
11  A. Yes. At this time I would take it to be Bill
12  Becker's initials.
13  Q. And then your initials as well?
14  A. Yes.
15  Q. Would this have been something that you would
16  have given to Bill to show what it was that you were
17  doing?
18  A. I don't recall at this time if I would have
19  given it to Bill or he would have given it to me.
20  Q. In terms of typing it up with respect to
21  general/miscellaneous duties, if I understand your
22  answer you're not sure whether Bill gave you P6 to
23  review or whether you gave it to him to review?
24  A. That's correct.

Page 60

1   Q. Okay. I'm just looking at sort of the
2   signatures with the initials. Does that mean that
3   both of you reviewed it at some point?
4   A. Yes. I would take that to mean that at this
5   time.
6   Q. And I'm taking revised 1/00 to mean January
7   2000. Is that correct?
8   A. At this time I would say that is correct.
9   Q. Would that have been what your general/
10  miscellaneous duties would have been for January 2000?
11  A. It would have been what Bill Becker and I
12  discussed them to be.
13  Q. Do you recall whether you put together sort of
14  the general/miscellaneous duties throughout the time
15  that you were reporting to Bill Becker or he put
16  together what they would be?
17  A. At this time I would say yes.
18  Q. Would you have monthly meetings with Bill when
19  you were reporting to him to go over your duties or
20  assignments?
21  A. Yes.
22  Q. Would it be on a monthly basis that you would
23  do it?
24  A. I don't recall if it was specifically monthly

Page 61

1   at this time.
2   Q. But from time to time you and he would get
3   together and go over what you were working on?
4   A. Yes.
5   Q. Looking at P5, and I realize that you don't
6   know what that is down at the lower left-hand page of
7   that, but do you know when it says portfolio assistant
8   position responsibilities do you know whether P5 came
9   before P3?
10  A. At this time I'm not sure.
11  Q. And in terms of P5 do you know how you got it?
12  Meaning did HR give it to you? Did someone else give
13  it to you?
14  A. I can't answer at this time exactly.
15  Q. Ms. Blozis, if you could take a look at the
16  first exhibit which is your complaint, please.
17  A. Yes.
18  Q. I want to turn your attention to paragraph 17
19  of the complaint. It's on page 5.
20  A. Yes.
21  Q. Take a look at paragraph 17.
22      Do you see it?
23  A. Yes, I do.
24  Q. It talks about a bonus that you received in

Case 1:05-cv-00891-SLR    Document 28-4    Filed 11/21/2006    Page 4 of 13

Blozis                                   v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1         C.A. # 05-891 (SLR)          July 26, 2006

Page 62

1  2001 for 2000 performance.
2  A. Yes. It says that.
3  Q. Do you remember how much that bonus was?
4  A. At this time I'm not sure.
5  Q. Do you know if other members of the Delaware
6  team received bonuses in 2001 for 2000 performance?
7  A. At this time I'm not sure. I'm not sure.
8  Q. Do you remember what your rating was in 2000
9  with respect to your performance rating?
10 A. In 2000?
11 Q. Yes.
12 A. I don't recall exactly at this time.
13 Q. Do you remember in terms of I guess in 2000 the
14 highest rating and the lowest rating?
15 A. Yes.
16 Q. What was it?
17 A. The highest rating as I recall today was
18 exceeds requirements. As I recall today, the lowest
19 was needs improvement.
20 Q. And then there were a couple in between?
21 A. Yes.
22 Q. Do you know how it was determined who would be
23 eligible for bonuses in let's say 2001?
24 A. Please repeat your question.

Page 63

1       MS. WILSON: Can you repeat that, please?
2       (The reporter read back the last
3  question.)
4       THE WITNESS: As I -- no. No. Not
5  exactly, no.
6  BY MS. WILSON:
7  Q. Do you know if bonuses were based solely on an
8  employee's good performance?
9  A. Not all the time.
10 Q. What would be times when it wouldn't be?
11 A. Cumulatively good work performed by the team,
12 as I recall.
13 Q. During the time that you held the position of
14 portfolio administrator, did you receive a bonus?
15 A. Repeat what position I held, please.
16 Q. Portfolio administrator.
17 A. To my recollection, yes, I did receive a bonus.
18 Q. You held the position for approximately four
19 years, is that fair, from 1999 to 2003?
20 A. That's approximately right, yes.
21 Q. Now, during that period was your bonus the same
22 amount?
23 A. The same amount?
24 Q. Would you get, say to throw out a number,

Page 64

1  5,000, did you get 5,000 each year?
2  A. No.
3  Q. It would vary in size?
4  A. To my recollection, yes.
5  Q. And do you know why it would vary in size?
6  A. No. At this time I don't recall.
7  Q. Were bonuses guaranteed for your team?
8  A. I don't recall them being guaranteed.
9  Q. Looking at paragraph 18.
10 A. Yes.
11 Q. It deals with incentive pay. Do you see where
12 I am?
13 A. Yes.
14 Q. You received $2,000 in 2002 for good
15 performance in 2001?
16 A. Yes.
17 Q. Do you see where I am? Do you remember what
18 your performance rating was in 2001?
19 A. At this time I'm not sure.
20 Q. Do you know if other members of your team
21 received incentive pay in 2002 for 2001 performance?
22 A. I'm not sure if all team members received that.
23 Q. And is the eligibility for the incentive pay
24 spelled out in the private wealth management 2001

Page 65

1  portfolio team incentive plan?
2  A. I would have to say yes at this time.
3  Q. In paragraph 18 you referenced a 2001 portfolio
4  team incentive plan. Was there one for each year,
5  like 2002, 2003?
6  A. I don't recall specifically at this time.
7  Q. In paragraph 19 you state that in October of
8  2002 you received a raise from 36,000 to thirty-nine
9  eight.
10      Do you see where I am?
11 A. Yes.
12 Q. Do you know how salary increases were
13 determined?
14 A. At this time I'm not sure.
15 Q. Would you receive something from HR saying that
16 you have gotten a raise?
17 A. I'm not sure what you're referring to.
18 Q. Would they send you a letter or some sort of
19 notification that you received a raise or were getting
20 a raise?
21 A. Not all the time.
22 Q. Would that have been the department that would
23 have notified you of a raise?
24 A. Not all the time.

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1    C.A. # 05-891 (SLR)    July 26, 2006

**Page 66**

1  Q. Would your manager have done it from time to
2  time?
3  A. Yes.
4  Q. In terms of your performance you testified that
5  usually the performance reviews were done annually but
6  not all the time. Is that correct?
7  A. Yes.
8  Q. In general, in terms of the paper performance
9  reviews how would that work in terms of the completion
10  of the form? Would you have any part of it to
11  complete? Let's give you a date. When you started
12  the portfolio administrator position.
13  A. Yes.
14  Q. How did that work in terms of getting your
15  performance management paper reviews done? Would you
16  get a form to fill out concerning your accomplishments
17  first and then your manager would review it?
18  A. Not first.
19  Q. If you could just walk me through the process.
20  A. To the best of my recollection, performance
21  reviews were initiated by your supervising manager.
22  He or she would fill out the form, present it to the
23  employee. The employee would review it. There would
24  be a discussion between your supervising manager and

**Page 67**

1  the employee.
2       The employee was given an opportunity to
3  make comments or remarks at the end of it. Ultimately
4  the supervising manager and the employee signed it and
5  it went to as best I recollect the team leader and it
6  was held I believe in a file.
7  Q. Would you get a copy of the final signed one
8  for your files?
9  A. Yes.
10      MS. WILSON: Mark this as whatever the
11  next number is.
12      (Blozis Deposition Exhibit No. 3 was
13  marked for identification.)
14  BY MS. WILSON:
15  Q. Ms. Blozis, if you would look at what's been
16  marked as Blozis 3 and let me know when you have
17  completed your review.
18  A. (Reviewing document) I have reviewed it.
19  Q. Ms. Blozis, have you seen what's been marked as
20  Blozis 3 before?
21  A. Yes.
22  Q. And what do you recognize it to be?
23  A. A performance review.
24  Q. Now looking at the first page, there's some

**Page 68**

1  handwriting at the top right. Is that your
2  handwriting?
3  A. At this time I don't believe that to be mine.
4  Q. Do you recognize it?
5  A. Recognize it? I recognize it to be "Assessment
6  year-end 2001 Blozis."
7  Q. Right. But do you recognize whose handwriting
8  it is?
9  A. I'm not sure at this time.
10  Q. Looking at page 8 of the review, is that your
11  signature on the top there in the box on page 8?
12  A. Do you mean the employee's signature and date?
13  Q. Yes. Is that you?
14  A. Yes.
15  Q. And underneath do you recognize that as the
16  manager's signature?
17  A. Yes.
18  Q. Who do you recognize that to be?
19  A. At this time I recognize it to be Bill Becker's
20  signature.
21  Q. Now, before I showed you Blozis 3 you had
22  described generally how the performance management
23  process would go in terms of the supervisor would
24  initiate it, fill it out, you would review it, you and

**Page 69**

1  he would sit down, go over it.
2       Do you remember that testimony?
3  A. Yes.
4  Q. Would that have been the way that it would have
5  been done for Blozis 3?
6  A. To the best of my recollection, yes.
7  Q. Looking at page 8 up at the top box under
8  Section IV, Summary and Final Performance Rating, do
9  you see where I am?
10  A. Yes.
11  Q. And down at the last category in that box,
12  Overall Rating, On-Target Performance is checked.
13  A. Yes.
14  Q. Do you see where I am?
15  A. Yes.
16  Q. Would that have been your rating for I guess
17  it's the year-end assessment 2001?
18  A. Yes.
19  Q. And looking at page 10.
20  A. Yes.
21  Q. It has paragraph 5, "What are your two areas
22  for improvement?"
23       Do you see where I am?
24  A. Yes.

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1   C.A. # 05-891 (SLR)   July 26, 2006

Page 70

1  Q. That information that's contained in the box,
2  is that something that you would have put down or
3  something Becker would have put down?
4  A. As I recall, I'm not sure if it's as a result
5  of what William Becker and I discussed.
6  Q. Whether he would have put that in or whether
7  you would have?
8  A. I understand it falls under the category of
9  competencies. I'm not sure at this time if it were
10 solely he or I or jointly agreed upon.
11 Q. Looking at the information that's contained in
12 paragraph 5 in that box where it says, "Product
13 knowledge - acquire a more fluid understanding of
14 basic Mellon investment principles," do you see where
15 I am?
16 A. Yes.
17 Q. Did you and he have a conversation about that
18 being an area for improvement for you?
19 A. As I recall, yes.
20 Q. Do you remember the substance of the
21 conversation?
22 A. The exact substance? No.
23 Q. In general?
24 A. At this time I recall Bill and I talking how

Page 71

1  the position, my position had evolved from trust
2  assistant to more involved investment officer support
3  and what Mellon expected or set forth as procedures
4  required of a portfolio administrator.
5  Q. Did he tell you what Mellon expected?
6  A. As I recall at this time regarding this
7  review --
8  Q. Yes.
9  A. -- Bill was trying to impress upon me what
10 Mellon and Brendan Gilmore as part of the Gilmore team
11 expected of the team members.
12 Q. Did he give you any specific as to what was
13 being expected?
14 A. To my recollection, it was more investment
15 involvement of the assistants.
16 Q. And during the time that you worked as a
17 portfolio administrator you were dealing with
18 customers that had a certain, I guess a million up in
19 terms of investment?
20 A. Yes.
21 Q. A million was the lowest that you dealt with?
22 A. At the time that we retained trust files of
23 that basis.
24 Q. Do you remember when in time that was or that

Page 72

1  it started?
2  A. At this time I do not exactly recall.
3  Q. Now, when Becker was saying that more
4  investment involvement was being required of the
5  assistants, what does "investment involvement" mean?
6  A. To the best of my recollection, William Becker
7  was trying to impress upon me the fact that Brendan
8  Gilmore expected the assistants to take on investment
9  duties that I recollect in a lot of instances were
10 contradictory to the prescribed responsibilities of
11 assistants.
12 Q. And I take it when you said Brendan Gilmore was
13 asking the portfolio assistants to take on more
14 investment duties that were contradictory to their
15 prescribed duties, what were the prescribed duties?
16 A. Of the portfolio --
17 Q. Right, the portfolio assistants.
18 A. To complete reports. To the best of my
19 recollection at this time, to complete reports, to
20 prepare client reviews, to set up client meetings, to
21 complete trades for the officers, the investment
22 officers, and that's what I recall at this time.
23 Q. As being the prescribed duties?
24 A. At this time, yes.

Page 73

1  Q. When you said that Gilmore was asking, I think
2  you said that Gilmore was asking portfolio
3  administrators to handle or to have investment duties
4  that were contradictory, were they in addition to what
5  you just identified as the prescribed duties?
6  A. As I recall, yes.
7  Q. And you used "contradictory." What was
8  contradictory in your mind in terms of what he was
9  asking you to do and what you thought your prescribed
10 duties were?
11 A. Specifically or non-specifically I believe the
12 assistants were asked to do jobs or work that seemed
13 to be worthy of vice president or trust officer or
14 investment officer level of responsibility.
15 Q. So it's fair to say that in terms of what
16 Gilmore was saying your duties were that you felt that
17 as a portfolio administrator that the duties were
18 better situated with VP's, the officer-level type?
19 A. In some instances, yes.
20 Q. Did you tell him at any point that you felt
21 that what he was asking you to do was better suited
22 for I guess a higher titled person?
23     THE WITNESS: Could you repeat that
24 question?

19 (Pages 70 to 73)

Page 74

1  MS. WILSON: You're getting it down.
2  You're asking him.
3  (The reporter read back the last
4  question.)
5  THE WITNESS: To the best of my
6  recollection, there may have been instances when I
7  imparted that feeling to Bill.
8  BY MS. WILSON:
9  Q. And what was his response?
10  A. As I recall, Bill was feeling pressures from
11  above, meaning Brendan Gilmore and whatever subsequent
12  management levels, to work harder and produce more
13  profits.
14  Q. So when you brought it up to Bill would his
15  response be, for example, "Linda, we all have more
16  work to do and that's the way it is"? I was trying to
17  understand what his response was when you brought it
18  to him.
19  A. As I recall, his response was not that
20  responsive to my point.
21  Q. Do you remember what he said?
22  A. Exactly?
23  Q. You know, it doesn't have to be exact but in
24  the ballpark, as we can say.

Page 75

1  A. Ballpark is a broad term.
2  Bill would have -- as I recall, Bill said
3  that I was expected to perform more. He may have said
4  he was getting a workload, but this was occurring in
5  his transition time from our team to becoming his own
6  team leader.
7  Q. So those conversations as I understand it were
8  taking place a little later than the 2001 time frame
9  or 2002?
10  A. At this time I'm not sure exactly.
11  Q. With respect to your description of the
12  expectations that there would be more investment
13  involvement of the portfolio assistants, was that just
14  an expectation that was placed on you or was it an
15  expectation placed on all of the portfolio assistants?
16  I say assistants. Administrators. I'm sorry.
17  A. I'm not sure at this time who it all covered
18  besides myself.
19  Q. Do you know whether it covered Maria?
20  A. I'm not sure at this time.
21  Q. Now going back, Ms. Blozis, to your year-end
22  assessment for 2001 on page 10 in that block under 5
23  where it says, "Meeting deadlines more accurately and
24  developing communication skills that allow me to meet

Page 76

1  those deadlines, i.e. alerting teammates when time-
2  locking is necessary."
3  Do you see that?
4  A. I see it, yes.
5  Q. Did you and he have discussions about meeting
6  deadlines more accurately?
7  A. As I recall, we may have.
8  Q. Did Mr. Becker say that you hadn't met
9  deadlines in an accurate fashion?
10  A. I don't recall if those were the exact words.
11  Q. Well, was there an issue concerning deadlines
12  that were raised at your sit down with him with
13  respect to your evaluation?
14  A. I'm not sure at this time.
15  Q. What about "developing communication skills
16  that allow me to meet those deadlines," do you know
17  when it says "allow me" whether that's pertaining to
18  you or to him?
19  A. This is my review. I would say yes.
20  Q. That it was you or him where it says, "allow
21  me"?
22  A. Me? It would mean me, Linda Blozis.
23  Q. Oh, okay. Do you know what that meant,
24  Ms. Blozis?

Page 77

1  A. At this time I would recollect that Bill was
2  expecting me to have the initiative to say no to other
3  team duties that would allow me to complete what he
4  specifically or the investment officer would be asking
5  me to do.
6  Q. When it says, "alerting teammates when
7  time-locking is necessary," what does "time-locking"
8  mean?
9  A. As I recall, time-locking under Mellon's policy
10  was to virtually not answer phones, not talk to other
11  teammates or employees and focus solely on the task at
12  hand.
13  Q. Was that for a particular period of time? For
14  example, 9:00 to 12:00 would be time lock for those
15  purposes?
16  A. It varied.
17  Q. Would it vary in accordance with what your
18  schedule was or was it a set time lock period?
19  A. You have asked two questions there.
20  Q. Well, when you say it varied, I'm just
21  wondering whether the time-locking as you have
22  described it would be specific as to you in terms of
23  you know what you have to do for a particular day so
24  you're going to time lock or whether there was

Case 1:05-cv-00891-SLR   Document 28-4   Filed 11/21/2006   Page 8 of 13

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 78

1 something, say Delaware team-wide which said from
2 such-and-such time there's time-locking?
3 A. It could vary from the task or the employee
4 that had the particular task.
5 Q. Drawing your attention to the period I guess
6 when you became a portfolio administrator around the
7 1999 time frame and ending with the 2001 period, so
8 that's the period of time that I'm interested in, had
9 Mr. Becker ever stated that he was unhappy with your
10 performance?
11 A. I don't recall exactly within that time frame.
12 Q. You don't recall whether it ever happened?
13 A. I remember Bill saying something to that
14 effect.
15 Q. What do you remember him saying?
16 A. To the best of my memory that more work was
17 expected of me.
18 Q. Did he say that he felt that you weren't
19 working hard enough?
20 A. Not in those specific terms.
21 Q. Well, in general.
22 A. In general, Bill as I recall said that more
23 work was expected of me, was expected of me.
24 Q. What about Brendan Gilmore during that same

Page 79

1 period of time, 1999 through the end of 2001, did he
2 ever offer any criticism, to you any criticism of your
3 work?
4 A. The -- yes.
5 Q. What did he say?
6 A. At a time close to the end of my employ --
7 Q. Just during let's keep it at that '99 through
8 2001 time frame.
9 A. No, I don't recall at that time.
10 Q. And you were going on to say something at the
11 end of your employ.
12 A. Yes.
13 Q. So I think you were going to answer something
14 having to do with Gilmore offering criticism of your
15 work at the end of your employ. Was I guessing right?
16 A. Yes.
17 Q. What was it?
18 A. Yes. But your question referred to the
19 '99-2001 time frame and my answer to that was no.
20 Q. Right. And then you had gone on to talk about
21 something at the end of your employment.
22 A. Yes.
23 Q. I take that to be what? Around 2003 time
24 frame?

Page 80

1 A. Yes.
2 Q. And did Gilmore say anything about your
3 performance around that time?
4 A. Yes.
5 Q. And what did he say?
6 A. I don't recall verbatim. It was the incident
7 in March where we were behind closed doors and he
8 loudly, rudely and unprofessionally criticized my
9 work.
10 Q. If you would look at your complaint which is
11 Blozis 1, paragraphs 25 and 26, page 6.
12 A. Yes.
13 Q. Is that the incident you're referring to?
14 A. Yes, it was.
15 Q. So there it says in late March 2003. You think
16 that's when it was?
17 A. It says late April.
18 Q. I'm sorry. Late April.
19 A. Yes. To the best of my recollection, yes.
20 Q. Now, what did he say?
21 A. As stated in my complaint, specifically he
22 referred to a client meeting booklet, not as I stated
23 in the complaint.
24 Q. Now, do you remember the client meeting booklet

Page 81

1 that he was referring to?
2 A. I recall -- I don't recall the specific
3 client's name, but I do know it was a booklet he was
4 alluding to.
5 Q. Had there been -- I'm just looking at your
6 paragraphs 25 and 26. Had there been an assignment
7 for you to complete a client booklet, client meeting
8 booklet?
9 A. Yes.
10 Q. And what is a client meeting booklet?
11 A. It was a presentation prepared for the clients
12 that would periodically review the standing of their
13 trust investments, the progress, essentially a
14 portfolio review and what Mellon had done for them up
15 until that time.
16 Q. And I recall your saying you don't recall the
17 specific client involved when it says a client meeting
18 booklet.
19     But had you completed the client meeting
20 booklet?
21 A. I had completed all paperwork pertinent
22 thereto.
23 Q. Was it one booklet that had to be completed?
24 A. It would have been a repetitive booklet that

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 82

1  would have been handed out to a number of clients at
2  the meeting. Some family members were more than one
3  that would appear at a meeting.
4   Q. So you would put together sort of the template
5  and then copies would be made of that template?
6   A. Not exactly.
7   Q. How would it go?
8   A. Figures and information would be compiled.
9  Color charts would be produced and run. They would be
10 collated and assembled.
11  Q. Was that your job to do the charts and the
12 other information you described?
13  A. It would be my responsibility to put in the
14 numbers pertinent to that particular client's
15 portfolio.
16  Q. Would you be getting materials from others to
17 put in the booklet?
18  A. "Others" meaning?
19  Q. Other, say, trust officers, other members of
20 the team.
21  A. Occasionally, yes.
22  Q. Do you remember whether it was the case that
23 you would be getting information from others for this
24 particular client meeting booklet?

Page 83

1   A. At this time I'm not certain.
2   Q. So when you said that all papers pertinent to
3  that client meeting booklet had been done --
4   A. All printed materials were completed by me.
5   Q. And was it collated or were they usually bound
6  in some way?
7   A. They were collated.
8   Q. And were the booklets that you bound Velo bound
9  or have some sort of binding to them?
10  A. Yes.
11  Q. Was that done as well?
12  A. In this instance?
13  Q. Yes.
14  A. To the best of my recollection, everything but
15 the binding was done.
16  Q. Was Mr. Gilmore upset that the binding hadn't
17 been done?
18  A. To the best of my memory, yes.
19  Q. Can you to the best of your recollection sort
20 of walk me through that particular sequence of events?
21 I gather Mr. Gilmore -- this happened in the Delaware
22 office?
23  A. Yes.
24  Q. He was in the Delaware office and said, "Linda,

Page 84

1  can you come see me"? When I say walk me through, I
2  mean from the beginning of the conversation to the
3  end.
4   A. He came to the Delaware office on a date in
5  April that I don't specifically remember at this time
6  and discussed my work performance, specifically
7  mentioning the client booklet. As I recall, I told
8  him all pertinent information was assembled, numbers
9  and proper information required in the particular
10 client's case was prepared. It was not bound because
11 it required an investment officer's review before
12 simply binding the product, binding the booklet.
13  Q. And what did he say in response?
14  A. He said to bind it or else, as I recall.
15  Q. Had you been given any timetables for
16 completion of the booklet?
17  A. I don't understand the question.
18  Q. Had someone said, by way of example, "Linda, we
19 would like for you to have the booklets done by" X
20 date?
21  A. In terms of preparation of the information in
22 it, it was completed.
23  Q. But my question was: Had someone given you a
24 timetable?

Page 85

1   A. I don't recall a specific date timetable at
2  this time.
3   Q. For having it done?
4   A. I only recall that the client presentation
5  booklet was to have been completed before I left for
6  vacation.
7   Q. And looking at I'm sort of going down to 27 it
8  says before leaving on vacation on May 2, '03.
9   A. Yes.
10  Q. Is that when you were going on vacation?
11  A. As I recall, yes, in that year, yes.
12  Q. So the client booklets were supposed to be
13 completed before you left on vacation. That was your
14 understanding?
15  A. Yes.
16  Q. Now, when you were speaking to Gilmore did he
17 say that -- did he look at your product?
18  A. I don't recall that he did.
19  Q. Do you know if he had seen the papers that you
20 say had been put together?
21  A. I don't recall that he had.
22  Q. But there's I guess a sense by him that the
23 work hadn't been completed?
24  A. There was a sense by him that the work hadn't

22 (Pages 82 to 85)

Case 1:05-cv-00891-SLR   Document 28-4   Filed 11/21/2006   Page 10 of 13

Blozis                              v.              Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1    C.A. # 05-891 (SLR)    July 26, 2006

Page 86

1  been completed? I'm recollecting that he meant
2  because the binding hadn't been done that it was not
3  completed.
4      Q. In terms of the conversation, did he come to
5  you and say, Linda, have you finished the blank, you
6  know, the particular client booklet, whoever the
7  client was, did he come and say have you finished it
8  and you said well, I have this done and then he says
9  what about the binding?
10         Do you know how it came up about the
11 booklets in the first place?
12     A. I don't recall exactly at this time.
13     Q. All right. Now, during that conversation you
14 went into his room, into his office?
15     A. He called me into the office.
16     Q. Did you sit at a carol, you know, a carol where
17 you have your desk and some walls that may not go up
18 to the top or did you have your own like an office
19 with a door and everything?
20     A. I didn't have an office.
21     Q. Was it a carol, your office space?
22     A. My office space was a carol.
23         (Discussion off the record.)
24

Page 87

1  BY MS. WILSON:
2      Q. So he called you into his office?
3      A. Brendan Gilmore called me into an office that
4  he would use in Delaware.
5      Q. Door closed?
6      A. Yes.
7      Q. Now, you said that he you used words like,
8  looking at your paragraph 25, strongly criticized her
9  work in a threatening and demeaning manner?
10     A. Yes.
11     Q. What did you find threatening and demeaning?
12     A. His lack of professional mannerism, the tone of
13 his voice, the fact that he said or used the words or
14 else, his bullying tactics.
15     Q. What was the unprofessional manners?
16     A. His tone was loud enough to be heard by people
17 outside the closed door.
18     Q. And how do you know that other people heard?
19     A. When I left the office very upset Maria Dunlop,
20 for one, came to my cubicle and shook her head and
21 said that was not, not in these specific terms, but
22 something to the effect that that was just terrible.
23     Q. And did you discuss it with her when she came
24 and said that was just terrible?

Page 88

1      A. As I recall, I was too upset to say anything to
2  anybody.
3      Q. When you say his bullying tactics, what do you
4  mean by that?
5      A. Brendan Gilmore had a personality that team
6  members understood to be dictatorial, to be demanding,
7  to be his way or no other way.
8      Q. Now, when you said that he had said with
9  respect to the client meeting booklet to bind it or
10 else, you used the term or else?
11     A. Yes.
12     Q. And did you have an understanding of what he
13 meant by or else?
14     A. At that time I wasn't sure what he meant. I
15 could only surmise what he would have meant.
16     Q. Did you ask him what or else meant?
17     A. At this time I'm not sure. I recall I think I
18 did.
19     Q. I'm sorry?
20     A. I think I did say to him -- I'm not sure. But
21 I think I did say to him "What do you mean by or
22 else?"
23     Q. Did he respond?
24     A. I think he responded, to the best of my memory

Page 89

1  I think he responded.
2      Q. What did he say?
3      A. I'm not even sure of the exact words.
4      Q. You had also looking at paragraph 26 you said
5  that he had used profanity?
6      A. Yes, he did.
7      Q. What was the profanity?
8      A. The exact profanity at this time I'm not sure,
9  but it was either taking the Lord's name in vain by
10 saying goddamn it and the word s-h-i-t.
11     Q. You think it was both?
12     A. As I recall, yes.
13     Q. Do you remember what he said?
14     A. As I recall, I was very upset. I do know he
15 used a profanity. I was very shocked by that. He
16 noticed my impression of that and I believe, as I
17 recall, he may -- I'm not sure at the time, but he...
18         I think he saw the error of his ways in
19 using a profanity in the presence of a lady and in an
20 expected professional situation.
21     Q. Why do you say that you think he realized the
22 error?
23     A. I don't recall specifically at this time, but
24 there was an expression on his face that he knew I was

23 (Pages 86 to 89)

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1   C.A. # 05-891 (SLR)   July 26, 2006

Page 90

1 stunned and shocked that a manager would talk to a
2 woman in that manner.
3  Q. So, Ms. Blozis, you believe in that closed door
4 meeting that you were referring to that Mr. Gilmore
5 during the course of the discussion used the terms
6 goddamn it and shit?
7  A. To the best of my recollection, yes.
8  Q. And I think you testified that you're not
9 certain of the exact exchange?
10  A. Yes.
11  Q. Had you heard Mr. Gilmore use profanity before?
12  A. Regrettably, yes.
13  Q. The same terms?
14  A. Yes.
15  Q. And where had you heard him?
16  A. As I recall, it may have been behind the closed
17 doors when Bill Becker was the investment officer and
18 Brendan would be in with him, with Martha Fetters when
19 she was an investment officer and perhaps at team
20 meetings, unfortunately.
21  Q. During the team meetings that he would be
22 holding with the rest of his team?
23  A. Yes.
24  Q. He would say goddamn it or shit during the team

Page 91

1 meetings?
2  A. As I recall, occasionally, yes.
3  Q. Would he be using it as emphasis?
4  A. I can't say at this time. I don't recall.
5  Q. Now, you said that you had overheard him using
6 the same terms with Becker and Fetters?
7  A. Martha Fetters.
8  Q. And Becker?
9  A. Yes.
10  Q. Now, during the periods that you overheard him
11 using those terms with Becker and Fetters, did you
12 ever go to anybody to complain?
13  A. I don't understand who you mean by "anybody."
14  Q. Well, HR, for example?
15  A. At this time I would say I recall not having a
16 good rapport with HR.
17  Q. At what point did you feel that you didn't have
18 a good rapport with HR?
19  A. Linda Squier and I and other Delaware team
20 members wanted to discuss an incident years prior to
21 this regarding the conduct of a sales officer. We
22 understood it to be a confidential meeting. The HR
23 director at that time brought in other officers that
24 were above Linda Squier and I besides herself.

Page 92

1  Q. Who was the HR director that you're referring
2 to?
3  A. Rosemary Thomas.
4  Q. And you said you had gone to her about a sales
5 officer?
6  A. Yes.
7  Q. When did you go to her?
8  A. As I recall, it would have been in the mid to
9 late nineties.
10  Q. And what was the issue with the sales officer?
11  A. I don't recall specifically at this time. To
12 my recollection, he was telling clients, he was
13 telling clients Mellon would deliver on different
14 items that were really not Mellon policy.
15  Q. And --
16  A. Prospective clients.
17  Q. Who was the sales officer?
18  A. Anthony Jasienski.
19  Q. Was he working out of the Delaware facility?
20  A. Is he working?
21  Q. At the time.
22  A. At the time, yes.
23  Q. And you said that you and Linda -- I'm sorry --
24 you and Ms. Squier had gone to Rosemary to complain

Page 93

1 about Anthony and you felt that it was in confidence
2 and then I guess there were other people who were
3 aware of it?
4  A. Yes.
5  Q. And you felt that she shouldn't have told
6 anybody else about it?
7  A. Yes.
8  Q. The people who were aware, were they Anthony's
9 I guess for lack of a better word bosses or
10 supervisors?
11  A. One of them would have been, yes.
12  Q. And who was the other one?
13  A. To the best of my recollection, Brendan Gilmore
14 was there, Brendan's supervisor Douglas Kloppenburg
15 and the regional sales manager of Tony Jasienski at
16 the time. I don't recall his name.
17  Q. And why did you feel that those individuals
18 shouldn't have been made aware of it?
19  A. Ms. Squier and I approached HR in confidence.
20 We were assured that it would be a confidential
21 discussion between Rosemary Thomas, Linda Squier and
22 myself and Rosemary Thomas showed up with the three
23 officers, additional three officers.
24  Q. Did you then tell your sort of story to the

24 (Pages 90 to 93)

Case 1:05-cv-00891-SLR   Document 28-4   Filed 11/21/2006   Page 12 of 13

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

**Page 94**

1 three officers?
2   A. Yes.
3   Q. And do you know whether anything happened to
4 Anthony?
5   A. As a result of this?
6   Q. Yes.
7   A. I'm not sure at this time.
8   Q. Did you feel that the three officers should
9 have known if Anthony was offering prospective
10 customers things that Mellon didn't sell?
11   A. Yes. Eventually.
12   Q. When you say, "Eventually," what do you mean?
13   A. I feel that a confidential meeting of women
14 complaining against a male officer or bringing to
15 light his inappropriate sales conduct should have been
16 held confidential and then handled in a proper manner
17 with his superiors.
18   Q. And how is it that you felt that it was handled
19 improperly?
20   A. That Ms. Squier and I were led to believe that
21 it would be a confidential discussion with
22 Ms. Rosemary Thomas to give her the details and that
23 we were virtually blind-sided with the three officers
24 walking into that, coming along with her.

**Page 95**

1   Q. Did you not want your identity known, so to
2 speak?
3   A. At this time I wouldn't say that was the case.
4   Q. You didn't mind them knowing that you were the
5 ones that were bringing it up?
6   A. At that time, no, I don't believe, I don't
7 recall that I was.
8   Q. I guess what I am trying to understand is what
9 your concern was. I guess you and Ms. Squier felt it
10 was just going to be the three of you meeting to
11 discuss this and then you have three officers, plus
12 Rosemary coming in. You had no preknowledge that
13 there was going to be more than the three of you?
14   A. Initially that's correct.
15   Q. And that's what you didn't like?
16   A. I didn't think that was how we were led to
17 believe we would be able to tell our side of the
18 incident.
19       MS. WILSON: Off the record.
20       (Discussion off the record.)
21 BY MS. WILSON:
22   Q. Ms. Blozis, you testified that Mr. Gilmore had
23 used certain words that you considered to be profane
24 during that meeting in your presence.

**Page 96**

1   Q. Have you ever used those words before?
2   A. I don't understand.
3   Q. Well, have you ever used the word shit before
4 or goddamn it?
5   A. To my recollection, not in an office
6 environment or professional environment.
7   Q. Outside of the office, outside of a
8 professional environment?
9   A. To my recollection, I may have outside of the
10 office.
11       MS. WILSON: We can take a 30-minute
12 break.
13       MR. LaROSA: Sure.
14       (Recessed for lunch at 1:15 p.m.)
15           - - - - -
16       AFTERNOON SESSION
17         1:50 p.m.
18 BY MS. WILSON:
19   Q. Ms. Blozis, with respect to the client meeting
20 booklet that we were discussing before the break in
21 which you and Gilmore were having the discussion, did
22 you get that booklet bound before you left on your
23 vacation?
24   A. No, I did not.

**Page 97**

1   Q. Why was that?
2   A. As I told Brendan Gilmore, it needed to be
3 looked over by the investment officer at the time, the
4 presenting officer, which I recollect was Greg Landis,
5 and he was not going to be available until after I
6 left.
7   Q. So Greg Landis was to look over the booklet
8 before it was bound?
9   A. Yes.
10   Q. And did you tell Mr. Gilmore this?
11   A. Yes. I recollect that I did state that.
12   Q. In that meeting that you characterized in your
13 complaint, that April meeting?
14   A. Yes.
15   Q. Did Mr. Gilmore say that he wanted it bound
16 regardless of whether Landis looked it over?
17   A. To the best of my recollection, yes.
18   Q. Did you have any discussions with Landis in
19 which you said, and not verbatim, but that Gilmore
20 wanted you to, wanted the books bound and he had to
21 look it over so that you could get it done?
22   A. As I recall, I believe I spoke on the phone to
23 Greg, who may have been out of town, and said or
24 informed him that the booklet numbers-wise,

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1   C.A. # 05-891 (SLR)   July 26, 2006

Page 98

1  information-wise was prepared and collated; it was
2  left for him to just review and that Maria Dunlop
3  volunteered to do the binding process when that was
4  done, which took all of five to seven minutes,
5  depending on the number of booklets.
6  Q. Did you speak to Mr. Gilmore to let him know
7  where you were with respect to the project after the
8  conversation you had in April?
9  A. I recall in that April incident that I tried to
10 impress upon Brendan that it was only a matter of
11 binding it, that it would mean destroying pages that
12 would otherwise be acceptable in the presentation if
13 not left for Landis's review and that Maria Dunlop
14 could bind it.
15 Q. And did Gilmore say that was acceptable to him?
16 A. I don't remember him admitting that it would
17 have been acceptable.
18 Q. Before you left on vacation did you have any
19 discussions with Gilmore about the booklet?
20 A. I don't understand in what terms you mean.
21 Q. At all. For example, did you say it's not been
22 bound, I'm waiting, you know, Landis has to look at
23 it, Maria says she can do it, you know, did you give
24 him an update before you left?

Page 99

1  A. I don't recall that I did. I recall that that
2  impression was given to him or I strongly attempted to
3  give it to him at the April meeting.
4  Q. Did he ever tell you that he thought that you
5  were being insubordinate to him with respect to that
6  booklet issue?
7  A. Not that I recall.
8  Q. Do you know if he had any conversations with
9  anybody about the booklet incident?
10 A. Did he or did I?
11 Q. Did he?
12 A. I don't know that he did.
13 Q. You had testified before the break, Ms. Blozis,
14 that sometimes during the team meetings that Gilmore
15 was leading that he would use profanity?
16 A. Yes, I did.
17 Q. Was that at the Delaware location?
18 A. As I recall, it may have been more frequently
19 the meetings of his team were done by either
20 teleconference or we were called into Philadelphia.
21 Q. And during those incidents or during those
22 times would there be males on the phone as well?
23 A. Oh, yes.
24 Q. It would generally be is it fair to say members

Page 100

1  of whoever the Delaware team consisted of?
2  A. All members of the Delaware team.
3  Q. During that meeting, the conversation that you
4  were having with Gilmore in late April of 2003 that's
5  referenced in your complaint, did you say something to
6  Gilmore along the lines of it's a good thing that you
7  have that in writing so that you have a paper trail as
8  it related to the booklet?
9  A. Did I say something to Brendan?
10 Q. Yes.
11 A. I don't quite understand your question.
12 Q. Did he show you any documents that set forth
13 the time frame for the completion of the booklet?
14 A. Not that I recall, no.
15 Q. Did you ever say to him it's a good thing that
16 you have something in writing to evidence so that you
17 have a paper trial of what you asked me to do?
18 A. I don't recall that.
19 Q. Now, after that particular meeting -- do you
20 recall how long it lasted?
21 A. To the best of my memory, fifteen or twenty
22 minutes.
23 Q. Was that all that was being discussed, the
24 booklet?

Page 101

1  A. I recall, I recall that he also took the time
2  at that time to criticize the rest of my performance
3  and work.
4  Q. And what did he say?
5  A. I don't remember specifically. I just recall
6  that I was stunned by his criticism of work that
7  seemed to formerly be very acceptable and gratefully
8  appreciated when I maintained the Delaware office on
9  my own as a support member of the team.
10 Q. Did he give you specifics in terms of the work
11 that he was referring to?
12 A. At this time I don't recall if there were
13 specifics given.
14 Q. Were there any specifics as to the criticisms?
15 A. I recall that he used the examples of other
16 younger portfolio administrators in Philadelphia
17 saying that they were responsible for much more than I
18 was accomplishing. I had no way of knowing that to be
19 the truth because I didn't work alongside of them day
20 to day.
21 Q. So you didn't know either way whether he was
22 correct when he said that?
23 A. That's correct, I didn't know either way.
24 Q. Did he, Ms. Blozis, when you said that he was

26 (Pages 98 to 101)