Case 1:05-cv-00891-SLR    Document 28-5    Filed 11/21/2006    Page 1 of 17

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1           C.A. # 05-891 (SLR)                        July 26, 2006

Page 102

1  using examples of the younger portfolio administrators
2  in Philadelphia during his conversation with you, did
3  he say, again not specifically, but did he say, Linda,
4  the younger portfolio administrators in Philadelphia
5  are doing this, why aren't you or did he just say
6  generally portfolio administrators in Philadelphia?
7     A. At this time I would say generally, but it's a
8  fact that they were younger.
9     Q. Right. I understand.
10    A. They were younger than I. And he alluded to,
11 he alluded to the fact that the other portfolio
12 administrators according to him at that time were
13 doing more and were capable of doing more.
14    Q. Okay. My question wasn't -- I understand that
15 the portfolio administrators in the Philadelphia
16 office, this is around the April 2003 time frame, what
17 you're saying is that they were younger than you were
18 at the time in age?
19    A. Yes.
20        That's your question?
21    Q. Yes. Right?
22    A. Yes.
23    Q. But in terms of what Gilmore said, did he refer
24 to youth or age or anything like that in making the

Page 103

1  comparison?
2     A. Not specifically.
3     Q. He just said the portfolio administrators in
4  Philadelphia can do it, or words to that effect, why
5  can't you?
6     A. Yes.
7     Q. Now, did you have a response to him?
8     A. I recollect my response was that, A, I was
9  doing the best that I could; B, that the portfolio
10 administrators in Philadelphia were not responsible in
11 addition to the regular duties that I was in caring
12 for the office at Two Greenville Crossing.
13    Q. And what do you mean by "caring for the
14 office"?
15    A. I took care of incoming-outgoing mail. I took
16 care of all phone calls. I took care of machinery
17 upkeeping, meaning the computers, the copiers, the
18 printers, the supplies for that. I took care of
19 notifying building maintenance when things might not
20 work, to mention a few.
21    Q. That was around the April 2003 time frame that
22 you had these responsibilities?
23    A. To the best of my recollection, from the time
24 that Kathleen Agne was let go until -- yes, that time.

Page 104

1     Q. So starting when Kathleen left to the time that
2  you yourself left, you had these additional
3  responsibilities that you just described?
4     A. More correctly, it was the responsibility of
5  the portfolio administrator to take care of those
6  tasks all the time.
7     Q. I see. All right. So when Kathleen was there
8  would it be fair to say that you and she sort of
9  divided up the work?
10    A. Yes.
11    Q. And then after she left, you were left as the
12 only portfolio administrator there until Maria got
13 there?
14    A. Yes.
15    Q. So when Maria got there, did you and she divide
16 up the work of what you just described, caring for the
17 office?
18    A. When Maria was hired, it was incumbent upon me
19 to teach her, to teach her the job more or less.
20    Q. In terms of caring for the office?
21    A. Primarily her workload and her work
22 responsibilities because there was no formal training
23 offered by Mellon. It was more or less on the job.
24    Q. So you were training Maria with respect to the

Page 105

1  care of the various portfolios?
2     A. Yes.
3     Q. The care and maintenance of those, whatever
4  that entailed?
5     A. The trust accounts, yes.
6     Q. As well as what you had described as caring for
7  the office?
8     A. Yes.
9     Q. Which I took to mean different duties than the
10 trust work that you were doing?
11    A. Yes.
12    Q. And did she at some point or did you at some
13 point sort of divide up the caring for the office
14 aspect and Maria took on some pieces of it?
15    A. It wasn't my call to divide that up. At some
16 point in time I recollect that Maria was up to speed
17 per se and she was designated Greg Landis's specific
18 assistant and I was to give support to Bruce
19 Holmquist, who was an investment officer in the
20 Washington area but part of the Delaware team, as well
21 as any other team responsibilities backing up Maria,
22 doing the investment work that Greg Landis was
23 responsible for.
24    Q. When was that?

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 106

1   A. Are you asking for a date?
2   Q. Yes.
3   A. I would recall, as I recollect it was up until
4   the time of Maria's, after Maria's wedding in
5   September I believe of 2002.
6   Q. And when I had asked you whether at some point
7   Maria started I guess caring for the office or doing
8   some duties that you had described as caring for the
9   office, did she ever?
10  A. At some time I would have to say Maria to her
11  understanding of the work responsibilities was a team
12  player but because of her lack of time in the company
13  would defer to me on various questions, whether they
14  be referring to the trust accounts, the portfolios
15  themselves or the maintenance and upkeep of the
16  office.
17  Q. So if there was an issue, she would come to you
18  on how to take care of it?
19  A. Yes.
20  Q. She couldn't sort of run the caring for the
21  office piece of it on her own?
22  A. If I were called away or had a day off, it
23  would be left to her to try to complete that.
24  Q. Otherwise, if you were there, she would come to

Page 107

1   you and say Linda, who do I call for this?
2   A. Frequently.
3   Q. You had said that it wasn't, you had said it
4   wasn't your I think it was — and you didn't put it
5   like this, but I had asked did there come a point when
6   Maria took over, you divided up the responsibilities.
7   I was just limiting it to caring for the office and
8   you said that wasn't something that you could do
9   because it left me to believe that there was somebody
10  else who would say Maria, your job is to divide up the
11  work with Linda as opposed to you saying Maria, I'll
12  do X, you do Y and that's how we will run it.
13  A. I have to say Maria and I worked as a team to
14  the best of her ability and knowledge as she
15  progressed in the job.
16  Q. Now, in your complaint you say, and I'm looking
17  at paragraphs 27 and 28, you say that before you left
18  on vacation that you went to see Rosemary Thomas in HR
19  to complain about Gilmore.
20  A. I contacted Rosemary Thomas. Her office was
21  sitused in Philadelphia and I contacted her from
22  Delaware.
23      MS. WILSON: Mark this, please.
24      (Blozis Deposition Exhibit No. 4 was

Page 108

1   marked for identification.)
2   BY MS. WILSON:
3   Q. Ms. Blozis, if you will look at what's been
4   marked as Blozis 4 and let me know when you have had a
5   chance to, when you're finished.
6   A. (Reviewing document) I'm finished.
7   Q. Now, looking at Blozis 4, do you recognize what
8   that is?
9   A. Yes.
10  Q. And what is it?
11  A. It looks -- it's a copy of an e-mail from me to
12  Rosemary Thomas.
13  Q. And the subject is Discussion with Brendan
14  Gilmore?
15  A. Yes.
16  Q. Is that in connection with the meeting that we
17  have been talking about that you had with Brendan
18  concerning the booklets and performance?
19  A. Yes.
20  Q. And on the sent line it's April 30th of '03.
21  Do you think that was the date that you had the
22  conversation with Brendan?
23  A. I would recollect on or about that date, yes.
24  Q. And then underneath there's some handwriting?

Page 109

1   A. Yes.
2   Q. Is that your handwriting?
3   A. Yes, it is.
4   Q. And what is the handwriting?
5   A. It's an indication that I spoke to Rosemary on
6   May 1st of 2003 and lodged my complaint against BMG,
7   are Brendan Gilmore's initials, regarding his
8   disruptive demeanor to me in that meeting.
9   Q. I guess after sending Blozis 4, the e-mail
10  itself, you printed it out and made a notation of when
11  you spoke with Rosemary?
12  A. Yes.
13  Q. Now, when you were speaking with Rosemary, did
14  you take any notes of the conversation?
15  A. I don't recall that I did.
16  Q. You don't recall either way?
17  A. I don't recall that I took notes of the
18  meeting, the teleconference to be exact.
19  Q. It wasn't face to face?
20  A. She didn't come to Delaware.
21  Q. So you and she spoke over the phone?
22  A. Yes.
23  Q. Do you know whether anyone else was in the room
24  with her at the time?

28 (Pages 106 to 109)

Blozis                                    v.                      Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1        C.A. # 05-891 (SLR)              July 26, 2006

Page 110

1  A. I have no way of knowing that.
2  Q. And where did you call her from?
3  A. I stepped into an empty private office and
4  called her.
5  Q. And were you the only one in the office?
6  A. Yes.
7  Q. And so in terms of whether she was taking
8  notes, you don't know that?
9  A. I have no way of knowing that.
10 Q. And what did you talk to Rosemary about?
11 A. I reiterated to the best of my recollection
12 because of how upset I was what transpired between
13 Brendan Gilmore and I prior to me leaving for vacation
14 about the meeting. I explained to her the situation,
15 that the booklet, as I had previously done in many,
16 many other client meetings, was taken to its logical
17 conclusion; that I didn't feel it was unreasonable to
18 leave what was prepared and completed until Greg
19 Landis could review it for Maria Bannister to bind it
20 so it wouldn't waste her time or company expense or
21 money to reproduce pages that would be destroyed upon
22 disbinding the booklet and that I was very upset at
23 his tone and his cursing at me and his general
24 unprofessional mannerism in that meeting, to the best

Page 111

1  of my recollection, and that I wanted to, I
2  specifically did state that I wanted to lodge a
3  complaint against him.
4  Q. Now, going back to the meeting which we believe
5  with was on or about April 30th that you had with
6  Brendan, did you feel that he was leveling the
7  profanity at you or whether it was because of the
8  situation?
9  A. I felt it was leveled at me.
10 Q. And why did you feel that way?
11 A. As I recall, he pointedly was criticizing me at
12 that meeting.
13 Q. When you spoke to Rosemary -- and I'm looking
14 at your paragraph 28 of your complaint.
15 A. Yes.
16 Q. Do you see on 28 where you say that you
17 believe, and I'm just paraphrasing, that you believe
18 that Gilmore's words and conduct toward you were, in
19 quotes, founded in age, end quote?
20 A. Yes.
21 Q. Do you see that?
22 A. Yes.
23 Q. Did you use those words with Rosemary?
24 A. As I recall, yes.

Page 112

1  Q. Did you tell her why you felt that they were
2  founded in age?
3  A. I recollect that I suspected Brendan was
4  systematically trying to intimidate me because I was
5  the last remaining original and the oldest team member
6  on the Delaware team.
7  Q. Did you tell Rosemary that?
8  A. Not maybe in those specific words, but I do
9  recall saying that Brendan Gilmore used the term in
10 referencing the original team that I was the survivor.
11 Q. When did he use the term that you were the
12 survivor?
13 A. In the course of that discussion on that date.
14 Q. Had he used that term to describe you before
15 that date? I guess the date being on or about April
16 30th of '03.
17 A. Not that I recall.
18 Q. So when he said that you were the survivor or
19 termed you as the survivor, you took that as an
20 age-related comment?
21 A. Yes.
22 Q. Why?
23 A. As I recall, I was reflecting on how I believed
24 and it was known throughout the team that Mr. Bell was

Page 113

1  forced to resign and Mr. Bell at that time was of an
2  age 60 or better, that Martha Fetters, a woman, was
3  forced to resign. She was over the age of 40. That
4  Linda Squler, a woman, was forced to resign. At the
5  time she was over the age, I believe over the age of
6  40. That Kathy Agne was fired, Kathleen Agne was
7  fired and she was a woman over the age of 40, as I
8  recall their ages, and that I was the remaining
9  original Delaware team member, meaning those people
10 sitused in Delaware.
11 Q. So when he called you a survivor you took it as
12 a negative instead of a positive?
13 A. Yes.
14 Q. Based on what you just said in terms of
15 everybody else was gone over the age of 40, some of
16 them female, so you felt that he was alluding to your
17 age when he said survivor?
18 A. Yes.
19 Q. Did you ask him what he meant by survivor?
20 A. No.
21 Q. You mentioned that Kathleen Agne was fired and
22 she was over the age of 40?
23 A. Yes.
24 Q. Who fired her?

Blozis                                        v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1        C.A. # 05-891 (SLR)                           July 26, 2006

Page 114

1  A. To the best of my recollection, I believe it
2  was Bill Becker on the bequest of Brendan Gilmore, the
3  team leader.
4  Q. What are you basing that on?
5  A. My recollection is that Kathleen was called
6  into Bill's office on a specific date in March, that
7  she was there for a while. I don't recall if it was
8  ten or fifteen minutes. That she exited the office,
9  went to her desk that was on the other side of my
10 cubicle, unbeknownst to me was packing up her things
11 and exited the building and Bill Becker came out and
12 told me that Kathleen was let go.
13 Q. Did he tell you why Kathleen was let go?
14 A. I don't specifically recall at that time
15 because I was so very upset and shocked by it.
16 Q. By Kathleen being let go?
17 A. Yes.
18 Q. Do you know if Kathleen was having any
19 performance problems?
20 A. I recollect that I surmised there must have
21 been.
22 Q. How did you surmise that?
23 A. During the last months of her employment I
24 could see that she was being overburdened with work

Page 115

1  and I would frequently ask her can I help you out in a
2  team spirit and she would not defer to my offer. And
3  I did not understand until after I was released that
4  she was instructed not to share that work as I was not
5  instructed to share my work with Maria Dunlop.
6  Q. How do you know that she was instructed not to
7  share her work?
8  A. After my release we may have had lunch and
9  talked about the situation.
10 Q. In terms of a performance evaluation did you
11 ever conduct one of Kathleen?
12 A. That wasn't the protocol at Mellon for
13 subordinates to review each other.
14 Q. She was your coworker?
15 A. Yes.
16 Q. So as a coworker you would not have reviewed
17 her work?
18 A. Absolutely not.
19 Q. It would have been Becker and/or Gilmore?
20 A. Yes.
21 Q. And do you know how they assessed her work?
22 A. That was not shared with me. That was not the
23 protocol to share each subordinate's reviews.
24 Q. Did Kathleen say that she felt she was let go

Page 116

1  because of her age?
2  A. Specifically she did not say the word -- no,
3  I'm not going to say that.
4         Specifically, she alluded to the fact of
5  her years in and her age and the fact that she was a
6  woman.
7  Q. That's what she was telling you after she had
8  gone when you were meeting with her?
9  A. Not in so many words but she alluded to that
10 fact, yes.
11 Q. And that was after she was already gone?
12 A. Yes.
13 Q. Now, getting back to your conversation with
14 Rosemary Thomas, did you go into detail with her that
15 you felt that Gilmore's conduct and words were founded
16 in age because four other individuals over 40 had been
17 let go and you felt it was systematic? Did you get
18 into that kind of detail?
19 A. I can't recall at this time specifically, but I
20 recollect that I told Rosemary that I found it very
21 odd that Mr. Bell was let go, that Linda Squier and
22 Martha Fetters were forced out, that Kathleen was
23 dismissed, that I went from being the saving grace of
24 the team, the work force in Delaware, the support work

Page 117

1  force in Delaware to all of a sudden being on a hit
2  list, but I didn't use the word hit list. In this
3  context I'm saying that.
4  Q. And what did Rosemary say?
5  A. As I recall, she listened to me. I think she
6  answered in a political fashion, that Mellon's
7  striving to be better, that everybody needed to work
8  harder.
9  Q. When you say, "a political fashion," what do
10 you mean by that?
11 A. I don't feel that Rosemary Thomas was
12 exceptionally sympathetic to the specific complaint I
13 was making.
14 Q. Why did you feel that way, that she wasn't
15 being sympathetic?
16 A. She didn't cite specific Mellon procedures that
17 would be taken as far as do I sign a formal complaint?
18 Does she sit down with a superior and Brendan and
19 discuss the specific charge that I was making?
20 Q. She didn't tell you what was going to happen as
21 a result of your conversation?
22 A. Not specifically what would transpire after it,
23 no, I don't recollect, no.
24 Q. Did she mention anything that would happen that

Case 1:05-cv-00891-SLR    Document 28-5    Filed 11/21/2006    Page 5 of 17

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 118

1  would transpire?
2  A. To the best of my memory, I think she said she
3  was going to speak to Brendan about it.
4  Q. Do you know if she spoke to Brendan?
5  A. I have no way of knowing that for sure.
6  Q. In terms of your answer, is it that Rosemary
7  never -- did Rosemary come back to you and say I've
8  spoken to Brendan and this is what has occurred or
9  what he says?
10 A. To my recollection, it would have to be that
11 when I returned from vacation I would have to assume
12 she spoke to Brendan because then I was handed a final
13 warning or given a final warning.
14 Q. And that's why you feel that she had spoken to
15 Brendan?
16 A. At this time I would have to say that's
17 probably why.
18 Q. And is it I guess the timing, is that what
19 you're basing it on, that you got the final warning
20 after you had complained about Brendan?
21 A. Yes.
22 Q. Do you know if there had been any discussions
23 about placing you on a final written warning prior to
24 your conversations with Rosemary about Brendan?

Page 119

1  A. Please repeat that.
2  Q. Sure.
3  MS. WILSON: Can you repeat that?
4  (The reporter read back the pending
5  question.)
6  THE WITNESS: I don't recall at this time.
7  BY MS. WILSON:
8  Q. When Brendan called you a survivor you took it
9  to mean a reference to you being the only one I
10 believe you had characterized it as left from the
11 team, the beginning team.
12 Was that in fact the case, that of all of
13 the initial team members that you were the only one
14 left?
15 A. Yes.
16 Q. Besides Brendan?
17 A. Before we went completely into a team concept
18 of people in Delaware working under people in
19 Philadelphia and people in Washington working under
20 people in Philadelphia, the original Delaware team
21 consisted of Robert Bell, Linda Squier, Kathleen Agne
22 and myself. Of those four, I was the only one
23 remaining.
24 Q. You and Brendan were the only ones remaining of

Page 120

1  that team?
2  A. Under his team. Under his team.
3  Q. Right.
4  A. Yes.
5  Q. Before the break, Ms. Blozis, we were talking
6  about Brendan Gilmore and one of the things that you
7  had said that you felt was indicative of age
8  discrimination was that he wanted to eliminate older
9  workers on his team and replace them with younger
10 people.
11     Do you remember that testimony?
12 A. Yes.
13 Q. Now, I believe we have gone through the older
14 workers that you were referring to and that would be
15 Kathleen Agne?
16 A. Yes.
17 Q. Robert Bell?
18 A. Yes.
19 Q. Martha Fetters?
20 A. Yes.
21 Q. And Linda Squier?
22 A. Yes.
23 Q. And there's also another one. I'm looking on
24 pages 9 and 10 of your complaint, paragraph it's

Page 121

1  starting with paragraph 53. It's 53a through e.
2  A. Yes.
3  Q. If you look at e, Frances Smith.
4  A. Yes.
5  Q. Now, where was she with respect to the team --
6  A. She was not a member of the Gilmore team.
7  Q. Was she on another team?
8  A. She was on the Philadelphia team.
9  Q. Do you know, did each team have a name like
10 whoever the leader was, the Gilmore team? Was there
11 another team that she was on?
12 A. Yes.
13 Q. What was the name of her team?
14 A. I don't recall at the end of her career with
15 Mellon. At one time it was the Jane Lefend team, but
16 I don't believe that was the team, that Jane was the
17 team leader on Mrs. Smith's team when she was
18 released.
19 Q. And it says that she was forced to resign in
20 approximately September of 2003?
21 A. Yes.
22 Q. You don't remember whose team she was on at the
23 time?
24 A. At this time -- excuse me. Yes. I believe

31 (Pages 118 to 121)

Page 122

1  Bill Becker had taken over that team. That was the
2  team that he had taken over at the time, William
3  Becker.
4    Q.  And how did you know Frances Smith?
5    A.  We had the occasion to work in conjunction with
6  mutual clients. Over the course of my employment at
7  Mellon, various files were shifted from team to team
8  when the management decided the size of the clients'
9  portfolio would be moved from different teams. They
10  were restructuring the file management. And
11  frequently I would talk to Fran if she needed to be
12  brought up to speed about a particular client that
13  might have been managed on the Delaware team or the
14  Gilmore team that was then taken over by her team.
15    Q.  Do you know what her title was in September of
16  '03?
17    A.  To the best of my recollection, Fran had at one
18  time been promoted to a trust officer, but I recollect
19  that she was demoted to a comparable portfolio
20  administrator.
21    Q.  And do you know why she was demoted?
22    A.  Specifically I do not.
23    Q.  Do you know who demoted her?
24    A.  I do not know.

Page 123

1    Q.  You say she was forced to resign. Why do you
2  say that?
3    A.  In discussions with Fran it became apparent
4  that she was going through the same thing that I was
5  as far as job overload, criticism of her work
6  performance and I think ultimately received the or
7  else prerogative and Fran chose to resign her post,
8  her position.
9    Q.  Did she tell you who it was that she was having
10  these issues with?
11    A.  I recollect at this time that it was William
12  Becker.
13    Q.  And did she tell you that she was being forced
14  to resign?
15    A.  She didn't, to my memory she did not say it
16  specifically in those terms, she was being forced.
17        She intimated that she did not understand
18  exactly why the criticism of her had arisen and why it
19  seemed after years of dedicated hard work it wasn't
20  satisfactory anymore, any longer.
21    Q.  So by her rendition of events you assumed it
22  was Bill Becker who was not happy with her work?
23    A.  I can't say specifically it was Bill Becker or
24  management's or Mellon's ploy at this time.

Page 124

1    Q.  Or Mellon's?
2    A.  Mellon's ploy.
3    Q.  Ploy, p-l-o-y?
4    A.  P-l-o-y to eliminate employees over the age,
5  over the age of 40.
6    Q.  When you say, "Mellon's ploy," what do you mean
7  by that?
8    A.  If Mellon was adopting a policy to drive out,
9  force out, fire employees of a certain age or time in
10  and, in turn, hiring younger, unskilled, inexperienced
11  people to replace them.
12    Q.  Do you ever see any written documentation that
13  Mellon had instituted such a thing?
14    A.  No.
15    Q.  Did anybody from Mellon ever tell you that
16  that's what was going on?
17    A.  Who do you mean "from Mellon"?
18    Q.  Other than the people, Martha and Frances or
19  Linda or Bell.
20    A.  I don't think that would have been a policy to
21  show if there were, in fact, a document to show that
22  to portfolio administrators.
23    Q.  Well, do you know if anything like that
24  existed?

Page 125

1    A.  I have no knowledge of that.
2    Q.  Did Frances Smith ever tell you that she was
3  forced to resign because of her age?
4    A.  Not in those specific terms.
5    Q.  It would have been along the lines of I have
6  been here for X number of years, I've done a good job,
7  I don't understand why now things aren't going well
8  for me or something along those lines?
9    A.  Yes.
10    Q.  Did you ever have any conversations with Bill
11  Becker about Frances Smith?
12    A.  No.
13    Q.  And I take it you never performed any
14  performance evaluations of Frances Smith?
15    A.  As I stated before, it was not a policy of
16  Mellon for trust portfolio assistants to offer reviews
17  on subordinates or certainly not people who were at
18  levels above my position.
19    Q.  Do you know whether any of the younger members
20  of the Gilmore team got any negative evaluations?
21    A.  I have no way of knowing that. I don't believe
22  they have.
23    Q.  What is your belief based on?
24    A.  My belief is based on the fact that Brendan

32 (Pages 122 to 125)

Case 1:05-cv-00891-SLR    Document 28-5    Filed 11/21/2006    Page 7 of 17

Blozis                                  v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1        C.A. # 05-891 (SLR)                    July 26, 2006

Page 126

1  Gilmore in that meeting tried to impress upon me that
2  the younger team members were working harder than I
3  was and was doing more, taking on more
4  responsibilities than I was.
5     Q.  But in terms of seeing any of their performance
6  evaluations or anything like that, you have never seen
7  them, correct?
8     A.  I'm sorry? I didn't hear you.
9     Q.  You have never seen any of the younger Gilmore
10 team members' performance evaluations, have you?
11    A.  No.
12    Q.  Just to be clear, during the conversation that
13 you were having with Gilmore around the April 30th
14 time frame he didn't mention the term younger?
15    A.  I don't recall he used the term younger.
16    Q.  Now, thinking beyond that meeting during the
17 time that you were employed at Mellon -- and I
18 understand that you have given me some examples of
19 this, but my question is for you to tell me everything
20 that Gilmore has said or done that you took to be
21 indicative of age discrimination. You don't have to
22 mention the elimination of the older workers issue,
23 the survivor, the profanity.
24         Anything other than what you have already

Page 127

1  testified to?
2     A.  I recall a couple of instances with Maria
3  Bannister, who I considered a team player but because
4  she was new and younger when Brendan Gilmore was in
5  the Delaware office he would frequently praise her
6  work and her performance and bypass me altogether
7  when, in essence, I helped train her and brought her
8  up to speed if she was accomplishing that work.
9     Q.  Is Maria the same woman as Dunlop?
10    A.  I beg your pardon. Maria was employed, she was
11 hired as Maria Bannister and got married and became
12 Maria Dunlop.
13    Q.  All right. So you felt that Gilmore's praise
14 of Maria's work was not warranted?
15    A.  I didn't say it was not warranted. I said I
16 believed it was founded on the fact that she was
17 younger and I was ignored.
18    Q.  Well, I guess in general Gilmore would say
19 Maria is doing a great job at whatever or words to
20 that effect?
21    A.  In general, yes.
22    Q.  So when he would give her praise for the work
23 that she did, did you feel that Maria didn't deserve
24 that praise.

Page 128

1     A.  I said she was a team player. I didn't say she
2  didn't deserve it. I said that she would be given
3  praise and I as a team player if she and I were
4  working together, I would be excluded from that.
5     Q.  Are you saying that -- I guess what -- I think
6  I understand what you're saying in terms of the
7  praise.
8         When I asked you whether you felt she was
9  undeserving of the praise, is your answer to that yes
10 or no?
11    A.  She was not undeserving of that praise.
12    Q.  You felt that you were deserving of some equal
13 praise?
14    A.  Yes.
15    Q.  Did you ever say Brendan, I'm working on this
16 too; I would like to hear some kudos for my work?
17    A.  Brendan Gilmore wasn't the type of team leader
18 that you could make a comment like that to and feel
19 comfortable within the realm of your position.
20    Q.  So Gilmore didn't like to be questioned or
21 approached on topics such as I would like to be
22 included in the praise?
23    A.  Exactly.
24    Q.  You were giving me instances of times where you

Page 129

1  thought Gilmore's conduct or words were indicative of
2  age discrimination.
3     A.  You're referring to instances of --
4     Q.  Where you felt that Gilmore either had by way
5  of statement, by way of conduct in some way evidenced
6  age discrimination. And the last example you gave me
7  was concerns about Maria Dunlop and I didn't want to
8  cut you off. I wanted to hear everything that you had
9  to say about that having to do with Gilmore.
10    A.  I don't quite understand what you're inquiring
11 about.
12    Q.  Well, are there any more instances where you
13 felt that Gilmore either by statement or by conduct in
14 some way was evidencing age discrimination? We talked
15 about giving praise to Maria, none to you, the
16 survivor comment, the cursing, the letting go of the
17 older workers, the hiring of the younger workers.
18        I'm looking for more examples of that that
19 you have.
20    A.  I recall there were instances when in team
21 meetings or prior to or after meetings he would be
22 more jovial with younger people than he would with the
23 older members of the team, "older" meaning age and/or
24 time in.

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1    C.A. # 05-891 (SLR)    July 26, 2006

Page 130

1  Q. When you say, "time in," you mean years of
2  service with the company?
3  A. Yes.
4  Q. Why do you feel that's indicative of age
5  discrimination?
6  A. We were all on the same team.
7  Q. So by "more jovial," you mean joking around?
8  A. Friendlier, more outgoing.
9  Q. You felt that with the older workers he didn't
10 have that same level of being friendly and outgoing?
11 A. No, I did not think that he had that same
12 level.
13 Q. Was he like nasty to the older workers in the
14 meeting?
15 A. I wouldn't use the term "nasty."
16 Q. But wouldn't you say that he wasn't as jovial
17 or outgoing? I'm just trying to get a sense of how he
18 was appearing with the younger workers as opposed to
19 the older ones.
20 A. If he was friendly and jovial with the younger
21 ones, it seemed apparent that he was aloof and distant
22 and borderline rude to the older workers.
23 Q. And when you say, "borderline rude," what would
24 he do?

Page 131

1  A. Just if they asked questions he would be abrupt
2  in his answers or not have time for them then.
3  Q. You felt with the younger workers he would
4  answer their questions and have time to discuss
5  whatever they were bringing up?
6  A. Yes.
7  Q. Did you ever approach him on this?
8  A. No.
9  Q. Did you ever speak with Rosemary or anybody
10 from HR about how you felt the meetings were going?
11 A. Not that I recall at this time.
12 Q. Would it be at all of the meetings that you
13 felt that way or some of them?
14 A. For the most part it would be at the
15 predominance of the meetings. Not all of the team
16 members were always included. It would depend on what
17 the particular situation required, whether it be
18 officers or officers and assistants.
19 Q. Would you be included on all of the meetings?
20 A. I was an assistant.
21 Q. So there would be meetings that you would not
22 be included on?
23 A. There were at times, yes.
24 Q. In terms of when the meetings were and who

Page 132

1  would be included on the meetings, would there be an
2  e-mail coming out from Brendan saying we're going to
3  have a meeting on X date and A, B and C should be
4  there at the meeting?
5  A. As I recollect, there could have been over the
6  time frame that he was the team leader, yes.
7  Q. So you would get some advanced word of a
8  meeting date and who was to attend the meeting?
9  A. For the most part, yes, there would be advanced
10 notice.
11 Q. Then I think you testified that some meetings
12 were done on the phone?
13 A. Yes.
14 Q. And some in person?
15 A. Yes.
16 Q. Any other examples of instances where you
17 thought Gilmore was being discriminatory on the basis
18 of age?
19 A. At this time I don't recall any.
20 Q. You also --
21 A. That's my phone.
22    MR. LaROSA: Let's go off the record for a
23 second.
24    (Discussion off the record.)

Page 133

1  BY MS. WILSON:
2  Q. Now, with respect to your complaint you also
3  have a gender discrimination allegation. And focusing
4  in on Gilmore --
5  A. Excuse me. I'm going to shut my phone off.
6  Q. Oh, sure.
7  A. I'm sorry. Would you repeat the question?
8  Q. Sure. Ready?
9  A. Yes.
10 Q. Going back to Gilmore.
11 A. Yes.
12 Q. And focusing now on your gender discrimination
13 claim.
14 A. Yes.
15 Q. Can you provide me with instances where you
16 feel that Gilmore either by word or conduct was
17 discriminating against you on the basis of gender?
18 A. To the best of my recollection, when I might be
19 in the Philadelphia offices and working alongside a
20 teammate for whatever purpose on an account I noticed
21 that Dan Merlino would not seem to be as busy as we
22 women might have been.
23 Q. And Dan Merlino was a portfolio administrator?
24 A. To the best of my recollection, that's how he

34 (Pages 130 to 133)

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1    C.A. # 05-891 (SLR)    July 26, 2006

Page 134

1  started on the team.
2  Q. When you say that Dan wasn't as busy as the
3  women, what women?
4  A. It would have been while she was still under
5  the employ Kathleen Agne, Marion whose name I don't
6  recall.
7  Q. I think I might have her name.
8     Is it Marion --
9  A. Marano.
10 Q. -- Marano?
11 A. It just came to me. Marano, Marion Marano.
12 Q. M-a-r-a-n-o.
13 A. Even Brendan's personal assistant, Cindy
14 Chambliss.
15 Q. Was Cindy a portfolio administrator?
16 A. I don't know what her correct title was at this
17 time since she was Brendan's personal assistant.
18 Q. And Marion, she was a portfolio administrator?
19 A. Yes, as I recall.
20 Q. So when you say that you visited the
21 Philadelphia office and Dan didn't seem to be as busy
22 as the rest of the women, why did you take that to be
23 gender related?
24 A. Because I recollect there were instances in

Page 135

1  which Marion and Cindy would intimate to me that we
2  have these tasks to complete and Dan did not have
3  comparable tasks. He was not giving comparable tasks
4  in a comparable work position.
5  Q. And who would be the person in charge of giving
6  Dan tasks?
7  A. It would be Brendan Gilmore.
8  Q. And did you ever do sort of your own
9  investigation as to what task Dan was being given?
10 A. I don't understand your question.
11 Q. Did you know what task that Dan was being given
12 to do?
13 A. There were specific job duties listed that the
14 portfolio administrators were responsible for and
15 sometimes we might have to work in conjunction with
16 one another or ask questions. It seems sometimes when
17 I would call Dan he wouldn't have the answers. He
18 would defer me to Marion or Cindy or one of the women.
19 Q. And you took from there, from his deferment to
20 the females that he didn't have the same work, the
21 comparable work that you had to do?
22 A. I took from there that he should have that
23 answer as part of his job and he didn't have it.
24 Q. So in terms of whether he had comparable work

Page 136

1  to do, do you know that?
2  A. As I recollect, if he was given the title of
3  portfolio administrator he would be given similar
4  duties as we women would be given.
5  Q. And you took that something was amiss when you
6  would call and ask for information and he wouldn't
7  know the answer?
8  A. Yes.
9  Q. Did that lead you to believe that either -- I
10 mean, what I took from your answer is you would ask
11 him a question, he didn't know the answer and you
12 thought he should have known the answer?
13 A. On some occasions, yes. On other times if I
14 asked could you check on something for me, he would
15 defer to I'll have Marion call you back or I'll have
16 Cindy call you back.
17 Q. And did you think there was something wrong
18 with him --
19 A. I thought that --
20 Q. -- doing that?
21 A. Yeah. I thought that he was very capable of
22 getting the answers or being able to work as a team
23 player and not defer to the women.
24 Q. So it sounds like you were thinking that he

Page 137

1  wasn't pulling his weight?
2  A. Yes.
3  Q. And instead of saying I'll have so-and-so get
4  you the answer that he should have gotten the answer
5  himself and given it to you?
6  A. Yes.
7  Q. Did you ever have any conversations with
8  Brendan Gilmore or Becker that Dan wasn't pulling his
9  weight?
10 A. You asked about the two of them.
11 Q. Well, with either one of them did you ever have
12 any conversations that Dan wasn't pulling his weight?
13 A. I don't recall specifically at this time, no.
14 Q. Do you know whether Kathleen or Marion or Cindy
15 ever complained to Brendan or, and I'll use his last
16 name, Becker, Bill Becker that Dan wasn't pulling his
17 weight?
18 A. I have no way of knowing that at this time.
19 Q. Do you know whether Brendan or Bill had any
20 knowledge that Dan wasn't pulling his weight?
21 A. Do I have any knowledge? I don't know for sure
22 that they would at this time.
23 Q. Are there other examples of gender
24 discrimination in connection with Gilmore?

35 (Pages 134 to 137)

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1    C.A. # 05-891 (SLR)    July 26, 2006

Page 138

1  A. None that I can recall at this time.
2  Q. If you would look at your complaint, paragraphs
3  56a through d.
4  A. Yes.
5  Q. Just look at that because my question is
6  earlier when we were talking about Brendan Gilmore you
7  had stated that he wanted to eliminate older workers
8  off the team and replace them with younger people.
9  That's probably not a direct quote, but that was the
10 gist of the testimony.
11      Are these the younger people that you were
12 referring, to 56a through d?
13 A. Yes.
14 Q. Now, with respect to looking at 56a, we have
15 got Investment Officer Bill Becker. Is it your
16 testimony that Bill replaced an older worker?
17 A. Bill Becker was ultimately put in place as the
18 senior trust officer in Delaware. At the time of my
19 first employment, that position was held by Mr. Robert
20 Bell.
21 Q. So is it your testimony that Bill replaced
22 Robert?
23 A. Considering the succession, Martha Fetters had
24 served as senior officer of Delaware in the interim

Page 139

1  between Mr. Bell and Bill Becker.
2  Q. So Bill replaced Martha?
3  A. Yes.
4  Q. Do you know whether there were any jobs, do you
5  know whether there were any advertisements for the
6  senior trust officer position?
7  A. At this time I don't recall if there were
8  advertisements.
9  Q. Do you know whether there were any individuals
10 who applied for the senior trust officer position?
11 A. To the best of my recollection -- when are you
12 referring to? What time frame? I'm sorry.
13 Q. I was just following up on your testimony that
14 Bill replaced Martha Fetters as the senior trust
15 officer.
16      So my question was whether you knew
17 whether there were people who applied for the position
18 of senior trust officer around the period that Martha
19 Fetters left.
20 A. To the best of my recollection, I believe Bill
21 said he was in competition with two other people, but
22 I don't recall who they were.
23 Q. Looking at b, Dan Merlino, is that the same
24 person we have been talking about, Masucci?

Page 140

1  A. No. Ray Masucci was an officer. Dan Merlino
2  was the portfolio administrator that I've been
3  referring to.
4  Q. And he was in the Philadelphia office?
5  A. Yes.
6  Q. And did he replace an older worker?
7  A. Yes, I believe he did. And I can't remember
8  her name at this time.
9  Q. In your complaint you have him as an investment
10 assistant?
11 A. Yes.
12 Q. Is that the same thing as portfolio
13 administrator?
14 A. To the best of my understanding, it's
15 synonymous with portfolio.
16 Q. Do you know whether other individuals applied
17 for the portfolio administrator/investment assistant
18 position that Dan got?
19 A. I have no way of knowing at this time.
20 Q. You have Assistant Maria Dunlop. That's the
21 Maria that we have been talking about in the Delaware
22 office?
23 A. Yes.
24 Q. And she came in as the portfolio administrator,

Page 141

1  correct?
2  A. Yes.
3  Q. And did she replace anybody?
4  A. I don't know if it's correct to say she
5  replaced, but Kathleen Agne was fired. There was the
6  time lapse between March and then Maria was hired in
7  July.
8  Q. Do you know whether others applied for the
9  position that Maria ultimately got?
10 A. To my recollection, I think others did. There
11 were other interviews conducted.
12 Q. Do you know who was being interviewed?
13 A. The names, I was not told who they were.
14 Q. Who was doing the interviewing for Maria's
15 position?
16 A. Initially it would have been Greg Landis and
17 then I'm under the understanding that Brendan Gilmore
18 made the ultimate decision.
19 Q. And do you know whether any advertisements were
20 placed for the position?
21 A. I'm not sure at this time.
22 Q. The next one, Investment Officer Kristy Hunt.
23 A. Yes.
24 Q. Was she in the Philadelphia office?

36 (Pages 138 to 141)

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 142

1   A. Yes.
2   Q. Did she replace an older worker?
3   A. I don't recall at this time.
4   Q. Was she in the Gilmore team?
5   A. Yes.
6   Q. Do you know whether there were other applicants
7   for the investment officer position that Kristy got?
8   A. I have no way of knowing for sure at this time.
9   Q. Looking at your complaint, Ms. Blozis, at
10  paragraph 22 it talks about a period of March '02 to
11  July 7 of '02.
12       Is that the period of time that Kathleen
13  had been let go and before Maria came on board?
14  A. Yes.
15  Q. And then the last part, the last sentence of
16  that 22, "Younger and male employees were not treated
17  similarly"?
18  A. Yes.
19  Q. Who are you referring to there?
20  A. I'm referring to all other team members on the
21  Brendan Gilmore team.
22  Q. During that period March '02 to July 7 '02?
23  A. Yes.
24  Q. So it would be fair to say you're referring to

Page 143

1   all male employees on Brendan's team during that
2   period?
3   A. Yes.
4   Q. And all employees under 40 on Brendan's team
5   during that period?
6   A. Yes.
7   Q. And when you say that they were not treated
8   similarly to you, is it your allegation that they
9   weren't put in charge of the responsibilities that you
10  identified in paragraph 22?
11  A. Yes.
12  Q. Is it your contention that they should have
13  been or the work should have been divided up?
14  A. I just know that they weren't because the
15  Delaware office was a subsidiary office and those
16  responsibilities were on my shoulders because I was
17  the only one there.
18  Q. So at that time you were the only portfolio
19  administrator in the Delaware office?
20  A. Yes.
21  Q. But there were portfolio administrators on his
22  team in Philadelphia?
23  A. Yes.
24  Q. So is it your argument that those portfolio

Page 144

1   administrators in the Philadelphia office should have
2   been brought down to Delaware to help you out?
3   A. That could have been a fair team concept.
4   Q. Did you ever raise that as something that
5   should be considered?
6   A. To whom?
7   Q. To anybody.
8   A. As I stated before, Brendan Gilmore was not a
9   personality or a manager that you could approach on
10  those issues. It would had to have been his
11  originating idea to send the help. And as a woman and
12  an older woman, it wasn't a consideration of his to
13  give help to me in that office.
14  Q. Now, with respect to Brendan Gilmore from what
15  you said, from your answer you never brought it up to
16  him that maybe you can send somebody else from
17  Philadelphia to help me out. Is that right?
18  A. Repeat that, please.
19  Q. It sounds like from your statement that you
20  never asked Brendan to send some folks from
21  Philadelphia to help you out during that period.
22  A. I didn't ask him specifically, no.
23  Q. And you also said that as an older woman, and
24  I'm paraphrasing, that it would not have been

Page 145

1   something that Brendan would even have thought about
2   doing for you?
3   A. Yes.
4   Q. And why do you say that?
5   A. Because there were instances when Brendan
6   Gilmore would come to Delaware as a means of a respite
7   from his work in Philadelphia and be aware of what I
8   was responsible for and not compliment me or say
9   you're doing a fine job or we should get you some
10  help, Linda, in doing it. It was expected. It was
11  intimidated -- I'm sorry. It was intimated that I was
12  expected to take care of those responsibilities.
13  Q. Is it fair to say that he never said Linda,
14  because you're an older woman I'm not going to get you
15  any help?
16  A. He never used those exact words.
17  Q. Did he ever refer to you as old?
18  A. Not that I recall at this time.
19  Q. When he would come -- this is Brendan -- when
20  he would come to the Philadelphia office, would he
21  ever give you any advice on how to handle trust
22  accounts or how to handle your work?
23  A. I believe you said come to Philadelphia.
24  Q. I'm sorry. I meant Delaware.

37 (Pages 142 to 145)

Page 146

1  A. Would he ever give me advice on how to?
2  Q. How to handle your work.
3  A. I don't recollect at that time because my
4  understanding up until the last months of my employ
5  was that he was satisfied with the way that I was
6  conducting the performance of my work duties.
7  Q. So I guess prior to the meeting that you had
8  with him in April of '03 where he brought up
9  performance issues, you were unaware that he had
10 concerns about your performance?
11 A. Yes.
12    I mean, are you asking a question?
13 Q. Let me rephrase the question.
14    Did Brendan Gilmore ever raise to you that
15 he had problems with your performance prior to the
16 April 30th, '03 meeting?
17 A. I don't recall specifically at this time.
18 Q. You don't recall either way?
19 A. Either way? I don't understand what you mean
20 by "either way."
21 Q. When you say you don't recall at this time, it
22 could be construed as two different things, that he
23 could have and you just don't remember it sitting here
24 today or he didn't.

Page 147

1  A. To me personally I do not recollect him
2  criticizing me. I don't think it would have been
3  smart on his part to criticize the only person he was
4  relying on to help support that office.
5  Q. So to your knowledge he didn't, at least he
6  didn't criticize you to your face prior to April 30th?
7  A. To the best of my recollection.
8  Q. Do you know whether he was talking about your
9  performance to others?
10 A. He could have been. I have no way of knowing
11 that at this time.
12 Q. Now, when he came to the Delaware office did he
13 ever discuss client investments and decision-making
14 processes with you?
15 A. In what time frame are you referring to?
16 Q. At any point.
17 A. When our team was more fully staffed, there
18 wouldn't have been the occasion for him to at length
19 discuss those things with me. As the team diminished,
20 he would be forced to have communication in whatever
21 level that it required.
22 Q. So when it diminished, would that be at the
23 point where Kathleen left?
24 A. Diminished?

Page 148

1  Q. Yes. When you said when your team
2  diminished --
3  A. Yes.
4  Q. And my question was: Was that the time when
5  Kathleen left when you're saying when it diminished?
6  I was just trying to put a time period on it.
7  A. It would have been as Mr. Bell left, Martha
8  left, Linda left and it was reduced to William Becker,
9  Greg Landis and Kathleen and myself and when she left,
10 yes.
11 Q. So I guess there was a point in time so that
12 the team, the Delaware team consisted of Bill, Greg,
13 Kathleen and you?
14 A. Yes.
15 Q. And then when Kathleen left the team was Bill,
16 Greg, you?
17 A. Yes.
18 Q. And then when Maria came it was Bill, Greg, you
19 and Maria?
20 A. There was a transition time when Bill was
21 spending a great deal of his time in Philadelphia and
22 this was before Maria came on board and so at times it
23 might have just been Greg and myself there.
24 Q. Now, during the time frame beginning, say, in

Page 149

1  2002, I sort of want to go back to 2002, did you have
2  any conversations with Bill Becker about your
3  performance?
4  A. (Pause).
5  Q. Other than what's on your review.
6  A. Repeat your question.
7  Q. I want to get into discussions that you had
8  with Bill Becker and I want to take it after the
9  review.
10 A. After the review?
11 Q. Yes. After the review, which I think was in
12 February of '02, discussed the review, but going after
13 the review, did you ever have any occasions in which
14 Bill Becker discussed your performance with you? And
15 let's keep it within the year 2002.
16 A. Yes.
17 Q. Now, did Bill Becker ever express any
18 dissatisfaction with your performance in 2002?
19 A. To the best of my recollection in 2002, yes.
20 Q. And what did he say?
21 A. I don't recall exactly his words, but I
22 recollect if the review was in February of 2002 Bill
23 was already commuting and dividing his time between
24 Philadelphia and Delaware and I felt that around late

38 (Pages 146 to 149)

Case 1:05-cv-00891-SLR   Document 28-5   Filed 11/21/2006   Page 13 of 17

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 150

1  fall and winter of 2002 he was sent as a messenger
2  from Brendan to tell me that I wasn't working
3  satisfactorily.
4      Q. Why did you think in late fall of 2002 that he
5  was sent as a messenger from Brendan?
6      A. Because Bill was still caring or overseeing
7  some trust accounts that were part of the Gilmore team
8  but taking on portfolios that would eventually lead
9  him into being his own team member and he intimated at
10 that time that Brendan was dissatisfied with my work.
11 And I was surprised to hear that because I was
12 carrying the burden of Bill's transitional work and I
13 hadn't heard from Brendan personally.
14     Q. Did he tell you any specifics of what Brendan
15 was dissatisfied with?
16     A. Not that I recall at this time.
17     Q. Did Bill ever tell you that he thought that you
18 weren't completing projects in a timely manner?
19     Q. Did Bill ever ask me -- I'm sorry. The
20 question?
21     Q. Did Bill ever tell you that he felt you weren't
22 completing projects in a timely manner?
23     A. I'm not sure.
24     Q. Bill Becker.

Page 151

1      A. Bill Becker? He may have. I'm not sure.
2          MR. LaROSA: Off the record.
3          (Discussion off the record.)
4          (A brief recess was taken.)
5  BY MS. WILSON:
6      Q. Ms. Blozis, I just want to return back to your
7  testimony concerning the April 30th meeting with
8  Gilmore.
9          Do you feel that he used the profanity
10 because of your age?
11     A. I can't say at this time.
12     Q. What about your gender?
13     A. I can't say at this time.
14     Q. When you say you can't say at this time, what
15 do you mean by that?
16     A. The best recollection of that date is that it
17 became on his part very heated. He became very
18 enraged and to my understanding it was unwarranted.
19 And any time that I tried to offer a professional
20 response to an accusation or a comment or a criticism,
21 he took the opportunity to intimidate or insult me
22 further and culminating in the use of profanity.
23 Whether it was his means of shock value to scare
24 tactics, as use of scare tactics to get me into

Page 152

1  submission, I can't say, but that would be my
2  explanation as to why I can't say. It was a very
3  horrible experience.
4      Q. After the meeting was over did you remain at
5  work?
6      A. Yes.
7      Q. You worked a full day?
8      A. I don't recall at this time. I think it was
9  the same day that I was so upset that I felt my blood
10 pressure had risen. I could feel the color rise in my
11 cheeks. I was crying at my desk and I don't recall if
12 that was the specific time that I had e-mailed Greg
13 that I was so upset I had to leave to compose myself
14 and that I would make up the time, which I did.
15     Q. I think I saw something, and maybe as we start
16 going through the files, where you had taken I think,
17 you left two hours early.
18     A. I recollect that was...
19     Q. Around the 2003 time frame you worked Monday
20 through Friday?
21     A. Yes.
22     Q. And did you have set times to be into work?
23     A. As I recall, Mellon instructed us to be there
24 from 8:00 to 5:00.

Page 153

1          I beg your pardon. 8:30 to 5:00.
2      Q. Was there a one-hour lunch break?
3      A. Yes.
4          MS. WILSON: If we could go off the record
5  for one second, please.
6          (Discussion off the record.)
7          (Blozis Deposition Exhibit No. 5 was
8  marked for identification.)
9  BY MS. WILSON:
10     Q. Ms. Blozis, I show you a document that's been
11 marked as Blozis 5, which is a redacted copy of a
12 series of e-mails. And I'll give you the clean copy
13 so that you can see what's been redacted there.
14     A. We're back on the record, I presume?
15     Q. We're back on the record.
16     A. Okay. (Reviewing document).
17         Yes. I understand what you have given me.
18     Q. Now, looking at it's a two-page document, P856
19 and P857, and looking down at the first e-mail
20 exchange from Bill Becker to you.
21         Do you see where I am?
22     A. Yes.
23     Q. Do you recall receiving this e-mail on or about
24 October 8, 2002?

Case 1:05-cv-00891-SLR   Document 28-5   Filed 11/21/2006   Page 14 of 17

Blozis                                v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1       C.A. # 05-891 (SLR)                July 26, 2006

Page 154

1  A. This e-mail would indicate that I did.
2  Q. And with respect to the e-mail, it's in
3  reference to a particular customer. Is that right?
4  A. Yes.
5  Q. And there's some question as to where certain
6  information is with respect to the customer?
7  A. Yes.
8  Q. Had you had some previous conversation with
9  Bill Becker about providing him information concerning
10 this particular customer?
11 A. I would like to reread this e-mail in full to
12 be able to answer that question.
13 Q. That's fine.
14 A. (Reviewing document) Your question again?
15    MS. WILSON: If you could read back that
16 question, please.
17    (The reporter read back the pending
18 question.)
19 BY MS. WILSON:
20 Q. Let me rephrase that question because after I
21 review the e-mail there are two customers that --
22 A. That are referred to.
23 Q. Exactly. Let's refer to the first customer as
24 Bill.

Page 155

1  A. All right.
2  Q. And the second customer as Naomi.
3  A. Yes.
4  Q. Had you had any conversations with Bill Becker
5  concerning providing information concerning Bill's
6  account, the customer Bill?
7  A. I recall that I did.
8  Q. And what was the nature of the conversation?
9  A. To the best of my recollection, I don't recall
10 if it was one conversation or many, but as I produced
11 this information, provided this information to the
12 defendants, it would indicate what I state in the
13 paragraph above, that I too had found the information
14 but that I felt very strongly it was officers', prior
15 officers' responsibilities, and I believe I named
16 them, who were unsuccessful in correcting the
17 situation; as I had earlier testified, that it seemed
18 the job had evolved to more and more investment
19 officer responsibility being placed or forced onto
20 portfolio administrators.
21    This, in essence, is proof that the
22 attempts were being made. Those decisions as far as
23 rectifying the client Bill's problem had been
24 blatantly ignored by previous trust officers, and

Page 156

1  they're named above and they're Mellon employees. I
2  don't believe them to be confidential. It's Bob
3  Chappelear, Clinton Pelfrey, Amy Simeone, Wanda
4  Caviness, Valerie Grimes, Paul Mulholland, and Martha
5  Fetters were unsuccessful in correcting that
6  situation.
7  Q. Martha is the same person you had referenced
8  that we have been talking about previously?
9  A. Yes.
10 Q. That's the same Martha?
11 A. Yes.
12 Q. If I understand your testimony, Ms. Blozis, it
13 is that you felt that previous portfolio officers
14 didn't address the issue and that it was then put on
15 your desk to do?
16 A. Yes.
17 Q. And did you feel it was your responsibility to
18 address the issues concerning Bill's account?
19 A. That who felt? Bill Becker?
20 Q. No. I'm sorry. Bill, the client?
21 A. No, that's not the case.
22 Q. I don't think you understood my question.
23 A. No.
24 Q. Looking at the bottom half of the e-mail from

Page 157

1  Bill Becker to you, he is asking for information
2  concerning the client Bill's account and is saying, "I
3  don't have it" or words to that effect.
4     As I understand your testimony, it's your
5  position that this information had been, well, that
6  the information should have been obtained earlier by
7  previous portfolio officers and that it shouldn't have
8  been left on your desk to complete. Is that your
9  testimony?
10 A. I don't think we're right on with this.
11 Q. Okay.
12 A. My understanding of the lower half of the
13 e-mail was that he was looking for 95 percent of the
14 cost basis to be reconstructed. Cost basing was
15 specific, was a specific responsibility of the
16 investment officer.
17    If you look at the third paragraph, the
18 last sentence down --
19 Q. "95 percent of what is needed"?
20 A. Right. That Bill Becker is saying that now
21 he's expecting a portfolio administrator to do that
22 type of work.
23    At the risk of sounding ignorant, that was
24 not the responsibility for liability purposes to put

Blozis                                                v.                          Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1          C.A. # 05-891 (SLR)                            July 26, 2006

Page 158

1  that job on a portfolio administrator. It was to be,
2  it was to have been completed by the investment
3  officer. And in the above e-mail I stated that the
4  opportunities existed for all those names listed to
5  have completed that, and it wasn't done. And I felt
6  that I was being unjustly singled out, blamed and held
7  responsible for the lack of performance by not only
8  Bill Becker himself but previous investment officers.
9  Q.  Okay. And that is your response to Bill in the
10 top e-mail?
11 A.  That is my response to Bill in the top e-mail.
12 Q.  Now, did he agree with your assessment?
13 A.  I don't recall at this time. I don't remember
14 any subsequent e-mails to that effect.
15 Q.  Now looking at your e-mail on top as it relates
16 to the client Bill.
17 A.  Yes.
18 Q.  The second sentence of the first paragraph, "I
19 apologize for my own delay in completing it in a more
20 timely manner."
21 A.  Yes.
22 Q.  What did you feel that you hadn't completed in
23 a timely manner?
24 A.  I don't recall at this time. I felt I always

Page 159

1  handled customer relations with the upmost of care,
2  but I also didn't know the extent of my liability and
3  responsibility and cost basing was not part of the
4  job. That was to be left to portfolio administrators.
5  Q.  You say in the second paragraph of your e-mail
6  to Bill "I will make every attempt to contact those
7  Mellon people who can help me resolve this issue."
8     Do you see that?
9  A.  Yes.
10 Q.  Was it in terms of next steps you were going to
11 reach out to others to provide that cost basing?
12 A.  To the best of my recollection, it would have
13 been my attempts to contact an officer who would have
14 performed the cost basing duties.
15 Q.  And prior to receiving the October 8th e-mail
16 from Bill to you, had you reached out to other Mellon
17 people to do the cost basis analysis?
18 A.  I don't recall at this time.
19 Q.  Is it fair to say that you disagreed with Bill
20 Becker's assessment of your handling of the client
21 Bill's account?
22 A.  Yes.
23 Q.  Just going back to the April 30th meeting with
24 Gilmore, is it fair to say you disagreed with his

Page 160

1  assessment of your performance?
2  A.  Yes.
3  Q.  Now going down to looking first at Bill's
4  e-mail to you concerning another customer, Naomi.
5  A.  Yes.
6  Q.  Before getting down to where he talks about
7  Naomi but that sentence right before, "There are a few
8  other projects that I've given you that have yielded
9  similar results."
10    Do you see where I am?
11 A.  Yes.
12 Q.  Do you know what projects he was talking about?
13 A.  I do not recall at this time.
14 Q.  He goes on to talk about Naomi?
15 A.  Yes.
16 Q.  What was the issue with Naomi, the customer
17 Naomi's account?
18 A.  What do you mean what was the issue?
19 Q.  Well, was Bill claiming that you hadn't gotten
20 back to him in a timely fashion regarding an issue or
21 information that he needed concerning Naomi's account?
22 A.  This sentence, that paragraph would indicate
23 that Bill thought I dropped the ball with Naomi.
24    What it doesn't state is how many times I

Page 161

1  personally drove out to visit her to try to elicit
2  information from her and she was uncooperative.
3  Q.  Do you know what the particular concerns that
4  Bill had with you concerning the customer Naomi?
5  A.  At this time I'm not sure. Bill was at this
6  juncture of October 8th very much involved in creating
7  another career as a team leader in Philadelphia and
8  was devoting less and less time, his time to the
9  Delaware office files, this Naomi being one of them
10 who had an unresolved issue from an investment
11 officer. I believe it got dumped on me and blamed on
12 me.
13 Q.  Do you remember who the investment officer was?
14 A.  It was Bill Becker.
15 Q.  It looks like it had something to do with her
16 savings bonds that were worth, according to the e-mail
17 her savings bonds were worth over a million dollars.
18 A.  I'm not sure about that.
19 Q.  You're not sure what the issue was
20 specifically?
21 A.  I'm not sure about the worth of a million
22 dollars.
23 Q.  Oh, about the value of the savings bonds?
24 A.  And if that was the entire issue.

41 (Pages 158 to 161)

Blozis                                  v.                           Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1         C.A. # 05-891 (SLR)                      July 26, 2006

Page 162

1   Q. It references on the second page, P857, the
2   mutual fund coding project. What was that?
3   A. (Pause).
4   Q. The second page. It's the first full sentence
5   on the second page.
6   A. I'm not sure I recall at this time.
7   Q. The mutual fund coding project?
8       You don't recall the mutual fund coding
9   project?
10  A. At this time the only recollection I have of
11  mutual fund coding was something that was done from
12  the analysts.
13  Q. Because it says, "The mutual fund coding
14  project has to be close to a year by now, and you've
15  not come to me to say that it is completed."
16      Was that a project that was given to you
17  to complete?
18  A. I don't recall at this time.
19  Q. You don't recall either way?
20  A. Either way what?
21  Q. Whether it was given to you to complete?
22  A. Either way.
23  Q. Do you know whether it was ever completed by
24  you?

Page 163

1   A. I can't say at this time because my
2   understanding of mutual fund coding is a job that
3   initially would be done by the investment analysts.
4   Q. So with respect to that particular reference in
5   the e-mail, you're not clear sitting here today what
6   that was?
7   A. That's correct.
8   Q. Looking at that second paragraph of his e-mail
9   where it says, second paragraph, second sentence,
10  "There needs to be improvement in completing these
11  tasks in a timely manner."
12      Do you see that?
13  A. No. I'm sorry. Where are you?
14  Q. On the second page. The second page, second
15  full paragraph, second sentence.
16      Do you see that?
17  A. I see that sentence.
18  Q. Had there been discussions with Bill Becker
19  before the receipt of the October 8th e-mail about
20  completion of projects in a timely manner?
21  A. I recollect we had discussed different projects
22  at different times.
23  Q. Prior to this time?
24  A. Yes.

Page 164

1   Q. That would be October. It goes on to say, "As
2   I've said for four years, you don't need my permission
3   to get your job done."
4       Did you and he have discussions about
5   getting your job done?
6   A. I recollect that there were discussions about
7   completing jobs and tasks.
8   Q. Looking down at the last paragraph, second
9   sentence where it says, "I hope the training Mellon is
10  offering"?
11  A. Yes. I see that sentence.
12  Q. What training?
13  A. I don't know what he's alluding to. There was
14  never really formal training.
15      Correction: Occasionally there might be a
16  seminar here or there, but to the best of my
17  recollection it was on-the-job training. It was find
18  out as you go along.
19  Q. Do you recall at any point, and I'm just not
20  limiting this question to 2002, but do you recall at
21  any point Cindy Chambliss coming down to the Delaware
22  office to assist you?
23  A. I recollect that -- I'm sorry. What time frame
24  did you give me?

Page 165

1   Q. Any time frame. I didn't limit it.
2   A. To the best of my recollection, Cindy came one
3   time and couldn't get the computer, couldn't log onto
4   the computer to be able to assist me.
5   Q. And she would come down. Do you know the
6   purpose of her coming down?
7   A. Do I know the purpose? Is that the question?
8   Do I know the purpose of her coming down?
9   Q. Yes.
10  A. To my recollection, it was to assist me in a
11  particular, perhaps a particular client project.
12  Q. Do you remember the time frame?
13  A. Time frame meaning?
14  Q. When she came down.
15  A. Not specifically, no, at this time.
16  Q. Did you ever go to Philadelphia to work with
17  Cindy or to train with Cindy on how to put certain
18  folders together, certain processes together?
19  A. I recall not fewer than one and not more than
20  maybe three occasions over the course of my being a
21  team member going for a half a day to Philadelphia and
22  working with her, but she was frequently involved in
23  responding to Brendan Gilmore's responses and could
24  not devote that entire time to instructing me.

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1    C.A. # 05-891 (SLR)    July 26, 2006

Page 166

1  Q. Did someone tell you to go to Philadelphia to
2  work with Cindy?
3  A. They may have suggested it.
4  Q. Who would that have been?
5  A. To the best of my memory, it was either Brendan
6  or within the time frame of when Bill was
7  transitioning from the Delaware team to his own team
8  it may have been Bill Becker. I'm not sure which one
9  specifically.
10 Q. And would it have been Gilmore or Becker that
11 told her to come down to Delaware?
12 A. I have no way of knowing that for sure. It
13 would seem to follow.
14 Q. All right. Now, I gather that your October-9
15 e-mail is a response to Bill Becker's e-mail, his
16 October 8th e-mail to you?
17 A. That's correct.
18 Q. Do you recall whether there was any more
19 conversation, be it e-mail, oral, concerning this
20 particular matter with the Bill account with respect
21 to getting that cost basis done?
22        THE WITNESS: Please repeat that question.
23        (The reporter read back the last
24 question.)

Page 167

1        THE WITNESS: To the best of my
2  recollection, I don't believe there was any more
3  conversation or e-mails between Bill Becker and myself
4  regarding the Bill account.
5  BY MS. WILSON:
6  Q. Do you know whether that cost basis got done?
7  A. At this time I'm not sure.
8  Q. Was there any more discussion concerning the
9  Naomi customer matter?
10 A. As I recollect, I believe Naomi's account was
11 moved to an appropriate team for the size of her
12 account and, thinking back, I believe the Bill client
13 situation, the Bill client file was taken over by
14 another team. That's the best of my recollection.
15 Q. All right.
16 A. I think those files left our team.
17 Q. Okay. Do you know why the Bill file left your
18 team?
19 A. It was restructuring from above that various
20 accounts were reshuffled between teams.
21 Q. And the Naomi account, do you know why it was
22 moved?
23 A. I recollect the same reason.
24 Q. Was there any discussion that the Bill file and

Page 168

1  the Naomi file had to be moved because they weren't
2  being serviced properly?
3  A. No.
4        MS. WILSON: Mark this.
5        (Blozis Deposition Exhibit No. 6 was
6  marked for identification.)
7  BY MS. WILSON:
8  Q. Ms. Blozis, if you would look at what's been
9  marked as Blozis 6, please.
10 A. Yes. (Reviewing document).
11        I've read it.
12 Q. Have you seen what's been marked as Blozis 6
13 before today?
14 A. Yes.
15 Q. I gather you have seen the e-mail to you
16 from -- this is from Linda Blozis to Walter Peters?
17 A. It's my e-mail.
18 Q. Have you seen the handwritten pieces of it
19 before?
20 A. If I submitted it, then it was on the e-mails
21 that I submitted, I believe.
22 Q. Well, the handwritten meaning down at the
23 bottom "LB didn't try"?
24 A. I see where that is initialed by Bill Becker,

Page 169

1  yeah.
2  Q. But my question was: Have you seen this
3  document before with the handwriting on it at the
4  bottom?
5  A. I'm not sure at this time if I have.
6  Q. Now looking at your e-mail to Walter Peters.
7  A. Yes.
8  Q. Who is Walter Peters?
9  A. To my recollection, he was an analyst who would
10 have been applying tax costs to various CUSIP's of
11 different Dreyfus funds.
12 Q. Had he asked you for information, "he" meaning
13 Walter?
14 A. I don't recall that Walter asked me for
15 information.
16 Q. Did Bill Becker ever say to you that he was not
17 happy with how you had handled the matter with Walter
18 Peters?
19 A. Are you referring to the matter that this
20 e-mail references?
21 Q. Yes, I am.
22 A. I don't recall that Bill specifically pointed
23 out that particular client that is stated here. I
24 don't recall.