| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 170

1  Q. Looking at the handwriting that says, "Greg -
2  Here are numbers," it's right below the printing.
3  A. Yes.
4  Q. Is that your handwriting?
5  A. Yes. I believe. Yes.
6  Q. And just looking at what it says, are you
7  asking Greg -- and that's Greg Landis?
8  A. Yes.
9  Q. Are you asking him to do something with respect
10 to this account?
11 A. To my understanding, yes.
12 Q. Now, did Greg ever say to you that he didn't
13 feel that that was what you should be asking him to
14 do; that you should be doing it yourself?
15 A. I don't recall that at this time.
16 Q. Did Bill Becker ever say to you that he felt
17 that you had asked Greg to do something that you
18 yourself should have done?
19 A. I don't recall.
20 Q. Did Bill Becker ever say to you with respect to
21 this account that it should have been done earlier?
22 A. On this particular client account?
23 Q. Yes.
24 A. I don't recall that.

Page 171

1  Q. Do you recall having any discussions regarding
2  this particular client account with Bill Becker?
3  A. Yes.
4  Q. And what do you recall?
5  A. This particular client lived in Naples and I --
6  Q. Florida?
7  A. Yes. And to the best of my recollection, that
8  client had moved from Pennsylvania to Naples, Florida.
9  Hence, as a resident there myself, we struck up a
10 rapport. On one of my visits, I visited with the
11 client, something that's not typically done by a
12 portfolio administrator, had lunch with them, listened
13 to their feelings about the account, working on good
14 customer and client relations and knowing my limits
15 and liabilities of my job performance took back the
16 information to the investment officer and reported
17 back to Bill Becker on what the client had said at our
18 meeting.
19 Q. But in terms of any dissatisfaction that Bill
20 may have had with you concerning this particular
21 client, do you recall him expressing anything to you
22 personally?
23 A. No, I do not at this time.
24 Q. With respect to Blozis 6, looking down at the

Page 172

1  part of Blozis 6 that has Bill Becker's, the BB by it
2  and information, did you ever go back to him and say
3  you disagreed with his characterization?
4  A. I don't recall at this time if I did. It would
5  seem a likelihood because I felt I had a good client
6  relationship with this particular client.
7  Q. So it's likely that you went back to him and
8  said, "I don't agree with what you said about it"?
9  A. I'm not sure at this time. It could have been.
10 Q. Now, you said before that with respect to this
11 particular client had moved from Pennsylvania to
12 Naples, Florida and that you're also a resident of
13 Naples, Florida.
14    When did you first become a resident of
15 Naples, Florida?
16 A. Not until after, a full-time resident not until
17 after I was dismissed from Mellon.
18 Q. But with respect to this client, that was
19 before you were dismissed?
20 A. Yes. I owned a property there and I would
21 visit the property and take the opportunity to visit
22 the client if it was beneficial to Mellon.
23 Q. When did you first own the property in Naples?
24 A. 1988.

Page 173

1  Q. Did you live at that property?
2  A. No, not full time.
3  Q. Part time?
4  A. I lived in Delaware and worked at Mellon.
5  Q. Did you go, was that your summer place?
6  A. No. It was a rental property.
7  Q. When you went down to Naples did you stay at
8  that property?
9  A. When I could, when there weren't tenants...
10 Q. Tenants there?
11 A. Yes.
12 Q. When you were working with Bill Becker, did you
13 have to complete forms called the automated investment
14 review? Are you familiar with that term?
15 A. To the best of my recollection, I believe you
16 may be talking about...
17 Q. Go ahead. I'm just looking for it. Go ahead.
18 A. A trust investment review.
19 Q. It could be.
20    (Blozis Deposition Exhibit No. 7 was
21 marked for identification.)
22 BY MS. WILSON:
23 Q. Are you finished?
24 A. Yes. I'm sorry.

44 (Pages 170 to 173)

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 174

1 Q. Mrs. Blozis, have you seen what's been marked
2 as Blozis 7 before today?
3 A. Yes. Well, to my recollection, this is
4 familiar with things that I would have seen.
5 Q. But in terms of whether you have seen this
6 particular one, you're not sure?
7 A. I'm not sure at this time if I have seen this
8 particular one.
9    The client name does sound familiar to me.
10 Q. And it's called an automated investment review
11 system?
12 A. Yes. I understand that.
13 Q. What is that?
14 A. These were periodic reports produced on each
15 and every client and their account. Some clients
16 having multiple clients as I recognize this name and
17 it would review basically the breakout of the
18 portfolio into categories of either the money market,
19 bond, stocks, the model mix, meaning whether it was
20 large, mid cap or small cap stock. And it was for the
21 investment officer to update that according to the
22 client's instructions or change of instructions
23 throughout the history of the account.
24 Q. Would you have anything to do with putting the

Page 175

1 information into the automated investment review
2 system?
3 A. Ultimately it was for the investment officer to
4 finalize the input of information, as you say, into
5 the works. It was the portfolio administrator, the
6 assistant's job to compile information to present to
7 him to make ultimate decisions of reallocation.
8 Q. On the right-hand side with the handwriting,
9 have you seen that before today?
10 A. I'm not sure that I have.
11 Q. Where it says, "LB - Inconsistent with
12 holdings. Now in a model" and it looks to be MPAM
13 Funds"?
14 A. Yes.
15 Q. Did you have any conversations with Becker
16 concerning this particular account and there being an
17 inconsistency?
18 A. I don't recall at this time.
19 Q. Now, with respect to when it says, "Now in a
20 model and MPAM Funds," do you know what that means?
21 A. That's an acronym for Mellon Private Asset
22 Management Funds, MPAM Funds.
23    And your question was?
24 Q. Where it says, "Now in a model and," as you

Page 176

1 say, "MPAM Funds," do you know what that's referring
2 to?
3 A. I have a recollection, yes.
4 Q. What's your recollection?
5 A. Mellon had various portfolio models that they
6 would oftentimes gear certain size relationships into
7 instead of a myriad upon thousands and thousands.
8 There were multiple accounts that fit certain model
9 portfolios.
10    And I would suspect that Becker is saying
11 this account was now in a model and holding Mellon
12 Private Asset Management Funds. I don't know, I don't
13 recollect at this time why, if he wrote this note why
14 he would have written this note.
15 Q. As you sit here today, you don't remember
16 having any conversations with him about this
17 particular fund and whether there was an inconsistency
18 with respect to holdings?
19 A. I can't say at this time not having more
20 information on this particular client.
21 Q. Do you recall having any conversations with
22 Becker, and not specific as to this client that we're
23 looking at, but any conversations with Becker
24 concerning inaccurate information on the automated

Page 177

1 investment review system?
2 A. Did I have conversations with Bill on any
3 client?
4 Q. Let me rephrase that for you to make it easier.
5    Did Bill Becker ever say to you that you
6 had provided inaccurate, incomplete, wrong information
7 as it related to information on the automated
8 investment review system reports?
9 A. That's a broad question. I don't recall him
10 criticizing my providing information because
11 information was derived from systems that were
12 available to me. So I don't understand how you're
13 saying did he -- did we have conversations about wrong
14 information provided?
15    You could punch in a client's name and get
16 information. You could punch in a model request and
17 get that information. So it's broad. I don't quite
18 understand.
19 Q. Let me see if I have a better example.
20    (Blozis Deposition Exhibit No. 8 was
21 marked for identification.)
22    THE WITNESS: Are you waiting for me to
23 say I see this?
24 BY MS. WILSON:

45 (Pages 174 to 177)

Case 1:05-cv-00891-SLR    Document 28-6    Filed 11/21/2006    Page 3 of 11

Blozis                                  v.                  Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1        C.A. # 05-891 (SLR)                    July 26, 2006

Page 178

1  Q. Yes.
2  A. I see this.
3  Q. Have you seen Blozis 8 before today?
4  A. This looks consistent with the automated
5  investment review system sheets that I would have seen
6  many. I can't say specifically at this time that I
7  have seen the one that's referring to this particular
8  client.
9  Q. It says, "Recode to '5'" on the right-hand
10 side?
11 A. Yes.
12 Q. "Balance Growth/Income"?
13 A. Yes.
14 Q. Do you know what that refers to?
15 A. It would have been to the best of my
16 recollection Bill Becker's instruction that upon
17 seeing this review to change the status of this
18 account to a coding of 5 in a mix of balanced growth
19 and income.
20 Q. Looking at the investment objective and it says
21 investment objective 007 growth, would that be where
22 you would recode it?
23 A. Yes. I'm thinking about this.
24     MR. LaROSA: Take your time.

Page 179

1  A. To the best of my recollection, yes, that would
2  be where it would be changed.
3  Q. But in terms of Blozis 8, I believe it's your
4  testimony that sitting here today you don't have a
5  specific recollection of this document?
6  A. Specifically seeing this? When you manage,
7  when you're responsible for over or between three and
8  500 accounts and that at the end of my employ accounts
9  were in a state of flux going back and forth between
10 teams, this specific document I can't perfectly say
11 that these were instructions that Bill gave to me
12 personally.
13 Q. All right. In terms of the investment
14 objective changing and recoding it to another number,
15 would that have been something that was your
16 responsibility to do on your own?
17 A. I don't recall at that time if the assistants
18 could recode, take it to a completion. To the best of
19 my recollection, we could have punched in the code,
20 but it was the investment officer's responsibility to,
21 in essence, throw the switch because that was the
22 finalization of the investment officer's review.
23     We could do the numbers, but the decision-
24 making was not left to the assistants.

Page 180

1  Q. So if I understand you correctly, Ms. Blozis,
2  the final determination of whether something should be
3  recoded or not was not left to the portfolio
4  administrators to do?
5  A. The assistants. The assistants. The portfolio
6  administrating assistants, not to be confused with the
7  name of portfolio administrator which was given to
8  trust officers at some point in time.
9      Yes, you're correct in assuming that the
10 decision to change the coding was not left up to
11 either an investment assistant, portfolio assistant or
12 a trust assistant.
13 Q. Did Mr. Becker ever say to you that he wanted
14 you to be in a position to analyze data on the
15 automated investment review system and recode, give
16 him suggestions to recode, if necessary?
17 A. I recollect that there may have been
18 discussions about the job evolving. I'm not sure at
19 this time.
20 Q. During the time that you were working with
21 Mr. Becker do you remember doing any recoding on your
22 own?
23 A. Recoding? We're talking about decision-making.
24 I could never do a decision, I never did

Page 181

1  decision-making on my own. The investment officer
2  always had to direct or instruct the assistants to do
3  that.
4  Q. By that recoding would never be something you
5  would say, for example, I'm looking at this; I think
6  it should be recoded to a different number; I'm going
7  to do it? That would not be something that you would
8  just do on your own?
9  A. If I understand you correctly, it would never
10 be something I would just -- the capability wasn't
11 there for an assistant to recode. It always -- there
12 was a system of checks and balances whereby investment
13 officers were responsible for the ultimate decisions
14 on the accounts.
15 Q. With respect to the automated investment review
16 system sheets, did Mr. Becker want you to provide any
17 analysis to him concerning the information that you
18 were pulling?
19 A. I don't recall specifically at this time that
20 he did.
21 Q. Looking down, for example, on Blozis 8 under
22 the title Investment Policy, there's an 026 written
23 there.
24     Do you know what that means?

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1   C.A. # 05-891 (SLR)   July 26, 2006

Page 182

1  A. At this time I don't recall those numbers, what
2  they mean.
3  Q. As well as 025 you don't recall?
4  A. I do not recall at this time.
5  Q. And Dreyfus it looks like NJ muni fund sold.
6     Do you know what that means?
7  A. As I recall, it would mean that Dreyfus New
8  Jersey municipal fund was sold out of this account.
9  Q. So that should just be notes concerning the
10 account?
11 A. And those notes would have been written by Bill
12 Becker if, in fact, he signed.
13 Q. It would not be written by you?
14 A. No. Oh, no. That's not my handwriting.
15 Q. While you were employed and working with Bill
16 were you given a project of completing the security
17 list of holders?
18 A. Could you be more specific?
19 Q. Have you heard of the term security list of
20 holders?
21 A. At this time it sounds vaguely familiar. I'm
22 not sure.
23 Q. You're not sure.
24     (Blozis Deposition Exhibit No. 9 was

Page 183

1  marked for identification.)
2     MR. LaROSA: Are all of these copies
3  redacted or was there an unredacted version of this?
4     MS. WILSON: The unredacted has the top
5  four, five taken out. I think what you're seeing
6  there is probably not redacted but probably
7  highlighted.
8     MR. LaROSA: Okay. Okay.
9     THE WITNESS: I've looked at these.
10 BY MS. WILSON:
11 Q. When I was referring to the security list of
12 holders, I was referring to what that says, what
13 Blozis 9 says at the top.
14 A. There's several things written there. What are
15 you referring to?
16 Q. Right here (indicating).
17 A. The security list of holders? I see this
18 sheet, yes.
19 Q. Is that the name of this sheet or it has
20 another name?
21 A. I wouldn't know if it has another name. It's
22 what it says at the top of this sheet.
23 Q. Have you seen Blozis 9 before?
24 A. I'm not sure at this time. I recognize some

Page 184

1  accounts that were at one time on the Delaware team on
2  this sheet that aren't darkened out.
3  Q. And were you at any point asked to put this
4  particular sheet together?
5  A. I don't recall that, I was asked to put a sheet
6  together.
7  Q. Looking at the right-hand side handwriting,
8  have you seen that before today?
9  A. I don't recall at this time.
10 Q. Do you recall whether there were any
11 discussions with Becker about putting information
12 together for I guess the security list of holders?
13 A. I don't recall specific discussions.
14 Q. During the time that you were working with
15 Mr. Becker did he ever complain to you that you had
16 put wrong information on asset allocation risk profile
17 questionnaires?
18 A. Not to my recollection.
19 Q. You're familiar with the asset allocation risk
20 profile questionnaires?
21 A. I vaguely remember those, yes.
22 Q. Would those questionnaires have been something
23 that you would have pulled?
24 A. They were, they were periodic reviews of...

Page 185

1  Q. Go ahead. I'm listening.
2  A. I'm thinking.
3     Periodic reviews of clients' portfolios.
4     (Blozis Deposition Exhibit No. 10 was
5  marked for identification.)
6     THE WITNESS: I've seen Exhibit 10.
7  BY MS. WILSON:
8  Q. Now, you have seen it before today?
9  A. I don't recollect specifically at this time.
10 Q. Is your handwriting on any portion of Blozis
11 10?
12 A. The numbering looks similar to my handwriting.
13 I don't see my initials on this page anyplace though.
14 Q. The asset allocation risk profile
15 questionnaire, could you tell me for what purpose you
16 would provide this information?
17 A. As I said, these were periodic reviews of
18 clients' portfolios, their asset allocation.
19 Q. When you say, "periodic," it would be something
20 that you would do on some sort of regular basis for
21 all of the clients?
22 A. Yes.
23 Q. And would Becker ask you to do it on specific
24 clients at a specific time?

47 (Pages 182 to 185)

Case 1:05-cv-00891-SLR    Document 28-6    Filed 11/21/2006    Page 5 of 11

Blozis                                              v.                          Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1                C.A. # 05-891 (SLR)                    July 26, 2006

Page 186

1  A. He wouldn't ask.
2  Q. It would be something that was on your agenda
3  to do?
4  A. These would be automatically produced by the
5  company.
6  Q. When you say, "automatically produced," what do
7  you mean?
8  A. They would come up on a regular schedule of
9  frequency for review based on the size or the holdings
10 in the account.
11 Q. So the frequency of the review was something
12 that was prompted by the company?
13 A. Yes.
14 Q. And then when it came up for time of review,
15 then you would run the questionnaire?
16 A. Yes. Or something that Mellon referred to
17 either as a PORCH or a listing of the holdings.
18 Q. I have heard the term PORCH before. P-O-R-C-H?
19 A. Yes.
20 Q. What is that?
21 A. It's a compilation that Mellon had, to the best
22 of my recollection that Mellon had of all the assets
23 held within a particular account and to the best of my
24 recollection how those holdings fared between reviews.

Page 187

1  Q. If I'm understanding the process, with respect
2  to the accounts that you were assigned to when it came
3  time to do the questionnaire as dictated by Mellon's
4  policy you would fill in the information?
5  A. More exact, I would check the previous review.
6  This sheet would be handed to an investment assistant
7  blank. The investment assistant would then or at
8  least I would fill in numbers based on the previous
9  review. And it would be for the investment officer --
10 looking at this account, it's a $5 million account.
11 That definitely is something that the decision-making
12 process was going to be done by Mr. Becker.
13 Q. Because of the amount of the account?
14 A. Absolutely.
15 Q. When you say because of the size of the account
16 it's definitely something Becker would have to review,
17 was there any amount that didn't have to be reviewed
18 by him?
19 A. No. The investment officer always had to look
20 at the reviews, always had to review the allocation
21 profile.
22 Q. Okay. And --
23 A. I referenced this because of the importance of
24 the size of this account. It should be more carefully

Page 188

1  looked at by the investment officer.
2  Q. Meaning the information that you provided?
3  A. What information are you referring to?
4  Q. The numbers.
5  A. The numbers that would have come from
6  information gathered by me and put onto a risk profile
7  questionnaire.
8  Q. And looking at the numbers on the right-hand
9  side where there's 2's and then there's the total down
10 there, do you see where I am?
11 A. Yes.
12 Q. Did you put in the 2's and the total?
13 A. This could have been -- I have no way of
14 knowing for sure that this is --
15 Q. What you did?
16 A. -- what I did. It's not initialed. But it
17 would seem consistent that an assistant, a portfolio
18 assistant would list numbers, maybe taken from a
19 previous review and what it was prior to a change in
20 the market, and the officer would go and subsequently
21 reallocate or consistently stay with a preceding
22 review.
23 Q. Ms. Blozis, you referred to portfolio
24 assistant. Is that different from portfolio

Page 189

1  administrator?
2  A. Titles in Mellon seemed to be changing every
3  other month. A portfolio administrator to the best of
4  my recollection was synonymous with an assistant. I
5  can't recall at this time what the trust officers were
6  called when I last was employed with Mellon.
7  Q. Because I have been going under the assumption
8  that around 1999 until the time you left your title
9  was portfolio administrator.
10 A. I understand that thinking back and portfolio
11 administrating assistant. But I also recollect that
12 the officer, Greg Landis specifically, was called a
13 portfolio, I believe portfolio administrating officer.
14    But in the terms of this context, you're
15 talking about my position.
16 Q. Right.
17 A. And I agree, yes.
18 Q. With respect to Blozis 10, I believe it's your
19 testimony -- you're looking at Blozis 10 -- you don't
20 know whether you put in the 2's or not?
21 A. At this time I would say it looks consistent
22 with my handwriting, but I wouldn't attest to that
23 absolutely.
24 Q. And then I see that the 2's have a strike

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 190

1  through them and next on the right-hand side of the
2  2's there's a line of 1's going down and then it looks
3  like the total has been struck out with another total
4  to the right of it.
5      Is that your striking out or do you know?
6  A. At this time I'm not sure if it is or if it was
7  Becker's, as I said, if this was my handwriting.
8  Q. So the normal process would be you would
9  complete information on the questionnaire, then hand
10 it to Becker for review?
11 A. I said before it was the assistant's
12 responsibility to prepare the paperwork by checking a
13 previous review, inserting numbers that the investment
14 officer may or may not comply with or change based on
15 the market fluctuations, based on the client's desire
16 to reallocate funds.
17 Q. Did you have any discussions with Mr. Becker
18 that he was not pleased with your handling of the
19 profile questionnaires?
20 A. Not that I recall at this specific time.
21 Q. At any point?
22 A. That's a broad question. Could you be more
23 specific?
24 Q. Well, at any point while you were employed at

Page 191

1  Mellon did you have any conversations with Mr. Becker
2  in which he stated that he was not happy with how you
3  were completing the asset allocation risk profile
4  questionnaires?
5  A. I recollect that as Bill was in a flux of
6  change from one position to another he was, he was
7  instructing me to ultimately do more for him so that
8  he could make the transition to another, to become a
9  team leader. My concern was that the duties were
10 going to encompass responsibilities for which the
11 liability was not, the liability was something that my
12 level of position should not have been responsible for
13 as described in my job description.
14 Q. Did you go back to him -- I understand your
15 answer. I just wanted to make sure that you actually
16 answer the question that I had asked relating to the
17 risk profile questionnaires, whether he had ever said
18 to you, and I'm paraphrasing just generally, Linda, I
19 don't like how you're doing the work on this; you put
20 in wrong numbers or --
21 A. I don't recall him ever saying wrong numbers.
22 My recollection is that from his advancement
23 aspirations he was hoping that I would take some of
24 the burden from him and from my aspect it was

Page 192

1  responsibilities that were not indigenous to my job
2  description.
3  Q. Was that in connection with the questionnaire
4  so that he wanted not to have to review it; he wanted
5  you to give it to him and it's going to be the final
6  product, so to speak?
7  A. To the best of my recollection, that's pretty
8  close to what my interpretation was of his attitude
9  and feelings.
10 Q. And you felt that in your position that he was
11 asking too much of you with respect to what your job
12 title was and you were concerned about certain
13 liability issues?
14 A. I was concerned about liability issues.
15 Q. And did you tell him that?
16 A. I don't specifically stating "Bill, I'm
17 concerned about liability issues."
18     I think there was an implied understanding
19 of concern about my feelings.
20 Q. That would have been because of the way you
21 discussed it with him?
22 A. As I recollect that to be the case, yes.
23 Q. Did he agree with you?
24 A. I don't understand did he agree with me.

Page 193

1  Q. Well, did he say when you were -- I guess as
2  you said, Ms. Blozis, you never said, "Bill, I'm
3  concerned about liability issues here," but probably
4  in the way you described it led him to believe that
5  that's what you were concerned about.
6     Did he say Linda, yeah, I know you got
7  these liability concerns, but they're really not real
8  or just do it? That's what I meant.
9  A. I don't recollect his agreement at this time.
10 He was on a career aspiration fast track.
11 Q. Do you know whether -- I guess this is 2002
12 time frame just looking at the date, December 2002.
13     Were there other project managers -- I'm
14 sorry -- portfolio administrators in the Philadelphia
15 office?
16 A. You mean portfolio administrative assistants in
17 the 2002?
18 Q. Yes.
19 A. Yes, there were.
20 Q. In sort of the team, the Delaware --
21 A. In all teams there were.
22 Q. Do you know whether Bill was asking them to
23 provide him with sort of what we have been terming as
24 sort of the final product with respect to the asset

49 (Pages 190 to 193)

Blozis                                  v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1         C.A. # 05-891 (SLR)              July 26, 2006

Page 194

1  allocation risk profile questionnaires?
2  A. I have no absolute knowledge of that at this
3  time.
4  Q. You had mentioned the PORCH. I guess that's an
5  analysis?
6  A. To the best of my recollection, yes.
7  Q. Were you ever asked to put one of those
8  together?
9  A. I'm not an analyst. I was never an analyst.
10  Q. Were you ever asked to provide information
11  having to do with the PORCH?
12  A. My recollection is that the administrative
13  assistants would run a PORCH. You would key in
14  numbers on a client. You would get that information
15  produced to the best of my recollection or have them
16  sent from the department that produced those and you
17  would assemble that information for the investment
18  officers.
19  Q. Was there ever any conversation that you had
20  with, say, Mr. Becker or Mr. Landis or Mr. Gilmore
21  that you hadn't provided information in connection
22  with the PORCH?
23  A. Not to my recollection at this time.
24  Q. When you were reporting to Mr. Becker, did he

Page 195

1  ever complain that you had provided incorrect
2  information on single bond buy sheets?
3  A. I don't recall that at this time.
4  Q. You have heard of single bond buy sheets?
5  A. I'm not sure I recollect those.
6         (Blozis Deposition Exhibit No. 11 was
7  marked for identification.)
8         THE WITNESS: I've seen this exhibit.
9  BY MS. WILSON:
10  Q. Have you seen it before today?
11  A. I don't recall specifically if I have or have
12  not. I will admit that I recognize the name of the
13  client attached thereto.
14  Q. This is what I was referring to when I said
15  single bond buy sheets.
16        Would this be a sheet that you would put
17  together?
18  A. No.
19  Q. Would you run information concerning the
20  client?
21  A. To the best of my recollection, this would be a
22  sheet that would have been produced upon the
23  instruction of the investment officer or even his own,
24  by his own hand to, as I recollect, buy a bond for a

Page 196

1  particular client or account.
2  Q. So it's my understanding, Ms. Blozis, you would
3  not have anything to do with running the sheet or
4  obtaining the information?
5  A. The assistant may have been told or instructed
6  by the investment officer to put through or
7  initiate -- let me be succinct.
8         To input the data to purchase the bond.
9  It was never ultimately completed without the
10  investment officer approving it. And I'm looking at
11  the way it says order number added. An officer would
12  have, to the best of my remembrance an officer would
13  have had to okay this buy for this amount of money in
14  order to produce that number, that order number on the
15  lower left side.
16  Q. Do you remember having any discussions with
17  Mr. Becker concerning this particular single bond buy
18  sheet as it relates to it looks like a hospital
19  client?
20  A. Not to my knowledge at this time.
21  Q. I'm just looking at where it says par value
22  800,000, there's a circle and then a line and it looks
23  to be that he's saying it should be 400,000.
24  A. "Per attached" it says.

Page 197

1         Where is the attachment?
2  Q. Let me just ask you this question: Do you
3  remember having any conversations with him about the
4  par value being something other than 800,000?
5  A. In reference to this client?
6  Q. Yes.
7  A. I don't recollect.
8  Q. Do you remember having any discussions with
9  Mr. Becker about his, about not being attentive to
10  detail as it relates to the single bond buy sheets?
11  A. Not at this time, no, I don't.
12  Q. Do you remember having any conversations with
13  Mr. Becker, and it's more expansive than Blozis 11,
14  but do you remember having any discussions with
15  Mr. Becker about his view that you were not being
16  attentive to detail with respect to your work?
17  A. My only recollection is the December review, I
18  think. I'm not sure at this time.
19  Q. So you recall it coming up at the December
20  review, but prior to the review you don't remember?
21  A. That's correct.
22  Q. Prior to your review in December -- I guess
23  actually it was January 27, '03, right, your next
24  review?

Page 198

1    A. To the best of my memory.
2    Q. Prior to that review, we'll call it the '03
3  review, did Mr. Becker complain to you that he thought
4  you weren't following instructions as it related to
5  customer files?
6    A. To my recollection, Bill and I were having
7  fewer and fewer communications based on his transition
8  from the senior investment officer in Delaware to the
9  new team.
10   Q. But do you remember him raising that with you,
11 that issue, failure to follow instructions concerning
12 client files?
13   A. Specifically, no, I do not remember.
14   Q. Turn back to Blozis 10.
15      Do you recall getting any asset allocation
16 risk profile questionnaires back from Mr. Becker with
17 any comments on it?
18   A. Not at this time, no, I don't recall.
19   Q. You don't recall that.
20      Do you recall having any discussions with
21 him concerning the asset allocation risk profile
22 questionnaires in which he would say, for example,
23 Linda, you gave me this; I thought the code should
24 have been different or there was information on it

Page 199

1  that I thought was incorrect?
2    A. What's your question, please?
3       MS. WILSON: Can you please repeat it?
4       (The reporter read back the last
5  question.)
6       THE WITNESS: At this time, no, I don't
7  recall.
8       (Blozis Deposition Exhibit No. 12 was
9  marked for identification.)
10      THE WITNESS: I've reviewed Exhibit 12.
11 BY MS. WILSON:
12   Q. Have you seen Exhibit 12 before today?
13   A. I have a recollection of an exchange between
14 Fredric Levine on a matter. I'm not sure I recollect
15 it was this account number.
16      That's my answer.
17   Q. All right. Do you remember having any
18 discussions with Mr. Becker about this particular
19 account?
20   A. Discussions would imply face to face. As I
21 recollect, on December 9th Bill Becker was spending
22 more and more time in Philadelphia. Communications
23 were reduced to telephone calls or e-mails.
24      This appears to be a response e-mail from

Page 200

1  me printed from Bill Becker's PC where I state that
2  this is the first I've seen the notification and, if
3  memory serves, I believe I provided information about
4  correspondence with Fredric Levine, who was to my
5  recollection a mutual fund analyst, but I'm not sure
6  at this time if it was in reference to this account
7  number. It doesn't mention a name tied to that
8  account number.
9    Q. Do you remember seeing the handwritten portion
10 of Blozis 12 before today?
11   A. No, I do not recall seeing the handwritten. I
12 have no way of knowing at what time or what date those
13 instructions were written.
14   Q. Did you have any discussions with Mr. Becker
15 about this particular account overdraft and that's
16 referenced in Blozis 12 in which he stated that he
17 felt you were inattentive to detail and didn't follow
18 instructions?
19   A. No, I did not.
20   Q. Have you heard of an investment review sheet or
21 form?
22   A. That sounds familiar, yes.
23   Q. Did you have any responsibility of pulling
24 those forms?

Page 201

1    A. To my recollection, the investment review forms
2  was the original name of the automated review systems
3  or risk questionnaire forms.
4    Q. Was it similar to Blozis 10 when you say risk
5  questionnaires?
6    A. To the best of my memory, they were the
7  predecessor of those forms.
8    Q. Did you ever have any discussions with
9  Mr. Becker in which he felt that you had provided
10 incorrect information on the investment review forms?
11   A. Not at this time, no, I don't have a
12 recollection.
13   Q. When I say discussions, I'm meaning it more
14 broadly than face to face. I mean it in terms of a
15 telephone call, e-mail exchange, paper exchange.
16   A. I still feel your question is very broad. I
17 can't say specifically at this time that there were
18 discussions that Bill said I provided incorrect
19 information.
20   Q. Meaning you don't remember either way?
21   A. At this time I don't remember either way.
22   Q. Was there ever any discussions with Mr. Becker
23 and yourself concerning putting together a stale price
24 report?

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 202

1  A. That sounds vaguely familiar, yes.
2  Q. Was there ever any discussions with Mr. Becker
3  about you not putting together the stale price report
4  on time?
5  A. I recall discussing or talking or communicating
6  with Bill somewhat about what I recollect to be a
7  stale pricing report.
8  Q. And what do you recall?
9  A. Not very much at this time.
10 Q. Do you recall whether he was upset or concerned
11 about not having it?
12 A. My recollections at this time was another
13 instance of a project that was forced on me because
14 either Bill Becker or Greg Landis or predecessor
15 investment officers did not complete a pricing report
16 that was becoming very stale dated and they looked to
17 Linda to put the blame. That's my recollection at
18 this time.
19 Q. And who had asked you to put it together?
20 A. I recall that initially it was Bill Becker and
21 then Greg Landis.
22 Q. The way that you characterized that piece of it
23 earlier sounded like it was your view that it should
24 have been done some time ago by other people, Becker,

Page 203

1  Landis or predecessor investment officers?
2  A. That's what I -- yes.
3  Q. I think you had said it was kind of dumped on
4  you or you felt it was dumped on you.
5  A. Yes.
6  Q. And why do you feel when you use -- I may be
7  paraphrasing, but it sounded like that's what you were
8  saying, that you just felt give it to Linda to do
9  because we haven't done it type of an approach.
10 A. To my recollection, that's what I recall that
11 happened with the stale pricing report.
12 Q. Did you at any point say, I shouldn't be doing
13 this or someone else should have done it some time
14 ago?
15 A. I recollect that I mentioned that in a
16 non-assertive way but distinct way to both of them,
17 but at the time did not protest vehemently because I
18 was concerned about my job.
19 Q. And you brought it up to Becker and Landis?
20 A. Yes. As I recollect, yes.
21 Q. And what did they say?
22 A. As I recall, they said it essentially was on my
23 shoulders now to do.
24 Q. Did you complete that project?

Page 204

1  A. To the best of my recall, I did not when I left
2  Mellon.
3  Q. Do you recall having any discussions with Bill
4  Becker concerning putting together books for a client
5  with the last name Fox?
6  A. We would have talked about preparations for
7  that particular client, family, yes.
8  Q. And was there any discussion that Becker felt
9  that you hadn't put together the books?
10 A. I don't recall at this time.
11 Q. Do you recall there being any discussion about
12 your performance on the Fox account?
13 A. To my recollection, Bill was working out of the
14 Philadelphia office. The Philadelphia office had
15 superior facilities to obtain information on high-end
16 clients.
17      I recollect he was working with a young
18 lady of Oriental extraction. I don't recall her name.
19      Jin Song was her name and she would
20 produce a lot of that information for Bill or compile
21 for Bill while he was in Philadelphia.
22 Q. Do you recall any discussion that you were
23 supposed to be compiling information or putting
24 together books that you hadn't completed, hadn't done?

Page 205

1  A. Discussion? I don't recall specific -- in
2  trying to recollect those last months when Bill was in
3  a state of flux, it was not always made clear what
4  files or accounts he was working on, which ones would
5  be taken over in the transition period by Brendan
6  Gilmore and essentially who was doing what job. If a
7  booklet was sent to me to assemble, I assembled the
8  booklet.
9  Q. So based on your recollection, Ms. Blozis,
10 there was not an issue concerning the assemblage of
11 books for the Fox account?
12 A. Not to the regard that it jeopardized the
13 client's status that I can recall at this time.
14 Q. Not going to the extent that it jeopardized the
15 client's status, but was there ever any communication
16 or discussion that books hadn't been put together for
17 the Fox account?
18 A. I believe towards the last months of my employ
19 that Bill while he was still in a somewhat supervisory
20 position he was becoming critical of my assemblage of
21 client review booklets, unfoundedly, unfoundedly.
22 Q. And you believe Fox was one of them?
23 A. It could have been, yes.
24 Q. When you say, "unfoundedly," why do you say it

52 (Pages 202 to 205)

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 206

1 was unfounded?
2 A. As I previously stated, he was in a state of
3 flux between wrapping up or what would appear to be
4 wrapping up his involvement with accounts that were
5 part of our team and then moving on to his position as
6 a team leader and he was more and more frequently
7 working in Philadelphia with better facilities to his
8 avail and it wasn't always made perfectly clear where
9 responsibilities began and ended as far as assistance
10 was concerned.
11 Q. So to paraphrase, you felt that because he was
12 in a state of flux that it wasn't always clear what
13 you should be doing and what he wanted you to do for
14 particular accounts?
15 A. My recollection is yes, that it wasn't always
16 clear.
17 Q. Did you ever say that to Bill?
18 A. I recollect I did.
19 Q. And what did he say?
20 A. I don't recall specifically what he answered,
21 but I don't seem to recall getting a defined
22 definition of where the duties began and ended with
23 the Delaware support team.
24 Q. During the period that you reported to Bill

Page 207

1 Becker, did he ever raise any issues with respect to
2 your performance on the Lickle, L-i-c-k-l-e, account?
3 A. Let me think about that name.
4      I don't recall a specific.
5 Q. You don't recall the Lickle account?
6 A. I recall the Lickle name. I don't recall
7 specific discussions or criticisms from Bill.
8 Q. Do you recall any criticisms on Lickle by
9 Landis or Gilmore?
10 A. No, not specifically.
11 Q. Before we took our break and maybe afterwards
12 we had gone through the reasons why you felt that
13 Gilmore had acted in a way that was discriminatory
14 because of age and gender and you gave me a list of
15 reasons.
16      Do you recall that?
17 A. Repeat your question. Before or after the
18 break we --
19 Q. During the course of your testimony today you
20 had given a list of reasons why you thought Gilmore
21 had acted in a way that was discriminatory because of
22 your age and your gender.
23 A. I recall us talking about that.
24 Q. I want to ask you the same question having to

Page 208

1 do with Becker.
2      First of all, let me ask you do you feel
3 that Bill Becker acted in a way that was
4 discriminatory towards you because of your age?
5 A. Yes.
6 Q. And because of your gender?
7 A. Yes.
8 Q. Let's start with age.
9      Can you give me the reasons why you feel
10 that Bill Becker was acting discriminatory against you
11 because of your age?
12 A. I can't give you specific reasons at this time.
13 I can only state that from my recollection when I
14 first worked for Bill in the early months and years he
15 seemed to be very satisfied with my employment and my
16 performance and especially after Kathleen Agne's
17 dismissal I felt that they were very appreciative of
18 all of the extra effort I was putting forth because I
19 was doing double duty. And it evolved to a point
20 where I didn't understand Bill's change in attitude
21 and criticism of my work.
22      And all I could determine was that he
23 became a pawn for Brendan Gilmore's plan to dismiss
24 the last surviving, to quote his own word, the

Page 209

1 survivor of the original team. So I could only
2 conclude that it was discrimination against me as far
3 as age and gender.
4 Q. With respect to Becker, did you ever hear him
5 make any comments that you considered to be
6 anti-older-worker related?
7 A. I don't recall at this time.
8 Q. What about anti-woman comments?
9 A. Towards?
10 Q. Towards you or anyone else.
11 A. Not towards me at this time, but there might
12 have been instances when comments were made about
13 older women in the Philadelphia office.
14 Q. By Bill?
15 A. As I recollect, perhaps, yes.
16 Q. What do you remember?
17 A. Nothing specific at this time.
18 Q. Were those comments that you overheard or
19 comments that people told you about?
20 A. I'm not sure at this time if they were either.
21 Q. You're not sure what they were in terms of
22 older women in Philadelphia?
23 A. I'm not sure.
24 Q. Do you remember whether he used the words older

53 (Pages 206 to 209)

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 210

1  women?
2  A. I don't believe he -- I don't recollect him
3  using older women, but if a name was mentioned
4  everyone was aware of that person's age or status
5  within the company as far as years in.
6  Q. But you don't remember specifically what it
7  was?
8  A. Not at this time.
9  Q. Do you remember the time?
10 A. Meaning time of day, time of year?
11 Q. The time frame in which -- I understand you
12 said you don't remember.
13 A. Not specifically, no.
14 Q. I didn't ask you about Gilmore. Did you ever
15 hear him make any anti-women comments?
16 A. At this time I don't recollect.
17 Q. Do you feel that Becker started to be more
18 critical of your job performance when he was trying to
19 move on to get his own team?
20 A. Yes.
21 Q. Did you ever hear Becker and Gilmore have any
22 discussions about getting rid of the older employees?
23 A. No.
24 Q. Or getting rid of you?

Page 211

1  A. Did I hear, overhear discussions?
2  Q. Yes.
3  A. I can't say at this time that I heard specific
4  discussions, no.
5  Q. I know we haven't talked about the period of
6  time that you started working with Landis, but while
7  we're on it I want to sort of finish this out.
8     With respect to Greg Landis, are you
9  claiming that Greg Landis acted in a way that was
10 discriminatory towards you because of your age or
11 gender?
12 A. I recollect that Greg was also acting on behalf
13 of Brendan Gilmore to subsequently get me dismissed.
14 Q. When you say that, is that similar to what you
15 were saying with Bill and that you felt that Greg like
16 Bill was acting as a pawn for Gilmore?
17 A. Yes.
18 Q. And you felt that was because of your age?
19 A. Yes.
20 Q. And because of your gender?
21 A. Yes.
22 Q. Did Greg Landis ever make any comments that you
23 felt to be anti-age comments, either to you or to
24 others?

Page 212

1  A. I don't recall at this time.
2  Q. What about anti-women comments to you or to
3  others?
4  A. I don't recall at this time.
5  Q. And did you ever hear any discussions between
6  Greg or Becker or Gilmore in which they were talking
7  about getting you out of the company?
8  A. I didn't hear specific discussions. They would
9  meet frequently behind closed doors.
10 Q. And because they were behind closed doors, you
11 don't know what they were talking about, correct?
12 A. Correct.
13 Q. Now, I've asked you about Becker, Gilmore and
14 Landis as it relates to age discrimination and sex
15 discrimination, sex or gender discrimination.
16    Were there others at Mellon that you're
17 claiming also engaged in age discrimination and sex
18 discrimination against you?
19 A. Specifically, I don't recall naming others than
20 Gilmore, Becker or Landis at this time.
21 Q. Is it those three?
22 A. Mm-hmm.
23 Q. Now, with respect to your employment,
24 Ms. Blozis, did you ever keep a diary of events?

Page 213

1  A. A diary?
2  Q. Right. In terms of a day, you write in today
3  met with Gilmore?
4  A. For what purpose?
5  Q. Any purpose. Some people keep diaries or
6  Day-Timers of things that happened every day on the
7  job.
8  A. My recollection is that if we discussed client
9  situations that notations might have been put in a
10 file or ticklers created as I recall to bring up
11 discussions or topics necessary for the client.
12 Q. So it would be client-related information that
13 you would be memorializing?
14 A. I wouldn't say memorializing. I would say
15 documenting or...
16 Q. I was thinking more in terms of some people --
17 for example, looking at Blozis 4, you made a little
18 note at the bottom that you spoke to Rosemary on a
19 particular day. Some people instead of putting it on
20 the bottom of something will put it in an actual
21 calendar or a Day-Timer of that nature.
22    Did you keep one of those while you were
23 employed?
24 A. I didn't keep a specific diary.

54 (Pages 210 to 213)