# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LINDA J. BLOZIS | : CIVIL ACTION NO. 05-891 (SLR) |
| Plaintiff, | : |
| vs. | : DECLARATION OF ROSEMARY THOMAS |
| MELLON TRUST OF DELAWARE, NATIONAL ASSOCIATION; MELLON BANK, NATIONAL ASSOCIATION; MELLON FINANCIAL CORPORATION, | : |
| Defendants. | : |

I, Rosemary Thomas, of full age, hereby certify and declare as follows based upon my own personal knowledge and information.

1. I began working for Mellon in approximately 1979. I am currently employed as Senior Human Resources Business Partner for Mellon. My client area is Private Wealth Management for the Mid-Atlantic Region. I provided human resources support to the group in which Ms. Blozis was assigned during the relevant time period. During the relevant time period, Ms. Blozis was assigned to Mr. Gilmore's team. I have been authorized by Mellon to make this Declaration in support of its Motion for Summary Judgment in the above-captioned matter.

2. Mellon provides a broad range of financial products and services for corporations and institutions such as investment management, trust and custody, foreign exchange, securities lending, performance analytics, fund administration, stock transfer, proxy solicitation, treasury management and banking services to affluent

individuals and trust and custody. One of the Mellon subsidiaries in the Private Wealth Management business is Mellon Trust of Delaware, National Association.

3.  The composition of Mr. Gilmore's Team changed over time in the Delaware and Philadelphia offices. For example, in 1998, the Delaware office consisted of Mr. Robert Bell, Assistant Portfolio Officer, Linda Squier, Portfolio Officer, Kathleen Agne, Portfolio Administrator, and William Becker, Portfolio Officer. Additionally, the other members located in the Philadelphia office were Hilda Ennis, Investment Specialist I, Deanna Coffin, Executive Secretary, Marian Marano, Portfolio Administrator, Bridget Vargo, Portfolio Officer, whose date of birth is November 4, 1969. Cindy Chambliss, Portfolio Administrator, whose date of birth is October 9, 1967 also reported to Mr. Gilmore in 1998. Mr. Bruce Holmquist, Portfolio Officer, whose date of birth is September 6, 1952 worked out of the Washington, D.C. office in 1998.

4.  Changes in personnel continued in the Delaware and Philadelphia offices. As non exclusive examples, Ms. Blozis joined in 1999; Ms. Vargo left in 2002; and Mr. Holmquist, Ms. Chambliss and Ms. Marano were still employed in 2003.

5.  Ms. Blozis, whose date of birth is December 10, 1945, was hired to work at Mellon Trust of Delaware on February 12, 1990 as an administrative secretary. She held several positions in the Mellon Private Asset Management group, located in Delaware with her last position being Portfolio Administrator. She started in this position on October 1, 1999 and remained in this position until her employment was terminated on July 19, 2003. During her tenure of employment with Mellon, Ms. Blozis was assigned only to work in the Delaware office and never worked in the Philadelphia or

Washington, D.C. offices. During the relevant period of time, Mr. Brendan Gilmore was the Team Leader for the Delaware office.

6. Generally, the Portfolio Administrator is responsible for supporting the Senior Portfolio Officers who are responsible for the management of assigned client relationships. The client relationships include personal trusts, agency, estates, charitable, pensions, and institutional accounts. The Portfolio Administrator assists the Senior Portfolio Officer in articulating investment objectives and review accounts to ensure that they are meeting those objectives. They also help to ensure that the account is administered in accordance with the governing instrument and accepted fiduciary principles.

7. The Portfolio Administrator's responsibilities grew over time and they were expected to do more, such as being in charge of their own accounts in many instances and being knowledgeable of Mellon's investment process. There was concern that Ms. Blozis could not meet these enhanced requirements because she was not meeting the more elementary ones.

8. In my human resources role, I was aware of ongoing performance problems that Ms. Blozis had. As an example, her supervisor, Mr. Bill Becker sent me an e-mail on December 4, 2002 expressing concern about Ms. Blozis. After discussion with Mr. Becker and Mr. Becker's supervisor, Mr. Gilmore, it was decided that Ms. Blozis would be placed on corrective action.

9. As part of its on-going efforts to assist employees with performance issues, Mellon has implemented a corrective action policy entitled <u>Managing Performance Through Corrective Act</u>, that is located in its Employee Handbook as well

as in other Mellon publications. In particular, the Handbook is available on Mellon's intranet and Blozis had access to it. Mellon's corrective action process is described in its <u>Steps in Corrective Action Process</u> and includes generally an Initial Written Warning, a Final Written Warning and Termination. In accordance with Mellon's policy it was decided that Ms. Blozis' 2002 performance review would constitute the Initial Written Warning. This process has been interpreted by Mellon, and in particular Mellon's human resources department whose job it is to interpret and implement Mellon's policies, to satisfy the requirements of providing an Initial Written Warning. A true and complete copy of Mellon's Handbook is attached hereto as **Exhibit 1**.

10. Ms. Blozis' performance problems continued after she was given the Initial Written Warning in February 2003. One example, was a meeting between Mr. Gilmore and Ms. Blozis on April 30, 2003. After Mr. Gilmore's meeting with Ms. Blozis, he contacted me to discuss his concerns that Ms. Blozis' performance was not improving since, as an example, she had already missed a project deadline in direct contravention to the terms of her February 2003 Initial Written Warning. The Warning had specifically directed that there would be a "zero tolerance standard for lack of timely submission." Mr. Landis, Mr. Gilmore and I discussed Ms. Blozis' overall performance since February 2003 and because there had been no immediate and sustained improvement, it was determined that Ms. Blozis would be placed on a Final Written Warning. That determination was made on April 30, 2003. I took notes of the April 30 meeting, a true and complete copy of which is attached hereto as **Exhibit 2**.

11. Mellon has a published <u>Equal Employment Opportunity</u> policy in its Handbook that prohibits discrimination on the basis of age, gender and other protected

- 4 -

categories. The Handbook also contains a section prohibiting <u>Sexual And Other Discriminatory Harassment</u> coupled with a complaint procedure. Mellon's Corporate <u>Policy and Procedures Manual</u> also contains policies that prohibit discrimination and retaliation against employees, who among other things, file a complaint of discrimination.

12.   The Manual is available to employees through the Company's intranet. True and complete copies of Mellon's Corporate Policy and Procedures Manual that relate to Equal Employment Opportunity, Employee Complaint/Appeal Process, Sexual and other Discriminatory Harassment, and Managing Performance and Conduct Through Corrective Action are attached hereto as **Exhibit 3**. Ms. Blozis availed herself of Mellon's policies on May 1, 2003 when she complained to me about Mr. Gilmore. She complained that Mr. Gilmore's statements were made to her because of age because he used profanity, had raised his voice, and had stated that younger workers did more work than her. However, Ms. Blozis acknowledged that Gilmore never used the term younger. I took notes of my meeting with Ms. Blozis. True and complete copies of my May 1, 2003 notes are attached hereto as **Exhibit 4**.

13.   I advised Ms. Blozis that I would speak to Mr. Gilmore, which I did. Mr. Gilmore denied making any age discriminatory comments.

14.   I also called Tom Galante in Employee Relations and discussed Ms. Blozis' complaint. I called Maria Dunlop and inquired if she had heard anything. Ms. Dunlop stated that she had heard elevated voices, but had not heard the substance of the conversation.

15.   I also interviewed Mr. Landis, Mr. Becker and Ms. Marano. Although Ms. Marano was in the Philadelphia office, she was closest to Ms. Blozis in age. Ms. Marano's date of birth is January 28, 1953 and is one of the original members of Mr. Gilmore's team as she was on the team in 1998. Ms. Marano did not feel that Mr. Gilmore practiced age discrimination. After completion of the interviews, I conferred with Mr. Galante and it was determined that Mr. Gilmore did not engage in age discriminatory conduct. I then informed Ms. Blozis of the results of the investigation.

16.   While Ms. Blozis was on vacation in early May 2003, additional performance issues were found. Based on Ms. Blozis' historical performance problems and the more recent ones that he characterized as insubordination, Mr. Gilmore's supervisor, Mr. Paul Kochis, wanted to terminate Ms. Blozis' employment upon her return from vacation. However, after I had further discussion with Messrs. Kochis, Gilmore, and Landis, it was determined that Ms. Blozis would be put on a Final Written Warning, as it had been decided initially on April 30, instead of immediate termination. Before the Final Written Warning was given to Ms. Blozis on May 19, Mr. Landis discovered additional examples of performance deficiencies.

17.   In the wake of the continuing performance problems after Ms. Blozis' receipt of the Final Written Warning, Mr. Landis conferred with me and Mr. Gilmore concerning appropriate steps. As part of the decision making process, I, in turn, conferred with Mr. Galante and provided Mr. Galante with the reasons that support Ms. Blozis' termination. The consensus among Messrs. Galante, Gilmore, Landis and me was that Plaintiff's employment should be terminated. Consequently, Ms. Blozis'

employment was terminated on July 19, 2003 for performance reasons. A true and complete copy of my memorandum to Mr. Galante is attached hereto as **Exhibit 5**.

18. After Ms. Blozis' employment was terminated, she filed a Charge with the EEOC that is dated May 7, 2004, a true and complete copy of which is attached hereto as **Exhibit 6**. After an investigation, the EEOC dismissed the Charge with a no probable cause finding.

19. During 2002, no Portfolio Administrator on the Gilmore Team was on corrective action, except Ms. Blozis. Because Ms. Blozis was placed on corrective action for 2002 performance, she was ineligible for a bonus that was paid in 2003.

20. Mr. Gilmore's date of birth is November 20, 1946 and, therefore, he is approximately one year younger than Blozis, whose date of birth is December 10, 1945.

21. Other than the May 1 internal age complaint, Ms. Blozis has not made any internal complaints based on age or sex or any other protected categories to me or anyone else in human resources.

Pursuant to 28 U.S.C. §1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing statements made by me are true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Rosemary Thomas

Dated: February 26, 2007

- 8 -

# EXHIBIT 1
# To
# EXHIBIT C

WILLIB-0014956.01-LALANKFO
February 27, 2007 2:44 PM

Your Employee Handbook window will reappear when you close this window.

## EQUAL EMPLOYMENT OPPORTUNITY (EEO)

**EEO Commitment**
Mellon is committed to providing equal employment opportunities to every employee and every applicant for employment regardless of, but not limited to, race, color, religion, sex, national origin, age, familial or marital status, ancestry, citizenship, sexual orientation, veteran or military status, being a qualified individual with a disability or other factors protected by law.

Employment decisions, including but not limited to, recruitment or recruitment advertisement, hiring, selection, placement, training, promotion, upgrade, demotion, transfer, reassignment, corrective action, compensation, benefits, educational assistance, separation and employee facilities are based solely on the qualifications and performance of each individual and legitimate business reasons. Such decisions must comply with laws regarding employment discrimination.

As a matter of policy, Mellon recognizes that employees should be able to work in an environment free from any form of illegal discrimination including sexual harassment and other types of discriminatory harassment.

**Reasonable Accommodation**
Mellon will make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless such accommodation would impose an undue hardship on the operation of business. The extent to which reasonable accommodations will be made will be a function of several factors, including business necessity and cost.

**Responsibilities**
- The **Manager of Corporate Employee Relations** is responsible for ensuring compliance with Mellon's EEO policies at all Mellon locations. Human Resources managers and HR Business Partners have responsibility for ensuring compliance within the areas they support.

- Managers and supervisors are accountable for fully complying with Mellon's EEO policies, practices and programs and for ensuring nondiscriminatory treatment of employees and applicants.

- All employees must comply with Mellon's policies, practices, and programs in order to achieve equal employment opportunity for all applicants and employees.

MEL/BLOZ 473

**Complaints**
If an employee has a concern in the area of EEO, they should promptly present the complaint orally or in writing to any appropriate member of management with whom they feel comfortable, such as their supervisor, any manager in their reporting relationship, up through the Chief Executive Officer of the Corporation; an HR Business Partner or the **Manager of Equal Employment Opportunity,** as described in the Employee Complaint/Appeal Process section of this handbook. An impartial investigation will be conducted and appropriate action will be taken. Any complaint decision made at the Chief Executive Officer level or third step of the complaint process will be considered final.

**Additional Information**
For additional information on EEO/AA policies refer to the policies and procedures found on the Mellon Intranet or contact the **Corporate Employee Relations/EO Compliance Manager.**


For information regarding Affirmative Action see Affirmative Action (AA) U.S. Only

Your Employee Handbook window will reappear when you <u>close this window</u>.

## SEXUAL AND OTHER DISCRIMINATORY HARASSMENT

**Policy**
It is the policy of the Corporation that harassment in any form on the basis of race, color, religion, sex, national origin, age, familial or marital status, ancestry, citizenship, sexual orientation, qualified individuals with disabilities, veteran or military status or any other factor protected by law will not be tolerated. The Corporation complies with all national, state and/or local sexual and discriminatory harassment laws, regulations and ordinances.

The anti-harassment policy applies in all work-related settings and activities, whether on or off Corporation premises. This policy also applies to actions towards or from customers or vendors. If such conduct occurs, prompt and appropriate action will be taken to eliminate the harassment and impose discipline. Senior Management is committed to ensuring that this policy is followed at all levels of the organization.

**Sexual Harassment Definition**
Sexual harassment refers to any intentional or unintentional unwelcome sexual advances with or without touching; coerced sexual acts; requests or demands for sexual favors or other verbal or physical conduct of a sexual nature by any employee, customer or vendor, when:

- Submission to such conduct is made, either explicitly or implicitly, a term or condition of employment;

- Submission to or rejection of such advances, requests, or conduct by an individual is used as the basis for employment decisions affecting an individual; or

- Such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile or offensive work environment.

**Discriminatory Harassment**
Discriminatory Harassment is defined as verbal or physical conduct that denigrates or shows hostility on the basis of race, color, religion, sex, age, national origin, familial or marital status, ancestry, citizenship, sexual orientation, qualified disability, veteran or military status or other protected status when such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile, humiliating or offensive work environment.

**Complaints**
Should you have concerns regarding treatment under this policy, please talk with your manager or submit your concern through the <u>Complaint Process</u>.

**Additional Information**
For additional information on EEO/AA policies refer to the policies and procedures found on the Mellon Intranet or contact the **Corporate Employee Relations/EO Compliance Manager.**

MEL/BLOZ 476