Corporate Policies & Procedures Manual 

| Chapter | Document Number |
|---|---|
| HUMAN RESOURCES | CPP-504-5(A) |
| **Section** | **Revised Date** |
| EMPLOYEE RELATIONS | 8/4/2004 |
| **Subject** | **Page Number** |
| Corrective Action Process | 2 of 3 |
| **Issuing Area** | |
| Human Resources | |

**GENERAL CORRECTIVE ACTION PROCESS: (Cont.)**

The manager must consult the department's or location's Human Resources Business Partner before issuing a final written warning. A copy of the final written warning must be given to the employee and a copy sent to the department's or location's Human Resources Business Partner. The manager must keep a copy of the final written warning with the initial written warning documentation in the employee's file.

*NOTE:* After a final written warning has been issued, the performance and/or conduct of employees should be carefully monitored. Immediate and sustained performance improvement must occur unless a time period is otherwise designated by the manager. Generally, termination may occur if sufficient and sustained improvement does not occur by the end of the designated time period. However, termination may occur at any time prior to the designated time period because employment is at will.

3. ***Termination*** - If the employee fails to improve as required after the previous warnings, or if other problems develop, termination may be appropriate. Managers must consult the department's or location's Human Resources Business Partner before conducting a termination meeting. Managers must document the performance deficiencies or unprofessional conduct that lead to the decision to terminate an employee. The termination meeting must also be documented. Copies of the documentation are not given to the employee, but are retained in the employee's file. Copies are also sent to the department's or location's Human Resources Business Partner.

After a decision regarding termination is made by department management in consultation with the department's or location's Human Resources Business Partner, a manager notifies the employee of the decision and the manager implements the procedure for processing the termination.

**ACCELERATED CORRECTIVE ACTION FOR INTOLERABLE WORK VIOLATIONS:**

There are occasions when acceleration of the Corrective Action process is warranted. For intolerable work violations (including but not limited to harassment, fighting, assault, embezzlement) or other situations where there is a risk of loss or damage to Mellon, the manager will immediately suspend the employee and consult with his/her Human Resources Business Partner to review the situation; after the review, Corrective Action may be accelerated to a final written warning or to termination. For employees, whether exempt or non-exempt, who are suspended, a decision will be made if the suspension will be with or without pay. The manager must consult with their Human Resources Business Partner before suspending an employee without pay. For some intolerable work violations, the decision may be made to accelerate Corrective Action to immediate termination without suspension.

Any employee who believes that an improper pay deduction has been made as the result of a suspension under this policy may use Mellon's Compliant and Appeal Process, CPP-504-6. Mellon will reimburse the employee for any improper deduction.

If the problem involves a known or suspected internal/external crime/incident, the manager or Human Resources Business Partner must contact the Audit & Risk Review Department. (Refer to CPP-1003-1, Reporting Known Or Suspected Internal/External Crimes/Incidents, for more information.)

**RECORD RETENTION:**

Corrective Action documentation must be retained for a minimum of three years. Generally, corrective action remains in effect for one year from the date of the issuance. The running of the one-year period will be suspended during a short term disability or leave of absence. The one-year period will resume upon the employee's return to work. Information regarding intolerable work violations may be considered in future corrective action and should be retained in the employee's file indefinitely.

# Corporate Policies & Procedures Manual

| Chapter | Document Number |
|---|---|
| HUMAN RESOURCES | CPP-504-21 |
| Section | Revised Date |
| EMPLOYEE RELATIONS | 5/13/2002 |
| Subject | Page Number |
| Performance Management Process | 1 of 4 |
| Issuing Area | |
| Human Resources | Superseded 4/29/04 |

**POLICY:** It is the policy of the Corporation, through its Performance Management Process, to review all employees' performance and effectiveness on an ongoing basis.

**PURPOSE:** The Performance Management Process is a management system designed to assist managers to perform their people management functions by:

- performance planning for exempt employees, which links individual goals with overall business success and development of results-based goals and a Shared Values Action Plan for the upcoming performance period
- agreement between employee and manager regarding behavior relative to core and job specific competencies
- on-going performance feedback and coaching on skills and abilities
- formal assessment of employees' performance relative to expectations, standards and measures for results-based goals, Shared Values and competencies
- identification of performance based development needs; performance shortfalls must be addressed by a time-bound, measurable plan to ensure performance reaches acceptable levels

**DEFINITIONS:** PERFORMANCE PLANNING:

***Exempt Employees*** - Performance Planning for an exempt employee establishes job related goals with specific and measurable standards of performance for a job based on business unit and company objectives. At the beginning of the performance period (as soon as possible following the most recent performance review), the manager and employee should jointly develop at least one results-based goal in each of the following categories. An overall total of six to eight goals is recommended:

- business and operating contributions
- customer-related contributions
- employee-related contributions
- other contributions (includes corporate, synergy, project specific)

FAX Memo No. of Pages 4 — Mellon Bank

| To: BARB ROSS | From: T. McGUIRE |
|---|---|
| Co./Dept.: LEGAL | Co./Dept.: FINANCE |
| FAX Number 66054 | FAX Number: |
| Comments: | Phone Number: |

# Corporate Policies & Procedures Manual

| Chapter | Document Number |
|---|---|
| HUMAN RESOURCES | CPP-504-21 |
| Section | Revised Date |
| EMPLOYEE RELATIONS | 5/13/2002 |
| Subject | Page Number |
| Performance Management Process | 2 of 4 |
| Issuing Area | |
| Human Resources | |

**DEFINITIONS: (Cont.)**

An exempt employee also develops a Shared Values Action Plan, a set of behaviors/actions that he/she commits to demonstrate Mellon's Shared Values. The employee initiates the development of the Action Plan and provides his/her manager with suggestions on behaviors. The manager guides, reviews and agrees on these behaviorial indicators for the year.

In the final section of the planning process, an exempt employee and manager review the competencies that appear on the form and complete the job/role specific competencies that will be utilized for the assessment.

Some business units may have additional or different assessment objectives for use relative to Mellon's Compensation Program.

***Non-Exempt Employees*** - Performance Planning for a non-exempt employee is the formal communication of Shared Values, job factors and core competencies. When an employee begins to work in the position, and on a regular and as needed, basis thereafter, the manager should focus on the employee's duties and responsibilities of the position and consider appropriate performance standards and/or specific results for the employee. The manager and employee should discuss the key requirements for the employee's position.

**MID-YEAR PROGRESS REVIEW** is an optional activity in the Performance Management Process whose purpose is to:

- create a formal opportunity for managers to provide honest feedback and to have a developmental discussion without the need to link ratings to pay
- ensure employees receive formal feedback at least once prior to the year-end performance assessment – avoiding unnecessary surprises at the year-end
- provide managers and employees an opportunity to determine whether the goals established during the performance planning process remain appropriate and, if not, to update these goals

# Corporate Policies & Procedures Manual

| Chapter<br>HUMAN RESOURCES | Document Number<br>CPP-504-21 |
|---|---|
| Section<br>EMPLOYEE RELATIONS | Revised Date<br>5/13/2002 |
| Subject<br>Performance Management Process | Page Number<br>3 of 4 |
| Issuing Area<br>Human Resources | |

**DEFINITIONS: (Cont.)**

**PERFORMANCE ASSESSMENT** is the formal evaluation and documentation of the employee's actual results and overall performance. The Performance Assessments are based on goals, Shared Values Action Plans and competencies that have been previously documented and agreed to by the employee in exempt employees Performance Plans. Non-exempt employees are evaluated on goals (optional), Shared Values, core competencies and job factors.

**RESPONSIBILITIES:** Performance Management is a shared responsibility between managers and employees and Mellon.

**MANAGERS** are responsible for completing the performance planning process as defined in this policy for all employees they supervise. Managers must prepare Performance Assessments and review them with all employees they supervise at least annually.

***NOTE:*** Managers will be evaluated on their performance on human resources management responsibilities as part of their Performance Assessment (e.g., developing and coaching others, attracting and retaining talent, managing for results) including completing of Performance Plans and Performance Assessments in a timely fashion.

**LINE OF BUSINESS MANAGERS** are responsible for communicating the business unit's goals and priorities prior to individuals and teams setting goals for the performance period. Also, they are responsible for ensuring that the Performance Management process is implemented and administered consistently across their organizations and according to policy.

**HUMAN RESOURCES BUSINESS PARTNERS** are responsible for ensuring the integrity and compliance intended for Performance Management process within the line of business they support.

# Corporate Policies & Procedures Manual

| | |
|---|---|
| Chapter<br>**HUMAN RESOURCES** | Document Number<br>**CPP-504-21** |
| Section<br>**EMPLOYEE RELATIONS** | Revised Date<br>**5/13/2002** |
| Subject<br>**Performance Management Process** | Page Number<br>**4 of 4** |
| Issuing Area<br>**Human Resources** | |

**RETENTION:** Retain Performance Management documents for three years from the date they are reviewed with the employee; then destroy unless instructed to retain longer by Human Resources or the Legal Department. If the employee transfers to a new manager or line of business, forward the Performance Management documents to the employee's new manager.

*NOTE:* Managers who leave Mellon (or transfer to another position) must forward all employee files to their next level of management or to the manager who assumes their supervisory responsibility.

**MORE INFORMATION:** For more information regarding Performance Management, including forms, frequently asked questions, training and communication kits, access the Human Resources site on Mellon's intranet.

# EXHIBIT 4

# To

# EXHIBIT C

5/01/03

Linda's mtg w/ Brendan Gilmore

Tone - + Timber of voice So disruptive to other staff members

Demeaning / degrading

Said age discrimination

"Other assistants producing a lot more & a lot faster." Age discrimination

He Hollered at Linda

Linda went to Gregg to see if Becker's group could do.

Bill talked to Brendan, Brendan came to her.

He only accused last week to her that they could not finish . . .

5/01/03

Linda and Maria did get the job done today

Brendan car, come + go with us are watching him.

Shells Crossment - Has not refused

# EXHIBIT 5
# To
# EXHIBIT C

Tom, I would like for you to review my decision to terminate a Portfolio Administrator in our Delaware Office.

History of Events:

**2/11/03** Given a **Needs Improvement on her Performance Review for 2002**. Manager (Bill Becker) stressed the importance of completing projects on time and taking ownership of projects without constant monitoring.

Emphasized that Linda needs a better understanding of the product; self-study encouraged. Manager noted in the PR there would be a zero tolerance standard for lack of timely completion of projects. If any further deadlines were missed further corrective action would follow.

**4/07/03** Failed to follow-up on request from manager (new manager, Gregg Landis) to review a file and run a porch. Linda did not feel that this was a priority because of other work that needed to be completed.

**5/07/03** Gregg met with Linda to discuss the fact that meeting booklets that he had requested from a future meeting had not been completed. Notice had been given to Linda on 4/30/03 that managers would need these books for an upcoming meeting. They knew that she was scheduled to go on vacation and specifically wanted the books completed before she left.

**5/09/03** Linda did not properly prepare an investment proposal after being given explicit instructions. The incomplete package was sent to a client.

5/19/03 Placed on **Final Written Warning for Performance**, specific issues:

Failure to determine the importance of finishing projects in a timely manner.

Lack of ownership of projects without constant monitoring

Product Knowledge and Work quality.

5/21/03 Manager requested that Linda provide updated pricing data re: 2003 Stale Price Report. Asked that this be completed by 6/20/03.

6/26/03 Manager followed up with Linda about his request from 5/21/03. Her response was that she had not had time to complete this project because she was just catching up on some others. Linda failed to notify manager prior to due date that she would not have project completed. Numerous requests have been made to Linda to notify management if a report would not be completed on time and she continues to fail to do this.

At this point, we would like to term Linda for Performance.

# EXHIBIT 6

# To

# EXHIBIT C

WILLIB-0014956.01-LALANKFO
February 27, 2007 2:44 PM

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA<br>☐ EEOC | 170-2004-02203 |

N/A

State or local Agency, if any and EEOC

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Linda J. Blozis | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| Hidden Lake Villas<br>788 Park Shore Drive #C-27 | Naples, Florida 34103 | 12/10/1945 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Mellon Financial Corporation | 500+ | (302) 421-2207 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| Two Greenville Crossing<br>4005 Kennett Pike, Suite 200 | Greenville, Delaware 19807 | New Castle |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☒ AGE
☒ RETALIATION ☐ NATIONAL ORIGIN ☐ DISABILITY ☐ OTHER *(Specify)*

DATE DISCRIMINATION TOOK PLACE EARLIEST *(ADEA/EPA)* LATEST *(ALL)*

7/14/2003 (ALL)

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s))*:

See "Bill of Particulars" (attached).

RECEIVED - EEOC PHILADELPHIA

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

5/7/04 Linda J. Blozis

Date Charging Party *(Signature)*

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

A-99

**BILL OF PARTICULARS**

1. This is a claim of age and sex discrimination and retaliation arising from the negative evaluation, discipline, and discharge of a then 57 year old woman employed by Respondent for over thirteen years.

**A. Parties**

2. Mellon Financial Corporation ("Mellon", "Respondent") is a corporation with more than 500 employees worldwide. Mellon does business throughout the State of Delaware. It has a principal place of business at Two Greenville Crossing, 4005 Kennett Pike, Suite 200, Greenville, Delaware 19807.

3. I am a citizen of the United States and a resident of Naples, Florida. I was employed continuously by Respondent from approximately February 14, 1990 to July 14, 2003.

4. I am a white female age 58 who at all times was a diligent, loyal, and capable employee. My wage package was approximately $39,800 per year plus a 401(k) plan with an employer matching; health, dental, vision, long term disability, accidental death and dismemberment, and life insurance coverage; and other benefits.

RECEIVED - EEOC PHILADELPHIA D.O.

**B. Employment History**

5. During my more than thirteen years with Respondent, I worked as a Portfolio Administrator in Respondent's Private Wealth Management Department and was entrusted to work on trust accounts valued between $1 million and $50 million dollars.

6. During my more than thirteen years with Respondent, I received many written commendations from my numerous supervisors for my customer service skills and dedication to my job.

7. During my more than thirteen years with Respondent, I was never cited for tardiness. My attendance record was commendable.

8. During my more than thirteen years with Respondent, I was never cited for unprofessionalism or gross neglect of responsibilities.

9. In 2001, I received a bonus for my good performance in 2000.

10. On February 20, 2002, I received a $2,000 incentive under Respondent's Private Wealth Management 2001 Portfolio Team Incentive Plan for my good performance in 2001.

11. In October of 2002, I received a raise in annual salary from $36,000 to $39,800.

12. From approximately February 14, 1990, through November of 2002, my annual evaluations and quarterly checks (collectively "performance evaluations") ranged from meets expectations to exceeds expectations. Prior to December of 2002, I never received an unfavorable performance evaluation from Respondent.

13. From approximately February 14, 1990, to May 19, 2003, I never received a demotion, suspension, written reprimand, or any other form of written discipline from Respondent.

C. **Increased Responsibilities and Negative Evaluation**

14. From approximately March of 2002 to July 7, 2002, Respondent made me responsible for all support work during the frequent absences of supervisors. Respondent made me alone responsible for telephone reception, mail delivery, equipment maintenance, arranging client meetings, handling all cash transactions, opening new accounts, closing terminated accounts, and training a new employee. Younger and male employees were not treated similarly.

15. On or about January 27, 2003, my immediate supervisor, Investment Officer Bill Becker, a white male in his late 30's, gave me my first unfavorable performance evaluation in my then more than twelve years with Respondent which criticized the speed of my work and knowledge of responsibilities. Younger and male employees were not treated similarly.

16. Between January 2003 and May of 2003, Respondent pressured me to work harder and faster. Younger and male employees were not treated similarly.

**D. <u>Oral Reprimand, Internal Complaint of Age Discrimination, and Discipline</u>**

17. In late April of 2003, Team Leader and First Vice President Brendan Gilmore, a white male approximately age 56, called me into his private office and strongly criticized my work in a threatening and demeaning manner. Specifically, he insisted that I immediately complete a client meeting booklet "or else."

18. Even though his door was closed, his tone and volume were disruptive to other employees outside of his office. Gilmore used profanity in speaking to me.

19. Before leaving for vacation on May 2, 2003, I lodged a verbal complaint against Brendan Gilmore for the unprofessional, threatening, and demeaning manner in which he had spoken to me. My complaint was recorded by Rosemary Thomas of Human Resources.

20. Specifically, I told Thomas that I believed that Gilmore's words and conduct toward me were "founded in age."

21. On May 19, 2003, Administrative Officer Gregg Landis, a white male in his mid-30's, gave me my first and only written reprimand, entitled "Final Written Warning for Performance" which later was signed by Brendan Gilmore.

**E. Discharge and Replacement**

22. Between May 19th and July 13th of 2003, I continued to make every effort to complete outstanding projects. Landis agreed with me that we were getting client files to a point of smooth transition for new replacement of Investment Officer Bill Becker.

23. Nevertheless on July 14, 2003, at approximately 10 a.m., Landis informed me via e-mail that he needed to talk to me in a private office about a Human Resources issue.

24. That same day, Landis and I met for a conference call with Rosemary Thomas. At that time, Landis told me I was being fired because of my performance.

25. Landis told me to clean out my desk and return to him my keys and pass cards, and I promptly complied.

26. Upon information and belief, in late 2003 or early 2004, Respondent replaced me with a female who is substantially younger than me.

**F. Comparative Treatment of Similarly Situated Younger and Male Employees**

27. Similarly situated younger and male employees were not treated similarly to me.

**(1) Denied Bonuses**

28. On March 18, 2003, Brendan Gilmore told me that I would not receive an annual bonus for 2002, contrary to previous indication.

29. Investment Officer Bruce K. Holmquist, a white male in his late 40's, was the only other team member who did not receive a bonus for 2002.

30. Portfolio Administrator Maria Dunlop, a white female in her 20's, received a bonus for 2002, and was informed by Respondent's management that I had not.

31. All other substantially younger team members received a bonus for 2002.

(2) **Denied Support**

32. Respondent's management told me not to ask Maria Dunlop for help with my workload.

33. Younger employees were not treated similarly. Dunlop was allowed to ask me for help with her workload.

34. Gilmore and Landis criticized me for leaving a booklet for Dunlop to bind. However, Dunlop previously was not criticized for leaving approximately sixty scholarship checks for me to assemble and mail to awardees.

(3) **Less Vacation Time**

35. In April of 2003, I requested two consecutive weeks of my earned and accrued vacation time. Gilmore denied my request. As a result, Respondent allowed me only six days of vacation beginning on May 2, 2003.

36. Younger employees were not treated similarly. In late May of 2003, Gilmore allowed Maria Dunlop seven days of vacation.

G. **Comparative Treatment of Similarly Situated Older and Female Employees**

37. On March 6, 2002, at the direction of Gilmore, Becker, and Landis discharged Kathleen Agne, a white female then age 49, after more than 23 years of service. No explanation was given to me for her discharge.

38. Gilmore gave Senior Trust Officer Robert Bell, a white male, an overwhelming book of business and forced him to retire at age 62.

39. Gilmore forced Vice President Martha Fetters to resign at age 43.

40. Gilmore forced Assistant Vice President and Administrative Officer Linda Squier, a white female, to retire in early 40's, after more than fifteen years of service to Respondent.

41. Respondent also issued a Corrective Action to Francis Smith, a white female age 61, demoted her to Administrative Officer, and forced her to resign in approximately September of 2003.

## I. Circumstantial and Direct Evidence of Age Bias

42. I was Respondent's oldest Portfolio Administrator in Delaware.

43. In fact, I was the oldest employee on Brendan Gilmore's Team.

44. All employees hired by Gilmore were under the age of 40, including the following:

a. Investment Officer Bill Becker, who was in his late 30's,

b. Assistant Maria Dunlop, a white female in her 20's,

c. Investment Officer Kristy Hunt, a white female in her 30's, and

d. Investment Assistant Dan Merlino, a white male in his early 30's.

45. Many older employees previously had retired or left Respondent's employ. Because I was the oldest employee on his team who had not retired or left Mellon, Gilmore called me "a survivor."

46. Respondent violated its work rules in terminating my employment, including its EEO policies against age and sex discrimination and retaliation.

J. **Stated Reason and Pretext**

47. Any alleged legitimate non-retaliatory and non-discriminatory reasons offered by Mellon for the difference in treatment is a pretext for retaliation and discrimination because of age and sex.

48. The natural probative force of the evidence demonstrates retaliation and discrimination. Alternatively, a reasonable fact finder could choose to disbelieve any non-retaliatory and non-discriminatory reasons offered by Mellon because I can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Respondent's explanation that make it unworthy of belief.

K. **Damages**

49. As a direct and proximate result of the actions of Respondent and its agents, I am suffering lost wages, earnings, incentives, and bonuses; lost or reduced 401(k) plan benefits, lost health, dental, vision, long term disability, accidental death and dismemberment, and life insurance coverage; and other benefits; decreased employment and earning opportunities; losses incurred as a result of being forced to sell my house; and other pecuniary and non-pecuniary losses.

Linda J. Blozis (signature)
**Linda J. Blozis**

May 7, 2004
**Date**

Attorney Files/John's Files/Client Files/Blozis/Pleadings/Bill of Particulars