# EXHIBIT E

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LINDA J. BLOZIS | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action |
| v. | ) No. 05-891 SLR |
| | ) |
| MELLON TRUST OF DELAWARE, NATIONAL | ) |
| ASSOCIATION, a Pennsylvania | ) |
| corporation; MELLON BANK, NATIONAL | ) |
| ASSOCIATION (formerly Mellon Bank | ) |
| (DE) NATIONAL ASSOCIATION), a | ) |
| Pennsylvania corporation; and | ) |
| MELLON FINANCIAL CORPORATION, a | ) |
| Pennsylvania corporation, | ) |
| | ) |
| Defendants. | ) |

Deposition of BRENDAN MICHAEL GILMORE taken pursuant to notice at the law offices of John M. LaRosa, Two East 7th Street, Wilmington, Delaware, beginning at 1:30 p.m., on Tuesday, December 19, 2006, before Eleanor J. Schwandt, Registered Merit Reporter and Notary Public.

APPEARANCES:

    JOHN M. LAROSA, ESQ.
    LAW OFFICE OF JOHN M. LAROSA
    Two East 7th Street
      Wilmington, Delaware  19801
      for the Plaintiff

    STEPHANIE WILSON, ESQ.
    REED SMITH, LLP
      13 Main Street - Suite 250
      P.O. Box 7839
      Princeton, New Jersey  08543-7839
      for the Defendants

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com




WILCOX & FETZER LTD.
Registered Professional Reporters

8

1  which was a wholly-owned subsidiary of Mellon, which
2  ultimately changed its name to Mellon Private Asset
3  Management of California. I'm sorry if there is so many
4  different titles. And I was responsible for the offices
5  in Los Angeles and Newport Beach, and also, well, San
6  Francisco too.
7      Q.  Approximately how long did you work in
8  California?
9      A.  Three years.
10     Q.  And then did you receive any additional
11 promotions or transfers at that point?
12     A.  I was subsequently -- after that time I was
13 transferred back east, and I managed a group in
14 Philadelphia, the Delaware office and the Washington,
15 D.C. office.
16     Q.  When did you begin managing those three offices?
17     A.  About 19 -- late '97, I believe, early '98.
18     Q.  And is that your current position or have you
19 since been promoted or transferred to another position?
20     A.  My job -- I have received additional -- different
21 responsibilities and promotions. I'm a senior director.
22 I do not -- I now am -- I'm the Senior Investment Officer
23 for the Mid-Atlantic Region and Director of Alternative
24 Investments.

9

1           And I have other functional -- I'm on the
2  investment policy committee, Mellon's investment strategy
3  committee.
4      Q.   When did you become a senior director, to the
5  best of your recollection?
6      A.   I guess, let's see, 2003.
7      Q.   When you managed the three offices in
8  Philadelphia, Delaware and Washington, D.C. --
9      A.   Yes.
10     Q.   -- beginning in late '97 or early '98,
11  approximately how long did you do that?
12     A.   Sometime around '93, maybe '92.  Late '92, early
13  '93 I believe is when they asked me to take on different
14  duties.
15     Q.   You mean 2003?
16     A.   Yes.  I'm sorry.  What did I say?
17          MS. WILSON:  1993.
18          THE WITNESS:  I'm sorry, 2003.
19  BY MR. LAROSA:
20     Q.   So some time in the first half of 2003, you think
21  that's when you --
22     A.   I would say it was either the fall of 2002, you
23  know, maybe October -- October/November, or January of
24  2003, right about that time.  This is '06 --

10

1  Q. Well, to the best of your recollection?

2  A. It was either January '03 or January of '04. I'm
3  a little unclear about that.

4  Q. It might be January '04, but you are not
5  positive?

6  A. Yes, right.

7  Q. When you managed those three offices in
8  Philadelphia, Delaware and D.C., where were you
9  stationed?

10 A. Philadelphia.

11 Q. Prior to that you were in California?

12 A. I was in Los Angeles. That's where the office
13 was I worked out of, although I had responsibilities for
14 other regions.

15 Q. When you became a senior director, you think that
16 was January of 2003 or January of 2004, approximately?

17 A. Yes.

18 Q. And where did you work when you became a senior
19 director?

20 A. Philadelphia. I've always officially been
21 located in the Philadelphia office since I've come back
22 from California.

23 Q. During your employment with Mellon were you
24 familiar with a Mellon Trust of Delaware?

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.   Yes.

2    Q.   Did you have responsibilities for Mellon Trust of
3 Delaware as well?

4    A.   Yes.

5    Q.   What were your responsibilities in connection
6 with Mellon Trust of Delaware?

7    A.   I managed the group of people in the Delaware
8 office which worked for Mellon Private Asset Management.

9    Q.   What is the relationship between Mellon Private
10 Asset Management and Mellon Trust of Delaware?

11   A.   Mellon Trust of Delaware is a wholly-owned --
12 was -- is a wholly-owned subsidiary of Mellon Bank, NA,
13 and Mellon Private Asset Management was the group that
14 did the, serviced the high -- excuse me -- high-net-worth
15 market, and so serviced the high-net-worth market in the
16 Delaware/Washington region.

17   Q.   Did Linda Blozis ever perform services for Mellon
18 Trust of Delaware?

19   A.   I don't know.  I don't know the -- I don't know
20 the technical answer to that.

21        She was an employee of Mellon Private Asset
22 Management, and I suspect, I assume that within, as an
23 employee in Delaware she was an employee of Mellon Trust
24 of Delaware.

15

1  Linda Blozis, there was never any issues with her
2  tardiness or attendance when she worked for Mellon; is
3  that correct?
4      A.   I don't know.
5      Q.   Do you know what the qualifications of a
6  portfolio assistant or portfolio administrator are?
7      A.   You mean from an education standpoint or just
8  from a --
9      Q.   Education and otherwise, any qualifications.
10     A.   I, I'm not sure what they were at the time she
11 was employed.  I believe that they have changed in
12 subsequent years.  What I mean -- well, should I go on
13 and explain it?
14          MS. WILSON:  If you feel you need to.
15     A.   Never mind.  I'd be speculating.
16     Q.   So at some point the qualifications for portfolio
17 administrator changed?
18     A.   Yes.
19     Q.   Do you remember when that was, approximately?
20     A.   Well, the jobs were upgraded some time in the
21 nineties.  I'm not -- I would say mid-nineties perhaps.
22 And at that time we also, we also gave the portfolio
23 managers additional -- a raise.
24     Q.   A raise and additional responsibilities?

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

16

1  A.  Yes, all of them were given additional
2  responsibilities, that's correct. The job was
3  reclassified.
4  Q.  And this reclassification, you believe that
5  occurred in the mid 1990s?
6  A.  Yes.
7  Q.  I show you a document and ask that it be marked
8  Gilmore 1.
9      (Gilmore Deposition Exhibit 1 was marked for
10 identification.)
11 Q.  Take a minute to read through that document.
12 A.  Mm-hmm.
13 Q.  Have you ever seen this type of form before?
14 A.  Yes, I've seen them.
15 Q.  I'll represent that this is a two-page document,
16 MEL/BLOZ 454 and MEL/BLOZ 455. They appear to be two
17 different dates, two different versions of the same
18 document, is that fair to say, at two different points in
19 time?
20 A.  It would appear to be the case.
21 Q.  What is this document referred to as or what is
22 it called?
23 A.  It says "Employee Profile/History" on the heading
24 of the document.

WILCOX & FETZER LTD.
Registered Professional Reporters

17

1    Q.    Have you seen these types of documents before?
2    A.    I have seen, yes, these. Yes.
3    Q.    And what does Mellon use these documents for?
4    A.    It is a history of the employees, salary history,
5  job history.
6    Q.    In your capacity as managing the three offices,
7  including the Delaware office, would you at any point
8  during the year review employee profiles?
9    A.    No. I can't think of why I would.
10   Q.    You have seen this document for some of your
11 employees?
12   A.    I would assume all employees have this in their
13 personnel file, myself included. It is a history of a
14 person's employment with the firm. That's all it is.
15   Q.    So I think you've told us that Mellon records
16 salary history on this form?
17   A.    Yes.
18   Q.    And there is something in the middle of the page
19 says "Job History" and then to the right of that it says
20 "PERF RTG." Is that performance ratings?
21   A.    Yes.
22   Q.    And does Mellon also keep records of the
23 performance ratings employees receive on their annual
24 evaluations?

Case 1:05-cv-00891-SLR    Document 44-11    Filed 03/01/2007    Page 10 of 19
Brendan Michael Gilmore

18

1   A.   Not a history on the annual evaluations, no.
2   This would not be included in an annual evaluation.
3   Q.   Right.  Is this a summary of --
4   A.   This is a summary of cumulative valuations, but
5   the employee evaluation would be for a specific period of
6   time only.
7   Q.   And as far as other information on this document,
8   calling your attention to the top right-hand page, does
9   Mellon record the employee's birth date on the document?
10  A.   I don't see a birth date.
11       Oh, yes, I do.  Yes, there is a birth date,
12  yes.
13  Q.   And does Mellon also record an employee's age on
14  the employee profile?
15  A.   On this thing?
16  Q.   Yes.
17  A.   Yes, it does.
18  Q.   Okay.  And does Mellon also record an employee's
19  marital status on this employee profile?
20  A.   It is on this, this form, yes.
21  Q.   And does Mellon also record an employee's race on
22  the employee profile?
23  A.   This one reflects race, yes.
24  Q.   Does Mellon record an employee's gender on an

A-155

WILCOX & FETZER LTD.
Registered Professional Reporters

20

1  that.

2  Q.  Was there a portfolio administrator in the
3  Delaware office named Kathleen Agne?

4  A.  Yes.

5  Q.  Was she eventually discharged?

6  A.  Yes.

7  Q.  And who discharged her?

8  A.  You mean who actually did it, or who had the
9  meeting with her, or how was the decision arrived?

10  Q.  Who made the decision?

11  A.  The decision was made ultimately by senior
12  management.

13  Q.  Who was that?

14  A.  Ultimately be my superior.

15  Q.  Who was that?

16  A.  And human resources together would have made
17  that, come to that conclusion.  At that time?

18  Q.  Yes.

19  A.  I believe his name was Doug Kloppenburg.

20  Q.  What was his title?

21  A.  He was the Manager for Private Asset Management
22  in the Mid-Atlantic Region.

23  Q.  Who was the HR person or persons?

24  A.  HR rep in that area is Rosemary Thomas.  But she

1  Q. And did he wind up interviewing Maria Bannister
2  or Maria Dunlop?
3  A. I don't believe so.
4  Q. Did you interview Maria Bannister or Maria
5  Dunlop?
6  A. Yes.
7  Q. At some point a decision was made that included
8  you to hire Maria?
9  A. Yes.
10 Q. And that decision was approved by senior
11 management?
12 A. Yes.
13 Q. Was that in approximately 2002?
14 A. I believe so. I don't know.
15 Q. Was there an individual named Frances Smith who
16 worked for you at Mellon?
17 A. No, not to my knowledge.
18 Q. Was there anybody named Smith that worked for you
19 out of the Delaware, Philadelphia or Washington, D.C.
20 office?
21 A. I don't remember anyone named Smith working for
22 me. I had a number of employees. I mean, I, I don't
23 remember anybody by that name.
24 Q. Do you remember anybody by the name of Martha

1  Fetters?

2  A. Yes.

3  Q. What was her title?

4  A. She was a vice president.

5  Q. What was her function?

6  A. She was, when I came to Philadelphia and took
7  responsibility for Delaware, she was responsible for the
8  Delaware office. She was in charge of the Delaware
9  office.

10 Q. At some point did she resign from Mellon?

11 A. Shortly after I came to the region she resigned,
12 within I think six months.

13 Q. Did you replace her with someone else to fill the
14 position?

15 A. Yes, yes.

16 Q. Who was that?

17 A. Bill Becker.

18 Q. Do you remember when that was?

19 A. 1998, thereabouts.

20 Q. Did Martha Fetters hold any other title other
21 than vice president and being the person responsible for
22 the Delaware office during the time she worked for you?

23 A. Not -- no.

24 Q. Did she ever take a step down to a lower

1   position?
2   A.   Not to my knowledge.
3   Q.   Are you familiar with a person named Linda
4   Squirer?
5   A.   Yes.
6   Q.   What was her job title?
7   A.   I think she was an assistant vice president.
8   Q.   Where did she work?
9   A.   In the Delaware office.
10  Q.   Did she eventually resign her position?
11  A.   Yes, she did.
12  Q.   Do you remember when she was?
13  A.   I would be speculating, but I believe it would
14  have been about a year and a half later, after -- well,
15  let me rephrase that. Perhaps late '99.
16  Q.   Had she previously reported to Martha Fetters?
17  A.   Yes.
18  Q.   At the time her employment ended did she report
19  to Bill Becker?
20  A.   Yes.
21  Q.   Are you familiar with a Robert Bell?
22  A.   Yes.
23  Q.   What was his title?
24  A.   I believe he was assistant vice president also.

64

1  this document?

2  A.  Well, again, it is not the sole discretion of the
3  manager to terminate an employee. It has to be done
4  following a very clearly delineated format. And so,
5  again, you know, this is ultimately -- I am the manager.
6  Ultimately I assume responsibility for this as the
7  manager. And so that's why it is addressed as me and
8  mine.

9        But the expectations are the expectations of
10  Mellon Private Asset Management and -- the minimum job
11  expectations. They are not just my personal
12  expectations. So in that regard I --

13  Q.  With regard to Linda Blozis not meeting the
14  expectations, Rosemary Thomas wouldn't have any input
15  into whether or not substantively Linda Blozis was doing
16  the job or meeting the expectations?

17  A.  Human resources would have an opportunity to hear
18  her side of the story and to make some judgments. So it
19  is, again, not done in a vacuum. But as to whether or
20  not she would have the professional expertise as to judge
21  the quality of the work, that's a different story.

22  Q.  That would be better left to --

23  A.  The professionals.

24  Q.  -- Linda Blozis' bosses?

1    A.    The professionals in Wealth Management.

2    Q.    Including you?

3    A.    Including me.

4    Q.    Did you feel there was a problem with Linda

5  Blozis with regard to attention to detail in her work?

6    A.    Yes.

7    Q.    Was that one of the reasons why her employment

8  ultimately was terminated?

9    A.    Among others.

10   Q.    Can you read the last sentence of page 471, the

11 second page?

12   A.    "However, if your performance continues to not

13 meet my expectations you may be subject to further

14 corrective action, up to and including termination of our

15 employment."

16   Q.    Did you mean "her" employment?

17   A.    I, yes, I -- I suppose that's a typo.

18   Q.    Is that a detail that should have been corrected?

19   A.    Well, I would have to ask if -- it is subject to

20 interpretation.  From the firm's standpoint, it may be

21 our employment, meaning that it is a relationship.

22   Q.    Well, were you talking about the termination of

23 her employment?

24   A.    Yes, we are clearly talking about her

73

1  any of our employees are asked to handle cash

2  transactions.

3      Q.   Was Laura Shannon ever asked to open new

4  accounts?

5      A.   Sure, she would participate in that function,

6  absolutely.

7      Q.   Was Laura Shannon asked to close terminated

8  accounts?

9      A.   She would also, again, if that were the case, she

10 would be involved in -- that's a normal part of her job.

11     Q.   Was Laura Shannon asked to arrange client

12 meetings?

13     A.   She could be.  Again, that's a normal part of

14 that job, that function.

15          MR. LAROSA:  Why don't we take a five-minute

16 break.  I think I'm close to the end for the day.

17          (Recess taken.)

18 BY MR. LAROSA:

19     Q.   Let's go back on the record.  Just a few more

20 questions and then we will be finished for the day.

21     A.   Sure.  Okay.

22     Q.   During the time that Linda Blozis worked in the

23 Delaware office there were no male portfolio

24 administrators in the Delaware office; is that correct?

74

1    A.    I believe that's correct.

2    Q.    And there were no younger portfolio

3 administrators in the Delaware office during the time

4 Linda Blozis worked there?

5    A.    I'm not sure.

6    Q.    Kathy Agne may have been a portfolio

7 administrator in the Delaware office who may have been

8 older than Linda Blozis; is that correct?

9    A.    That's a possibility.  That's the reason for me

10 not being sure.

11   Q.    Aside from Kathy Agne, after she left there were

12 no younger portfolio administrators in the Delaware

13 office; is that correct?

14   A.    Well, there were only two.  There was Linda and

15 then there was Marie -- Maria, I guess.  And clearly

16 Maria was younger than her.  I don't know how old Maria

17 was.

18   Q.    Why was that clear or clearly?

19   A.    Well, my guess is Linda would have probably

20 been -- not Linda.  Excuse me.  Maria would probably have

21 been about 30.  I mean she, she wasn't -- she looked

22 young.  I mean, I, I don't know how --

23   Q.    You could tell by looking at her?

24   A.    I mean you could easily tell that one was

A-163



WILCOX & FETZER LTD.
Registered Professional Reporters

```
 1  State of Delaware )
                     )
 2  New Castle County )

 3

 4              CERTIFICATE OF REPORTER

 5
              I, Eleanor J. Schwandt, Registered
 6  Professional Reporter and Notary Public, do hereby
    certify that there came before me on the 19th day of
 7  December, 2006, the deponent herein, BRENDAN MICHAEL
    GILMORE, who was duly sworn by me and thereafter examined
 8  by counsel for the respective parties; that the questions
    asked of said deponent and the answers given were taken
 9  down by me in Stenotype notes and thereafter transcribed
    by use of computer-aided transcription and computer
10  printer under my direction.
11              I further certify that the foregoing is a
    true and correct transcript of the testimony given at
12  said examination of said witness.
13              I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15                                COPY
16
17                        Eleanor J. Schwandt
18                        Certification No. 125-RPR
19                        (Expires January 31, 2008)
20
    DATED:
21
22
23
24
```