1    files and documents on his desk as to others?
2       A.   As to others?
3       Q.   When you said you went to Philadelphia and you
4    saw on his desk trust files and other documents, it
5    seemed like you were saying that he had more of it on
6    his desk to do than other people?
7       A.   Yes.
8       Q.   My question was: Who are the other people that
9    seemed to have less on their desk than Mr. Bell?
10      A.   To the best of my recollection, the other trust
11   administrating officers at that time.
12      Q.   When was the period of time where you would go
13   and you would make that observation about the amount
14   of work on Mr. Bell's desk?
15      A.   As I remember, for the time period that
16   Mr. Bell was assigned to, was sitused in Philadelphia
17   as part of the team, of the Gilmore Delaware team.
18      Q.   Did you ever ask Mr. Bell why it was that he
19   had more files and documents on his desk than the
20   other trust officers?
21      A.   I don't recall asking Mr. Bell specifically
22   that question.
23      Q.   But words to that effect?
24      A.   Words to the effect?



1  Q. That you seem to have more -- when you say you
2  don't recall specifically asking him that question, it
3  may not have been the specific question of "I see you
4  have more trust files and documents on your desk than
5  the other trust officers."
6         It may have been "Oh, I see that you seem,
7  you know, you have more work than the others" or what
8  I was getting at when you said not specifically, it
9  may not have been that specific question but it may
10 have been in the ballpark of that question.
11 A. In the ballpark of that question.
12 Q. What would it have been?
13 A. To the best of my memory, I may have made a
14 comment to Mr. Bell about his workload and what was
15 apparent to all team members to be his workload.
16 Q. Did Mr. Bell ever say that he felt that he was
17 given more work because of his age?
18 A. No.
19 Q. And Mr. Gilmore was the person that was
20 responsible for giving all the trust officers work, to
21 your knowledge?
22 A. To my knowledge, as team leader Brendan Gilmore
23 assigned the case loads to the individual trust
24 officers.

1   Q.  Before we were talking about others that
2   Mr. Gilmore had put pressure on and Mr. Bell was one
3   and Ms. Squier was another?
4   A.  Is that your question?
5   Q.  Yes.
6   A.  Linda Squier was another.
7   Q.  And why do you say that Mr. Gilmore put
8   pressure on Linda Squier to resign?
9   A.  I was a witness to instances of those times
10  when Brendan Gilmore put pressure on Linda Squier.
11  Q.  And what did you witness?
12  A.  I witnessed Brendan Gilmore's unprofessional,
13  critical criticisms of how Linda Squier conducted her
14  work.
15  Q.  And do you remember when you witnessed this?
16  A.  Specifically not the dates.
17  Q.  Years?
18  A.  To the best of my memory, it would have been
19  the last year and a half that Linda Squier was
20  employed by Mellon.
21  Q.  I take it you don't remember when she left
22  Mellon?
23  A.  Not the exact date.
24  Q.  Was it sometime in 2000, in the 2000's?

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.   To the best of my memory, it was before then,
2  the late 1990's.
3    Q.   Before we talk about Linda Squier, do you
4  remember -- I want to close the loop on Bell.
5         You had said that you also had
6  conversations with Linda Squier about Bell's workload?
7    A.   Yes.
8    Q.   When did you have conversations with her?
9    A.   I don't recall the exact dates.
10   Q.   What was the substance of the conversations?
11   A.   To the best of my recollection, on various
12 occasions Linda Squier would share information about
13 Robert Bell's workload.
14   Q.   And what would she say about the workload?
15   A.   To the best of my recollection, Linda strongly
16 intimated and stated that Mr. Bell was overloaded with
17 work.
18   Q.   Do you know if Mr. Bell -- let me back up.
19        Do you know if Mr. Gilmore ever had any
20 criticisms of Mr. Bell's work?
21   A.   To the best of my memory, I don't recall
22 specific dates, but I do recall Brendan Gilmore
23 criticizing Mr. Bell's history or work as a past
24 employee.

1   that she would have been responsible for in her
2   history with Mellon.
3       Q.   And do you know if the criticism was accurate
4   criticism?
5       A.   Not always.
6       Q.   When you say, "Not always," meaning not always
7   accurate criticism?
8       A.   Of Linda Squier's?
9       Q.   That's what I mean.
10          When you say not always accurate
11  criticism, why do you say that?
12      A.   Brendan Gilmore was a brusque, arrogant
13  manager.  I recollect Linda Squier's rapport with the
14  trust clients to be professional.  I felt when Brendan
15  Gilmore criticized her, it was completely unwarranted.
16      Q.   Did Linda Squier discuss with you that she felt
17  that Brendan Gilmore's criticisms of her were
18  unwarranted?
19      A.   Yes.
20      Q.   Would that be what she would say, words to that
21  effect?
22      A.   Yes.
23      Q.   Did Linda Squier ever tell you that she felt
24  that she was being treated by Mr. Gilmore in that

1  fashion, unprofessional criticism, brusque, because of
2  her age?
3      A.   Specifically I don't recall that she used the
4  word "age."
5      Q.   What did she use?
6      A.   Used in?
7      Q.   When she didn't use the specific "I think I'm
8  being treated this way because of my age," I gather
9  she never said that, did she say things that made you
10 believe that age was the reason?
11     A.   To the best of my memory, Linda would talk
12 about, she would talk about the length of time that
13 she had served her trust clients in Mellon.
14     Q.   In fact, in terms of she held the position for
15 a while and knew her job, so to speak?
16     A.   Yes.
17     Q.   You said that you had, I guess you had actually
18 seen Gilmore brusquely criticizing Linda and you said
19 you also had heard it?
20     A.   Yes.
21     Q.   The same thing, brusque criticism?
22     A.   Yes.
23     Q.   When you say you heard it, is your office next
24 to hers or is it in the hallway?  How is it that you

1   you weren't in the Philadelphia office?

2       A.   That's correct.  Yes.

3       Q.   Were there any individuals 40 and younger who

4   left Brendan's team at any point that you were there?

5       A.   As I recall, I don't know the exact age of Ray

6   Masucci and Scott Gilliland, but they had left the

7   Gilmore team.

8       Q.   Do you know why Masucci left?

9       A.   No.

10      Q.   And you had said Scott?

11      A.   Gilliland.

12      Q.   Gilliland.  Do you know why he left?

13      A.   No.

14           MR. LaROSA:  Ms. Blozis, we have been

15  going for over 90 minutes.  Would you like to take a

16  break?

17           THE WITNESS:  I would like to take a rest

18  room break.

19           MR. LaROSA:  Can we take a five-minute

20  break?

21           MS. WILSON:  Sure.

22           (A brief recess was taken.)

23           MS. WILSON:  Can you mark this as Blozis

24  2, please?

```
 1              (Blozis Deposition Exhibit No. 2 was
 2   marked for identification.)
 3   BY MS. WILSON:
 4      Q.   If you will look at what's been marked as
 5   Blozis 2 and for the record, since it's a number of
 6   documents, it's P3, P4, P5 and P6 Bates stamped.
 7      A.   (Reviewing document).
 8      Q.   Ready?
 9      A.   May I take a few more moments to scan this?
10      Q.   Sure.  Let me know when you're ready.
11      A.   (Reviewing document)  I'm ready.
12      Q.   Great.  Ms. Blozis, if you would look at the
13   first page of Blozis 2 Bates stamped P3, the title is
14   Portfolio Administrator Position, Philadelphia Private
15   Wealth Management.
16              Do you see where I am?
17      A.   Yes.
18      Q.   Do you recognize this document?
19      A.   To the best of my memory, yes.
20      Q.   On the left-hand side of the upper part, it
21   says, "Current as of 2003"?
22      A.   Yes.
23      Q.   Is that your writing?
24      A.   I would have to say it looks like my
```

1   the employee.
2           The employee was given an opportunity to
3   make comments or remarks at the end of it.  Ultimately
4   the supervising manager and the employee signed it and
5   it went to as best I recollect the team leader and it
6   was held I believe in a file.
7       Q.  Would you get a copy of the final signed one
8   for your files?
9       A.  Yes.
10          MS. WILSON:  Mark this as whatever the
11  next number is.
12          (Blozis Deposition Exhibit No. 3 was
13  marked for identification.)
14  BY MS. WILSON:
15      Q.  Ms. Blozis, if you would look at what's been
16  marked as Blozis 3 and let me know when you have
17  completed your review.
18      A.  (Reviewing document)  I have reviewed it.
19      Q.  Ms. Blozis, have you seen what's been marked as
20  Blozis 3 before?
21      A.  Yes.
22      Q.  And what do you recognize it to be?
23      A.  A performance review.
24      Q.  Now looking at the first page, there's some

1   handwriting at the top right.  Is that your
2   handwriting?
3        A.    At this time I don't believe that to be mine.
4        Q.    Do you recognize it?
5        A.    Recognize it?  I recognize it to be "Assessment
6   year-end 2001 Blozis."
7        Q.    Right.  But do you recognize whose handwriting
8   it is?
9        A.    I'm not sure at this time.
10       Q.    Looking at page 8 of the review, is that your
11  signature on the top there in the box on page 8?
12       A.    Do you mean the employee's signature and date?
13       Q.    Yes.  Is that you?
14       A.    Yes.
15       Q.    And underneath do you recognize that as the
16  manager's signature?
17       A.    Yes.
18       Q.    Who do you recognize that to be?
19       A.    At this time I recognize it to be Bill Becker's
20  signature.
21       Q.    Now, before I showed you Blozis 3 you had
22  described generally how the performance management
23  process would go in terms of the supervisor would
24  initiate it, fill it out, you would review it, you and

1  the position, my position had evolved from trust
2  assistant to more involved investment officer support
3  and what Mellon expected or set forth as procedures
4  required of a portfolio administrator.
5      Q.  Did he tell you what Mellon expected?
6      A.  As I recall at this time regarding this
7  review --
8      Q.  Yes.
9      A.  -- Bill was trying to impress upon me what
10 Mellon and Brendan Gilmore as part of the Gilmore team
11 expected of the team members.
12     Q.  Did he give you any specific as to what was
13 being expected?
14     A.  To my recollection, it was more investment
15 involvement of the assistants.
16     Q.  And during the time that you worked as a
17 portfolio administrator you were dealing with
18 customers that had a certain, I guess a million up in
19 terms of investment?
20     A.  Yes.
21     Q.  A million was the lowest that you dealt with?
22     A.  At the time that we retained trust files of
23 that basis.
24     Q.  Do you remember when in time that was or that



1   it started?
2       A.   At this time I do not exactly recall.
3       Q.   Now, when Becker was saying that more
4   investment involvement was being required of the
5   assistants, what does "investment involvement" mean?
6       A.   To the best of my recollection, William Becker
7   was trying to impress upon me the fact that Brendan
8   Gilmore expected the assistants to take on investment
9   duties that I recollect in a lot of instances were
10  contradictory to the prescribed responsibilities of
11  assistants.
12      Q.   And I take it when you said Brendan Gilmore was
13  asking the portfolio assistants to take on more
14  investment duties that were contradictory to their
15  prescribed duties, what were the prescribed duties?
16      A.   Of the portfolio --
17      Q.   Right, the portfolio assistants.
18      A.   To complete reports.  To the best of my
19  recollection at this time, to complete reports, to
20  prepare client reviews, to set up client meetings, to
21  complete trades for the officers, the investment
22  officers, and that's what I recall at this time.
23      Q.   As being the prescribed duties?
24      A.   At this time, yes.



1   period of time, 1999 through the end of 2001, did he
2   ever offer any criticism, to you any criticism of your
3   work?
4       A.   The -- yes.
5       Q.   What did he say?
6       A.   At a time close to the end of my employ --
7       Q.   Just during let's keep it at that '99 through
8   2001 time frame.
9       A.   No, I don't recall at that time.
10      Q.   And you were going on to say something at the
11  end of your employ.
12      A.   Yes.
13      Q.   So I think you were going to answer something
14  having to do with Gilmore offering criticism of your
15  work at the end of your employ. Was I guessing right?
16      A.   Yes.
17      Q.   What was it?
18      A.   Yes. But your question referred to the
19  '99-2001 time frame and my answer to that was no.
20      Q.   Right. And then you had gone on to talk about
21  something at the end of your employment.
22      A.   Yes.
23      Q.   I take that to be what? Around 2003 time
24  frame?

1    A.    Yes.

2    Q.    And did Gilmore say anything about your
3  performance around that time?

4    A.    Yes.

5    Q.    And what did he say?

6    A.    I don't recall verbatim. It was the incident
7  in March where we were behind closed doors and he
8  loudly, rudely and unprofessionally criticized my
9  work.

10    Q.    If you would look at your complaint which is
11  Blozis 1, paragraphs 25 and 26, page 6.

12    A.    Yes.

13    Q.    Is that the incident you're referring to?

14    A.    Yes, it was.

15    Q.    So there it says in late March 2003. You think
16  that's when it was?

17    A.    It says late April.

18    Q.    I'm sorry. Late April.

19    A.    Yes. To the best of my recollection, yes.

20    Q.    Now, what did he say?

21    A.    As stated in my complaint, specifically he
22  referred to a client meeting booklet, not as I stated
23  in the complaint.

24    Q.    Now, do you remember the client meeting booklet

1   that he was referring to?
2   A.  I recall -- I don't recall the specific
3   client's name, but I do know it was a booklet he was
4   alluding to.
5   Q.  Had there been -- I'm just looking at your
6   paragraphs 25 and 26.  Had there been an assignment
7   for you to complete a client booklet, client meeting
8   booklet?
9   A.  Yes.
10  Q.  And what is a client meeting booklet?
11  A.  It was a presentation prepared for the clients
12  that would periodically review the standing of their
13  trust investments, the progress, essentially a
14  portfolio review and what Mellon had done for them up
15  until that time.
16  Q.  And I recall your saying you don't recall the
17  specific client involved when it says a client meeting
18  booklet.
19      But had you completed the client meeting
20  booklet?
21  A.  I had completed all paperwork pertinent
22  thereto.
23  Q.  Was it one booklet that had to be completed?
24  A.  It would have been a repetitive booklet that



WILCOX & FETZER LTD.
Registered Professional Reporters

1  would have been handed out to a number of clients at
2  the meeting. Some family members were more than one
3  that would appear at a meeting.
4      Q.   So you would put together sort of the template
5  and then copies would be made of that template?
6      A.   Not exactly.
7      Q.   How would it go?
8      A.   Figures and information would be compiled.
9  Color charts would be produced and run. They would be
10 collated and assembled.
11     Q.   Was that your job to do the charts and the
12 other information you described?
13     A.   It would be my responsibility to put in the
14 numbers pertinent to that particular client's
15 portfolio.
16     Q.   Would you be getting materials from others to
17 put in the booklet?
18     A.   "Others" meaning?
19     Q.   Other, say, trust officers, other members of
20 the team.
21     A.   Occasionally, yes.
22     Q.   Do you remember whether it was the case that
23 you would be getting information from others for this
24 particular client meeting booklet?

1    A.    At this time I'm not certain.

2    Q.    So when you said that all papers pertinent to
3 that client meeting booklet had been done --

4    A.    All printed materials were completed by me.

5    Q.    And was it collated or were they usually bound
6 in some way?

7    A.    They were collated.

8    Q.    And were the booklets that you bound Velo bound
9 or have some sort of binding to them?

10   A.    Yes.

11   Q.    Was that done as well?

12   A.    In this instance?

13   Q.    Yes.

14   A.    To the best of my recollection, everything but
15 the binding was done.

16   Q.    Was Mr. Gilmore upset that the binding hadn't
17 been done?

18   A.    To the best of my memory, yes.

19   Q.    Can you to the best of your recollection sort
20 of walk me through that particular sequence of events?
21 I gather Mr. Gilmore -- this happened in the Delaware
22 office?

23   A.    Yes.

24   Q.    He was in the Delaware office and said, "Linda,

BY MS. WILSON:

Q. So he called you into his office?

A. Brendan Gilmore called me into an office that he would use in Delaware.

Q. Door closed?

A. Yes.

Q. Now, you said that he you used words like, looking at your paragraph 25, strongly criticized her work in a threatening and demeaning manner?

A. Yes.

Q. What did you find threatening and demeaning?

A. His lack of professional mannerism, the tone of his voice, the fact that he said or used the words or else, his bullying tactics.

Q. What was the unprofessional manners?

A. His tone was loud enough to be heard by people outside the closed door.

Q. And how do you know that other people heard?

A. When I left the office very upset Maria Dunlop, for one, came to my cubicle and shook her head and said that was not, not in these specific terms, but something to the effect that that was just terrible.

Q. And did you discuss it with her when she came and said that was just terrible?