1  something that Brendan would even have thought about
2  doing for you?
3      A.   Yes.
4      Q.   And why do you say that?
5      A.   Because there were instances when Brendan
6  Gilmore would come to Delaware as a means of a respite
7  from his work in Philadelphia and be aware of what I
8  was responsible for and not compliment me or say
9  you're doing a fine job or we should get you some
10 help, Linda, in doing it.  It was expected.  It was
11 intimidated -- I'm sorry.  It was intimated that I was
12 expected to take care of those responsibilities.
13     Q.   Is it fair to say that he never said Linda,
14 because you're an older woman I'm not going to get you
15 any help?
16     A.   He never used those exact words.
17     Q.   Did he ever refer to you as old?
18     A.   Not that I recall at this time.
19     Q.   When he would come -- this is Brendan -- when
20 he would come to the Philadelphia office, would he
21 ever give you any advice on how to handle trust
22 accounts or how to handle your work?
23     A.   I believe you said come to Philadelphia.
24     Q.   I'm sorry.  I meant Delaware.

1  A.  Bill Becker? He may have. I'm not sure.
2      MR. LaROSA: Off the record.
3      (Discussion off the record.)
4      (A brief recess was taken.)
5  BY MS. WILSON:
6  Q.  Ms. Blozis, I just want to return back to your testimony concerning the April 30th meeting with Gilmore.
       Do you feel that he used the profanity because of your age?
11 A.  I can't say at this time.
12 Q.  What about your gender?
13 A.  I can't say at this time.
14 Q.  When you say you can't say at this time, what do you mean by that?
16 A.  The best recollection of that date is that it became on his part very heated. He became very enraged and to my understanding it was unwarranted. And any time that I tried to offer a professional response to an accusation or a comment or a criticism, he took the opportunity to intimidate or insult me further and culminating in the use of profanity. Whether it was his means of shock value to scare tactics, as use of scare tactics to get me into

1  submission, I can't say, but that would be my
2  explanation as to why I can't say. It was a very
3  horrible experience.
4    Q. After the meeting was over did you remain at
5  work?
6    A. Yes.
7    Q. You worked a full day?
8    A. I don't recall at this time. I think it was
9  the same day that I was so upset that I felt my blood
10 pressure had risen. I could feel the color rise in my
11 cheeks. I was crying at my desk and I don't recall if
12 that was the specific time that I had e-mailed Greg
13 that I was so upset I had to leave to compose myself
14 and that I would make up the time, which I did.
15   Q. I think I saw something, and maybe as we start
16 going through the files, where you had taken I think,
17 you left two hours early.
18   A. I recollect that was...
19   Q. Around the 2003 time frame you worked Monday
20 through Friday?
21   A. Yes.
22   Q. And did you have set times to be into work?
23   A. As I recall, Mellon instructed us to be there
24 from 8:00 to 5:00.

1   that job on a portfolio administrator. It was to be,
2   it was to have been completed by the investment
3   officer. And in the above e-mail I stated that the
4   opportunities existed for all those names listed to
5   have completed that, and it wasn't done. And I felt
6   that I was being unjustly singled out, blamed and held
7   responsible for the lack of performance by not only
8   Bill Becker himself but previous investment officers.
9      Q.   Okay. And that is your response to Bill in the
10  top e-mail?
11     A.   That is my response to Bill in the top e-mail.
12     Q.   Now, did he agree with your assessment?
13     A.   I don't recall at this time. I don't remember
14  any subsequent e-mails to that effect.
15     Q.   Now looking at your e-mail on top as it relates
16  to the client Bill.
17     A.   Yes.
18     Q.   The second sentence of the first paragraph, "I
19  apologize for my own delay in completing it in a more
20  timely manner."
21     A.   Yes.
22     Q.   What did you feel that you hadn't completed in
23  a timely manner?
24     A.   I don't recall at this time. I felt I always

1  handled customer relations with the upmost of care,
2  but I also didn't know the extent of my liability and
3  responsibility and cost basing was not part of the
4  job. That was to be left to portfolio administrators.
5  Q. You say in the second paragraph of your e-mail
6  to Bill "I will make every attempt to contact those
7  Mellon people who can help me resolve this issue."
8  Do you see that?
9  A. Yes.
10 Q. Was it in terms of next steps you were going to
11 reach out to others to provide that cost basing?
12 A. To the best of my recollection, it would have
13 been my attempts to contact an officer who would have
14 performed the cost basing duties.
15 Q. And prior to receiving the October 8th e-mail
16 from Bill to you, had you reached out to other Mellon
17 people to do the cost basis analysis?
18 A. I don't recall at this time.
19 Q. Is it fair to say that you disagreed with Bill
20 Becker's assessment of your handling of the client
21 Bill's account?
22 A. Yes.
23 Q. Just going back to the April 30th meeting with
24 Gilmore, is it fair to say you disagreed with his

1  do with Becker.
2           First of all, let me ask you do you feel
3  that Bill Becker acted in a way that was
4  discriminatory towards you because of your age?
5     A.   Yes.
6     Q.   And because of your gender?
7     A.   Yes.
8     Q.   Let's start with age.
9           Can you give me the reasons why you feel
10 that Bill Becker was acting discriminatory against you
11 because of your age?
12    A.   I can't give you specific reasons at this time.
13 I can only state that from my recollection when I
14 first worked for Bill in the early months and years he
15 seemed to be very satisfied with my employment and my
16 performance and especially after Kathleen Agne's
17 dismissal I felt that they were very appreciative of
18 all of the extra effort I was putting forth because I
19 was doing double duty.  And it evolved to a point
20 where I didn't understand Bill's change in attitude
21 and criticism of my work.
22          And all I could determine was that he
23 became a pawn for Brendan Gilmore's plan to dismiss
24 the last surviving, to quote his own word, the

1   survivor of the original team. So I could only
2   conclude that it was discrimination against me as far
3   as age and gender.
4       Q.   With respect to Becker, did you ever hear him
5   make any comments that you considered to be
6   anti-older-worker related?
7       A.   I don't recall at this time.
8       Q.   What about anti-woman comments?
9       A.   Towards?
10      Q.   Towards you or anyone else.
11      A.   Not towards me at this time, but there might
12  have been instances when comments were made about
13  older women in the Philadelphia office.
14      Q.   By Bill?
15      A.   As I recollect, perhaps, yes.
16      Q.   What do you remember?
17      A.   Nothing specific at this time.
18      Q.   Were those comments that you overheard or
19  comments that people told you about?
20      A.   I'm not sure at this time if they were either.
21      Q.   You're not sure what they were in terms of
22  older women in Philadelphia?
23      A.   I'm not sure.
24      Q.   Do you remember whether he used the words older

1   women?

2   A.   I don't believe he -- I don't recollect him

3   using older women, but if a name was mentioned

4   everyone was aware of that person's age or status

5   within the company as far as years in.

6   Q.   But you don't remember specifically what it

7   was?

8   A.   Not at this time.

9   Q.   Do you remember the time?

10  A.   Meaning time of day, time of year?

11  Q.   The time frame in which -- I understand you

12  said you don't remember.

13  A.   Not specifically, no.

14  Q.   I didn't ask you about Gilmore.  Did you ever

15  hear him make any anti-women comments?

16  A.   At this time I don't recollect.

17  Q.   Do you feel that Becker started to be more

18  critical of your job performance when he was trying to

19  move on to get his own team?

20  A.   Yes.

21  Q.   Did you ever hear Becker and Gilmore have any

22  discussions about getting rid of the older employees?

23  A.   No.

24  Q.   Or getting rid of you?



WILCOX & FETZER LTD.
Registered Professional Reporters

1   A.   Did I hear, overhear discussions?

2   Q.   Yes.

3   A.   I can't say at this time that I heard specific
4   discussions, no.

5   Q.   I know we haven't talked about the period of
6   time that you started working with Landis, but while
7   we're on it I want to sort of finish this out.

8        With respect to Greg Landis, are you
9   claiming that Greg Landis acted in a way that was
10  discriminatory towards you because of your age or
11  gender?

12  A.   I recollect that Greg was also acting on behalf
13  of Brendan Gilmore to subsequently get me dismissed.

14  Q.   When you say that, is that similar to what you
15  were saying with Bill and that you felt that Greg like
16  Bill was acting as a pawn for Gilmore?

17  A.   Yes.

18  Q.   And you felt that was because of your age?

19  A.   Yes.

20  Q.   And because of your gender?

21  A.   Yes.

22  Q.   Did Greg Landis ever make any comments that you
23  felt to be anti-age comments, either to you or to
24  others?

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.   I don't recall at this time.

2    Q.   What about anti-women comments to you or to
3 others?

4    A.   I don't recall at this time.

5    Q.   And did you ever hear any discussions between
6 Greg or Becker or Gilmore in which they were talking
7 about getting you out of the company?

8    A.   I didn't hear specific discussions.  They would
9 meet frequently behind closed doors.

10   Q.   And because they were behind closed doors, you
11 don't know what they were talking about, correct?

12   A.   Correct.

13   Q.   Now, I've asked you about Becker, Gilmore and
14 Landis as it relates to age discrimination and sex
15 discrimination, sex or gender discrimination.

16        Were there others at Mellon that you're
17 claiming also engaged in age discrimination and sex
18 discrimination against you?

19   A.   Specifically, I don't recall naming others than
20 Gilmore, Becker or Landis at this time.

21   Q.   Is it those three?

22   A.   Mm-hmm.

23   Q.   Now, with respect to your employment,
24 Ms. Blozis, did you ever keep a diary of events?

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

```
 1    A.    I don't recall at this time.
 2    Q.    What about Gilmore, did Gilmore during the
 3  period between February of '03 and May 19th of '03
 4  express any dissatisfaction with your work?
 5    A.    Between -- I'm sorry.  The dates?
 6    Q.    February of '03 and May 19th of '03.
 7    A.    That would have included the infamous April
 8  date.
 9    Q.    That's right.
10    A.    And that's the only time I recollect that
11  Brendan Gilmore was critical to the extent of
12  unprofessionalism and ungentlemanly conduct.
13    Q.    Did you have any conversations prior to receipt
14  of Blozis 14 with anyone that it was coming?
15    A.    I don't understand.
16    Q.    Well, did someone say, you know, prior to you
17  actually receiving Blozis 14 did anyone say, for
18  example, Linda, we're not seeing improvement; we're
19  going to be issuing you a final written warning for
20  performance?
21    A.    I don't believe anybody said anything.  There
22  was a reference to it in the review.
23    Q.    Other than the reference in the review?
24    A.    I don't recall anybody specifically saying that
```

1   A. I recollect that's the time frame.

2   Q. And the basis for your belief that Blozis 14
3   was given to you because you complained is what?

4   A. I'm sorry. I didn't hear the end of your
5   sentence, your question.

6   Q. Let me change it and make it a better question,
7   if I can.

8         Why do you think that, why do you think
9   that you were given Blozis 14 because you complained
10  about Gilmore?

11  A. I don't know why Gilmore would have pushed it
12  to that limit.

13  Q. With respect to giving you the final written
14  warning?

15  A. Yes.

16  Q. My question still was unclear.

17        As I recall your complaint, you alleged
18  that you were placed on final written warning for
19  performance out of retaliation for having complained
20  about Brendan Gilmore to Rosemary. Is that accurate?

21  A. Yes.

22  Q. And my question is: Why do you feel it was
23  retaliatory conduct?

24  A. I'm not sure at this time other than I believe

1  Brendan Gilmore may have been grossly offended by my
2  complaint to HR and expedited his dismissal of me for
3  that reason.
4      Q.   Why do you feel he was grossly offended by it?
5      A.   Because of his arrogant, unprofessional
6  demeanor that was displayed in the past and at that
7  meeting.
8           MS. WILSON:   It's 7:00.
9           MR. LaROSA:   Are we finished with this
10 exhibit?
11          MS. WILSON:   We are.
12          MR. LaROSA:   So why don't we adjourn for
13 the day?
14          (Deposition adjourned at 7:00 p.m.)

```
 1   State of Delaware    )
                          )
 2   New Castle County    )

 3

 4                    CERTIFICATE OF REPORTER

 5
          I, Kurt A. Fetzer, Registered Diplomate
 6   Reporter and Notary Public, do hereby certify that
     there came before me on Wednesday, July 26, 2006, the
 7   deponent herein, LINDA J. BLOZIS, who was duly sworn
     by me and thereafter examined by counsel for the
 8   respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
 9   in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.

11        I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.

13        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16              [signature]
                _____
17              Kurt A. Fetzer, RDR, CRR
                Certification No. 100-RPR
18              (Expires January 31, 2008)

19   DATED: _____7-31-06_____

20

21

22

23

24
```



WILCOX & FETZER LTD.
Registered Professional Reporters

A-249