# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LINDA J. BLOZIS                     )
                                    )
              Plaintiff,            )
                                    )   Civil Action
v.                                  )   No. 05-891 SLR
                                    )
MELLON TRUST OF DELAWARE, NATIONAL  )
ASSOCIATION, a Pennsylvania         )
corporation; MELLON BANK, NATIONAL  )
ASSOCIATION (formerly Mellon Bank   )
(DE) NATIONAL ASSOCIATION), a       )
Pennsylvania corporation; and       )
MELLON FINANCIAL CORPORATION, a     )
Pennsylvania corporation,           )
                                    )
              Defendants.           )


         Deposition of ROSEMARY CURTIS THOMAS taken
pursuant to notice at the law offices of John M. LaRosa,
Two East 7th Street, Wilmington, Delaware, beginning at
9:27 a.m., on Tuesday, December 19, 2006, before Eleanor
J. Schwandt, Registered Merit Reporter and Notary Public.

APPEARANCES:

        JOHN M. LAROSA, ESQ.
        LAW OFFICE OF JOHN M. LAROSA
        Two East 7th Street
          Wilmington, Delaware  19801
          for the Plaintiff

        STEPHANIE WILSON, ESQ.
        REED SMITH, LLP
          13 Main Street - Suite 250
          P.O. Box 7839
          Princeton, New Jersey  08543-7839
          for the Defendants


            WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Rosemary Curtis Thomas

48

1    managers just have one location.  He had two.

2              Now, there are other teams in Philadelphia

3    besides what we were refer to it as the Gilmore team,

4    because he was the manager.  There are other managers of

5    other teams in the Philadelphia office.  That's the

6    largest office.  So there is more than one investment

7    management team there.

8              And I don't believe that Frances Smith had

9    anything to do with Brendan Gilmore on his team.

10       Q.   Other than they both worked in the Philadelphia

11   office?

12       A.   Other than they both worked in the Philadelphia

13   office, that's it.

14       Q.   And was there a Martha Fetters who worked for

15   Mellon?

16       A.   Yes.

17       Q.   What was her title?

18       A.   I don't remember.

19       Q.   Did she work for Brendan Gilmore?

20       A.   Yes, she did.

21       Q.   And did she eventually resign?

22       A.   I don't remember.  I believe she did.

23       Q.   As far as a time frame, was that in approximately

24   2003?



Rosemary Curtis Thomas

49

1   A.   I really don't remember.

2   Q.   Was there a Linda Squirer who worked at Mellon?

3   A.   Yes.

4   Q.   And did she work for Brendan Gilmore?

5   A.   Yes.

6   Q.   What was her title?

7   A.   I don't remember.

8   Q.   Did she eventually resign?

9   A.   Yes.

10  Q.   Was that recently or was that a few years ago?

11  A.   That would have been a few years ago.

12  Q.   Do you think that was in approximately 2003?

13  A.   I'm sorry, I really don't remember the year.

14  Q.   Was there a Robert Bell who worked at Mellon?

15  A.   Yes.

16  Q.   Was he a senior trust officer?

17  A.   Yes, I believe he was.

18  Q.   Did he work for Brendan Gilmore?

19  A.   Yes, he did.

20  Q.   And did he eventually resign?

21  A.   As I recall, he retired.

22  Q.   Was that a joint decision by him and Mr. Gilmore?

23  A.   As I recall, he retired, and retirement would be

24  solely his decision.  We don't have mandatory retirement.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Rosemary Curtis Thomas

72

1    they feel that the problem is with their manager, they

2    can go to their human resources person, which would be

3    me.

4            If they want to go to someone else, there is

5    a third forum or a person they can go to which would be

6    Employee Relations.

7    Q.    Okay.  So they can go to their manager, they can

8    go to the Employee Relations or they can go to you?

9    A.    Mm-hmm.  Or, I'm sorry, they can go to their

10   manager's manager.

11   Q.    And did there come a point in time in 2003 when

12   Linda Blozis came to you about an employment

13   discrimination issue?

14   A.    I had a meeting with Linda in 2003, after a

15   meeting that she had had with Brendan Gilmore, and she

16   felt that some of Brendan's comments to her were based on

17   age discrimination.

18   Q.    Okay.  I'm going to show you a document, ask that

19   it be marked as Exhibit, I believe it is Exhibit 4.

20           (Thomas Deposition Exhibit 4 was marked for

21   identification.)

22   Q.    Take a moment to review this two-page document.

23           Have you had a chance to read that?

24   A.    Yes.



Rosemary Curtis Thomas

73

1  Q.   I'll represent to you that this document says

2  MEL/BLOZ 468, on the second page MEL/BLOZ 469 at the

3  bottom right-hand corner.  Have you seen a copy of this

4  document before?

5  A.   Yes.

6  Q.   And what is this document?

7  A.   These are notes that I took after a phone call or

8  on a phone call with Linda.

9  Q.   Okay.  This is in cursive handwriting?

10  A.   Yes, and not quite good cursive handwriting

11  either.

12  Q.   Okay.  Fair.  Fair enough.  But not the most

13  illegible handwriting either.

14            So can you walk us through and read out loud

15  what you wrote on this, starting with this first page?

16  A.   Yes.  Okay.  I said "Linda's meeting with Brenda

17  Gilmore, tone and timber of voice so disruptive to other

18  staff members, demeaning and degrading."  And she "Said

19  age discrimination."

20            And then I'm quoting what she said Brendan

21  said, "Other assistants are producing a lot more," or "a

22  lot more and a lot faster."  So "Other assistants

23  producing a lot more and a lot faster.

24            "He hollered at Linda.  Linda went to Gregg



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-333

Rosemary Curtis Thomas

74

1   to see if Becker's group could do." That meant do the

2   work that she was assigned to do.

3           "Bill talked to Brendan. Brendan came to

4   see her." That means Brendan came down to Delaware to

5   talk with her.

6           She said, "It only occurred last week to her

7   that they could not finish," she could not finish the

8   assignment on time.

9           "Linda and Maria did get the job done."

10          And then she goes on to say, "Brendan can

11  come and go with no one watching him." And we talk about

12  a "Skills assessment" and "Has not refused," which means

13  she did not refuse to do the skills assessment.

14          And the skills assessment was something that

15  we had asked all of the portfolio administrators to

16  complete, so we could get a handle on where they were

17  with their skills and would be able to assist them where

18  we felt that they were lacking.

19      Q.  So what is the date you have put on the top

20  right-hand corner of this?

21      A.  5/01/03.

22      Q.  Did you make these notes the same day you met

23  with Miss Blozis?

24      A.  I made them the same day. Might not have been

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

1   when I was on the phone with her, but a lot of times I'll

2   go back and write things down after I've gotten off the

3   phone, because I may get distracted once I get off the

4   phone, I may have another call or something, but I try to

5   write them in the same day.

6       Q.   So to the best of your recollection, these were

7   taken the same day that she came to you?

8       A.   Mm-hmm.

9       Q.   I'm sorry?

10              MS. WILSON:   Yes?

11      A.   Yes.  I'm sorry.

12      Q.   And she had complained about age discrimination

13  by Brendan Gilmore?

14      A.   Yes.

15      Q.   So was Miss Blozis following the proper channels

16  and the proper policy by coming to you with an age

17  discrimination complaint?

18      A.   Yes.  And I think I'm looking at the order of the

19  notes and it says "age discrimination" and typically if

20  someone says that to me, any type of discrimination, I

21  ask them why, why do you feel that way, and that's when

22  she said that Brendan said to her the "Other assistants

23  are producing a lot more and a lot faster."

24      Q.   And what was the next two words?



WILCOX & FETZER LTD.
Registered Professional Reporters

Rosemary Curtis Thomas

76

1    A.    Then I have "age discrimination" again, and she

2    felt that that was age discrimination because he referred

3    to the other assistants who she said were younger than

4    her.

5    Q.    I think you have told us too that no one was

6    older, none of the other portfolio administrators were

7    older than her?

8    A.    To my knowledge, none of them were older than

9    her, but there were definitely other portfolio

10   administrators who were over 40.

11   Q.    With regard to Mellon's policies and procedures,

12   what did you do next after recording these notes?

13   A.    Okay.

14   Q.    With regard to this issue?

15   A.    I called Tom Galante.  And Tom Galante is our

16   Employee Relations person.  And I discussed the

17   conversation that I had with Linda with Tom.

18   Q.    What did you do next?

19   A.    Tom said that he would contact Brendan to have a

20   discussion with him about this, and I remember then

21   calling the office in Delaware and talking to Maria

22   Bannister, who is the other portfolio administrator

23   there, and asking her about this incident, did she hear

24   anything, did she hear what Brendan said.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Rosemary Curtis Thomas

77

1    And as I recall, Maria said that there was

2 some noise, louder noise surrounding their conversation,

3 but it appears that they were in an office so she did not

4 hear, you know, what was being said.  She could just hear

5 that they were talking in elevated voices.

6    I talked to Brendan about the age

7 discrimination, and then I circled back around to meet

8 with Tom Galante and to discuss this some more.  And we

9 determined from the conversations that we had with

10 people, in looking at the situation, that we did not see

11 evidence of age discrimination.

12    Q.   Okay.  You said the conversations that we had

13 with people?

14    A.   Yes.

15    Q.   Other than Brendan Gilmore and Maria Bannister --

16    A.   I talked with Gregg Landis and Bill Becker.

17    Q.   Okay.  Other than them, did you interview anyone

18 else?

19    A.   I believe I spoke with Marion Marano, because

20 Marion was the other person in the group that would have

21 been closest to Linda's age.

22    Q.   Was she someone who was stationed in

23 Philadelphia?

24    A.   Yes.

Rosemary Curtis Thomas

78

1    Q.   After you made a determination about this issue,

2    was it decided that any further action should be taken?

3    A.   We determined that the actions were not based on

4    age discrimination, and I got back to Linda to have a

5    conversation with her about it.

6    Q.   Aside from Maria Dunlop, who that you interviewed

7    indicated that they overheard the conversation between

8    Linda Blozis and Brendan Gilmore?

9    A.   Only Maria.  And like I said, she said she could

10   hear that their voices were elevated, but she didn't hear

11   what they were saying.

12   Q.   Is it Mellon's policy for human resources to open

13   up a confidential file when an HR complaint is made?

14   A.   I don't think I understand what you are saying.

15   Q.   Was any kind of a file, internal file, opened up

16   regarding this complaint?

17   A.   In other words, would I have notes in a file,

18   separate file regarding the complaint?

19   Q.   Yes.

20   A.   It is not our policy to necessarily do that, no.

21   Q.   Did you do that?

22   A.   I -- you know, I am sure that I jotted down

23   something else.  I'm not quite sure what happened to it.

24   Tom would probably have more notes than I would.

Rosemary Curtis Thomas

79

1    Q.   Tom Galante?

2    A.   Yes.

3         MR. LAROSA:  To the extent that there is any

4    other notes by Miss Thomas, we would request those notes.

5         MS. WILSON:  John, if you can just put that

6    in a letter, I would take it under advisement.

7         MR. LAROSA:  Sure.

8         THE WITNESS:  I would say I transitioned

9    offices and, unfortunately, some of my records could have

10   been destroyed in that transition.

11   BY MR. LAROSA:

12   Q.   When did you transition offices?

13   A.   It was right around this time.  I don't remember

14   exactly.  But I was on another floor in the building and

15   I moved up to the eighth floor.

16   Q.   When you moved up to the eighth floor did you

17   find that some of your things were missing or destroyed?

18   A.   I found that as I was putting things back in the

19   file, there were some things that I thought I had that I

20   did not see.

21   Q.   As far as disciplinary action, does Mellon have a

22   form of disciplinary action called a final written

23   warning?

24   A.   Yes, we have a corrective action process.  The

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Rosemary Curtis Thomas

80

1    process is initial warning, final written warning, and

2    the third stage would be termination.  When we terminate

3    we do not type up the warning to give to the employee at

4    that point.

5        Q.   Because they have already received a final

6    written warning?

7        A.   Yes.

8        Q.   Prior to that?

9        A.   Yes.  And the final written warning states if

10   there is not continued, and some other word they use in

11   there, improvement, sustained -- continued and sustained

12   improvement, that it could lead to the next stage of the

13   corrective action policy, up to and including

14   termination.

15       Q.   So there were no other written reprimands in

16   Linda Blozis' file other than the final written warning?

17       A.   Correct.  And I can explain that.

18       Q.   Okay.  Go ahead.

19       A.   Okay.  In one of Linda's performance reviews, the

20   one that she was rated needs improvement, it is stated if

21   you are rated at that level, that that would be an

22   initial warning to you.  She was given that initial

23   warning in the review, which is not uncommon if you are

24   rated at that level to get an initial warning with your

1   State of Delaware )
                      )
2   New Castle County )

3

4                  CERTIFICATE OF REPORTER

5

6           I, Eleanor J. Schwandt, Registered
    Professional Reporter and Notary Public, do hereby
    certify that there came before me on the 19th day of
7   December, 2006, the deponent herein, ROSEMARY CURTIS
    THOMAS, who was duly sworn by me and thereafter examined
8   by counsel for the respective parties; that the questions
    asked of said deponent and the answers given were taken
9   down by me in Stenotype notes and thereafter transcribed
    by use of computer-aided transcription and computer
10  printer under my direction.
11          I further certify that the foregoing is a
    true and correct transcript of the testimony given at
12  said examination of said witness.
13          I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.

15                       COPY

16

17                  Eleanor J. Schwandt

18                  Certification No. 125-RPR

19                  (Expires January 31, 2008)

20

    DATED:

21

22

23

24