## SUMMARY OF ARGUMENT

Plaintiff certainly can establish a prima facie case of retaliation under the ADEA. She engaged in protected activity by making a human resources' complaint of age discrimination against her Team Leader Gilmore. HR informed Gilmore, and he immediately issued Plaintiff a Final Written Warning on May 14th. Then exactly two months later on July 14th, Defendants discharged Plaintiff. The sole, motivating, or determinative reason for terminating Plaintiff was retaliation for her protected activity.

Also under the ADEA, Plaintiff has a prima facie case of discriminatory discharge. She was 57 years old and qualified for her position after more than thirteen years of continuous service. Defendants fired her and replaced her with a substantially younger employee in her 30's.

Under prong two of Fuentes, the natural probative force or weight of the evidence demonstrates retaliation and discrimination. The circumstantial evidence of retaliation includes (1) Gilmore's awareness of Plaintiff's protected activity, (2) the very suggestive and close temporal sequence of events in which Gilmore's only disciplinary action against her occurred just 14 days after she reported him for age discrimination, (3) Defendants' violation of its own progressive discipline policy in issuing Plaintiff a "Final" Written Warning without ever issuing her an Initial Written Warning, and (4) Gilmore's demonstrated antagonism toward her that included his ripping down her vacation notice which she posted at her cubicle. This *circum*stantial evidence allows a jury to infer that retaliation was more likely than not a motivating or determinative cause of the adverse employment actions.

Similarly, there also is a great deal of evidence of age discrimination including (1) Gilmore's demonstrated antagonism in yelling and cursing at Plaintiff in a closed door meeting on April 30, 2003, (2) his poor treatment of the 57 year old plaintiff and his positive treatment of

2

her 23 year old peer in granting training, bonuses, and vacation requests, (3) his age bias against Plaintiff and other older employees as evidenced by the firing or forced resignation of all of the older, long-term employees shortly after he took over, (4) his discriminatory motive of replacing all of those older employees with significantly younger ones, and (5) his statement that Plaintiff was a "survivor" made just days before he issued her the "final" written warning. This remark along with all of this circumstantial evidence allows a jury to infer that age discrimination was more likely than not a motivating or determinative cause of the adverse employment actions.

Under prong one of Fuentes, a jury also can choose to disbelieve any non-discriminatory reason offered by Defendants because Plaintiff can demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendants' stated reasons.

Moreover, Defendants discriminated against Plaintiff in the terms and conditions of her employment because of her age by the aforementioned preferential treatment of Plaintiff's 23 year old peer in granting her training, bonuses, and vacation requests.

Finally, Defendants discriminated against Plaintiff in the terms and conditions of her employment because of her sex, as demonstrated by Gilmore's preferential treatment of the one, lone male portfolio administrator who was not required to perform as much work as Plaintiff or other female peers, nor disciplined or discharged for his performance problems.

### STATEMENT OF FACTS

**I. Parties.** Plaintiff Linda J. Blozis is presently a 61 year old female. Compl. at ¶¶ 7-8 and Answ. at ¶ 8: B2, 20.[1] She was employed continuously by Defendants from February 14, 1990 to July 14, 2003. Landis at 9-10, Gilmore at 11-12; B432-33, 694-95. During those more than thirteen years, she worked as a portfolio administrator in Defendants' Private Wealth Management Department and was entrusted to work on trust accounts valued between $1 million

---

[1] She was 57 when discharged on July 14, 2003. Pl. at 3, 291, 293, Compl. and Answ. at ¶¶ 31-32: B7, 23, 53, 341, 343.

3

and $50 million dollars. Gilmore at 11, Thomas at 23; B432, 603.[2]

Defendant Mellon Trust of Delaware, National Association ("Mellon Trust") is a Pennsylvania corporation operating a trust bank engaging in fiduciary activities. Compl. at ¶ 9; B3. It is a subsidiary of both Defendant Mellon Bank, National Association ("Mellon Bank") and Defendant Mellon Financial Corporation ("Mellon Financial"). Gilmore at 11, Thomas at 19; B432, 599. Defendant Mellon Financial is the parent of Defendant Mellon Bank, and Mellon Financial also owns Mellon Trust. Thomas at 20-21; B600-601.

**II. Plaintiff's Good and Excellent Performance Record.** Plaintiff's performance record reveals she was a good to excellent employee. From 1992 to 2002, her performance met or exceeded expectations. Thomas at 33; B613. In over 13 years, Plaintiff was never cited for unprofessionalism, gross neglect of responsibilities, or tardiness, and her attendance record was commendable. Dunlop at 10; B509. In fact, from February 14, 1990, to May 19, 2003, she never received a demotion, suspension, written reprimand, or any other written discipline from Defendants. Gilmore at 19, Thomas at 37, Landis at 23; B440, 617, 708.

**A. Excellent Performance Under Linda Squier and Martha Fetters Until September of 1998.** As a portfolio administrator, Plaintiff reported to Administrative Officer Linda Squier and Portfolio Managers Martha Fetters, Bill Becker, and Gregg Landis. Pl. at 18, Becker at 15; B68, 808. Under Fetters and Squier from 1993 to 1997, Plaintiff's performance rating was "Exceeds Expectations" for five straight years. Thomas at 33; B613.

**B. Good Performance Under Becker: September of 1998 to December of 2002.** Fetters' employment ended prior to September of 1998. Becker at 12-13; B805-806. Plaintiff reported to Portfolio Manager Bill Becker from September of 1998 to the end of 2002. Becker at 5, 8; B798, 801. Her performance still met or exceeded expectations. Thomas at 36;

---

[2] Initially, her job title was that of a trust secretary, then trust assistant, then trust specialist and finally became a portfolio administrator. Pl. at 7, 8, 10, 14, Thomas at 23; B57, 58, 60, 64, 603.

4

B616.

**1. Covering for Becker: 2001-2002.** In 2002, Plaintiff received a $2,000 incentive bonus for her good performance in 2001. P173, Pl. at 64, Compl. at ¶ 18; B5, 114, 909.[3] Becker admits that Plaintiff did "a good job covering for [him] in 2002 . . . when [he] was out of town on client meetings, [or] working in Philadelphia." Becker at 62; B855.[4] In October of 2002, Plaintiff received a raise in annual salary from $36,000 to $39,800. Pl. at 65, Compl. at ¶ 19; B5, 115.[5] Although her boss through 2002, Becker never tried to fire Plaintiff or even recommended her discharge. Becker at 58-59, 104; B851-52, 897. Eventually in 2003, Becker left the Gilmore Team to head his own team in Philadelphia. Pl. at 24-25; B74-75.

**III. Gilmore Actively Manages Plaintiff: 2003.** Team Leader Gilmore managed the offices in Delaware, Philadelphia, and Washington, D.C. beginning in early 1998. Gilmore at 8; B429. Once Becker was re-assigned, Gilmore took a more active role in Delaware where he filled Becker's old job on an interim basis and had a closer supervisory role over Plaintiff. Gilmore at 44, Landis at 74; B465, 759. Landis was Plaintiff's direct boss, but she reported to Gilmore, and he took a more active role in managing her in 2003. Thomas at 13-14; B593-94.[6]

In early 2003, Plaintiff was named to Mellon's Innovation Council. Pl. at 368; B417.

---

[3] Bonuses were received for an employee's good performance or good performance by the team. Pl. at 63; B113.

[4] Between 2001 and 2002, Becker left the Delaware office and worked in Philadelphia. Pl. at 20; B70. While he was in Philadelphia, Plaintiff reported both to him and Landis and supported the Gilmore Team. Pl. at 21; B71. After Assistant Kathleen Agne was dismissed in March of 2002, all of the responsibility for the office fell on Plaintiff. Pl. at 250; B300. At that time, Landis and Becker were very grateful for her conscientiousness, dedication, and professional approach to her job. Pl. at 250; B300. They were very pleased that she showed up every day and took on more duties. Pl. at 250; B300.

[5] Though it was unusual for a boss to give a written commendation, Plaintiff received many written commendations from her numerous supervisors for her customer service skills and dedication to her job. Thomas at 25-26, Dunlop at 9, see, e.g., MEL/BLOZ453; B508, 605-606, 911.

[6] Along with fellow portfolio administrator Dunlop, Landis and Plaintiff worked well together. Dunlop at 77; B576.

5

The council is a group of Mellon employees given the additional responsibility of sharing and exchanging ideas in order to expedite work. Pl. at 368; B417. Plaintiff was the only employee from Delaware named to the Council. Pl. at 368; B417. Thus, up until the last months of her employment in 2003, Plaintiff understood that even Gilmore was satisfied with her performance. Pl. at 146; B196. In fact, Gilmore did not criticize Plaintiff to her face until April 30, 2003. Pl. at 147; B197. See Statement of Facts Part IV infra.

**IV. Demonstrated Antagonism: Gilmore Curses the "Survivor".** On April 30, 2003, Gilmore met with Plaintiff in his office. Pl. at 108; B158. He was upset with her because there was no binding yet on a client presentation booklet to be completed before Plaintiff left for vacation on May 2, 2003. Pl. at 83, 85; B133, 135. Plaintiff explained that all pertinent information was assembled and all numbers required in the particular client's case were prepared, but it required an investment officer's review before simply binding the booklet. Pl. at 84; B134. She further explained that the presenting officer, Landis, was unavailable until after Plaintiff left for vacation. Pl. at 97; B147.

In response, Gilmore became "very heated[]" and "very enraged[.]" Pl. at 151; B201. Though management could extend deadlines, Gilmore wanted the booklet bound regardless of whether Landis looked at it. Dunlop at 23, Pl. at 97; B147, 522. The tone of Gilmore's voice was loud enough to be heard by people outside the closed door. Pl. at 87; B137. He used "bullying" or "scare tactics" to "get [Plaintiff] into submission[.]" Pl. at 87, 151-52; B137, 201-02. He strongly criticized her work in a threatening and demeaning manner. Pl. at 87; B137. Plaintiff was stunned by his criticism of work that had always been "very acceptable and gratefully appreciated" when she previously maintained the Delaware office. Pl. at 101; B151. He told her to bind it "or else[!]" Pl. at 84, Dunlop at 35; B134, 456.

**A. Code Words By the Decisionmaker.** In addition to criticizing her work on the booklet, Gilmore "used examples of other younger portfolio administrators in Philadelphia[,]

6

saying that they were responsible for much more than [Plaintiff] was accomplishing." Pl. at 101, 126; B151, 176. He told her that younger portfolio administrators "were capable of doing more." Pl. at 102; B152. He told her those younger assistants were "producing a lot more and a lot faster." Thomas at 73, MEL/BLOZ 468; B653, 928. Plaintiff felt that some of these comments were criticizing her because of her age. Thomas at 72; B652.

In referencing her original team, Gilmore then stated that Plaintiff "was the survivor." Pl. at 112; B162. Plaintiff also interpreted this as an age-related comment. Pl. at 112; B162. Plaintiff "suspected that Brendan [Gilmore] was systematically trying to intimidate [her] because [she] was the last remaining original and oldest member on the Delaware team." Pl. at 112; B162.

"[A]ny time that [Plaintiff] tried to offer a professional response to an accusation or a comment or a criticism, he took the opportunity to intimidate or insult [her] further and culminat[ed] in [his] use of profanity." Pl. at 151, accord Gilmore at 50-51; B201, 471-72. He "t[ook] the Lord's name in vain by saying goddamn it and [used] the word s-h-i-t." Pl. at 89; B139.[7] Plaintiff was "very upset" and "very shocked by that." Pl. at 89; B139.

Plaintiff "was so upset that [she] felt [her] blood pressure had risen." Pl. at 152; B202. The meeting lasted 15 or 20 minutes. Pl. at 100; B150. She "could feel the color rise in [her] cheeks." Pl. at 152; B202. Plaintiff left Gilmore's office very upset, she "was crying at [her] desk ...," (Pl. at 87, 152; B137, 202), and was in tears because of her meeting with Gilmore. Dunlop at 31-32; B530-31. "It was a very horrible experience." Pl. at 152; B202.

One or two employees on the floor came to Plaintiff afterward to actually see if she was okay because of the raised voices in the meeting. Landis at 76; B761. Dunlop could hear the talking in elevated voices and some noise surrounding the conversation. Thomas at 77; B657.

---

[7] Gilmore admittedly used profanity at Plaintiff. Gilmore at 50-51; B471-72. He testified that he said, "What the hell is going on?" or "For Christ's sake," Gilmore at 51; B472. This was unwarranted. Pl. at 89, 151; B139, 201.

7

Afterwards, she came to Plaintiff's cubicle, shook her head, and said "that was just terrible." Pl. at 87, 89; B137, 139. Plaintiff told Dunlop that she thought Mellon was trying to get rid of the older people. Dunlop at 60; B559.[8]

**V. Plaintiff's Protected Activity: Filing an Age Discrimination Complaint Against Gilmore.** Because of the way Gilmore referred to the other younger assistants, Plaintiff felt she was the victim of age discrimination. Thomas at 76; B656. Defendants had policies for reporting employment discrimination to human resources. Dunlop at 36; B535.[9] So the next day on May 1, 2003, Plaintiff made an internal age discrimination complaint against Gilmore to HR. Thomas at 74, 75, Pl. at 109; B159, 654, 655. She told Thomas that Gilmore's words and conduct toward her were "founded in age[.]" Pl. at 111; B161.

**A. Gilmore's Awareness of Protected Activity.** Thomas told Gilmore that Plaintiff made an age discrimination complaint. Gilmore at 53-54, Thomas at 77; B474-75, 657. In connection with her investigation into Plaintiff's age discrimination complaint, she also spoke to Dunlop, portfolio administrator Maria Marano, Landis, and Plaintiff's prior supervisor, Bill Becker. Thomas at 77; B657.

**VI. Adverse Actions Following Protected Activity.**

**A. "Final" Written Warning.** Plaintiff then left for vacation on May 2nd. See E-mail from L. Blozis to G. Landis of 3/13/03 RE: Vacation dates; B922. After she returned, Gilmore issued her a "Final" Written Warning for Performance on May 19th. P42; B933. Gilmore decided to do this as early as May 9th. MEL/BLOZ689; B925. He had HR's Thomas

---

[8] Plaintiff and Dunlop completed the booklet on May 1, 2003. See MEL/BLOZ469; B929.

[9] Under Defendants' HR Policy, an employee who feels they have been subject to discrimination can go to their manager, their manager's manager, Employee Relations, or their HR person, which in this case was Thomas. Thomas at 71-72; B651-52.

8

prepare the document. MEL/BLOZ689, Thomas at 85; B665, 925.[10] Gilmore had Landis and Thomas meet and deliver his Final Written Warning to her on May 19th. MEL/BLOZ687, Thomas at 85, Gilmore at 62; B483, 665, 931. Though handed to Plaintiff by Landis, the Final Written Warning was signed and approved by Gilmore. Thomas at 86, Pl. at 235; B285, 666. After Gilmore learned she had filed her complaint, he began criticizing plaintiff and made it clear that he was out to get her. Pl. at 226, 235, 239, 250; B276, 285, 289, 300. While Plaintiff was sitting at her cubicle, Landis just handed it to her, she read it, and he walked away. Pl. at 236: B286. "[I]t was already predetermined that [Defendants] were going to get rid of [Plaintiff]." Pl. at 237; B287.

**B. More and More Criticism.** Clearly, Gilmore was "grossly offended by [Plaintiff's] complaint to HR and expedited his dismissal of [her] for that reason." Pl. at 239; B289. Plaintiff continued to come to work every day with the same professional approach and conscientious attitude towards the responsibility of her job. Pl. at 250; B300. But as time went on, it seemed that was not sufficient. Pl. at 250; B300. Suddenly after thirteen years, nothing she did was acceptable; instead she was being criticized more and more. Pl. at 250; B300. Now it seemed "[t]here was a plan to get [Plaintiff] out." Pl. at 226; B276.

**C. The Discharge.** By July 2, 2003, Gilmore decided to fire Plaintiff. MEL/BLOZ693; B934. Because she would be out of the office on July 7th and 8th, Thomas asked him to wait until at least Wednesday, July 9th. MEL/BLOZ693; B927. Then on July 14th, Landis told Plaintiff to go into an office and HR would contact her by phone. Pl. at 291; B341.

HR's Thomas actually said Plaintiff's employment was terminated. Pl. at 293, 311; B343, 361.[11] Thomas said the reason was lack of performance. Pl. at 293; B343.

---

[10] Thomas originally prepared a draft for his review on May 14th. Thomas at 85; B665. The finalized warning was dated May 19, 2003. Gilmore at 62, P42; B483.

[11] Both Landis and Dunlop were completely surprised, shocked and upset when Plaintiff was fired. Dunlop at 72-73, 74; B571-72, 573.

9