**VII. Gilmore Then Hires a Younger Replacement Who Did Not Pull Her Own Weight.** Defendants "eventually hired . . . a replacement . . . to fill [Plaintiff's] job duties." Pl. at 316-17; B366-67. Specifically, Gilmore then hired 34 year old Laura Shannon to replace Plaintiff. Gilmore at 68, Becker at 103-104, Dunlop at 14, 71, Thomas at 90-91; B484, 513, 570, 670-71, 896, 897.[12] But this replacement could not pull her own weight. Pl. at 317; B367. Dunlop "felt that she was carrying more of the burden than what she . . . shared of the duties within that [same] office when [she and Plaintiff] worked together." Pl. at 317; B367. After replacing the 13 year veteran Plaintiff, Shannon worked for Defendants for less than two years. Landis at 93; B778.

**STANDARD OF REVIEW**

A motion for summary judgment should only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c). To raise a genuine issue of material fact, "the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant, but simply must exceed the 'mere scintilla' standard." Boyle, 139 F.3d at 393 (internal punctuation omitted). "All facts and inferences are construed in the light most favorable to the non-moving party." Id.; accord Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1072 (3d Cir. 1996)(en banc). The court also "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id.

Great deference is given to the jury's role because "[o]ne of the oldest established rules of Anglo-American jurisprudence is that the jury is the arbiter of credibility of witnesses." U.S.

---

[12] Shannon's birth date is January 24, 1969. Def. Resp. to Int. 2 at p.3, accord Dunlop at 47; B38, 546.

v. Giampa, 758 F.2d 928, 935 (3d Cir. 1985); see, e.g. Sheridan, 100 F.3d at 1072. Likewise, "[i]t is well settled that where there is a conflict or contradiction of evidence, the question should be submitted to the jury." U.S. v. Rockwell, 781 F.2d 985, 990 (3d Cir. 1986). "It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts." Id.

Importantly, the court also "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 151; Springer v. Henry, 435 F.3d 268, 281 (3d Cir. 2006). As this Court recently explained in the civil rights context, even the uncontradicted testimony of interested witnesses supporting the employer, such as friends, supervisors, employees or other co-workers, should not be considered or otherwise weighed in the summary judgment balancing. "[W]hen evaluating a summary judgment motion a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant." Hill v. City of Scranton, 411 F.3d 118, 131 n.22 (3d Cir. 2005)(emphasis added)(citing Reeves, 530 U.S. at 149-151); accord id. at 129 n.16; see also Ridley v. Costco Wholesale Corp., 2007 WL 328852, slip op. at 4 (3d Cir. Feb. 5, 2007)(noting that because of the required standard of review under Reeves and Hill, an employee of the defendant was not a "disinterested witness" and disregarding her testimony on a critical evidentiary point).

## ARGUMENT

### I. PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF ADEA RETALIATION.

Plaintiff has established a prima facie cases of retaliation under the ADEA. "To establish a claim for retaliation, a plaintiff must show that: (1) [s]he was engaged in protected activities; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." Glanzman v. Metropolitan Mgt. Corp., 391 F.3d

506, 508-09 (3d Cir. 2004)(ADEA)(citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)); accord,Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).

**A. Plaintiff Engaged in Protected Activity.** Plaintiff engaged in protected activity by making an age discrimination complaint to HR. The ADEA provides that it is "unlawful for an employer to discriminate against his employees . . . because such individual . . . has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. §§ 623(d)(2000). Thus, even without an EEOC complaint, filing an internal complaint is sufficient to show that a plaintiff has engaged in a protected activity. EEOC v. Wyeth Pharm., 2004 WL 503417, at *2 (E.D.Pa. Mar. 11, 2004); Mroczek v. Bethlehem Steel Corp., 126 F.Supp.2d at 379, 387 (E.D. Pa. 2001). Here, on May 1, 2003, Plaintiff complained directly to Thomas that Gilmore engaged in age discrimination. Thomas allegedly conducted an investigation into Plaintiff's age discrimination complaint. Thus, Plaintiff engaged in protected activity.

**B. Plaintiff Was Subject To Adverse Employment Action Subsequent To The Protected Activity.** In Burlington Northern and Santa Fe Ry. Co. v. White, -- U.S. --, 126 S.Ct. 2405, 2411-16 (2006), the Supreme Court explained the proper adverse action standard in statutory retaliation cases.[13] A plaintiff must show that the action taken "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (internal punctuation omitted). Subjecting a plaintiff to a written warning and discharge satisfies this standard as a matter of law.

**C. A Causal Link Is Easily Proven.** The evidence discussed in the Facts above falls into several causal categories, all of which are more than sufficient to meet plaintiff's causal burden.

---

[13] The Title VII Burlington Northern adverse action standard applies to the ADEA's nearly identical provision. See Kessler v. Westchester County Dep't of Soc. Serv., 461 F.3d 199, 207-09 (2d Cir. 2006).

1. **Knowledge of Protected Conduct.** See Keenan v. City of Phila., 983 F.2d 459, 466 (3d Cir. 1992). Gilmore admittedly knew about plaintiff's complaint against him.

2. **Unduly Suggestive Temporal Proximity.** See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989); Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). As discussed above, there is an unusually suggestive eight day temporal proximity between the filing of plaintiff's internal complaint and Gilmore's May 9th decision to issue her a Final Written Warning. MEL/BLOZ689; B925.

3. **Demonstrated Antagonism.** See, e.g. Robinson v. SEPTA, 982 F.2d 892, 895 (3d Cir. 1993); Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005); Adkins v. Rumsfeld, 389 F.Supp.2d 579, 586 (D.Del. 2005). Gilmore did not like Plaintiff, and it was demonstrably apparent that he did not treat her well. Dunlop at 32; B531.[14] Even putting to the side the yelling and cursing at the April 30th meeting which led to her HR complaint, Gilmore's antagonism toward Plaintiff was further demonstrated when she was away on vacation after filing the age discrimination complaint against him. When Plaintiff took her annual vacation to Florida, "she would put a cute tent sign on her desk that said 'Gone south,' and it had a palm tree." Dunlop at 56-57; B555-56. But, Gilmore "ripped that off, crumpled it up and threw it in the trash." Dunlop at 57; B556. He didn't like Plaintiff and crumpled up the paper sign even though it was "not doing [him] any harm[.]" Dunlop at 57; B556. Simply put, Gilmore wasn't nice to Plaintiff. Dunlop at 32; B531.

In the same way, after Gilmore learned she had filed her complaint, he began criticizing

---

[14] Gilmore "was attracted to the younger people in the office, and the middle-aged or little older employees . . . were ignored or tolerated in their work." Pl. at 261; B311. So prior to, during, and after these team meetings, Gilmore would be more jovial with the younger people than he would be with the older members of the team. Pl. at 129; B179. In stark contrast, he was aloof, distant, and borderline rude to the older workers. Pl. at 130; B180. With younger workers, he would have time to answer their questions and discuss whatever they brought up, but if older workers asked questions, he would be abrupt in his answers or not have time for them. Pl. at 131; B181.

plaintiff and made it clear that he was out to get her. Pl. at 226, 239, 250; B276, 289, 300.

**4. Violation of Rules, Policies, or Procedures.** See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 267 (1977); Stewart v. Rutgers, the State Univ., 120 F.3d 426, 434 (3d Cir. 1997); Bray v. Marriott Hotels, 110 F.3d 986, 992, 994 (3d Cir. 1997); Kunda v. Muhlenberg College, 621 F.2d 532, 539 (3d Cir. 1980); Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 143-44 (3d Cir. 1977); Adkins, 389 F.Supp.2d at 586.

Plaintiff was terminated under Defendants' progressive discipline policy allegedly for poor performance. Thomas at 82, Becker at 98-99; B662, 891-92. This policy, also known as the corrective action process, or Corrective Action Policy, requires an Initial Written Warning, a Final Written Warning, and then Termination. Gilmore at 55-56, Thomas at 79, 80, 83; B476-77, 659, 660, 663. In essence, it was a "three strikes and you're out . . . rule." Dunlop at 39; B538. The three strikes included an Initial Written Warning, a Final Written Warning, and then termination. Dunlop at 40, Gilmore at 55-56, Thomas at 79, 80, 83; B476-77, 539, 659, 660, 663.

However, Defendants never issued an Initial Written Warning. Instead, "[Plaintiff] was given [only] ***a*** corrective action document in 2003 [allegedly] for unsatisfactory performance." Thomas at 68; B648 (emphasis added). That was the Final Written Warning. Thomas at 69; B649.[15] Thus, Defendants violated their own disciplinary policies and procedures.

**5. Falsehoods and Other Pretextual Reasons.** See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. at 147; Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d at 1069; Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000). Defendants' sham affidavits which flatly contradict their earlier sworn deposition testimony are compelling

---

[15] Importantly, Defendants concede that Plaintiff was not fired for an intolerable offense which could result in immediate termination. Gilmore at 56, Becker at 98, Thomas at 82; B477, 662, 891. Nor was Plaintiff's performance or conduct so egregious to escalate it immediately to a Final Written Warning. Thomas at 82-83; B662-63.

evidence in this regard.

**6. The Evidence as a Whole.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents. but on the overall scenario." Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990); Woodson, 109 F.3d at 921.

## II. PLAINTIFF ALSO HAS PROVEN A PRIMA FACIE CASE THAT SHE WAS DISCHARGED BECAUSE OF HER AGE.

Under the three step "pretext"or "indirect evidence" framework, the evidence also demonstrates that Gilmore intentionally discriminated against Plaintiff because of her age.

**A. Step 1: A Prima Facie Case Has Been Proven.** Under the first step, plaintiff has proven a prima facie case that she was discharged because of her age. The framework of McDonnell Douglas v. Green, 411 U.S. 792 (1973), applies to claims brought under the ADEA. See, e.g., O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996); Showalter v. University of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

"The burden of establishing a prima facie case . . . is not onerous." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248. 253 (1981).[16] Indeed, disputes over its elements are deferred to the pretext stage of the analysis. Iadimarco v. Runyon, 190 F.3d 151, 163 (3d Cir. 1999); Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997). According to the Third Circuit, the favorable treatment of merely one non-protected employee is enough to meet the prima facie burden. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645-46 (3d Cir. 1998). An "initial presumption of discrimination arises from the plaintiff's prima facie case of discrimination because [the court] presume[s such] acts. if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."

---

[16] Accord, Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 986 (1988); Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d at 1084; Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497, 508 (3d Cir. 1996); Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995); Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992)(the prima facie case is "easily made out").

Sheridan, 100 F.3d at 1069 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)(internal quotation marks omitted)).

The "elements of a prima facie case depend on the facts of the particular case" and "cannot be established on a one-size-fits-all basis." Jones v. School Dist. of Phila., 198 F.3d 403, 411 (3d Cir. 1999). Under the ADEA, "the prima facie case requires proof that (i) the plaintiff was a member of the protected class, i.e., was 40 years of age or older . . . , (ii) that the plaintiff was discharged, (iii) that the plaintiff was qualified for the job, and (iv) that the plaintiff was replaced by a *sufficiently younger person* to create an inference of age discrimination." Showalter, 190 F.3d at 234 (emphasis added). "In order for a plaintiff to satisfy the sufficiently younger standard, [the Third Circuit has] noted that there is no particular age difference that must be shown, but while different courts have held that a five year age difference can be sufficient, a one year difference cannot." Id. at 236 (internal quotation marks, citations, and ellipses omitted). See also Sempier, 45 F.3d at 729 (holding that the fourth prong of a prima facie age discrimination case was satisfied where plaintiff was replaced by two individuals-one who was four years younger than plaintiff and the other who was ten years younger).

**1. Plaintiff Was Qualified for Her Job of Over 13 Years.** Defendants' feeble attempt to defeat Plaintiff's prima facie case by arguing that she was not qualified for her position because defendants placed her on corrective action is precluded by Third Circuit case law and our factual record. On our facts, the qualifications for the portfolio administrator position in 2002 and 2003 were "investment understanding" and "good communication skills." Dunlop at 11; B510. Plaintiff "had worked in that position for several years . . . ." Landis at 12; B697. Gilmore even admitted that Plaintiff was qualified for the position of portfolio administrator! Gilmore at 38-39; B459-460, accord Dunlop at 10, 66; B509, 565.[17]

[17] Since being discharged by Gilmore, Plaintiff has secured two banking positions. First, she was hired by First National Bank in July of 2004. Pl. at 340; B390. Then she left it for an even better opportunity at Orion Bank beginning on January 2, 2005. Pl. at 340-41, 345; B390-91, 395. In the two

Under the law, it is well established that a plaintiff's prior satisfactory performance of a job "leads to the almost inevitable inference that [she] was qualified for the position" she held. Sempier v. Johnson & Higgins, 45 F.3d at 729; accord Jalil v. Avdel Corp., 873 F.2d at 707. The Third Circuit recently reaffirmed this law and rejected this same defense argument. See Hugh v. Butler County Family YMCA, 418 F.3d 265, 268 (3d Cir. 2005). Simply put, defendants were well aware of plaintiff's satisfactory performance for over 13 years from **February 14, 1990 to May 14, 2003**. The law discussed above simply does not allow defendants to rely upon just one written disciplinary action issued two weeks after her age discrimination complaint to defeat Plaintiff's prima facie case.

Moreover, when the employer's criteria for the position are subjective in nature as they are here, a prima facie analysis of such subjective qualities "is better left to the later stage of the McDonnell Douglas analysis." Matczak, 136 F.3d at 938; accord Sempier, 45 F.3d at 729 (the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to consideration of whether the employer's nondiscriminatory reason . . . is pretext.)(internal punctuation omitted). "The rationale behind this position is that subjective evaluations are more susceptible of abuse and more likely to mask pretext and, for that reason, are better examined at the pretext stage than at the prima facie stage." Matczak, 136 F.3d at 938 (internal punctuation omitted).

**2. Substantially Younger Replacement.** The Unites States Supreme Court has held that "the fact that an ADEA plaintiff was replaced by someone outside the protected class is *not a proper element of the McDonnell Douglas prima facie case*." O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. at 312 (emphasis added). Rather, "[b]ecause the ADEA prohibits discrimination on the basis of age and *not class membership*, the fact that a replacement is

years she has been with Orion Bank, she has received two raises in salary from $24,960 to $27,040 to approximately $32,000 per year. Pl. at 344, 347; B394, 396.

*substantially younger* than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." Id. at 313 (emphasis in original). Therefore, "[t]he fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as [s]he has lost out *because of h[er] age*." Id. at 312 (emphasis in original). In so holding, the Court hypothesized that "there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40 year-old is replaced by a 39 year-old than when a 56 year-old is replaced by a 40 year-old." Id. Here, the 57 year old Plaintiff was replaced by a 34 year old. Jones, 198 F.3d at 411. Because there is an age difference of more than 20 years, Shannon is substantially younger than Plaintiff. Accordingly, plaintiff has demonstrated her prima facie case, under our unique facts. Jones, 198 F.3d at 411.

## III. UNDER A PRETEXT THEORY, PLAINTIFF HAS SUFFICIENT EVIDENCE OF PRETEXT TO GO TO THE JURY UNDER PRONGS 1 AND 2 OF FUENTES v. PERSKIE, 32 F.3d 759 (3d Cir. 1994).

**A. Step 2: Defendants' Burden.** Once plaintiff's prima facie showing is made, "the employer [i]s obliged to proffer a nondiscriminatory [and non-retaliatory] reason for its adverse employment action." Sheridan, 100 F.3d at 1065. The reason here is "performance reasons[.]" See Def. Op. Brf. at 24, ¶ 3. Through the testimony of Gilmore and others, Defendants argue that despite Plaintiff's unblemished performance record for over 13 years, she was issued a Final Written Warning and discharged because she could not and did not satisfactorily perform her job.

**B. Step 3: Plaintiff's Ultimate Burden.** "[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory [or retaliatory] reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759,

764 (3d Cir. 1994); Sheridan, 100 F.3d at 1067. Here, following articulation by the defendants of a legitimate non-discriminatory reason, a plaintiff can proceed under either of the two prongs found in Fuentes, 32 F.3d at 764, and which were reaffirmed twice by the Third Circuit en banc in Sheridan, 100 F.3d at 1067, and in Keller v. Oriz Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)(en banc). Under prong one, plaintiff proceeds with a "credibility" or "unworthy of credence case." Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997). Here to make the case a "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence." Sheridan, 100 F.3d at 1072; Bray, 110 F.3d at 990; Keller, 130 F.3d at 1108-09. The second prong requires evidence that "allows the fact finder to infer that discrimination [or retaliation] was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762.

The district court's role here is limited. "The role of determining whether the inference of discrimination [or retaliation] is warranted must remain within the province of the jury, because a finding of discrimination [or retaliation] is at bottom a determination of intent." Sheridan, 100 F.3d at 1071. In making that finding, the jury must perform its traditional function of assessing the weight of the evidence, the credibility of the witnesses through observation of both direct testimony and cross-examination at trial, and the strength of the inferences that can be drawn from the prima facie case and the evidence that undermines the employer's proffered reasons for its actions. This is uniquely the role of the factfinder, not the court. Id. at 1071-72. All the trial court must determine is "whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible . . . ." Id. at 1072. "But once the court is satisfied that the evidence meets this threshold requirement, it may not pretermit the jury's ability to draw inferences of discrimination from the testimony, including the inference of intentional discrimination drawn from an

unbelievable reason proffered by the employer." Id.

"In deciding the 'ultimate question' of whether the employer unlawfully discriminated . . . the factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination." Sheridan, 100 F.3d at 1067 (quoting Saint Mary's Honor Ctr. v. Hicks 509 U.S. 502, 511 (1993)). In other words, "[i]f the plaintiff has pointed to evidence sufficiently to discredit the Defendants' proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination [or retaliation] beyond his or her prima facie case." Fuentes, 32 F.3d at 764; Sheridan, 100 F.3d at 1071. Rather, "no additional proof of discrimination [or retaliation] is required." Hicks, 509 U.S. at 511; Sheridan, 100 F.3d at 1066, 1071 (emphasis added).

"It is the jury's determination that the reason given was pretextual together with the evidence that supported the prima facie case that will sustain a finding of intentional discrimination [or retaliation] . . . ." Sheridan, 100 F.3d at 1071. "Proof that the Defendants' explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination [or retaliation] , and it may be quite persuasive." Reeves, 530 U.S. at 147. The "trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Id. This is because "[r]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct." Sheridan, 100 F.3d at 1069.

Regarding the effect of the falsity of a Defendants' stated reason or other evidence, the Third Circuit has said, "a party's falsehood . . . in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that

consciousness may be inferred the fact itself of the cause's lack of truth and merit." Sheridan, 100 F.3d at 1069 (citing McQueeney v. Wilmington Trust Co., 779 F.2d 916, 921-22 (3d Cir. 1985)). Importantly, there the en banc court also declared "[w]e routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful discrimination." Sheridan, 100 F.3d at 1069.

"Thus, when all legitimate reasons for [Defendants' adverse action] have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration . . . ." Sheridan, 100 F.3d at 1069 (citing Furnco Constr. Corp., 438 U.S. at 577).

**1. Prong 2 - The Weight of the Evidence.**

**a. The Weight of the Evidence Demonstrates Retaliation is the Reason Plaintiff Was Discharged.** There is persuasive evidence from which the jury can conclude that retaliation for complaining of age discrimination is the reason plaintiff was discharged. In summary, some examples include (1) Gilmore's awareness of Plaintiff's protected activity, (2) the very suggestive and close temporal sequence of events in which the only written corrective action occurred less than two weeks after Plaintiff reported age discrimination, (3) Defendants' violation of its own progressive discipline policy in issuing Plaintiff a "Final" Written Warning without ever issuing her an Initial Written Warning, and (4) Gilmore's demonstrated antagonism toward Plaintiff that surfaced even while she was away on vacation after reporting age discrimination by him. See Statement of Facts Part VIII supra. This circumstantial evidence allows a jury to infer that retaliation was more likely than not a motivating or determinative cause of the adverse employment actions.

**b. The Weight of the Evidence Also Demonstrates Age Discrimination is the Reason Plaintiff Was Discharged.** There also is persuasive evidence from which the jury can conclude that age discrimination is the reason plaintiff was discharged.

The following circumstantial evidence allows a jury to infer that age discrimination was more likely than not a motivating or determinative cause of the adverse employment actions.[18]

**(1). The Double Standard for the 57 Year Old Plaintiff and Her 23 Year Old Peer.**

**(a). Gilmore Praised the Younger Dunlop But Ignored Plaintiff's Work.** There also is much circumstantial evidence of age discrimination, including Gilmore's preferential treatment of 23 year old Dunlop over the 57 year old Plaintiff.[19] When Dunlop was hired, it was incumbent upon Plaintiff to teach her the job including her workload, work responsibilities, the systems, and the office protocol. Dunlop at 22, 28, Pl. at 104, 298; B154, 348, 521, 527. Plaintiff was "the only person that trained [Dunlop.]" Dunlop at 28; B527. Plaintiff was happy to train her and bring her up to speed in addition to all her other responsibilities. Pl. at 262-63; B312-13. Gilmore "would frequently praise [Dunlop's] work and her performance and bypass [Plaintiff] altogether [after Plaintiff] helped train her and brought her up to speed [to do the work] she was accomplishing . . . ." Pl. at 127, 262-63; B177, 312-13. Furthermore, it soon became apparent that once Dunlop was trained, Plaintiff was criticized more and more. Pl. at 250-51; B300-301.

---

[18] Gilmore was 56 when he discharged Plaintiff. His date of birth is November 20, 1946. Gilmore at 4; B425. Now age 60, he admittedly doesn't like being old. Gilmore at 71; B492.

Defendants cite to non-binding authority from foreign jurisdictions in a flawed attempt to argue that because Gilmore too is in the ADEA's protected class of employees over age 40, he could not possibly have discriminated against the 57 year old Plaintiff based on age. However, this naive notion has been rejected by the U.S. Supreme Court for over thirty years. "'Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.'" Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 78 (1998)(quoting Castaneda v. Partida, 430 U.S. 482, 499 (1977)).

[19] Such disparate treatment is compelling causal evidence. See,e.g. San Filippo v. Bongiovanni, 30 F.3d 424, 444 (3d Cir. 1994); Brennan v. Norton, 350 F.3d 399, 421 (3d Cir. 2003); Adkins v. Rumsfeld, 389 F.Supp.2d 579, 586 (D.Del. 2005).

**(b). Gilmore Singled Plaintiff Out, Violated Mellon Policies, and Refused to Allow Teammates to Assist Her, but Applied a Different Standard to Younger Employees.** Mellon believes in teamwork and went to a team concept in the mid-nineties. Landis at 70, Pl. at 11, 12; B61, 62, 755. So initially, Plaintiff and Dunlop shared job responsibilities. Pl. at 298; B348. But then, Gilmore violated Mellon's polices and procedures and told Plaintiff, "You cannot ask Maria for help." Pl. at 298; B348.[20] Defendants required Plaintiff to do projects and booklets without assistance from Dunlop. Pl. at 297; B347. Gilmore and Landis criticized Plaintiff after the fact for asking Dunlop to help her bind a booklet. Landis at 72; B757. Soon, Plaintiff became "unjustly burdened by work that was not asked of the younger employee." Pl. at 297; B347.

Dunlop could not assist Plaintiff in completing any projects. Pl. at 297; B347. Yet paradoxically, Plaintiff was allowed to help Dunlop complete assignments if there was more work than she had time to complete. Dunlop at 30; B529. If Dunlop could not get a task done, she would ask for help. Dunlop at 62; B561. The double standard is made even more clear when it is revealed that Dunlop was encouraged to come to Plaintiff and other team members for help when necessary. Landis at 71-72; B756-57. Plaintiff willingly and gladly offered her assistance to Dunlop, and this was allowed. Pl. at 297; B347. Unlike Plaintiff who was criticized for seeking help from Dunlop to complete a client presentation booklet, Dunlop was not criticized for leaving 60 scholarship checks for Plaintiff to assemble and mail to awardees when Dunlop was leaving for vacation. Pl. at 308; B358. Thus, Dunlop never had any performance issues. Dunlop at 61; B560.

**(c). Plaintiff Was Singled Out and Denied a Bonus.** Gilmore determined bonuses. Landis at 69, Dunlop at 29; B528, 754. On March 18, 2003,

---

[20] As noted above, violation of rules, policies, or procedures is evidence of causation. See Argument Part I.C.4 supra.

Gilmore told Plaintiff she was not getting a bonus and that Dunlop was. P31; B923. In fact, everyone on Gilmore's Team received a bonus in 2003, except for Plaintiff and Bruce Holmquist, an older Portfolio Manager in his late forties. Pl. at 354, Thomas at 52; B403, 632. Up until that point, Plaintiff had always received bonuses at the same time other employees had. Pl. at 355; B404.

In contrast, Gilmore gave Dunlop a bonus every year she worked there. Dunlop at 29; B528.[21] Moreover, Gilmore actually told Dunlop that Plaintiff was not getting a bonus. P31; B923.[22] Again, Gilmore wanted Plaintiff out of Mellon and was taking systematic steps to do so. Pl. at 353; B402.

**(d). Plaintiff Was Singled Out and Denied Vacation.**

Each Mellon employee is entitled to a certain number of vacation days per year based on a formula that includes years of service, position within the company, pay grade, and salary. Landis at 72, Thomas at 69, Gilmore at 46; B467, 649, 757. Generally, if you have greater length of service, you are entitled to more vacation. Gilmore at 48; B469. As of April of 2003, Plaintiff was entitled to four weeks of vacation per year. Pl. at 300; B350. Plaintiff always took two or three weeks to go to Florida. Dunlop at 34, 56; B533, 555. So on March 13, 2003, she requested two weeks' vacation from May 5th to May 16, 2003. See E-mail from L. Blozis to G. Landis of 3/13/03 RE: Vacation dates, Pl. at 299; B349, 922. Landis initially approved the two weeks. Pl.

---

[21] Bonuses were based on profitability of the firm and the various departments and each group and each individual's contribution. Gilmore at 39-40; B460-61. Though Dunlop had started in mid-year in 2002, Gilmore gave her a bonus over Plaintiff who had been the sole portfolio administrator in the Delaware office for three months before Dunlop was even hired.

[22] Bonuses were paid at the manager's discretion, and Plaintiff was told that they were not contingent on performance reviews. Pl. at 351; B400. Indeed, they were based on other factors including profitability of the firm and the various departments and each group and each individual's contribution. Gilmore at 39-40; B460-61. When it got to Gilmore's group, he had a bonus pool and made recommendations for how to allocate that bonus based on each one's contribution. Gilmore at 40; B460. He could make recommendations for bonus or no bonus for the employees on his team. Gilmore at 40; B460.

at 303; B353.

But then Gilmore did not allow Plaintiff to take what she had taken in the past for vacation. Dunlop at 34; B533. Instead, she could only take a "shortened vacation" of six days. Dunlop at 34, Pl. at 304; B354, 533. Gilmore wanted to have a role in agreeing or disagreeing with Landis and Becker's decisions on vacation approval. Gilmore at 47; B468.[23] Amazingly. he admits that "the only time . . . was with Linda Blozis on this occasion. that we ever had an issue about whether or not it was appropriate [to deny a vacation request]." Gilmore at 47; B468.

In stark contrast. no one ever denied Dunlop's vacation requests. Dunlop at 31; B530. Instead. she was given extended vacation time for a wedding. Pl. at 305; B355. Though she was a new employee. Dunlop was given considerations for vacation time for her house settlement. preparations for her wedding. and honeymoon time itself. Pl. at 305-06; B355-56. Unlike Plaintiff who had requested the full amount of time two months in advance and was partially denied, Dunlop put in for a certain number of days on short notice, without consideration to the fact that Plaintiff would be left to man the office, then realized she wanted more time, requested more time. and received *more* time than her initial request! Pl. at 306; B356.

Plaintiff was the oldest portfolio administrator on Gilmore's team when Dunlop worked there. Dunlop at 16-17; B515-16. In sum, Plaintiff was not treated fairly compared to her co-workers on Gilmore's Team. Dunlop at 38, 39. 52-53; B537, 538. 551-52. Dunlop herself tellingly admitted that Gilmore and Becker were harder on Plaintiff than they were on her! Dunlop at 39; B538.

---

[23] Normally, in the Delaware office, managers Landis and Bill Becker would be responsible for approving or denying vacation days of portfolio administrators. Gilmore at 46; B467. Thus, decisions as to Plaintiff's vacation could be handled by Landis and Becker. Landis at 73; B758. However, the Team Leader was ultimately responsible for denying a vacation request. Landis at 73; B758.

**(2). Discriminatory Motive.**

**(a). Older Employees Eliminated.** "Brendan Gilmore wanted to eliminate older members of the team and replace them with younger people." Pl. at 36, 120; B86, 170. Gilmore pressured Robert Bell, a Senior Trust Officer over age 60, by giving him an overwhelming book of business and forced him to resign in the early 2000's. Compl. at ¶ 53.b, Pl. at 30, 31, 33-34, 37, 113, Becker at 50; B9, 80, 81, 83-84, 87, 163, 843. As team leader, Gilmore assigned case loads to the individual trust officers, and Plaintiff saw the work on Bell's desk and how much more he was given versus other officers. Pl. at 41, 43; B91, 93. Administrative Officer Linda Squier also stated that Bell was "overloaded with work." Pl. at 45; B95. Bell "had been there a long time." Becker at 50; B843.

Gilmore also pressured both Vice President Martha Fetters and Assistant Vice President and Administrative Officer Linda Squier to resign when they were both over age 40. Pl. at 37, 44, 113, Gilmore at 23, 24, Becker at 15; B87, 94, 163, 444-45, 808. Tellingly, Fetters reported to Gilmore and resigned within six months of Gilmore coming to the region. Gilmore at 23, Becker at 48, Thomas at 48; B444, 628, 841.

Administrative Officer Linda Squier also worked for Gilmore. Thomas at 49; B629. Though her rapport with the trust clients was professional, Gilmore gave Squier "unwarranted[]" and "unprofessional critical criticisms of how [she] conducted her work" during her last year and a half at Mellon in the late 1990's. Pl. at 44, 45, 50, Becker at 15; B94, 95, 100, 808. In late 1999, she eventually resigned in her 40's, after more than fifteen years of service to Defendant. Gilmore at 24, Thomas at 49, Compl. at ¶ 53.d; B10, 445, 629.

In 2000 or 2001, Gilmore discharged portfolio administrator Kathleen Agne, who also was over age 40. Becker at 11, Pl. at 113, Compl. at ¶ 53.a; B9, 163, 804.[24] Agne was

---

[24] The stated reason, which parallels a criticism against Plaintiff, was that Agne was not timely completing work. Becker at 11; B804.

overburdened and instructed not to share her work with Plaintiff just as plaintiff was later instructed not to share her work with Dunlop. Pl. at 114-15; B164-65. After some 18-20 years with the company, Defendants suddenly "were becoming more and more displeased with her performance." Pl. at 263; B313. After Agne was fired, there were no Portfolio Administrators in Delaware older than Plaintiff. Thomas at 50: B 630. Plaintiff was the older, last survivor.

**(b). Younger Employees Hired.** In 1998, Gilmore hired Bill Becker at age ***32***, to replace the older Fetters as ***senior*** trust officer in Delaware. Gilmore at 23, 29. Becker at 49, 52, Thomas at 51, Pl. at 138: B188, 444, 450, 631. In 1999, Gilmore transferred Landis, then also age 32, from Vice President Robert Chappelear's Team in Philadelphia to his own Delaware Team. Landis at 34-35: B719-720. Gilmore also hired Dan Merlino, a portfolio assistant, salary grade 6 in his 30's. Gilmore at 29, Becker at 52, Thomas as 51; B450, 845.

Though others applied and were interviewed, Gilmore hired then 23 year old Dunlop to replace the older Agne in July of 2002. Becker at 12, 51, 52, Thomas at 44, 46, 51, Pl. at 23, 141, Gilmore at 21-22, 29, Dunlop at 15; B73, 191, 442-43, 514, 624, 626, 631, 805, 844, 845.[25] "[S]he looked young," Gilmore at 74; B495, and "clearly Maria was younger than [Plaintiff]." Gilmore at 74; B495. When looking at her and Plaintiff, he "could easily tell that one was significantly younger than the other." Gilmore at 74-75; B495-96.

To his now younger subordinates at team meetings, Gilmore said the Delaware team was not going to be like it was under Bell, Squier, or Fetters. Pl. at 48; B98. He also told his team not to follow the examples of employees that were let go or resigned. Pl. at 48; B98. Plaintiff was now the oldest portfolio administrator on Gilmore's team. Dunlop at 16-17; B515-16. None of Gilmore's portfolio administrators were older than Plaintiff. Thomas at 50; B630. In 2003, Gilmore hired then 34 year old Laura Shannon to replace Plaintiff. Gilmore at 68, Becker at 103-

---

[25] Again, Dunlop's date of birth is February 24, 1979. Dunlop at 4; B503.

104, Dunlop at 14, Thomas at 90-91; B489, 513, 670-71, 896-97. See Statement of Facts Part VII supra. Clearly, "Brendan Gilmore wanted to . . . replace [his older team members] with younger people." Pl. at 36, 120; B86, 170. Unfortunately for Plaintiff and many others, he was successful.

**(3). Code Words By the Decisionmaker.** While not direct evidence of discrimination . . . , stray remarks . . . may be given some probative effect if made by a decisionmaker. Albright v. City of Phila., 399 F.Supp.2d 575, 589-590 (E.D. Pa. 2005)(citing Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1097 (3d Cir. 1995). Though inadequate to support an inference of discrimination when standing alone, stray remarks are "available 'to build a circumstantial case of discrimination,'" Hartwell v. Lifetime Doors, Inc., 2006 WL 381685, at *7 (E.D. Pa. 2006)(quoting Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214 (3d Cir. 1995). Cf. Creasy v. Novelty, Inc., 2005 WL 2787022, at *7 (M.D. Pa. Oct. 26, 2005)(statement made on or about the day of the adverse employment action by the decisionmaker constitutes direct evidence of age discrimination).

Here, in his April 30, 2003 meeting with Plaintiff, Gilmore referenced her original team and said that Plaintiff "was the survivor." Pl. at 112; B162.[26] Plaintiff took that as an age-related comment. Pl. at 112; B162. Plaintiff "suspected that Brendan [Gilmore] was systematically trying to intimidate [her] because [she] was the last remaining original and oldest member on the Delaware team." Pl. at 112: B162.

Gilmore also "used examples of other younger portfolio administrators in Philadelphia[.] saying that they were responsible for much more than [Plaintiff] was accomplishing." Pl. at 101, 126; B151, 176. He told her that younger portfolio administrators "were capable of doing more." Pl. at 102; B152. He told her those younger assistants were "producing a lot more and a lot

[26] Calling plaintiff a "survivor" was a "code word" for ageist discrimination. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996); Abramson v. William Paterson College of N.J., 260 F.3d 265, 278 (3d Cir. 2001).

faster." Thomas at 73, MEL/BLOZ 468; B653, 928. Plaintiff also felt that some of these comments were based on age discrimination. Thomas at 72; B652.

**2. Prong 1 - The Weaknesses, Implausibilities, Inconsistencies, Incoherencies, or Contradictions in Defendants' Case.** The prima facie showings, when joined with disbelief as demonstrated by the following weaknesses, implausibilities, inconsistencies, incoherencies and contradictions from the defense case also permits the jury to return a verdict of retaliation and age discrimination. Sheridan, 100 F.3d at 1071.

**a. Inconsistencies and Contradictions.**

**(1). Defendants' Contradictory Statements About When Gilmore Decided to Issue the "Final" Written Warning.** Gilmore decided to issue the Final Written Warning on **May 9th, 2003**. MEL/BLOZ689; B925. This was just eight days after Plaintiff accused him of age discrimination! However, Defendants, **contradict** themselves by stating the decision was made on May 12, 2003. See Landis at 43-45, MEL/BLOZ684; B728-730, 930. Realizing that Landis's testimony and handcrafted note stating that the decision was made on May 12th **contradict** his e-mail of May 9th stating that Gilmore had already decided to issue Plaintiff a "Final" Written Warning and do not decrease the temporal proximity between the Plaintiff's May 1st HR complaint and Gilmore's decision made days later, Defendants wade even farther into their raging river of prevarication by creating declarations that indicate the decision was made on April 30th! See Landis Decl. at ¶ 15, Thomas Decl. at ¶ 10 (citing to MEL/BLOZ695); B681, 787-88, 921. Landis' e-mail is **inconsistent** with his notes and deposition testimony which in turn **contradict** the declarations. Furthermore, Thomas' April 30th note is **incoherent**. See MEL/BLOZ683; B927. Therefore, the Court should disregard the post-deposition declarations and allow a jury to determine the credibility of the witnesses based on their sworn testimony and the e-mails and notes they created before this litigation. See also Argument Part IV infra.