**(2). An Initial Written Warning is Separate from a Performance Review.** Defendants try to argue that performance criticism on an annual review constitutes an Initial Written Warning. But such an argument is **inconsistent** with and **contradicted** by the explanation of the progressive discipline policy given by Defendants' employees, including Gilmore himself. On their annual reviews, each employee receives written feedback on areas in which they could improve their performance, but this is something entirely separate from being written up. Dunlop at 43-44; B542-43. Under the three strikes rule, notice of the first two strikes would not come on an employee's evaluation but rather must be in separate documentation. Dunlop at 44-45; B543-44.

If an individual has a performance issue, they could be given some kind of counseling at any time. Gilmore at 59; B480. *Then* if the performance issues did not improve, they would be given a written warning. Gilmore at 60; B481. In general, there is written counseling, a semiannual or annual evaluation, training opportunities, and *then* if problems persist, an initial written warning. Gilmore at 60-61; B481-82. Then after the initial written warning they could be placed on final written warning and ultimately terminated. Gilmore at 60; B481. So Defendants should have called Plaintiff into a manager's office, informed her of constructive criticism about her work, and then officially handed her a paper that says, "This is a written warning." Pl. at 254; B304. In reality, nowhere did Plaintiff's 2002 annual review state, "Initial Written Warning". See MEL/BLOZ456-60; B912-16. Thus, Plaintiff did not take her annual review to be the Initial Written Warning about performance. Pl. at 251-52; B301-302. Instead, it was the counseling that could occur at any time, as described by Gilmore. See Gilmore at 59, 60-61; B480, 481-82.

### b. Weaknesses, Incoherencies, and Implausibilities.

**(1). Plaintiff's Job Responsibilities Changed Many Years Before the Performance Criticisms.** Defendants' allegation that Plaintiff could not perform her job under its increased requirements is **weak** and **implausible** because the role was upgraded years before the performance criticisms. Essentially, Plaintiff was an assistant. Becker at 10; B803.[27] Plaintiff's job responsibilities last evolved in 1997 or 1998, when she became a trust specialist. Pl. at 10; B60. According to Gilmore, the portfolio administrator jobs were upgraded in the mid-nineties. Gilmore at 15; B436. Defendants did not change or upgrade the role of portfolio administrator while Dunlop was employed there from June of 2002 to May of 2004. Dunlop at 6, 12; B505, 511. According to Becker, the increase in job responsibilities for Plaintiff and other assistants began in or before 1998. Becker at 43; B836.[28] So that is when Ms. Blozis's job expectations would have increased. Gilmore at 15-16; B436-37. Yet, Plaintiff's performance still met or exceeded expectations from 1998 to 2002. Thomas at 36; B616. So the assertion that the thirteen year veteran Plaintiff could not handle the increased responsibilities of her role is **weak** and **implausible**.

---

[27] Plaintiff's role with Defendant was always as an assistant. Initially, she was a trust secretary, then her title was changed to trust assistant in approximately 1994 and 1995, then her position evolved to trust specialist in 1997 or 1998, and then her title eventually was changed to portfolio administrator. Pl. at 7, 8, 10; B57, 58, 60. Portfolio administrators are also referred to as administrative help. Dunlop at 7: B506.
    As a trust secretary, she assisted someone. Pl. at 7; B57. Then as trust assistant in 1994 and 1995, and a trust specialist in 1997 or 1998, she reported to Administrative Officer Linda M. Squier. Pl. at 8, 10, Becker at 15; B58, 60, 808. Eventually, her title became portfolio administrator, but she had "basically the same responsibilities[]" as trust specialist, "to assist the trust officers and investment officers." Pl. at 10, 11; B60, 61. In addition to being a trust assistant, the portfolio administrator also assisted the investment officer. Pl. at 14; B64. Portfolio administrators assist Portfolio Officers. Thomas at 24; B604. A portfolio administrator "was synonymous with an assistant." Pl. at 189, Landis at 26-27; B239.

[28] Becker recants this testimony in his post-deposition declaration by writing that "during the late 1990s or early 2000s," portfolio administrators were expected to do more sophisticated type of work than previously required. Becker Decl. at ¶ 3; B901-902. This sham declaration can be disregarded by the Court. See Argument Part IV infra.

31

(2). **Plaintiff's Failure to Complete Projects in a Timely Manner Due to Excessive Workload.** In his "Final" Written Warning to Plaintiff, Gilmore cited failure to determine the importance of finishing projects in a timely manner. See P42; B933. This is **weak and implausible** because the Delaware office was short-staffed. Becker at 24; B817. Portfolio Officer Becker admitted that Plaintiff did "a good job covering for [him] in 2002 . . . when [he] was out of town . . . ." Becker at 62; B855. Admittedly, he stressed Plaintiff out by giving her such a large workload. Becker at 87; B880. This was compounded by the fact that there were times when Portfolio Officers would not set priorities over projects. Dunlop at 20; B519. Yet, Defendants expected increased productivity. Landis at 25; B710.

In her April 30, 2003 meeting regarding the client presentation booklet, Plaintiff told Gilmore that she did not have enough time to complete all of her work. Gilmore at 33; B454. Plaintiff told management that all of the work assigned to her could not be completed in the 37.5 hours for which she was paid each week. Landis at 40; B725.[29] She also expressed this concern to Thomas in 2003. Thomas at 58; B638. Specifically, Plaintiff told Landis that she was unwilling to work 50 hour weeks. Landis at 42; B727. Though Plaintiff was just a salary grade 6 and Landis then was a salary grade 11 or 12, he was frustrated that Plaintiff did not have the same level of commitment as he! Landis at 63-64; B748-49.[30]

(3). **Lack of Ownership of Projects Due to Managers Dumping Their Duties Onto Her.** In his Final Written Warning, Gilmore also said that Plaintiff lacked ownership of projects without constant monitoring. See P42; B933. This is **weak and implausible** because it was Plaintiff's supervisors who lacked ownership for their work. When Becker was in a flux from one position to another, he instructed Plaintiff to do more

---

[29] As a portfolio administrator, Plaintiff was paid for just 37.5 hours per week. Thomas at 54, 59, Becker at 74, Gilmore at 33; B454, 634, 639, 867.

[30] Plaintiff was a salary grade 6, and as a Portfolio Officer, Robert Bell was a salary grade 10. So expectations would be significantly different. Gilmore at 26; B447.

32

for him so that he could make the transition. Pl. at 191; B241. In October of 2002, *he* needed Plaintiff to help him increase the level of service to *his* clients. Becker at 69-70; B862-63. Also, "stale dated reports ha[d] been ignored by previous portfolio *officers* from years back, and [were] being dumped on [Plaintiff.]" Pl. at 270; B320. Yet, this "was a job . . . handled by an officer level to determine the valuations of various assets in the accounts and not . . . the portfolio assistants." Pl. at 270; B320. Plaintiff's position should not have been responsible for those duties according to her job description. Pl. at 191; B241.

       **(4). Insufficient Product Knowledge Due to Lack of Training.** Gilmore criticized Plaintiff's product knowledge. P42; B933. This is **weak and implausible** because Plaintiff was not given the training to increase her knowledge. Training was mostly on-the-job. Gilmore at 36; B457. But in 2002, Becker spent more time in Philadelphia than he had between 1998 and 2000. Becker at 61; B854. By "December 9th [2002,] Bill Becker was spending more and more time in Philadelphia. Pl. at 199; B249. Yet even though he was around less time to mentor and supervise her, Becker expected Plaintiff to increase her level of knowledge. Becker at 64; B857. Yet, he admitted he needed to get better at letting Plaintiff know when things did not go the way they should. Becker at 70, MEL/BLOZ593; B863, 910, 910. In contrast, for Dunlop, management "provided a good explanation of what to do . . . ." Dunlop at 26; B525. Thus, it is **weak and implausible** to criticize Plaintiff's product knowledge.

**IV. THE SHAM AFFIDAVIT DOCTRINE APPLIES TO DEFENDANTS'
   CONTRADICTORY POST-DEPOSITION DECLARATIONS.**

  After the completion of discovery, Defendants tried to alter the record with declarations by their previously deposed vice presidents in order to belatedly change the date when the retaliatory decision to issue Plaintiff the "final" written warning was made. Cf. Landis at 43-44, Thomas at 84-85, MEL/BLOZ684, 695 with Landis Decl. at ¶ 15, Thomas Decl. at ¶ 10; B664-

65, 681, 728-29, 787-88, 930. Unfortunately, their declaration testimony is contradicted by their deposition testimony and a fair reading of their own documents. Thus, under the sham affidavit doctrine, this back door evidence should be disregarded by the Court.[31]

The Third Circuit first recognized the sham affidavit doctrine in Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 705-06 (3d Cir. 1988).[32] When an affidavit clearly contradicts prior sworn testimony and no satisfactory explanation is offered for the contradiction, it allows a court to disregard the affidavit and not allow it to create a genuine issue of material fact which would otherwise preclude summary judgment. Martin, 85 F.2d at 705-06; see Baer v. Chase, 392 F.3d 609, 623-26 (3d Cir. 2004). Although more detailed tests are in the case law, the gist of the doctrine is that the affidavit may not be used "without demonstrating a plausible explanation for the conflict." Baer, 392 F.3d at 624.

Importantly, the rule "cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ significantly from interrogatories in that regard. A deposition is not a take home examination." Burns v. Board of County Com'rs of Jackson County, 330 F.3d 1275, 1282 (10th Cir. 2003)(quoting Greenway v. International Paper Co., 144 F.R.D. 322, 325 (W.D.La. 1992)); see also Whitaker v. Trans Union Corp., 2004 WL 1982527, at *2 (D.Kan. Sept. 3, 2004)("Errata sheets may be used to correct errors or to clarify or change an answer when a question is not understood, but it may not be used to alter what has been stated under oath").

---

[31] This evidence also must be ignored under the standard of review because it comes from interested employee witnesses. See Hill, 411 F.3d at 131 n.22, 129 n.16; Reeves, 530 U.S. at 149-151.

[32] See Cain v. Green Tweed & Co., Inc., 832 A.2d 737, 740-41 (Del. 2003)(noting that the doctrine "has been adopted in some form by all Federal Circuit courts and by the courts of most states"); Van T. Junkins and Assoc., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984).

## V. DEFENDANTS ALSO DISCRIMINATED AGAINST PLAINTIFF IN THE TERMS AND CONDITIONS OF HER EMPLOYMENT BASED ON HER AGE.

**A. Defendants Took Adverse Action Against Plaintiff.** Even before she was discharged, Defendants took adverse action against Plaintiff because of her age. To constitute adverse employment action, the discriminatory "conduct must be serious and tangible enough to alter [the] employee's compensation, terms, conditions, or privileges of employment," Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d. Cir. 1997), or to "deprive or tend to deprive [the employee] of employment opportunities or otherwise adversely affect his status as an employee." Id. at 1297 (internal bracketing omitted). Certainly, Plaintiff has met any of these tests.[33]

Here, Defendants required Plaintiff to learn her duties on the job but in 2002 and 2003, required her to provide training to her 23 year old peer, Dunlop. Then, Gilmore denied Plaintiff her vacation request of two weeks despite the facts that she requested it two months in advance, was entitled to four weeks' vacation per year, and had always taken two to three weeks off to go to Florida each year. Yet, Gilmore admitted that this was the only time he had denied a vacation request. In stark contrast, Gilmore allowed the 23 year old newcomer Dunlop her vacation request made on short notice and then even allowed her additional time when she amended her initial request. Finally, in 2003, Gilmore denied Plaintiff a bonus for 2002, but granted one to Dunlop and even told her that Plaintiff was not receiving one. In fact, Gilmore gave bonuses to all of his team members that year except Plaintiff and Bruce Holmquist who was in his 40's. These actions were adverse and clearly altered 1) Plaintiff's compensation which previously had included a bonus every year they were granted, 2) the terms, conditions, or privileges of her employment, such as her earned and accrued vacation, and 3) deprived her of employment opportunities or otherwise adversely affected her status as an employee because she was not

---

[33] Adverse action also may occur with just a lateral transfer absent any loss in pay or benefits. Torre v. Casio, Inc., 42 F.3d 825, 831 n.7 (3d Cir. 1994); Dilenno v. Goodwill Indus. of Mid-Eastern Pa., 162 F.3d 235, 236 (3d Cir. 1998).

35

provided training and then ultimately fired for alleged lack of performance.

VI.  **DEFENDANTS ALSO DISCRIMINATED AGAINST PLAINTIFF IN THE TERMS AND CONDITIONS OF HER EMPLOYMENT BECAUSE OF HER SEX.**

Finally, Defendants discriminated against Plaintiff in the terms and conditions of her employment based on her sex by their preferential treatment of the one, lone male portfolio administrator who was not required to perform as much work as Plaintiff or her female peers, nor was he disciplined or discharged for such lack of performance. As the Seventh Circuit observed, "[o]ne does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." Collins v. State of Ill., 830 F.2d 692, 703 (7th Cir. 1987). Adverse action also may be found in a "reassignment with significantly different [job] responsibilities," Durham Life Insur. Co. v. Evans, 166 F.3d 139, 152-53 (3d Cir. 1999), or by decreasing an employee's earning potential and causing "significant disruption in h[er] working conditions." Id. at 153. The law is clear that adverse action is a very broad umbrella which covers a multitude of sins.[34]

In addition to age discrimination and retaliation, Gilmore's other sin was that he did not treat women in the office as well as he treated the men. Dunlop at 33; B532.[35] After Kathleen

---

[34] See e.g. Jones v. School Dist. of Phila., 198 F.3d at 412 (adverse action when teacher involuntarily transferred to a less desirable assignment and lost the opportunity to do the job he "sought most"); Torre v. Casio, Inc., 42 F.3d at 831 n.7 (transfer to a dead-end job); see also Rodriguez v. Board of Ed., 620 F.2d 362, 364-66 (2d Cir. 1980)(adverse action where transfer radically changed nature of employee's work and resulted in "severe professional trauma.")(internal ellipses omitted).

[35] Before Dunlop arrived, Gilmore would stop by the desk of an attractive but professional, single mother in Mellon's retail sales and say unprofessional things to her of a sexual nature in an inappropriate manner of gushing and flirting. Pl. at 258, 259, 260; B308, 309, 310. Then after he hired the 23 year old Dunlop, Gilmore made inappropriate comments about Dunlop's attire. Pl. at 257-58, Gilmore at 22, 29; Dunlop at 4; B307-308, 443, 450, 503.

On one occasion in 2002 or 2003, Dunlop wore knee-high boots to work. Dunlop at 33, 58; B532, 557. While she was standing next to the printer, Gilmore looked her up and down from head to toe. Dunlop at 58; B557. He looked at her in a way that was inappropriate. Dunlop at 33, 35; B532, 534. The way he looked at her from head to toe made her uncomfortable. Dunlop at 59, 60; B557, 558. He then made an inappropriate comment to her about her boots. Dunlop at 33, 58; B532, 557. She looked at him, and he walked away. Dunlop at 58, 60; B557, 559. She then went over to Plaintiff's desk

36

Agne was fired. Plaintiff was the only Portfolio Administrator in the Delaware office. Pl. at 143: B193. Portfolio administrators from the Philadelphia office, including Dan Merlino, should have been brought down to Delaware to help her out. Pl. at 143-44; B193-94. But Gilmore did not even consider giving her help because Plaintiff was an older woman. Pl. at 144; B194. In fact, during the entire time that Plaintiff worked there, Gilmore had no male portfolio administrators in the Delaware office. Gilmore at 73-74, Becker at 22, Thomas at 44, Dunlop at 14; B494-95, 513, 624, 815.

Whenever Plaintiff was in the Philadelphia office, working alongside a teammate, she noticed that fellow portfolio assistant Dan Merlino was not as busy as she and the other female portfolio administrators, Kathleen Agne, Marion Marano, and Cindy Chambliss. Pl. at 133, 134; B183-84.[36] Like Plaintiff, Dan Merlino was a portfolio assistant, salary grade 6. Gilmore at 29, Thomas at 52; B450, 632. Though he was in a comparable position to them, Merlino was not given comparable tasks to Marion and Cindy. Pl. at 135; B185. Then when Plaintiff called to ask questions regarding specific job duties that the portfolio administrators were responsible for, Merlino would not have the answers that he should have had as part of his job, and instead he would defer to Marion or Cindy, even though he was very capable of getting the answers or being able to work as a team player. Pl. at 135, 136; B185, 186.

Gilmore allowed this lack of teamwork and cooperation and tolerated Merlino's ignorance of certain aspects of his job. Yet, he issued Plaintiff a "Final" Written Warning and ultimately discharged her for an alleged lack of performance.[37] Therefore, Gilmore clearly

---

and said, "Can you believe the comment[?]" Dunlop at 58: B557.

[36] During 2001-2002, the portfolio administrators included Plaintiff, Marion Marano, and Dan Merlino. Pl. at 22, 134, Gilmore at 29, Becker at 52, Thomas at 51; B72, 184, 450, 631, 845.

[37] The selective or discriminatory enforcement of rules and regulations also is compelling evidence of causation. See Holder, 987 F.2d at 197; Hill, 411 F.3d at 131-132; Cox v. Louisiana, 379 U.S. 536, 557-558 (1965).

adversely affected Plaintiff's status as an employee by his preferential and more lenient treatment of this similarly situated male employee.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

        **THE NEUBERGER FIRM, P.A.**

        **/s/ Stephen J. Neuberger**
        **THOMAS S. NEUBERGER, ESQ. (#243)**
        **STEPHEN J. NEUBERGER, ESQ. (#4440)**
        Two East Seventh Street, Suite 302
        Wilmington, Delaware 19801
        (302) 655-0582
        TSN@NeubergerLaw.com
        SJN@NeubergerLaw.com

        **LAW OFFICE OF JOHN M. LaROSA**

        **/s/ John M. LaRosa**
        **JOHN M. LaROSA, ESQ. (#4275)**
        Two East 7th Street, Suite 302
        Wilmington, Delaware 19801-3707
        (302) 888-1290
        JLR@LaRosaLaw.com

Dated:  March 12, 2007        Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LINDA J. BLOZIS, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> MELLON TRUST OF DELAWARE, NATIONAL : <br> ASSOCIATION, a Pennsylvania corporation; : <br> MELLON BANK, NATIONAL ASSOCIATION, : <br> (formerly MELLON BANK (DE) NATIONAL : <br> ASSOCIATION), a Pennsylvania corporation; and : <br> MELLON FINANCIAL CORPORATION, a : <br> Pennsylvania corporation, : <br> : <br> Defendants. : | C.A. NO. 05-891 SLR |

## CERTIFICATE OF SERVICE

I, John M. LaRosa, Esquire, being a member of the Bar of this Court, do hereby certify that on March 12, 2007, I electronically filed this **PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** and the appendix thereto with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

| | | |
|---|---|---|
| Thad J. Bracegirdle, Esquire <br> **REED SMITH LLP** <br> 1201 Market Street, Suite 1500 <br> Wilmington, Delaware 19801 | John Unkovic, Esquire <br> **REED SMITH LLP** <br> 435 Sixth Avenue <br> Pittsburgh, PA 15219 | Stephanie Wilson, Esquire <br> Sherri A. Affrunti, Esquire <br> **REED SMITH LLP** <br> Princeton Forrestal Village <br> 136 Main Street, Suite 250 <br> Princeton, NJ 08540 |

/s/ John M. LaRosa
JOHN M. LaROSA, ESQ. (#4275)

cc: Thomas S. Neuberger, Esquire
Stephen J. Neuberger, Esquire
Ms. Linda J. Blozis

Attorney Files/John's Files/Client Files/Blozis/Pleadings/Motions/Summary Judgment/Answering Brief