## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LINDA J. BLOZIS,                                      :
                                                      :
   Plaintiff,                          :
                                                      :
  v.                                         :  **C.A. NO. 05-891 SLR**
                                                      :
MELLON TRUST OF DELAWARE, NATIONAL                    :
ASSOCIATION, a Pennsylvania corporation;              :
MELLON BANK, NATIONAL ASSOCIATION,                    :
(formerly MELLON BANK (DE) NATIONAL                   :
ASSOCIATION), a Pennsylvania corporation; and         :
MELLON FINANCIAL CORPORATION, a                       :
Pennsylvania corporation,                             :
                                                      :
   Defendants.                          :

### APPENDIX TO
### PLAINTIFF'S ANSWERING BRIEF
### IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

LAW OFFICE OF JOHN M. LaROSA
JOHN M. LaROSA, ESQ. (#4275)
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
JLR@LaRosaLaw.com

Dated:  March 12, 2007     Attorneys for Plaintiff

## TABLE OF CONTENTS

**Page**

COMPLAINT ..........................................................................................................B001

DEFENDANTS' ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF'S COMPLAINT.........................................................B019

DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES DIRECTED TO DEFENDANTS ............................B036

Deposition of LINDA J. BLOZIS.............................................................................B050

Deposition of BRENDAN MICHAEL GILMORE.......................................................B422

Deposition of MARIA F. DUNLOP...........................................................................B500

Deposition of ROSEMARY CURTIS THOMAS............................................................B581

DECLARATION OF ROSEMARY THOMAS...............................................................B678

Deposition of GREGG L. LANDIS............................................................................B686

DECLARATION OF GREGG L. LANDIS...................................................................B783

Deposition of WILLIAM S. BECKER.........................................................................B794

DECLARATION OF WILLIAM S. BECKER................................................................B901

EMPLOYEE PROFILE/HISTORY for Blozis, Linda J[.] (10/23/1998) ...............B907

EMPLOYEE PROFILE/HISTORY for Blozis, Linda J[.] (8/30/2004) .................B908

Letter from D. Kloppenburg to L. Blozis of 2/20/02 ................................................B909

E-mail from W. Becker to L. Blozis of 10/8/02 RE: Projects....................................B910

E-mail from R. Olney to L. Blozis of 10/18/02 .......................................................B911

Performance Management Form for Linda J. Blozis (1/27/2003)..............................B912

Linda Blozis Response to Manager Review dated 1/27/03 (2/11/03)........................B917

History of Events (2/11/03-6/26/03) .......................................................................B921

E-mail from L. Blozis to G. Landis of 3/13/03 RE: Vacation dates ..........................B922

E-mail from L. Blozis to G. Landis of 3/18/03 RE: Brendan ...................................B923

E-mail from G. Landis to B. Gilmore of 5/9/03 RE: Linda Blozis .........................................B924

E-mail from P. Kochis to R. Thomas 5/9/03 RE: Linda Blozis ................................................B925

Notes of Rosemary Thomas (4/30/03) .................................................................................B927

Notes of Rosemary Thomas (5/01/03) .................................................................................B928

Notes of Gregg Landis RE: LINDA BLOZIS FILE................................................................B930

E-mail from R. Thomas to G. Landis of 5/16/03 RE: Linda Blozis..........................................B931

Gregg [Landis]'s notes RE: final written warning meeting.......................................................B932

Interoffice Memo from B. Gilmore to L. Blozis of 5/19/03
RE: Final Written Warning for Performance ........................................................................B933

E-mail from R. Thomas to B. Gilmore of 7/2/03 RE: L. Blozis ..............................................B934

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

LINDA J. BLOZIS,                                          :
                                                         :
        Plaintiff,                           :     CIVIL ACTION NO.
                                                         :
    v.                                          :
                                                         :
MELLON TRUST OF DELAWARE, NATIONAL      :     0 5 - 8 9 1 -
ASSOCIATION, a Pennsylvania corporation;           :
MELLON BANK, NATIONAL ASSOCIATION,      :
(formerly MELLON BANK (DE) NATIONAL               :
ASSOCIATION), a Pennsylvania corporation; and      :
MELLON FINANCIAL CORPORATION, a        :
Pennsylvania corporation,                           :     **TRIAL BY JURY DEMANDED**
                                                         :
        Defendants.                          :

## COMPLAINT

1.    This is a civil action arising from age and sex discrimination and retaliation

which seeks compensatory, punitive, and statutory liquidated damages and injunctive relief for

the negative evaluation, discipline, and discharge of a then 57 year old woman employed by

Defendants for over thirteen years.

### I. JURISDICTION AND VENUE

2.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and

1343; 42 U.S.C. § 1981a; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e et seq. ("Title VII"); and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et

seq. ("ADEA").



DEPOSITION
EXHIBIT
Blozis 1
7-26-06 KF

3.      This Court has jurisdiction over the state law claims under 19 Del. C. §§ 711(a)(1) and (f) in Counts I - III pursuant to 28 U.S.C. § 1367, which provides for supplemental jurisdiction.

4.      The causes of action arise under Title VII, the ADEA, and 19 Del. C. §§ 711(a)(1) and (f).

5.      All conditions precedent to jurisdiction have occurred or have been complied with. Plaintiff filed a timely administrative complaint with the United States Equal Employment Opportunity Commission. All administrative proceedings have been terminated. Plaintiff received a Notice of Right to Sue on or about September 28, 2005. She files this Complaint within 90 days of receipt of such Notice.

6.      Venue is proper in this district because it is the judicial district where Plaintiff was employed, the unlawful employment practices and discrimination complained of occurred, and the claims arose.

## II. THE PARTIES

7.      Plaintiff Linda J. Blozis is a citizen of the United States and a resident of Naples, Florida. She was employed continubusly by Defendants from approximately February 14, 1990 to July 14, 2003.

8.      Plaintiff is a white female age 58, who at all times was a diligent, loyal, and capable employee.

B002

9.      Defendant Mellon Trust of Delaware, National Association ("Mellon Trust") is a Pennsylvania corporation. It operates a trust bank engaging in fiduciary activities but cannot take deposits or lend money. It does business throughout the State of Delaware. It was the joint employer of Plaintiff. Mellon Trust has a principal place of business at Two Greenville Crossing, 4005 Kennett Pike, Suite 200, Greenville, Delaware 19807. The Secretary of State of the State of Delaware is authorized to accept service for Mellon Trust in accordance with Rule 4(e)(1) of the Federal Rules of Civil Procedure and 8 Del. C. § 382. It is a wholly-owned subsidiary of Defendant Mellon Bank, National Association. Throughout the facts alleged herein, its management had actual or imputed knowledge of the discriminatory actions taken against Plaintiff, but it took no steps to redress this conduct.

10.      Defendant Mellon Bank, National Association ("Mellon Bank") is a Pennsylvania corporation. It does business throughout the State of Delaware. Previously, Mellon Bank (DE) National Association ("Mellon DE") merged into Mellon Bank. Mellon Bank, through its predecessor, Mellon DE, was the joint employer of Plaintiff. Mellon Bank is the parent company of Defendant Mellon Trust. The Secretary of State of the State of Delaware is authorized to accept service for Mellon Bank in accordance with Rule 4(e)(1) of the Federal Rules of Civil Procedure and 8 Del. C. § 382. Throughout the facts alleged herein, its management had actual or imputed knowledge of the discriminatory actions taken against Plaintiff, but it took no steps to redress this conduct.

11.      Defendant Mellon Financial Corporation ("Mellon Financial") is a Pennsylvania corporation. It is a bank holding company, a financial services holding company, and the parent company of Defendant Mellon Bank. Its corporate headquarters are located at One Mellon

3

**B003**

Center, Pittsburgh, Pennsylvania 15258-0001. It does business throughout the State of Delaware.

It was the joint employer of Plaintiff. The Secretary of State of the State of Delaware is

authorized to accept service for Mellon Financial in accordance with Rule 4(e)(1) of the Federal

Rules of Civil Procedure and 8 Del. C. § 382. Throughout the facts alleged herein, its

management had actual or imputed knowledge of the discriminatory actions taken against

Plaintiff, but it took no steps to redress this conduct.

      12.     The three Defendants all are one single "employer" as defined by the ADEA and

Title VII. They function as one integrated enterprise with 1) common management, 2)

interrelated operations in which all of the businesses are in the financial services industry, 3)

common ownership and financial control by a parent over the subsidiaries, and

4) centralized control over labor relations. This integrated enterprise of corporations had twenty

or more employees for each working day in each of twenty or more calendar weeks in 2003.

### III. FACTS GIVING RISE TO THE ACTION

**A.**    **Excellent Employment History**

      13.     During Plaintiff's more than thirteen years with Defendant, she worked as a

Portfolio Administrator in Defendants' Private Wealth Management Department and was

entrusted to work on trust accounts valued between $1 million and $50 million dollars.

      14.     During her more than thirteen years with Defendant, Plaintiff received many

written commendations from her numerous supervisors for her customer service skills and

dedication to her job.

      15.     During her more than thirteen years with Defendant, Plaintiff was never cited for

tardiness. Her attendance record was commendable.

16.    During her more than thirteen years with Defendant, Plaintiff was never cited for unprofessionalism or gross neglect of responsibilities.

17.    In 2001, Plaintiff received a bonus for her good performance in 2000.

18.    On February 20, 2002, Plaintiff received a $2,000 incentive under Defendants' Private Wealth Management 2001 Portfolio Team Incentive Plan for her good performance in 2001.

19.    In October of 2002, Plaintiff received a raise in annual salary from $36,000 to $39,800.

20.    From approximately February 14, 1990, through November of 2002, Plaintiff's annual evaluations and quarterly checks (collectively "performance evaluations") ranged from meets expectations to exceeds expectations. Prior to December of 2002, Plaintiff never received an unfavorable performance evaluation from Defendant.

21.    From approximately February 14, 1990, to May 19, 2003, Plaintiff never received a demotion, suspension, written reprimand, or any other form of written discipline from Defendant.

**B.    Increased Responsibilities and Negative Evaluation**

22.    From approximately March of 2002 to July 7, 2002, Defendants made Plaintiff responsible for all support work during the frequent absences of supervisors. Defendants made Plaintiff alone responsible for telephone reception, mail delivery, equipment maintenance, arranging client meetings, handling all cash transactions, opening new accounts, closing terminated accounts, and training a new employee. Younger and male employees were not treated similarly.

23.      On or about January 27, 2003, Plaintiff's immediate supervisor, Investment

Officer Bill Becker, a white male then in his late 30's, gave Plaintiff her first unfavorable

performance evaluation in her then more than twelve years with Defendants which criticized the

speed of her work and knowledge of responsibilities.  Younger and male employees were not

treated similarly.

24.      Between January 2003 and May of 2003, Defendants pressured Plaintiff to work

harder and faster.  Younger and male employees were not treated similarly.

**C.      Oral Reprimand, Internal Complaint of Age Discrimination, and Discipline**

25.      In late April of 2003, Team Leader and First Vice President Brendan Gilmore, a

white male approximately age 56, called Plaintiff into his private office and strongly criticized

her work in a threatening and demeaning manner.  Specifically, he insisted that Plaintiff

immediately complete a client meeting booklet "or else."

26.      Even though his door was closed, his tone and volume were disruptive to other

employees outside of his office.  Gilmore used profanity in speaking to Plaintiff.

27.      Before leaving for vacation on May 2, 2003, Plaintiff lodged a verbal complaint

against Brendan Gilmore for the unprofessional, threatening, and demeaning manner in which he

had spoken to her.  Her complaint was recorded by Rosemary Thomas of Human Resources.

28.      Specifically, Plaintiff told Thomas in good faith that she believed that Gilmore's

words and conduct toward Plaintiff were "founded in age."

29.      On May 19, 2003, Administrative Officer Gregg Landis, a white male in his mid-

30's, gave Plaintiff her first and only written reprimand, entitled "Final Written Warning for

Performance" which later was signed by Brendan Gilmore.

6

**D.**   **Discharge and Replacement**

      30.    Between May 19th and July 13th of 2003, Plaintiff continued to make every effort to complete outstanding projects.  Landis agreed with Plaintiff that she was getting client files to a point of smooth transition for the new replacement of Investment Officer Bill Becker.

      31.    Nevertheless on July 14, 2003, at approximately 10 a.m., Landis informed Plaintiff via e-mail that he needed to talk to her in a private office about a Human Resources issue.

      32.    That same day, Landis and Plaintiff met for a conference call with Rosemary Thomas.  At that time, Landis told Plaintiff she was fired because of her performance.

      33.    Landis told Plaintiff to clean out her desk and return to him her keys and pass cards, and she promptly complied.

      34.    Upon information and belief, in late 2003 or early 2004, Defendants replaced Plaintiff with a female who is sufficiently younger than Plaintiff.

**E.**   **Stated Reason**

      35.    Any alleged legitimate non-retaliatory and non-discriminatory reasons offered by Defendants for the difference in treatment of Plaintiff is a pretext for retaliation and discrimination because of age and sex.

**F.**   **Plaintiff's Prima Facie and Pretext Case**

      36.    At the time her employment ended, Plaintiff was over the age of 40.

      37.    Plaintiff was qualified for her position and was performing her job competently.

      38.    Her employment was terminated by Defendant.

      39.    Plaintiff's replacement was sufficiently younger than Plaintiff.

7

B007

40.    Plaintiff's replacement was less productive than Plaintiff, and of less value to Defendants than Plaintiff.

41.    The reason for the termination of Plaintiff is discrimination based upon Plaintiff's age.

42.    Any alleged legitimate non-discriminatory reasons offered by Defendants for the termination is a pretext for discrimination because of age.

43.    The natural probative force of the evidence demonstrates retaliation and discrimination.  Alternatively, a reasonable fact finder could choose to disbelieve any non-retaliatory and non-discriminatory reasons offered by Defendants because Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendants' explanation that make it unworthy of belief.

**G.    Comparative Treatment of Similarly Situated Younger and Male Employees**

44.    Similarly situated younger and/or male employees were not treated similarly to Plaintiff.

**(1)    Denied Bonuses**

45.    On March 18, 2003, Brendan Gilmore told Plaintiff that she would not receive an annual bonus for 2002, contrary to previous indication.

46.    Portfolio Administrator Maria Dunlop, a white female in her 20's, received a bonus for 2002.

47.    All other team members less than 40 years old received a bonus for 2002.

8

(2)    **Denied Support**

48.    Defendants' management told Plaintiff not to ask Maria Dunlop for help with her

workload.

49.    Younger employees were not treated similarly.  Dunlop was allowed to ask

Plaintiff for help with her workload.

50.    Gilmore and Landis criticized Plaintiff for leaving a booklet for Dunlop to bind.

However, Dunlop previously was not criticized for leaving approximately sixty scholarship

checks for Plaintiff to assemble and mail to awardees.

(3)    **Less Vacation Time**

51.    In April of 2003, Plaintiff requested two consecutive weeks of her earned and

accrued vacation time.  Gilmore denied her request.  As a result, Defendants allowed Plaintiff

only six days of vacation beginning on May 2, 2003.

52.    Younger employees were not treated similarly.  In late May of 2003, Gilmore

allowed Maria Dunlop seven days of vacation.

**H.    Comparative Treatment of Similarly Situated Older and Female Employees**

53.    Other employees age 40 or older have been discharged, forced to resign, or

disciplined by Defendants and its agents because of their age and include the following:

a.    On March 6, 2002, at the direction of Gilmore, Becker and Landis

discharged Kathleen Agne, a white female then age 49, after more than 23 years of service.  No

explanation was given to Plaintiff for her discharge.

b.    Gilmore gave Senior Trust Officer Robert Bell, a white male, an

overwhelming book of business and forced him to retire at age 62.

9

    c.      Gilmore forced Vice President Martha Fetters to resign at age 43.

    d.      Gilmore forced Assistant Vice President and Administrative Officer

Linda Squier, a white female, to resign in early 40's, after more than fifteen years of service to

Defendant.

    e.      Defendant also issued a Corrective Action to Francis Smith, a white

female age 61, demoted her to Administrative Officer, and forced her to resign in approximately

September of 2003.

**I.**    **Circumstantial and Direct Evidence of Age Bias**

54.    Plaintiff was Defendants' oldest Portfolio Administrator in Delaware.

55.    In fact, Plaintiff was the oldest employee on Brendan Gilmore's Team.

56.    All employees hired by Gilmore were under the age of 40, including the

following:

    a.      Investment Officer Bill Becker, a white male in his late 30's,

    b.      Investment Assistant Dan Merlino, a white male in his early 30's.

    c.      Assistant Maria Dunlop, a white female in her 20's, and

    d.      Investment Officer Kristy Hunt, a white female in her 30's.

57.    Many older employees previously had retired or left Defendants' employ.

Because Plaintiff was the oldest employee on his team who had not retired or left Mellon,

Gilmore called her "a survivor."

58.    Defendant violated its work rules in terminating Plaintiff's employment,

including its EEO policies against age and sex discrimination and retaliation.

10

B010

**J.** **Distinct Lack of Employee Criticism in Evaluations and Written Discipline**

59.    Prior to December of 2002, Plaintiff never received an unfavorable performance evaluation from Defendant.

60.    From approximately February 14, 1990, to May 19, 2003, Plaintiff never received a demotion, suspension, written reprimand, or any other form of written discipline from Defendant.

61.    There is a distinct lack of employee criticism in Plaintiff's personnel file.

**K.** **Plaintiff's Losses and Injuries**

62.    Plaintiff's wage package was approximately $39,800 per year plus a 401(k) plan; health, dental, vision, long term disability, accidental death and dismemberment, and life insurance coverage; and other benefits.

63.    As a direct and proximate result of the actions of Defendants and its agents, Plaintiff is suffering lost wages, earnings, incentives, and bonuses; lost or reduced 401(k) plan benefits, lost health, dental, vision, long term disability, accidental death and dismemberment, and life insurance coverage; and other benefits; decreased employment and earning opportunities; losses incurred as a result of being forced to sell her house; emotional pain, suffering, anger, disappointment, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain, physical injury, anguish, humiliation, embarrassment, injury to reputation; and other pecuniary and non-pecuniary losses and injuries.

**IV. ALLEGATIONS REGARDING DEFENDANTS' CONDUCT**

64.    The reason for the difference in treatment between Plaintiff and younger employees is discrimination because of age.

11

65.    The reason for the difference in treatment between Plaintiff and male employees is discrimination because of sex.

66.    The actions of the Defendants were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federally protected rights. Defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal rights. Their actions were outrageous and taken with evil or improper motive, in bad faith, out of personal animus, or motivated by bias and without any reasonable grounds to support them. Their actions were wanton and malicious or taken with reckless indifference to federally protected rights.

## V. CLAIMS

### COUNT I
### (DISCHARGE - CIRCUMSTANTIAL EVIDENCE
### ADEA and 19 DEL. C. § 711(a)(1) - AGE)

67.    Plaintiff repeats and realleges ¶¶ 1 - 66 set out above.

68.    Plaintiff was qualified to do the job of Portfolio Administrator.  Plaintiff suffered an adverse action when Defendants discharged her.

69.    The reason Defendants discharged Plaintiff was her age.

70.    Plaintiff was replaced by a less qualified younger employee.

71.    Plaintiff's replacement was sufficiently younger than Plaintiff.

72.    The sole, motivating or determinative reason for the discharge of Plaintiff was her age.

12

73.    Any stated legitimate non-discriminatory reason offered by the Defendants for their actions is a pretext for intentional discrimination based on age.  Any reason offered by the Defendants is unworthy of credence because Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them unworthy of credence and hence infer that the Defendants did not act for the asserted non-discriminatory reason.

74.    Alternatively, Plaintiff can demonstrate pretext because the natural probative force of the evidence demonstrates discrimination.

75.    Defendants cannot meet their burden of proving that they would have made the same decision to discharge Plaintiff regardless of age bias.

76.    Plaintiff's statutory right to be free of age discrimination has been denied under the ADEA and 19 Del. C. § 711(a)(1) because she was discharged or otherwise discriminated against on the basis of her age.

### COUNT II (TERMS AND CONDITIONS - ADEA and 19 DEL. C. § 711(a)(1) - AGE)

77.    Plaintiff repeats and realleges paragraphs 1 - 76 set out above.

78.    Because of her age, Plaintiff suffered intentional discrimination which was severe or pervasive, regular and continuous.  This detrimentally affected her, and it would do so for a reasonable person of the same age in her position.

13

79.     The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of an older worker.

80.     The acts identified herein were severe and pervasive, regular and continuous, and they created an intimidating, hostile, or offensive work environment.

81.     Under all the circumstances, Plaintiff has been illegally discriminated against in terms and conditions of employment, and otherwise harassed, by a discriminatory, hostile, and abusive work environment which was created, approved, and tolerated by management because of age.

82.     Plaintiffs' statutory right to be free of discrimination because of age has been denied under the ADEA and 19 Del. C. § 711(a)(1).

## COUNT III (TERMS AND CONDITIONS - TITLE VII and 19 DEL. C. § 711(a)(1) - SEX)

83.     Plaintiff repeats and realleges paragraphs 1 - 82 set out above.

84.     Because of her sex, Plaintiff suffered intentional discrimination which was severe or pervasive, regular and continuous.  This detrimentally affected her, and it would do so for a reasonable person of the same sex in her position.

85.     The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of a woman.

86.     The acts identified herein were severe and pervasive, regular and continuous, and they created an intimidating, hostile, or offensive work environment.

B014

87.    Because of sex, Plaintiff suffered intentional discrimination which was severe or pervasive, regular, and continuous. This detrimentally affected her, and it would do so for a reasonable person of the same sex in her position. The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of a female.

88.    Under all the circumstances, Plaintiff has been illegally discriminated against in terms and conditions of employment, and otherwise harassed, by a discriminatory, hostile, and abusive work environment which was created, approved, and tolerated by management because of sex.

89.    Plaintiffs' statutory right to be free of discrimination because of sex has been denied under Title VII and 19 Del. C. § 711(a)(1).

### COUNT IV
### (DISCHARGE IN RETALIATION FOR OPPOSING ILLEGAL PRACTICES ADEA and 19 DEL. C. § 711(f))

90.    Plaintiff repeats and realleges ¶¶ 1 - 89 set out above.

91.    Plaintiff opposed practices made illegal by the ADEA.

92.    Defendant retaliated against her for her opposition and terminated her employment.

93.    There is a causal connection between Plaintiff's opposition and Defendants' retaliation.

94.    Any non-retaliatory reason given by the Defendants is a pretext for retaliation.

15

95.    Any stated legitimate non-retaliatory reason offered by the Defendants for their actions is a pretext for retaliation and intentional discrimination based on age.  Any reason offered by the Defendants is unworthy of credence because Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them unworthy of credence and hence infer that the Defendants did not act for the asserted non-retaliatory reason.

96.    Alternatively, Plaintiff can demonstrate pretext because the natural probative force of all direct and circumstantial evidence establishes that it is more likely than not that a motivating or determinative cause of the adverse employment action was Plaintiff's age.

97.    Plaintiff's rights were violated under ADEA, because she was discharged or otherwise discriminated against in retaliation for opposing illegal practices and on the basis of her age.

98.    Plaintiffs' statutory right to be free of retaliation and age discrimination has been denied under the ADEA and 19 Del. C. § 711(f).

**WHEREFORE,** Plaintiff prays that the Court:

(a)    Enter judgment against all Defendants, jointly and severally.

(b)    Enter a declaratory judgment declaring the acts of the Defendants to be a violation of Plaintiff's statutory rights.

16

**B016**

(c)    Under the ADEA, Title VII, and 19 <u>Del. C.</u> § 715(1)c, enter a judgment against all

Defendants, jointly and severally, for compensatory damages, including lost wages, earnings,

incentives, and bonuses; lost or reduced 401(k) plan benefits, lost health, dental, vision, long

term disability, accidental death and dismemberment, and life insurance coverage; and other

benefits; decreased employment and earning opportunities; losses incurred as a result of being

forced to sell her house; and other pecuniary losses.

(d)    Under Title VII and 19 <u>Del. C.</u> § 715(1)c, enter a judgment against all Defendants,

jointly and severally, for compensatory damages for emotional distress, humiliation,

embarrassment, and injury to reputation.

(e)    Under the ADEA, enter a judgment against all Defendants, jointly and severally,

for statutory liquidated damages.

(f)    Under Title VII and 19 <u>Del. C.</u> § 715(1)c, enter a judgment gainst all Defendants,

jointly and severally, for punitive damages.

(g)    Issue a mandatory injunction directing the Defendants to reinstate Plaintiff

to the position of Portfolio Administrator or an equivalent position.

(h)    Alternatively, issue a mandatory injunction requiring the Defendants to place

Plaintiff in the next appropriate vacancy to which she normally would have progressed and been

entitled but for the illegal discrimination and retaliation against her.

(i)    Award front pay until Plaintiff can be reinstated or placed in a comparable or

appropriate position.

17

(j)    Issue a permanent injunction requiring the Defendants to:

(i)    Notify everyone who learned of Defendants' treatment of Plaintiff that their conduct was illegal,

(ii)    Expunge Plaintiff's personnel files of any derogatory information relating to this matter,

(k)    Award Plaintiff costs, interest, and attorneys' fees for this suit.

(l)    Require such other and further relief as the Court deems just and proper under the circumstances.

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQUIRE (#243)
STEPHEN J. NEUBERGER, ESQUIRE (#4440)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com


LAW OFFICE OF JOHN M. LaROSA

JOHN M. LaROSA, ESQUIRE (#4275)
Two East 7th Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
JLR@LaRosaLaw.com

Dated: December 27, 2005             Attorneys for Plaintiff Linda J. Blozis

Attorney Files/John's Files/Client Files/Blozis/Pleadings/Complaint

B018

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LINDA J. BLOZIS | : |
|             Plaintiff, | :   **CIVIL ACTION NO. 05-891** |
|       **vs.** | : |
| **MELLON TRUST OF DELAWARE,** | : |
| **NATIONAL ASSOCIATION; MELLON** | : |
| **BANK, NATIONAL ASSOCIATION;** | : |
| **MELLON FINANCIAL CORPORATION** | : |
|            **Defendants.** | : |

### DEFENDANTS' ANSWER AND
### AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendants Mellon Trust of Delaware, National Association, Mellon Bank,

National Association, and Mellon Financial Corporation ("Defendants"), by and through

their undersigned counsel hereby Answers the Complaint of Plaintiff Linda J. Blozis

("Plaintiff") and asserts affirmative defenses as follows:

    1.     Defendants deny the allegations of Paragraph 1 of Plaintiff's Complaint,

except admit only that Plaintiff purports to assert claims for age and sex discrimination

and retaliation and is seeking damages and injunctive relief.

### I.    AS TO JURISDICTION AND VENUE

    2.     Paragraph 2 alleges conclusions of law for which no response is required.

To the extent that Paragraph 2 contains factual allegations for which a response is

required, those allegations are denied.

B019

WILLIB-47208.1-JGHARRIS 2/24/06 9:11 AM

DKT NO.:_____5_____

3.      Paragraph 3 alleges conclusions of law for which no response is required. To the extent that Paragraph 3 contains factual allegations for which a response is required, those allegations are denied.

4.      Paragraph 4 alleges conclusions of law for which no response is required. To the extent that Paragraph 4 contains factual allegations for which a response is required, those allegations are denied.

5.      Paragraph 5 alleges conclusions of law for which no response is required. To the extent that Paragraph 5 contains factual allegations for which a response is required, those allegations are denied.

6.      Paragraph 6 alleges conclusions of law for which no response is required. To the extent that Paragraph 6 contains factual allegations for which a response is required, those allegations are denied.

## II.    **AS TO THE PARTIES**

7.      Defendants deny the allegations contained in Paragraph 7 of the Plaintiff's Complaint, except admit that Plaintiff was employed by Mellon Trust of Delaware, National Association and are without knowledge or information sufficient to form a belief as to where Plaintiff resides.

8.      Defendants deny the allegations contained in Paragraph 8 of the Plaintiff's Complaint, except admit that Plaintiff is a white female.

9.      Paragraph 9 contains conclusions of law of which no response is required. To the extent that Paragraph 9 contains factual allegations, those allegations are denied.

**B020**

2

10.    Paragraph 10 contains conclusions of law of which no response is required.  To the extent that Paragraph 10 contains factual allegations, those allegations are denied.

11.    Paragraph 11 contains conclusions of law of which no response is required.  To the extent that Paragraph 11 contains factual allegations, those allegations are denied.

12.    Paragraph 12 contains conclusions of law of which no response is required.  To the extent that Paragraph 12 contains factual allegations, those allegations are denied.

III.    **AS TO FACTS GIVING RISE TO THE ACTION**

A.    **AS TO EXCELLENT EMPLOYMENT HISTORY**

13.    Defendants deny the allegations contained in Paragraph 13 of Plaintiff's Complaint.

14.    Defendants deny the allegations contained in Paragraph 14 of Plaintiff's Complaint.

15.    Defendants deny the allegations contained in Paragraph 15 of Plaintiff's Complaint.

16.    Defendants deny the allegations contained in Paragraph 16 of Plaintiff's Complaint.

17.    Defendants deny the allegations contained in Paragraph 17 of Plaintiff's Complaint.

18.    Defendants deny the allegations contained in Paragraph 18 of Plaintiff's Complaint.

**B021**

WILLIB-47208 1-JGHARRIS 2/24/06 9:11 AM

19.    Defendants deny the allegations contained in Paragraph 19 of Plaintiff's Complaint.

20.    Defendants deny the allegations contained in Paragraph 20 of Plaintiff's Complaint.

21.    Defendants deny the allegations contained in Paragraph 21 of Plaintiff's Complaint.

**B.    AS TO INCREASED RESPONSIBILITIES AND NEGATIVE EVALUATION**

22.    Defendants deny the allegations contained in Paragraph 22 of Plaintiff's Complaint.

23.    Defendants deny the allegations contained in Paragraph 23 of Plaintiff's Complaint.

24.    Defendants deny the allegations contained in Paragraph 24 of Plaintiff's Complaint.

**C.    AS TO ORAL REPRIMAND, INTERNAL COMPLAINT OF AGE DISCRIMINATION AND DISCIPLINE**

25.    Defendants deny the allegations contained in Paragraph 25 of Plaintiff's Complaint.

26.    Defendants deny the allegations contained in Paragraph 26 of Plaintiff's Complaint.

27.    Defendants deny the allegations contained in Paragraph 27 of Plaintiff's Complaint, except admit that Plaintiff complained to Rosemary Thomas concerning Mr. Gilmore on or about May 2, 2003.

28.    Defendants deny the allegations contained in Paragraph 28 of Plaintiff's Complaint.

**B022**

4

29.    Defendants deny the allegations contained in Paragraph 29 of Plaintiff's Complaint, except admit that Mr. Gregg Landis along with human resources gave Plaintiff a final written warning for performance.

### D.    AS TO DISCHARGE AND REPLACEMENT

30.    Defendants deny the allegations contained in Paragraph 30 of Plaintiff's Complaint.

31.    Defendants deny the allegations contained in Paragraph 31 of Plaintiff's Complaint, except admit that Landis met with Plaintiff on July 14, 2003.

32.    Defendants deny the allegations contained in Paragraph 32 of Plaintiff's Complaint, except admit that Landis and Plaintiff met in a conference room, that Rosemary Thomas was present via conference call, and that Plaintiff's employment was terminated because of her performance.

33.    Defendants deny the allegations contained in Paragraph 33 of Plaintiff's Complaint, except admit that Plaintiff was asked to return certain items.

34.    Paragraph 34 contains conclusions of law to which no response is required.  To the extent that Paragraph 34 contains factual allegations for which a response is required, Defendants deny the allegations.

### E.    AS TO STATED REASON

35.    Defendants deny the allegations contained in Paragraph 35 of Plaintiff's Complaint.

### F.    As to Plaintiff's Prima Facie And Pretext Case

36.    Defendants admit the allegations contained in Paragraph 36 of Plaintiff's Complaint.

B023

WILLIB-47208.1-JGHARRIS 2/24/06 9 11 AM

37.     Defendants deny the allegations contained in Paragraph 37 of Plaintiff's Complaint.

38.     Defendants deny the allegations contained in Paragraph 38 of Plaintiff's Complaint, except admit that Plaintiff's employment with Mellon Trust of Delaware, National Association was terminated.

39.     Paragraph 39 of Plaintiff's Complaint contains conclusions of law to which no response is required.  To the extent that Paragraph 39 contains factual allegations, those allegations are denied.

40.     Paragraph 40 of Plaintiff's Complaint contains conclusions of law for which no response is required.  To the extent Paragraph 40 contains factual allegations, those allegations are denied.

41.     Defendants deny the allegations contained in Paragraph 41 of Plaintiff's Complaint.

42.     Defendants deny the allegations contained in Paragraph 42 of Plaintiff's Complaint.

43.     Defendants deny the allegations contained in Paragraph 43 of Plaintiff's Complaint.

**G.     AS TO COMPARATIVE TREATMENT OF SIMILARLY SITUATED YOUNGER AND MALE EMPLOYEES**

44.     Defendants deny the allegations contained in Paragraph 44 of Plaintiff's Complaint.

**(1) AS TO DENIED BONUSES**

45.     Defendants deny the allegations contained in Paragraph 45 of Plaintiff's Complaint.

**B024**

6

46.    Defendants deny the allegations contained in Paragraph 46 of Plaintiff's Complaint.

47.    Defendants deny the allegations contained in Paragraph 47 of Plaintiff's Complaint.

### (2) AS TO DENIED SUPPORT

48.    Defendants deny the allegations contained in Paragraph 48 of Plaintiff's Complaint.

49.    Defendants deny the allegations contained in Paragraph 49 of Plaintiff's Complaint.

50.    Defendants deny the allegations contained in Paragraph 50 of Plaintiff's Complaint.

### (3) AS TO LESS VACATION TIME

51.    Defendants deny the allegations contained in Paragraph 51 of Plaintiff's Complaint.

52.    Defendants deny the allegations contained in Paragraph 52 of Plaintiff's Complaint.

### H.    AS TO COMPARATIVE TREATMENT OF SIMILARLY SITUATED OLDER AND FEMALE EMPLOYEES

53.    Defendants deny the allegations contained in Paragraph 53 of Plaintiff's Complaint.

53 (a). Defendants deny the allegations contained in Paragraph 53(a) of Plaintiff's Complaint.

53 (b) Defendants deny the allegations contained in Paragraph 53(b) of Plaintiff's Complaint.

**B025**

7

53 (c) Defendants deny the allegations contained in Paragraph 53(c) of Plaintiff's Complaint.

53 (d) Defendants deny the allegations contained in Paragraph 53(d) of Plaintiff's Complaint.

53 (e) Defendants deny the allegations contained in Paragraph 53(e) of Plaintiff's Complaint.

I.     **AS TO CIRCUMSTANTIAL AND DIRECT EVIDENCE OF AGE BIAS**

54.     Defendants deny the allegations contained in Paragraph 54 of Plaintiff's Complaint.

55.     Defendants deny the allegations contained in Paragraph 55 of Plaintiff's Complaint.

56.     Defendants deny the allegations contained in Paragraph 56 of Plaintiff's Complaint.

56 (a) Defendants deny the allegations contained in Paragraph 56(a) of Plaintiff's Complaint.

56 (b) Defendants deny the allegations contained in Paragraph 56(b) of Plaintiff's Complaint.

56 (c) Defendants deny the allegations contained in Paragraph 56(c) of Plaintiff's Complaint.

56 (d) Defendants deny the allegations contained in Paragraph 56(d) of Plaintiff's Complaint.

57.     Defendants deny the allegations contained in Paragraph 57 of Plaintiff's Complaint.

**B026**

8

58.    Defendants deny the allegations contained in Paragraph 58 of Plaintiff's
Complaint.

### J.    AS TO DISTINCT LACK OF EMPLOYEE CRITICISM IN EVALUATIONS AND WRITTEN DISCIPLINE

59.    Defendants deny the allegations contained in Paragraph 59 of Plaintiff's
Complaint.

60.    Defendants deny the allegations contained in Paragraph 60 of Plaintiff's
Complaint.

61.    Defendants deny the allegations contained in Paragraph 61 of Plaintiff's
Complaint.

### K.    AS TO PLAINTIFF'S LOSSES AND INJURIES

62.    Defendants deny the allegations contained in Paragraph 62 of Plaintiff's
Complaint.

63.    Defendants deny the allegations contained in Paragraph 63 of Plaintiff's
Complaint.

### IV.    AS TO ALLEGATIONS REGARDING DEFENDANTS' CONDUCT

64.    Defendants deny the allegations contained in Paragraph 64 of Plaintiff's
Complaint.

65.    Defendants deny the allegations contained in Paragraph 65 of Plaintiff's
Complaint.

66.    Defendants deny the allegations contained in Paragraph 66 of Plaintiff's
Complaint.

**B027**

WILLIB-47208.1-JGHARRIS 2/24/06 9:11 AM

## V.    AS TO CLAIMS
### COUNT I
### (DISCHARGE – CIRCUMSTANTIAL EVIDENCE
### ADEA AND 19 DEL. C. § 711(a)(1)-AGE

67.    Defendants repeat their answers to the allegations contained in Paragraph 1-66 of Plaintiff's Complaint as if set forth at length herein.

68.    Defendants deny the allegations contained in Paragraph 68 of Plaintiff's Complaint.

69.    Defendants deny the allegations contained in Paragraph 69 of Plaintiff's Complaint.

70.    Defendants deny the allegations contained in Paragraph 70 of Plaintiff's Complaint.

71.    Defendants deny the allegations contained in Paragraph 71 of Plaintiff's Complaint.

72.    Defendants deny the allegations contained in Paragraph 72 of Plaintiff's Complaint.

73.    Defendants deny the allegations contained in Paragraph 73 of Plaintiff's Complaint.

74.    Defendants deny the allegations contained in Paragraph 74 of Plaintiff's Complaint.

75.    Defendants deny the allegations contained in Paragraph 75 of Plaintiff's Complaint.

76.    Defendants deny the allegations contained in Paragraph 76 of Plaintiff's Complaint.

**B028**

## AS TO COUNT II (TERMS AND CONDITIONS – ADEA
## AND 19 DEL. C. § 711(a)(1)-AGE)

77.    Defendants repeat their answers to the allegations contained in Paragraph 1-76 of Plaintiff's Complaint as if set forth at length herein.

78.    Defendants deny the allegations contained in Paragraph 78 of Plaintiff's Complaint.

79.    Defendants deny the allegations contained in Paragraph 79 of Plaintiff's Complaint.

80.    Defendants deny the allegations contained in Paragraph 80 of Plaintiff's Complaint.

81.    Defendants deny the allegations contained in Paragraph 81 of Plaintiff's Complaint.

82.    Defendants deny the allegations contained in Paragraph 82 of Plaintiff's Complaint.

## AS TO COUNT III (TERMS AND CONDITIONS – TITLE VII
## AND 19 DEL. C. § 711(a)(1) – SEX

83.    Defendants repeat their answers to the allegations contained in Paragraph 1-82 of Plaintiff's Complaint as if set forth at length herein.

84.    Defendants deny the allegations contained in Paragraph 84 of Plaintiff's Complaint.

85.    Defendants deny the allegations contained in Paragraph 85 of Plaintiff's Complaint.

86.    Defendants deny the allegations contained in Paragraph 86 of Plaintiff's Complaint.

**B029**

WILLIB-47209.1-JGHARRIS 2/24/06 9 11 AM

87.     Defendants deny the allegations contained in Paragraph 87 of Plaintiff's Complaint.

88.     Defendants deny the allegations contained in Paragraph 88 of Plaintiff's Complaint.

89.     Defendants deny the allegations contained in Paragraph 89 of Plaintiff's Complaint.

### AS TO COUNT IV (DISCHARGE IN RETALIATION FOR OPPOSING ILLEGAL PRACTICES ADEA AND 19. DEL. C. § 711(f)

90.     Defendants repeat their answers to the allegations contained in Paragraph 1-89 of Plaintiff's Complaint as if set forth at length herein.

91.     Defendants deny the allegations contained in Paragraph 91 of Plaintiff's Complaint.

92.     Defendants deny the allegations contained in Paragraph 92 -two of Plaintiff's Complaint.

93.     Defendants deny the allegations contained in Paragraph 93 of Plaintiff's Complaint.

94.     Defendants deny the allegations contained in Paragraph 94 of Plaintiff's Complaint.

95.     Defendants deny the allegations contained in Paragraph 95 of Plaintiff's Complaint.

96.     Defendants deny the allegations contained in Paragraph 96 of Plaintiff's Complaint.

97.     Defendants deny the allegations contained in Paragraph 97 of Plaintiff's Complaint.

**B030**

WILLIB-47208.1-JGHARRIS 2/24/06 9:11 AM

98.     Defendants deny the allegations contained in Paragraph 98 of Plaintiff's Complaint.

**WHEREFORE,** Defendants deny that Plaintiff is entitled to any of the relief demanded in her Complaint and respectfully requests that the Court enter judgment in Defendants' favor and against Plaintiff, dismissing Plaintiff's Complaint in its entirety and with prejudice, and awarding Defendants' attorneys' fees, costs and such other and further relief as the Court deems equitable and just.

## AFFIRMATIVE DEFENSES

By way of further Answer to Plaintiff's Complaint, Defendants set forth the following affirmative Defenses to Plaintiff's claims:

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's allegations fail, in whole or in part, to state any claim against Defendants upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited, in whole or in part, by Plaintiff's failure to mitigate her alleged damages.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited by the Doctrine of Unclean Hands.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited by the Doctrine of Estoppel.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited by the Doctrine of Laches.

**B031**

WILLLIB-47208.1-JGHARRIS 2/24/06 9:11 AM

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited by the Doctrine of Waiver.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff does not have any statutory or other basis for recovering attorneys' fees, costs of suit, injunctive relief or damages in this action.

## EIGHTH AFFIRMATIVE DEFENSE

The injuries for which Plaintiff seeks compensation are or may be barred by the exclusivity provision of the Delaware Worker's Compensation Act.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, by her failure to timely invoke or exhaust her mandatory administrative or contractual remedies.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited, in whole or in part, by her failure to have invoked an internal complaint or grievance mechanism, the existence of which was both known and available to Plaintiff.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited, in whole or in part, because any alleged conduct directed towards Plaintiff was engaged in or caused by a fellow servant, or by persons or entities over whom Defendants had no control, opportunity or authority to control, or by persons who acted outside of the scope of their employment with Defendants.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or limited, in whole or in part, by the applicable

14

**B032**

statute of limitations and administrative time periods governing the claims asserted.

### THIRTEENTH AFFIRMATIVE DEFENSE

Defendants exercised reasonable care to prevent and promptly correct any alleged discriminatory or harassing behavior, and Plaintiff unreasonably failed to take advantage of the preventative and/or corrective opportunities that Defendants provided or to avoid the harm otherwise.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for damages are or may be barred or limited by the Doctrine of After-Acquired Evidence.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for damages are barred by Defendants' good faith efforts to comply with the applicable anti-discrimination and harassment laws and the absence of any *respondeat superior* liability.

### SIXTEENTH AFFIRMATIVE DEFENSE

All actions taken towards Plaintiff by Defendants were taken in good faith and were based upon reasonable, legitimate and non-discriminatory business reasons.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed because there is no causal connection between the events alleged in the Complaint and any damages that Plaintiff has allegedly suffered.

### EIGHTEENTH AFFIRMATIVE DEFENSE

At all material times hereto, Defendants maintained an appropriate policy and program against harassment and an effective complaint procedure that was known and available to all employees.  To the extent Plaintiff availed himself of the policy/program,

**B033**

WILLIB-47208.1-JGHARRIS 2/24/06 9 11 AM

Defendants took prompt, remedial action to correct any alleged harassing or discriminatory conduct.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's damages, if any, were caused, in whole or in part, by her own acts or omissions.

## TWENTIETH AFFIRMATIVE DEFENSE

Not all of the named Defendants are Plaintiff's employer for purposes of maintaining this action.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

This Court does not have jurisdiction over Plaintiff's claims.

## ADDITIONAL DEFENSES

Defendants hereby reserve the right to assert such other and further defenses to Plaintiff's Complaint as further investigation and discovery of the facts may warrant.

WHEREFORE, having fully Answered, Defendants respectfully request that Plaintiff take nothing by this cause and that Defendants be awarded its costs and attorneys' fees for having to defend against this suit, as well as such other and further relief that the Court deems equitable, proper and just.


Dated:  February 24, 2006                Respectfully submitted,

                                         REED SMITH LLP


                            By:   /s/ John G. Harris
                                  John G. Harris, Esq. (ID No. 4017)
                                  1201 Market Street - Suite 1500
                                  Wilmington, DE 19801
                                  Telephone:  (302) 778-7500
                                  Facsimile:  (302) 778-7575
                                  E-mail:  jharris@reedsmith.com

**B034**

WILLIB-47208.1-JGHARRIS 2/24/05 9:11 AM

Attorneys for Defendants
Mellon Trust of Delaware, National
Association, Mellon Bank, National
Association and Mellon Financial Corporation

OF COUNSEL:
John C. Unkovic, Esq.
435 Sixth Avenue
Pittsburgh, PA 15219

Stephanie Wilson, Esq.
Sherri A. Affrunti, Esq.
136 Main Street
Princeton, NJ 08540

**B035**

17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LINDA J. BLOZIS | : | |
| | : | CIVIL ACTION NO. 05-891 |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| MELLON TRUST OF DELAWARE, | : | DEFENDANTS' RESPONSES AND |
| NATIONAL ASSOCIATION; MELLON | : | OBJECTIONS TO PLAINTIFF'S FIRST |
| BANK, NATIONAL ASSOCIATION; | : | SET OF INTERROGATORIES |
| MELLON FINANCIAL CORPORATION | : | DIRECTED TO DEFENDANTS |
| | : | |
| | : | |
| Defendants. | : | |

To:    John M. LaRosa, Esq.
       Two East 7th Street. Suite 302
       Wilmington. DE 19801-3707

Defendants Mellon Trust of Delaware, National Association, Mellon Bank,

National Association and Mellon Financial Corporation by its attorneys. Reed Smith

LLP, hereby respond to Plaintiff's First Set of Interrogatories.  The responses set forth

herein are made subject to and without waiving the following General Objections.

## GENERAL OBJECTIONS

1.    Defendants object to each interrogatory propounded by plaintiff to the

extent each seeks information protected by the attorney-client privilege or the attorney

work product doctrine.  Defendants further object to each interrogatory to the extent it

seeks to impose obligations on defendants beyond those required by the Court Rules.

Defendants also object to each interrogatory to the extent each purports to require

identification or production of documents prepared subsequent to the institution of this

lawsuit or in anticipation of litigation.

**B036**

2.    Defendants object to each interrogatory in so far as it seeks information beyond the temporal scope of discovery appropriate to this case, on the grounds that such requests are overly broad, unduly burdensome and seek information that is neither relevant to this case nor reasonably calculated to lead to the discovery of admissible evidence.

3.    The inadvertent production of a document or information that is protected by the attorney-client privilege, attorney work product doctrine, or any other privilege, will not waive defendants' right to assert such privilege.  Defendants also retain the right to retrieve documents or information inadvertently produced, including copies made of said documents, if any, which are deemed to be protected by any such privilege.

4.    Defendants object to each interrogatory insofar as they make the legal conclusion that all three corporate defendants were Plaintiff's employer for purposes of her allegations.

5.    Defendants reserve the right to amend and supplement these responses as additional information or documents may warrant.

### SPECIFIC RESPONSES AND OBJECTIONS
### TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

1.    Identify by name, date of birth, sex and title the individual(s) with whom Defendants replaced Plaintiff as Portfolio Administrator in 2003 or 2004.

**RESPONSE:**

**Defendants object to this Interrogatory on the grounds that it requires them to make a legal determination of who constitutes a "replace[ment]" for Plaintiff's position, and, as such, the interrogatory is improperly directed at Defendants. Defendants object further on the grounds that the Interrogatory as written is**

**B037**

- 2 -

vague and ambiguous.  Subject to and without waiving the foregoing objections,

Defendants answer as follows: Laura Shannon (F/DOB 1/24/69).

2.    Identify by name, date of birth, and job site all Portfolio Administrators who

Defendants hired in 2003 and 2004.

RESPONSE:

Defendants object to this Interrogatory on the grounds that it is overly

broad, unduly burdensome, and seeks information that is irrelevant and not

reasonably calculated to lead to the discovery of admissible evidence at trial.

Subject to and without waiver of the foregoing objections, Defendants answer as

follows:  In the Delaware office, Ms. Laura Shannon (DOB 1/24/69) was hired in

2003.

3.    Identify by name, date of birth, sex, and title all individuals on Brendan

Gilmore's team who received bonuses for 2002 and 2003, and the amounts received.

RESPONSE:

Defendants object to this Interrogatory on the grounds that it is overly

broad, unduly burdensome, and seeks information that is irrelevant and not

reasonably calculated to lead to the discovery of admissible evidence at trial.

Subject to and without waiver of the foregoing objections, Defendants answer as

**B038**

- 3 -

follows: In the Delaware office, the Portfolio Administrators who received

bonuses in 2002 were Plaintiff and Maria Dunlop. In 2002, Ms. Dunlop and

Plaintiff received $2,000.00. In 2003, Ms. Dunlop received $4,143.00.

4.    Identify by name, date of birth, sex and title all individuals on Brendan

Gilmore's team who took authorized vacation day(s) in 2003, and the date(s) thereof.

**RESPONSE:**

Defendants object to this Interrogatory on the grounds that it is overly

broad, unduly burdensome, and seeks information that is irrelevant and not

reasonably calculated to lend to the discovery of admissible evidence at trial.

5.    Identify by name, sex and date of birth all of Defendant's Portfolio

Administrators working in Delaware in 2002 and/or 2003.

**RESPONSE:**

**Plaintiff, Maria Dunlop (D/O/B 2/14/75), Kathy Agne (D/O/B 4/17/52), Laura**

**Shannon (D/O/B 1/24/69).**

6.    Identify by name, title, sex and date of birth all employees on Brendan

Gilmore's Team in 2002 and/or 2003.

**RESPONSE:**

**B039**

Defendants object to this Interrogatory on the grounds that it is overly broad, unduly burdensome, seeks information that is irrelevant and not reasonably calculated to lead to discovery of admissible evidence at trial. Subject to and without waiver of the foregoing, Defendants answer as follows: see Defendants' answers and objections to Request No. 5.

7.     Identify by name, title, sex and date of birth all employees hired by Brendan Gilmore from 2002 to the present.

**RESPONSE:**

Defendants object to this Interrogatory on the grounds that it is overly broad, unduly burdensome, seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at trial. Subject to and without waiver of the foregoing, Defendants answer as follows: Laura Shannon was hired in 2003 for a Portfolio Administrator position in Delaware.

8.     Identify the dates of birth of Investment Officer Bill Becker, Investment Assistant Dan Merlino, Maria Dunlop and Investment Officer Kristy Hunt.

**RESPONSE:**

Defendants object to this Interrogatory on the grounds that it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at trial.  Subject to and without waiver of the foregoing, Mr. Becker's date of birth is October 28, 1966; Ms. Dunlop's date of birth is February 24, 1975.

9.     Identify the date of birth of Kathleen Agne and the state reason for her discharge.

**RESPONSE:**

**Defendants object to this Interrogatory on the grounds that it is overly broad, seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at trial.  Defendants object further to this Request on the grounds that it seeks confidential personnel information of a non-party.  See answer to Request No. 5 for Ms. Agne's date of birth.**

10.     Identify the date of birth of Francis Smith and the stated reasons for her Corrective Action and demotion to Administrative Officer.

**RESPONSE:**

**See Defendants' objections to Interrogatory No. 9.**

**B041**

11.    Identify the dates of birth and dates of resignation or retirement of Senior Trust Officer Robert Bell, Vice President Martha Fetters, Assistant Vice President, and Administrative Officer Linda Squier.

RESPONSE:

See Defendants' objections to Interrogatory No. 9.

12.    Identify all documents, including all electronic documents or e-mail, that refer or relate to either Plaintiff or the individual(s) listed in response to Interrogatory Nos. 1 and 2, and that were created by, sent to, or used by Defendants in making any decisions a) to issue Plaintiff a Final Written Warning, b) to terminate Plaintiff's employment, c) to hire and/or assign any employee under age 40 to Brendan Gilmore's Team in 2003 or 2004.

RESPONSE:

Defendants object to this Interrogatory on the grounds that it is overly broad and, as written, is vague and ambiguous.  Defendants object further to this Request on the grounds that it seeks documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at trial. Moreover, Defendants object to this Request to the extent it seeks confidential personnel information of non-parties.  Defendants object further to the form of this Interrogatory to the extent it presupposes that Defendants engaged in age discrimination or that there was a plan to hire individuals under 40 to Mr.

**B042**

- 7 -

Gilmore's team.  There was no such plan.  Subject to and without waiver of the

foregoing, <u>see</u> Exhibits attached to Defendants' Responses and Objections to

Plaintiff's First Request For Production of Documents.


13.    Identify all persons who saw, heard, or in any other manner perceived or

witnessed any of the facts upon which you base any defense to Plaintiff's claims or who

have knowledge of any other event or fact which tends to prove any defense to

Plaintiff's claims.

<u>RESPONSE:</u>

**Defendants object to this Interrogatory to the extent it seeks information**

**that is protected by the attorney work product privilege or attorney client**

**privilege.  Defendants object further to the request on the grounds that it is overly**

**broad.  Subject to and without waiver of the following, Defendants answer as**

**follows: Plaintiff, Rosemary Thomas, William Becker, Gregg Landis, Tom Galante,**

**and Brendan Gilmore.  <u>See also</u>, Defendants' Rule 26 disclosures.  Defendants**

**state further that any individual identified in discovery may have such knowledge.**


14.    Identify each person who has been interviewed on your behalf or from

whom an oral or written statement has been taken concerning the facts alleged in any

pleading.

<u>RESPONSE:</u>

B043

PRCLIB-428417.1-SWILSON 12/14/06 11:14 AM

Defendants object to this Request to the extent it seeks information that is protected by the attorney client privilege or attorney work product privilege.

15.    Identify each person who has supplied information for the answers to each of these interrogatories and all requests for production of documents filed by Plaintiff specifically identifying each item for which he or she has supplied information.

**RESPONSE:**

**Defendants object to this Interrogatory on the grounds that it is overly broad, unduly burdensome, seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at trial. Moreover, Defendants object further to this Request to the extent it calls for information that is subject to the attorney client privilege or attorney work product privilege.**

16.    If there were ever any oral or written complaints, concerns, or problems relating to the satisfactory performance of any of the duties or responsibilities of Plaintiff during the course of her employment, identify the facts, witnesses, and documents supporting each complaint, concern, or problem.

**RESPONSE:**

**B044**

PRCLIB-428417.1-SWILSON 12/14/06 11:14 AM

Defendants object to this interrogatory on the grounds that it is overly broad and unduly burdensome.  Subject to and without waiving any of the foregoing objections, see Exhibits attached to Defendants' Responses and Objections to Plaintiff's First Request For Production of Documents.

17.     If there were ever any oral or written complaints relative to the satisfactory performance of any of the duties and responsibilities of Plaintiff, Maria Dunlop. or any of the individual(s) listed in response to Interrogatory Nos. 1 and 2 during the course of their employment, identify the facts, witnesses, and documents supporting each complaint, concern, or problem.

**RESPONSE:**

**See Defendants' answers and objections to Interrogatory Requests Nos. 1, 2, and 16.  Defendants state further that Maria Dunlop's and Laura Shannon's job performance was satisfactory.**

18.     Identify Maria Dunlop's date of birth and job title in 2003.

**RESPONSE:**

**Maria Dunlop's date of birth is 2/14/75 and job title in 2003 was Portfolio Administrator.**

**B045**

19.    For each affirmative defense or Rule 12(b) defense raised in your Answer, state, individually for each such defense, all facts supporting it, the names and present or last known addresses of all persons having knowledge of any such facts, and the description or designation of each document, as defined in Rule 34(a), which in any way records or refers to any such facts.

RESPONSE:

Defendants object to this Interrogatory to the extent it seeks information that is protected by the Attorney client privilege or attorney work product privilege. Defendants object further to this Request on the grounds that discovery is still ongoing. Moreover, Defendants object to this Request on the grounds that it is overly broad and unduly burdensome. Subject to and without waiving the foregoing, Defendants answer as follows: See Defendants' answers to Interrogatory Requests Nos. 12, 13, and 16. Defendants state further that Plaintiff's employment was terminated for legitimate and non-discriminatory and non-retaliatory reasons. Plaintiff was given ample opportunity to improve her performance, but failed to do so to Defendants' satisfaction. Some of Plaintiff's allegations are time barred; Plaintiff refers to individuals in her Complaint who are not her comparators; Plaintiff has mitigated her damages by finding comparable employment. Plaintiff's claim of age discrimination was thoroughly investigated and there was no support for the claim.

20.    Identify each person who has knowledge of the facts relating to the litigation or the facts alleged in the Complaint, the Answer, or any Rule 12(b) pleading,

PRCLIB-428417.1-SWILSON 12/14/06 11:14 AM

and in each instance. give the paragraphs of the Complaint, the Answer, or the Rule

12(b) pleading with respect to which that person has knowledge.

**RESPONSE:**

See Defendants' answer and objections for Interrogatory No. 13.

21.    For each denial or partial denial found in your Answer, which denies in

whole or in part any allegation of the Complaint, state all facts upon which said denial or

partial denial is based. the names and last known addresses of all persons having

knowledge of such facts, and the description or designation of each document, as

defined in Rule 34(a), which in any way records or refers to such facts.

**RESPONSE:**

See Defendants' answer and objections to Interrogatory No. 19.

22.    Identify each person whom you expect to call as an expert witness at trial,

and state the subject matter on which the expert is expected to testify, the substance of

the facts and opinions to which the expert is expected to testify, a summary of the

grounds for each opinion, and the dates of any reports relating thereto.

**B047**

**RESPONSE:**

Defendants have not retained an expert at this point. Should they decide to do so, they will timely supplement this Request.

Reed Smith LLP
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302)778-7500

BY: _____
Thad J. Bracegirdle

Attorneys for Defendants, Mellon
Trust of Delaware National
Association, Mellon Bank,
National Association And Mellon
Financial Corporation

Dated: December 14, 2006

**B048**

PRCLIB-428417.1-SWILSON 12/14/06 11:14 AM

## VERIFICATION

COMMONWEALTH OF PENNSYLVANIA )
                                           ) ss:
COUNTY OF PHILADELPHIA            )

Rosemary Thomas, being duly sworn, deposes and says, as the Senior

Human Resources Business Partner. Vice President:

I have read the Objections and Responses to Plaintiff's First Set of

Interrogatories.  The responses set forth therein are true to the best of my knowledge and

belief.

Rosemary Thomas

Sworn to and subscribed
before me this _11th_ day of December 2006

Notary Public

My Commission Expires: _____

> COMMONWEALTH OF PENNSYLVANIA
> NOTARIAL SEAL
> Rita Ann Gilson, Notary Public
> City of Philadelphia, Philadelphia County
> My Commission Expires Mar. 24, 2008



**WILCOX & FETZER LTD.**

In the Matter Of:

# Blozis

v.

# Mellon Trust of Delaware, et al.

C.A. # 05-891 (SLR)

Transcript of:

# Linda J. Blozis

Volume # 1
July 26, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

VOLUME ONE


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


LINDA J. BLOZIS,                        )
                                        )
              Plaintiff,                )
                                        )  Civil Action
v.                                      )  No. 05-891 (SLR)
                                        )
MELLON TRUST OF DELAWARE,               )
NATIONAL ASSOCIATION; MELLON            )
BANK, NATIONAL ASSOCIATION;             )
MELLON FINANCIAL CORPORATION,           )
                                        )
              Defendants.               )


              Deposition of LINDA J. BLOZIS taken
pursuant to notice at the Law Office of John M.
LaRosa, Two East 7th Street, Suite 302, Wilmington,
Delaware, beginning at 10:05 a.m., on Wednesday,
July 26, 2006, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

        JOHN M. LaROSA, ESQ.
        LAW OFFICE OF JOHN M. LaROSA
           Two East 7th Street - Suite 302
           Wilmington, Delaware  19801
           For the Plaintiff

        STEPHANIE WILSON, ESQ.
        REED SMITH LLP
           Princeton Forrestal Village
           136 Main Street - Suite 250
           Princeton, New Jersey  08543-7839
           For the Defendant
                WILCOX & FETZER
        1330 King Street -  Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Page 2

```
 1                    LINDA J. BLOZIS,

 2          the deponent herein, having first been

 3          duly sworn on oath, was examined and

 4          testified as follows:

 5                    EXAMINATION

 6   BY MS. WILSON:

 7     Q.   Good morning, Ms. Blozis.  My name is Stephanie

 8   Wilson.  I'm with the law firm of Reed Smith and we

 9   have been retained by Mellon to represent it in the

10   lawsuit that you brought against it.

11                There are other attorneys that are also

12   working with me on this matter, but for now it's just

13   me.

14                Today we will be taking your deposition

15   which is a question and answer process and I'll be

16   asking you questions about allegations that you have

17   made in your complaint.  And you have just been sworn

18   in, so your answers are under oath and although we're

19   in an informal setting in Mr. LaRosa's office, it

20   still has the same force and effect as if we were in a

21   more formal court setting.

22                If at any point you don't understand a

23   question that I'm asking of you, please let me know

24   and I will try to make the question clear so that you
```

Page 3

```
 1    understand what I am asking you.

 2              If you don't hear what I am asking you,

 3    please say so and I will speak up.

 4              If you don't say, "I don't understand the

 5    question" or "I didn't hear the question" and you go

 6    ahead and try to answer it, I will assume that you

 7    have understood it and you heard it and that you're

 8    answering accordingly.

 9              If at any point in time you need to take a

10    break, please let me know.  You can take a break.

11              If at any point Mr. LaRosa makes an

12    objection to a question I'm asking you, please don't

13    answer until Mr. LaRosa and I have worked out the

14    objection if we can and then he will direct you on how

15    to proceed with respect to that question.

16              Any questions of me so far?

17    A.    No.

18    Q.    Okay.  Ms. Blozis, what is your date of birth?

19    A.    December 10th, 1945.

20    Q.    And, Ms. Blozis, have you ever had your

21    deposition taken before, what we're doing now?

22    A.    Do you mean in this case?

23    Q.    No.  At any point in time?

24    A.    No.
```

B053

Page 4

1    Q.    And have you ever been a plaintiff before in a

2    lawsuit other than this one, by "plaintiff" bringing

3    an action?

4    A.    No.

5    Q.    Now, looking at your discovery information that

6    you produced to us, I saw that around I believe it was

7    1990 you were involved in a divorce proceeding?

8    A.    Yes.

9    Q.    Is that correct?

10   A.    Yes.

11   Q.    Were you the one petitioning the Court for it?

12   A.    Yes.

13   Q.    Did you have your deposition taken in

14   connection with that?

15   A.    No.

16   Q.    Was that the only time that you were married?

17   A.    Yes.

18   Q.    And you're single right now?

19   A.    Yes.

20   Q.    Ms. Blozis, other than your attorney, have you

21   spoken to anyone about your deposition today?

22   A.    I don't understand what you mean by "anyone."

23   Q.    Anyone being -- again, one of the caveats is

24   that you can't discuss conversations that you have

Page 5

1    spoken with your attorney about any issues.

2           But did you speak, for example, with any

3    Mellon employees, former or present Mellon employees

4    about your deposition?

5    A.    No.

6    Q.    That's what I meant by have you spoken to

7    anyone about your deposition.

8           Did you mention to anybody I have a

9    deposition coming up, I'm going to be going into

10   Delaware on such-and-such date?

11   A.    And by "anybody" you mean?

12   Q.    Anybody, other than your attorney.

13   A.    My family.

14   Q.    Okay.  Other than family members?

15   A.    One friend.

16   Q.    Okay.  Family members and friends?

17   A.    One friend.

18   Q.    Okay.  But no one that either was employed by

19   Mellon at some point or presently employed by Mellon?

20   A.    No.

21          MS. WILSON:  Can you could mark this as

22   Blozis 1, please?

23          (Blozis Deposition Exhibit No. 1 was

24   marked for identification.)

Page 6

1    BY MS. WILSON:

2       Q.   Ms. Blozis, I show you what's been marked as

3    Blozis 1 for identification.  Have you seen that

4    document before?  Take some time to look through it.

5            MR. LaROSA:  Go ahead and flip through the

6    whole document.

7       A.   (Reviewing document)  Please repeat the

8    question.

9            MS. WILSON:  Could you repeat the

10   question, please?

11           (The reporter read back the last

12   question.)

13           THE WITNESS:  Yes.

14   BY MS. WILSON:

15      Q.   And you have seen it before today?

16      A.   Yes.

17      Q.   And did you have an opportunity to review it

18   prior to today?

19      A.   Yes.

20      Q.   And are the allegations set forth in Blozis 1

21   true and accurate?

22      A.   Yes.

23      Q.   I'm going to be asking you about some of the

24   allegations in a few moments, but before we get into

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                          July 26, 2006

Page 7

```
 1    that I wanted to talk a bit about your employment with

 2    Mellon.

 3            You were first employed around the --

 4    well, I guess you tell me.  When did you start your

 5    employment?

 6      A.   February 1990.

 7      Q.   And which Mellon entity were you employed by?

 8      A.   At that time Mellon Bank Delaware, N.A.

 9      Q.   And what was the physical location when you

10    started in 1990?

11      A.   The building located at 10th and Market

12    Streets.

13      Q.   Now, is that a different address from

14    Greenville Crossing?

15      A.   Yes.

16      Q.   It's different.  Okay.  When you started in

17    1990 what was your title?

18      A.   At this time I recollect it was trust

19    secretary.

20      Q.   And I take it that you assisted someone or you

21    were the assistant to someone as trust secretary?

22      A.   Yes.

23      Q.   And who was that?

24      A.   I don't recall his name at this time.
```

B057

Blozis
Linda J. Blozis, Volume 1                    v.
                          C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 8

1    Q.    That's fine.

2              Now, at some point in time your title

3    changed?

4    A.    Yes.

5    Q.    And what was the next position that you held?

6    A.    To the best of my recollection, it changed from

7    trust secretary to trust assistant.

8    Q.    Is that the same thing as senior trust

9    specialist?

10   A.    The responsibilities evolved to that and the

11   company changed the title.

12   Q.    And when -- and we will use your title for

13   purposes of this question when you say that your next

14   title after trust secretary was trust assistant.

15             Do you remember when that occurred?

16   A.    To the best of my recollection, I believe

17   approximately 1994 and '95.

18   Q.    Were you reporting to the same gentleman that

19   you were reporting to as trust secretary?

20   A.    No.

21   Q.    A different person?

22   A.    Yes.

23   Q.    Do you remember who it was?

24   A.    Linda M. Squier.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 9

```
 1    Q.   Were you still at the 10th and Market address

 2    at that point?

 3    A.   Yes.

 4    Q.   At what point did you change locations from

 5    10th and Market?

 6    A.   To the best of my memory, we moved to

 7    Greenville in 2001 or 2002.

 8    Q.   All right.  And do you know why you moved?

 9    A.   I don't quite understand your question.

10    Q.   Do you know what precipitated the move from the

11    10th and Market location to the Greenville location?

12    A.   To the best of my knowledge, the company wanted

13    to place the private trust management offices closer

14    to a private banking location there.

15    Q.   And what was the private banking location?

16    A.   The private bank was located on the first floor

17    of Two Greenville Crossing.

18    Q.   And you were located on another floor?

19    A.   Yes.

20    Q.   Now, with respect to the trust assistant

21    position that you held around the '95 time frame, was

22    there another position that you held after that?

23    A.   I don't understand quite what you mean.

24    Q.   Well, you didn't hold the trust assistant
```

Page 10

1    position throughout the term of your employment,

2    correct?

3      A.   Are you referring to the title of the position?

4      Q.   Yes.

5      A.   The title changed.

6      Q.   All right.  And what was the next title change?

7      A.   To the best of my recollection, it evolved to

8    trust specialist.

9      Q.   At some point did your title change to

10   portfolio administrator?

11     A.   Yes, it did.

12     Q.   Is that different from trust specialist?

13     A.   It's different words but basically the same

14   responsibilities.

15     Q.   And do you remember when your title became

16   trust specialist?

17     A.   To the best of my recollection, 1997 or '98.

18     Q.   And as a trust specialist were you still

19   reporting to Linda Squier?

20     A.   To the best of my recollection.

21     Q.   And at some point you say -- let me just back

22   up.

23          With respect to your duties as a trust

24   specialist, can you describe what they were?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 11

1    A.    As a trust specialist?

2    Q.    Yes.

3    A.    It was to assist the trust officers and

4    investment officers.

5    Q.    And I believe you testified, Ms. Blozis, that

6    at the time that you were trust specialist you were

7    reporting to Linda Squier.

8         Were there any other individuals you were

9    reporting to?

10   A.    To the best of my recollection, at that time

11   Mellon went to a more team concept.

12   Q.    And does that mean there were people on a

13   particular team that you reported to or did

14   assignments for?

15   A.    Yes.

16   Q.    And did it have a name, the particular team?

17   A.    Yes.

18   Q.    And what was the team name?

19   A.    It was the Delaware team under Brendan Gilmore.

20   Q.    And that was according to my notes you believe

21   you started or your title changed to trust specialist

22   around the '97-98 time frame?

23   A.    To the best of my recollection at this time.

24   Q.    Is that when the team concept came into play?

Page 12

1    A.    As best as I can remember, about the mid to,

2    midnineties to that time.

3    Q.    And that team was headed up by Brendan Gilmore,

4    the Delaware team?

5    A.    Yes.

6    Q.    Now, with respect to your duties, you were in

7    private banking?

8    A.    No.

9    Q.    What was the name, what was the name of the

10   team?

11   A.    As best as I recall at that time Mellon started

12   to call the trust teams private asset management

13   teams.

14   Q.    Now, I want to get a sense of the Delaware team

15   and it appears based on your time frame that you were

16   still at the 10th and Market location around that time

17   that it went to the team concept.

18          Does that sound accurate?

19   A.    That's your question?

20   Q.    Yes.

21   A.    Yes.

22   Q.    I want to get a sense of who consisted of the

23   Delaware team.    You obviously?

24   A.    (The witness nodded.)

Page 13

1    Q.    Who else was on the team?

2    A.    At that time?

3    Q.    Yes.

4    A.    Bob, Robert H. Bell was the senior trust

5    officer.  Linda Squier was a trust officer.  Kathleen

6    Agne was an assistant and I was an assistant.

7    Q.    And at the top would have been Brendan?

8    A.    Top of?

9    Q.    The top of, sort of the top of the team?

10   A.    Those people reported to Brendan Gilmore.

11   Q.    Do you know who Brendan Gilmore reported to

12   around the '97-98 time frame?

13   A.    It would have been the senior regional officer

14   in Philadelphia.

15   Q.    Do you know who that was?

16   A.    At this time I don't recall the name.

17   Q.    Was Brendan Gilmore's office at the 10th and

18   Market location?

19   A.    No.

20   Q.    Do you know where his office was?

21   A.    At the Mellon building, office building in

22   Philadelphia on Market Street.

23   Q.    You said, Ms. Blozis, that at some point in

24   time your title changed to portfolio administrator.

Blozis                                           v.              Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                    July 26, 2006

Page 14

1          Do you remember when that was?

2     A.    To the best of my recollection, that changed in

3     the late nineties, '98 to '99.

4     Q.    I believe you also testified that while your

5     title changed, your responsibilities didn't change

6     from that of trust specialist.

7     A.    When are you referring to testifying?

8     Q.    Around -- let's see.  If you became portfolio

9     administrator around the late nineties and you believe

10    that you held the position of trust specialist around

11    the '97-98 time frame, I wanted to get a sense of

12    whether the portfolio administrator position carried

13    with it different responsibilities than the trust

14    specialist position.

15    A.    It did.

16    Q.    It did.  Okay.  And what was the difference?

17    A.    The portfolio administrator in addition to

18    being a trust assistant also assisted the investment

19    officer at that time.

20    Q.    Now, with respect to the portfolio

21    administrator position, you held that position until

22    the time you left Mellon.  Is that correct?

23    A.    I believe, to the best of my recollection, yes.

24    That was -- yes.

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1          C.A. # 05-891 (SLR)                          July 26, 2006

Page 15

1    Q.    And you left Mellon in 2003?

2    A.    Yes.

3    Q.    Now, when you became a portfolio administrator

4    was that considered a promotion from trust specialist?

5    A.    I don't understand what you mean by a

6    promotion.

7    Q.    Well, was there an upgrade in I think it was

8    grades?  Did you go from one grade to a higher grade?

9    A.    To the best of my recollection, yes.

10   Q.    Do you remember how it came about that you

11   became a portfolio administrator?

12   A.    I don't understand what you mean.

13   Q.    Did you have to apply for the position?  Did

14   someone ask you if you would like to become a

15   portfolio administrator?

16   A.    You asked two questions there.

17   Q.    You said you didn't understand my question, so

18   I was trying to give you some examples of how to think

19   about the question.  When I ask you how did it come

20   about, sometimes how it comes about is somebody asks

21   you if you want the position.  Sometimes it comes

22   about you hear about it and you go to someone and say

23   I would like to have it.

24              When I am asking how it came about, those

Blozis                                                    v.                          Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1                    C.A. # 05-891 (SLR)                              July 26, 2006

Page 16

1    are some examples that might help you with the

2    question.

3        A.    To the best of my memory, Mellon changed their

4    structuring, their job titles and the structuring.

5        Q.    And as a result your job title changed?

6        A.    Yes.

7        Q.    With respect to the trust specialist position,

8    you identified a number of people that was on I guess

9    the private asset management team for Delaware and

10   those were Robert Bell, Linda Squier, Kathleen Agne

11   and yourself?

12       A.    Is that your question?

13       Q.    Yes.

14       A.    Yes.

15       Q.    And when you became portfolio administrator

16   around the 1999 time frame, was that still the team?

17       A.    Not the complete team.

18       Q.    In 1999 who consisted of the team?

19       A.    Martha Fetters was on that team, Mr. Bell,

20   Linda Squier, Kathleen, myself and there were members

21   in the Philadelphia office.

22       Q.    When you say, "members in the Philadelphia

23   office," do you know who they were?

24       A.    As I remember at this time, Kristy Hunt, Cindy

Blozis                                    v.                  Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                    July 26, 2006

Page 17

```
 1    Chambliss, Marion -- I don't remember Marion's last

 2    name at this time.  And I don't recall who else at

 3    that time.

 4       Q.   Martha Fetters, what was her title around the

 5    1999 time frame?

 6       A.   To the best of my recollection, Martha was an

 7    investment officer.

 8       Q.   Kristy Hunt, do you remember what her title was

 9    around the 1999 time frame?

10       A.   As I recall, she was an investment officer.

11       Q.   And Cindy Chambliss?

12       A.   Was assistant to Brendan Gilmore.

13       Q.   And Marion?

14       A.   Was a portfolio administrator.

15       Q.   Now, you held the position of portfolio

16    administrator from approximately 1999 to 2003, so I

17    would take it that during that time the composition of

18    the groups changed, people leaving, people coming in.

19    Is that fair to say?

20       A.   Yes.

21       Q.   Over a four-year period.

22            Turning to just the period of time that

23    you held the title of portfolio administrator, did you

24    report -- my question is broad.  It's from 1999 to
```

Blozis
Linda J. Blozis, Volume 1                              v.
                              C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 18

```
 1   2003.

 2                 Did you always report to Brendan Gilmore?

 3       A.    He was the team leader.

 4       Q.    And did you have a direct reporting

 5   relationship with him?

 6       A.    No.

 7       Q.    Now, just drawing your attention to the period

 8   of time that you held the portfolio administrator

 9   position, who did you report to?  If you want to start

10   by 1999.

11       A.    Linda Squier, Martha Fetters, William Becker

12   and Greg Landis, to the best of my recollection.

13       Q.    In 1999 what was William Becker's title?

14       A.    As I remember, he was a vice president and an

15   investment officer.

16       Q.    And Greg Landis?

17       A.    Vice president - trust officer.

18       Q.    Now, and these were the four individuals that

19   you had direct reporting obligations to, Linda,

20   Martha, William and Greg, in 1999?

21       A.    Not all at the same time.

22       Q.    When you say, "Not all at the same time," what

23   do you mean?

24       A.    You said in 1999?
```

Page 19

```
 1    Q.    Yes.

 2    A.    To the best of my recollection, the reporting

 3  went from Martha Fetters to William Becker.

 4    Q.    Okay.  In 1999?

 5    A.    To the best of my memory.

 6    Q.    That's fine.  It's only to the best that you

 7  can remember.  It's good that you're saying to the

 8  best of your memory that that's what occurred.

 9              So in 1999 to the best of your

10  recollection you were initially reporting to Martha

11  Fetters and then at some point in 1999 you began

12  reporting to William Becker?

13    A.    To the best of my memory about the year, yes.

14    Q.    Now, would it be fair to say that Martha would

15  give you assignments to do when you were reporting to

16  her?  Did she, for example, say Linda, can you do Z, Y

17  and Z?  Is that how it worked?

18    A.    Yes.

19    Q.    And then after you started reporting to

20  William, he was the one who would give you

21  assignments?

22    A.    William Becker?

23    Q.    Yes.

24    A.    Yes.
```

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 20

1     Q.    And would he give you assignments for the

2   entire group or assignments for him?  By that I mean

3   did he have a set group of clients that he worked for

4   and you, in turn, worked for those clients or were you

5   doing work for the entire group?

6     A.    Predominantly I reported to Mr. Becker and the

7   portfolio of clients that we were responsible for

8   and...

9     Q.    And how long did you report to William Becker?

10    A.    To the best of my memory, for as long as

11   William Becker was the senior officer in Delaware

12   until he transferred to Philadelphia.

13    Q.    Do you remember when he transferred?

14    A.    As best I remember, Mr. Becker left the

15   Delaware offices and did work in Philadelphia about

16   between 2001 and 2002.

17    Q.    When William Becker transferred to the

18   Philadelphia office, is that the point in time that

19   you started reporting to Greg Landis?

20    A.    Reporting?  How do you mean "reporting"?

21    Q.    Reporting in the same sense of what you were

22   doing with William Becker, taking on or working with

23   his portfolio of clients.

24    A.    Not exclusively to Greg Landis.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 21

1    Q.    And who were the other people?

2    A.    While Mr. Becker was in Philadelphia, there was

3    still reporting to him and jointly with Greg Landis

4    and supporting the team.

5    Q.    And that was around approximately the 2001-2002

6    time frame?

7    A.    What was approximately?

8    Q.    That your reporting was to Greg Landis, William

9    Becker and to the team?

10    A.    To the best of my memory, yes.

11    Q.    Around 2001-2002 who -- when you say the team,

12    who consisted of the team?

13    A.    The team meaning?

14    Q.    Your term the team.

15    A.    The team, the Delaware team.  It was headed by

16    Brendan Gilmore.  Cindy, Cindy Chambliss was his

17    assistant.  As best I recall, William Becker was still

18    an investment officer.  Marion, her last name I don't

19    recall.

20    Q.    She was still in Philly?

21    A.    Marion was in Philadelphia.  Bruce Holmquist

22    was the investment officer in the D.C. area as part of

23    the Delaware team.  Until her release, Kathleen Agne

24    was part of the team.  I was part of the team.  And at

B071

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 22

1    some point Maria Dunlop became part of the team.

2       Q.   Now, around the 2001-2002 time frame you just

3    described what you recall as being the Delaware team.

4            Were there other portfolio managers part

5    of the Delaware team during 2001-2002 other than

6    yourself?  For example, like I believe you had

7    testified at some point that Kathleen Agne was a

8    portfolio administrator.

9       A.   Administrator.

10      Q.   Did I say manager?

11      A.   Yes.

12      Q.   I meant administrator.  Agne was a portfolio

13   administrator.  Anybody else?

14      A.   Myself, Marion and, as I recall, as I

15   recollect, Dan Merlino in Philadelphia.

16      Q.   You recall him to be around 2001-2002 in the

17   Philadelphia office?

18      A.   As best as I remember, yes.

19      Q.   And he was a portfolio administrator, Dan

20   Merlino?

21      A.   To the best of my recollection, yes.

22      Q.   And Maria Dunlop, was she a portfolio

23   administrator?

24      A.   When she was hired.

Page 23

1     Q.    She came in as a portfolio administrator?

2     A.    Yes.

3     Q.    Now, at some point Kathleen Agne was no longer

4   working at Mellon.  Is that right?

5     A.    Yes.

6     Q.    Do you remember when that was?

7     A.    To the best of my memory, March of 2002.

8     Q.    Do you remember when Maria Dunlop was hired?

9     A.    To the best of my memory, July 2002.

10    Q.    Was Maria hired as a result of Kathleen's

11  departure?

12    A.    I don't understand your question.

13    Q.    I gather when Kathleen left you were down one

14  portfolio administrator.  It was just you in the

15  Delaware office?

16    A.    Yes.

17    Q.    And was Maria hired to bring you back up to the

18  complement of I guess two portfolio administrators in

19  the Delaware office?

20    A.    I believe that was -- I'm not sure.

21    Q.    Did you ever at any point in time work

22  physically in the Philadelphia office?

23    A.    Work physically how do you mean?

24    Q.    Go to the office on a meeting or work related.

Blozis                                    v.                        Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                            July 26, 2006

Page 24

```
 1              MR. LaROSA:  You're not asking her about

 2    physical work?  You're asking her where she was

 3    physically located?

 4              MS. WILSON:  Yes.

 5    BY MS. WILSON:

 6      Q.   You went to the Philadelphia office, had an

 7    office or conference area or meetings?

 8      A.   No.  Only for meetings.

 9      Q.   Ms. Blozis, at the time that you left in 2003

10    did the Delaware team still consist of Brendan

11    Gilmore, Cindy Chambliss, William Becker, Marion,

12    Bruce Holmquist, Maria Dunlop, Dan Merlino?

13      A.   No.

14      Q.   How had it changed?

15      A.   How do you mean how had it changed?

16      Q.   When you said that it didn't have that same

17    composition, I assume that someone either left or

18    someone came in?

19      A.   It changed.

20      Q.   When I said how did it change, did someone

21    leave the team or someone came into the team?

22      A.   To the best of my recollection, at the time

23    William Becker became a team leader at another team.

24      Q.   Do you remember what team that he went to?
```

B074

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1          C.A. # 05-891 (SLR)                        July 26, 2006

Page 25

1    A.    To the best of my memory, he headed up his own

2    team in Philadelphia.

3    Q.    And Greg Landis, he was a part of the team

4    around the 2002 time frame?

5    A.    Which team?

6    Q.    The Delaware team.

7    A.    Yes.

8    Q.    Ms. Blozis, at the time that you left Mellon --

9    and I have it here as being around July 19 of '03.

10            Does that sound right to you?

11   A.    Yes.

12   Q.    You were making 39,800 in terms of salary?

13   A.    Yes.

14   Q.    And at the time that you left were you covered

15   by a health plan?

16   A.    At the time that I left?

17   Q.    Right.  Were you on any health plan, by that I

18   mean medical, dental, vision?

19   A.    When I worked for Mellon I was under the health

20   plan they offered.

21   Q.    And did that include vision, dental?

22   A.    They offered that at that time.

23   Q.    And that's what you took?

24   A.    I had medical, dental and at this time I don't

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                    July 26, 2006

Page 26

1    recall if I took advantage of the vision.

2    Q.    Was there a co-pay?  I'm thinking if we could

3    just hone in around the 2003 time frame.

4    A.    Co-pay for?

5    Q.    For your health.  For example, did you have to

6    pay 20 percent and they paid 80?

7    A.    Yes.

8    Q.    Was it 20/80?

9    A.    To the best of my memory now, yes.

10   Q.    And did they have a 401(k) plan?

11   A.    In 2003?

12   Q.    Yes.

13   A.    Yes.

14   Q.    Were you a participant?

15   A.    Yes.

16   Q.    Do you remember what your level of contribution

17   was in 2003?

18   A.    To the best of my memory now, I contributed

19   between 2 and 5 percent.

20   Q.    And was there a match that the company made?

21   A.    As I recall, yes.

22   Q.    Do you remember what it was?

23   A.    Not at this time.

24   Q.    When you left Mellon around the July '03 time

Page 27

```
 1   frame, did you roll over your 401(k) into another

 2   plan?

 3      A.   No.

 4      Q.   Did you cash out your account?

 5      A.   No.

 6      Q.   It's still sitting with Mellon?

 7      A.   Yes.

 8      Q.   Do you remember how much you have in there?

 9      A.   Yes.

10      Q.   How much?

11      A.   I don't understand your question about the

12   amount of it at this time.

13      Q.   As of 2003 usually you get statements of how

14   much you have in your account, your 401(k) account,

15   and my question was:  When you left do you remember

16   how much you had in your account, your 401(k) account?

17      A.   To the best of my memory at this time and the

18   conditions of the market at that time, approximately

19   twenty-six or $27,000.

20      Q.   Ms. Blozis, did Mr. Robert Bell ever supervise

21   you?

22      A.   I don't understand what you mean by

23   "supervise."

24      Q.   Well, did he ever give you work assignments?
```

B077

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 28

```
 1    A.    To the best of my memory in his capacity as

 2  senior trust officer sitused at Delaware, yes,

 3  occasionally.

 4    Q.    Did he ever complete any performance

 5  evaluations of you?

 6    A.    Yes.

 7    Q.    Do you remember when he completed performance

 8  evaluations of you?

 9    A.    As I recall, at periodic intervals in my

10  history with Mellon from 1990.

11    Q.    When you say, "from 1990," was there a period

12  in the 1990's?

13    A.    A period?

14    Q.    When you say from the 1990's, are you saying

15  from the 1990's through the time that you left in 2003

16  or was it sometime in the 1990's?

17    A.    While Mr. Becker was senior officer sitused in

18  Delaware, he conducted the reviews of those team

19  members there.

20    Q.    When you said that Mr. Bell had also --

21    A.    I'm sorry.  Did I say Bell or Becker?

22    Q.    You said Becker.

23    A.    I meant to say Robert Bell.

24    Q.    Okay.
```

B078

Page 29

```
 1              MS. WILSON:  Could you back up, please,
 2     with that when Ms. Blozis was answering the question
 3     about Becker, please?
 4              (The reporter read back as follows:
 5         "Answer:  While Mr. Becker was senior officer
 6         sitused in Delaware, he conducted the reviews
 7         of those team members there.")
 8     BY MS. WILSON:
 9       Q.   Did you mean with respect to that answer
10     Mr. Bell?
11       A.   Yes, I did.
12       Q.   And with respect to Mr. Bell was there ever a
13     point where he filled out a paper review of you?
14       A.   Yes.
15       Q.   And do you remember the periods of time that he
16     filled out a paper review?
17       A.   Reviews were scheduled yearly.  They were not
18     always done yearly.
19       Q.   Do you remember the years that Mr. Bell filled
20     out a paper review of you?
21       A.   Not exactly at this time.
22       Q.   At some point in time Mr. Bell left the
23     company?
24       A.   Yes.
```

B079

Page 30

1    Q.    Do you remember when that was?

2    A.    To the best of my memory, Mr. Bell was

3    transferred from Delaware to Philadelphia on the

4    Delaware team.  And to the best of my memory, he left

5    Mellon in the early two hundreds -- 2000's.

6    Q.    2000's.  You said he was transferred from

7    Delaware to Philadelphia at some point, Mr. Bell?

8    A.    Yes.

9    Q.    Do you remember when he was transferred?

10   A.    To the best of my memory, the late 1990's.

11   Q.    Do you know why he was transferred?

12   A.    No.

13   Q.    But after the transfer he remained a part of

14   the Delaware team, although he was in the Philadelphia

15   office?

16   A.    Mr. Bell?

17   Q.    Mr. Bell.

18   A.    Yes.

19   Q.    Do you know why Mr. Bell left the company?

20   A.    To the best of my memory, he was forced to

21   resign.

22   Q.    And who forced him to resign?

23   A.    To the best of my memory, Brendan Gilmore.

24   Q.    And how do you know that Brendan Gilmore forced

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 31

1    Mr. Bell to resign?

2      A.    Brendan Gilmore was the Delaware team leader.

3      Q.    So are you making the assumption that because

4    Brendan was the Delaware team leader that he had had

5    something to do with Mr. Bell resigning?

6      A.    Please repeat the question.

7            MS. WILSON:  Can you repeat the question,

8    please?

9            (The reporter read back the last

10   question.)

11           THE WITNESS:  It's not an assumption.

12   BY MS. WILSON:

13     Q.    When you say it's not an assumption, how do you

14   know?

15     A.    Members of the team understood pressures

16   Brendan Gilmore placed on Robert Bell.

17     Q.    Now, did Mr. Bell ever tell you that

18   Mr. Gilmore had forced him to resign?

19     A.    I don't understand your question.

20     Q.    Well, did you have any conversations with

21   Mr. Bell in which he said, "Mr. Gilmore forced me to

22   resign"?

23     A.    To the best of my memory, Mr. Bell did not use

24   your exact words.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 32

1    Q.    Okay.  What did he say?

2    A.    To the best of my recollection, Mr. Bell felt

3    the workload was becoming unbearable.

4    Q.    And those were the discussions that you and

5    Mr. Bell were having?

6    A.    I don't understand what you mean by

7    "discussions."

8    Q.    Well, you said that he didn't use those exact

9    words and I believe I had said that Mr. Gilmore had

10   forced him to resign and then you were saying that

11   Mr. Bell felt that the workload was becoming I think

12   unbearable.

13            My question was:  Did Mr. Bell tell you

14   this?

15   A.    To the best of my memory, he did not say that

16   directly.  I don't recall his exact words.

17   Q.    You don't recall it, but you do recall having

18   some conversations with Mr. Bell concerning his

19   workload?

20   A.    Not specifically at this time.

21   Q.    Do you remember having any discussions with

22   Mr. Bell about why Mr. Bell was resigning?

23   A.    Not specifically at this time.

24   Q.    When you say, "Not specifically at this time"

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 33

1    what do you mean by that?

2    A.    At this time I don't recall exact dates of

3    conversations regarding his resignation.

4    Q.    Okay.  You don't have to give me exact dates.

5    The substance.

6    A.    Substantively Mr. Bell had worked for Mellon a

7    number of years, had been a senior officer, trust

8    officer for Mellon in Delaware from the time of my

9    initiation of employment until his transfer into

10   Philadelphia and at the time of his resignation.

11   Q.    And those are the substance of conversations

12   that you had with Mr. Bell?

13   A.    What was?

14   Q.    What you just described.

15   A.    I described his, I described his title and

16   position from when I first was employed until the time

17   he left and to the best of my recollection Mr. Bell's

18   employment, Mr. Bell's employment evolved to pressures

19   put on him to resign.

20   Q.    Now, Ms. Blozis, did you ever have any

21   conversations with Mr. Bell in which he talked about

22   pressures to resign?

23   A.    Not firsthandedly that I recall at this time.

24   Q.    And was it Mr. Gilmore who was putting these

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 34

1    pressures on Mr. Bell?

2       A.    To the best of my knowledge at this time, yes.

3       Q.    And why do you say it was Mr. Gilmore, to the

4    best of your knowledge?

5       A.    Mr. Gilmore's reputation as a team leader

6    demonstrated that.

7       Q.    What do you mean by that?

8       A.    What do I mean by?

9       Q.    When you say his reputation as a team leader

10   demonstrated that.

11      A.    Mr. Gilmore was an extremely difficult

12   personality to work for.

13      Q.    Is that what members of his team said about

14   him?

15      A.    What members?

16      Q.    When you say that, and I'm just paraphrasing my

17   notes of what you said, that Mr. Gilmore's reputation

18   as a team leader demonstrated, and I'm paraphrasing

19   now, that he was difficult to work for, so my

20   assumption was that people on his team were talking

21   and saying he's difficult.  Am I wrong?  I mean,

22   that's what I was gathering from your answer.

23      A.    Yes.

24      Q.    That was right, that people on the team were

Page 35

1    saying he's difficult to work for?

2      A.   Yes.

3      Q.   Okay.  And who were the people who were saying

4    that he was difficult to work for?

5      A.   To the best of my reccllection, William Becker,

6    Greg Landis at any time they were team members,

7    Marion, Linda Squier, Martha Fetters, Scott Gilliland,

8    Ray Masucci, Bruce Holmquist.

9      Q.   You mentioned a couple of names that I didn't

10   have before.  Ray Masucci?

11     A.   As I recall, Ray Masucci was an investment

12   officer on our team at some point in time in

13   Philadelphia.

14     Q.   Now, did Mr. Bell ever tell you that he felt

15   that he was being forced to resign because of his age?

16     A.   Not directly.

17     Q.   When you say, "Not directly," what do you mean?

18   In terms of having a conversation and having said,

19   "Linda, I feel like I'm being pressured because of my

20   age"?

21     A.   Mr. Bell was a man of great integrity.  He

22   would never have made that comment directly to an

23   employee at my level.

24     Q.   Did you feel that Mr. Bell was being forced to

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                    July 26, 2006

Page 36

```
 1    resign because of his age?

 2      A.    To the best of my recollection, yes.

 3      Q.    Why did you believe that?

 4      A.    I believe Brendan Gilmore wanted to eliminate

 5    older members of the team and replace them with

 6    younger people.

 7      Q.    Now, do you know Brendan Gilmore's age?

 8      A.    To the best of my memory -- do you mean at this

 9    time?

10      Q.    Yes.

11      A.    To the best of my memory, Brendan Gilmore would

12    be between 55 and 58.

13      Q.    Now, Ms. Blozis, you said that you feel that

14    Brendan Gilmore wanted to eliminate older workers of

15    the team and replace them with younger ones?

16      A.    Yes.

17      Q.    And that was in response to the question why do

18    you think that Mr. Bell's forced resignation was as a

19    result of age?  Why do you say that Gilmore wanted to

20    eliminate the older workers of the team and replace

21    them with younger ones?

22      A.    I don't understand the question.

23      Q.    What do you base that on when you make the

24    statement that Gilmore wanted to eliminate older
```

Page 37

1    workers of the team and replace them with younger

2    ones?

3      A.    I don't know why Brendan Gilmore wanted to

4    replace older members.  I know that he replaced

5    Mr. Bell.

6              Correction:  He put pressure on Mr. Bell

7    to resign.  He put pressure on Linda Squier to resign.

8    He put pressure on Martha Fetters to resign.

9      Q.    When you say that Gilmore put pressure on Bell

10   to resign, how do you know that?

11     A.    I know that from conversations with other

12   members of the team.

13     Q.    And who were those conversations with?

14     A.    Martha Fetters, Linda Squier.

15     Q.    And what did Martha Fetters tell you?

16     A.    At this time I cannot quote exactly.

17     Q.    You don't have to give me the exact.

18   Abbreviated or whatever you can recall.

19     A.    To the best of my recollection, Martha

20   indicated that Brendan Gilmore was overwhelming Robert

21   Bell with work that was unrealistic for any team

22   officer to do at that time.

23     Q.    And those were the gist of the conversations

24   that you were having with Martha Fetters about

Page 38

1   Mr. Bell?

2      A.    Repeat that question, please.

3      Q.    You were giving me I guess an overall summary

4   of the conversations that you were having with Martha

5   Fetters concerning Mr. Bell and why Martha felt that

6   Gilmore was trying to force Mr. Bell to resign and she

7   was saying that Gilmore was giving Bell an

8   overwhelming amount of work to do that was

9   unrealistic.

10     A.    That was not the predominance of my

11  conversations with Martha Fetters regarding Bob Bell's

12  work.

13     Q.    What was the predominance?

14     A.    The predominance would include team work, team

15  responsibilities and would occasionally go towards the

16  fact of Mr. Bell's workload.

17     Q.    I think I understand what you're saying,

18  Ms. Blozis, is that you would have conversations with

19  Martha Fetters about work-related issues and from time

20  to time there would be conversations about Bell and

21  his workload but that wouldn't be what you and she

22  would be discussing in terms of it wouldn't be

23  Mr. Bell all the time; it would be work that you had

24  to complete?

B088

Blozis                                    v.              Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1            C.A. # 05-891 (SLR)                    July 26, 2006

Page 39

1    A.    Yes.

2    Q.    That was a convoluted question, but I think you

3    understood what I meant because you had said the

4    predominance wasn't Mr. Bell and it sounded like the

5    predominance of the conversations that you and Martha

6    were having had to do with other work-related issues,

7    not having to do with Mr. Bell.

8    A.    That's correct.

9    Q.    Okay.  But focusing on the conversations that

10   you were having about Mr. Bell and the perception that

11   he was being given a lot of work to do in order to

12   force him out, that was conversation, you and Martha

13   were having those conversations from time to time.  Is

14   that right?

15   A.    Yes.

16   Q.    Did you ever have any conversations with

17   Gilmore about Mr. Bell receiving unrealistic work

18   assignments?

19   A.    To the best of my memory, no.

20   Q.    Did you ever have any conversations with

21   Mr. Gilmore about Mr. Bell's performance, job

22   performance at any time?

23   A.    It wouldn't have been something Mr. Gilmore and

24   I would discuss.

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                        July 26, 2006

Page 40

```
 1      Q.    Do you know what job assignments Mr. Gilmore

 2   was giving Mr. Bell?

 3      A.    In the Mellon team structure of trust teams,

 4   Mr. Bell would have been given specific duties as a

 5   trust administrating officer.

 6      Q.    Do you know specifically what Gilmore was

 7   giving Mr. Bell to do?

 8      A.    Mr. Bell was in the Philadelphia offices, so

 9   specifically I would not know the exact job

10   responsibilities he was getting from Mr. Gilmore.

11      Q.    Do you know, did you ever have any discussions

12   with Mr. Gilmore about the level of work that was

13   being given to Mr. Bell?

14      A.    No.

15      Q.    Did you ever have any discussions with Mr. Bell

16   about the level of work that he was being given by

17   Mr. Gilmore?

18      A.    Specifically at this time I cannot recall exact

19   discussions with Mr. Bell.

20      Q.    Now, when you say that you can't recall at this

21   time, are you saying, Ms. Blozis, that you may have

22   had the discussions and you don't remember sitting

23   here today or that you didn't have the discussions?

24      A.    I'm not sure I understand what you mean by the
```

Blozis                                      v.                        Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                        July 26, 2006

Page 41

1    word "discussion."

2      Q.    Conversation, talking.

3      A.    At this time I don't recall specific

4    conversations, other than when I may have seen

5    Mr. Bell in the Philadelphia offices at team meetings

6    and could read indications from him and see by the

7    work on his desk how much he was given versus other

8    officers.

9      Q.    So it was by when you went to his office or at

10   the meetings in Philadelphia, what, he seemed

11   stressed?

12     A.    Mr. Bell appeared to be stressed but had too

13   much panache to complain to coworkers.

14     Q.    And you said you would see on his desk more

15   work than you would see on others' desks.

16          Do you remember when you said when you

17   went to the Philadelphia office and you would see more

18   work on his desk than others' desks?

19     A.    Yes.

20     Q.    Who are you comparing his I guess the height of

21   the documents or the work?

22     A.    I would have seen trust files and work and

23   documents on Mr. Bell's desk.

24     Q.    And you were comparing the size of his, the

Page 42

1    files and documents on his desk as to others?

2       A.   As to others?

3       Q.   When you said you went to Philadelphia and you

4    saw on his desk trust files and other documents, it

5    seemed like you were saying that he had more of it on

6    his desk to do than other people?

7       A.   Yes.

8       Q.   My question was:  Who are the other people that

9    seemed to have less on their desk than Mr. Bell?

10      A.   To the best of my recollection, the other trust

11   administrating officers at that time.

12      Q.   When was the period of time where you would go

13   and you would make that observation about the amount

14   of work on Mr. Bell's desk?

15      A.   As I remember, for the time period that

16   Mr. Bell was assigned to, was sitused in Philadelphia

17   as part of the team, of the Gilmore Delaware team.

18      Q.   Did you ever ask Mr. Bell why it was that he

19   had more files and documents on his desk than the

20   other trust officers?

21      A.   I don't recall asking Mr. Bell specifically

22   that question.

23      Q.   But words to that effect?

24      A.   Words to the effect?

Page 43

```
 1    Q.    That you seem to have more -- when you say you

 2   don't recall specifically asking him that question, it

 3   may not have been the specific question of "I see you

 4   have more trust files and documents on your desk than

 5   the other trust officers."

 6              It may have been "Oh, I see that you seem,

 7   you know, you have more work than the others" or what

 8   I was getting at when you said not specifically, it

 9   may not have been that specific question but it may

10   have been in the ballpark of that question.

11    A.    In the ballpark of that question.

12    Q.    What would it have been?

13    A.    To the best of my memory, I may have made a

14   comment to Mr. Bell about his workload and what was

15   apparent to all team members to be his workload.

16    Q.    Did Mr. Bell ever say that he felt that he was

17   given more work because of his age?

18    A.    No.

19    Q.    And Mr. Gilmore was the person that was

20   responsible for giving all the trust officers work, to

21   your knowledge?

22    A.    To my knowledge, as team leader Brendan Gilmore

23   assigned the case loads to the individual trust

24   officers.
```

Blozis                                              v.                     Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1                    C.A. # 05-891 (SLR)              July 26, 2006

Page 44

1    Q.    Before we were talking about others that

2  Mr. Gilmore had put pressure on and Mr. Bell was one

3  and Ms. Squier was another?

4    A.    Is that your question?

5    Q.    Yes.

6    A.    Linda Squier was another.

7    Q.    And why do you say that Mr. Gilmore put

8  pressure on Linda Squier to resign?

9    A.    I was a witness to instances of those times

10 when Brendan Gilmore put pressure on Linda Squier.

11   Q.    And what did you witness?

12   A.    I witnessed Brendan Gilmore's unprofessional,

13 critical criticisms of how Linda Squier conducted her

14 work.

15   Q.    And do you remember when you witnessed this?

16   A.    Specifically not the dates.

17   Q.    Years?

18   A.    To the best of my memory, it would have been

19 the last year and a half that Linda Squier was

20 employed by Mellon.

21   Q.    I take it you don't remember when she left

22 Mellon?

23   A.    Not the exact date.

24   Q.    Was it sometime in 2000, in the 2000's?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 45

```
 1     A.    To the best of my memory, it was before then,

 2    the late 1990's.

 3     Q.    Before we talk about Linda Squier, do you

 4    remember -- I want to close the loop on Bell.

 5            You had said that you also had

 6    conversations with Linda Squier about Bell's workload?

 7     A.    Yes.

 8     Q.    When did you have conversations with her?

 9     A.    I don't recall the exact dates.

10     Q.    What was the substance of the conversations?

11     A.    To the best of my recollection, on various

12    occasions Linda Squier would share information about

13    Robert Bell's workload.

14     Q.    And what would she say about the workload?

15     A.    To the best of my recollection, Linda strongly

16    intimated and stated that Mr. Bell was overloaded with

17    work.

18     Q.    Do you know if Mr. Bell -- let me back up.

19            Do you know if Mr. Gilmore ever had any

20    criticisms of Mr. Bell's work?

21     A.    To the best of my memory, I don't recall

22    specific dates, but I do recall Brendan Gilmore

23    criticizing Mr. Bell's history or work as a past

24    employee.
```