Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 46

1   Q.   And was that while Mr. Bell was employed that

2   you remember this?

3   A.   I don't recall that it was when Mr. Bell was

4   still an employee of Mellon.

5   Q.   You think it may have been after Mr. Bell left?

6   A.   As I remember, it would be after he left.

7   Q.   And do you remember what Mr. Gilmore was

8   saying?

9   A.   At this time I don't exactly recall the words,

10  but I do recall Mr. Gilmore frequently criticizing

11  past or retired, resigned or fired employees of the

12  team.

13  Q.   Do you remember specifically him mentioning

14  Mr. Bell?

15  A.   At this time I don't specifically remember a

16  date that he mentioned Mr. Bell.

17  Q.   Not a date.  But do you remember him saying,

18  mentioning Mr. Bell specifically with respect to

19  criticism of the work?

20  A.   To the best of my memory, there would have been

21  a team meeting where Brendan may have mentioned Robert

22  Bell, Linda Squier or Martha Fetters and the way they

23  conducted the trust business.

24  Q.   Can you be more specific when you said the way

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 47

1    that they conducted the trust business what he said

2    about that?

3    A.    Brendan Gilmore would conduct the team meetings

4    in a very brusque, arrogant manner in order to incite

5    the team to work harder and he would use those

6    instances to degrade past performances of employees

7    that were no longer part of the team.

8    Q.    So he would mention the past employees by name?

9    A.    Not always.

10   Q.    Would it be along the lines of criticisms of

11   how past employees had done a particular job?  I'm

12   just trying to get a sense of when you said that he

13   would use it as a mechanism to degrade past employees'

14   performances whether he would say this is how a report

15   was done by past employees and that was bad and this

16   is how we're going to do it now.  I'm just trying to

17   get a sense of what you meant by that.

18   A.    I'm not sure I understand fully the question.

19   Q.    Well, when you say he would use the team

20   meetings at times to degrade past employees'

21   performances, can you tell me, give me some specifics

22   by way of examples of what he would do?

23   A.    The team meetings weren't always conducted to

24   degrade past employees.  Team meetings were held to,

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1            C.A. # 05-891 (SLR)                        July 26, 2006

Page 48

1    team meetings were held to review the current

2    situations of the files and to impart his feelings of

3    how the team should be working harder or better and

4    not to follow the examples of employees that were

5    released, let go or resigned.

6      Q.   And so did you take from that that he

7    considered employees who were no longer there, let go,

8    forced to resign that he considered their work not to

9    be good work and that you should follow somebody

10   else's example of work?

11     A.   I would have taken that in that manner.

12     Q.   And do you remember him ever saying, you know,

13   don't do what Bell or Squier or Fetters did, that was

14   bad work or words to that effect?

15     A.   I don't recall him specifically saying don't do

16   Bell's, Squier's or Fetters' work, that was bad work.

17            I recall Brendan Gilmore saying the

18   Delaware team was not going to be like it was under

19   Bell, Squier or Fetters, to the best of my

20   recollection.

21     Q.   Okay.  And did he tell you how the Delaware

22   team was going to be?

23     A.   Mr. Gilmore would conduct the meetings and tell

24   the team members how he wanted it to be.

Page 49

1    Q.    What did he say in terms of how -- and I gather

2    how he wanted work to be done when you said how he

3    wanted things to be?

4    A.    I'm not sure I fully understand your question.

5    Q.    In the team meetings when you say that Mr. Bell

6    would tell everybody how he wanted things to be, would

7    he be talking about how he wanted the PORCH to be run,

8    how he wanted customers to be serviced, things of that

9    nature?

10   A.    Yes.

11   Q.    We were talking about Linda Squier and I

12   believe you said that you were a witness or you

13   witnessed Gilmore's unprofessional criticisms of her

14   work.

15         Did you ever overhear conversations that

16   Gilmore and Squier were having or did you see it?

17   When you said that you witnessed it, I'm trying to get

18   a sense of how it came about.

19   A.    To the best of my recollection, I both heard

20   and saw.

21   Q.    What did you see?

22   A.    I recollect Brendan Gilmore brusquely

23   criticizing Linda's decisions or her conduct in

24   handling workloads, case files that she, trust files

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 50

1    that she would have been responsible for in her

2    history with Mellon.

3      Q.    And do you know if the criticism was accurate

4    criticism?

5      A.    Not always.

6      Q.    When you say, "Not always," meaning not always

7    accurate criticism?

8      A.    Of Linda Squier's?

9      Q.    That's what I mean.

10              When you say not always accurate

11    criticism, why do you say that?

12     A.    Brendan Gilmore was a brusque, arrogant

13    manager.  I recollect Linda Squier's rapport with the

14    trust clients to be professional.  I felt when Brendan

15    Gilmore criticized her, it was completely unwarranted.

16     Q.    Did Linda Squier discuss with you that she felt

17    that Brendan Gilmore's criticisms of her were

18    unwarranted?

19     A.    Yes.

20     Q.    Would that be what she would say, words to that

21    effect?

22     A.    Yes.

23     Q.    Did Linda Squier ever tell you that she felt

24    that she was being treated by Mr. Gilmore in that

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 51

1   fashion, unprofessional criticism, brusque, because of

2   her age?

3     A.    Specifically I don't recall that she used the

4   word "age."

5     Q.    What did she use?

6     A.    Used in?

7     Q.    When she didn't use the specific "I think I'm

8   being treated this way because of my age," I gather

9   she never said that, did she say things that made you

10  believe that age was the reason?

11    A.    To the best of my memory, Linda would talk

12  about, she would talk about the length of time that

13  she had served her trust clients in Mellon.

14    Q.    In fact, in terms of she held the position for

15  a while and knew her job, so to speak?

16    A.    Yes.

17    Q.    You said that you had, I guess you had actually

18  seen Gilmore brusquely criticizing Linda and you said

19  you also had heard it?

20    A.    Yes.

21    Q.    The same thing, brusque criticism?

22    A.    Yes.

23    Q.    When you say you heard it, is your office next

24  to hers or is it in the hallway?  How is it that you

Page 52

1    heard it?

2    A.    At the time I reported to Linda Squier as a

3    trust officer she sat two desks away from me.  I had

4    to hear whatever he said to her, whether at her desk

5    or behind a closed door because their voices would be

6    raised.

7                 Correction:  His voice would be raised.

8    Q.    He would be speaking in a loud manner?

9    A.    Brendan Gilmore would be speaking in a loud

10   manner?  Yes.

11   Q.    And so as a result you could hear what he was

12   saying to her?

13   A.    Substantively, yes.

14   Q.    And what you heard was criticism of the

15   performance?

16   A.    Yes.

17   Q.    I take it that you never performed a

18   performance review of Linda Squier?

19   A.    That's correct.

20   Q.    Did you ever hear Brendan Gilmore speak

21   brusquely to employees who were 40 and younger?

22   A.    As I remember, the 40 and younger people that

23   were in the Philadelphia office, no.

24   Q.    So those folks you wouldn't know about because

Blozis                                                        v.                          Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1                          C.A. # 05-891 (SLR)                              July 26, 2006

Page 53

```
 1    you weren't in the Philadelphia office?

 2    A.    That's correct.  Yes.

 3    Q.    Were there any individuals 40 and younger who

 4    left Brendan's team at any point that you were there?

 5    A.    As I recall, I don't know the exact age of Ray

 6    Masucci and Scott Gilliland, but they had left the

 7    Gilmore team.

 8    Q.    Do you know why Masucci left?

 9    A.    No.

10    Q.    And you had said Scott?

11    A.    Gilliland.

12    Q.    Gilliland.  Do you know why he left?

13    A.    No.

14              MR. LaROSA:  Ms. Blozis, we have been

15    going for over 90 minutes.  Would you like to take a

16    break?

17              THE WITNESS:  I would like to take a rest

18    room break.

19              MR. LaROSA:  Can we take a five-minute

20    break?

21              MS. WILSON:  Sure.

22              (A brief recess was taken.)

23              MS. WILSON:  Can you mark this as Blozis

24    2, please?
```

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 54

1          (Blozis Deposition Exhibit No. 2 was

2    marked for identification.)

3    BY MS. WILSON:

4      Q.    If you will look at what's been marked as

5    Blozis 2 and for the record, since it's a number of

6    documents, it's P3, P4, P5 and P6 Bates stamped.

7      A.    (Reviewing document).

8      Q.    Ready?

9      A.    May I take a few more moments to scan this?

10     Q.    Sure.  Let me know when you're ready.

11     A.    (Reviewing document)  I'm ready.

12     Q.    Great.  Ms. Blozis, if you would look at the

13   first page of Blozis 2 Bates stamped P3, the title is

14   Portfolio Administrator Position, Philadelphia Private

15   Wealth Management.

16             Do you see where I am?

17     A.    Yes.

18     Q.    Do you recognize this document?

19     A.    To the best of my memory, yes.

20     Q.    On the left-hand side of the upper part, it

21   says, "Current as of 2003"?

22     A.    Yes.

23     Q.    Is that your writing?

24     A.    I would have to say it looks like my

Page 55

1    handwriting.

2        Q.    I gather from that that this job summary was in

3    effect as of 2003?

4        A.    Yes.

5        Q.    And this would be a job summary of what your

6    job responsibilities were with respect to the

7    portfolio administrator position?

8        A.    Yes.

9        Q.    And was this something that human resources

10   gave to you?

11       A.    To the best of my memory, no.

12       Q.    Who gave it to you?

13       A.    As I recall, it would have been my supervising

14   officer at that time.

15       Q.    In 2003 would that have been Landis?

16       A.    Yes.

17       Q.    Do you remember when in 2003 he gave it to you?

18       A.    No.

19       Q.    Do you know why he gave P3 to you?

20       A.    No.

21       Q.    Do you know if he -- I guess in 2003 Maria

22   Dunlop was on board?

23       A.    Yes.

24       Q.    Do you know if she got the same document, P3?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 56

1    A.    No.

2    Q.    You don't know?

3    A.    I don't recall at this time.

4    Q.    When you believe Landis gave you what's been

5    Bates as P3, did you and he have any discussion about

6    the document?

7    A.    I don't recall at this time.

8    Q.    Did you read it?

9    A.    Yes.

10    Q.    And did you take it to be what your

11    responsibilities were?

12    A.    Yes.

13    Q.    Looking at P4, do you recognize that document?

14    A.    Recognize it how?

15    Q.    Do you know what it is?

16    A.    It looks like a sheet that states LB's, meaning

17    Linda Blozis's current work as of 3-30-01.

18    Q.    Do you know who put P4 together?

19    A.    To my recollection, it was probably me.

20    Q.    And why did you put P4 together?

21    A.    I'm not sure at this time.

22    Q.    Do you know if you gave P4 to your supervising

23    officer?

24    A.    Supervising officer?

Page 57

1      Q.    In the 2001 time frame it would have been

2    Gilmore.

3      A.    As I recall now, it would either have been --

4    I'm sorry.  You said Gilmore.

5      Q.    Who was it in 2001?

6      A.    As I recall, it could have been Bill Becker or

7    Greg Landis.

8      Q.    All right.  Would P4 have been something that

9    you would have given to keep them apprised of what you

10   were working on?

11     A.    Yes.

12     Q.    Do you know whether Becker or Landis asked you

13   to put P4 together?

14     A.    I'm not sure at this time.

15     Q.    Looking at what's been Bates as P5.

16     A.    Yes.

17     Q.    Do you recognize that document?  You might want

18   to look at P6 because I'm not sure both of those pages

19   go together.

20     A.    Your question is?

21     Q.    The first question is:  Does P5 and P6 go

22   together?

23     A.    At this time I can't recall exactly.

24     Q.    Looking at P5, do you recognize P5?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 58

1    A.    I would have to say yes.

2    Q.    Is that your handwriting to the right?

3    A.    It appears to be my handwriting at this time.

4    Q.    Is that "specific to Linda Blozis"?

5    A.    That's what it says.

6    Q.    Do you know why you wrote that on there?

7    A.    I don't recall at this time.

8    Q.    Looking down at the bottom of P5 there seems to

9    be some handwriting down there?

10   A.    Yes.

11   Q.    Is that yours?

12   A.    At this time I'm not sure.

13   Q.    You're not sure whether it is or not?

14   A.    The handwriting in the lower left, whether

15   that's mine or not?

16   Q.    Right.

17   A.    Yes.

18   Q.    Looking at P6, do you recognize what P6 is?

19   A.    Yes.

20   Q.    And what is that?

21   A.    As it states, general miscellaneous duties

22   list.

23   Q.    And would that have been -- I'm just looking at

24   the bottom.  It says, "Revised 1/00."

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 59

```
 1              Do you see where I am?

 2    A.   Yes, I do.

 3    Q.   Did you type that in?

 4    A.   I can't say at this time that I typed that in.

 5    Q.   It has the initials BB/LB.  Is that Becker and

 6    you?

 7    A.   Yes.

 8    Q.   And then underneath it there's some

 9    handwriting.  Is that Becker's BB?  It looks like some

10    initials.

11    A.   Yes.  At this time I would take it to be Bill

12    Becker's initials.

13    Q.   And then your initials as well?

14    A.   Yes.

15    Q.   Would this have been something that you would

16    have given to Bill to show what it was that you were

17    doing?

18    A.   I don't recall at this time if I would have

19    given it to Bill or he would have given it to me.

20    Q.   In terms of typing it up with respect to

21    general/miscellaneous duties, if I understand your

22    answer you're not sure whether Bill gave you P6 to

23    review or whether you gave it to him to review?

24    A.   That's correct.
```

B109

Blozis                                                              Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1          C.A. # 05-891 (SLR)              July 26, 2006

Page 60

1    Q.    Okay.  I'm just looking at sort of the

2    signatures with the initials.  Does that mean that

3    both of you reviewed it at some point?

4    A.    Yes.  I would take that to mean that at this

5    time.

6    Q.    And I'm taking revised 1/00 to mean January

7    2000.  Is that correct?

8    A.    At this time I would say that is correct.

9    Q.    Would that have been what your general/

10   miscellaneous duties would have been for January 2000?

11   A.    It would have been what Bill Becker and I

12   discussed them to be.

13   Q.    Do you recall whether you put together sort of

14   the general/miscellaneous duties throughout the time

15   that you were reporting to Bill Becker or he put

16   together what they would be?

17   A.    At this time I would say yes.

18   Q.    Would you have monthly meetings with Bill when

19   you were reporting to him to go over your duties or

20   assignments?

21   A.    Yes.

22   Q.    Would it be on a monthly basis that you would

23   do it?

24   A.    I don't recall if it was specifically monthly

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 61

1    at this time.

2       Q.    But from time to time you and he would get

3    together and go over what you were working on?

4       A.    Yes.

5       Q.    Looking at P5, and I realize that you don't

6    know what that is down at the lower left-hand page of

7    that, but do you know when it says portfolio assistant

8    position responsibilities do you know whether P5 came

9    before P3?

10      A.    At this time I'm not sure.

11      Q.    And in terms of P5 do you know how you got it?

12   Meaning did HR give it to you?  Did someone else give

13   it to you?

14      A.    I can't answer at this time exactly.

15      Q.    Ms. Blozis, if you could take a look at the

16   first exhibit which is your complaint, please.

17      A.    Yes.

18      Q.    I want to turn your attention to paragraph 17

19   of the complaint.  It's on page 5.

20      A.    Yes.

21      Q.    Take a look at paragraph 17.

22            Do you see it?

23      A.    Yes, I do.

24      Q.    It talks about a bonus that you received in

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 62

1    2001 for 2000 performance.

2    A.   Yes.  It says that.

3    Q.   Do you remember how much that bonus was?

4    A.   At this time I'm not sure.

5    Q.   Do you know if other members of the Delaware

6    team received bonuses in 2001 for 2000 performance?

7    A.   At this time I'm not sure.  I'm not sure.

8    Q.   Do you remember what your rating was in 2000

9    with respect to your performance rating?

10   A.   In 2000?

11   Q.   Yes.

12   A.   I don't recall exactly at this time.

13   Q.   Do you remember in terms of I guess in 2000 the

14   highest rating and the lowest rating?

15   A.   Yes.

16   Q.   What was it?

17   A.   The highest rating as I recall today was

18   exceeds requirements.  As I recall today, the lowest

19   was needs improvement.

20   Q.   And then there were a couple in between?

21   A.   Yes.

22   Q.   Do you know how it was determined who would be

23   eligible for bonuses in let's say 2001?

24   A.   Please repeat your question.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 63

1              MS. WILSON:  Can you repeat that, please?

2              (The reporter read back the last

3    question.)

4              THE WITNESS:  As I -- no.  No.  Not

5    exactly, no.

6    BY MS. WILSON:

7    Q.   Do you know if bonuses were based solely on an

8    employee's good performance?

9    A.   Not all the time.

10   Q.   What would be times when it wouldn't be?

11   A.   Cumulatively good work performed by the team,

12   as I recall.

13   Q.   During the time that you held the position of

14   portfolio administrator, did you receive a bonus?

15   A.   Repeat what position I held, please.

16   Q.   Portfolio administrator.

17   A.   To my recollection, yes, I did receive a bonus.

18   Q.   You held the position for approximately four

19   years, is that fair, from 1999 to 2003?

20   A.   That's approximately right, yes.

21   Q.   Now, during that period was your bonus the same

22   amount?

23   A.   The same amount?

24   Q.   Would you get, say to throw out a number,

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 64

```
 1    5,000, did you get 5,000 each year?

 2    A.    No.

 3    Q.    It would vary in size?

 4    A.    To my recollection, yes.

 5    Q.    And do you know why it would vary in size?

 6    A.    No.  At this time I don't recall.

 7    Q.    Were bonuses guaranteed for your team?

 8    A.    I don't recall them being guaranteed.

 9    Q.    Looking at paragraph 18.

10    A.    Yes.

11    Q.    It deals with incentive pay.  Do you see where

12    I am?

13    A.    Yes.

14    Q.    You received $2,000 in 2002 for good

15    performance in 2001?

16    A.    Yes.

17    Q.    Do you see where I am?  Do you remember what

18    your performance rating was in 2001?

19    A.    At this time I'm not sure.

20    Q.    Do you know if other members of your team

21    received incentive pay in 2002 for 2001 performance?

22    A.    I'm not sure if all team members received that.

23    Q.    And is the eligibility for the incentive pay

24    spelled out in the private wealth management 2001
```

Blozis                                          v.                          Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1                 C.A. # 05-891 (SLR)                              July 26, 2006

Page 65

```
 1    portfolio team incentive plan?

 2    A.    I would have to say yes at this time.

 3    Q.    In paragraph 18 you referenced a 2001 portfolio

 4    team incentive plan.  Was there one for each year,

 5    like 2002, 2003?

 6    A.    I don't recall specifically at this time.

 7    Q.    In paragraph 19 you state that in October of

 8    2002 you received a raise from 36,000 to thirty-nine

 9    eight.

10              Do you see where I am?

11    A.    Yes.

12    Q.    Do you know how salary increases were

13    determined?

14    A.    At this time I'm not sure.

15    Q.    Would you receive something from HR saying that

16    you have gotten a raise?

17    A.    I'm not sure what you're referring to.

18    Q.    Would they send you a letter or some sort of

19    notification that you received a raise or were getting

20    a raise?

21    A.    Not all the time.

22    Q.    Would that have been the department that would

23    have notified you of a raise?

24    A.    Not all the time.
```

Blozis                                    v.                     Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                    July 26, 2006

Page 66

1     Q.    Would your manager have done it from time to

2   time?

3     A.    Yes.

4     Q.    In terms of your performance you testified that

5   usually the performance reviews were done annually but

6   not all the time.  Is that correct?

7     A.    Yes.

8     Q.    In general, in terms of the paper performance

9   reviews how would that work in terms of the completion

10  of the form?  Would you have any part of it to

11  complete?  Let's give you a date.  When you started

12  the portfolio administrator position.

13    A.    Yes.

14    Q.    How did that work in terms of getting your

15  performance management paper reviews done?  Would you

16  get a form to fill out concerning your accomplishments

17  first and then your manager would review it?

18    A.    Not first.

19    Q.    If you could just walk me through the process.

20    A.    To the best of my recollection, performance

21  reviews were initiated by your supervising manager.

22  He or she would fill out the form, present it to the

23  employee.  The employee would review it.  There would

24  be a discussion between your supervising manager and

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 67

1    the employee.

2              The employee was given an opportunity to

3    make comments or remarks at the end of it.  Ultimately

4    the supervising manager and the employee signed it and

5    it went to as best I recollect the team leader and it

6    was held I believe in a file.

7    Q.    Would you get a copy of the final signed one

8    for your files?

9    A.    Yes.

10             MS. WILSON:   Mark this as whatever the

11   next number is.

12             (Blozis Deposition Exhibit No. 3 was

13   marked for identification.)

14   BY MS. WILSON:

15   Q.    Ms. Blozis, if you would look at what's been

16   marked as Blozis 3 and let me know when you have

17   completed your review.

18   A.    (Reviewing document)  I have reviewed it.

19   Q.    Ms. Blozis, have you seen what's been marked as

20   Blozis 3 before?

21   A.    Yes.

22   Q.    And what do you recognize it to be?

23   A.    A performance review.

24   Q.    Now looking at the first page, there's some

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 68

1   handwriting at the top right.  Is that your

2   handwriting?

3      A.   At this time I don't believe that to be mine.

4      Q.   Do you recognize it?

5      A.   Recognize it?  I recognize it to be "Assessment

6   year-end 2001 Blozis."

7      Q.   Right.  But do you recognize whose handwriting

8   it is?

9      A.   I'm not sure at this time.

10     Q.   Looking at page 8 of the review, is that your

11  signature on the top there in the box on page 8?

12     A.   Do you mean the employee's signature and date?

13     Q.   Yes.  Is that you?

14     A.   Yes.

15     Q.   And underneath do you recognize that as the

16  manager's signature?

17     A.   Yes.

18     Q.   Who do you recognize that to be?

19     A.   At this time I recognize it to be Bill Becker's

20  signature.

21     Q.   Now, before I showed you Blozis 3 you had

22  described generally how the performance management

23  process would go in terms of the supervisor would

24  initiate it, fill it out, you would review it, you and

B118

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 69

1    he would sit down, go over it.

2            Do you remember that testimony?

3    A.    Yes.

4    Q.    Would that have been the way that it would have

5    been done for Blozis 3?

6    A.    To the best of my recollection, yes.

7    Q.    Looking at page 8 up at the top box under

8    Section IV, Summary and Final Performance Rating, do

9    you see where I am?

10   A.    Yes.

11   Q.    And down at the last category in that box,

12   Overall Rating, On-Target Performance is checked.

13   A.    Yes.

14   Q.    Do you see where I am?

15   A.    Yes.

16   Q.    Would that have been your rating for I guess

17   it's the year-end assessment 2001?

18   A.    Yes.

19   Q.    And looking at page 10.

20   A.    Yes.

21   Q.    It has paragraph 5, "What are your two areas

22   for improvement?"

23            Do you see where I am?

24   A.    Yes.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 70

1    Q.    That information that's contained in the box,

2    is that something that you would have put down or

3    something Becker would have put down?

4    A.    As I recall, I'm not sure if it's as a result

5    of what William Becker and I discussed.

6    Q.    Whether he would have put that in or whether

7    you would have?

8    A.    I understand it falls under the category of

9    competencies.  I'm not sure at this time if it were

10    solely he or I or jointly agreed upon.

11    Q.    Looking at the information that's contained in

12    paragraph 5 in that box where it says, "Product

13    knowledge - acquire a more fluid understanding of

14    basic Mellon investment principles," do you see where

15    I am?

16    A.    Yes.

17    Q.    Did you and he have a conversation about that

18    being an area for improvement for you?

19    A.    As I recall, yes.

20    Q.    Do you remember the substance of the

21    conversation?

22    A.    The exact substance?  No.

23    Q.    In general?

24    A.    At this time I recall Bill and I talking how

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 71

 1    the position, my position had evolved from trust

 2    assistant to more involved investment officer support

 3    and what Mellon expected or set forth as procedures

 4    required of a portfolio administrator.

 5       Q.   Did he tell you what Mellon expected?

 6       A.   As I recall at this time regarding this

 7    review --

 8       Q.   Yes.

 9       A.   -- Bill was trying to impress upon me what

10    Mellon and Brendan Gilmore as part of the Gilmore team

11    expected of the team members.

12       Q.   Did he give you any specific as to what was

13    being expected?

14       A.   To my recollection, it was more investment

15    involvement of the assistants.

16       Q.   And during the time that you worked as a

17    portfolio administrator you were dealing with

18    customers that had a certain, I guess a million up in

19    terms of investment?

20       A.   Yes.

21       Q.   A million was the lowest that you dealt with?

22       A.   At the time that we retained trust files of

23    that basis.

24       Q.   Do you remember when in time that was or that

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 72

1    it started?

2      A.    At this time I do not exactly recall.

3      Q.    Now, when Becker was saying that more

4    investment involvement was being required of the

5    assistants, what does "investment involvement" mean?

6      A.    To the best of my recollection, William Becker

7    was trying to impress upon me the fact that Brendan

8    Gilmore expected the assistants to take on investment

9    duties that I recollect in a lot of instances were

10   contradictory to the prescribed responsibilities of

11   assistants.

12     Q.    And I take it when you said Brendan Gilmore was

13   asking the portfolio assistants to take on more

14   investment duties that were contradictory to their

15   prescribed duties, what were the prescribed duties?

16     A.    Of the portfolio --

17     Q.    Right, the portfolio assistants.

18     A.    To complete reports.  To the best of my

19   recollection at this time, to complete reports, to

20   prepare client reviews, to set up client meetings, to

21   complete trades for the officers, the investment

22   officers, and that's what I recall at this time.

23     Q.    As being the prescribed duties?

24     A.    At this time, yes.

Blozis
Linda J. Blozis, Volume 1                          v.
                                C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 73

1    Q.    When you said that Gilmore was asking, I think

2    you said that Gilmore was asking portfolio

3    administrators to handle or to have investment duties

4    that were contradictory, were they in addition to what

5    you just identified as the prescribed duties?

6    A.    As I recall, yes.

7    Q.    And you used "contradictory."  What was

8    contradictory in your mind in terms of what he was

9    asking you to do and what you thought your prescribed

10   duties were?

11   A.    Specifically or non-specifically I believe the

12   assistants were asked to do jobs or work that seemed

13   to be worthy of vice president or trust officer or

14   investment officer level of responsibility.

15   Q.    So it's fair to say that in terms of what

16   Gilmore was saying your duties were that you felt that

17   as a portfolio administrator that the duties were

18   better situated with VP's, the officer-level type?

19   A.    In some instances, yes.

20   Q.    Did you tell him at any point that you felt

21   that what he was asking you to do was better suited

22   for I guess a higher titled person?

23             THE WITNESS:  Could you repeat that

24   question?

Page 74

1          MS. WILSON:  You're getting it down.

2    You're asking him.

3              (The reporter read back the last

4    question.)

5              THE WITNESS:  To the best of my

6    recollection, there may have been instances when I

7    imparted that feeling to Bill.

8    BY MS. WILSON:

9    Q.    And what was his response?

10   A.    As I recall, Bill was feeling pressures from

11   above, meaning Brendan Gilmore and whatever subsequent

12   management levels, to work harder and produce more

13   profits.

14   Q.    So when you brought it up to Bill would his

15   response be, for example, "Linda, we all have more

16   work to do and that's the way it is"?  I was trying to

17   understand what his response was when you brought it

18   to him.

19   A.    As I recall, his response was not that

20   responsive to my point.

21   Q.    Do you remember what he said?

22   A.    Exactly?

23   Q.    You know, it doesn't have to be exact but in

24   the ballpark, as we can say.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 75

1    A.    Ballpark is a broad term.

2          Bill would have -- as I recall, Bill said

3    that I was expected to perform more.  He may have said

4    he was getting a workload, but this was occurring in

5    his transition time from our team to becoming his own

6    team leader.

7    Q.    So those conversations as I understand it were

8    taking place a little later than the 2001 time frame

9    or 2002?

10    A.    At this time I'm not sure exactly.

11    Q.    With respect to your description of the

12    expectations that there would be more investment

13    involvement of the portfolio assistants, was that just

14    an expectation that was placed on you or was it an

15    expectation placed on all of the portfolio assistants?

16    I say assistants.  Administrators.  I'm sorry.

17    A.    I'm not sure at this time who it all covered

18    besides myself.

19    Q.    Do you know whether it covered Maria?

20    A.    I'm not sure at this time.

21    Q.    Now going back, Ms. Blozis, to your year-end

22    assessment for 2001 on page 10 in that block under 5

23    where it says, "Meeting deadlines more accurately and

24    developing communication skills that allow me to meet

Page 76

1    those deadlines, i.e. alerting teammates when time-

2    locking is necessary."

3              Do you see that?

4    A.   I see it, yes.

5    Q.   Did you and he have discussions about meeting

6    deadlines more accurately?

7    A.   As I recall, we may have.

8    Q.   Did Mr. Becker say that you hadn't met

9    deadlines in an accurate fashion?

10   A.   I don't recall if those were the exact words.

11   Q.   Well, was there an issue concerning deadlines

12   that were raised at your sit down with him with

13   respect to your evaluation?

14   A.   I'm not sure at this time.

15   Q.   What about "developing communication skills

16   that allow me to meet those deadlines," do you know

17   when it says "allow me" whether that's pertaining to

18   you or to him?

19   A.   This is my review.  I would say yes.

20   Q.   That it was you or him where it says, "allow

21   me"?

22   A.   Me?  It would mean me, Linda Blozis.

23   Q.   Oh, okay.  Do you know what that meant,

24   Ms. Blozis?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 77

```
 1      A.      At this time I would recollect that Bill was
 2    expecting me to have the initiative to say no to other
 3    team duties that would allow me to complete what he
 4    specifically or the investment officer would be asking
 5    me to do.
 6      Q.      When it says, "alerting teammates when
 7    time-locking is necessary," what does "time-locking"
 8    mean?
 9      A.      As I recall, time-locking under Mellon's policy
10    was to virtually not answer phones, not talk to other
11    teammates or employees and focus solely on the task at
12    hand.
13      Q.      Was that for a particular period of time?  For
14    example, 9:00 to 12:00 would be time lock for those
15    purposes?
16      A.      It varied.
17      Q.      Would it vary in accordance with what your
18    schedule was or was it a set time lock period?
19      A.      You have asked two questions there.
20      Q.      Well, when you say it varied, I'm just
21    wondering whether the time-locking as you have
22    described it would be specific as to you in terms of
23    you know what you have to do for a particular day so
24    you're going to time lock or whether there was
```

Blozis
Linda J. Blozis, Volume 1                    v.
                                 C.A. # 05-891 (SLR)          Mellon Trust of Delaware, et al.
                                                                         July 26, 2006

Page 78

1    something, say Delaware team-wide which said from

2    such-and-such time there's time-locking?

3        A.   It could vary from the task or the employee

4    that had the particular task.

5        Q.   Drawing your attention to the period I guess

6    when you became a portfolio administrator around the

7    1999 time frame and ending with the 2001 period, so

8    that's the period of time that I'm interested in, had

9    Mr. Becker ever stated that he was unhappy with your

10   performance?

11       A.   I don't recall exactly within that time frame.

12       Q.   You don't recall whether it ever happened?

13       A.   I remember Bill saying something to that

14   effect.

15       Q.   What do you remember him saying?

16       A.   To the best of my memory that more work was

17   expected of me.

18       Q.   Did he say that he felt that you weren't

19   working hard enough?

20       A.   Not in those specific terms.

21       Q.   Well, in general.

22       A.   In general, Bill as I recall said that more

23   work was expected of me, was expected of me.

24       Q.   What about Brendan Gilmore during that same

Blozis
Linda J. Blozis, Volume 1                    v.                    Mellon Trust of Delaware, et al.
                                     C.A. # 05-891 (SLR)                    July 26, 2006

Page 79

1    period of time, 1999 through the end of 2001, did he

2    ever offer any criticism, to you any criticism of your

3    work?

4        A.    The -- yes.

5        Q.    What did he say?

6        A.    At a time close to the end of my employ --

7        Q.    Just during let's keep it at that '99 through

8    2001 time frame.

9        A.    No, I don't recall at that time.

10       Q.    And you were going on to say something at the

11   end of your employ.

12       A.    Yes.

13       Q.    So I think you were going to answer something

14   having to do with Gilmore offering criticism of your

15   work at the end of your employ.  Was I guessing right?

16       A.    Yes.

17       Q.    What was it?

18       A.    Yes.  But your question referred to the

19   '99-2001 time frame and my answer to that was no.

20       Q.    Right.  And then you had gone on to talk about

21   something at the end of your employment.

22       A.    Yes.

23       Q.    I take that to be what?  Around 2003 time

24   frame?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 80

```
 1    A.    Yes.

 2    Q.    And did Gilmore say anything about your

 3  performance around that time?

 4    A.    Yes.

 5    Q.    And what did he say?

 6    A.    I don't recall verbatim.  It was the incident

 7  in March where we were behind closed doors and he

 8  loudly, rudely and unprofessionally criticized my

 9  work.

10    Q.    If you would look at your complaint which is

11  Blozis 1, paragraphs 25 and 26, page 6.

12    A.    Yes.

13    Q.    Is that the incident you're referring to?

14    A.    Yes, it was.

15    Q.    So there it says in late March 2003.  You think

16  that's when it was?

17    A.    It says late April.

18    Q.    I'm sorry.  Late April.

19    A.    Yes.  To the best of my recollection, yes.

20    Q.    Now, what did he say?

21    A.    As stated in my complaint, specifically he

22  referred to a client meeting booklet, not as I stated

23  in the complaint.

24    Q.    Now, do you remember the client meeting booklet
```

Page 81

1    that he was referring to?

2       A.    I recall -- I don't recall the specific

3    client's name, but I do know it was a booklet he was

4    alluding to.

5       Q.    Had there been -- I'm just looking at your

6    paragraphs 25 and 26.  Had there been an assignment

7    for you to complete a client booklet, client meeting

8    booklet?

9       A.    Yes.

10      Q.    And what is a client meeting booklet?

11      A.    It was a presentation prepared for the clients

12   that would periodically review the standing of their

13   trust investments, the progress, essentially a

14   portfolio review and what Mellon had done for them up

15   until that time.

16      Q.    And I recall your saying you don't recall the

17   specific client involved when it says a client meeting

18   booklet.

19            But had you completed the client meeting

20   booklet?

21      A.    I had completed all paperwork pertinent

22   thereto.

23      Q.    Was it one booklet that had to be completed?

24      A.    It would have been a repetitive booklet that

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 82

1    would have been handed out to a number of clients at

2    the meeting.  Some family members were more than one

3    that would appear at a meeting.

4        Q.    So you would put together sort of the template

5    and then copies would be made of that template?

6        A.    Not exactly.

7        Q.    How would it go?

8        A.    Figures and information would be compiled.

9    Color charts would be produced and run.  They would be

10   collated and assembled.

11       Q.    Was that your job to do the charts and the

12   other information you described?

13       A.    It would be my responsibility to put in the

14   numbers pertinent to that particular client's

15   portfolio.

16       Q.    Would you be getting materials from others to

17   put in the booklet?

18       A.    "Others" meaning?

19       Q.    Other, say, trust officers, other members of

20   the team.

21       A.    Occasionally, yes.

22       Q.    Do you remember whether it was the case that

23   you would be getting information from others for this

24   particular client meeting booklet?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 83

1    A.   At this time I'm not certain.

2    Q.   So when you said that all papers pertinent to

3  that client meeting booklet had been done --

4    A.   All printed materials were completed by me.

5    Q.   And was it collated or were they usually bound

6  in some way?

7    A.   They were collated.

8    Q.   And were the booklets that you bound Velo bound

9  or have some sort of binding to them?

10   A.   Yes.

11   Q.   Was that done as well?

12   A.   In this instance?

13   Q.   Yes.

14   A.   To the best of my recollection, everything but

15  the binding was done.

16   Q.   Was Mr. Gilmore upset that the binding hadn't

17  been done?

18   A.   To the best of my memory, yes.

19   Q.   Can you to the best of your recollection sort

20  of walk me through that particular sequence of events?

21  I gather Mr. Gilmore -- this happened in the Delaware

22  office?

23   A.   Yes.

24   Q.   He was in the Delaware office and said, "Linda,

Page 84

1    can you come see me"?  When I say walk me through, I

2    mean from the beginning of the conversation to the

3    end.

4      A.    He came to the Delaware office on a date in

5    April that I don't specifically remember at this time

6    and discussed my work performance, specifically

7    mentioning the client booklet.  As I recall, I told

8    him all pertinent information was assembled, numbers

9    and proper information required in the particular

10   client's case was prepared.  It was not bound because

11   it required an investment officer's review before

12   simply binding the product, binding the booklet.

13     Q.    And what did he say in response?

14     A.    He said to bind it or else, as I recall.

15     Q.    Had you been given any timetables for

16   completion of the booklet?

17     A.    I don't understand the question.

18     Q.    Had someone said, by way of example, "Linda, we

19   would like for you to have the booklets done by" X

20   date?

21     A.    In terms of preparation of the information in

22   it, it was completed.

23     Q.    But my question was:  Had someone given you a

24   timetable?

Blozis
Linda J. Blozis, Volume 1                          v.                    Mellon Trust of Delaware, et al.
                                        C.A. # 05-891 (SLR)                              July 26, 2006

Page 85

1    A.    I don't recall a specific date timetable at

2    this time.

3    Q.    For having it done?

4    A.    I only recall that the client presentation

5    booklet was to have been completed before I left for

6    vacation.

7    Q.    And looking at I'm sort of going down to 27 it

8    says before leaving on vacation on May 2, '03.

9    A.    Yes.

10   Q.    Is that when you were going on vacation?

11   A.    As I recall, yes, in that year, yes.

12   Q.    So the client booklets were supposed to be

13   completed before you left on vacation.  That was your

14   understanding?

15   A.    Yes.

16   Q.    Now, when you were speaking to Gilmore did he

17   say that -- did he look at your product?

18   A.    I don't recall that he did.

19   Q.    Do you know if he had seen the papers that you

20   say had been put together?

21   A.    I don't recall that he had.

22   Q.    But there's I guess a sense by him that the

23   work hadn't been completed?

24   A.    There was a sense by him that the work hadn't

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                      July 26, 2006

Page 86

1    been completed?  I'm recollecting that he meant

2    because the binding hadn't been done that it was not

3    completed.

4       Q.    In terms of the conversation, did he come to

5    you and say, Linda, have you finished the blank, you

6    know, the particular client booklet, whoever the

7    client was, did he come and say have you finished it

8    and you said well, I have this done and then he says

9    what about the binding?

10            Do you know how it came up about the

11   booklets in the first place?

12      A.    I don't recall exactly at this time.

13      Q.    All right.  Now, during that conversation you

14   went into his room, into his office?

15      A.    He called me into the office.

16      Q.    Did you sit at a carol, you know, a carol where

17   you have your desk and some walls that may not go up

18   to the top or did you have your own like an office

19   with a door and everything?

20      A.    I didn't have an office.

21      Q.    Was it a carol, your office space?

22      A.    My office space was a carol.

23            (Discussion off the record.)

24

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 87

1    BY MS. WILSON:

2       Q.    So he called you into his office?

3       A.    Brendan Gilmore called me into an office that

4    he would use in Delaware.

5       Q.    Door closed?

6       A.    Yes.

7       Q.    Now, you said that he you used words like,

8    looking at your paragraph 25, strongly criticized her

9    work in a threatening and demeaning manner?

10      A.    Yes.

11      Q.    What did you find threatening and demeaning?

12      A.    His lack of professional mannerism, the tone of

13   his voice, the fact that he said or used the words or

14   else, his bullying tactics.

15      Q.    What was the unprofessional manners?

16      A.    His tone was loud enough to be heard by people

17   outside the closed door.

18      Q.    And how do you know that other people heard?

19      A.    When I left the office very upset Maria Dunlop,

20   for one, came to my cubicle and shook her head and

21   said that was not, not in these specific terms, but

22   something to the effect that that was just terrible.

23      Q.    And did you discuss it with her when she came

24   and said that was just terrible?

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                      July 26, 2006

Page 88

```
 1    A.   As I recall, I was too upset to say anything to

 2   anybody.

 3    Q.   When you say his bullying tactics, what do you

 4   mean by that?

 5    A.   Brendan Gilmore had a personality that team

 6   members understood to be dictatorial, to be demanding,

 7   to be his way or no other way.

 8    Q.   Now, when you said that he had said with

 9   respect to the client meeting booklet to bind it or

10   else, you used the term or else?

11    A.   Yes.

12    Q.   And did you have an understanding of what he

13   meant by or else?

14    A.   At that time I wasn't sure what he meant.  I

15   could only surmise what he would have meant.

16    Q.   Did you ask him what or else meant?

17    A.   At this time I'm not sure.  I recall I think I

18   did.

19    Q.   I'm sorry?

20    A.   I think I did say to him -- I'm not sure.  But

21   I think I did say to him "What do you mean by or

22   else?"

23    Q.   Did he respond?

24    A.   I think he responded, to the best of my memory
```

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 89

1    I think he responded.

2    Q.    What did he say?

3    A.    I'm not even sure of the exact words.

4    Q.    You had also looking at paragraph 26 you said

5    that he had used profanity?

6    A.    Yes, he did.

7    Q.    What was the profanity?

8    A.    The exact profanity at this time I'm not sure,

9    but it was either taking the Lord's name in vain by

10   saying goddamn it and the word s-h-i-t.

11   Q.    You think it was both?

12   A.    As I recall, yes.

13   Q.    Do you remember what he said?

14   A.    As I recall, I was very upset.  I do know he

15   used a profanity.  I was very shocked by that.  He

16   noticed my impression of that and I believe, as I

17   recall, he may -- I'm not sure at the time, but he...

18            I think he saw the error of his ways in

19   using a profanity in the presence of a lady and in an

20   expected professional situation.

21   Q.    Why do you say that you think he realized the

22   error?

23   A.    I don't recall specifically at this time, but

24   there was an expression on his face that he knew I was

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 90

1    stunned and shocked that a manager would talk to a

2    woman in that manner.

3        Q.    So, Ms. Blozis, you believe in that closed door

4    meeting that you were referring to that Mr. Gilmore

5    during the course of the discussion used the terms

6    goddamn it and shit?

7        A.    To the best of my recollection, yes.

8        Q.    And I think you testified that you're not

9    certain of the exact exchange?

10       A.    Yes.

11       Q.    Had you heard Mr. Gilmore use profanity before?

12       A.    Regrettably, yes.

13       Q.    The same terms?

14       A.    Yes.

15       Q.    And where had you heard him?

16       A.    As I recall, it may have been behind the closed

17   doors when Bill Becker was the investment officer and

18   Brendan would be in with him, with Martha Fetters when

19   she was an investment officer and perhaps at team

20   meetings, unfortunately.

21       Q.    During the team meetings that he would be

22   holding with the rest of his team?

23       A.    Yes.

24       Q.    He would say goddamn it or shit during the team

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 91

```
 1    meetings?

 2        A.    As I recall, occasionally, yes.

 3        Q.    Would he be using it as emphasis?

 4        A.    I can't say at this time.  I don't recall.

 5        Q.    Now, you said that you had overheard him using

 6    the same terms with Becker and Fetters?

 7        A.    Martha Fetters.

 8        Q.    And Becker?

 9        A.    Yes.

10        Q.    Now, during the periods that you overheard him

11    using those terms with Becker and Fetters, did you

12    ever go to anybody to complain?

13        A.    I don't understand who you mean by "anybody."

14        Q.    Well, HR, for example?

15        A.    At this time I would say I recall not having a

16    good rapport with HR.

17        Q.    At what point did you feel that you didn't have

18    a good rapport with HR?

19        A.    Linda Squier and I and other Delaware team

20    members wanted to discuss an incident years prior to

21    this regarding the conduct of a sales officer.  We

22    understood it to be a confidential meeting.  The HR

23    director at that time brought in other officers that

24    were above Linda Squier and I besides herself.
```

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 92

1   Q.   Who was the HR director that you're referring

2   to?

3   A.   Rosemary Thomas.

4   Q.   And you said you had gone to her about a sales

5   officer?

6   A.   Yes.

7   Q.   When did you go to her?

8   A.   As I recall, it would have been in the mid to

9   late nineties.

10  Q.   And what was the issue with the sales officer?

11  A.   I don't recall specifically at this time.  To

12  my recollection, he was telling clients, he was

13  telling clients Mellon would deliver on different

14  items that were really not Mellon policy.

15  Q.   And --

16  A.   Prospective clients.

17  Q.   Who was the sales officer?

18  A.   Anthony Jasienski.

19  Q.   Was he working out of the Delaware facility?

20  A.   Is he working?

21  Q.   At the time.

22  A.   At the time, yes.

23  Q.   And you said that you and Linda -- I'm sorry --

24  you and Ms. Squier had gone to Rosemary to complain

Page 93

1    about Anthony and you felt that it was in confidence

2    and then I guess there were other people who were

3    aware of it?

4        A.    Yes.

5        Q.    And you felt that she shouldn't have told

6    anybody else about it?

7        A.    Yes.

8        Q.    The people who were aware, were they Anthony's

9    I guess for lack of a better word bosses or

10   supervisors?

11       A.    One of them would have been, yes.

12       Q.    And who was the other one?

13       A.    To the best of my recollection, Brendan Gilmore

14   was there, Brendan's supervisor Douglas Kloppenburg

15   and the regional sales manager of Tony Jasienski at

16   the time.  I don't recall his name.

17       Q.    And why did you feel that those individuals

18   shouldn't have been made aware of it?

19       A.    Ms. Squier and I approached HR in confidence.

20   We were assured that it would be a confidential

21   discussion between Rosemary Thomas, Linda Squier and

22   myself and Rosemary Thomas showed up with the three

23   officers, additional three officers.

24       Q.    Did you then tell your sort of story to the

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 94

1    three officers?

2    A.    Yes.

3    Q.    And do you know whether anything happened to

4    Anthony?

5    A.    As a result of this?

6    Q.    Yes.

7    A.    I'm not sure at this time.

8    Q.    Did you feel that the three officers should

9    have known if Anthony was offering prospective

10   customers things that Mellon didn't sell?

11   A.    Yes.  Eventually.

12   Q.    When you say, "Eventually," what do you mean?

13   A.    I feel that a confidential meeting of women

14   complaining against a male officer or bringing to

15   light his inappropriate sales conduct should have been

16   held confidential and then handled in a proper manner

17   with his superiors.

18   Q.    And how is it that you felt that it was handled

19   improperly?

20   A.    That Ms. Squier and I were led to believe that

21   it would be a confidential discussion with

22   Ms. Rosemary Thomas to give her the details and that

23   we were virtually blind-sided with the three officers

24   walking into that, coming along with her.

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                          July 26, 2006

Page 95

1    Q.    Did you not want your identity known, so to

2    speak?

3    A.    At this time I wouldn't say that was the case.

4    Q.    You didn't mind them knowing that you were the

5    ones that were bringing it up?

6    A.    At that time, no, I don't believe, I don't

7    recall that I was.

8    Q.    I guess what I am trying to understand is what

9    your concern was.  I guess you and Ms. Squier felt it

10   was just going to be the three of you meeting to

11   discuss this and then you have three officers, plus

12   Rosemary coming in.  You had no preknowledge that

13   there was going to be more than the three of you?

14   A.    Initially that's correct.

15   Q.    And that's what you didn't like?

16   A.    I didn't think that was how we were led to

17   believe we would be able to tell our side of the

18   incident.

19              MS. WILSON:  Off the record.

20              (Discussion off the record.)

21   BY MS. WILSON:

22   Q.    Ms. Blozis, you testified that Mr. Gilmore had

23   used certain words that you considered to be profane

24   during that meeting in your presence.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 96

1              Have you ever used those words before?

2    A.   I don't understand.

3    Q.   Well, have you ever used the word shit before

4    or goddamn it?

5    A.   To my recollection, not in an office

6    environment or professional environment.

7    Q.   Outside of the office, outside of a

8    professional environment?

9    A.   To my recollection, I may have outside of the

10   office.

11              MS. WILSON:  We can take a 30-minute

12   break.

13              MR. LaROSA:  Sure.

14              (Recessed for lunch at 1:15 p.m.)

15                 -   -   -   -   -

16                 AFTERNOON SESSION

17                    1:50 p.m.

18   BY MS. WILSON:

19   Q.   Ms. Blozis, with respect to the client meeting

20   booklet that we were discussing before the break in

21   which you and Gilmore were having the discussion, did

22   you get that booklet bound before you left on your

23   vacation?

24   A.   No, I did not.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 97

```
1      Q.    Why was that?

2      A.    As I told Brendan Gilmore, it needed to be

3   looked over by the investment officer at the time, the

4   presenting officer, which I recollect was Greg Landis,

5   and he was not going to be available until after I

6   left.

7      Q.    So Greg Landis was to look over the booklet

8   before it was bound?

9      A.    Yes.

10     Q.    And did you tell Mr. Gilmore this?

11     A.    Yes.  I recollect that I did state that.

12     Q.    In that meeting that you characterized in your

13   complaint, that April meeting?

14     A.    Yes.

15     Q.    Did Mr. Gilmore say that he wanted it bound

16   regardless of whether Landis looked it over?

17     A.    To the best of my recollection, yes.

18     Q.    Did you have any discussions with Landis in

19   which you said, and not verbatim, but that Gilmore

20   wanted you to, wanted the books bound and he had to

21   look it over so that you could get it done?

22     A.    As I recall, I believe I spoke on the phone to

23   Greg, who may have been out of town, and said or

24   informed him that the booklet numbers-wise,
```

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 98

1   information-wise was prepared and collated; it was

2   left for him to just review and that Maria Dunlop

3   volunteered to do the binding process when that was

4   done, which took all of five to seven minutes,

5   depending on the number of booklets.

6   Q.   Did you speak to Mr. Gilmore to let him know

7   where you were with respect to the project after the

8   conversation you had in April?

9   A.   I recall in that April incident that I tried to

10  impress upon Brendan that it was only a matter of

11  binding it, that it would mean destroying pages that

12  would otherwise be acceptable in the presentation if

13  not left for Landis's review and that Maria Dunlop

14  could bind it.

15  Q.   And did Gilmore say that was acceptable to him?

16  A.   I don't remember him admitting that it would

17  have been acceptable.

18  Q.   Before you left on vacation did you have any

19  discussions with Gilmore about the booklet?

20  A.   I don't understand in what terms you mean.

21  Q.   At all.  For example, did you say it's not been

22  bound, I'm waiting, you know, Landis has to look at

23  it, Maria says she can do it, you know, did you give

24  him an update before you left?

Page 99

1    A.    I don't recall that I did.  I recall that that

2    impression was given to him or I strongly attempted to

3    give it to him at the April meeting.

4    Q.    Did he ever tell you that he thought that you

5    were being insubordinate to him with respect to that

6    booklet issue?

7    A.    Not that I recall.

8    Q.    Do you know if he had any conversations with

9    anybody about the booklet incident?

10   A.    Did he or did I?

11   Q.    Did he?

12   A.    I don't know that he did.

13   Q.    You had testified before the break, Ms. Blozis,

14   that sometimes during the team meetings that Gilmore

15   was leading that he would use profanity?

16   A.    Yes, I did.

17   Q.    Was that at the Delaware location?

18   A.    As I recall, it may have been more frequently

19   the meetings of his team were done by either

20   teleconference or we were called into Philadelphia.

21   Q.    And during those incidents or during those

22   times would there be males on the phone as well?

23   A.    Oh, yes.

24   Q.    It would generally be is it fair to say members

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 100

1    of whoever the Delaware team consisted of?

2       A.    All members of the Delaware team.

3       Q.    During that meeting, the conversation that you

4    were having with Gilmore in late April of 2003 that's

5    referenced in your complaint, did you say something to

6    Gilmore along the lines of it's a good thing that you

7    have that in writing so that you have a paper trail as

8    it related to the booklet?

9       A.    Did I say something to Brendan?

10      Q.    Yes.

11      A.    I don't quite understand your question.

12      Q.    Did he show you any documents that set forth

13   the time frame for the completion of the booklet?

14      A.    Not that I recall, no.

15      Q.    Did you ever say to him it's a good thing that

16   you have something in writing to evidence so that you

17   have a paper trial of what you asked me to do?

18      A.    I don't recall that.

19      Q.    Now, after that particular meeting -- do you

20   recall how long it lasted?

21      A.    To the best of my memory, fifteen or twenty

22   minutes.

23      Q.    Was that all that was being discussed, the

24   booklet?

Blozis
Linda J. Blozis, Volume 1                    v.
                          C.A. # 05-891 (SLR)        Mellon Trust of Delaware, et al.
                                                                   July 26, 2006

Page 101

1    A.    I recall, I recall that he also took the time

2    at that time to criticize the rest of my performance

3    and work.

4    Q.    And what did he say?

5    A.    I don't remember specifically.  I just recall

6    that I was stunned by his criticism of work that

7    seemed to formerly be very acceptable and gratefully

8    appreciated when I maintained the Delaware office on

9    my own as a support member of the team.

10    Q.    Did he give you specifics in terms of the work

11    that he was referring to?

12    A.    At this time I don't recall if there were

13    specifics given.

14    Q.    Were there any specifics as to the criticisms?

15    A.    I recall that he used the examples of other

16    younger portfolio administrators in Philadelphia

17    saying that they were responsible for much more than I

18    was accomplishing.  I had no way of knowing that to be

19    the truth because I didn't work alongside of them day

20    to day.

21    Q.    So you didn't know either way whether he was

22    correct when he said that?

23    A.    That's correct, I didn't know either way.

24    Q.    Did he, Ms. Blozis, when you said that he was

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 102

1    using examples of the younger portfolio administrators

2    in Philadelphia during his conversation with you, did

3    he say, again not specifically, but did he say, Linda,

4    the younger portfolio administrators in Philadelphia

5    are doing this, why aren't you or did he just say

6    generally portfolio administrators in Philadelphia?

7       A.    At this time I would say generally, but it's a

8    fact that they were younger.

9       Q.    Right.  I understand.

10      A.    They were younger than I.  And he alluded to,

11   he alluded to the fact that the other portfolio

12   administrators according to him at that time were

13   doing more and were capable of doing more.

14      Q.    Okay.  My question wasn't -- I understand that

15   the portfolio administrators in the Philadelphia

16   office, this is around the April 2003 time frame, what

17   you're saying is that they were younger than you were

18   at the time in age?

19      A.    Yes.

20            That's your question?

21      Q.    Yes.  Right?

22      A.    Yes.

23      Q.    But in terms of what Gilmore said, did he refer

24   to youth or age or anything like that in making the

B152

Blozis
Linda J. Blozis, Volume 1                          v.                          Mellon Trust of Delaware, et al.
                                        C.A. # 05-891 (SLR)                          July 26, 2006

Page 103

1    comparison?

2       A.    Not specifically.

3       Q.    He just said the portfolio administrators in

4    Philadelphia can do it, or words to that effect, why

5    can't you?

6       A.    Yes.

7       Q.    Now, did you have a response to him?

8       A.    I recollect my response was that, A, I was

9    doing the best that I could; B, that the portfolio

10   administrators in Philadelphia were not responsible in

11   addition to the regular duties that I was in caring

12   for the office at Two Greenville Crossing.

13      Q.    And what do you mean by "caring for the

14   office"?

15      A.    I took care of incoming-outgoing mail.  I took

16   care of all phone calls.  I took care of machinery

17   upkeeping, meaning the computers, the copiers, the

18   printers, the supplies for that.  I took care of

19   notifying building maintenance when things might not

20   work, to mention a few.

21      Q.    That was around the April 2003 time frame that

22   you had these responsibilities?

23      A.    To the best of my recollection, from the time

24   that Kathleen Agne was let go until -- yes, that time.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 104

1    Q.    So starting when Kathleen left to the time that

2    you yourself left, you had these additional

3    responsibilities that you just described?

4    A.    More correctly, it was the responsibility of

5    the portfolio administrator to take care of those

6    tasks all the time.

7    Q.    I see.  All right.  So when Kathleen was there

8    would it be fair to say that you and she sort of

9    divided up the work?

10    A.    Yes.

11    Q.    And then after she left, you were left as the

12    only portfolio administrator there until Maria got

13    there?

14    A.    Yes.

15    Q.    So when Maria got there, did you and she divide

16    up the work of what you just described, caring for the

17    office?

18    A.    When Maria was hired, it was incumbent upon me

19    to teach her, to teach her the job more or less.

20    Q.    In terms of caring for the office?

21    A.    Primarily her workload and her work

22    responsibilities because there was no formal training

23    offered by Mellon.  It was more or less on the job.

24    Q.    So you were training Maria with respect to the

Blozis
Linda J. Blozis, Volume 1
v.
C.A. # 05-891 (SLR)
Mellon Trust of Delaware, et al.
July 26, 2006

Page 105

1    care of the various portfolios?

2    A.    Yes.

3    Q.    The care and maintenance of those, whatever

4    that entailed?

5    A.    The trust accounts, yes.

6    Q.    As well as what you had described as caring for

7    the office?

8    A.    Yes.

9    Q.    Which I took to mean different duties than the

10   trust work that you were doing?

11   A.    Yes.

12   Q.    And did she at some point or did you at some

13   point sort of divide up the caring for the office

14   aspect and Maria took on some pieces of it?

15   A.    It wasn't my call to divide that up.  At some

16   point in time I recollect that Maria was up to speed

17   per se and she was designated Greg Landis's specific

18   assistant and I was to give support to Bruce

19   Holmquist, who was an investment officer in the

20   Washington area but part of the Delaware team, as well

21   as any other team responsibilities backing up Maria,

22   doing the investment work that Greg Landis was

23   responsible for.

24   Q.    When was that?

Page 106

1    A.    Are you asking for a date?

2    Q.    Yes.

3    A.    I would recall, as I recollect it was up until

4    the time of Maria's, after Maria's wedding in

5    September I believe of 2002.

6    Q.    And when I had asked you whether at some point

7    Maria started I guess caring for the office or doing

8    some duties that you had described as caring for the

9    office, did she ever?

10   A.    At some time I would have to say Maria to her

11   understanding of the work responsibilities was a team

12   player but because of her lack of time in the company

13   would defer to me on various questions, whether they

14   be referring to the trust accounts, the portfolios

15   themselves or the maintenance and upkeep of the

16   office.

17   Q.    So if there was an issue, she would come to you

18   on how to take care of it?

19   A.    Yes.

20   Q.    She couldn't sort of run the caring for the

21   office piece of it on her own?

22   A.    If I were called away or had a day off, it

23   would be left to her to try to complete that.

24   Q.    Otherwise, if you were there, she would come to

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 107

1    you and say Linda, who do I call for this?

2      A.    Frequently.

3      Q.    You had said that it wasn't, you had said it

4    wasn't your I think it was -- and you didn't put it

5    like this, but I had asked did there come a point when

6    Maria took over, you divided up the responsibilities.

7    I was just limiting it to caring for the office and

8    you said that wasn't something that you could do

9    because it left me to believe that there was somebody

10   else who would say Maria, your job is to divide up the

11   work with Linda as opposed to you saying Maria, I'll

12   do X, you do Y and that's how we will run it.

13     A.    I have to say Maria and I worked as a team to

14   the best of her ability and knowledge as she

15   progressed in the job.

16     Q.    Now, in your complaint you say, and I'm looking

17   at paragraphs 27 and 28, you say that before you left

18   on vacation that you went to see Rosemary Thomas in HR

19   to complain about Gilmore.

20     A.    I contacted Rosemary Thomas.  Her office was

21   sitused in Philadelphia and I contacted her from

22   Delaware.

23              MS. WILSON:  Mark this, please.

24              (Blozis Deposition Exhibit No. 4 was

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 108

1    marked for identification.)

2    BY MS. WILSON:

3      Q.   Ms. Blozis, if you will look at what's been

4    marked as Blozis 4 and let me know when you have had a

5    chance to, when you're finished.

6      A.   (Reviewing document)  I'm finished.

7      Q.   Now, looking at Blozis 4, do you recognize what

8    that is?

9      A.   Yes.

10     Q.   And what is it?

11     A.   It looks -- it's a copy of an e-mail from me to

12   Rosemary Thomas.

13     Q.   And the subject is Discussion with Brendan

14   Gilmore?

15     A.   Yes.

16     Q.   Is that in connection with the meeting that we

17   have been talking about that you had with Brendan

18   concerning the booklets and performance?

19     A.   Yes.

20     Q.   And on the sent line it's April 30th of '03.

21   Do you think that was the date that you had the

22   conversation with Brendan?

23     A.   I would recollect on or about that date, yes.

24     Q.   And then underneath there's some handwriting?

Blozis
Linda J. Blozis, Volume 1
v.
C.A. # 05-891 (SLR)
Mellon Trust of Delaware, et al.
July 26, 2006

Page 109

1    A.    Yes.

2    Q.    Is that your handwriting?

3    A.    Yes, it is.

4    Q.    And what is the handwriting?

5    A.    It's an indication that I spoke to Rosemary on

6    May 1st of 2003 and lodged my complaint against BMG,

7    are Brendan Gilmore's initials, regarding his

8    disruptive demeanor to me in that meeting.

9    Q.    I guess after sending Blozis 4, the e-mail

10   itself, you printed it out and made a notation of when

11   you spoke with Rosemary?

12   A.    Yes.

13   Q.    Now, when you were speaking with Rosemary, did

14   you take any notes of the conversation?

15   A.    I don't recall that I did.

16   Q.    You don't recall either way?

17   A.    I don't recall that I took notes of the

18   meeting, the teleconference to be exact.

19   Q.    It wasn't face to face?

20   A.    She didn't come to Delaware.

21   Q.    So you and she spoke over the phone?

22   A.    Yes.

23   Q.    Do you know whether anyone else was in the room

24   with her at the time?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 110

1    A.    I have no way of knowing that.

2    Q.    And where did you call her from?

3    A.    I stepped into an empty private office and

4    called her.

5    Q.    And were you the only one in the office?

6    A.    Yes.

7    Q.    And so in terms of whether she was taking

8    notes, you don't know that?

9    A.    I have no way of knowing that.

10    Q.    And what did you talk to Rosemary about?

11    A.    I reiterated to the best of my recollection

12    because of how upset I was what transpired between

13    Brendan Gilmore and I prior to me leaving for vacation

14    about the meeting.  I explained to her the situation,

15    that the booklet, as I had previously done in many,

16    many other client meetings, was taken to its logical

17    conclusion; that I didn't feel it was unreasonable to

18    leave what was prepared and completed until Greg

19    Landis could review it for Maria Bannister to bind it

20    so it wouldn't waste her time or company expense or

21    money to reproduce pages that would be destroyed upon

22    disbinding the booklet and that I was very upset at

23    his tone and his cursing at me and his general

24    unprofessional mannerism in that meeting, to the best

Page 111

```
 1    of my recollection, and that I wanted to, I
 2    specifically did state that I wanted to lodge a
 3    complaint against him.
 4       Q.    Now, going back to the meeting which we believe
 5    with was on or about April 30th that you had with
 6    Brendan, did you feel that he was leveling the
 7    profanity at you or whether it was because of the
 8    situation?
 9       A.    I felt it was leveled at me.
10       Q.    And why did you feel that way?
11       A.    As I recall, he pointedly was criticizing me at
12    that meeting.
13       Q.    When you spoke to Rosemary -- and I'm looking
14    at your paragraph 28 of your complaint.
15       A.    Yes.
16       Q.    Do you see on 28 where you say that you
17    believe, and I'm just paraphrasing, that you believe
18    that Gilmore's words and conduct toward you were, in
19    quotes, founded in age, end quote?
20       A.    Yes.
21       Q.    Do you see that?
22       A.    Yes.
23       Q.    Did you use those words with Rosemary?
24       A.    As I recall, yes.
```

Page 112

1    Q.    Did you tell her why you felt that they were

2    founded in age?

3    A.    I recollect that I suspected Brendan was

4    systematically trying to intimidate me because I was

5    the last remaining original and the oldest team member

6    on the Delaware team.

7    Q.    Did you tell Rosemary that?

8    A.    Not maybe in those specific words, but I do

9    recall saying that Brendan Gilmore used the term in

10   referencing the original team that I was the survivor.

11   Q.    When did he use the term that you were the

12   survivor?

13   A.    In the course of that discussion on that date.

14   Q.    Had he used that term to describe you before

15   that date?  I guess the date being on or about April

16   30th of '03.

17   A.    Not that I recall.

18   Q.    So when he said that you were the survivor or

19   termed you as the survivor, you took that as an

20   age-related comment?

21   A.    Yes.

22   Q.    Why?

23   A.    As I recall, I was reflecting on how I believed

24   and it was known throughout the team that Mr. Bell was

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 113

1    forced to resign and Mr. Bell at that time was of an

2    age 60 or better, that Martha Fetters, a woman, was

3    forced to resign. She was over the age of 40. That

4    Linda Squier, a woman, was forced to resign. At the

5    time she was over the age, I believe over the age of

6    40. That Kathy Agne was fired, Kathleen Agne was

7    fired and she was a woman over the age of 40, as I

8    recall their ages, and that I was the remaining

9    original Delaware team member, meaning those people

10    sitused in Delaware.

11    Q.    So when he called you a survivor you took it as

12    a negative instead of a positive?

13    A.    Yes.

14    Q.    Based on what you just said in terms of

15    everybody else was gone over the age of 40, some of

16    them female, so you felt that he was alluding to your

17    age when he said survivor?

18    A.    Yes.

19    Q.    Did you ask him what he meant by survivor?

20    A.    No.

21    Q.    You mentioned that Kathleen Agne was fired and

22    she was over the age of 40?

23    A.    Yes.

24    Q.    Who fired her?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 114

1     A.     To the best of my recollection, I believe it

2   was Bill Becker on the bequest of Brendan Gilmore, the

3   team leader.

4     Q.     What are you basing that on?

5     A.     My recollection is that Kathleen was called

6   into Bill's office on a specific date in March, that

7   she was there for a while.  I don't recall if it was

8   ten or fifteen minutes.  That she exited the office,

9   went to her desk that was on the other side of my

10  cubicle, unbeknownst to me was packing up her things

11  and exited the building and Bill Becker came out and

12  told me that Kathleen was let go.

13    Q.     Did he tell you why Kathleen was let go?

14    A.     I don't specifically recall at that time

15  because I was so very upset and shocked by it.

16    Q.     By Kathleen being let go?

17    A.     Yes.

18    Q.     Do you know if Kathleen was having any

19  performance problems?

20    A.     I recollect that I surmised there must have

21  been.

22    Q.     How did you surmise that?

23    A.     During the last months of her employment I

24  could see that she was being overburdened with work

Page 115

1    and I would frequently ask her can I help you out in a

2    team spirit and she would not defer to my offer.   And

3    I did not understand until after I was released that

4    she was instructed not to share that work as I was not

5    instructed to share my work with Maria Dunlop.

6       Q.    How do you know that she was instructed not to

7    share her work?

8       A.    After my release we may have had lunch and

9    talked about the situation.

10      Q.    In terms of a performance evaluation did you

11   ever conduct one of Kathleen?

12      A.    That wasn't the protocol at Mellon for

13   subordinates to review each other.

14      Q.    She was your coworker?

15      A.    Yes.

16      Q.    So as a coworker you would not have reviewed

17   her work?

18      A.    Absolutely not.

19      Q.    It would have been Becker and/or Gilmore?

20      A.    Yes.

21      Q.    And do you know how they assessed her work?

22      A.    That was not shared with me.   That was not the

23   protocol to share each subordinate's reviews.

24      Q.    Did Kathleen say that she felt she was let go

**B165**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 116

1    because of her age?

2    A.    Specifically she did not say the word -- no,

3    I'm not going to say that.

4              Specifically, she alluded to the fact of

5    her years in and her age and the fact that she was a

6    woman.

7    Q.    That's what she was telling you after she had

8    gone when you were meeting with her?

9    A.    Not in so many words but she alluded to that

10   fact, yes.

11   Q.    And that was after she was already gone?

12   A.    Yes.

13   Q.    Now, getting back to your conversation with

14   Rosemary Thomas, did you go into detail with her that

15   you felt that Gilmore's conduct and words were founded

16   in age because four other individuals over 40 had been

17   let go and you felt it was systematic?  Did you get

18   into that kind of detail?

19   A.    I can't recall at this time specifically, but I

20   recollect that I told Rosemary that I found it very

21   odd that Mr. Bell was let go, that Linda Squier and

22   Martha Fetters were forced out, that Kathleen was

23   dismissed, that I went from being the saving grace of

24   the team, the work force in Delaware, the support work

Blozis
Linda J. Blozis, Volume 1                    v.
                                   C.A. # 05-891 (SLR)                    Mellon Trust of Delaware, et al.
                                                                         July 26, 2006

Page 117

1    force in Delaware to all of a sudden being on a hit

2    list, but I didn't use the word hit list.  In this

3    context I'm saying that.

4    Q.    And what did Rosemary say?

5    A.    As I recall, she listened to me.  I think she

6    answered in a political fashion, that Mellon's

7    striving to be better, that everybody needed to work

8    harder.

9    Q.    When you say, "a political fashion," what do

10   you mean by that?

11   A.    I don't feel that Rosemary Thomas was

12   exceptionally sympathetic to the specific complaint I

13   was making.

14   Q.    Why did you feel that way, that she wasn't

15   being sympathetic?

16   A.    She didn't cite specific Mellon procedures that

17   would be taken as far as do I sign a formal complaint?

18   Does she sit down with a superior and Brendan and

19   discuss the specific charge that I was making?

20   Q.    She didn't tell you what was going to happen as

21   a result of your conversation?

22   A.    Not specifically what would transpire after it,

23   no, I don't recollect, no.

24   Q.    Did she mention anything that would happen that

B167

Blozis                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                    July 26, 2006

Page 118

1    would transpire?

2    A.    To the best of my memory, I think she said she

3    was going to speak to Brendan about it.

4    Q.    Do you know if she spoke to Brendan?

5    A.    I have no way of knowing that for sure.

6    Q.    In terms of your answer, is it that Rosemary

7    never -- did Rosemary come back to you and say I've

8    spoken to Brendan and this is what has occurred or

9    what he says?

10    A.    To my recollection, it would have to be that

11    when I returned from vacation I would have to assume

12    she spoke to Brendan because then I was handed a final

13    warning or given a final warning.

14    Q.    And that's why you feel that she had spoken to

15    Brendan?

16    A.    At this time I would have to say that's

17    probably why.

18    Q.    And is it I guess the timing, is that what

19    you're basing it on, that you got the final warning

20    after you had complained about Brendan?

21    A.    Yes.

22    Q.    Do you know if there had been any discussions

23    about placing you on a final written warning prior to

24    your conversations with Rosemary about Brendan?

**B168**

Page 119

1    A.    Please repeat that.

2    Q.    Sure.

3              MS. WILSON:  Can you repeat that?

4              (The reporter read back the pending

5    question.)

6              THE WITNESS:  I don't recall at this time.

7    BY MS. WILSON:

8    Q.    When Brendan called you a survivor you took it

9    to mean a reference to you being the only one I

10   believe you had characterized it as left from the

11   team, the beginning team.

12             Was that in fact the case, that of all of

13   the initial team members that you were the only one

14   left?

15   A.    Yes.

16   Q.    Besides Brendan?

17   A.    Before we went completely into a team concept

18   of people in Delaware working under people in

19   Philadelphia and people in Washington working under

20   people in Philadelphia, the original Delaware team

21   consisted of Robert Bell, Linda Squier, Kathleen Agne

22   and myself.  Of those four, I was the only one

23   remaining.

24   Q.    You and Brendan were the only ones remaining of

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 120

1    that team?

2    A.    Under his team.   Under his team.

3    Q.    Right.

4    A.    Yes.

5    Q.    Before the break, Ms. Blozis, we were talking

6    about Brendan Gilmore and one of the things that you

7    had said that you felt was indicative of age

8    discrimination was that he wanted to eliminate older

9    workers on his team and replace them with younger

10   people.

11              Do you remember that testimony?

12   A.    Yes.

13   Q.    Now, I believe we have gone through the older

14   workers that you were referring to and that would be

15   Kathleen Agne?

16   A.    Yes.

17   Q.    Robert Bell?

18   A.    Yes.

19   Q.    Martha Fetters?

20   A.    Yes.

21   Q.    And Linda Squier?

22   A.    Yes.

23   Q.    And there's also another one.   I'm looking on

24   pages 9 and 10 of your complaint, paragraph it's

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 121

1    starting with paragraph 53.  It's 53a through e.

2    A.    Yes.

3    Q.    If you look at e, Frances Smith.

4    A.    Yes.

5    Q.    Now, where was she with respect to the team --

6    A.    She was not a member of the Gilmore team.

7    Q.    Was she on another team?

8    A.    She was on the Philadelphia team.

9    Q.    Do you know, did each team have a name like

10   whoever the leader was, the Gilmore team?  Was there

11   another team that she was on?

12   A.    Yes.

13   Q.    What was the name of her team?

14   A.    I don't recall at the end of her career with

15   Mellon.  At one time it was the Jane Lefend team, but

16   I don't believe that was the team, that Jane was the

17   team leader on Mrs. Smith's team when she was

18   released.

19   Q.    And it says that she was forced to resign in

20   approximately September of 2003?

21   A.    Yes.

22   Q.    You don't remember whose team she was on at the

23   time?

24   A.    At this time -- excuse me.  Yes.  I believe

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 122

1    Bill Becker had taken over that team.  That was the

2    team that he had taken over at the time, William

3    Becker.

4       Q.    And how did you know Frances Smith?

5       A.    We had the occasion to work in conjunction with

6    mutual clients.  Over the course of my employment at

7    Mellon, various files were shifted from team to team

8    when the management decided the size of the clients'

9    portfolio would be moved from different teams.  They

10   were restructuring the file management.  And

11   frequently I would talk to Fran if she needed to be

12   brought up to speed about a particular client that

13   might have been managed on the Delaware team or the

14   Gilmore team that was then taken over by her team.

15      Q.    Do you know what her title was in September of

16   '03?

17      A.    To the best of my recollection, Fran had at one

18   time been promoted to a trust officer, but I recollect

19   that she was demoted to a comparable portfolio

20   administrator.

21      Q.    And do you know why she was demoted?

22      A.    Specifically I do not.

23      Q.    Do you know who demoted her?

24      A.    I do not know.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 123

1    Q.    You say she was forced to resign.  Why do you

2    say that?

3    A.    In discussions with Fran it became apparent

4    that she was going through the same thing that I was

5    as far as job overload, criticism of her work

6    performance and I think ultimately received the or

7    else prerogative and Fran chose to resign her post,

8    her position.

9    Q.    Did she tell you who it was that she was having

10   these issues with?

11   A.    I recollect at this time that it was William

12   Becker.

13   Q.    And did she tell you that she was being forced

14   to resign?

15   A.    She didn't, to my memory she did not say it

16   specifically in those terms, she was being forced.

17          She intimated that she did not understand

18   exactly why the criticism of her had arisen and why it

19   seemed after years of dedicated hard work it wasn't

20   satisfactory anymore, any longer.

21   Q.    So by her rendition of events you assumed it

22   was Bill Becker who was not happy with her work?

23   A.    I can't say specifically it was Bill Becker or

24   management's or Mellon's ploy at this time.

B173

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 124

1    Q.    Or Mellon's?

2    A.    Mellon's ploy.

3    Q.    Ploy, p-l-o-y?

4    A.    P-l-o-y to eliminate employees over the age,

5    over the age of 40.

6    Q.    When you say, "Mellon's ploy," what do you mean

7    by that?

8    A.    If Mellon was adopting a policy to drive out,

9    force out, fire employees of a certain age or time in

10   and, in turn, hiring younger, unskilled, inexperienced

11   people to replace them.

12   Q.    Do you ever see any written documentation that

13   Mellon had instituted such a thing?

14   A.    No.

15   Q.    Did anybody from Mellon ever tell you that

16   that's what was going on?

17   A.    Who do you mean "from Mellon"?

18   Q.    Other than the people, Martha and Frances or

19   Linda or Bell.

20   A.    I don't think that would have been a policy to

21   show if there were, in fact, a document to show that

22   to portfolio administrators.

23   Q.    Well, do you know if anything like that

24   existed?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 125

1    A.    I have no knowledge of that.

2    Q.    Did Frances Smith ever tell you that she was

3    forced to resign because of her age?

4    A.    Not in those specific terms.

5    Q.    It would have been along the lines of I have

6    been here for X number of years, I've done a good job,

7    I don't understand why now things aren't going well

8    for me or something along those lines?

9    A.    Yes.

10    Q.    Did you ever have any conversations with Bill

11    Becker about Frances Smith?

12    A.    No.

13    Q.    And I take it you never performed any

14    performance evaluations of Frances Smith?

15    A.    As I stated before, it was not a policy of

16    Mellon for trust portfolio assistants to offer reviews

17    on subordinates or certainly not people who were at

18    levels above my position.

19    Q.    Do you know whether any of the younger members

20    of the Gilmore team got any negative evaluations?

21    A.    I have no way of knowing that.  I don't believe

22    they have.

23    Q.    What is your belief based on?

24    A.    My belief is based on the fact that Brendan

**B175**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 126

1   Gilmore in that meeting tried to impress upon me that

2   the younger team members were working harder than I

3   was and was doing more, taking on more

4   responsibilities than I was.

5      Q.   But in terms of seeing any of their performance

6   evaluations or anything like that, you have never seen

7   them, correct?

8      A.   I'm sorry?  I didn't hear you.

9      Q.   You have never seen any of the younger Gilmore

10  team members' performance evaluations, have you?

11     A.   No.

12     Q.   Just to be clear, during the conversation that

13  you were having with Gilmore around the April 30th

14  time frame he didn't mention the term younger?

15     A.   I don't recall he used the term younger.

16     Q.   Now, thinking beyond that meeting during the

17  time that you were employed at Mellon -- and I

18  understand that you have given me some examples of

19  this, but my question is for you to tell me everything

20  that Gilmore has said or done that you took to be

21  indicative of age discrimination.  You don't have to

22  mention the elimination of the older workers issue,

23  the survivor, the profanity.

24                Anything other than what you have already

Blozis                                v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)              July 26, 2006

Page 127

1    testified to?

2      A.    I recall a couple of instances with Maria

3    Bannister, who I considered a team player but because

4    she was new and younger when Brendan Gilmore was in

5    the Delaware office he would frequently praise her

6    work and her performance and bypass me altogether

7    when, in essence, I helped train her and brought her

8    up to speed if she was accomplishing that work.

9      Q.    Is Maria the same woman as Dunlop?

10     A.    I beg your pardon.  Maria was employed, she was

11   hired as Maria Bannister and got married and became

12   Maria Dunlop.

13     Q.    All right.  So you felt that Gilmore's praise

14   of Maria's work was not warranted?

15     A.    I didn't say it was not warranted.  I said I

16   believed it was founded on the fact that she was

17   younger and I was ignored.

18     Q.    Well, I guess in general Gilmore would say

19   Maria is doing a great job at whatever or words to

20   that effect?

21     A.    In general, yes.

22     Q.    So when he would give her praise for the work

23   that she did, did you feel that Maria didn't deserve

24   that praise.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 128

1    A.   I said she was a team player.  I didn't say she

2    didn't deserve it.  I said that she would be given

3    praise and I as a team player if she and I were

4    working together, I would be excluded from that.

5    Q.   Are you saying that -- I guess what -- I think

6    I understand what you're saying in terms of the

7    praise.

8              When I asked you whether you felt she was

9    undeserving of the praise, is your answer to that yes

10   or no?

11   A.   She was not undeserving of that praise.

12   Q.   You felt that you were deserving of some equal

13   praise?

14   A.   Yes.

15   Q.   Did you ever say Brendan, I'm working on this

16   too; I would like to hear some kudos for my work?

17   A.   Brendan Gilmore wasn't the type of team leader

18   that you could make a comment like that to and feel

19   comfortable within the realm of your position.

20   Q.   So Gilmore didn't like to be questioned or

21   approached on topics such as I would like to be

22   included in the praise?

23   A.   Exactly.

24   Q.   You were giving me instances of times where you

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 129

1    thought Gilmore's conduct or words were indicative of

2    age discrimination.

3        A.    You're referring to instances of --

4        Q.    Where you felt that Gilmore either had by way

5    of statement, by way of conduct in some way evidenced

6    age discrimination.  And the last example you gave me

7    was concerns about Maria Dunlop and I didn't want to

8    cut you off.  I wanted to hear everything that you had

9    to say about that having to do with Gilmore.

10       A.    I don't quite understand what you're inquiring

11   about.

12       Q.    Well, are there any more instances where you

13   felt that Gilmore either by statement or by conduct in

14   some way was evidencing age discrimination?  We talked

15   about giving praise to Maria, none to you, the

16   survivor comment, the cursing, the letting go of the

17   older workers, the hiring of the younger workers.

18             I'm looking for more examples of that that

19   you have.

20       A.    I recall there were instances when in team

21   meetings or prior to or after meetings he would be

22   more jovial with younger people than he would with the

23   older members of the team, "older" meaning age and/or

24   time in.

**B179**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 130

1    Q.    When you say, "time in," you mean years of

2    service with the company?

3    A.    Yes.

4    Q.    Why do you feel that's indicative of age

5    discrimination?

6    A.    We were all on the same team.

7    Q.    So by "more jovial," you mean joking around?

8    A.    Friendlier, more outgoing.

9    Q.    You felt that with the older workers he didn't

10   have that same level of being friendly and outgoing?

11   A.    No, I did not think that he had that same

12   level.

13   Q.    Was he like nasty to the older workers in the

14   meeting?

15   A.    I wouldn't use the term "nasty."

16   Q.    But wouldn't you say that he wasn't as jovial

17   or outgoing?  I'm just trying to get a sense of how he

18   was appearing with the younger workers as opposed to

19   the older ones.

20   A.    If he was friendly and jovial with the younger

21   ones, it seemed apparent that he was aloof and distant

22   and borderline rude to the older workers.

23   Q.    And when you say, "borderline rude," what would

24   he do?

B180

Blozis
Linda J. Blozis, Volume 1                                    v.                        Mellon Trust of Delaware, et al.
                                            C.A. # 05-891 (SLR)                        July 26, 2006

Page 131

1    A.    Just if they asked questions he would be abrupt

2    in his answers or not have time for them then.

3    Q.    You felt with the younger workers he would

4    answer their questions and have time to discuss

5    whatever they were bringing up?

6    A.    Yes.

7    Q.    Did you ever approach him on this?

8    A.    No.

9    Q.    Did you ever speak with Rosemary or anybody

10   from HR about how you felt the meetings were going?

11   A.    Not that I recall at this time.

12   Q.    Would it be at all of the meetings that you

13   felt that way or some of them?

14   A.    For the most part it would be at the

15   predominance of the meetings.  Not all of the team

16   members were always included.  It would depend on what

17   the particular situation required, whether it be

18   officers or officers and assistants.

19   Q.    Would you be included on all of the meetings?

20   A.    I was an assistant.

21   Q.    So there would be meetings that you would not

22   be included on?

23   A.    There were at times, yes.

24   Q.    In terms of when the meetings were and who

**B181**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 132

1    would be included on the meetings, would there be an

2    e-mail coming out from Brendan saying we're going to

3    have a meeting on X date and A, B and C should be

4    there at the meeting?

5    A.    As I recollect, there could have been over the

6    time frame that he was the team leader, yes.

7    Q.    So you would get some advanced word of a

8    meeting date and who was to attend the meeting?

9    A.    For the most part, yes, there would be advanced

10   notice.

11   Q.    Then I think you testified that some meetings

12   were done on the phone?

13   A.    Yes.

14   Q.    And some in person?

15   A.    Yes.

16   Q.    Any other examples of instances where you

17   thought Gilmore was being discriminatory on the basis

18   of age?

19   A.    At this time I don't recall any.

20   Q.    You also --

21   A.    That's my phone.

22            MR. LaROSA:    Let's go off the record for a

23   second.

24            (Discussion off the record.)

Page 133

```
 1    BY MS. WILSON:

 2       Q.    Now, with respect to your complaint you also

 3    have a gender discrimination allegation.  And focusing

 4    in on Gilmore --

 5       A.    Excuse me.  I'm going to shut my phone off.

 6       Q.    Oh, sure.

 7       A.    I'm sorry.  Would you repeat the question?

 8       Q.    Sure.  Ready?

 9       A.    Yes.

10       Q.    Going back to Gilmore.

11       A.    Yes.

12       Q.    And focusing now on your gender discrimination

13    claim.

14       A.    Yes.

15       Q.    Can you provide me with instances where you

16    feel that Gilmore either by word or conduct was

17    discriminating against you on the basis of gender?

18       A.    To the best of my recollection, when I might be

19    in the Philadelphia offices and working alongside a

20    teammate for whatever purpose on an account I noticed

21    that Dan Merlino would not seem to be as busy as we

22    women might have been.

23       Q.    And Dan Merlino was a portfolio administrator?

24       A.    To the best of my recollection, that's how he
```

**B183**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

1    started on the team.

2      Q.    When you say that Dan wasn't as busy as the

3    women, what women?

4      A.    It would have been while she was still under

5    the employ Kathleen Agne, Marion whose name I don't

6    recall.

7      Q.    I think I might have her name.

8            Is it Marion --

9      A.    Marano.

10     Q.    -- Marano?

11     A.    It just came to me.  Marano, Marion Marano.

12     Q.    M-a-r-a-n-o.

13     A.    Even Brendan's personal assistant, Cindy

14    Chambliss.

15     Q.    Was Cindy a portfolio administrator?

16     A.    I don't know what her correct title was at this

17    time since she was Brendan's personal assistant.

18     Q.    And Marion, she was a portfolio administrator?

19     A.    Yes, as I recall.

20     Q.    So when you say that you visited the

21    Philadelphia office and Dan didn't seem to be as busy

22    as the rest of the women, why did you take that to be

23    gender related?

24     A.    Because I recollect there were instances in

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 135

1    which Marion and Cindy would intimate to me that we

2    have these tasks to complete and Dan did not have

3    comparable tasks.  He was not giving comparable tasks

4    in a comparable work position.

5        Q.    And who would be the person in charge of giving

6    Dan tasks?

7        A.    It would be Brendan Gilmore.

8        Q.    And did you ever do sort of your own

9    investigation as to what task Dan was being given?

10       A.    I don't understand your question.

11       Q.    Did you know what task that Dan was being given

12   to do?

13       A.    There were specific job duties listed that the

14   portfolio administrators were responsible for and

15   sometimes we might have to work in conjunction with

16   one another or ask questions.  It seems sometimes when

17   I would call Dan he wouldn't have the answers.  He

18   would defer me to Marion or Cindy or one of the women.

19       Q.    And you took from there, from his deferment to

20   the females that he didn't have the same work, the

21   comparable work that you had to do?

22       A.    I took from there that he should have that

23   answer as part of his job and he didn't have it.

24       Q.    So in terms of whether he had comparable work

B185

Blozis                                v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1          C.A. # 05-891 (SLR)              July 26, 2006

Page 136

1    to do, do you know that?

2      A.    As I recollect, if he was given the title of

3    portfolio administrator he would be given similar

4    duties as we women would be given.

5      Q.    And you took that something was amiss when you

6    would call and ask for information and he wouldn't

7    know the answer?

8      A.    Yes.

9      Q.    Did that lead you to believe that either -- I

10   mean, what I took from your answer is you would ask

11   him a question, he didn't know the answer and you

12   thought he should have known the answer?

13     A.    On some occasions, yes.  On other times if I

14   asked could you check on something for me, he would

15   defer to I'll have Marion call you back or I'll have

16   Cindy call you back.

17     Q.    And did you think there was something wrong

18   with him --

19     A.    I thought that --

20     Q.    -- doing that?

21     A.    Yeah.  I thought that he was very capable of

22   getting the answers or being able to work as a team

23   player and not defer to the women.

24     Q.    So it sounds like you were thinking that he

Blozis
Linda J. Blozis, Volume 1                          v.                    Mellon Trust of Delaware, et al.
                                        C.A. # 05-891 (SLR)                              July 26, 2006

Page 137

1    wasn't pulling his weight?

2       A.    Yes.

3       Q.    And instead of saying I'll have so-and-so get

4    you the answer that he should have gotten the answer

5    himself and given it to you?

6       A.    Yes.

7       Q.    Did you ever have any conversations with

8    Brendan Gilmore or Becker that Dan wasn't pulling his

9    weight?

10      A.    You asked about the two of them.

11      Q.    Well, with either one of them did you ever have

12   any conversations that Dan wasn't pulling his weight?

13      A.    I don't recall specifically at this time, no.

14      Q.    Do you know whether Kathleen or Marion or Cindy

15   ever complained to Brendan or, and I'll use his last

16   name, Becker, Bill Becker that Dan wasn't pulling his

17   weight?

18      A.    I have no way of knowing that at this time.

19      Q.    Do you know whether Brendan or Bill had any

20   knowledge that Dan wasn't pulling his weight?

21      A.    Do I have any knowledge? I don't know for sure

22   that they would at this time.

23      Q.    Are there other examples of gender

24   discrimination in connection with Gilmore?

**B187**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 138

1    A.    None that I can recall at this time.

2    Q.    If you would look at your complaint, paragraphs

3    56a through d.

4    A.    Yes.

5    Q.    Just look at that because my question is

6    earlier when we were talking about Brendan Gilmore you

7    had stated that he wanted to eliminate older workers

8    off the team and replace them with younger people.

9    That's probably not a direct quote, but that was the

10   gist of the testimony.

11               Are these the younger people that you were

12   referring, to 56a through d?

13   A.    Yes.

14   Q.    Now, with respect to looking at 56a, we have

15   got Investment Officer Bill Becker.  Is it your

16   testimony that Bill replaced an older worker?

17   A.    Bill Becker was ultimately put in place as the

18   senior trust officer in Delaware.  At the time of my

19   first employment, that position was held by Mr. Robert

20   Bell.

21   Q.    So is it your testimony that Bill replaced

22   Robert?

23   A.    Considering the succession, Martha Fetters had

24   served as senior officer of Delaware in the interim

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 139

1    between Mr. Bell and Bill Becker.

2        Q.    So Bill replaced Martha?

3        A.    Yes.

4        Q.    Do you know whether there were any jobs, do you

5    know whether there were any advertisements for the

6    senior trust officer position?

7        A.    At this time I don't recall if there were

8    advertisements.

9        Q.    Do you know whether there were any individuals

10   who applied for the senior trust officer position?

11       A.    To the best of my recollection -- when are you

12   referring to?  What time frame?  I'm sorry.

13       Q.    I was just following up on your testimony that

14   Bill replaced Martha Fetters as the senior trust

15   officer.

16             So my question was whether you knew

17   whether there were people who applied for the position

18   of senior trust officer around the period that Martha

19   Fetters left.

20       A.    To the best of my recollection, I believe Bill

21   said he was in competition with two other people, but

22   I don't recall who they were.

23       Q.    Looking at b, Dan Merlino, is that the same

24   person we have been talking about, Masucci?

**B189**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 140

1    A.    No.   Ray Masucci was an officer.   Dan Merlino

2    was the portfolio administrator that I've been

3    referring to.

4    Q.    And he was in the Philadelphia office?

5    A.    Yes.

6    Q.    And did he replace an older worker?

7    A.    Yes, I believe he did.   And I can't remember

8    her name at this time.

9    Q.    In your complaint you have him as an investment

10   assistant?

11   A.    Yes.

12   Q.    Is that the same thing as portfolio

13   administrator?

14   A.    To the best of my understanding, it's

15   synonymous with portfolio.

16   Q.    Do you know whether other individuals applied

17   for the portfolio administrator/investment assistant

18   position that Dan got?

19   A.    I have no way of knowing at this time.

20   Q.    You have Assistant Maria Dunlop.   That's the

21   Maria that we have been talking about in the Delaware

22   office?

23   A.    Yes.

24   Q.    And she came in as the portfolio administrator,

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 141

1    correct?

2    A.    Yes.

3    Q.    And did she replace anybody?

4    A.    I don't know if it's correct to say she

5    replaced, but Kathleen Agne was fired.  There was the

6    time lapse between March and then Maria was hired in

7    July.

8    Q.    Do you know whether others applied for the

9    position that Maria ultimately got?

10   A.    To my recollection, I think others did.  There

11   were other interviews conducted.

12   Q.    Do you know who was being interviewed?

13   A.    The names, I was not told who they were.

14   Q.    Who was doing the interviewing for Maria's

15   position?

16   A.    Initially it would have been Greg Landis and

17   then I'm under the understanding that Brendan Gilmore

18   made the ultimate decision.

19   Q.    And do you know whether any advertisements were

20   placed for the position?

21   A.    I'm not sure at this time.

22   Q.    The next one, Investment Officer Kristy Hunt.

23   A.    Yes.

24   Q.    Was she in the Philadelphia office?

**B191**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 142

1    A.    Yes.

2    Q.    Did she replace an older worker?

3    A.    I don't recall at this time.

4    Q.    Was she in the Gilmore team?

5    A.    Yes.

6    Q.    Do you know whether there were other applicants

7    for the investment officer position that Kristy got?

8    A.    I have no way of knowing for sure at this time.

9    Q.    Looking at your complaint, Ms. Blozis, at

10   paragraph 22 it talks about a period of March '02 to

11   July 7 of '02.

12         Is that the period of time that Kathleen

13   had been let go and before Maria came on board?

14   A.    Yes.

15   Q.    And then the last part, the last sentence of

16   that 22, "Younger and male employees were not treated

17   similarly"?

18   A.    Yes.

19   Q.    Who are you referring to there?

20   A.    I'm referring to all other team members on the

21   Brendan Gilmore team.

22   Q.    During that period March '02 to July 7 '02?

23   A.    Yes.

24   Q.    So it would be fair to say you're referring to

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 143

1    all male employees on Brendan's team during that

2    period?

3        A.    Yes.

4        Q.    And all employees under 40 on Brendan's team

5    during that period?

6        A.    Yes.

7        Q.    And when you say that they were not treated

8    similarly to you, is it your allegation that they

9    weren't put in charge of the responsibilities that you

10   identified in paragraph 22?

11       A.    Yes.

12       Q.    Is it your contention that they should have

13   been or the work should have been divided up?

14       A.    I just know that they weren't because the

15   Delaware office was a subsidiary office and those

16   responsibilities were on my shoulders because I was

17   the only one there.

18       Q.    So at that time you were the only portfolio

19   administrator in the Delaware office?

20       A.    Yes.

21       Q.    But there were portfolio administrators on his

22   team in Philadelphia?

23       A.    Yes.

24       Q.    So is it your argument that those portfolio

**B193**