Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 144

1    administrators in the Philadelphia office should have

2    been brought down to Delaware to help you out?

3    A.    That could have been a fair team concept.

4    Q.    Did you ever raise that as something that

5    should be considered?

6    A.    To whom?

7    Q.    To anybody.

8    A.    As I stated before, Brendan Gilmore was not a

9    personality or a manager that you could approach on

10   those issues.  It would had to have been his

11   originating idea to send the help.  And as a woman and

12   an older woman, it wasn't a consideration of his to

13   give help to me in that office.

14   Q.    Now, with respect to Brendan Gilmore from what

15   you said, from your answer you never brought it up to

16   him that maybe you can send somebody else from

17   Philadelphia to help me out.  Is that right?

18   A.    Repeat that, please.

19   Q.    It sounds like from your statement that you

20   never asked Brendan to send some folks from

21   Philadelphia to help you out during that period.

22   A.    I didn't ask him specifically, no.

23   Q.    And you also said that as an older woman, and

24   I'm paraphrasing, that it would not have been

Blozis
Linda J. Blozis, Volume 1                  v.                    Mellon Trust of Delaware, et al.
                                  C.A. # 05-891 (SLR)                          July 26, 2006

Page 145

1    something that Brendan would even have thought about

2    doing for you?

3        A.    Yes.

4        Q.    And why do you say that?

5        A.    Because there were instances when Brendan

6    Gilmore would come to Delaware as a means of a respite

7    from his work in Philadelphia and be aware of what I

8    was responsible for and not compliment me or say

9    you're doing a fine job or we should get you some

10   help, Linda, in doing it.  It was expected.  It was

11   intimidated -- I'm sorry.  It was intimated that I was

12   expected to take care of those responsibilities.

13       Q.    Is it fair to say that he never said Linda,

14   because you're an older woman I'm not going to get you

15   any help?

16       A.    He never used those exact words.

17       Q.    Did he ever refer to you as old?

18       A.    Not that I recall at this time.

19       Q.    When he would come -- this is Brendan -- when

20   he would come to the Philadelphia office, would he

21   ever give you any advice on how to handle trust

22   accounts or how to handle your work?

23       A.    I believe you said come to Philadelphia.

24       Q.    I'm sorry.  I meant Delaware.

**B195**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 146

1    A.    Would he ever give me advice on how to?

2    Q.    How to handle your work.

3    A.    I don't recollect at that time because my

4    understanding up until the last months of my employ

5    was that he was satisfied with the way that I was

6    conducting the performance of my work duties.

7    Q.    So I guess prior to the meeting that you had

8    with him in April of '03 where he brought up

9    performance issues, you were unaware that he had

10   concerns about your performance?

11   A.    Yes.

12              I mean, are you asking a question?

13   Q.    Let me rephrase the question.

14              Did Brendan Gilmore ever raise to you that

15   he had problems with your performance prior to the

16   April 30th, '03 meeting?

17   A.    I don't recall specifically at this time.

18   Q.    You don't recall either way?

19   A.    Either way?  I don't understand what you mean

20   by "either way."

21   Q.    When you say you don't recall at this time, it

22   could be construed as two different things, that he

23   could have and you just don't remember it sitting here

24   today or he didn't.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 147

1    A.    To me personally I do not recollect him

2    criticizing me.  I don't think it would have been

3    smart on his part to criticize the only person he was

4    relying on to help support that office.

5    Q.    So to your knowledge he didn't, at least he

6    didn't criticize you to your face prior to April 30th?

7    A.    To the best of my recollection.

8    Q.    Do you know whether he was talking about your

9    performance to others?

10   A.    He could have been.  I have no way of knowing

11   that at this time.

12   Q.    Now, when he came to the Delaware office did he

13   ever discuss client investments and decision-making

14   processes with you?

15   A.    In what time frame are you referring to?

16   Q.    At any point.

17   A.    When our team was more fully staffed, there

18   wouldn't have been the occasion for him to at length

19   discuss those things with me.  As the team diminished,

20   he would be forced to have communication in whatever

21   level that it required.

22   Q.    So when it diminished, would that be at the

23   point where Kathleen left?

24   A.    Diminished?

**B197**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 148

1    Q.    Yes.  When you said when your team

2    diminished --

3    A.    Yes.

4    Q.    And my question was:  Was that the time when

5    Kathleen left when you're saying when it diminished?

6    I was just trying to put a time period on it.

7    A.    It would have been as Mr. Bell left, Martha

8    left, Linda left and it was reduced to William Becker,

9    Greg Landis and Kathleen and myself and when she left,

10   yes.

11   Q.    So I guess there was a point in time so that

12   the team, the Delaware team consisted of Bill, Greg,

13   Kathleen and you?

14   A.    Yes.

15   Q.    And then when Kathleen left the team was Bill,

16   Greg, you?

17   A.    Yes.

18   Q.    And then when Maria came it was Bill, Greg, you

19   and Maria?

20   A.    There was a transition time when Bill was

21   spending a great deal of his time in Philadelphia and

22   this was before Maria came on board and so at times it

23   might have just been Greg and myself there.

24   Q.    Now, during the time frame beginning, say, in

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 149

1    2002, I sort of want to go back to 2002, did you have

2    any conversations with Bill Becker about your

3    performance?

4    A.    (Pause).

5    Q.    Other than what's on your review.

6    A.    Repeat your question.

7    Q.    I want to get into discussions that you had

8    with Bill Becker and I want to take it after the

9    review.

10   A.    After the review?

11   Q.    Yes.  After the review, which I think was in

12   February of '02, discussed the review, but going after

13   the review, did you ever have any occasions in which

14   Bill Becker discussed your performance with you?  And

15   let's keep it within the year 2002.

16   A.    Yes.

17   Q.    Now, did Bill Becker ever express any

18   dissatisfaction with your performance in 2002?

19   A.    To the best of my recollection in 2002, yes.

20   Q.    And what did he say?

21   A.    I don't recall exactly his words, but I

22   recollect if the review was in February of 2002 Bill

23   was already commuting and dividing his time between

24   Philadelphia and Delaware and I felt that around late

**B199**

Blozis
Linda J. Blozis, Volume 1                  v.
                                  C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 150

1    fall and winter of 2002 he was sent as a messenger

2    from Brendan to tell me that I wasn't working

3    satisfactorily.

4        Q.    Why did you think in late fall of 2002 that he

5    was sent as a messenger from Brendan?

6        A.    Because Bill was still caring or overseeing

7    some trust accounts that were part of the Gilmore team

8    but taking on portfolios that would eventually lead

9    him into being his own team member and he intimated at

10   that time that Brendan was dissatisfied with my work.

11   And I was surprised to hear that because I was

12   carrying the burden of Bill's transitional work and I

13   hadn't heard from Brendan personally.

14       Q.    Did he tell you any specifics of what Brendan

15   was dissatisfied with?

16       A.    Not that I recall at this time.

17       Q.    Did Bill ever tell you that he thought that you

18   weren't completing projects in a timely manner?

19       Q.    Did Bill ever ask me -- I'm sorry.  The

20   question?

21       Q.    Did Bill ever tell you that he felt you weren't

22   completing projects in a timely manner?

23       A.    I'm not sure.

24       Q.    Bill Becker.

Blozis
Linda J. Blozis, Volume 1                              v.                   Mellon Trust of Delaware, et al.
                                      C.A. # 05-891 (SLR)                              July 26, 2006

Page 151

1    A.    Bill Becker?  He may have.  I'm not sure.

2          MR. LaROSA:  Off the record.

3          (Discussion off the record.)

4          (A brief recess was taken.)

5    BY MS. WILSON:

6    Q.    Ms. Blozis, I just want to return back to your

7    testimony concerning the April 30th meeting with

8    Gilmore.

9          Do you feel that he used the profanity

10   because of your age?

11   A.    I can't say at this time.

12   Q.    What about your gender?

13   A.    I can't say at this time.

14   Q.    When you say you can't say at this time, what

15   do you mean by that?

16   A.    The best recollection of that date is that it

17   became on his part very heated.  He became very

18   enraged and to my understanding it was unwarranted.

19   And any time that I tried to offer a professional

20   response to an accusation or a comment or a criticism,

21   he took the opportunity to intimidate or insult me

22   further and culminating in the use of profanity.

23   Whether it was his means of shock value to scare

24   tactics, as use of scare tactics to get me into

**B201**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 152

1    submission, I can't say, but that would be my

2    explanation as to why I can't say.  It was a very

3    horrible experience.

4        Q.    After the meeting was over did you remain at

5    work?

6        A.    Yes.

7        Q.    You worked a full day?

8        A.    I don't recall at this time.  I think it was

9    the same day that I was so upset that I felt my blood

10   pressure had risen.  I could feel the color rise in my

11   cheeks.  I was crying at my desk and I don't recall if

12   that was the specific time that I had e-mailed Greg

13   that I was so upset I had to leave to compose myself

14   and that I would make up the time, which I did.

15       Q.    I think I saw something, and maybe as we start

16   going through the files, where you had taken I think,

17   you left two hours early.

18       A.    I recollect that was...

19       Q.    Around the 2003 time frame you worked Monday

20   through Friday?

21       A.    Yes.

22       Q.    And did you have set times to be into work?

23       A.    As I recall, Mellon instructed us to be there

24   from 8:00 to 5:00.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 153

1            I beg your pardon.  8:30 to 5:00.

2      Q.    Was there a one-hour lunch break?

3      A.    Yes.

4            MS. WILSON:  If we could go off the record

5      for one second, please.

6            (Discussion off the record.)

7            (Blozis Deposition Exhibit No. 5 was

8      marked for identification.)

9      BY MS. WILSON:

10     Q.    Ms. Blozis, I show you a document that's been

11     marked as Blozis 5, which is a redacted copy of a

12     series of e-mails.  And I'll give you the clean copy

13     so that you can see what's been redacted there.

14     A.    We're back on the record, I presume?

15     Q.    We're back on the record.

16     A.    Okay.  (Reviewing document).

17           Yes.  I understand what you have given me.

18     Q.    Now, looking at it's a two-page document, P856

19     and P857, and looking down at the first e-mail

20     exchange from Bill Becker to you.

21           Do you see where I am?

22     A.    Yes.

23     Q.    Do you recall receiving this e-mail on or about

24     October 8, 2002?

**B203**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 154

```
 1    A.   This e-mail would indicate that I did.

 2    Q.   And with respect to the e-mail, it's in

 3  reference to a particular customer.  Is that right?

 4    A.   Yes.

 5    Q.   And there's some question as to where certain

 6  information is with respect to the customer?

 7    A.   Yes.

 8    Q.   Had you had some previous conversation with

 9  Bill Becker about providing him information concerning

10  this particular customer?

11    A.   I would like to reread this e-mail in full to

12  be able to answer that question.

13    Q.   That's fine.

14    A.   (Reviewing document)  Your question again?

15           MS. WILSON:  If you could read back that

16  question, please.

17               (The reporter read back the pending

18  question.)

19  BY MS. WILSON:

20    Q.   Let me rephrase that question because after I

21  review the e-mail there are two customers that --

22    A.   That are referred to.

23    Q.   Exactly.  Let's refer to the first customer as

24  Bill.
```

Blozis
Linda J. Blozis, Volume 1                    v.                    Mellon Trust of Delaware, et al.
                              C.A. # 05-891 (SLR)                          July 26, 2006

Page 155

1    A.    All right.

2    Q.    And the second customer as Naomi.

3    A.    Yes.

4    Q.    Had you had any conversations with Bill Becker

5    concerning providing information concerning Bill's

6    account, the customer Bill?

7    A.    I recall that I did.

8    Q.    And what was the nature of the conversation?

9    A.    To the best of my recollection, I don't recall

10   if it was one conversation or many, but as I produced

11   this information, provided this information to the

12   defendants, it would indicate what I state in the

13   paragraph above, that I too had found the information

14   but that I felt very strongly it was officers', prior

15   officers' responsibilities, and I believe I named

16   them, who were unsuccessful in correcting the

17   situation; as I had earlier testified, that it seemed

18   the job had evolved to more and more investment

19   officer responsibility being placed or forced onto

20   portfolio administrators.

21             This, in essence, is proof that the

22   attempts were being made.  Those decisions as far as

23   rectifying the client Bill's problem had been

24   blatantly ignored by previous trust officers, and

**B205**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 156

1    they're named above and they're Mellon employees.  I

2    don't believe them to be confidential.  It's Bob

3    Chappelear, Clinton Pelfrey, Amy Simeone, Wanda

4    Caviness, Valerie Grimes, Paul Mulholland, and Martha

5    Fetters were unsuccessful in correcting that

6    situation.

7        Q.    Martha is the same person you had referenced

8    that we have been talking about previously?

9        A.    Yes.

10       Q.    That's the same Martha?

11       A.    Yes.

12       Q.    If I understand your testimony, Ms. Blozis, it

13   is that you felt that previous portfolio officers

14   didn't address the issue and that it was then put on

15   your desk to do?

16       A.    Yes.

17       Q.    And did you feel it was your responsibility to

18   address the issues concerning Bill's account?

19       A.    That who felt?  Bill Becker?

20       Q.    No.  I'm sorry.  Bill, the client?

21       A.    No, that's not the case.

22       Q.    I don't think you understood my question.

23       A.    No.

24       Q.    Looking at the bottom half of the e-mail from

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 157

1    Bill Becker to you, he is asking for information

2    concerning the client Bill's account and is saying, "I

3    don't have it" or words to that effect.

4              As I understand your testimony, it's your

5    position that this information had been, well, that

6    the information should have been obtained earlier by

7    previous portfolio officers and that it shouldn't have

8    been left on your desk to complete.  Is that your

9    testimony?

10   A.    I don't think we're right on with this.

11   Q.    Okay.

12   A.    My understanding of the lower half of the

13   e-mail was that he was looking for 95 percent of the

14   cost basis to be reconstructed.  Cost basing was

15   specific, was a specific responsibility of the

16   investment officer.

17             If you look at the third paragraph, the

18   last sentence down --

19   Q.    "95 percent of what is needed"?

20   A.    Right.  That Bill Becker is saying that now

21   he's expecting a portfolio administrator to do that

22   type of work.

23             At the risk of sounding ignorant, that was

24   not the responsibility for liability purposes to put

**B207**

Page 158

1    that job on a portfolio administrator.  It was to be,

2    it was to have been completed by the investment

3    officer.  And in the above e-mail I stated that the

4    opportunities existed for all those names listed to

5    have completed that, and it wasn't done.  And I felt

6    that I was being unjustly singled out, blamed and held

7    responsible for the lack of performance by not only

8    Bill Becker himself but previous investment officers.

9        Q.    Okay.  And that is your response to Bill in the

10   top e-mail?

11       A.    That is my response to Bill in the top e-mail.

12       Q.    Now, did he agree with your assessment?

13       A.    I don't recall at this time.  I don't remember

14   any subsequent e-mails to that effect.

15       Q.    Now looking at your e-mail on top as it relates

16   to the client Bill.

17       A.    Yes.

18       Q.    The second sentence of the first paragraph, "I

19   apologize for my own delay in completing it in a more

20   timely manner."

21       A.    Yes.

22       Q.    What did you feel that you hadn't completed in

23   a timely manner?

24       A.    I don't recall at this time.  I felt I always

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 159

1    handled customer relations with the upmost of care,

2    but I also didn't know the extent of my liability and

3    responsibility and cost basing was not part of the

4    job.    That was to be left to portfolio administrators.

5        Q.    You say in the second paragraph of your e-mail

6    to Bill "I will make every attempt to contact those

7    Mellon people who can help me resolve this issue."

8              Do you see that?

9        A.    Yes.

10       Q.    Was it in terms of next steps you were going to

11   reach out to others to provide that cost basing?

12       A.    To the best of my recollection, it would have

13   been my attempts to contact an officer who would have

14   performed the cost basing duties.

15       Q.    And prior to receiving the October 8th e-mail

16   from Bill to you, had you reached out to other Mellon

17   people to do the cost basis analysis?

18       A.    I don't recall at this time.

19       Q.    Is it fair to say that you disagreed with Bill

20   Becker's assessment of your handling of the client

21   Bill's account?

22       A.    Yes.

23       Q.    Just going back to the April 30th meeting with

24   Gilmore, is it fair to say you disagreed with his

**B209**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 160

1    assessment of your performance?

2    A.    Yes.

3    Q.    Now going down to looking first at Bill's

4    e-mail to you concerning another customer, Naomi.

5    A.    Yes.

6    Q.    Before getting down to where he talks about

7    Naomi but that sentence right before, "There are a few

8    other projects that I've given you that have yielded

9    similar results."

10           Do you see where I am?

11   A.    Yes.

12   Q.    Do you know what projects he was talking about?

13   A.    I do not recall at this time.

14   Q.    He goes on to talk about Naomi?

15   A.    Yes.

16   Q.    What was the issue with Naomi, the customer

17   Naomi's account?

18   A.    What do you mean what was the issue?

19   Q.    Well, was Bill claiming that you hadn't gotten

20   back to him in a timely fashion regarding an issue or

21   information that he needed concerning Naomi's account?

22   A.    This sentence, that paragraph would indicate

23   that Bill thought I dropped the ball with Naomi.

24           What it doesn't state is how many times I

Blozis
Linda J. Blozis, Volume 1

v.

C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 161

1  personally drove out to visit her to try to elicit

2  information from her and she was uncooperative.

3    Q.    Do you know what the particular concerns that

4  Bill had with you concerning the customer Naomi?

5    A.    At this time I'm not sure.  Bill was at this

6  juncture of October 8th very much involved in creating

7  another career as a team leader in Philadelphia and

8  was devoting less and less time, his time to the

9  Delaware office files, this Naomi being one of them

10  who had an unresolved issue from an investment

11  officer.  I believe it got dumped on me and blamed on

12  me.

13    Q.    Do you remember who the investment officer was?

14    A.    It was Bill Becker.

15    Q.    It looks like it had something to do with her

16  savings bonds that were worth, according to the e-mail

17  her savings bonds were worth over a million dollars.

18    A.    I'm not sure about that.

19    Q.    You're not sure what the issue was

20  specifically?

21    A.    I'm not sure about the worth of a million

22  dollars.

23    Q.    Oh, about the value of the savings bonds?

24    A.    And if that was the entire issue.

B211

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 162

1    Q.    It references on the second page, P857, the

2    mutual fund coding project.  What was that?

3    A.    (Pause).

4    Q.    The second page.  It's the first full sentence

5    on the second page.

6    A.    I'm not sure I recall at this time.

7    Q.    The mutual fund coding project?

8          You don't recall the mutual fund coding

9    project?

10   A.    At this time the only recollection I have of

11   mutual fund coding was something that was done from

12   the analysts.

13   Q.    Because it says, "The mutual fund coding

14   project has to be close to a year by now, and you've

15   not come to me to say that it is completed."

16         Was that a project that was given to you

17   to complete?

18   A.    I don't recall at this time.

19   Q.    You don't recall either way?

20   A.    Either way what?

21   Q.    Whether it was given to you to complete?

22   A.    Either way.

23   Q.    Do you know whether it was ever completed by

24   you?

B212

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 163

```
 1    A.    I can't say at this time because my

 2   understanding of mutual fund coding is a job that

 3   initially would be done by the investment analysts.

 4    Q.    So with respect to that particular reference in

 5   the e-mail, you're not clear sitting here today what

 6   that was?

 7    A.    That's correct.

 8    Q.    Looking at that second paragraph of his e-mail

 9   where it says, second paragraph, second sentence,

10   "There needs to be improvement in completing these

11   tasks in a timely manner."

12              Do you see that?

13    A.    No.  I'm sorry.  Where are you?

14    Q.    On the second page.  The second page, second

15   full paragraph, second sentence.

16              Do you see that?

17    A.    I see that sentence.

18    Q.    Had there been discussions with Bill Becker

19   before the receipt of the October 8th e-mail about

20   completion of projects in a timely manner?

21    A.    I recollect we had discussed different projects

22   at different times.

23    Q.    Prior to this time?

24    A.    Yes.
```

**B213**

Page 164

1    Q.    That would be October.  It goes on to say, "As

2    I've said for four years, you don't need my permission

3    to get your job done."

4             Did you and he have discussions about

5    getting your job done?

6    A.    I recollect that there were discussions about

7    completing jobs and tasks.

8    Q.    Looking down at the last paragraph, second

9    sentence where it says, "I hope the training Mellon is

10   offering"?

11   A.    Yes.  I see that sentence.

12   Q.    What training?

13   A.    I don't know what he's alluding to.  There was

14   never really formal training.

15            Correction:  Occasionally there might be a

16   seminar here or there, but to the best of my

17   recollection it was on-the-job training.  It was find

18   out as you go along.

19   Q.    Do you recall at any point, and I'm just not

20   limiting this question to 2002, but do you recall at

21   any point Cindy Chambliss coming down to the Delaware

22   office to assist you?

23   A.    I recollect that -- I'm sorry.  What time frame

24   did you give me?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 165

1    Q.    Any time frame.  I didn't limit it.

2    A.    To the best of my recollection, Cindy came one

3    time and couldn't get the computer, couldn't log onto

4    the computer to be able to assist me.

5    Q.    And she would come down.  Do you know the

6    purpose of her coming down?

7    A.    Do I know the purpose?  Is that the question?

8    Do I know the purpose of her coming down?

9    Q.    Yes.

10    A.    To my recollection, it was to assist me in a

11    particular, perhaps a particular client project.

12    Q.    Do you remember the time frame?

13    A.    Time frame meaning?

14    Q.    When she came down.

15    A.    Not specifically, no, at this time.

16    Q.    Did you ever go to Philadelphia to work with

17    Cindy or to train with Cindy on how to put certain

18    folders together, certain processes together?

19    A.    I recall not fewer than one and not more than

20    maybe three occasions over the course of my being a

21    team member going for a half a day to Philadelphia and

22    working with her, but she was frequently involved in

23    responding to Brendan Gilmore's responses and could

24    not devote that entire time to instructing me.

**B215**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 166

1    Q.    Did someone tell you to go to Philadelphia to

2    work with Cindy?

3    A.    They may have suggested it.

4    Q.    Who would that have been?

5    A.    To the best of my memory, it was either Brendan

6    or within the time frame of when Bill was

7    transitioning from the Delaware team to his own team

8    it may have been Bill Becker.  I'm not sure which one

9    specifically.

10   Q.    And would it have been Gilmore or Becker that

11   told her to come down to Delaware?

12   A.    I have no way of knowing that for sure.  It

13   would seem to follow.

14   Q.    All right.  Now, I gather that your October 9

15   e-mail is a response to Bill Becker's e-mail, his

16   October 8th e-mail to you?

17   A.    That's correct.

18   Q.    Do you recall whether there was any more

19   conversation, be it e-mail, oral, concerning this

20   particular matter with the Bill account with respect

21   to getting that cost basis done?

22           THE WITNESS:  Please repeat that question.

23           (The reporter read back the last

24   question.)

Page 167

1          THE WITNESS:  To the best of my

2      recollection, I don't believe there was any more

3      conversation or e-mails between Bill Becker and myself

4      regarding the Bill account.

5      BY MS. WILSON:

6      Q.    Do you know whether that cost basis got done?

7      A.    At this time I'm not sure.

8      Q.    Was there any more discussion concerning the

9      Naomi customer matter?

10     A.    As I recollect, I believe Naomi's account was

11     moved to an appropriate team for the size of her

12     account and, thinking back, I believe the Bill client

13     situation, the Bill client file was taken over by

14     another team.  That's the best of my recollection.

15     Q.    All right.

16     A.    I think those files left our team.

17     Q.    Okay.  Do you know why the Bill file left your

18     team?

19     A.    It was restructuring from above that various

20     accounts were reshuffled between teams.

21     Q.    And the Naomi account, do you know why it was

22     moved?

23     A.    I recollect the same reason.

24     Q.    Was there any discussion that the Bill file and

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 168

```
1    the Naomi file had to be moved because they weren't

2    being serviced properly?

3      A.   No.

4             MS. WILSON:   Mark this.

5             (Blozis Deposition Exhibit No. 6 was

6    marked for identification.)

7    BY MS. WILSON:

8      Q.   Ms. Blozis, if you would look at what's been

9    marked as Blozis 6, please.

10     A.   Yes.   (Reviewing document).

11            I've read it.

12     Q.   Have you seen what's been marked as Blozis 6

13   before today?

14     A.   Yes.

15     Q.   I gather you have seen the e-mail to you

16   from -- this is from Linda Blozis to Walter Peters?

17     A.   It's my e-mail.

18     Q.   Have you seen the handwritten pieces of it

19   before?

20     A.   If I submitted it, then it was on the e-mails

21   that I submitted, I believe.

22     Q.   Well, the handwritten meaning down at the

23   bottom "LB didn't try"?

24     A.   I see where that is initialed by Bill Becker,
```

B218

Page 169

1    yeah.

2      Q.    But my question was:  Have you seen this

3    document before with the handwriting on it at the

4    bottom?

5      A.    I'm not sure at this time if I have.

6      Q.    Now looking at your e-mail to Walter Peters.

7      A.    Yes.

8      Q.    Who is Walter Peters?

9      A.    To my recollection, he was an analyst who would

10   have been applying tax costs to various CUSIP's of

11   different Dreyfus funds.

12     Q.    Had he asked you for information, "he" meaning

13   Walter?

14     A.    I don't recall that Walter asked me for

15   information.

16     Q.    Did Bill Becker ever say to you that he was not

17   happy with how you had handled the matter with Walter

18   Peters?

19     A.    Are you referring to the matter that this

20   e-mail references?

21     Q.    Yes, I am.

22     A.    I don't recall that Bill specifically pointed

23   out that particular client that is stated here.  I

24   don't recall.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 170

1    Q.    Looking at the handwriting that says, "Greg -

2    Here are numbers," it's right below the printing.

3    A.    Yes.

4    Q.    Is that your handwriting?

5    A.    Yes.  I believe.  Yes.

6    Q.    And just looking at what it says, are you

7    asking Greg -- and that's Greg Landis?

8    A.    Yes.

9    Q.    Are you asking him to do something with respect

10   to this account?

11   A.    To my understanding, yes.

12   Q.    Now, did Greg ever say to you that he didn't

13   feel that that was what you should be asking him to

14   do; that you should be doing it yourself?

15   A.    I don't recall that at this time.

16   Q.    Did Bill Becker ever say to you that he felt

17   that you had asked Greg to do something that you

18   yourself should have done?

19   A.    I don't recall.

20   Q.    Did Bill Becker ever say to you with respect to

21   this account that it should have been done earlier?

22   A.    On this particular client account?

23   Q.    Yes.

24   A.    I don't recall that.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 171

 1      Q.    Do you recall having any discussions regarding

 2    this particular client account with Bill Becker?

 3      A.    Yes.

 4      Q.    And what do you recall?

 5      A.    This particular client lived in Naples and I --

 6      Q.    Florida?

 7      A.    Yes.   And to the best of my recollection, that

 8    client had moved from Pennsylvania to Naples, Florida.

 9    Hence, as a resident there myself, we struck up a

10    rapport.   On one of my visits, I visited with the

11    client, something that's not typically done by a

12    portfolio administrator, had lunch with them, listened

13    to their feelings about the account, working on good

14    customer and client relations and knowing my limits

15    and liabilties of my job performance took back the

16    information to the investment officer and reported

17    back to Bill Becker on what the client had said at our

18    meeting.

19      Q.    But in terms of any dissatisfaction that Bill

20    may have had with you concerning this particular

21    client, do you recall him expressing anything to you

22    personally?

23      A.    No, I do not at this time.

24      Q.    With respect to Blozis 6, looking down at the

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 172

1    part of Blozis 6 that has Bill Becker's, the BB by it

2    and information, did you ever go back to him and say

3    you disagreed with his characterization?

4        A.    I don't recall at this time if I did.  It would

5    seem a likelihood because I felt I had a good client

6    relationship with this particular client.

7        Q.    So it's likely that you went back to him and

8    said, "I don't agree with what you said about it"?

9        A.    I'm not sure at this time.  It could have been.

10       Q.    Now, you said before that with respect to this

11   particular client had moved from Pennsylvania to

12   Naples, Florida and that you're also a resident of

13   Naples, Florida.

14             When did you first become a resident of

15   Naples, Florida?

16       A.    Not until after, a full-time resident not until

17   after I was dismissed from Mellon.

18       Q.    But with respect to this client, that was

19   before you were dismissed?

20       A.    Yes.  I owned a property there and I would

21   visit the property and take the opportunity to visit

22   the client if it was beneficial to Mellon.

23       Q.    When did you first own the property in Naples?

24       A.    1988.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 173

1    Q.    Did you live at that property?

2    A.    No, not full time.

3    Q.    Part time?

4    A.    I lived in Delaware and worked at Mellon.

5    Q.    Did you go, was that your summer place?

6    A.    No.  It was a rental property.

7    Q.    When you went down to Naples did you stay at

8    that property?

9    A.    When I could, when there weren't tenants...

10   Q.    Tenants there?

11   A.    Yes.

12   Q.    When you were working with Bill Becker, did you

13   have to complete forms called the automated investment

14   review?  Are you familiar with that term?

15   A.    To the best of my recollection, I believe you

16   may be talking about...

17   Q.    Go ahead.  I'm just looking for it.  Go ahead.

18   A.    A trust investment review.

19   Q.    It could be.

20            (Blozis Deposition Exhibit No. 7 was

21   marked for identification.)

22   BY MS. WILSON:

23   Q.    Are you finished?

24   A.    Yes.  I'm sorry.

B223

Blozis                                    v.                Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                July 26, 2006

Page 174

1    Q.    Mrs. Blozis, have you seen what's been marked

2    as Blozis 7 before today?

3    A.    Yes.  Well, to my recollection, this is

4    familiar with things that I would have seen.

5    Q.    But in terms of whether you have seen this

6    particular one, you're not sure?

7    A.    I'm not sure at this time if I have seen this

8    particular one.

9              The client name does sound familiar to me.

10   Q.    And it's called an automated investment review

11   system?

12   A.    Yes.  I understand that.

13   Q.    What is that?

14   A.    These were periodic reports produced on each

15   and every client and their account.  Some clients

16   having multiple clients as I recognize this name and

17   it would review basically the breakout of the

18   portfolio into categories of either the money market,

19   bond, stocks, the model mix, meaning whether it was

20   large, mid cap or small cap stock.  And it was for the

21   investment officer to update that according to the

22   client's instructions or change of instructions

23   throughout the history of the account.

24   Q.    Would you have anything to do with putting the

Blozis
Linda J. Blozis, Volume 1                v.                Mellon Trust of Delaware, et al.
                        C.A. # 05-891 (SLR)                July 26, 2006

Page 175

1    information into the automated investment review

2    system?

3        A.    Ultimately it was for the investment officer to

4    finalize the input of information, as you say, into

5    the works.  It was the portfolio administrator, the

6    assistant's job to compile information to present to

7    him to make ultimate decisions of reallocation.

8        Q.    On the right-hand side with the handwriting,

9    have you seen that before today?

10       A.    I'm not sure that I have.

11       Q.    Where it says, "LB - Inconsistent with

12   holdings.  Now in a model" and it looks to be MPAM

13   Funds"?

14       A.    Yes.

15       Q.    Did you have any conversations with Becker

16   concerning this particular account and there being an

17   inconsistency?

18       A.    I don't recall at this time.

19       Q.    Now, with respect to when it says, "Now in a

20   model and MPAM Funds," do you know what that means?

21       A.    That's an acronym for Mellon Private Asset

22   Management Funds, MPAM Funds.

23                And your question was?

24       Q.    Where it says, "Now in a model and," as you

B225

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 176

1    say, "MPAM Funds," do you know what that's referring

2    to?

3        A.    I have a recollection, yes.

4        Q.    What's your recollection?

5        A.    Mellon had various portfolio models that they

6    would oftentimes gear certain size relationships into

7    instead of a myriad upon thousands and thousands.

8    There were multiple accounts that fit certain model

9    portfolios.

10                And I would suspect that Becker is saying

11   this account was now in a model and holding Mellon

12   Private Asset Management Funds.  I don't know, I don't

13   recollect at this time why, if he wrote this note why

14   he would have written this note.

15       Q.    As you sit here today, you don't remember

16   having any conversations with him about this

17   particular fund and whether there was an inconsistency

18   with respect to holdings?

19       A.    I can't say at this time not having more

20   information on this particular client.

21       Q.    Do you recall having any conversations with

22   Becker, and not specific as to this client that we're

23   looking at, but any conversations with Becker

24   concerning inaccurate information on the automated

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 177

```
 1    investment review system?

 2      A.    Did I have conversations with Bill on any

 3    client?

 4      Q.    Let me rephrase that for you to make it easier.

 5            Did Bill Becker ever say to you that you

 6    had provided inaccurate, incomplete, wrong information

 7    as it related to information on the automated

 8    investment review system reports?

 9      A.    That's a broad question.  I don't recall him

10    criticizing my providing information because

11    information was derived from systems that were

12    available to me.  So I don't understand how you're

13    saying did he -- did we have conversations about wrong

14    information provided?

15            You could punch in a client's name and get

16    information.  You could punch in a model request and

17    get that information.  So it's broad.  I don't quite

18    understand.

19      Q.    Let me see if I have a better example.

20            (Blozis Deposition Exhibit No. 8 was

21    marked for identification.)

22            THE WITNESS:  Are you waiting for me to

23    say I see this?

24    BY MS. WILSON:
```

**B227**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 178

1    Q.    Yes.

2    A.    I see this.

3    Q.    Have you seen Blozis 8 before today?

4    A.    This looks consistent with the automated

5    investment review system sheets that I would have seen

6    many.  I can't say specifically at this time that I

7    have seen the one that's referring to this particular

8    client.

9    Q.    It says, "Recode to '5'" on the right-hand

10   side?

11   A.    Yes.

12   Q.    "Balance Growth/Income"?

13   A.    Yes.

14   Q.    Do you know what that refers to?

15   A.    It would have been to the best of my

16   recollection Bill Becker's instruction that upon

17   seeing this review to change the status of this

18   account to a coding of 5 in a mix of balanced growth

19   and income.

20   Q.    Looking at the investment objective and it says

21   investment objective 007 growth, would that be where

22   you would recode it?

23   A.    Yes.  I'm thinking about this.

24         MR. LaROSA:  Take your time.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 179

1  A.   To the best of my recollection, yes, that would

2  be where it would be changed.

3  Q.   But in terms of Blozis 8, I believe it's your

4  testimony that sitting here today you don't have a

5  specific recollection of this document?

6  A.   Specifically seeing this?  When you manage,

7  when you're responsible for over or between three and

8  500 accounts and that at the end of my employ accounts

9  were in a state of flux going back and forth between

10  teams, this specific document I can't perfectly say

11  that these were instructions that Bill gave to me

12  personally.

13  Q.   All right.  In terms of the investment

14  objective changing and recoding it to another number,

15  would that have been something that was your

16  responsibility to do on your own?

17  A.   I don't recall at that time if the assistants

18  could recode, take it to a completion.  To the best of

19  my recollection, we could have punched in the code,

20  but it was the investment officer's responsibility to,

21  in essence, throw the switch because that was the

22  finalization of the investment officer's review.

23        We could do the numbers, but the decision-

24  making was not left to the assistants.

**B229**

Blozis
Linda J. Blozis, Volume 1                              v.
                                          C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 180

1      Q.    So if I understand you correctly, Ms. Blozis,

2    the final determination of whether something should be

3    recoded or not was not left to the portfolio

4    administrators to do?

5      A.    The assistants.  The assistants.  The portfolio

6    administrating assistants, not to be confused with the

7    name of portfolio administrator which was given to

8    trust officers at some point in time.

9              Yes, you're correct in assuming that the

10   decision to change the coding was not left up to

11   either an investment assistant, portfolio assistant or

12   a trust assistant.

13     Q.    Did Mr. Becker ever say to you that he wanted

14   you to be in a position to analyze data on the

15   automated investment review system and recode, give

16   him suggestions to recode, if necessary?

17     A.    I recollect that there may have been

18   discussions about the job evolving.  I'm not sure at

19   this time.

20     Q.    During the time that you were working with

21   Mr. Becker do you remember doing any recoding on your

22   own?

23     A.    Recoding?  We're talking about decision-making.

24   I could never do a decision, I never did

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 181

1    decision-making on my own.  The investment officer

2    always had to direct or instruct the assistants to do

3    that.

4        Q.    By that recoding would never be something you

5    would say, for example, I'm looking at this; I think

6    it should be recoded to a different number; I'm going

7    to do it?  That would not be something that you would

8    just do on your own?

9        A.    If I understand you correctly, it would never

10   be something I would just -- the capability wasn't

11   there for an assistant to recode.  It always -- there

12   was a system of checks and balances whereby investment

13   officers were responsible for the ultimate decisions

14   on the accounts.

15       Q.    With respect to the automated investment review

16   system sheets, did Mr. Becker want you to provide any

17   analysis to him concerning the information that you

18   were pulling?

19       A.    I don't recall specifically at this time that

20   he did.

21       Q.    Looking down, for example, on Blozis 8 under

22   the title Investment Policy, there's an 026 written

23   there.

24             Do you know what that means?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 182

1    A.   At this time I don't recall those numbers, what

2    they mean.

3    Q.   As well as 025 you don't recall?

4    A.   I do not recall at this time.

5    Q.   And Dreyfus it looks like NJ muni fund sold.

6         Do you know what that means?

7    A.   As I recall, it would mean that Dreyfus New

8    Jersey municipal fund was sold out of this account.

9    Q.   So that should just be notes concerning the

10   account?

11   A.   And those notes would have been written by Bill

12   Becker if, in fact, he signed.

13   Q.   It would not be written by you.

14   A.   No.  Oh, no.  That's not my handwriting.

15   Q.   While you were employed and working with Bill

16   were you given a project of completing the security

17   list of holders?

18   A.   Could you be more specific?

19   Q.   Have you heard of the term security list of

20   holders?

21   A.   At this time it sounds vaguely familiar.  I'm

22   not sure.

23   Q.   You're not sure.

24              (Blozis Deposition Exhibit No. 9 was

Blozis                                    v.              Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1              C.A. # 05-891 (SLR)                    July 26, 2006

Page 183

```
 1    marked for identification.)

 2                 MR. LaROSA:  Are all of these copies

 3    redacted or was there an unredacted version of this?

 4                 MS. WILSON:  The unredacted has the top

 5    four, five taken out.  I think what you're seeing

 6    there is probably not redacted but probably

 7    highlighted.

 8                 MR. LaROSA:  Okay.  Okay.

 9                 THE WITNESS:  I've looked at these.

10    BY MS. WILSON:

11    Q.   When I was referring to the security list of

12    holders, I was referring to what that says, what

13    Blozis 9 says at the top.

14    A.   There's several things written there.  What are

15    you referring to?

16    Q.   Right here (indicating).

17    A.   The security list of holders?  I see this

18    sheet, yes.

19    Q.   Is that the name of this sheet or it has

20    another name?

21    A.   I wouldn't know if it has another name.  It's

22    what it says at the top of this sheet.

23    Q.   Have you seen Blozis 9 before?

24    A.   I'm not sure at this time.  I recognize some
```

**B233**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 184

1    accounts that were at one time on the Delaware team on

2    this sheet that aren't darkened out.

3        Q.    And were you at any point asked to put this

4    particular sheet together?

5        A.    I don't recall that, I was asked to put a sheet

6    together.

7        Q.    Looking at the right-hand side handwriting,

8    have you seen that before today?

9        A.    I don't recall at this time.

10       Q.    Do you recall whether there were any

11    discussions with Becker about putting information

12    together for I guess the security list of holders?

13       A.    I don't recall specific discussions.

14       Q.    During the time that you were working with

15    Mr. Becker did he ever complain to you that you had

16    put wrong information on asset allocation risk profile

17    questionnaires?

18       A.    Not to my recollection.

19       Q.    You're familiar with the asset allocation risk

20    profile questionnaires?

21       A.    I vaguely remember those, yes.

22       Q.    Would those questionnaires have been something

23    that you would have pulled?

24       A.    They were, they were periodic reviews of...

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 185

1    Q.    Go ahead.  I'm listening.

2    A.    I'm thinking.

3            Periodic reviews of clients' portfolios.

4            (Blozis Deposition Exhibit No. 10 was

5    marked for identification.)

6            THE WITNESS:  I've seen Exhibit 10.

7    BY MS. WILSON:

8    Q.    Now, you have seen it before today?

9    A.    I don't recollect specifically at this time.

10   Q.    Is your handwriting on any portion of Blozis

11   10?

12   A.    The numbering looks similar to my handwriting.

13   I don't see my initials on this page anyplace though.

14   Q.    The asset allocation risk profile

15   questionnaire, could you tell me for what purpose you

16   would provide this information?

17   A.    As I said, these were periodic reviews of

18   clients' portfolios, their asset allocation.

19   Q.    When you say, "periodic," it would be something

20   that you would do on some sort of regular basis for

21   all of the clients?

22   A.    Yes.

23   Q.    And would Becker ask you to do it on specific

24   clients at a specific time?

B235

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 186

1     A.    He wouldn't ask.

2     Q.    It would be something that was on your agenda

3     to do?

4     A.    These would be automatically produced by the

5     company.

6     Q.    When you say, "automatically produced," what do

7     you mean?

8     A.    They would come up on a regular schedule of

9     frequency for review based on the size or the holdings

10    in the account.

11    Q.    So the frequency of the review was something

12    that was prompted by the company?

13    A.    Yes.

14    Q.    And then when it came up for time of review,

15    then you would run the questionnaire?

16    A.    Yes.  Or something that Mellon referred to

17    either as a PORCH or a listing of the holdings.

18    Q.    I have heard the term PORCH before.  P-O-R-C-H?

19    A.    Yes.

20    Q.    What is that?

21    A.    It's a compilation that Mellon had, to the best

22    of my recollection that Mellon had of all the assets

23    held within a particular account and to the best of my

24    recollection how those holdings fared between reviews.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 187

1    Q.    If I'm understanding the process, with respect

2    to the accounts that you were assigned to when it came

3    time to do the questionnaire as dictated by Mellon's

4    policy you would fill in the information?

5    A.    More exact, I would check the previous review.

6    This sheet would be handed to an investment assistant

7    blank.   The investment assistant would then or at

8    least I would fill in numbers based on the previous

9    review.   And it would be for the investment officer --

10   looking at this account, it's a $5 million account.

11   That definitely is something that the decision-making

12   process was going to be done by Mr. Becker.

13   Q.    Because of the amount of the account?

14   A.    Absolutely.

15   Q.    When you say because of the size of the account

16   it's definitely something Becker would have to review,

17   was there any amount that didn't have to be reviewed

18   by him?

19   A.    No.   The investment officer always had to look

20   at the reviews, always had to review the allocation

21   profile.

22   Q.    Okay.   And --

23   A.    I referenced this because of the importance of

24   the size of this account.   It should be more carefully

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 188

1    looked at by the investment officer.

2    Q.    Meaning the information that you provided?

3    A.    What information are you referring to?

4    Q.    The numbers.

5    A.    The numbers that would have come from

6    information gathered by me and put onto a risk profile

7    questionnaire.

8    Q.    And looking at the numbers on the right-hand

9    side where there's 2's and then there's the total down

10   there, do you see where I am?

11   A.    Yes.

12   Q.    Did you put in the 2's and the total?

13   A.    This could have been -- I have no way of

14   knowing for sure that this is --

15   Q.    What you did?

16   A.    -- what I did.  It's not initialed.  But it

17   would seem consistent that an assistant, a portfolio

18   assistant would list numbers, maybe taken from a

19   previous review and what it was prior to a change in

20   the market, and the officer would go and subsequently

21   reallocate or consistently stay with a preceding

22   review.

23   Q.    Ms. Blozis, you referred to portfolio

24   assistant.  Is that different from portfolio

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 189

1    administrator?

2    A.    Titles in Mellon seemed to be changing every

3    other month.  A portfolio administrator to the best of

4    my recollection was synonymous with an assistant.  I

5    can't recall at this time what the trust officers were

6    called when I last was employed with Mellon.

7    Q.    Because I have been going under the assumption

8    that around 1999 until the time you left your title

9    was portfolio administrator.

10   A.    I understand that thinking back and portfolio

11   administrating assistant.  But I also recollect that

12   the officer, Greg Landis specifically, was called a

13   portfolio, I believe portfolio administrating officer.

14          But in the terms of this context, you're

15   talking about my position.

16   Q.    Right.

17   A.    And I agree, yes.

18   Q.    With respect to Blozis 10, I believe it's your

19   testimony -- you're looking at Blozis 10 -- you don't

20   know whether you put in the 2's or not?

21   A.    At this time I would say it looks consistent

22   with my handwriting, but I wouldn't attest to that

23   absolutely.

24   Q.    And then I see that the 2's have a strike

**B239**

Page 190

1    through them and next on the right-hand side of the

2    2's there's a line of 1's going down and then it looks

3    like the total has been struck out with another total

4    to the right of it.

5              Is that your striking out or do you know?

6    A.    At this time I'm not sure if it is or if it was

7    Becker's, as I said, if this was my handwriting.

8    Q.    So the normal process would be you would

9    complete information on the questionnaire, then hand

10   it to Becker for review?

11   A.    I said before it was the assistant's

12   responsibility to prepare the paperwork by checking a

13   previous review, inserting numbers that the investment

14   officer may or may not comply with or change based on

15   the market fluctuations, based on the client's desire

16   to reallocate funds.

17   Q.    Did you have any discussions with Mr. Becker

18   that he was not pleased with your handling of the

19   profile questionnaires?

20   A.    Not that I recall at this specific time.

21   Q.    At any point?

22   A.    That's a broad question.  Could you be more

23   specific?

24   Q.    Well, at any point while you were employed at

Page 191

1    Mellon did you have any conversations with Mr. Becker

2    in which he stated that he was not happy with how you

3    were completing the asset allocation risk profile

4    questionnaires?

5        A.    I recollect that as Bill was in a flux of

6    change from one position to another he was, he was

7    instructing me to ultimately do more for him so that

8    he could make the transition to another, to become a

9    team leader.  My concern was that the duties were

10   going to encompass responsibilities for which the

11   liability was not, the liability was something that my

12   level of position should not have been responsible for

13   as described in my job description.

14       Q.    Did you go back to him -- I understand your

15   answer.  I just wanted to make sure that you actually

16   answer the question that I had asked relating to the

17   risk profile questionnaires, whether he had ever said

18   to you, and I'm paraphrasing just generally, Linda, I

19   don't like how you're doing the work on this; you put

20   in wrong numbers or --

21       A.    I don't recall him ever saying wrong numbers.

22   My recollection is that from his advancement

23   aspirations he was hoping that I would take some of

24   the burden from him and from my aspect it was

**B241**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 192

1    responsibilities that were not indigenous to my job

2    description.

3      Q.    Was that in connection with the questionnaire

4    so that he wanted not to have to review it; he wanted

5    you to give it to him and it's going to be the final

6    product, so to speak?

7      A.    To the best of my recollection, that's pretty

8    close to what my interpretation was of his attitude

9    and feelings.

10     Q.    And you felt that in your position that he was

11   asking too much of you with respect to what your job

12   title was and you were concerned about certain

13   liability issues?

14     A.    I was concerned about liability issues.

15     Q.    And did you tell him that?

16     A.    I don't specifically stating "Bill, I'm

17   concerned about liability issues."

18              I think there was an implied understanding

19   of concern about my feelings.

20     Q.    That would have been because of the way you

21   discussed it with him?

22     A.    As I recollect that to be the case, yes.

23     Q.    Did he agree with you?

24     A.    I don't understand did he agree with me.

Page 193

1    Q.    Well, did he say when you were -- I guess as

2    you said, Ms. Blozis, you never said, "Bill, I'm

3    concerned about liability issues here," but probably

4    in the way you described it led him to believe that

5    that's what you were concerned about.

6              Did he say Linda, yeah, I know you got

7    these liability concerns, but they're really not real

8    or just do it?  That's what I meant.

9    A.    I don't recollect his agreement at this time.

10   He was on a career aspiration fast track.

11   Q.    Do you know whether -- I guess this is 2002

12   time frame just looking at the date, December 2002.

13             Were there other project managers -- I'm

14   sorry -- portfolio administrators in the Philadelphia

15   office?

16   A.    You mean portfolio administrative assistants in

17   the 2002?

18   Q.    Yes.

19   A.    Yes, there were.

20   Q.    In sort of the team, the Delaware --

21   A.    In all teams there were.

22   Q.    Do you know whether Bill was asking them to

23   provide him with sort of what we have been terming as

24   sort of the final product with respect to the asset

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 194

1    allocation risk profile questionnaires?

2    A.    I have no absolute knowledge of that at this

3    time.

4    Q.    You had mentioned the PORCH.  I guess that's an

5    analysis?

6    A.    To the best of my recollection, yes.

7    Q.    Were you ever asked to put one of those

8    together?

9    A.    I'm not an analyst.  I was never an analyst.

10   Q.    Were you ever asked to provide information

11   having to do with the PORCH?

12   A.    My recollection is that the administrative

13   assistants would run a PORCH.  You would key in

14   numbers on a client.  You would get that information

15   produced to the best of my recollection or have them

16   sent from the department that produced those and you

17   would assemble that information for the investment

18   officers.

19   Q.    Was there ever any conversation that you had

20   with, say, Mr. Becker or Mr. Landis or Mr. Gilmore

21   that you hadn't provided information in connection

22   with the PORCH?

23   A.    Not to my recollection at this time.

24   Q.    When you were reporting to Mr. Becker, did he

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 195

1    ever complain that you had provided incorrect

2    information on single bond buy sheets?

3        A.    I don't recall that at this time.

4        Q.    You have heard of single bond buy sheets?

5        A.    I'm not sure I recollect those.

6                    (Blozis Deposition Exhibit No. 11 was

7    marked for identification.)

8                    THE WITNESS:  I've seen this exhibit.

9    BY MS. WILSON:

10       Q.    Have you seen it before today?

11       A.    I don't recall specifically if I have or have

12   not.  I will admit that I recognize the name of the

13   client attached thereto.

14       Q.    This is what I was referring to when I said

15   single bond buy sheets.

16                   Would this be a sheet that you would put

17   together?

18       A.    No.

19       Q.    Would you run information concerning the

20   client?

21       A.    To the best of my recollection, this would be a

22   sheet that would have been produced upon the

23   instruction of the investment officer or even his own,

24   by his own hand to, as I recollect, buy a bond for a

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 196

1   particular client or account.

2      Q.   So it's my understanding, Ms. Blozis, you would

3   not have anything to do with running the sheet or

4   obtaining the information?

5      A.   The assistant may have been told or instructed

6   by the investment officer to put through or

7   initiate -- let me be succinct.

8             To input the data to purchase the bond.

9   It was never ultimately completed without the

10  investment officer approving it.  And I'm looking at

11  the way it says order number added.  An officer would

12  have, to the best of my remembrance an officer would

13  have had to okay this buy for this amount of money in

14  order to produce that number, that order number on the

15  lower left side.

16     Q.   Do you remember having any discussions with

17  Mr. Becker concerning this particular single bond buy

18  sheet as it relates to it looks like a hospital

19  client?

20     A.   Not to my knowledge at this time.

21     Q.   I'm just looking at where it says par value

22  800,000, there's a circle and then a line and it looks

23  to be that he's saying it should be 400,000.

24     A.   "Per attached" it says.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 197

1             Where is the attachment?

2     Q.    Let me just ask you this question:  Do you

3     remember having any conversations with him about the

4     par value being something other than 800,000?

5     A.    In reference to this client?

6     Q.    Yes.

7     A.    I don't recollect.

8     Q.    Do you remember having any discussions with

9     Mr. Becker about his, about not being attentive to

10    detail as it relates to the single bond buy sheets?

11    A.    Not at this time, no, I don't.

12    Q.    Do you remember having any conversations with

13    Mr. Becker, and it's more expansive than Blozis 11,

14    but do you remember having any discussions with

15    Mr. Becker about his view that you were not being

16    attentive to detail with respect to your work?

17    A.    My only recollection is the December review, I

18    think.  I'm not sure at this time.

19    Q.    So you recall it coming up at the December

20    review, but prior to the review you don't remember?

21    A.    That's correct.

22    Q.    Prior to your review in December -- I guess

23    actually it was January 27, '03, right, your next

24    review?

**B247**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 198

1    A.    To the best of my memory.

2    Q.    Prior to that review, we'll call it the '03

3    review, did Mr. Becker complain to you that he thought

4    you weren't following instructions as it related to

5    customer files?

6    A.    To my recollection, Bill and I were having

7    fewer and fewer communications based on his transition

8    from the senior investment officer in Delaware to the

9    new team.

10    Q.    But do you remember him raising that with you,

11    that issue, failure to follow instructions concerning

12    client files?

13    A.    Specifically, no, I do not remember.

14    Q.    Turn back to Blozis 10.

15            Do you recall getting any asset allocation

16    risk profile questionnaires back from Mr. Becker with

17    any comments on it?

18    A.    Not at this time, no, I don't recall.

19    Q.    You don't recall that.

20            Do you recall having any discussions with

21    him concerning the asset allocation risk profile

22    questionnaires in which he would say, for example,

23    Linda, you gave me this; I thought the code should

24    have been different or there was information on it

Blozis
Linda J. Blozis, Volume 1                    v.
                        C.A. # 05-891 (SLR)                    Mellon Trust of Delaware, et al.
                                        July 26, 2006

Page 199

```
 1    that I thought was incorrect?

 2       A.    What's your question, please?

 3              MS. WILSON:  Can you please repeat it?

 4              (The reporter read back the last

 5    question.)

 6              THE WITNESS:  At this time, no, I don't

 7    recall.

 8              (Blozis Deposition Exhibit No. 12 was

 9    marked for identification.)

10              THE WITNESS:  I've reviewed Exhibit 12.

11    BY MS. WILSON:

12       Q.    Have you seen Exhibit 12 before today?

13       A.    I have a recollection of an exchange between

14    Fredric Levine on a matter.  I'm not sure I recollect

15    it was this account number.

16              That's my answer.

17       Q.    All right.  Do you remember having any

18    discussions with Mr. Becker about this particular

19    account?

20       A.    Discussions would imply face to face.  As I

21    recollect, on December 9th Bill Becker was spending

22    more and more time in Philadelphia.  Communications

23    were reduced to telephone calls or e-mails.

24              This appears to be a response e-mail from
```

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 200

1    me printed from Bill Becker's PC where I state that

2    this is the first I've seen the notification and, if

3    memory serves, I believe I provided information about

4    correspondence with Fredric Levine, who was to my

5    recollection a mutual fund analyst, but I'm not sure

6    at this time if it was in reference to this account

7    number.  It doesn't mention a name tied to that

8    account number.

9        Q.    Do you remember seeing the handwritten portion

10   of Blozis 12 before today?

11       A.    No, I do not recall seeing the handwritten.  I

12   have no way of knowing at what time or what date those

13   instructions were written.

14       Q.    Did you have any discussions with Mr. Becker

15   about this particular account overdraft and that's

16   referenced in Blozis 12 in which he stated that he

17   felt you were inattentive to detail and didn't follow

18   instructions?

19       A.    No, I did not.

20       Q.    Have you heard of an investment review sheet or

21   form?

22       A.    That sounds familiar, yes.

23       Q.    Did you have any responsibility of pulling

24   those forms?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 201

```
 1    A.    To my recollection, the investment review forms

 2   was the original name of the automated review systems

 3   or risk questionnaire forms.

 4    Q.    Was it similar to Blozis 10 when you say risk

 5   questionnaires?

 6    A.    To the best of my memory, they were the

 7   predecessor of those forms.

 8    Q.    Did you ever have any discussions with

 9   Mr. Becker in which he felt that you had provided

10   incorrect information on the investment review forms?

11    A.    Not at this time, no, I don't have a

12   recollection.

13    Q.    When I say discussions, I'm meaning it more

14   broadly than face to face.  I mean it in terms of a

15   telephone call, e-mail exchange, paper exchange.

16    A.    I still feel your question is very broad.  I

17   can't say specifically at this time that there were

18   discussions that Bill said I provided incorrect

19   information.

20    Q.    Meaning you don't remember either way?

21    A.    At this time I don't remember either way.

22    Q.    Was there ever any discussions with Mr. Becker

23   and yourself concerning putting together a stale price

24   report?
```

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 202

1    A.    That sounds vaguely familiar, yes.

2    Q.    Was there ever any discussions with Mr. Becker

3    about you not putting together the stale price report

4    on time?

5    A.    I recall discussing or talking or communicating

6    with Bill somewhat about what I recollect to be a

7    stale pricing report.

8    Q.    And what do you recall?

9    A.    Not very much at this time.

10    Q.    Do you recall whether he was upset or concerned

11    about not having it?

12    A.    My recollections at this time was another

13    instance of a project that was forced on me because

14    either Bill Becker or Greg Landis or predecessor

15    investment officers did not complete a pricing report

16    that was becoming very stale dated and they looked to

17    Linda to put the blame.  That's my recollection at

18    this time.

19    Q.    And who had asked you to put it together?

20    A.    I recall that initially it was Bill Becker and

21    then Greg Landis.

22    Q.    The way that you characterized that piece of it

23    earlier sounded like it was your view that it should

24    have been done some time ago by other people, Becker,

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 203

1    Landis or predecessor investment officers?

2    A.    That's what I -- yes.

3    Q.    I think you had said it was kind of dumped on

4    you or you felt it was dumped on you.

5    A.    Yes.

6    Q.    And why do you feel when you use -- I may be

7    paraphrasing, but it sounded like that's what you were

8    saying, that you just felt give it to Linda to do

9    because we haven't done it type of an approach.

10    A.    To my recollection, that's what I recall that

11    happened with the stale pricing report.

12    Q.    Did you at any point say, I shouldn't be doing

13    this or someone else should have done it some time

14    ago?

15    A.    I recollect that I mentioned that in a

16    non-assertive way but distinct way to both of them,

17    but at the time did not protest vehemently because I

18    was concerned about my job.

19    Q.    And you brought it up to Becker and Landis?

20    A.    Yes.  As I recollect, yes.

21    Q.    And what did they say?

22    A.    As I recall, they said it essentially was on my

23    shoulders now to do.

24    Q.    Did you complete that project?

**B253**

Page 204

1    A.    To the best of my recall, I did not when I left

2    Mellon.

3    Q.    Do you recall having any discussions with Bill

4    Becker concerning putting together books for a client

5    with the last name Fox?

6    A.    We would have talked about preparations for

7    that particular client, family, yes.

8    Q.    And was there any discussion that Becker felt

9    that you hadn't put together the books?

10    A.    I don't recall at this time.

11    Q.    Do you recall there being any discussion about

12    your performance on the Fox account?

13    A.    To my recollection, Bill was working out of the

14    Philadelphia office.  The Philadelphia office had

15    superior facilities to obtain information on high-end

16    clients.

17            I recollect he was working with a young

18    lady of Oriental extraction.  I don't recall her name.

19            Jin Song was her name and she would

20    produce a lot of that information for Bill or compile

21    for Bill while he was in Philadelphia.

22    Q.    Do you recall any discussion that you were

23    supposed to be compiling information or putting

24    together books that you hadn't completed, hadn't done?

Page 205

1    A.    Discussion?  I don't recall specific -- in

2    trying to recollect those last months when Bill was in

3    a state of flux, it was not always made clear what

4    files or accounts he was working on, which ones would

5    be taken over in the transition period by Brendan

6    Gilmore and essentially who was doing what job.  If a

7    booklet was sent to me to assemble, I assembled the

8    booklet.

9    Q.    So based on your recollection, Ms. Blozis,

10   there was not an issue concerning the assemblage of

11   books for the Fox account?

12   A.    Not to the regard that it jeopardized the

13   client's status that I can recall at this time.

14   Q.    Not going to the extent that it jeopardized the

15   client's status, but was there ever any communication

16   or discussion that books hadn't been put together for

17   the Fox account?

18   A.    I believe towards the last months of my employ

19   that Bill while he was still in a somewhat supervisory

20   position he was becoming critical of my assemblage of

21   client review booklets, unfoundedly, unfoundedly.

22   Q.    And you believe Fox was one of them?

23   A.    It could have been, yes.

24   Q.    When you say, "unfoundedly," why do you say it

Blozis                              v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1          C.A. # 05-891 (SLR)                    July 26, 2006

Page 206

1    was unfounded?

2       A.    As I previously stated, he was in a state of

3    flux between wrapping up or what would appear to be

4    wrapping up his involvement with accounts that were

5    part of our team and then moving on to his position as

6    a team leader and he was more and more frequently

7    working in Philadelphia with better facilities to his

8    avail and it wasn't always made perfectly clear where

9    responsibilities began and ended as far as assistance

10   was concerned.

11      Q.    So to paraphrase, you felt that because he was

12   in a state of flux that it wasn't always clear what

13   you should be doing and what he wanted you to do for

14   particular accounts?

15      A.    My recollection is yes, that it wasn't always

16   clear.

17      Q.    Did you ever say that to Bill?

18      A.    I recollect I did.

19      Q.    And what did he say?

20      A.    I don't recall specifically what he answered,

21   but I don't seem to recall getting a defined

22   definition of where the duties began and ended with

23   the Delaware support team.

24      Q.    During the period that you reported to Bill

Blozis                                                    v.                    Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1                    C.A. # 05-891 (SLR)                              July 26, 2006

Page 207

```
 1    Becker, did he ever raise any issues with respect to

 2    your performance on the Lickle, L-i-c-k-l-e, account?

 3    A.    Let me think about that name.

 4              I don't recall a specific.

 5    Q.    You don't recall the Lickle account?

 6    A.    I recall the Lickle name.  I don't recall

 7    specific discussions or criticisms from Bill.

 8    Q.    Do you recall any criticisms on Lickle by

 9    Landis or Gilmore?

10    A.    No, not specifically.

11    Q.    Before we took our break and maybe afterwards

12    we had gone through the reasons why you felt that

13    Gilmore had acted in a way that was discriminatory

14    because of age and gender and you gave me a list of

15    reasons.

16              Do you recall that?

17    A.    Repeat your question.  Before or after the

18    break we --

19    Q.    During the course of your testimony today you

20    had given a list of reasons why you thought Gilmore

21    had acted in a way that was discriminatory because of

22    your age and your gender.

23    A.    I recall us talking about that.

24    Q.    I want to ask you the same question having to
```

B257

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 208

1   do with Becker.

2              First of all, let me ask you do you feel

3   that Bill Becker acted in a way that was

4   discriminatory towards you because of your age?

5   A.    Yes.

6   Q.    And because of your gender?

7   A.    Yes.

8   Q.    Let's start with age.

9              Can you give me the reasons why you feel

10  that Bill Becker was acting discriminatory against you

11  because of your age?

12  A.    I can't give you specific reasons at this time.

13  I can only state that from my recollection when I

14  first worked for Bill in the early months and years he

15  seemed to be very satisfied with my employment and my

16  performance and especially after Kathleen Agne's

17  dismissal I felt that they were very appreciative of

18  all of the extra effort I was putting forth because I

19  was doing double duty.  And it evolved to a point

20  where I didn't understand Bill's change in attitude

21  and criticism of my work.

22              And all I could determine was that he

23  became a pawn for Brendan Gilmore's plan to dismiss

24  the last surviving, to quote his own word, the

Page 209

 1    survivor of the original team.  So I could only

 2    conclude that it was discrimination against me as far

 3    as age and gender.

 4       Q.    With respect to Becker, did you ever hear him

 5    make any comments that you considered to be

 6    anti-older-worker related?

 7       A.    I don't recall at this time.

 8       Q.    What about anti-woman comments?

 9       A.    Towards?

10       Q.    Towards you or anyone else.

11       A.    Not towards me at this time, but there might

12    have been instances when comments were made about

13    older women in the Philadelphia office.

14       Q.    By Bill?

15       A.    As I recollect, perhaps, yes.

16       Q.    What do you remember?

17       A.    Nothing specific at this time.

18       Q.    Were those comments that you overheard or

19    comments that people told you about?

20       A.    I'm not sure at this time if they were either.

21       Q.    You're not sure what they were in terms of

22    older women in Philadelphia?

23       A.    I'm not sure.

24       Q.    Do you remember whether he used the words older

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 210

1    women?

2    A.    I don't believe he -- I don't recollect him

3    using older women, but if a name was mentioned

4    everyone was aware of that person's age or status

5    within the company as far as years in.

6    Q.    But you don't remember specifically what it

7    was?

8    A.    Not at this time.

9    Q.    Do you remember the time?

10   A.    Meaning time of day, time of year?

11   Q.    The time frame in which -- I understand you

12   said you don't remember.

13   A.    Not specifically, no.

14   Q.    I didn't ask you about Gilmore.  Did you ever

15   hear him make any anti-women comments?

16   A.    At this time I don't recollect.

17   Q.    Do you feel that Becker started to be more

18   critical of your job performance when he was trying to

19   move on to get his own team?

20   A.    Yes.

21   Q.    Did you ever hear Becker and Gilmore have any

22   discussions about getting rid of the older employees?

23   A.    No.

24   Q.    Or getting rid of you?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 211

 1     A.    Did I hear, overhear discussions?

 2     Q.    Yes.

 3     A.    I·can't say at this time that I heard specific

 4     discussions, no.

 5     Q.    I know we haven't talked about the period of

 6     time that you started working with Landis, but while

 7     we're on it I want to sort of finish this out.

 8           With respect to Greg Landis, are you

 9     claiming that Greg Landis acted in a way that was

10     discriminatory towards you because of your age or

11     gender?

12     A.    I recollect that Greg was also acting on behalf

13     of Brendan Gilmore to subsequently get me dismissed.

14     Q.    When you say that, is that similar to what you

15     were saying with Bill and that you felt that Greg like

16     Bill was acting as a pawn for Gilmore?

17     A.    Yes.

18     Q.    And you felt that was because of your age?

19     A.    Yes.

20     Q.    And because of your gender?

21     A.    Yes.

22     Q.    Did Greg Landis ever make any comments that you

23     felt to be anti-age comments, either to you or to

24     others?

**B261**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 212

1   A.   I don't recall at this time.

2   Q.   What about anti-women comments to you or to

3   others?

4   A.   I don't recall at this time.

5   Q.   And did you ever hear any discussions between

6   Greg or Becker or Gilmore in which they were talking

7   about getting you out of the company?

8   A.   I didn't hear specific discussions.  They would

9   meet frequently behind closed doors.

10   Q.   And because they were behind closed doors, you

11   don't know what they were talking about, correct?

12   A.   Correct.

13   Q.   Now, I've asked you about Becker, Gilmore and

14   Landis as it relates to age discrimination and sex

15   discrimination, sex or gender discrimination.

16          Were there others at Mellon that you're

17   claiming also engaged in age discrimination and sex

18   discrimination against you?

19   A.   Specifically, I don't recall naming others than

20   Gilmore, Becker or Landis at this time.

21   Q.   Is it those three?

22   A.   Mm-hmm.

23   Q.   Now, with respect to your employment,

24   Ms. Blozis, did you ever keep a diary of events?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 213

1    A.    A diary?

2    Q.    Right.  In terms of a day, you write in today

3    met with Gilmore?

4    A.    For what purpose?

5    Q.    Any purpose.  Some people keep diaries or

6    Day-Timers of things that happened every day on the

7    job.

8    A.    My recollection is that if we discussed client

9    situations that notations might have been put in a

10    file or ticklers created as I recall to bring up

11    discussions or topics necessary for the client.

12    Q.    So it would be client-related information that

13    you would be memorializing?

14    A.    I wouldn't say memorializing.  I would say

15    documenting or...

16    Q.    I was thinking more in terms of some people --

17    for example, looking at Blozis 4, you made a little

18    note at the bottom that you spoke to Rosemary on a

19    particular day.  Some people instead of putting it on

20    the bottom of something will put it in an actual

21    calendar or a Day-Timer of that nature.

22            Did you keep one of those while you were

23    employed?

24    A.    I didn't keep a specific diary.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 214

1          MR. LaROSA:  It's now 6:00 o'clock.  Are

2    we anywhere close to being on damages and mitigation?

3          MS. WILSON:  You know, we're very close

4    because this is the '03 performance, so I wanted to go

5    over that.  And then there's the final written warning

6    that came a couple of months later and then there's

7    the termination that came months after that and then

8    we're onto mitigation.

9          MR. LaROSA:  Okay.  So how much longer do

10   you think you have on liability?

11         MS. WILSON:  If we're closing up in an

12   hour, I'm not going to finish liability.

13         MR. LaROSA:  You're saying you have more

14   than an hour on liability?

15         MS. WILSON:  Yes.

16         MR. LaROSA:  Well, I don't think this

17   deposition has been conducted in a very efficient

18   manner.  The documents were not premarked and sent to

19   us for our review, so we have taken up a lot of time

20   with that.

21         We have taken an hour and 12 minutes in

22   breaks from the eight-hour day, so we have almost gone

23   the seven hours now and only got into twelve exhibits

24   and you're telling me there's still over an hour on

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 215

1    liability, plus damages, plus mitigation, plus the

2    documents that have not been produced at this point.

3              I think what we should do is take a short

4    break here because you have gone for over an hour and

5    a half now and see what we can get through till 7:00

6    o'clock and then we will adjourn for the day.

7              MS. WILSON:  All right.  I just want to

8    put something on the record as well.

9              Obviously, I disagree with Mr. LaRosa's

10   characterization that the deposition hasn't been

11   conducted efficiently and we will leave it to the

12   judge to read the transcript and make that

13   determination.

14             As far as having premarked exhibits to

15   show to you in advance, there's no obligation in the

16   rules or elsewhere for that to occur.  I have had the

17   exhibits ready with copies to give to you, Ms. Blozis

18   and copies have already been made and handed out.  So

19   I feel that that's been done very efficiently.  In

20   terms of marking the exhibits, it's probably been less

21   than a minute with respect to getting those marked and

22   turned over for review and testimony on it.  So I

23   would object to that characterization and leave it to

24   the judge to read the transcript and make her own

Page 216

1    determination.

2              MR. LaROSA:   Okay.  You're correct,

3    there's no obligation to premark the exhibits.  The

4    obligation is to conduct the deposition in seven hours

5    and no further than seven hours without court

6    approval.

7              MS. WILSON:   And we have had that

8    conversation, I believe it was yesterday, with the

9    judge and she made a ruling on that.  And as I

10   understand it, if we can't work out our differences

11   with respect to it, then she has told us to go back to

12   her and make our arguments to her and she will make a

13   decision on it.

14             MR. LaROSA:   Right.  And she hasn't made a

15   ruling authorizing a longer-than-seven-hour

16   deposition.  So we're agreeing for the purpose of the

17   day to go to 7:00 after we take a short break here,

18   but I think then we may have to be going back to the

19   judge.

20             MS. WILSON:   Right.  Whether we do it --

21   hopefully we can work it out.  If we don't, we will go

22   back to where she left it open in terms of let's see

23   how it goes on the first day and then she will make a

24   determination subsequently if we can't agree.  It

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 217

1    sounds like we're not going to be able to agree, so I

2    will be happy to go back to the judge.

3              I would be happy for her to read this

4    transcript because I feel like I've been flying

5    actually.

6              MR. LaROSA:  Okay.

7              (A brief recess was taken.)

8              MS. WILSON:  Mark this please.

9              (Blozis Deposition Exhibit No. 13 was

10   marked for identification.)

11             THE WITNESS:  I've looked over these

12   pages.

13   BY MS. WILSON:

14   Q.    Before we talk about Blozis 13, going back to

15   your testimony concerning Gilmore, Becker, Landis in

16   which you gave examples of why you felt their conduct

17   or comments were indicative of age discrimination and

18   gender discrimination, with the exception of Gilmore,

19   because I remember there's an incident that you went

20   to Rosemary about on May 1st of '03, did you go to HR

21   about any of the instances where you felt that Becker

22   or Landis was acting discriminatory?

23   A.    Not that I recall.

24   Q.    Let's look at Blozis 13.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 218

1    A.    Yes.

2    Q.    And have you seen Blozis 13 before today?

3    A.    Yes.

4    Q.    And Blozis 13 also includes the typewritten

5    response by you which is at the end that's a two-page

6    document?

7    A.    I see that and I see my signature on the page,

8    the second page.

9    Q.    And did you type that up?

10    A.    My recollection is that I did that, yes.

11    Q.    And it's entitled Response to Manager Review

12    dated 1/27/03 which is looking at the first page of

13    Blozis 13 where it says Date of Final Assessment

14    1/27/03?

15    A.    Yes.

16    Q.    That's what you were responding to?

17    A.    Yes.

18    Q.    Before, Ms. Blozis, you had gone through in

19    general terms how these performance management forms

20    are completed.

21        Do you recall that testimony early today?

22    A.    Yes.

23    Q.    And to your recollection was Blozis 13 done in

24    the same manner?

Blozis
Linda J. Blozis, Volume 1                          v.
                              C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 219

1     A.    To my recollection, yes.

2     Q.    And in terms of the person giving you the

3    review, it was Becker, Bill Becker?

4     A.    It indicates that -- I'm looking for Bill's

5    signature on it.

6     Q.    It's the third page from the end.

7     A.    Yes.  I see Bill's signature.

8     Q.    Bill's signature with the 1-31-03 date and your

9    signature above it with the 2-11-03 date?

10    A.    Yes.

11    Q.    Would you have sat down on 2-11-03 to discuss

12   it with --

13    A.    Sat down to discuss it?

14    Q.    Yes.

15    A.    I don't recall at this time because Bill, as I

16   said, was in transition and to my recollection I don't

17   know if we did this via phone or in person.  I don't

18   recall at this time.

19    Q.    All right.  Whether it was by phone or in

20   person, do you think you had Blozis 13 in front of you

21   when you were having your phone or in-person

22   discussion?

23    A.    I'm not sure at this time.

24    Q.    Now, with respect to looking at the third page

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 220

1    in under section IV, Summary and Final Performance

2    Rating.

3        A.    Yes.

4        Q.    There you received a needs improvement?    The

5    third page from the back.

6        A.    You seem to be looking at something -- are you

7    looking at a page that has Bill's and my signature on

8    it?

9        Q.    Yes.    And up at the top there's a box, section

10   IV.

11       A.    I see that it says needs improvement.

12       Q.    And that's checked off and then action needed

13   checked off?    It's right underneath.

14       A.    Yes.    I see that.

15       Q.    Did you have discussions with Mr. Becker about

16   your needs improvement rating?

17       A.    I listened to Bill criticize my work.

18       Q.    What do you recall him saying?

19       A.    I don't recall specifically at this time.

20   Looking at the review, it probably was what's

21   paraphrased in the paragraph at the middle of the page

22   where he and I signed.

23       Q.    Okay.    Now, looking at the middle box where

24   there's information on it says, "Manager's Comments

Blozis
Linda J. Blozis, Volume 1                    v.
                         C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 221

1   for Assessment Period - required if 'Action Needed'

2   was selected on final performance rating" and then in

3   that box there's typewritten information.

4       A.    That I see.

5       Q.    Do you see that, where I am?

6       A.    Yes.

7       Q.    If you would take a moment to review that

8   typewritten information, please.

9       A.    (Reviewing document)   This information contains

10  a name of a client that you previously --

11      Q.    I see that.

12            MS. WILSON:  Mr. LaRosa, if you don't mind

13  for purposes of that review, if we could black out

14  Naomi's name.

15            MR. LaROSA:   Okay.

16            MS. WILSON:   Thank you.

17            THE WITNESS:   I have read this item in the

18  box.

19  BY MS. WILSON:

20      Q.    And with respect to the information in the box,

21  did you and Mr. Becker go over that information?

22      A.    I don't recall specifically if he read that out

23  loud to me.  I recollect that we discussed these

24  items.

**B271**

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 222

1    Q.    And during your discussion with him, be it on

2    the phone or in person, did you express disagreement

3    with his assessment of the information that's

4    contained in the manager's comments?

5    A.    I recollect that I did.  And it seems to be

6    substantiated by my two-page response attached

7    thereto.

8    Q.    So with respect to your two-page response, just

9    looking at the back, the second page of your two-page

10   response, it's dated February 11, '03.  Is that when

11   you submitted it you believe?

12   A.    I recollect, yes.

13   Q.    And did you submit it to Becker?

14   A.    I can't specifically say at this time.  He was

15   in a state of flux.  I don't know if those notes were

16   passed to Greg Landis or they were Fed Ex'd to Bill

17   Becker.  I'm not sure at this time.

18   Q.    I'm just looking at your two-page response and,

19   again, there's the reference to the customer name on

20   it looks like the last paragraph of your first page,

21   if we could black that out as well.

22            Do you remember having any conversations

23   with Mr. Becker or Mr. Landis about your response?

24   A.    Not specifically, other than producing it,

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 223

1    signing it and securing it hopefully to my review.

2    Q.    Now, looking back at the manager's comments

3    that's in that box, it appears that there's some

4    action items that are identified there towards the

5    bottom; five lines up from the bottom, "Linda should

6    identify all outstanding projects."

7    A.    I see what you're referring to.

8    Q.    Did you do that?

9    A.    I don't recall what he's saying, what he means

10   by the outstanding projects specifically.

11   Q.    Do you remember putting together any

12   information about things that needed to be done or

13   assignments that are to be done and then saying when

14   they were expected or when you expected to get it

15   done?

16   A.    I recollect that I could have.  I'm not sure at

17   this time.

18   Q.    You're not sure whether you did that at this

19   time?

20   A.    I have a vague recollection that there might

21   have been a list of some things and I do recall Greg

22   saying we're moving along with them.

23   Q.    You think that was in relationship --

24   A.    No.  With the completion of some things.  I do

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 224

1    have a recollection of Greg saying after Bill was

2    finally gone from our team that as work was being

3    piled on and I was trying to complete things that I

4    recollect Greg saying we were getting things done.

5        Q.    Do you know whether you had submitted the

6    outstanding projects list, for lack of a better way to

7    describe it, to Greg?

8        A.    I don't know if I would say I submitted it.  I

9    don't exactly recollect, but to the best of my memory

10   I think there might have been a list that he and I

11   compiled together.  I'm not sure at this time.

12       Q.    You and Greg?

13       A.    Yes, Greg Landis.

14       Q.    Do you remember compiling a list with Becker?

15       A.    No, I don't recall that.

16       Q.    Did you have any discussions with him, "him"

17   being Becker, that if a deadline was missed that

18   further corrective action will follow?

19       A.    It's stated in here, but I don't recall Bill

20   verbalizing that to me.

21       Q.    Do you remember Bill verbalizing to you that

22   there would be a zero tolerance standard for lack of

23   timely completion?

24       A.    Not verbalizing, no.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 225

1    Q.    But as you were reviewing your review, you saw

2    that in there?

3    A.    I would have had read, I would have had to have

4    read the review in order to sign off on it.

5    Q.    Did you ever object to having a zero tolerance

6    standard for lack of timely completion of projects?

7    A.    Object to whom?

8    Q.    Object to HR, to Becker, to Landis, Gilmore.

9    A.    I don't recall a specific objection being made

10   other than my response.

11   Q.    Your objection is it fair to say was in your

12   response?

13   A.    I think it's specifically stated at my last

14   sentence, "I therefore disagree with these review

15   criticisms both in tone and substance."

16   Q.    Do you think your January 27th, '03 review,

17   that was for '02 performance?

18   A.    I'm not sure.  I'm looking at the front of it

19   and it says date of prior assessment was February '02,

20   so I'm not sure exactly what time frame this

21   encompasses.

22   Q.    You're not sure sitting here today?

23   A.    I'm not sure sitting here today.

24   Q.    Now, with respect to Blozis 13 which is the

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 226

1    January 27, '03 assessment, did you feel that this was

2    an example of age or sex discrimination?

3       A.   I'd have to say in a roundabout way, yes.   I

4    think it was part of the greater plan to force me out

5    of the company.

6       Q.   And the greater plan going back to what you had

7    testified before in terms of getting the older workers

8    out?

9       A.   Yes.

10       Q.   What about gender?

11       A.   I would have to say that I believe that it

12    applied to gender too.

13       Q.   Do you think there was a plan of getting women

14    out?

15       A.   I think there was a plan to get me out.

16       Q.   Now, based on your testimony, Mrs. Blozis, it

17    appears that shortly after this January 27, '03 review

18    that Becker transitioned onto Philadelphia and then

19    you were reporting to Landis?

20       A.   Yes.

21       Q.   Did you have any other, after Becker

22    transitioned to Philadelphia did you have any other

23    reporting responsibilities to him?

24       A.   Not that I recollect at this time.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 227

1    Q.   So it was Landis from then on?

2    A.   (The witness nodded.)

3    Q.   Is that right?

4    A.   As I recollect, it was Landis.  But I remember

5    a specific time where I wasn't sure who was going to

6    do my next review.

7    Q.   In terms of whether it would be Becker or

8    Landis?

9    A.   In terms of whether it was left up to Greg at

10   that point in time.

11   Q.   When you say your next review, when was that

12   coming around?

13   A.   I have no specific recollection of when that

14   was scheduled.

15   Q.   Was it done on a yearly basis?

16   A.   In Mellon it was typically to be done, but that

17   was not always the case as I recall.

18   Q.   Sometimes it wouldn't be done on an annual

19   basis?

20   A.   It might stretch longer than twelve months.

21   Q.   And did you ask anybody who would be doing your

22   next review?

23   A.   I recall an incident of being in Greg's office

24   asking him if it were to be he to do the next review

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 228

 1    and I don't recollect if he was sure at that time

 2    himself.

 3       Q.    Now, around I guess say the February '03 time

 4    frame would it be fair to say that's when you started

 5    reporting to Greg?

 6       A.    As I recall, yes.

 7       Q.    Now, did Greg have -- let me just change this

 8    so I can give you some dates here.

 9              I believe you received your final written

10    warning for performance that's dated May 19, 2003?

11       A.    I'm not sure of the exact date, but...

12       Q.    Let's get it.

13              (Blozis Deposition Exhibit No. 14 was

14    marked for identification.)

15              THE WITNESS:  I have Blozis 14 in hand.

16    BY MS. WILSON:

17       Q.    If you would take a look at it, please.

18       A.    (Reviewing document)  I've read it.

19       Q.    Now, it has a May 19, '03 date on it up at the

20    upper left-hand side?

21       A.    Yes.

22       Q.    And then down at the bottom under copy

23    received, is that your signature?

24       A.    Yes.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 229

 1    Q.    And that's your signature?

 2    A.    It looks like my signature.

 3    Q.    And then May 19, '03 written down, I mean by

 4    your signature?

 5    A.    Yes.

 6    Q.    Do you think that's your handwriting as well?

 7    A.    Yes, I do.  I would have to say I do.

 8    Q.    Between, say, February of '03 and May 19th of

 9    '03, did Mr. Landis ever express to you any concerns

10    or dissatisfaction that he had with your work?

11    A.    I don't remember specifically at this time.

12    Q.    When you say you don't remember specifically at

13    this time, are you saying that he could have and you

14    don't remember or he didn't do it?

15    A.    I'm only recollecting the sheet that I

16    previously stated of projects to be completed and my

17    recollection is that we were checking those off as

18    completed to prompt Greg to say we're getting things

19    done.

20    Q.    Do you remember the date of that sheet?

21    A.    No, I don't remember the date that it was

22    produced.

23    Q.    Did he ever say that there were things that

24    weren't checked off that he wanted to have completed?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 230

1    A.    I don't recall at this time.

2    Q.    What about Gilmore, did Gilmore during the

3    period between February of '03 and May 19th of '03

4    express any dissatisfaction with your work?

5    A.    Between -- I'm sorry.  The dates?

6    Q.    February of '03 and May 19th of '03.

7    A.    That would have included the infamous April

8    date.

9    Q.    That's right.

10    A.    And that's the only time I recollect that

11    Brendan Gilmore was critical to the extent of

12    unprofessionalism and ungentlemanly conduct.

13    Q.    Did you have any conversations prior to receipt

14    of Blozis 14 with anyone that it was coming?

15    A.    I don't understand.

16    Q.    Well, did someone say, you know, prior to you

17    actually receiving Blozis 14 did anyone say, for

18    example, Linda, we're not seeing improvement; we're

19    going to be issuing you a final written warning for

20    performance?

21    A.    I don't believe anybody said anything.  There

22    was a reference to it in the review.

23    Q.    Other than the reference in the review?

24    A.    I don't recall anybody specifically saying that

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 231

1    a final written warning was coming.

2    Q.    Did Mr. Landis ever express any concern to you

3    that the Fox booklets hadn't been done?

4    A.    I don't recollect at this time that he did.

5    Q.    Do you recollect whether prior to May 19, '03

6    whether the Fox booklets had been done?

7    A.    My only recollection is -- and you're referring

8    to a client also.

9    Q.    Yes. I'm not using the full name.

10    A.    My only recollection is that the Gilmore

11    episode in April was referring to a client booklet

12    that I believe pertained, that I recollect pertained

13    to the Fox account and being done all I can determine

14    is that short of binding the information together.

15    Q.    Between the February '03 time frame and May

16    19th, '03 time frame, did Landis or Gilmore ever

17    complain to you about your work having to do with the

18    Lickle account?

19    A.    I don't recall that at this time.

20                (Blozis Deposition Exhibit No. 15 was

21    marked for identification.)

22    BY MS. WILSON:

23    Q.    Look at what's been marked as Blozis 15,

24    please.

Blozis                                    v.              Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1          C.A. # 05-891 (SLR)                    July 26, 2006

Page 232

```
 1    A.    Yes, I have.

 2    Q.    And have you seen Blozis 15 before today?

 3    A.    This specific sheet?  I recognize the

 4  similarity of a combined equity diversification for

 5  individual accounts.  The numbers of these accounts I

 6  can't specifically say I recall.  My only hint is what

 7  appears to be Greg's notation on the side and when

 8  that was written I'm not sure, even though it's dated.

 9  These names sound familiar.

10    Q.    Now, with respect to the handwritten notation

11  on the side, do you recall seeing Blozis 15 with the

12  handwritten notation on the side?

13    A.    No, I do not recall that.

14    Q.    With respect to the combined equity

15  diversification for individuals, is that a form that

16  you would put together as a portfolio administrator?

17    A.    It would have been a part of a portfolio

18  booklet presentation to the clients.

19    Q.    Would that be something that you would put

20  together?

21    A.    It would be part of some of the work that I was

22  responsible for.

23    Q.    And with respect to the information on the form

24  such as looking down on the left-hand side producer
```

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 233

1    goods and I guess that's services?

2    A.    Yes.

3    Q.    And there's a number 25.03?

4    A.    Yes.

5    Q.    What does that refer to?

6    A.    To the best of my recollection, it was a

7    breakout of the performance of the account against,

8    measured against, if I recollect correctly, the

9    Standard & Poor's.  It's the portfolios in the dark

10   and the Standard and Poor's indices is the unshaded

11   part.

12   Q.    And with respect to the information, I see that

13   the dark represents portfolio and then the light

14   Standard & Poor's and so the information would relate

15   to whatever that bar coding is?

16   A.    It would be the percentage.

17   Q.    And do you recall having any discussions with

18   Landis about incorrect information on the

19   diversification form?

20   A.    No.  And I don't understand this handwriting

21   because it says, "25.03 but appears to be 6 percent"

22   and I don't know if Greg wrote this what he exactly

23   refers to.  It seems inconsistent.

24   Q.    When you're saying the reference to the 6

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 234

1    percent, you're not sure where that's coming from?

2        A.    No, I'm not sure where that's coming from.

3        Q.    You don't recall having any specific

4    conversation with him concerning this particular form?

5        A.    I don't recall that.  The form does not look

6    incorrect to me at this time.

7        Q.    Do you recall having any conversations with

8    Landis about incorrect information contained on the

9    combined equity diversification for individual forms

10   that you prepared?

11       A.    No, I do not.

12                   (Blozis Deposition Exhibit No. 16 was

13   marked for identification.)

14                   THE WITNESS:  I see Exhibit 16.

15   BY MS. WILSON:

16       Q.    Have you seen Exhibit 16 before today?

17       A.    I can't say at this time.

18       Q.    It's the top says Investment Review?

19       A.    Yes.

20       Q.    Is that a document that you would run in your

21   capacity as portfolio administrator?

22       A.    It would have been a type of document, yes.

23       Q.    Do you remember having any discussions with

24   Greg Landis concerning this Blozis 16?

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 235

```
 1    A.    No, I do not recollect.

 2    Q.    Do you remember having any discussions in

 3    general with Greg Landis about inaccurate or

 4    incomplete information being placed on the investment

 5    review forms in general?

 6    A.    Inaccurate or?

 7    Q.    Incomplete.

 8    A.    Incomplete?  No.  My recollection is that these

 9    were produced with the data that was supplied.

10    Oftentimes the officers would say that they in a

11    particular instance in a client presentation would

12    want additional or less information provided than

13    maybe a previous presentation done.

14    Q.    Did Landis ever tell you that he preferred to

15    have more information provided in his presentations?

16    A.    I don't recollect specifically.  He could have.

17    Q.    Now, going to Blozis 14, which is your final

18    written warning.

19    A.    Yes.

20    Q.    Did someone give it to you?

21    A.    To the best of my recollection, I think it was

22    handed to me by Greg Landis even though it was signed

23    by Brendan Gilmore.

24    Q.    Right.  Did you have any discussions with Greg
```

Blozis                                    v.                Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1          C.A. # 05-891 (SLR)                   July 26, 2006

Page 236

1    Landis about Blozis 14?

2       A.    I don't recall talking to Greg about it after

3    it was handed to me.

4       Q.    When he handed it to you did you read it at

5    that point?

6       A.    I recollect that I read it.

7       Q.    Did he call you into his office?

8       A.    I don't remember him -- I don't remember being

9    called into his office.

10      Q.    So you remember him handing it to you and then

11   you read what he had handed to you?

12      A.    To the best of my memory, I was sitting at my

13   cubicle and he handed it to me and I read it and he

14   walked away.

15      Q.    When you read it, did you have any follow-up

16   discussions with Greg Landis about it?

17      A.    Not that I recall.

18      Q.    And did you have any discussions with Brendan

19   Gilmore about it?

20      A.    Not that I recall.

21      Q.    Now, looking at the substance of Blozis 14 in

22   which there's a couple of bullet points that are

23   highlighted?

24      A.    Yes.

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 237

1    Q.    Did you feel that those items were accurate?

2    A.    I don't recollect that I felt that they were.

3    I felt that it was already predetermined that they

4    were going to get rid of me.

5    Q.    And when you say that it was already

6    predetermined that they were going to get rid of you,

7    that was Gilmore and Becker and Landis?

8    A.    Bill Becker was no longer a direct supervisor.

9    I thought it remained the responsibility or it was

10   under Gilmore and Landis.

11   Q.    And is it fair to say that when you read Blozis

12   14 that I asked you about the three bulleted point

13   items but in general you disagreed with the assessment

14   of your performance?

15   A.    Yes, I did.

16   Q.    Did you write a rebuttal to it?

17   A.    I don't recall.

18   Q.    Did you have any conversations with HR,

19   Rosemary Thomas or anyone in HR about Blozis 14?

20   A.    I don't recall at this time other than the

21   conversation of my complaint against Brendan Gilmore.

22   Q.    Now, I think that in your complaint you allege

23   that you received Blozis 14 because you complained

24   about Brendan Gilmore.  Is that your belief?

Page 238

1    A.    I recollect that's the time frame.

2    Q.    And the basis for your belief that Blozis 14

3    was given to you because you complained is what?

4    A.    I'm sorry.  I didn't hear the end of your

5    sentence, your question.

6    Q.    Let me change it and make it a better question,

7    if I can.

8              Why do you think that, why do you think

9    that you were given Blozis 14 because you complained

10   about Gilmore?

11   A.    I don't know why Gilmore would have pushed it

12   to that limit.

13   Q.    With respect to giving you the final written

14   warning?

15   A.    Yes.

16   Q.    My question still was unclear.

17             As I recall your complaint, you alleged

18   that you were placed on final written warning for

19   performance out of retaliation for having complained

20   about Brendan Gilmore to Rosemary.  Is that accurate?

21   A.    Yes.

22   Q.    And my question is:  Why do you feel it was

23   retaliatory conduct?

24   A.    I'm not sure at this time other than I believe

Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 239

```
 1    Brendan Gilmore may have been grossly offended by my

 2    complaint to HR and expedited his dismissal of me for

 3    that reason.

 4       Q.   Why do you feel he was grossly offended by it?

 5       A.   Because of his arrogant, unprofessional

 6    demeanor that was displayed in the past and at that

 7    meeting.

 8               MS. WILSON:  It's 7:00.

 9               MR. LaROSA:  Are we finished with this

10    exhibit?

11               MS. WILSON:  We are.

12               MR. LaROSA:  So why don't we adjourn for

13    the day?

14               (Deposition adjourned at 7:00 p.m.)

15

16

17

18

19

20

21

22

23

24
```