Blozis
Linda J. Blozis, Volume 1

v.
C.A. # 05-891 (SLR)

Mellon Trust of Delaware, et al.
July 26, 2006

Page 240

```
1                    I N D E X

2   DEPONENT:   LINDA J. BLOZIS              PAGE

3      Examination by Ms. Wilson            2

4                 E X H I B I T S

5   BLOZIS DEPOSITION EXHIBITS             MARKED

6    1 Complaint                              5

7    2 Document Bates stamp numbered P003    54

8    3 Multipage document captioned "Performance
       Management Exempt Form"              67
9
     4 Document Bates stamp numbered P030   107
10
     5 Document Bates stamp numbered P856-857  153
11
     6 E-mail to Walter G. Peters from Linda J.
12     Blozis dated November 19, 2002      168

13   7 Document captioned "Automated Investment
       Review System"                      173
14
     8 Document captioned "Automated Investment
15     Review System"                      177

16   9 Document captioned "Security List Of
       Holders"                            182
17
    10 Document captioned "Asset Allocation
18     Risk Profile Questionnaire"         185

19  11 Document captioned "Single Bond Buy"  195

20  12 E-mail to William S. Becker from Linda J.
       Blozis dated December 9, 2002       199
21
    13 Multipage document captioned "Performance
22     Management Form"                    217

23  14 Document Bates stamp numbered P042   228

24
```

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

B290

Page 241

1    BLOZIS DEPOSITION EXHIBITS              MARKED

2    15 Document captioned "Combined Equity
        Diversification For Indivi"              231

3

     16 Document captioned "Investment Review
4        May 14, 2003"                          234

5

     ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 242
6

     CERTIFICATE OF REPORTER               PAGE 243
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ATTACH TO DEPOSITION OF: *Linda J. Slozis*

DATE TAKEN: *July 26, 2006*

IN THE MATTER OF: *Slozis v Mellon Trust of Delaware*

## ERRATA SHEET

<u>INSTRUCTIONS</u>: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. **Do not make any marks or notations on the transcript itself.** Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 49 | 5 | The name "Mr. Bell" should be "Mr. Gilmore" because pg. 48 line 23. refers to Mr. Gilmore |
| 150 | 9 | I believe the word "member" should be "manager" |
| 212 | 22 | Mm-hmm [response] should mean "Yes." |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED *Jan 26, 2007*      *Linda J. Slozis*
                              (Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
              1330 King Street
              Wilmington, DE  19801

Page 243

```
 1    State of Delaware    )
                           )
 2    New Castle County    )

 3

 4                 CERTIFICATE OF REPORTER

 5
              I, Kurt A. Fetzer, Registered Diplomate
 6    Reporter and Notary Public, do hereby certify that
      there came before me on Wednesday, July 26, 2006, the
 7    deponent herein, LINDA J. BLOZIS, who was duly sworn
      by me and thereafter examined by counsel for the
 8    respective parties; that the questions asked of said
      deponent and the answers given were taken down by me
 9    in Stenotype notes and thereafter transcribed by use
      of computer-aided transcription and computer printer
10    under my direction.

11            I further certify that the foregoing is a true
      and correct transcript of the testimony given at said
12    examination of said witness.

13            I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
14    interested in the event of this suit.

15

16

17                    Kurt A. Fetzer, RDR, CRR
                      Certification No. 100-RPR
18                    (Expires January 31, 2008)

19
      DATED:
20

21

22

23

24
```

Volume 2


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LINDA J. BLOZIS                )
                              )
            Plaintiff,         )
                              )       Civil Action
v.                            )       No. 05-891 SLR
                              )
MELLON TRUST OF DELAWARE, NATIONAL )
ASSOCIATION, a Pennsylvania   )
corporation; MELLON BANK, NATIONAL )
ASSOCIATION (formerly Mellon Bank )
(DE) NATIONAL ASSOCIATION), a )
Pennsylvania corporation; and )
MELLON FINANCIAL CORPORATION, a )
Pennsylvania corporation,     )
                              )
            Defendants.        )

        Deposition of LINDA J. BLOZIS taken pursuant to
notice at the law offices of John M. LaRosa, Two East 7th
Street, Wilmington, Delaware, beginning at 10:04 a.m., on
Saturday, January 13, 2007, before Eleanor J. Schwandt,
Registered Merit Reporter and Notary Public.

APPEARANCES:

            JOHN M. LAROSA, ESQ.
            LAW OFFICE OF JOHN M. LAROSA
            Two East 7th Street
              Wilmington, Delaware  19801
              for the Plaintiff

            STEPHANIE WILSON, ESQ.
            REED SMITH, LLP
              13 Main Street - Suite 250
              P.O. Box 7839
              Princeton, New Jersey  08543-7839
              for the Defendants


                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



1            LINDA BLOZIS,

2        the witness herein, having first been

3        duly sworn on oath, was examined and

4        testified as follows:

5            CONTINUED EXAMINATION

6    BY MS. WILSON:

7        Q.    Good morning, Miss Blozis.  The last time we were

8    here was July 26 of last year.  And we went over some

9    preliminaries, do's and don't's with respect to

10   depositions.  Do you want me to go over them again?  Such

11   as, if you don't understand a question, to say so.  If

12   you don't hear the question, to ask me to speak up so

13   that you hear the question.

14       A.    I understand that.

15       Q.    Okay.

16       A.    And I will do that.

17       Q.    All right.  Great.

18            Miss Blozis, I want to turn your attention

19   to one of the exhibits that was marked last time, and it

20   is Blozis 14.  They are in numerical order.

21       A.   Oh, okay.

22       Q.    So look at the bottom, keep going until you see

23   14, which is the final written warning for performance.

24       A.    Mm-hmm.

Linda J. Blozis

246

1    Q.    Got it?

2    A.    Yes.

3    Q.    All right.  And it has a May 19th, '03 date.  It

4    says "Copy Received."  Is that the day that you received

5    it, down at the bottom?

6    A.    I would say that with my signature and the date,

7    yes, that's the date I received it.

8    Q.    And so I am understanding that it was given to

9    you by Gregg Landis?

10    A.    Handed to me by Gregg Landis, yes.

11    Q.    All right.  And did you --

12    A.    To my recollection, yes.

13    Q.    All right.  And did you and Gregg go over the

14    contents of Blozis 14?

15    A.    I can't recollect that we sat down together and

16    specifically reviewed it or it was just handed to me.

17    Q.    Okay.  Did you have any conversations with

18    Rosemary Thomas about Blozis 14?

19    A.    May I just reread this?

20    Q.    Oh, certainly.

21    A.    And then I can answer the question.

22          Having re-read this, my recollection is I

23    don't recall if I specifically contacted Rosemary Thomas

24    to discuss this after being given this notice.

Linda J. Blozis

247

1    Q.    All right.  Did you have any conversations with

2    Brendan Gilmore about Blozis 14?

3    A.    To my recollection, specifically after receiving

4    this, I don't recall immediately, within that day or

5    whatever day of the week it might have been, succeeding

6    day, no.

7    Q.    Okay.  With respect to the question, Miss Blozis,

8    don't limit yourself to that day or the preceding day.

9    At any point did you have any discussions with Brendan

10   Gilmore about Blozis 14?

11   A.    At this time I can't recall specifically if I did

12   or if it was via conversations with Gregg Landis over the

13   concern of this.

14   Q.    Okay.  So let's go back to my previous question

15   when I asked whether you had any conversation with Gregg

16   Landis about Blozis 14.  Again, don't limit your answer

17   to the day or the preceding day.  Did you at any point

18   have conversations with Gregg about Blozis 14?

19   A.    I would recall that this -- I would have found

20   this very upsetting.  And as to specific dates, I may

21   have, or days, I may have said -- tried to discuss this

22   with Gregg to some point of the substance of it, the

23   outcome of it.

24   Q.    Okay.  When you say "the substance," what do you



Linda J. Blozis

248

1  mean by that?

2    A.    Well, the criticism of projects unfinished in a

3  timely manner, the fact that they were accusing me of

4  lack of ownership of projects without constant

5  monitoring, work quality, better understanding, those

6  types of things.

7            In retrospect, it would have to have been a

8  question saying why up until that point my work was

9  commended and now it is not.  It seems to have done a

10  180.

11    Q.    And what did Gregg tell you?

12    A.    Specifically, I don't recall.  But my

13  recollection is that criticism generally came down about

14  everything that I was doing from that time on.

15    Q.    And the criticism came down from whom?

16    A.    Whoever his superior was or who he was answering

17  to at that time.

18    Q.    So Brendan Gilmore?

19    A.    If you were to structurally look at the company,

20  I would suspect it was Brendan Gilmore.

21    Q.    So --

22    A.    Or feel.  Correction, I would feel that it was

23  Brendan Gilmore.

24    Q.    In terms of your answer, Miss Blozis, if I'm

Linda J. Blozis

249

1    understanding it correctly, you felt that Brendan Gilmore

2    was criticizing your work and then telling Gregg about

3    his concerns, and then Gregg was then telling you?

4        A.    That would seem to follow.

5        Q.    Is it fair to say that when you reviewed Blozis

6    14 that you didn't agree with the performance issues that

7    were outlined in it?

8        A.    It would be fair to say that.

9        Q.    And did you voice your disagreements with Gregg?

10       A.    I believe I attempted to.

11       Q.    And when you say you attempted to, what do you

12   mean?

13       A.    That if I had the opportunity to sit with Gregg

14   over a project, or the criticism, that it may have been

15   falling on deaf ears.  My explanation that, yes, this is

16   getting done, this particular project is in the works,

17   and yet I'm still being criticized for it.

18       Q.    Okay.  And did Gregg make any sort of response

19   when you would have those conversations with him?

20       A.    To my recollection, what I remember is that if he

21   may, in fact, have thought things were accomplished, it

22   was necessary that I do work harder and longer, that it

23   wasn't what I was accomplishing may not -- wasn't being

24   interpreted as satisfactory.



Linda J. Blozis

250

1     Q.    You had testified, Miss Blozis, earlier in your

2   description of events that up until then, and I'm taking

3   then to mean when you got the final written warning, that

4   your work had been commended, and I wanted to ask you

5   about what part of your work was being commended.

6     A.    What part of my work was being commended up until

7   then?  My recollection is that after Kathleen Agne was

8   dismissed, all of the responsibility for that office fell

9   on me.  Both Mr. Landis and Mr. Becker were very grateful

10   for my conscientiousness and my dedication and my

11   approach, my professional approach to the job, and were

12   very pleased that I showed up every day and took on even

13   more duties, and intimated to me that if I needed more

14   time, whether it be for lunch, that was fine.

15             I continued to come to work every day with

16   the same approach, professional approach, and

17   conscientious attitude towards the responsibility of my

18   job.  And as time went on, it seemed to be that was not

19   sufficient, that nothing that I did was becoming

20   acceptable, that it was being criticized more and more,

21   and it evolved to a point where they terminated me.

22     Q.    When in time did you feel that your work was

23   starting to be criticized?

24     A.    To my recollection, it became apparent when an

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

**B300**

1    additional younger person was hired, that being Maria

2    Dunlop, at the time Maria Bannister, before she married.

3        Q.    Now, with respect to Bill Becker, when you

4    reported to him, before you went to the Philadelphia

5    office, had Bill Becker given you a review where there

6    was a needs improvement?

7        A.    To my recollection, the last review that Bill

8    gave me I thought was overall meeting expectations.

9        Q.    Okay.  If you take a look at Blozis 13.

10       A.    Do you have a question about this?

11       Q.    I wanted you to look at it, refresh yourself.

12   Have you refreshed yourself?

13       A.    Up to page 2, it says "Meets Target."

14       Q.    Look at page 5, section 4.

15       A.    I see a check mark by "Needs Improvement."

16       Q.    Okay.  Does that refresh your recollection?

17       A.    Of this review?

18       Q.    Yes.

19       A.    To some extent, yes.

20       Q.    And that was the last review that Bill Becker

21   gave to you, correct?

22       A.    Yes.

23       Q.    Now, upon receipt of Blozis 13, did you take that

24   to be an initial written warning about performance?



Linda J. Blozis

252

1    A.    No, I did not.

2    Q.    Why not?

3    A.    Because it was not in a format that was explained

4    at my hiring of the process of employment warnings.

5    Q.    And what process was described to you at your

6    time of hire?

7    A.    That my recollection, my understanding was I

8    think a verbal, then a written, and then a final.

9    Q.    Now, when were you first hired, Miss Blozis?

10    A.    In February 14th of 1990.

11    Q.    And who described the process to you when you

12    were hired?

13    A.    I don't think it was the HR person at that time.

14    It may have been the head of the Trust Department at that

15    time, to my recollection.

16    Q.    Do you remember who that was?

17    A.    I first worked for Robert H. Bell.  I reported to

18    Robert H. Bell.

19    Q.    Now, when you were hired in 1990 it was described

20    that you have a verbal warning, a written, a final?

21    A.    I believe it was in that, it was in that order,

22    yes.

23    Q.    Okay.  And why didn't you take Blozis 13 to be a

24    written?

**W&F**

Linda J. Blozis

253

1    A.    Looking back at this copy, refreshing my memory

2    from that year, I would suspect that I would have been

3    confused -- not confused but dumbfounded by a "Meets

4    Targets" and by the end of the review it dissolves into a

5    "Needs Improvement."

6                I see the check mark where it says

7    "Integrity" is checked, and by the time we get to the end

8    of it, it says "Needs Improvement."

9                And also the fact that on page, the

10   succeeding page, just above signatures, I don't see the

11   number, "Meets Targets, Highly Effective," and then it

12   jumps to "Needs Improvement."  I don't find that

13   consistent.

14   Q.    So if I understand your testimony, Miss Blozis,

15   is that you didn't consider Blozis 13 to be a written

16   warning because you viewed some of the information in

17   Blozis 13 to be inconsistent?

18                MR. LAROSA:  Objection.

19   A.    I think you are calling for a flat-out judgment

20   here, and I'm not prepared to --

21   Q.    Okay.  Let me ask you this:  Why didn't you

22   consider Blozis 13 to be a written warning?

23   A.    I was not of the belief that that was the format

24   a written warning was to be given.

Linda J. Blozis

254

1    Q.    Okay.  And when you say format, what do you mean

2    by that?

3    A.    Format in the sense that an employee may have

4    been called into a manager's office, most likely would

5    have been informed of constructive criticism about the

6    work, and then officially handed a paper that says, "This

7    is a written warning."

8    Q.    Okay.  And when you got the final written

9    warning, which is Blozis 14, did you ever appeal your

10   receipt of Blozis 14?

11   A.    To my recollection, I may have.

12   Q.    To whom?

13   A.    Of, I'm sorry, Blozis 14?

14   Q.    Yes, which is the final written warning.

15   A.    At that time I believe Mr. Becker was already in

16   charge of another team, was no longer overseeing my work,

17   so that would have excluded him.

18            Gregg Landis I felt at that time was

19   becoming less approachable about my work.  And Brendan

20   Gilmore, in my estimation, at that point wanted me out.

21   So I, I really didn't -- he was not accessible, that

22   accessible to me.  Gregg Landis, being my immediate

23   supervisor, if I talked to him, if it were that I was to

24   talk, it would be to Gregg.

Linda J. Blozis

255

1    Q.    Did you go to Human Resources?

2    A.    I don't recall at this time exact contacts with

3    Rosemary Thomas of Human Resources, and she would have

4    been the contact person.  The exact dates of our

5    exchanges I can't recall right at this time.

6    Q.    But in terms of appealing receipt of Blozis 14 or

7    being on corrective action, did you ever go to anyone in

8    HR to appeal it?

9    A.    I did not feel that Rosemary Thomas was fully

10   someone I could confide in regarding the situation as it

11   was happening to me.

12   Q.    And why is that?

13   A.    I believe I stated a previous incident where,

14   years back, a former supervisor, Linda Squirer and I,

15   asked to have a private conference with her.  She agreed,

16   and in turn came down to Wilmington with supervisors and

17   other people involved.

18   Q.    That was the testimony you had given about I

19   guess a salesperson who you felt was making improper

20   representation to clients?

21   A.    Yes.

22   Q.    If I recall?

23   A.    Yes.

24   Q.    Okay.  Did you consider going over Rosemary's

Linda J. Blozis

256

1    head, so to speak, to her supervisor?

2        A.    We in the Delaware office were instructed as to

3    the fact that Rosemary was the person we dealt with.    To

4    go any higher would have meant to contact people in

5    Pittsburgh that were removed from that issue or the

6    situation.

7        Q.    Did you consider contacting someone in

8    Pittsburgh?

9        A.    At this time I don't recollect that.

10       Q.    Miss Blozis, during the time that you worked at

11   Mellon did you ever express an intent to move to Naples,

12   Florida?

13       A.    In what sense?  I don't understand your question

14   fully.

15       Q.    That you wanted to move to Naples, that you would

16   like, for example, if Mellon opened up an office in

17   Naples, to move down to Naples?

18       A.    I had expressed on several occasions that I

19   thought Mellon as a company would be wise to open an

20   office on the southwest coast of Florida, due to the

21   economic opportunity there, and that I would be happy to

22   work there if the opportunity presented itself.

23       Q.    And who did you talk to about that?

24       A.    I, if you are asking for specific people, I would



Linda J. Blozis

257

1  say sometimes co-workers at the time, a number of

2  co-workers, and perhaps Mr. Becker or Mr. Landis.

3      Q.    What about Mr. Gilmore?

4      A.    I can't recollect if I had that type of

5  conversation with him.

6      Q.    Why did you say that you would be interested in

7  going down to Naples?

8      A.    Because it was a nice place to live and work, and

9  warm and sunny.

10     Q.    And you had a house down there, correct?

11     A.    I did, yes.

12     Q.    While you were employed at Mellon did you ever

13 hear Brendan Gilmore make a comment about Maria Dunlop's

14 boots?

15     A.    Specifically, I can't recollect.  But there were

16 comments and asides that Gilmore had made about other

17 employees at the time, that I worked at the Greenville

18 office.

19     Q.    But specifically as it relates to Maria, did you

20 ever hear Mr. Gilmore make any comments about her boots

21 or her attire

22     A.    Her attire, sometimes, yes.

23     Q.    What did you hear?

24     A.    Exact and specifically, I don't recollect at this

Linda J. Blozis

258

1    time.   But some comments that I thought might be

2    inappropriate.

3        Q.    Like what?

4        A.    Perhaps -- my recollection is that perhaps, how

5    an outfit looks or possibly fits somebody.

6        Q.    When you say somebody, meaning Maria?

7        A.    Maria, and I am also recalling when, a specific

8    incident, instance when we shared space with the retail

9    folks, before they became Citizens, there was a sales gal

10   who was married, and who was an attractive single mother,

11   a responsible worker, and others in that office --

12   because at the time Maria wasn't even on board yet -- he,

13   Gilmore would come into the office and stop by her desk

14   and say things and comments to her that appeared to be

15   unprofessional.

16       Q.    Like what?

17       A.    The exact words I don't recall.  But I can tell

18   you that Miss Cindy Wilson was an employee of Mellon at

19   the time, myself, I'm trying to think of -- Joan Rowe,

20   who worked for Holding Companies, he just seemed to talk

21   in an inappropriate manner to her, his tone of voice, an

22   obvious, I think we used the term gushing or flirting.

23   And this young lady tried to conduct herself in a

24   professional manner and get on with her work, and then he

Linda J. Blozis

259

1    would move on to speak to the supervising officer, which

2    I think was Landis or Becker at that time.

3        Q.    What time frame?

4        A.    Time frame meaning what?  I don't understand.

5        Q.    What year?  If you have a specific date that

6    would be great.

7        A.    It would have been prior to the lift-out that

8    occurred when Mellon sold the retail and business banking

9    operations to Citizens Bank.

10        Q.    1998?

11        A.    No.  We had gone -- our group had moved into the

12    Greenville office -- oh, my gosh, see if I can recollect

13    that year -- probably around 2002 to 2003, and Citizens,

14    or that which became Citizens retail was still operating

15    in that office until it can move out.

16        Q.    Now, the person that you described her as a

17    single mom, who was it?

18        A.    At this point I don't recollect her name, but I

19    could, with research I probably could find that out.  She

20    sat at the next desk from me.  She may still be with

21    Citizens.  She was an attractive girl, but a professional

22    worker.

23        Q.    Now, with respect to, you described what Mr.

24    Gilmore would do I guess when he came down to the

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B309

Linda J. Blozis

260

1    Delaware office, and she would be sitting at her desk?

2        A.    Yes.

3        Q.    Okay.  Now, did you overhear the conversations?

4        A.    Several of us overheard the conversations.

5        Q.    Did Mr. Gilmore ever make any comments to you

6    that you felt were inappropriate?

7        A.    At this point I don't recollect in the same way

8    that he did to this younger employee.

9        Q.    Okay.  When you say "in the same way," whether

10   they were in the same way or some other way, you had

11   spoken earlier about the conversation that you had in his

12   office where you felt he yelled at you, so you told me

13   about that time.  Any other times?

14       A.    I don't fully understand your comparison or the

15   premise.

16       Q.    Let me just --

17       A.    Would you clarify?

18       Q.    Because what I'm getting from you is that Mr.

19   Gilmore made comments that you took to be of a sexual

20   nature concerning this woman who may or may not have been

21   a Citizens employee; is that right?

22       A.    That's correct.  And it was not just myself who

23   understood this to be that way.

24       Q.    All right.  Did Mr. Gilmore ever make any

Linda J. Blozis

261

1    comments to you that you felt were of a sexual nature?

2        A.    To my recollection, no.  Not of a sexual nature.

3        Q.    All right.  Now when you say "not of a sexual

4    nature," that leads me to believe that there were

5    comments that he said to you that you felt were

6    inappropriate but may not have been of a sexual nature.

7        A.    I understand that that is the way you would have

8    taken that comment, yes.

9        Q.    Did I take it correctly?

10       A.    Yes, I would say so.

11       Q.    Okay.  Now, what were the comments?

12       A.    In conversations, my recollection overall with

13   Brendan Gilmore is if you tried to converse with him,

14   perhaps about non-work things, he mostly made you feel

15   uneasy or unapproachable or aloof, and so you wouldn't

16   engage him in conversation.

17       Q.    Can you give an example?

18       A.    A specific example, no.  An overall generality,

19   feeling is that Brendan Gilmore was attracted to the

20   younger people in the office, and the middle-aged or

21   little older employees were, were not ignored but -- were

22   ignored or tolerated in their work.

23       Q.    When you say he was attracted to the younger

24   people in the office, do you mean younger females?

**W&F**

Linda J. Blozis

262

1    A.    I think he, besides the females, he felt that

2  if -- the younger male employees of our team, he would

3  show preference to them over people of a certain age.

4    Q.    And how would preference be shown either to the

5  younger males or the younger females?

6    A.    That he would engage them in conversations,

7  whether work-related or non-work-related.

8    Q.    And you felt that with the older employees, if

9  they tried to engage him in work-related conversations or

10  non-work-related conversations, he didn't have much to

11  say?

12    A.    Yes, I would say so.

13    Q.    Now, earlier you said that you felt that you were

14  starting to get criticized, and I had asked you when in

15  time that you started having that feeling, and you said

16  that it was when Maria Dunlop started.  Do you remember

17  that?

18    A.    I remember saying that to you.

19    Q.    Okay.  And why do you feel that you started to

20  get criticized more when she came?

21    A.    I don't really know at this time why I would be

22  getting criticized, because I felt my performance and my

23  attitude towards work was constant.  I was happy to train

24  her and bring, try to bring her up to speed, in addition



Linda J. Blozis

263

1   to all my other responsibilities.

2       Q.   Do you know if any other portfolio administrators

3   were on corrective action at any point in time that you

4   were at Mellon?

5       A.   I don't believe that is something that would have

6   been shared with me.  Protocol didn't dictate that we

7   each know the other's reviews.

8       Q.   So is it fair to say that the only review that

9   you knew about was your own?

10      A.   I don't understand the time frame.  Do you mean,

11  do you mean in reference to --

12      Q.   At any point while you were at Mellon.

13      A.   At any point while I was at Mellon.  Kathleen

14  Agne, in retrospect, I recall that Kathleen Agne didn't

15  specifically share any criticism that she was getting,

16  but I could sense there was trouble, and upon approaching

17  her could tell -- approaching her and asking, "What is

18  going on?" that she may have been going through a

19  reprimand or a criticism of work after 20 some, 18 to 20

20  some years with the company.

21      Q.   Did she tell you that that was happening?

22      A.   She intimated to me, and I cannot give you

23  specific words, that they were becoming more and more

24  displeased with her performance.

Linda J. Blozis

264

1    Q.    Did she tell you who?

2    A.    It would have been the immediate supervisors at

3    that time, and I believe, recollection says that it would

4    have been Bill Becker and Gregg Landis, under the

5    supervision of Brendan Gilmore.

6    Q.    Did you ever review any of Kathleen's performance

7    evaluations?

8    A.    I wouldn't -- that wouldn't be -- I wouldn't have

9    access to them.  I want to clarify, I would not have

10   access to them from the standpoint of seeing something in

11   paper.  I would have not been given that when I reported

12   to a supervisor either.

13   Q.    Okay.  And did you have any discussions with Mr.

14   Becker or Mr. Landis or Mr. Gilmore about Kathleen's

15   performance?

16   A.    My recollection is that a brief attempt to

17   inquire from Bill Becker what was happening was dismissed

18   as not something that he could talk about.

19                And if you ask me for a specific date, I

20   cannot give that.  It is just the recollection that I

21   have then.

22   Q.    So you had asked Gregg, "What is going on with

23   Kathleen" --

24   A.    Bill Becker.



Linda J. Blozis

265

1    Q.   Oh, Bill Becker?

2    A.   Bill Becker.

3    Q.   "What is going on with Kathleen," or something

4    like that, and he said, "I can't talk about it"?

5    A.   Yes, to my recollection, yes.

6    Q.   Anybody else?

7    A.   There -- no, no.

8            (Blozis Deposition Exhibit 17 was marked for

9    identification.)

10   Q.   Miss Blozis, if you could look at what has been

11   marked as Blozis 17, please.

12   A.   All right.  I've read it.

13   Q.   Okay.  Miss Blozis, have you seen what has been

14   marked as Blozis 17 before?

15   A.   Yes.

16   Q.   And what is it?

17   A.   It is titled an "Information Questionnaire" from

18   the Office of Labor Law Enforcement.

19   Q.   Do you know, is that the agency, Office of Labor

20   Law Enforcement?

21   A.   The unemployment agency or the employment -- to

22   my recollection, I don't know what it is called now in

23   Delaware, but I would say it is.

24   Q.   You think it is unemployment?

Linda J. Blozis

266

1    A.    I think this is the office affiliated with

2  unemployment where grievances or complaints can be filed,

3  in recollection.  It is on a different floor.

4    Q.    And looking down at the bottom, it is dated May

5  20th of 2003.

6    A.    Yes.

7    Q.    Is that your signature and your writing, the May

8  20th?

9    A.    Yes, it is.

10    Q.    Do you take that to mean that that is the day you

11  completed the form?

12    A.    Yes, it was.

13    Q.    Do you know if anyone at Mellon received a copy?

14    A.    I don't know the protocol at the Labor Law

15  Enforcement office, but I don't believe I personally

16  recollect handing them a copy of this.

17    Q.    And why is it that you filled out the

18  questionnaire?

19    A.    I would recollect at the time that I thought I

20  had a genuine grievance against Mellon.

21    Q.    And is all of the writing on Blozis 17 your

22  writing?

23    A.    At this time I would have to say yes.  I don't

24  suspect it has been altered.

Linda J. Blozis

267

1    Q.    All right.

2    A.    I would hope not.

3    Q.    Well, is there any reason for you to suspect that

4   it has been altered?

5    A.    This particular piece of paper, exhibit, no.

6    Q.    Right.  You produced it.  It says P214.  So this

7   is a document that you produced to us.

8              Other than Blozis 17, this particular

9   questionnaire, did you submit anymore documents to the

10  Office of Labor Law Enforcement?

11   A.    At this time I can't fully recollect if there

12  were other documents that went along with this.  There

13  may have been.  I'm not sure at this time.

14              (Blozis Deposition Exhibit 18 was marked for

15  identification.)

16   Q.    Blozis 17, on the second page, is redacted of the

17  client name and identifying information.  There is the

18  unredacted version so you can look at --

19   A.    You said Blozis 17.  This is --

20   Q.    Oh, is it 18?

21   A.    It is numbered 18.

22   Q.    Okay, Blozis 18.  If you would take a look at

23  that, please.

24   A.    I have read Exhibit 18.

**W&F**

Linda J. Blozis

268

1    Q.    Okay.  Have you seen what has been marked as

2  Blozis 18 before?

3    A.    I don't recollect that I have.

4    Q.    Okay.  While you were employed at Mellon have you

5  heard of a stale priced assets report before?

6    A.    To my recollection, yes.

7    Q.    What is a stale priced assets report?

8    A.    To my recollection, as this indicates, codes that

9  may need updating or re-evaluation pertaining to various

10  accounts, as it says, real estate, leased partnerships,

11  insurance policies, other miscellaneous assets.

12    Q.    Okay.  And what is the purpose of updating that

13  information?

14    A.    To my recollection, it was most likely to bring

15  those holdings within the accounts to a standard of that

16  given time, evaluation of that given time.

17    Q.    Were you ever asked by Gregg Landis to review and

18  do a report concerning stale pricing?

19    A.    I recollect that you have asked me this question

20  before, and I recollect that my answer was that Landis,

21  Mr. Landis had asked me to address this issue, and my

22  response was that it was always a portfolio officer's

23  responsibility to evaluate those holdings, that a person

24  in my level, as an administrative assistant, did not have

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B318

Linda J. Blozis

269

1    the authority to evaluate those holdings.

2        Q.    Did you ever tell Mr. Landis what you just said,

3    in essence, that it is not someone with your, I guess, in

4    your job status to evaluate those holdings?

5        A.    I recollect that I may have told him, and Mr.

6    Becker before him.

7        Q.    Okay.  And do you remember what Mr. Landis said?

8        A.    My recollection would be that -- I don't know if

9    I have a recollection.  I think he turned it back on me.

10       Q.    And you said you had also spoken to Mr. Becker as

11   well?

12       A.    I recollect I did.

13       Q.    And what did he say?

14       A.    My recollection is he turned it back on me.

15       Q.    And when you say turning it back on you, what do

16   you mean by that?

17       A.    In remembrance, that I was to handle this, these

18   valuations, and to probably not bother them further with

19   them.

20       Q.    Do you know whether other portfolio

21   administrators were handling the stale pricing?

22       A.    I do not have knowledge of that at this time.

23              (Blozis Deposition Exhibit 19 was marked for

24   identification.)

Linda J. Blozis

270

1    A.    I have read Exhibit 19.

2    Q.    Have you seen what has been marked as Exhibit 19

3  before?

4    A.    I think I have.

5    Q.    Again, looking down at the bottom right.  It is

6  P848.  It is one of the documents that you produced to

7  us.

8    A.    Mm-hmm.

9    Q.    Looking at the e-mail chain, does it refresh your

10  recollection?

11    A.    Yes, it does.  But I feel there is a portion

12  missing from this where I indicated to Mr. Landis and Mr.

13  Becker, and possibly Paul Wasielewski, that, if I'm

14  correct in recollecting, the stale dated reports have

15  been ignored by previous portfolio officers from years

16  back, and I had felt that it was being dumped on me to

17  take responsibility for it.

18              And I felt all along and knew all along that

19  it was a job that was handled by an officer level to

20  determine the valuations of various assets in the

21  accounts and not the administrative assistants or the

22  portfolio assistants.

23    Q.    And you believe you had communications in writing

24  or orally with Gregg or Paul Wasielewski concerning that?

Linda J. Blozis

271

1    A.    My recollection is, when you say writing, I can

2    only say e-mail or, and/or verbal.    My recollection is

3    that, yes, I had those communications.

4    Q.    Is it fair to say that Gregg wanted you to do a

5    stale pricing report, nonetheless?

6    A.    From reading, re-reading this e-mail, I think it

7    would be safe to interpret that he expected me to do it,

8    nonetheless.

9    Q.    And looking at the second e-mail exchange from

10   the bottom, which is an e-mail from Gregg to you, with a

11   May 21, '03 date on it, do you see where I am?

12   A.    Where, are you reading --

13   Q.    Second from the bottom.

14   A.    Yes, I see that, yes.

15   Q.    It says, "Per our discussion, please complete by

16   6/20/03."

17   A.    I see that.

18   Q.    Do you see where I am?

19   A.    Yes.

20   Q.    Had you and he had discussions on when he wanted

21   to see the completed project?

22   A.    Specific verbal discussions I can't recollect.

23   But this e-mail would intimate that there probably were.

24   Q.    And then was there further follow-up on the

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Linda J. Blozis

272

1  status of the project?

2      A.    Specifically, I can't recollect if there was

3  follow-up to that via e-mail or discussions.  My general

4  recollection is that, what I have expressed before, that

5  I tried to convey to them that I knew that to be a job

6  that was the responsibility of the officers, to set

7  valuations, and that I was talking to a blank wall.

8      Q.    Now, with respect to the top e-mail from you to

9  Gregg concerning the status of the project, it has a June

10  26th, '03 date on it.  Do you see where I am?

11     A.    Yes.

12     Q.    Had the project not been completed by June 26?

13     A.    The e-mail says, "In short, the task is not

14  completed."

15     Q.    What was Gregg's reaction to that?

16     A.    Recollecting, I don't specifically know his

17  reaction to it.  I do know that up until that point I was

18  of the impression that a lot of the projects that were

19  left me alone in that office were getting done, and I do

20  remember Gregg saying we are moving along, to some

21  extent -- I don't know the exact verbiage now -- but that

22  we were handling things.

23     Q.    Did he say specific projects that he thought were

24  being handled?



Linda J. Blozis

273

1    A.    I can't recall specifically.  I have the sense

2    that he had a sense of accomplishment.

3    Q.    But in terms of projects or work, can you give me

4    specific projects or work where you had the sense that

5    Gregg was feeling a sense of accomplishment?

6    A.    In our working relationship?

7    Q.    Yes.

8    A.    I have that sense, that without help for a second

9    portfolio assistant, that we were moving along.

10    Q.    Did Gregg ever express to you that he felt that

11    he was doing the lion's share of the work?

12    A.    Not in so many words, but, in fairness, I saw the

13    hours that he was putting in.

14    Q.    And were they significant hours?

15    A.    Significant in what sense?

16    Q.    Well, you said you saw the hours that he was

17    putting in.  That led me to believe that you saw him

18    working long hours.

19    A.    Yes.

20    Q.    Did he ever say to you that he wanted you to work

21    harder?

22    A.    In those specific terms, I don't recollect that.

23    Q.    Not in specific terms, but did he say, for

24    example, he would like for you to work longer, longer

Linda J. Blozis

274

1   hours during the day or come in over the weekend?

2       A.   I felt there were times that I had done that, on

3   more than one occasion.  Specifically him stating that to

4   me, I don't recollect that he was dissatisfied with the

5   time that I was putting in.

6       Q.   Okay.  And because you don't recall him saying

7   that to you, is that, when you say you don't recollect?

8       A.   Please be more specific.

9       Q.   When you said that you don't recollect him saying

10  that he wanted you to work longer or on the weekends and

11  that he was satisfied with the time that you were putting

12  in on your work, did he say that?  In maybe not specific

13  words but in general words?

14      A.   That he was not satisfied with the time that I

15  was putting in?

16      Q.   Yes.  Did he ever say that?

17      A.   I, I don't recall specifics about him saying that

18  he was dissatisfied, but the criticisms that were coming

19  either via Gilmore or himself intimated that the time I

20  was putting in apparently was not sufficient to them.

21      Q.   In focusing on the criticism that you were

22  getting from Gregg Landis, what was the criticism?

23      A.   My recollection is that -- are you okay?

24                THE COURT REPORTER:  Yes.



Linda J. Blozis

275

1           My recollection is that I had to produce

2     more work, more quickly.

3       Q.    Now, with respect to Blozis 19 and your last

4     response, which is actually the response at the top, did

5     you have any conversations with Gregg Landis about the

6     completion of the May 2003 stale priced report?

7       A.    I don't recall specific conversations at this

8     time, after this e-mail.

9       Q.    Did you finish the stale priced report?

10      A.    I don't recollect that it was completed.  May

11    have been an attempt on my part to illicit information

12    from other officers.  I can't recall now.

13            (Blozis Deposition Exhibit 20 was marked for

14    identification.)

15      A.    I have looked at this.

16      Q.    Okay.  Do you recognize what has been marked as

17    Blozis 20?

18      A.    Yes.

19      Q.    And what is it?

20      A.    It looks as if it is a things to be done list.

21      Q.    All right.  Is that your handwriting?

22      A.    It looks to be my handwriting.

23      Q.    All right.  All of it, the full page?

24      A.    I think it is a safe assumption that it is my



Linda J. Blozis

276

1    handwriting.

2        Q.    Now, with respect to Blozis 20, would you give

3    that to Gregg Landis?

4        A.    I don't recall that.

5        Q.    Would Blozis 20 be something that you would keep

6    for yourself?

7        A.    Probably was a reminder or to do list for myself.

8        Q.    Now, looking at item 4 --

9        A.    Yes.

10       Q.    -- on your to do list, is that the stale pricing

11   that we have been discussing earlier?

12       A.    I would assume that it is.

13       Q.    Okay.  And in looking towards the right hand of

14   that, where it says "June 20th," do you see that?

15       A.    Yes.

16       Q.    Was that the due date?

17       A.    In reflection of the previous e-mail exhibit, I

18   would think that that is the June 20th you are referring

19   to.

20       Q.    In looking at the date on the top, May 21 of '03,

21   is that the date that you completed your to do list in

22   terms of putting down items 1 through 10?

23       A.    It would seem so.

24       Q.    Okay.  So you think with Blozis 20 this was

Linda J. Blozis

277

1    something that you kept for yourself as opposed to giving

2    to Gregg?

3        A.    I'm not sure that he might not -- I might not

4    have shared this with him at some time or we discussed it

5    or we even jointly created it.  I don't recollect at this

6    time.

7                (Blozis Deposition Exhibit 21 was marked for

8    identification.)

9        A.    I have read, re-read or read 21.

10       Q.    Okay.  Miss Blozis, have you seen what has been

11   marked as Blozis 21 before?

12       A.    I'm not sure that I have at this time.

13       Q.    Let's look at the first page where it says "From:

14   Gregg Landis, To:  Linda Blozis."  It is the first

15   e-mail, down at the bottom.

16       A.    Yes.

17       Q.    Do you see that?

18       A.    Yes.

19       Q.    It has a June 4 date on it?

20       A.    Yes.

21       Q.    And I understand that you said that you can't say

22   that you have seen it, actually seen the document before.

23       A.    Mm-hmm.

24       Q.    But if you look at it, maybe it might refresh

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Linda J. Blozis

278

1    your recollection.  Do you recall getting a spreadsheet

2    concerning various notations?

3        A.    At this time I can't say I have the spreadsheet

4    because the name of the account has been blacked out.

5        Q.    I gave you a clean copy that you can look at.

6        A.    I'm sorry.  I seem to recall that we possibly had

7    this particular trust account.

8        Q.    So the trust account sounds familiar to you?

9        A.    Somewhat.

10       Q.    Did you have any conversations with Gregg about I

11   guess the tasks that he had given you on June 4 of '03?

12       A.    Right now my recollection isn't clear about a

13   discussion on this particular trust account, but the

14   e-mail would indicate that an exchange was made.

15       Q.    Did Gregg ever express any dissatisfaction with

16   you concerning this particular trust account about not

17   having the task completed?

18       A.    I don't recall specific verbal discussion.  This

19   e-mail would indicate that there is some sense of

20   dissatisfaction on Gregg Landis' part.

21             But there is the mention of Bruce Holmquist,

22   the other portfolio officer, in Washington, that I was

23   responsible for working on, and it may indicate that

24   there may have been responsibilities that Bruce was to

Linda J. Blozis

279

1  complete too.  I'm not sure at this time.

2    Q.    All right.  So sitting here today, concerning, in

3  connection with this particular trust account, you don't

4  have any specific recollections of the information that's

5  contained in Blozis 21?

6    A.    The only recollection that I can say for certain

7  is that Mr. So and So's trust was not at jeopardy for

8  anything that I did or apparently, according to Landis,

9  did not do.

10    Q.    And how do you know this?

11    A.    Up until the final day of my employment I believe

12  this gentleman was still a client of ours.

13    Q.    But putting to the side as to whether the trust

14  account was ever in any jeopardy, do you recall having

15  any conversations with Mr. Landis about any

16  dissatisfaction with the timeliness of the work that he

17  had assigned to you?

18    A.    I don't recall dissatisfaction on this particular

19  trust, and I have no recollection or recall that it

20  hadn't been completed --

21    Q.    When you say --

22    A.    -- prior to my, prior to my dismissal or release.

23    Q.    Okay.  So your release came, was it around July

24  of '03?

1    A.    Yes.

2    Q.    So you are not sure, you think it had been

3  completed prior to July of '03?

4    A.    I'm thinking it had been completed prior to the

5  6/6 appointment that Gregg says Bruce and he have set to

6  work more intensively on this.  Whether it -- I don't

7  recollect if it was a client meeting or anymore attention

8  that he and Mr. Holmquist, Bruce Holmquist were to give,

9  I don't recall.

10              (Blozis Deposition Exhibit 22 was marked for

11  identification.)

12    Q.    Tell me when you have finished reviewing.

13    A.    I have.

14    Q.    Okay.  Have you seen what has been marked as

15  Blozis 22 before?

16    A.    The e-mail indication would be that I had

17  received it.

18    Q.    Had you had any conversations with Mr. Landis

19  concerning this particular client, client trust account?

20    A.    This specific trust account involved many

21  discussions, I believe.  If I'm correct in assuming, this

22  gentleman was the chief legal counsel for Mellon and his

23  personal trusts were on our team.  And I can recall some

24  issues, specifically I'm not sure about this particular

Linda J. Blozis

281

1    one, unless it is pertaining to other situations that

2    arose later with Mr. Gilmore and Mr., let's call him Jeb.

3        Q.   Now, with respect to, I guess call it the Jeb

4    account, did Mr. Landis ever express to you any

5    dissatisfaction with your work on the account?

6        A.   I don't recall that he did.  And I have no way of

7    knowing for sure when this note was written, on or about,

8    before or after the date of the e-mail of this particular

9    exhibit.

10       Q.   You mean the handwritten, writing down at the

11   bottom?

12       A.   That's what I'm referring to.

13       Q.   Okay.  And do you recognize the handwriting at

14   the bottom?

15       A.   It is not mine.

16       Q.   Do you recognize it to be Gregg Landis'?

17       A.   I can't say specifically at this time that I do.

18       Q.   Okay.  Do you remember any discussions that you

19   and Gregg Landis had about the Jeb account in connection

20   with I guess Jeb asking questions about mutual fund fees?

21       A.   Specifically on mutual fund fees, I can't recall.

22   I'm trying to recall other situations that -- because

23   there were situations with the Jeb accounts that arose.

24       Q.   But in terms of you and Mr. Landis having



Linda J. Blozis

282

1  discussions about following up to Jeb about mutual fund

2  fees, do you have any specific recollection?

3      A.    Not as far as discussions with Mr. Landis.  I had

4  a very good working rapport with Jeb, who, as I said, was

5  chief legal counsel for Mellon Delaware and happened to

6  have personal trust accounts with us.

7              I know Mr. Bell was concerned about

8  treatment that he was getting, but as far as mutual

9  funds, I feel they were resolved at the time of my

10  dismissal, based on conversation I had with him.

11     Q.    With who?

12     A.    Jeb.

13     Q.    Now, in terms of conversations with Mr. Landis,

14  and I'm just looking, I'm referring to the handwritten

15  portion down at the bottom, and I understand your

16  testimony that you don't recall seeing this and you don't

17  have a direct recollection of it, do you recall any

18  dissatisfaction that Mr. Landis had with you about

19  following up with Jeb on the mutual fund fees?

20     A.    Not at this time do I have a recollection about

21  that.

22     Q.    Okay.  Did you ever have any discussions with Mr.

23  Landis about his dissatisfaction with any trading issues?

24     A.    Specifically, I can't say that I recollect

Linda J. Blozis

283

1    dissatisfaction.  I know we discussed various trading

2    situations in the accounts.  That was his job, that was

3    my job, to talk about the trades.

4        Q.    Do you know whether he was ever dissatisfied with

5    any work that you did with respect to a trade concerning

6    Nortel, N-O-R-T-E-L, Network?

7        A.    Specifically, no.  Perhaps if you were to give me

8    a trust name, it might help me recollect.  But no, at

9    this time.

10       Q.    Did Mr. Landis ever complain to you that he felt

11   that you failed to demonstrate ownership of your work?

12       A.    I can't give you a specific time that I recollect

13   he said that, but overall I felt after the employment of

14   Maria Dunlop and the fact that I brought her up to speed

15   in training, that the attitude towards me was worsening

16   and becoming more critical of work that seemed to prior

17   be totally acceptable and meets standards, at the very

18   least.

19       Q.    But with respect to specific conversations with

20   Mr. Landis concerning any dissatisfaction with ownership

21   with your work, do you remember having any conversations

22   with him about that?

23       A.    Using the term owner -- I beg your pardon --

24   ownership, I don't have specific recollections.

Linda J. Blozis

284

1    Q.    Don't limit it to ownership, because it may not

2  be the specific word, he may not have sat down and used

3  the word ownership.  But think of it in terms of, I

4  assume you have an understanding of what ownership of a

5  project means.  Correct?

6    A.    I thought I did, yes.

7    Q.    What is your understanding?

8    A.    To take those responsibilities that were within

9  my job realm and do them to the best of my ability.

10    Q.    Now, did you ever have any discussions, dealing

11  with your definition of ownership, did you have any

12  conversations with Gregg about his feeling that you

13  weren't taking ownership?

14    A.    I don't recall specific discussions other than

15  occasional meetings that would indicate this particular

16  project may be, the time line may be more pressing than

17  another.

18    Q.    Okay.  And when you say that, a particular

19  project might be more pressing than another, what do you

20  mean?

21    A.    I don't understand how more specific you want me

22  to get.  That perhaps there was a filing -- this is a

23  generalization -- a filing that needed to be

24  accomplished, a letter needed to be sent to a client, a

Linda J. Blozis

285

1   booklet that needed to be prepared for a certain meeting

2   date, that is what I'm referring to.

3       Q.   Now, in terms of your testimony thus far, I get

4   the sense that Mr. Landis was asking you to do certain

5   things which you felt was not within your job category.

6   Is that correct?

7       A.   Not everything.

8       Q.   Not everything that he was asking you to do was

9   within your job category, as you saw it?

10      A.   The pricing evaluation I felt was not in my job

11  realm.

12      Q.   Anything else?

13      A.   Offhand, I don't recollect right now.

14      Q.   Did you ever have any discussions with Mr. Landis

15  or Mr. Gilmore that they were not pleased with your

16  performance in preparing for, I'll just use the last

17  name, a Lickle meeting, L-I-C-K-L-E?

18      A.   Specifically, no recollection specifically.  I

19  know they were a client that, client relationship that

20  required a level of attention that may have been more

21  demanding than other client relationships.

22           I can recall, not specifically, but Landis,

23  Gilmore and Becker having discussions back and forth

24  about how they might be working or planned to work with

Linda J. Blozis

286

1    this particular family and their relationship.

2        Q.   As it relates to you, was there any discussions

3    that you had with either Gregg Landis or Bill Becker or

4    Brendan Gilmore about your performance on any tasks

5    concerning this particular I guess family account?

6        A.   Not that I understood those discussions to be

7    criticisms.  It was how we were going to approach this

8    family relationship.  I'm trying to be protective of

9    their privacy here.  How we would increase the value of

10   our business with them, what meetings we may schedule or

11   luncheons we may have.  That's the only recollection.

12            I know I -- I think I made personal calls to

13   various family members in trying to attempt to set up

14   appointments for them.

15       Q.   Was there ever any criticism of your handling of

16   any I guess presentation booklets for that family?

17       A.   Offhand, I don't recall.  I think any booklets

18   that I prepared were done satisfactorily, because each

19   officer was required to review those preparations before

20   going into a meeting.

21       Q.   I take it that you did put together some booklets

22   for that family?

23       A.   I would recollect that at the time those accounts

24   were assigned to us, because there was a great deal of

Linda J. Blozis

287

1   reshifting of accounts in the last months of my being

2   employed, last six months, that went from team to team,

3   that at the time that they were our specific Delaware

4   office responsibility, there may have been some booklets

5   prepared.  To the best of my recollection, there may have

6   been some booklets prepared.

7       Q.   Do you know whether, upon review of the booklets

8   that you prepared, Mr. Landis saw mistakes and had to

9   correct them?

10      A.   Mistakes would have been brought out in numbers

11  before the actual assemblage of the booklets.  Oftentimes

12  Gregg or Bill might, as portfolio officers, would change

13  information or data that they would relate to me to be

14  input into the assemblage of the booklets.

15      Q.   In terms of the work that you did with respect to

16  the booklets, was there ever any criticism by Mr. Landis

17  or Mr. Becker?

18      A.   Regarding this particular family, familial

19  relationship?

20      Q.   Yes, yes.

21      A.   To my knowledge now, I don't recall.

22      Q.   Did anyone, Mr. Landis or Mr. Gilmore, ever state

23  that you had placed inaccurate information on statement

24  of investment policy forms?



Linda J. Blozis

288

1    A.    I'm sorry, repeat that question, please.

2    Q.    Did Mr. Landis or Mr. Gilmore ever say to you

3    that you had placed inaccurate information on statement

4    of investment policy forms?

5    A.    Right now I don't recall that they did.

6    Q.    While you were employed at Mellon were you ever

7    asked to pull baseline reports on concentrated stock

8    holdings?

9    A.    At this time it sounds like something that may

10   have been -- repeat the terms again.  I'm sorry.  I've

11   been away from them for so long.

12              MS. WILSON:  Can you repeat that, please.

13              (Record read.)

14              THE WITNESS:  Those are terms that I recall

15   were indigenous to the business that we did.

16   Specifically if I were asked to pull them, at this time I

17   can't recall.

18   BY MS. WILSON:

19   Q.    Either way?

20   A.    Either way.  I would have had to have had the

21   various technical systems at my avail to be able to do

22   that, and I don't recall that right now.

23   Q.    Okay.  So in terms of that question, do you

24   recall ever being criticized on your handling of it?

**W&F**

Linda J. Blozis

289

1    A.    I don't know how I could have been criticized if

2  I, technically, lacked the capabilities to do that.  But

3  I would have to say no, I don't recall.

4    Q.    Okay.  When you say technically lacking the

5  capability to do that, what do you mean?

6    A.    That my system -- that the system was not

7  available to me.  I was at a level where that information

8  may be not programmed into my desktop.  Do you understand

9  what I answered?

10    Q.    Sure.  Would there have been another desktop that

11  would have had access to the information?

12    A.    More likely -- most likely, I'm recollecting that

13  it would have been the officers who may or may not have

14  had that.

15    Q.    All right.  Would that have been something that,

16  with respect to the technical information, I guess the

17  pulling of that sort of technical information, was that

18  something that you had been trained on how to do?

19    A.    There was a marked lack of training at Mellon in

20  the last years of my employment.  If you were responsible

21  or if it was a part of the portfolio administration, it

22  was more or less related from either the officer or -- my

23  recollection is.

24          There were some reports that I would pull.

**W&F**

Linda J. Blozis

290

1    I can't recall the specific titles of them right at this

2    moment.

3        Q.    Now, just so that I understand your testimony,

4    when I had asked about training, and my question related

5    to the concentrated stock holdings, whether you had had

6    training on how to pull that information off the system?

7        A.    The only recollection I have about stock

8    information was something that I know they called a

9    PORCH, which I was capable of doing and able to do and

10   did frequently.

11       Q.    That's P-O-R-C-H, correct?

12       A.    P-O-R-C-H was an acronym for it, yes.

13       Q.    And had you ever received any criticism by Mr.

14   Landis or Mr. Gilmore about untimely submission of PORCH

15   reports?

16       A.    I don't recall that, because to request a PORCH,

17   and the relating of the immediacy of the need for it,

18   would prompt me to go to my desk, interrupt all other

19   projects, and pull the PORCH.

20       Q.    So you don't recall getting any criticism on the

21   PORCH as to timeliness?

22       A.    Not that I recall at this time.

23       Q.    All right.  Do you recall getting any criticism

24   on the contents of the PORCH?

Linda J. Blozis

291

1    A.    To my recollection, the PORCH was a set substance

2    of information that ran for a particular client and a

3    particular time, based on the portfolio and the types of

4    holdings that those particular accounts or the file held.

5    Q.    All right.  So the system itself would generate

6    the report, and it was really nothing for you to do sort

7    of analytically other than run the report?

8    A.    To the best of my recollection, that's correct.

9    Perhaps just extend a time frame or not is all I can

10    recollect at this time.

11    Q.    Now, there came a time when your employment was

12    terminated; is that right?

13    A.    Yes.

14    Q.    And do you remember, you had a conversation with

15    Gregg Landis in which he conveyed that to you?

16    A.    He didn't specifically convey my termination.  He

17    asked me, and I believe that is documented, that, via an

18    e-mail, I was to go into an office and HR would contact

19    me.

20    Q.    Okay.  Do you remember when you went into the

21    office, the date of going into that office?

22    A.    I believe it was July 14th.

23    Q.    All right.  And when you went into the office it

24    was an office in Delaware, correct?

Linda J. Blozis

292

1    A.   Yes.

2    Q.   Was there anybody in the office?

3    A.   No.  It was designated, I was to go into an

4 empty, unoccupied office.

5    Q.   And did you have a sense of what was happening?

6    A.   I didn't have a good feeling, Ms. Wilson.

7    Q.   Why didn't you feel a good feeling?

8    A.   Because it seemed as though prior to that date,

9 based on occurrences as we have reviewed here, that

10 something unpleasant was about to happen.

11    Q.   All right.  When you went into the office, Gregg

12 Landis, did he join you in the office?

13    A.   No, he did not.

14    Q.   Was Rosemary Thomas on the phone or did she call

15 in?

16    A.   I can't be certain if I wasn't supposed to call

17 her or she called me, in all honesty.

18    Q.   Okay.  So during the time that you were in the

19 office was Gregg Landis ever in the room with you?

20    A.   No, he was not.

21    Q.   Was he on the phone with you?

22    A.   No, he was not.

23    Q.   You had a discussion with Rosemary Thomas?

24    A.   Yes.



Linda J. Blozis

293

1      Q.    And that was the only person you had a
2  conversation with on July 14th about your termination?
3      A.    In those specific sense, that's my recollection,
4  that it was just Rosemary Thomas.
5      Q.    All right.
6      A.    Telling me.
7      Q.    And what did Rosemary Thomas tell you?
8      A.    Wait a minute.  I might be confused.
9            I believe she said the actual termination,
10 and that I was to give Gregg keys and such.
11     Q.    All right.  Did she tell you why you were being
12 terminated?
13     A.    Specifically, I don't recall.  I don't recall,
14 other than lack of performance, I think.
15     Q.    And it was over the phone?
16     A.    Yes, it was.
17     Q.    And your testimony is that Gregg wasn't in there
18 with you?
19     A.    He was not in that office.  He -- my recollection
20 is that, and this is a very emotional thing for me, he
21 came to my desk and said, after the e-mail, that I will
22 need to go into the office and HR needs to discuss
23 something with me.
24     Q.    Okay.  And I realize that you are not being

W&F

Linda J. Blozis

294

1   specific, but, generally, Rosemary Thomas said that your

2   employment was being terminated for performance?

3       A.    Well, it was as a result of getting that e-mail

4   that Gregg handed me from Brendan Gilmore.

5       Q.    Are you talking about Blozis 14?

6       A.    No.  I'm confused.  I'm confusing the dates.  No,

7   that was, that was one thing.  The termination was a

8   separate thing.

9       Q.    Okay.  So do you want to start over with respect

10  to the termination in July?

11      A.    The recollection is that Gregg Landis e-mailed me

12  that at a certain time HR -- I had to step into a private

13  office and HR would be talking to me.  I don't recall if,

14  specifically, if I had to dial in or Rosemary Thomas

15  called me.

16              And I knew something was very bad because

17  Gregg stood at my desk and he said, "Regardless of the

18  outcome, I want you to know that you have always been

19  nice to my family."  Then I walked into the office and

20  had the conversation with Rosemary Thomas.

21      Q.    Okay.

22      A.    So I would assume that he was aware that I was

23  being terminated.

24      Q.    Okay.

Linda J. Blozis

295

1    A.    In retrospect.

2    Q.    All right.  So it was Rosemary, to your

3    recollection, who said that your performance was the

4    reason why you were being terminated?

5    A.    To my recollection.

6    Q.    And did you respond?

7    A.    I suspect that I did.  I don't recall what I

8    would have said.  Termination is termination.  It is a

9    final -- there is a finality about it.

10    Q.    Did you ever appeal the termination?

11    A.    I don't think that was the case, that could be

12    done at Mellon.

13    Q.    You don't think so?

14    A.    I'm pretty sure I know so, that once you are

15    terminated, you are terminated.

16    Q.    You don't --

17    A.    Is there any other definition to the word

18    termination?

19    Q.    When you were terminated, you didn't feel that

20    you could go to somebody and say, My termination was

21    unfair, I want you to relook at it?

22    A.    Considering who at that time were my supervisors

23    and how I felt, that they had systematically,

24    systematically conducted what I thought was my eventual

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B345

Linda J. Blozis

296

1    termination, I didn't think there was anybody that could

2    -- I could go to.

3        Q.    You didn't think that you could go to anyone in

4    HR in Pittsburgh?

5        A.    My recollection is that Rosemary Thomas may have

6    conveyed all of the happenings prior to that, and I'm

7    recollecting that she may have intimated there is no

8    recourse on this action.

9        Q.    Did you ask her whether there was recourse?

10       A.    I don't specifically recall.  I have a sense, a

11   recollecting sense that she systematically said to me

12   what may have been appurtenant to her job as far as

13   terminating an employee, that I could continue with

14   Cobra, that sort of thing, standardized things.

15       Q.    Now, during any point that you were employed with

16   Mellon did you have any discussions with anyone in which

17   you said that you would like to resign and receive

18   unemployment?

19       A.    I don't recall I ever said that.

20       Q.    What about, did you ever say to anyone that just

21   go ahead and terminate you or fire you?

22       A.    I don't recall I said anything in that manner to

23   anyone.  I liked working there.

24       Q.    Did you ever tell Rosemary Thomas or anyone at

Linda J. Blozis

297

1   Mellon that you didn't want to continue working at the

2   level or pace that you were working?

3       A.   I don't know if I understand fully your question.

4   But I may have had, in recalling discussions, the few

5   times that I talked to Rosemary, that I felt unjustly

6   burdened by work that was not asked of the younger

7   employee.

8       Q.   When you say "unjustly burdened," what was the

9   work that you were given that you felt that you were

10  being unjustly burdened by?

11      A.   I believe I testified before that there were

12  projects or booklets that I was required to do and could

13  not ask the assistance of Maria Dunlop, yet I willingly

14  and gladly offered my assistance to her, which was

15  allowed, but she was not allowed to help me.  And I

16  believe that testimony appears earlier.

17      Q.   Well, as I recall it, that was relating to those

18  booklets that were in issue in that discussion with

19  Brendan Gilmore?

20      A.   Those were the specific booklets, but it

21  pertained to any projects.

22      Q.   When you say "any projects" are you saying that

23  Maria could not assist you in completing any projects?

24      A.   That was my understanding and belief.

Linda J. Blozis

298

1    Q.    And what was that based on?

2    A.    I don't know why she would have been told that.

3  Based on the fact that she was not allowed to help me.

4            I was told, I recollect one time Brendan

5  Gilmore saying, "You cannot ask Maria for help."

6    Q.    And was that during that meeting, that

7  closed-door meeting that you testified to earlier?

8    A.    Could have been on or before that date.  I don't

9  recollect specifically when.

10   Q.    Okay.  Did Brendan tell you why that you couldn't

11 ask Maria for help?

12   A.    I don't recollect specifically why.  I don't

13 think he would tell me.

14   Q.    Did he feel that you were unfairly imposing upon

15 Maria to help you?

16   A.    I don't know what he was feeling.

17   Q.    Did Maria help you with any work?

18   A.    She had in the past, yes.  We shared, we shared

19 job responsibilities.  After all, I taught her the

20 systems and the protocol for that office.  She did not go

21 to a training session.

22   Q.    So if I understand your testimony, Miss Blozis,

23 is that Maria had in the past helped you with work, but

24 then there came a time when she did not?

Linda J. Blozis

299

1    A.    I think the clarification would be that I was not

2   allowed to ask her for help.

3    Q.    Okay.  Do you remember when it was that you were

4   not allowed to ask her for help?

5    A.    It is, my recollection is that it seemed to be on

6   or around the time when I -- the vacation issue that we

7   had discussed before had come up.

8    Q.    And the vacation issue, is that the time that you

9   and Brendan were in that closed-door meeting?

10    A.    Either that specific meeting where he used

11   profanity or one before it, saying that I could not take

12   the requested time that I had asked for or the time that

13   I had put in for.

14    Q.    The requested vacation time?

15    A.    Mm-hmm.

16    Q.    Now, putting to the side that Brendan had told

17   you that you couldn't ask Maria for help, did she help

18   you, nonetheless?

19    A.    My recollection is that she did where she could.

20   We always had a -- I want it understood, we had a good

21   working rapport, and we could count on each other for

22   different small projects, larger projects, help where it

23   might require phone coverage or something else.

24    Q.    Now, in your complaint you make an allegation

Linda J. Blozis

300

1  concerning vacation time.

2                    MR. LAROSA:   It is at page 9.

3                    MS. WILSON:   Thank you.   Yes.

4  BY MS. WILSON:

5      Q.    Page 9, paragraphs 51 and 52, with respect to

6  vacation, and according to your allegation, it was April

7  of 2003 where you requested two consecutive weeks of

8  vacation.

9      A.    Earned vacation.

10     Q.    Okay.   And in terms of, when you say earned, I

11 guess earned and accrued, it was vacations earned and

12 accrued on an annual basis?   For example, that you get

13 say four, four weeks vacation every year?   Or was it more

14 than that?

15     A.    It was earned every year, to my recollection.   I

16 can't recall when they went to the system where you, if

17 didn't use it in a year you couldn't carry it over.   I'm

18 not positive at this time.

19     Q.    Okay.   In 2003 do you know how much vacation you

20 had earned and accrued, as of April 2003?

21     A.    As of April 2003, within that year I could take

22 four weeks vacation.

23     Q.    So you had requested two weeks off for vacation?

24     A.    Yes.

Linda J. Blozis

301

1    Q.    And who did you put the request into?

2    A.    My recollection is that I would have initiated it

3  with my direct supervisor, who was Gregg Landis at that

4  time, and then it would go however up the chain.

5    Q.    And looking at your allegation, you were denied

6  the two weeks and given six, six days?

7    A.    Yes.

8    Q.    All right.  You seem like you had something else

9  to say.

10   A.    I'm thinking that, my recollection is that it was

11  previously approved and then take away.

12   Q.    So your recollection is that you had been

13  approved for the ten?

14   A.    For the ten working days.

15   Q.    And who had previously approved it?

16   A.    It would have been Gregg or my supervisor at the

17  time of seeking that initial time off.

18   Q.    Gregg or Bill?

19   A.    Yes.  I'm not sure of the specific crossover, but

20  they both would have been aware of the request.

21   Q.    Do you know who you specifically asked it of?

22   A.    Not specifically initially, but I do know that

23  both Gregg and Bill would have been -- if, if it was --

24  fell in that time or that requested time when Bill was

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Linda J. Blozis

302

1    still a part of the Delaware team, they would have been

2    made aware.  As a small office, we, as a courtesy, would

3    inform each other of times that we wanted, and it was

4    noted what would be available for office coverage, who

5    would be remaining.

6        Q.   Okay.  Now, in terms of the requests for

7    vacation, do you know, in general, what was considered in

8    approving or denying a vacation request?

9        A.   Specific, no, I don't recall.  I don't know.  I

10   would submit my request.  They would come and say at some

11   short time after that, yes, that's approved.

12                (Blozis Deposition Exhibit 23 was marked for

13   identification.)

14       A.   I have looked at this exhibit.

15       Q.   Have you seen what has been marked as Blozis 23

16   before?

17       A.   I can say that I probably have seen the e-mail,

18   the printed e-mail exchange.

19       Q.   In terms of the handwriting, do you recall seeing

20   that before today?

21       A.   No.

22       Q.   Do you recognize the handwriting?

23       A.   Well, the "GL" looks like what I recollect the

24   way Gregg Landis used to sign his name or his initials.

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Linda J. Blozis

303

1    Q.    Now, looking at Blozis 23, up at the top, this is

2    your request to Gregg about vacation, correct?

3    A.    Yes.

4    Q.    And this request is relating to your paragraph 51

5    of your complaint?

6    A.    Yes.

7    Q.    Okay.  Now, in terms of the request, and I'm

8    looking at the handwritten portions underneath, where it

9    says, "Brendan advised Linda on March 18, '03 that her

10   request was partially approved," did you have

11   conversations with Brendan Gilmore about your vacation

12   request?

13   A.    On that date, I don't recall.

14   Q.    All right.

15   A.    My recollection is that on or around March 13th,

16   I was allowed to take -- or I was, I was given the okay

17   to take the full time that I requested in the printed

18   e-mail above.

19   Q.    And who was it that had given you the okay?

20   A.    Considering this exchange, it would have been

21   Gregg Landis.

22   Q.    So it is your testimony that Gregg had initially

23   given you the okay for the two weeks?

24   A.    That's my recollection at this time, yes.

Linda J. Blozis

304

1    Q.   All right.  But you recall getting, I guess,

2  subsequent information about not being able to take the

3  two weeks and being able to take six days?

4    A.   I recall getting subsequent information to that

5  extent, yes.

6    Q.   And was that from Gregg who told you that?

7    A.   I can't recall specifically if it was Gregg or if

8  it was Gilmore that told me, sometime after March 13th.

9    Q.   Was there any discussion why you couldn't take

10  the two weeks?

11    A.   I don't recall.  I don't recall a specific

12  discussion.  I'm thinking back, trying to remember what

13  Brendan Gilmore would have said, if it possibly was that

14  Maria was too new to be left on her own.  I don't know.

15  I'm not sure.  I was just shocked by the fact that I was

16  of the understanding I was going to get the two weeks and

17  then didn't.

18    Q.   Was there any discussion that you couldn't get

19  the two weeks because the office would be short-staffed?

20    A.   Specifically, I don't recall that, because my

21  belief is we were short-staffed even before Maria came on

22  board and I was handling all the responsibilities.

23    Q.   Was there any discussion that you had taken a

24  two-week vacation in December of '02?

Linda J. Blozis

305

1     A.    No specific discussion.  It was, it was done.

2     Q.    Now, with respect to I guess the vacation policy

3    in 2003, if you didn't take all of your vacation would

4    you get paid for it at the end of the year?

5     A.    I don't recall that.  I thought it was possibly

6    -- like I said, I'm not sure when they went to you

7    couldn't roll over and at what level, but I don't know if

8    at my level it was a use it or it.  I'm not sure at this

9    time.

10     Q.    I guess sort of how it was concluded was that you

11    took six days, and looking down at the bottom, were those

12    the six days you were allowed to take?

13     A.    That's right.  I only did get six days.

14     Q.    And you say, looking at your complaint, that

15    younger employees were not treated the same way?

16     A.    Yes.

17     Q.    And who are the younger employees?

18     A.    I believe in my complaint was based on the fact

19    that Maria had just come on board in, oh, was it March,

20    and she was given time, extended time for a wedding.  The

21    dates are -- I'm getting them confused right now.  But I

22    know that she was allowed extended honeymoon time, which

23    I did not have a problem with manning the office, but it

24    seemed like, as a new employee, that considerations were

Linda J. Blozis

306

1    given her for one reason or another as far as vacation,

2    whether it be house settlement or preparations for the

3    wedding or the honeymoon time itself, yes.

4        Q.    So Maria, to your recollection, came in March of

5    '03?

6        A.    No.   I have to recall when she was hired.   I'm

7    sorry.   I'm mixing up the dates.

8             I do recall Maria wasn't there very long

9    that she was given what I considered consideration,

10   exceptional consideration for vacation time requested.

11       Q.    And Maria was getting married and went on her

12   honeymoon, correct?

13       A.    Yes.

14       Q.    So you felt that was exceptional consideration?

15       A.    In the sense that she had specifically put in, my

16   recollection says, for a certain number of days and then

17   realized she wanted more time, requested a day or two

18   more and then got it.

19       Q.    So you thought that was exceptional?

20       A.    Exceptional that it was given on such short

21   notice, without consideration to the fact that I would be

22   left to man the office, and my previously requested two

23   weeks was given at a two-month advance of wanting --

24   March, April, May, three-month advance of requesting the

**W&F**

Linda J. Blozis

307

1   time, and then having it denied.

2       Q.    Do you think that the, I guess the denial of your

3   two-week request and I guess allowing Maria to take the

4   seven days was based on age?

5       A.    I'm not sure that it wasn't.

6       Q.    And so when you say you are not sure that it

7   wasn't, do you think that it was?

8       A.    Could very well have been part of what I

9   considered a systematic plan to dismiss me.

10      Q.    Do you not think that her wedding and honeymoon

11  had anything to do with it?

12      A.    I think that was very important to her.  And I

13  was very happy and excited for her.  I'm referring to

14  what I consider the fairness of the request and the

15  denial of mine.

16      Q.    Other than Maria, were there any other instances

17  where you felt that younger employees were given

18  preferential treatment as it related to vacation?

19      A.    As to vacation, I can't say at this time.  They

20  would have been in another office.

21      Q.    Looking at that same page, page 9, up above in

22  paragraph 50, where it says, "Gilmore and Landis

23  criticized plaintiff for leaving a booklet for Dunlop to

24  bind," that is the booklet we have been talking about as

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B357

Linda J. Blozis

308

1    a result of I guess that meeting that you had with

2    Brendan Gilmore?

3        A.    I suspect that it is, yes.  It is.

4        Q.    And it says, "However, Dunlop previously was not

5    criticized for leaving approximately 60 scholarship

6    checks for plaintiff to assemble and mail to awardees."

7        A.    Yes.

8        Q.    And when in time was that?

9        A.    In time?  She was either leaving for vacation or

10   the honeymoon, and there were scholarship checks that

11   were to be mailed out to awardees, and she just wasn't

12   going to finish it.  And I told Maria I'll be happy to do

13   that for her and make --

14       Q.    Go ahead.

15       A.    And not to worry.  And they did get mailed out,

16   and demonstrated the working rapport that she and I had.

17       Q.    Did Maria ask you to send out the scholarship

18   checks?

19       A.    She must have, because I did it.

20       Q.    And did you complain to Gilmore or Landis or I

21   guess Bill Becker that you did it?

22       A.    I did not complain.  I was happy to help her.

23       Q.    Did they know that you did it?

24       A.    I'm sure they were aware they got mailed out,

Linda J. Blozis

309

1    yes.

2        Q.    But in terms of, did they know that you did it in

3    terms of getting it mailed out?

4        A.    Specifically, that's a good question.  I don't

5    know that they knew for sure that it was myself who did

6    it.

7        Q.    When you say the scholarship checks, who were the

8    people getting them?  Are these students getting checks

9    for something?

10       A.    We, Mellon had two -- several down-state

11   scholarship funds that were set up as a trust for

12   students of schools in the lower counties, and every year

13   the school advisers and teachers would get together and

14   submit names, and based on merit, need, Mellon would

15   award dollars that were allotted to each particular

16   school district, to a number of students.  And in this

17   case, in this year there were 60.

18       Q.    So you would have a list of the awardees, and

19   then the amounts of the checks, and I guess there would

20   be --

21       A.    Exactly.

22       Q.    -- like a letter?

23       A.    They had to be produced and a letter had to

24   accompany that to the college or the school of higher

Linda J. Blozis

310

1  education that the student, the high school student was

2  going on to.

3      Q.   Okay.  And how long did that take you to do?

4      A.   I recollect -- I don't know.  However long it

5  would take to make sure I'm covering phones and

6  everything else, and assemble checks and letters and get

7  them in the mail.

8      Q.   But in terms of the time that it took you for

9  that particular project, can you say?

10     A.   Specifically, no.  Because thinking back, I'm not

11  sure if Maria had completed each school district and

12  whether or not there were a stack of letters and checks

13  to go, and yet there were some letters that were on a

14  shared drive that needed to be printed and run and be

15  signed and assembled that way.  Specifically, I can't

16  tell you the time.

17              Looking and making a judgment call at this,

18  maybe an hour's plus worth of work, if it required

19  everything that I've suggested it may have required.

20     Q.   Okay.  Miss Blozis, if you can look at page 7 of

21  your complaint, please.  And if you look at paragraph 32.

22  Does that refresh your memory as to who was in the room

23  with you?

24     A.   It indicates that Gregg was there.

Linda J. Blozis

311

1    Q.    Do you recall him, sitting here today, being in

2    the room with you?

3    A.    I can't specifically say if he was in the room,

4    at the door, on the conference call, in his office.    I

5    would have to go back and check my own personal notes.

6    Q.    Okay.    When you say --

7    A.    Apparently, I testified that he was in the room.

8    Q.    Okay.    And do you remember what he said to you?

9    A.    The only recollection I have is what I earlier

10   testified, that before I went into the room, Gregg looked

11   at me and said, "Regardless, all I can say is you were

12   good to my family."    And then I went into the room.

13        I don't, I don't have a real clear

14   recollection of him saying anything else probably other

15   than coming out and him stepping back to my desk and

16   asking me to turn in my keys and any swipe cards or

17   anything that I would have had.

18   Q.    All right.    Do you remember the time of day that

19   you had the discussion?

20   A.    It was mid to late morning, anywhere between

21   10:00 and 11:30 -- I'm sorry.    What discussion?

22   Q.    Where you were told that your employment was

23   terminated.

24   A.    Terminated, yes.    Assuming that it was Rosemary

Linda J. Blozis

312

1    Thomas who did the actual stating of termination, between

2    10:00 and 11:30.

3        Q.    And then shortly thereafter you left?  You didn't

4    work the full day out?

5        A.    No.

6        Q.    Okay.

7        A.    They asked me to leave the building.

8        Q.    All right.  Did you speak with anybody before you

9    left, such as Maria?

10       A.    I don't believe -- she was in the office, but I,

11   I have the recollection that Gregg may have taken her

12   into his office, similar to the way I was treated when

13   Kathleen Agne was dismissed.

14       Q.    When you say similar to the way that you were

15   treated when Kathleen was dismissed, what do you mean?

16       A.    Well, I would assume that Maria may have been

17   shocked, as I was shocked when Kathleen received her

18   termination, and at that time Bill, Bill Becker had told

19   me, "Kathleen is being released," and my reaction was

20   total surprise and shock and very upset.  And he told me

21   if I needed to take time, but I wasn't supposed to talk

22   to her, and she was packing up her things and left.

23              In retrospect, Maria was not noticeable, and

24   I just went through the process of any personal

Linda J. Blozis

313

1   belongings, collecting them, and leaving.  So --

2       Q.   Go ahead.

3       A.   And based on the good rapport that Maria and I

4   had -- sorry -- I would have thought she would have been

5   shocked and surprised too.

6               Did you get that?

7               THE COURT REPORTER:  Yes.

8               MS. WILSON:  Why don't we take five minutes

9   or a couple minutes.

10              MR. LAROSA:  That's fine.

11              (Lunch recess taken.)

12              MS. WILSON:  Can you please read back the

13  last question and answer before the break.

14              (Record read.)

15  BY MS. WILSON:

16      Q.   Did you have any conversations at all with Maria

17  about your termination?

18      A.   At what time are you referring to?

19      Q.   At any time?

20      A.   Termination specifically, I don't recall.  We

21  wrote or communicated -- we communicated with one another

22  after that, and it could have been, to the best of my

23  recollection, via phone call or a letter.  I'm not sure.

24      Q.   Did you ever tell Maria that you felt that your

Linda J. Blozis

314

1    termination was based on your age?

2        A.    I recollect I may have done so, yes.

3        Q.    And what did she say?

4        A.    Specifically, I don't recall, other than her

5    being sympathetic and missing me.

6        Q.    And did you ever tell Maria that you felt that

7    your termination was based on your gender?

8        A.    I don't recall specifically.  We may have

9    discussed that.

10        Q.    Do you remember what her response was?

11        A.    My recollection is that based on her newness, she

12    wasn't quite sure, but, as time went by, may have seemed

13    more apparent to her.

14        Q.    And what happened as time went by that made it

15    more apparent to her?

16        A.    That any of the responsibilities that I bore were

17    then transferred to her.  She was left to tend the office

18    alone, as I was, and on several occasions in either our

19    discussions or communications said to me she didn't know

20    how I did it, how I accomplished it all.

21        Q.    And when you left Maria was the only portfolio

22    administrator left until they hired another person?

23        A.    To the best of my knowledge, yes.

24        Q.    Did you ever tell Maria that you felt that you



Linda J. Blozis

315

1   were terminated in retaliation for complaining about

2   Brendan Gilmore?

3      A.   To my recollection, I may have intimated that to

4   her.

5      Q.   And what did she say?

6      A.   To my recollection, it -- excuse me -- that it

7   was a possibility, within the realm of possibility.

8      Q.   That's what she said, that "it was within the

9   realm of possibility"?

10     A.   Not those exact words, but intimated that it

11  could have been.

12     Q.   Had you discussed with her, while both of you

13  were employed, that you had put in a complaint against

14  Brendan Gilmore to Rosemary?

15              THE WITNESS:  Repeat that question for me,

16  please.

17              (Record read.)

18              THE WITNESS:  I don't recall specifically at

19  this time if I did discuss that with her.  I may have.

20  BY MS. WILSON:

21     Q.   But you don't have a specific recollection either

22  way?

23     A.   Either way, no.

24     Q.   Okay.  Looking at your complaint, which is what

Linda J. Blozis

316

1    is in front of you --

2        A.    Yes.

3        Q.    -- at paragraph 40, which is on page 8, but look

4    at the bottom of page 7, starting with paragraph 36, so

5    you can get the full context of the question I'm going to

6    ask.

7        A.    I have read all of that.

8        Q.    Do you know who was hired?

9        A.    Her specific name I do not have.

10        Q.    Do you know in general who was hired?

11        A.    I believe it was a young lady whose age I was not

12    informed of.

13        Q.    Had you and Maria talked about who was hired?

14        A.    Maria had informed me that they eventually hired

15    somebody as a replacement or to fill my job duties.

16        Q.    And I gather that you say you didn't know this

17    individual that was hired?

18        A.    No, I did not know the name.  I don't recognize

19    that she was from within the company.

20        Q.    And did you know anything about her background?

21        A.    In what terms?

22        Q.    In terms of school, where she worked previously?

23        A.    That was not made known to me, no.

24        Q.    Do you know what kind of employee she was at

Linda J. Blozis

317

1    Mellon?

2        A.    Maria in our conversations or communications

3    intimated to me that she was not pulling her weight,

4    whatever that meant.

5        Q.    That's what I was going to ask you.  Do you know

6    what that meant?

7        A.    Whatever not pulling your weight means.  I would

8    have suspected that Maria felt she was carrying more of

9    the burden than what she and I may have shared of the

10   duties within that office when we worked together.

11       Q.    Did Maria tell you how Gregg Landis felt about

12   the new employee?

13       A.    No.

14       Q.    Or Brendan Gilmore?

15       A.    No.

16       Q.    Did Maria tell you what kind of evaluations the

17   new employee received?

18       A.    No.

19       Q.    Did Maria tell you that she complained about the

20   new employee to Gregg or Brendan?

21       A.    She did not intimate that to me, no, no.  I don't

22   recall that she said anything about complaining about the

23   new employee.

24       Q.    In your allegation in paragraph 40 you say,

Linda J. Blozis

318

1    "Plaintiff's replacement was less productive than

2    plaintiff and of less value to defendants than

3    plaintiff."  What do you mean by that?

4        A.    I mean that information that Maria relayed to me

5    was that she was dissatisfied with her co-worker.

6        Q.    Maria did?  Maria told you that she was

7    dissatisfied with her co-worker?

8        A.    In not so many words but intimated that, yes.

9        Q.    Do you know if Maria ever told Gregg Landis or

10   Brendan Gilmore that she was dissatisfied with you?

11       A.    I don't believe she would have done that.

12       Q.    But do you know whether she did or not?

13       A.    I have no way of knowing that.

14       Q.    When you were employed by Mellon did anyone ever

15   ask you your age?

16       A.    Mellon employees or --

17       Q.    Mellon employees.

18       A.    I think at some point over the 13 years somebody

19   may have inquired about how old I was or how many years

20   in I had.

21       Q.    Did Brendan Gilmore ever ask you your age?

22       A.    In the topic of conversation it may have come up.

23   I don't know specifically yes or no.

24       Q.    What about Gregg Landis?

Linda J. Blozis

319

1    A.    I don't recall him asking.  I think he probably

2    was aware based on my personnel file and years, when I

3    graduated.

4    Q.    When you say your personnel file what do you

5    mean?

6    A.    A file that he would have -- that portion of the

7    file he would have been privy to when he became a

8    supervisor.

9    Q.    And what portion of that are you --

10    A.    Maybe a resume was in there that indicated the

11    year I graduated.

12    Q.    So in terms of whether he saw any materials that

13    said how old you were, do you know whether he saw those

14    materials or not?

15    A.    I don't -- I never saw him specifically looking

16    at them, but I would assume that he would have been privy

17    to the portion of the file that he would have been

18    responsible for.

19    Q.    What about Bill Becker, did he ever mention or

20    ask you your age?

21    A.    Well, they helped me celebrate birthday parties

22    so, yes, they would have known my age.  I wouldn't lie

23    about it.

24    Q.    So in terms of a birthday party, you would say

Linda J. Blozis

320

1   I'm X amount?

2       A.   Congratulations.   It would be a joke.   X amount

3   of years, absolutely.

4       Q.   And would that be something that you would say,

5   I'm celebrating my X birthday, whatever it was?

6       A.   I wasn't ashamed of it.   Yes, I would admit to

7   it.

8       Q.   Did you ever have to fill out any documents for

9   Mellon that asked you your age?

10      A.   I don't think that ever came up, no.

11      Q.   What about any documents that asked you your

12  gender?

13      A.   There may have been some forms, medical or

14  otherwise, that may have asked dates or gender.

15              (Blozis Deposition Exhibit 24 was marked for

16  identification.)

17      Q.   If you would take a look at what has been marked

18  as Blozis 24 and let me know when you've had time to look

19  at it.

20      A.   I have read it.

21      Q.   Have you seen what has been marked as Blozis 24

22  before today?

23      A.   I don't think that was ever handed to me.   It is

24  a memo to the file.

Linda J. Blozis

321

1    Q.    All right.  Did you have any conversations with

2    Gregg Landis concerning the sale of shares of Nortel?

3    A.    Not to my recollection.

4    Q.    You don't recall any conversations concerning it?

5    A.    Specific to this, no, I don't recall.

6    Q.    Looking down at what is paragraph 2, that has the

7    number 2 by it.

8    A.    Yes.

9    Q.    And there is reference to five trusts for a

10   particular family.

11   A.    Yes.

12   Q.    Did you ever have any conversations with Gregg

13   Landis about the information contained in paragraph 2?

14   A.    I recollect that I may have, because that name is

15   very prominent in this area, and at the time that we

16   managed these files or dealt with these files there was a

17   great deal of activity that occurred.  Specifically this,

18   I don't recall.

19   Q.    Do you know, did Gregg Landis ever have any

20   discussions with you about tax considerations for this

21   particular, is it series of trust accounts?

22   A.    Repeat that question, please.

23              MS. WILSON:  Can you repeat the question.

24              (Record read.)

Linda J. Blozis

322

1          THE WITNESS:  I specifically don't remember

2  a specific discussion about this familial relationship.

3  BY MS. WILSON:

4      Q.   Did Gregg Landis ever have any discussions with

5  you around the May 29th, 2003 time frame, about his

6  dissatisfaction with your understanding of the job?

7      A.   Specifically, I don't recall about, discussions

8  about my understanding of the job.

9      Q.   So with respect --

10     A.   At that time.  You said on this date.

11     Q.   At around the May 2003 date.

12     A.   Specifically, other than trying to attend to the

13  necessities, day-to-day necessities of the files, I don't

14  recall a specific conversation about this familial

15  relationship.

16          (Blozis Deposition Exhibit 25 was marked for

17  identification.)

18     Q.   Miss Blozis, have you seen what has been marked

19  as Blozis 25 before, before today?

20     A.   I may have seen the preprinted matter before that

21  time.

22     Q.   Would this have been something you would put

23  together, the preprinted matter?

24     A.   It may have been a part of a client booklet.

Linda J. Blozis

323

1    Q.   Did Mr. Landis ever have any discussion with you

2    about outdated information being put in material, this

3    one, for the Lickle presentation?

4    A.   That's a local client, and to respect his

5    privacy, a specific discussion about any presentation,

6    the only answer I can give is that all the information

7    that went into booklets, as you can tell by the binding

8    marks, was reviewed by the investment officer or the

9    presenting officer prior to making the presentation.  And

10   I would assume that Gregg would have been aware of that

11   date and approved it, if it was part of the book.

12   Q.   So is it your testimony that if outdated

13   information got into a booklet it should have been

14   Gregg's responsibility to catch it?

15   A.   I'm not going to specifically say it was his

16   responsibility.  But they reviewed every book, and

17   frequently information that was inserted in books could

18   have been a week old, a month old and so forth.  I had no

19   control over that, as I was not the marketing department

20   to prepare this, to prepare the information.  I assembled

21   the books, compiled.

22   Q.   Did Gregg ever say that he wanted you to make

23   sure, even if marketing gave you information, to make

24   sure that the information was current information?

Linda J. Blozis

324

1     A.    I don't recall specifically, especially in

2   referencing this family relationship.

3     Q.    Do you remember having any conversations with

4   Gregg about this particular matter that's referred to in

5   Blozis 25?

6     A.    No.   And I have no way of knowing when for sure

7   that handwritten note was applied to this matter either.

8     Q.    Regardless of the handwritten note, when it was

9   applied, did you ever have any conversations with Gregg

10  about it?

11    A.    "About it" meaning?

12    Q.    About outdated information being placed in a

13  client booklet.

14    A.    We may have, we may have discussed the fact that

15  we would try to avoid that situation.

16    Q.    Did he say it was your responsibility to make

17  sure that outdated information wasn't placed in a

18  booklet?

19    A.    I don't recall him specifically telling me that,

20  no.   I know I would try to call it to his attention.

21          I would like to clarify something else.

22    Q.    Go ahead.

23    A.    I have no way of knowing for sure, because of the

24  exchange of the files, as I reiterated before, that files

Linda J. Blozis

325

1    were constantly in a state of flux between teams, I have

2    no way of knowing for sure that this information was part

3    of a book that I may have assembled for that family.

4        Q.   All right.  So --

5        A.   At this time.

6        Q.   So in terms of -- what is that number -- Blozis?

7        A.   25.

8        Q.   -- 25, your testimony is that you are not sure

9    whether that was even something that you were responsible

10   for?

11       A.   At this time, I am not sure.  Based on the

12   exchange of files, as I recall, they were transferred

13   between teams.

14       Q.   Do you remember at any point being responsible

15   for that particular family's account?

16       A.   There was a time when we had several, several of

17   the familial accounts.  To my recollection, there were

18   many accounts tied to this family.  I don't know that our

19   team had all of them.

20       Q.   And --

21       A.   There is no file reference number on these pages.

22       Q.   When you say teams, you mean Gilmore team would

23   have some responsibility?  Who would be the other teams?

24       A.   There were teams in Philadelphia at which various

Linda J. Blozis

326

1    sized accounts were being transferred back and forth.

2    There seemed to be, in the last six to eight months of my

3    employ, for lack of a better term, a real shake-up of how

4    the allotment of file size, meaning portfolio worth, was

5    going to be distributed, as evidenced by how many times I

6    would pack up files and ship them back and forth and

7    unpack them.

8        Q.    And who was making those determinations?

9        A.    Determinations could have been anybody from team

10   leaders like Brendan Gilmore to people above him, might

11   have been Paul Kochis who I think he reported to.  I'm

12   not sure.

13               (Blozis Deposition Exhibit 26 was marked for

14   identification.)

15       A.    This is Exhibit --

16       Q.    26.

17       A.    Yes, I have read it.

18       Q.    Have you seen what has been marked as Blozis 26

19   before today?

20       A.    The indication that the e-mail came to me would

21   indicate that.

22       Q.    Did you have any discussions with Mr. Landis

23   about sending materials to Jeb in a confidential way?

24       A.    I don't specifically recall that.



Linda J. Blozis

327

1    Q.    Do you --

2    A.    I have no proof that this e-mail was received by

3    me and opened by me either.

4    Q.    So is it your testimony that you didn't receive

5    Blozis 26?

6    A.    My testimony is that I'm not sure that this

7    particular e-mail specifically came to me.

8    Q.    But it has the "To" reference on it?

9    A.    That could have been produced on paper.

10   Q.    So you are saying that 26 was doctored?

11   A.    I'm not saying it is doctored.  I have no way of

12   proving it, proving for sure.  Because I know, I know the

13   working rapport I had with Jeb and his accounts.  And I

14   don't believe that a criticism would have gone -- he

15   would have called me specifically.  And I don't recall

16   him doing that.

17   Q.    So your testimony is that if Jeb had a problem

18   with something you did, he would call you personally and

19   let you know?

20   A.    Yes.

21   Q.    Do you know whether he ever called Gregg Landis

22   and said he had a problem with something you did?

23   A.    I wouldn't know if he had called Gregg Landis.

24   Q.    Did you ever have any conversations with Gregg

Linda J. Blozis

328

1    Landis about placing information for Jeb in a

2    confidential envelope or to be mindful of the

3    confidential nature of materials?

4        A.    Ms. Wilson, I don't think that would have been

5    necessary because I would have fully comprehended that

6    Jeb's personal trust accounts were just that, personal,

7    and would have needed to go in and be treated

8    confidentially.

9        Q.    Okay.  I understand that.  But if you can answer

10   my question:  Did you ever have any conversations with

11   Gregg Landis about it?

12       A.    I don't recall that at this time.

13       Q.    While you were employed at Mellon did you ever

14   see any psychiatrists?

15       A.    No.

16       Q.    Any mental health provider, be it psychiatrist,

17   psychologist, therapist?

18       A.    I -- no.

19       Q.    One of your allegations is as a result of your

20   termination that you suffered mental distress; is that

21   right?

22       A.    That's right.

23       Q.    And what kind of mental distress?

24       A.    I think I was very emotionally upset.  I felt my

Linda J. Blozis

329

1  heart racing upon termination.  I just felt very

2  distraught, very demeaned, hurt, embarrassed.  I can't

3  think of any other adjective at this time.

4      Q.   You said that upon termination that you felt

5  these things.  Did you feel any of these things while you

6  were employed at Mellon?

7      A.   In those last months, I certainly did, yes.

8      Q.   And when you say the "last months," when?

9      A.   I would say approximately from the last dealings

10 with Bill Becker, which would be December/January, on

11 through the termination, the ultimate termination in

12 July.

13     Q.   Bill Becker, would that have been with your

14 evaluation where you got the action needed?

15     A.   Yes.

16     Q.   So that's when it began?

17     A.   That is about as close approximation as I can

18 give at this time.

19     Q.   And would it have been the same things that you

20 testified to emotionally, distressed, heart racing,

21 distraught, hurt, demeaned, embarrassed?

22     A.   Also add to that confused and perplexed over

23 having been complimented and appreciated, and even

24 financially rewarded for my job performance, and then

Linda J. Blozis

330

1    have it turn around to criticism and needs improvement,

2    yes.

3        Q.    Within the time frame of when you first started

4    feeling these things, around the time that you got your

5    action needed evaluation, to the time of termination, so

6    that's going through sort of July, mid July of '03, did

7    you see any mental health providers in connection with

8    these feelings?

9        A.    No, I did not.

10        Q.    Did you see any doctors in connection with these

11    feelings?

12        A.    I'm sure my medical records would indicate, but I

13    don't know that I didn't probably go to my primary care

14    physician for acid reflux or something.  I don't know.

15    I'm not sure.

16        Q.    Which one?  Who would that have been?

17        A.    At that time it probably would have been -- oh,

18    my gosh.  What is the name of -- a gentleman on

19    Silverside Road.  I can't believe I've forgotten his name

20    already.

21        Q.    Kenneth DeMarco maybe?

22        A.    Kenneth, yes, Dr. DeMarco.  Thank you.  Yes.

23        Q.    So you went to him for acid reflux?

24        A.    I'm not sure.  I may have.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

**B380**

Linda J. Blozis

331

1    Q.    Do you know if he prescribed anything for you?

2    A.    No, I do not recall at this time.

3    Q.    Whether or not he prescribed any medication for

4    you, did you take any medication in connection with the

5    feelings that you described?

6    A.    Nothing that would have been a prescription drug.

7    Q.    Over the counter?

8    A.    Probably just headache.

9    Q.    Tylenol, stuff like that?

10   A.    Tylenols, yes.

11   Q.    Now, you said that one of the feelings that you

12   experienced while you were at Mellon was your heart

13   racing?

14   A.    Yes.

15   Q.    Now, previous to I guess getting the action

16   needed and the termination, had you been diagnosed with a

17   positive stress test?

18   A.    I think I -- when you say stress test, I recall

19   Dr. DeMarco giving me one, but I don't recall the exact

20   time frame.  I'm sure my medical records will indicate

21   that.

22   Q.    Were you having some irregular heart beats at

23   some point?

24   A.    At some point, I don't understand the time frame

Linda J. Blozis

332

1   you are referring to.

2       Q.   Well, based on the records, I see a positive

3   stress test on March 31st of 2000.  So when I saw that it

4   kind of led me to believe that you probably went because

5   you were having some irregular heart beats?

6       A.   To my recollection now, it was either that or the

7   fact that, as a primary care physician, it indicated that

8   it was time for me to have a stress test.

9       Q.   Were you given any medications in connection with

10  that?

11      A.   Not that I recall, no.

12      Q.   I see that on March, I guess March 9th of 2000

13  that you were diagnosed with osteoporosis?

14      A.   Yes.

15      Q.   Did you take any medicines with respect to that?

16      A.   I believe that was the start of the prescribed

17  application of Actonel, a drug that is comparable to

18  Fosamax, for osteoporosis.

19      Q.   And did that sort of alleviate the problem?

20      A.   I don't think osteoporosis is a problem you can

21  totally reverse, to my understanding.

22      Q.   Not reverse but to sort of hold it, hold it at a

23  point?

24      A.   In check.  To my understanding, it may have



Linda J. Blozis

333

1   helped me increase my bone mass a little bit more.

2       Q.   Are you still taking it?

3       A.   Yes.

4       Q.   I see that on August 23rd of 2001 that you were

5   diagnosed with Morton's neuroma.

6       A.   I -- you have the records.  Yes.

7       Q.   What is Morton's neuroma?

8       A.   I think that's an inflammation of one of the toes

9   of the foot.

10      Q.   And did you take any medication for that?

11      A.   Other than over the counter, there was no

12  prescribed medication, other than exercise to keep the

13  arthritis moving.

14      Q.   Did that get rectified?

15      A.   I have to say it has improved with exercise, yes.

16      Q.   I see in your records that you treated with a

17  Ronald Domingo around May of 2000.  Does his name sound

18  familiar to you?

19      A.   Yes.

20      Q.   And that you were concerned about Alzheimer's?

21      A.   I may have asked that question of him.

22      Q.   Were you ever diagnosed as having it?

23      A.   Not specifically, no.

24      Q.   When you say "not specifically"?

Linda J. Blozis

334

1      A.    I never went to a specific physician and received

2   a positive diagnosis that I was Alzheimer's, in the state

3   of Alzheimer's, no.

4      Q.    Was there something that made you wary, that you

5   may be showing some symptoms?

6      A.    At that time, it could have been job-related

7   stress, and the fact that often times stress can diminish

8   your memory retention.  We've had Alzheimer's instances

9   in our family that gave me cause for concern.

10     Q.    So the date that I have is May 9th of 2000 that

11  you went to Dr. Domingo and raised that.

12     A.    Dr. Domingo is a OB/GYN, and, to my recollection,

13  in the context of our conversation, I may have just

14  inquired, may have asked a question about Alzheimer's and

15  related medical questions of gynecological matter.

16     Q.    Because in your testimony you say it may have

17  been sort of job-related stress that may have contributed

18  to your asking the question.  What job related stress, in

19  May of 2000?

20     A.    Specifically, I don't remember at this time.

21     Q.    Following your termination, and you listed the

22  factors that constituted your emotional distress, did you

23  see any physicians, mental or otherwise, concerning these

24  issues, mental health providers?



Linda J. Blozis

335

1    A.    No, I did not.

2    Q.    Did you take any medications in connection with

3    them?

4    A.    Other than over the counter --

5    Q.    Would that have been --

6    A.    -- remedies, Tylenol, Zantac, Excedrin.

7    Q.    At any point in time did the, I guess the

8    emotional issues that you said that you described, heart

9    racing, distraught, hurt, demeaned, embarrassed,

10   confused, perplexed, did they subside?

11   A.    I suspect after a time, when I could assimilate

12   the fact that I had been terminated from a job that I

13   enjoyed, and I thought was very good at for 13 years,

14   there might have been a time when they diminished to some

15   small degree.  But do you ever really get over being

16   terminated?  You try to get on with your life.

17   Q.    Can you put a time as to when they diminished?

18   A.    I can't specifically at this time, because I

19   threw myself into a job search, immediate job search, and

20   had to direct my energies towards that.

21   Q.    Sitting here today, have they diminished?

22   A.    Sitting here today, they have been revived.

23          No.  They have -- they have -- they are gone

24   to an extent.  I have tried to get on with my life.  You

Linda J. Blozis

336

1    never, you just don't forget what has been done to you.

2        Q.    After your employment was terminated, did you

3    receive unemployment compensation?

4        A.    Yes, I did.

5        Q.    Do you remember how long you received it?

6        A.    Six months.

7        Q.    Do you remember how much it was?

8        A.    I think it is in my records, the exact amount.    I

9    forget if it was around $230 a week.    I'm not sure.

10        Q.    Around that, approximate?

11        A.    Approximate, yes.

12        Q.    And after your employment was terminated did you

13    look for new employment?

14        A.    Absolutely.

15        Q.    And you looked at places within Delaware?

16        A.    Yes.

17        Q.    And you ended up in Florida, correct?

18        A.    Yes, I did.

19               (Blozis Deposition Exhibit 27 was marked for

20    identification.)

21        Q.    Miss Blozis, if you would look at page 10 of

22    Blozis 27.

23        A.    Yes.

24        Q.    Now, in terms of the chart, this is a chart of

Linda J. Blozis

337

1   places that you looked for subsequent employment?

2       A.   Yes.

3       Q.   And down on page 10, where it says Colonial Bank,

4   do you see that?

5       A.   Yes.

6       Q.   You had gotten an offer from them?

7       A.   Yes, I did.

8       Q.   And the date of the offer, looking at the chart,

9   was the early winter of 2003 or 2004?

10      A.   Yes.

11      Q.   You don't remember which one it was, 2003 or

12  2004?

13      A.   Winter runs from, what, November, December,

14  January, so it could have been the end of the year 2003

15  to 2004.

16      Q.   All right.  And you got an offer?

17      A.   Yes.

18      Q.   And you turned it down because of the money being

19  offered?

20      A.   Yes.

21      Q.   Just looking at the chart, it looks like you were

22  being offered 22,000 a year?

23      A.   Yes.

24      Q.   And you wanted to see if you could make more; is