Linda J. Blozis

338

1    that it?

2        A.    Yes.

3        Q.    And were you I guess also interviewing at other

4    places?

5        A.    Yes.

6        Q.    How is it that you decided to start looking in

7    Naples?

8        A.    I owned a property there.  Upon being terminated

9    from Mellon, even though I occasionally rented that

10   property, I could not maintain it, so it had to go on the

11   market, and I suppose, not as a last-ditch effort but as

12   trying to hold on to that property, if I could find work

13   there I would take employment wherever I first could find

14   it.

15       Q.    Did you have to sell the property?

16       A.    Yes, I did.

17       Q.    And when we say "the property," was it a condo?

18       A.    It was a condo, yes.

19       Q.    And how much did you sell it for?

20       A.    It went on the market for $495,000.

21       Q.    Did you get that?

22       A.    I had a mortgage to pay off.

23       Q.    Did you get what you were looking for, the 495?

24       A.    It is what it sold for.

Linda J. Blozis

339

1      Q.    Was that market value or was it above or below

2   what condos were going for?

3      A.    That was about market value.  I believe I

4   initially asked over 500 for it and got 495.

5      Q.    How is it that you had the condo in the first

6   place?

7      A.    It was bought when I was married, when I was

8   still married.

9      Q.    And then after your divorce that was what you

10  got?

11     A.    It was not a settlement.  I had to buy out my

12  husband's interest in it, in order to retain it, which I

13  wanted to do.

14     Q.    And then after, I guess after you sold the

15  property did you buy another property in Naples?

16     A.    Not immediately.

17     Q.    Okay.  When did you?

18     A.    Time frame wise, my efforts to find work in

19  Delaware were unsuccessful, and upon family's

20  encouragement, that I liked warmer climates, and the fact

21  that I had to prepare the place for sale, and ultimately

22  sold it, moved down there, and made the preparations to

23  move out, I subsequently took a smaller place, rented a

24  smaller place, and started a full-fledged job search down

Linda J. Blozis

1   there, with the hopes of being able to stay there.

2        Q.    And are you still renting?

3        A.    No.  I presently own.

4        Q.    And do you own a condo?  A house?

5        A.    I own a smaller condo, yes.

6        Q.    And when did you buy?

7        A.    I made settlement on my place, gosh, in 2000 --

8   August 2004.  I'm sorry.  I've got to remember when the

9   Hurricane Charlie hit, because that's when I had

10  settlement.

11       Q.    So whenever the hurricane hit, that was when you

12  went to your attorney's office?

13       A.    I think, yes, mm-hmm.

14       Q.    Looking at page 11, your first employment was

15  with First National Bank?

16       A.    Yes.

17       Q.    As a teller?

18       A.    Yes.

19       Q.    Making 23,000 a year?

20       A.    Approximately that, yes.

21       Q.    And what were your dates of employment with First

22  National Bank?

23       A.    July 2004 until just after New Year's 2005.

24       Q.    And why did you leave First National?

Linda J. Blozis

341

1    A.    I had a better opportunity presented at Orion

2    Bank.

3    Q.    Was it better in terms of compensation?

4    A.    A bit better in terms of compensation, hours, and

5    definitely cost of benefits in that sense.

6                    (Blozis Deposition Exhibit 28 was marked for

7    identification.)

8    Q.    Do you see what has been marked as Blozis 28?

9    A.    Yes.

10    Q.    And have you seen it before?

11    A.    Yes, I have.

12    Q.    And what is it?

13    A.    It is an offer for a job at First National, the

14    terms of and conditions of that job.

15    Q.    And looking at the second, the sentence of the

16    first paragraph where it says, "Your semi-monthly salary

17    will be 959" --

18    A.    Yes.

19    Q.    -- is that accurate?

20    A.    If it adds up to approximately what I indicated

21    in that per year, yes.

22    Q.    Approximately 23,000?

23    A.    Yes.

24    Q.    And looking down towards the second paragraph,

Linda J. Blozis

342

1    where it lists your benefits, 1 through 5 --

2        A.    Yes.

3        Q.    -- is that an accurate representation?

4        A.    Yes.

5        Q.    Did you participate in the 401(k) plan?

6        A.    No, I did not.

7        Q.    And why was that?

8        A.    I needed the money immediately to subsist.

9        Q.    Did you participate in the health and dental

10   plan?

11       A.    Yes.

12       Q.    Was there a co-pay with that?

13       A.    Yes.

14       Q.    How much was it?

15       A.    I recollect at the time, I'm not sure if it was

16   10 or 15 dollars per visit.

17       Q.    To the health provider, you would have to pay 10

18   or 15?

19       A.    Yes, yes.  I would have to look at a pay stub to

20   see what was deducted from my salary monthly or pay

21   period.

22       Q.    Did you participate in the life and long-term

23   disability?

24       A.    I think I may have.  I'm not sure.

Linda J. Blozis

343

1    Q.   With respect to the 401(k) plan, did the bank

2    contribute regardless of whether you put in any money on

3    your own?

4    A.   They may have, because I recollect that I got a

5    notice -- they were taken over by Fifth Third, which was

6    another reason I went to a smaller, community bank.  And

7    there seems to have been some money put aside, that I had

8    to settle with them, in recollection, yes.

9    Q.   While you were employed at First National were

10   you also seeking employment at, is it Orion?  Is that how

11   you pronounce it?

12   A.   That's how you pronounce it.  I didn't start to

13   seek other employment until First National was taken over

14   by Fifth Third.

15   Q.   Fifth Third is a bank?

16   A.   Is a bank that's pretty well-known in Ohio and

17   the central United States.  It was a similar bank to

18   Mellon, and learning what their plans -- their health

19   plans were, it was going to cost more per month for equal

20   coverage.  Not really wanting to work for another mega

21   bank, after my regrettable experience with Mellon, I

22   tried to seek other employment and did.

23   Q.   And that was with Orion?

24   A.   Orion, mm-hmm.



Linda J. Blozis

344

1    Q.    And you, according to your chart, were making

2    $24,960?

3    A.    Are you asking with Orion or First National?

4    Q.    Orion.

5    A.    That was the initial offering, yes.

6    Q.    When you say the initial, did you get more than

7    that?

8    A.    I had -- in the two years that I've been there my

9    salary has increased.

10    Q.    Okay.  And what do you make now?

11    A.    I have accepted another -- recently I've accepted

12    another position and I now make approximately $32,000 a

13    year.

14    Q.    Is the new position with Orion?

15    A.    It is still with Orion, yes.

16    Q.    And what is the new position?

17    A.    It is in a department called Merchant Services.

18    Q.    And what does that --

19    A.    What does it entail?

20    Q.    Entail, yes.

21    A.    It is a department that services our deposit

22    customers that have credit card relationships with us, to

23    be able to process the credit card purchases in their

24    retail and restaurant businesses.

Linda J. Blozis

345

1    Q.   And what is your title?

2    A.   I believe it is just Administrative Assistant.

3    Q.   And when did you get that position?

4    A.   That was finalized -- well, last Monday was my

5    first day.  It was final -- the offer was made just prior

6    to New Years.  I stayed as a teller until somebody could

7    be trained in my stead, until I moved over to the

8    department.

9    Q.   And is that considered a promotion?

10   A.   Yes.

11   Q.   So you started with Orion around January 3rd of

12   '05?

13   A.   No, '04.

14   Q.   '04, okay.

15   A.   I beg your pardon.  Yes.  No, January --

16   Q.   Maybe I can find it.

17        MR. LAROSA:  I think it is January 3rd, '05,

18   looking at page 11.

19        THE WITNESS:  That's right.  I beg your

20   pardon.  The end of this month will mark two years of my

21   being there.  It is, it is, yes, '05.  I apologize.

22        MS. WILSON:  That's okay.  I think I have

23   the letter here.

24        (Blozis Deposition Exhibit 29 was marked for

Linda J. Blozis

346

1   identification.)

2   BY MS. WILSON:

3       Q.   If you could look at what has been marked as

4   Blozis 29, please.

5       A.   Yes.

6       Q.   Have you seen that document before?

7       A.   Yes.

8       Q.   And what is it?

9       A.   It is the job offer to accept the position at

10  Orion Bank.

11      Q.   And looking at the, I guess the second paragraph

12  that lays out the fringe benefits, is that an accurate

13  representation?

14      A.   Yes.

15      Q.   With respect to the 401(k) plan, did you

16  participate?

17      A.   Not at this time yet, no, I have not.

18      Q.   Do they put in any moneys to your account,

19  regardless of whether you put in any?

20      A.   I'm not sure that they do.  Might be just a few

21  dollars.

22      Q.   Are you a member of the group benefits plan?

23      A.   Yes.

24      Q.   Now, with respect to, I guess you held the teller

Linda J. Blozis

347

1    position from January 3rd, 2005, through the end of 2006?

2        A.    Yes.

3        Q.    And was your salary $24,960 during that time

4    frame?

5        A.    It had increased.  I had achieved a raise.

6        Q.    And what had it increased to?

7        A.    Approximately 27,040 or 90 dollars, at my last

8    review.

9        Q.    So you had gotten an annual review?

10       A.    Yes.

11       Q.    And as a result of the review you got an increase

12   in salary?

13       A.    Yes.

14       Q.    Did you get a bonus?

15       A.    Orion didn't pay yearly bonuses.  Our branch

16   would earn quarterly, based on quality of performance

17   jointly and so forth.

18       Q.    Did you get one?

19       A.    Yes.

20       Q.    How many during that time frame?

21       A.    I'm trying to think how many quarters we might

22   have been awarded.  Truthfully, it was either three or

23   four quarters.  And tellers were paid proportionately,

24   and it amounted to approximately between 250 and 300

Linda J. Blozis

348

1    dollars cash, before taxes.

2        Q.    And then starting 2007, that's when you got your

3    promotion to the Merchant Services Department?

4        A.    Yes.

5        Q.    And there you are making $32,000?

6        A.    I hope my paycheck reflects that, yes.

7        Q.    All right.  And in terms of the fringe benefits

8    such as vacation, does that stay the same?

9        A.    It will, yes.

10        Q.    Sick days will stay the same?

11        A.    Yes.

12        Q.    I take it that you will continue on in the

13    benefits plan?

14        A.    The benefits as far as the medical coverage plan,

15    yes.

16        Q.    Is there a co-pay with that?

17        A.    Yes.

18        Q.    And how much is it?

19        A.    It is now 15 or 20 dollars, depending on.

20        Q.    And do you anticipate joining the 401(k) plan?

21        A.    I haven't given it deep consideration as of this

22    time.

23        Q.    Now, in the Merchant Services Department, are

24    there bonuses that you can get?

Linda J. Blozis

349

1    A.    I'm unaware of that at this time.

2    Q.    You don't know either way?

3    A.    I don't know either way.  I haven't asked that.

4    Q.    What about salary increases?

5    A.    I would suspect that there will be reviews and

6    opportunities to do that.

7    Q.    Do you know in the teller position, as it related

8    to salary increases, whether there was a scale in terms

9    of, say, one percent to whatever percentage increase?

10    A.    A fixed scale?

11    Q.    Yes.

12    A.    I'm unaware of how that was regulated.  I was

13    honestly told that I was given the max at one point that

14    was allowed, and I think it was either three or four

15    percent of your salary.

16    Q.    Do you know if that's the way it will go in

17    Merchant Services?

18    A.    I don't have knowledge of that at this time.

19    Q.    Because you are new in the position?

20    A.    Exactly.

21         (Blozis Deposition Exhibit 30 was marked for

22    identification.)

23    Q.    Can you please look at what has been marked as

24    Blozis 28, please.

Linda J. Blozis

350

1    A.    28?

2    Q.    I'm sorry.  What was that?

3          THE COURT REPORTER:  30.

4    Q.    Sorry, 30.

5    A.    I have read this.

6    Q.    And have you seen it before?

7    A.    Yes.

8    Q.    Now, in it, could you just describe what it is?

9    A.    It is an e-mail from me to Gregg, indicating

10   that, regarding news received from Brendan Gilmore, I was

11   overcome with a horrible pressure headache, and I

12   couldn't concentrate anymore on my work on a particular

13   afternoon.

14   Q.    What was the news?

15   A.    Well, that I was not getting a bonus for my work,

16   and Maria, who was just recently hired, was, and that he

17   had told Maria that, that he had gone so far as to share

18   that with her.

19   Q.    Did Brendan tell you why you weren't getting a

20   bonus?

21   A.    I don't recall specifically.  I know he did tell

22   me I wasn't getting it.  I presume it was because he was

23   dissatisfied or said he was dissatisfied with my work.

24   Q.    Was it because you had gotten an action needed on

Linda J. Blozis

351

1  your last review?

2      A.    That would have been his determination, not mine.

3      Q.    That you would get an action needed?

4      A.    Well, you asked if it would have been because of

5  I got an action needed, and I answered that it was -- it

6  would have been his determination why or why not he was

7  giving me a bonus.

8      Q.    Oh, you mean in terms of why.  Okay.  I didn't

9  understand your answer.  Well, let me ask you this:  If

10  an employee was on an action or received an action

11  needed, would the employee be entitled to bonus?

12      A.    I don't know.

13      Q.    And --

14      A.    Because Mellon did not pay advances or bonuses,

15  and this was specifically made known to all of us, as a

16  result of performances.  We were told that increases or

17  bonuses were not contingent on performance reviews.

18      Q.    So it is your testimony that one's performance

19  had nothing to do with getting a bonus?

20      A.    That was my understanding from what I had been

21  previously told.

22      Q.    And were you ever told what bonuses were based

23  on?

24      A.    Specifically, they were rewards at the discretion

Linda J. Blozis

352

```
 1   of the managers, and their budgetary allotments, yes.

 2       Q.   And when you said that you were previously told

 3   this information, who told you that?

 4       A.   I recall, I believe it was Bill Becker who had

 5   qualified that.

 6       Q.   And said that it wasn't contingent on

 7   performance, meaning individual performance?

 8       A.   Yes, yes.  Are we talking about bonuses?

 9       Q.   Yes.

10       A.   Or increases in salary?

11       Q.   Bonus.

12       A.   I believe that was him, to my recollection, yes.

13       Q.   Is this your handwriting down at the bottom?

14       A.   Yes.

15       Q.   Of Blozis 30?

16       A.   Yes.

17       Q.   And then you say that Bill -- I'm sorry --

18   Brendan Gilmore told you that Maria was getting one?

19       A.   Yes.

20       Q.   Did he tell you how much?

21       A.   Not that I recall, no.

22       Q.   Did you think that it was age discrimination that

23   Maria was getting a bonus and you weren't?

24       A.   I think it could have been.
```

Linda J. Blozis

353

1        Q.    And why do you say that?

2        A.    I think at that time I was, as I recollect,

3    believing that Brendan Gilmore wanted me out of Mellon

4    and was taking systematic steps to do so.

5        Q.    Do you know how much Maria received?

6        A.    I don't know specifically, no.  She didn't

7    discuss it with me.

8        Q.    In your complaint you had alleged that you didn't

9    receive a bonus.  And is it for the 2003 time frame that

10   you are alleging that you did not receive a bonus?

11                   THE WITNESS:  Please repeat that.

12                   (Record read.)

13                   THE WITNESS:  At this point I'm not sure

14   what time frame that bonus allotment was covering, so I

15   can't specifically give you an answer to that.

16                   MR. LAROSA:  Page 8 of the complaint talks

17   about bonuses.

18                   THE WITNESS:  That, I see where I say, it

19   indicates for 2002.  I think you asked a different year.

20   Did you not?

21   BY MS. WILSON:

22       Q.    I said 2003.

23       A.    Mm-hmm.

24       Q.    So it is 2002 that you were referring to?

Linda J. Blozis

354

1    A.    Yes.

2    Q.    And then looking at paragraph 47 you say, "All

3    other team members less than 40 years old received a

4    bonus for 2002."

5    A.    Yes.

6    Q.    What team members?

7    A.    I can tell you that it was everyone except I

8    think Bruce Holmquist and myself, and he was an older

9    portfolio manager that I helped assist.  He was situs in

10   the Washington/Baltimore area.

11   Q.    How old was Bruce Holmquist?

12   A.    His exact age I'm not sure of.  I believe he was

13   older forties.

14   Q.    And how is it that you know that Bruce didn't

15   receive a bonus?

16   A.    He told me.

17   Q.    Did he tell you why?

18   A.    He specifically didn't say so.

19   Q.    Did you ask Brendan Gilmore or Bill Becker or

20   Gregg Landis why it was that Bruce didn't receive a

21   bonus?

22   A.    No, I did not.

23   Q.    Had you gotten a bonus for every year that you

24   were employed by Mellon except for 2002?

Linda J. Blozis

355

1    A.    I received bonuses at the same time other

2    employees had.  They were not always awarded every year.

3    It just seemed concurrently when other employees of the

4    Trust Department got them, so did I, up until that point.

5    Q.    And you say that bonuses weren't awarded every

6    year.  Were there some years where no one got bonus?

7    A.    As I recollect, that's correct.

8    Q.    Do you know why that was?

9    A.    No, I don't.

10    Q.    Do you know who made the determination as to who

11    would get bonuses?

12    A.    No, I don't know for sure who made the

13    determination.

14    Q.    Do you know who made the determination as to what

15    amount the bonuses would be?

16    A.    For sure, no.  I don't know if it was the

17    regional manager or team leaders such as Gilmore.  I'm

18    not sure.

19              (Blozis Deposition Exhibit 31 was marked for

20    identification.)

21    Q.    Have you seen what has been marked as Blozis 31

22    before?

23    A.    Yes, I have.

24    Q.    What is it?



Linda J. Blozis

356

1      A.    It is a letter from my attorney, Mr. LaRosa here,

2   to the EEOC, investigator, a Miss Novella West.

3      Q.    And it is outlining your damages?

4      A.    Yes, it is.

5      Q.    Looking at what is Bates as P122, which is the

6   second page of it, under paragraph 14.

7      A.    Yes.

8      Q.    Looking at paragraph 14a --

9      A.    Yes.

10     Q.    -- "Lost or reduced profit."

11     A.    Yes.

12     Q.    Is that the house that you were referring to

13  in --

14     A.    It is my property in Naples, yes.

15     Q.    That was my question.  And when you say, you have

16  a 225,000 -- 255,000 dollar number by that.

17     A.    Yes.

18     Q.    How did you arrive at that?

19     A.    I believe we took into consideration the mortgage

20  that was still on the property and what it may have sold

21  for if I was able to retain it longer.

22     Q.    You mean in terms of able to reduce the

23  outstanding mortgage?

24     A.    Yes.  And take advantage of an increasing real

Linda J. Blozis

357

1    estate market at that time.

2        Q.   At the time of sale what was the mortgage on it?

3        A.   Gosh, I don't know for sure right now.  I'm

4    sorry.  I don't recall.

5        Q.   Looking down at "b, Lost rental income at 22,000

6    per year" --

7        A.   Yes.

8        Q.   -- "for the seven years from 2004 to 2010" --

9        A.   Yes.

10       Q.   -- what does that reference?

11       A.   That's based on the assumption that I could rent

12   it to somebody for six months at a time.

13       Q.   At 22 per year?

14       A.   At 22 per, yes, the year, yes.

15       Q.   And so when you say six months at a time, why six

16   months as opposed to a year?

17       A.   That figure, because I had had a tenant who had

18   asked me if I would let her take the place for six

19   months, and that was the rate at that time.

20       Q.   That she was paying?

21       A.   Yes.

22       Q.   And for the other remaining six months, what went

23   on with the property?

24       A.   It was vacant or I might, you know, try and get

Linda J. Blozis

358

1   to vacation there.

2       Q.   And so when you went on vacations to Naples is

3   that where you stayed?

4       A.   Yes.

5       Q.   And is that why you wanted it for a six-month

6   period as opposed to a year?

7       A.   That, and, as I recall, the condo association may

8   have had restrictions on the length of rentals.

9       Q.   When you say for the seven-year period from 2004

10  to 2010, why do you put it at this particular seven-year

11  block?

12      A.   Thinking in terms that I would have remained in

13  the employ of Mellon and taken a subsequent retirement or

14  -- from them at that time.

15      Q.   And then moved down into the property?

16      A.   Presumably, yes.

17      Q.   And is it your testimony that, you know, upon

18  2010 that the mortgage would have been paid off?

19      A.   Hopefully, or close to it.

20      Q.   How many year mortgage did you have on it?

21      A.   I had a 30 on that, on that one.

22      Q.   And what were the monthly mortgage payments?

23      A.   They fluctuated, because when I first, when we

24  first bought it, it was --

Linda J. Blozis

359

1       Q.    Adjustable?

2       A.    -- an adjustable rate mortgage.

3       Q.    So what was it averaging out at?

4       A.    There was a time when it had hit 12 or 13

5    percent, and then -- it had dropped.  It had dropped.

6       Q.    How low did it drop?

7       A.    Pardon?

8       Q.    How low?

9       A.    I'm not sure if it was anywhere between 7 or 9

10   percent.

11      Q.    Who did you have the mortgage with?

12      A.    The ultimate bank, as many were taken over, the

13   original bank was taken over, not that the mortgage was

14   sold, was Bank of America.

15      Q.    Do you remember the amount of the mortgage?

16      A.    If you asked me what I'm paying now I could tell

17   you.  The amount of the mortgage on the first condo, I

18   think it was approximately a hundred thousand dollars.

19   It might have even been as much as a hundred and forty.

20      Q.    When did you take it out?

21      A.    The property was purchased in February of 1988.

22      Q.    Looking at 14c.

23      A.    Yes.

24      Q.    "Out-of-pocket expenses incurred to sell her home

Linda J. Blozis

360

1    including air conditioner replacement, mold removal, and

2    moving expenses," that is with respect to the condo that

3    we have been talking about?

4         A.    Yes.

5         Q.    The first one?

6         A.    Yes.

7         Q.    And the moving expenses, what is that?

8         A.    Moving expenses were the fact that I didn't sell

9    the entire -- it wasn't purchased to -- they didn't want

10   the contents, so I -- there were many things that I

11   disposed of myself, and with the intention or hopes of

12   finding work and being able to stay there, put bedroom

13   set, essential things like that into storage.

14        Q.    And that relates to d, i and ii beneath it?

15        A.    Yes, and c also includes the fact that the

16   condenser and everything had to be replaced.

17        Q.    That was something that the buyers wanted to have

18   done?

19        A.    A home inspection indicated that it needed

20   replacement and that was part of the deal.

21        Q.    As well as, is that related to the mold?

22        A.    They had a home inspection and saw an indication

23   of something in a particular room, and I had to have a

24   Hepa cleaner done over the course of 48 hours, yes.

Linda J. Blozis

361

```
 1      Q.   Looking at "e, Out-of-pocket expenses for
 2  apartment rent" --
 3      A.   Yes.
 4      Q.   -- is this the apartment that you subsequently
 5  bought or is this a different property?
 6      A.   It was the same complex, a different unit.  I was
 7  able to buy in the complex where I rented.
 8      Q.   So you rented for approximately 11 months?
 9      A.   Yes, yes.
10      Q.   And then you were able to buy within that
11  complex?
12      A.   Yes, mm-hmm.
13      Q.   And how much did you buy the condo for?
14      A.   $190,000.
15      Q.   That's where you are presently living?
16      A.   Yes.
17      Q.   Do you have a roommate?
18      A.   No.
19      Q.   You live alone?
20      A.   Yes.
21      Q.   Are you presently on any medications?
22      A.   Yes.
23      Q.   What are they?
24      A.   Zyrtec, Z-Y-R-T-E-C, is an allergy medication.
```

Linda J. Blozis

362

1  And Actonel, which is for osteoporosis.

2     Q.   Anything else?

3     A.   I was taking Evista, but there is some question

4  about its safety, and I'm in a state of flux with my PCP

5  over that.

6     Q.   And what is Evista for?

7     A.   It was -- it is a drug other than any hormonal

8  for hormonal replacement, a non, like -- something that

9  was initially to be safer then Premarin or Provera.  It

10 was initially stated to be safe for cancer survivors too.

11    Q.   And you've had a history of skin cancer?

12    A.   I -- not a history.  I had an incident of a basal

13 cell carcinoma back in 19 -- I don't know, 19 -- between

14 the end of 1977 and 1980.

15    Q.   I see that I guess in connection with a Dr.

16 Harris, April 22, '04, there was surgery to remove some

17 skin, micrographic skin?

18    A.   Dr. Harris?

19    Q.   Yes.  H. Ross Harris, do you recall having any --

20    A.   Surgery, his report said surgery was done?

21    Q.   Yes.  Did you have any sort of skin cells removed

22 from your face?

23    A.   He may have taken a sample.  He may have taken a

24 sample.  I didn't think it qualified as surgery, but...

Linda J. Blozis

363

1    Q.   He took a sample.  Were you concerned about skin

2   cancer?

3    A.   Yes, I asked him about something on my face.  I

4   remember that, yes.

5    Q.   Was there any sort of diagnosis?

6    A.   It came back clear.

7    Q.   I also saw in your report where you were taking

8   Valium.  Are you still taking that?

9    A.   Only when I fly.

10    Q.   To calm you down?  Yes?

11    A.   On a plane ride, yes.

12    Q.   It appears that, just looking from the records,

13   that you were initially taking Valium as a result of your

14   mother's diagnosis with pancreatic cancer?

15    A.   Initially taking it, I don't know if that's the

16   case.  Read a little more to me.  I'm sorry, I hadn't

17   read.

18    Q.   This is from April 26, 2005, Anchor Health

19   Centers.  "Mother recently diagnosed with pancreatic

20   cancer which is increasing her stress and symptoms.  Did

21   improve mildly when she took Valium, 5 milligrams."

22    A.   There may have been, around the time of my

23   mother's death I took a tablet, yes, or two.

24    Q.   Was your mother living with you?



Linda J. Blozis

364

1    A.    I lived with my mother here in Delaware.

2    Q.    Were you responsible for her care during that

3    time?

4    A.    There was another sister living there too.  We

5    shared our concern for her health.

6          Let me clarify.  I had lived with her for a

7    long duration of my employment with Mellon, but had moved

8    to Florida, and then when she was sick came back for

9    subsequent visits.

10   Q.    While you were living I guess in Delaware and

11   working at Mellon were you living with your mother?

12   A.    Yes, I was.

13   Q.    Just looking at your records from Anchor Health

14   Centers, dated July 7th of '06, were you diagnosed with

15   hypertension and edema?

16   A.    It could have been '07.  What date is that again?

17   I'm sorry?

18   Q.    July 7, 2006.

19   A.    '06.  It could have been around the time, in

20   preparation for the first deposition, yes.

21   Q.    What is edema?

22   A.    I'm not sure I know.

23   Q.    E-D-E-M-A?

24   A.    Almost sounds -- I'm not sure I know.

Linda J. Blozis

365

1      Q.    But do you recall being sort of stressful in

2   connection with the deposition?

3      A.    Yes, yes.

4      Q.    Did you get any medication as a result of it?

5      A.    I think I was prescribed some Asafex for acid

6   reflux, and I don't know if Dr. Ferber might have given

7   some Valium, 5 milligrams.

8             MS. WILSON:  If you give me like ten minutes

9   to review everything.

10             MR. LAROSA:  Sure.  We will take a

11   ten-minute break.

12             (Recess taken.)

13             (Blozis Deposition Exhibit 32 was marked for

14   identification.)

15   BY MS. WILSON:

16      Q.    Miss Blozis.

17      A.    Yes.

18      Q.    If you would look at what has been marked as

19   Blozis 32.

20      A.    Yes.

21      Q.    Do you recognize it?

22      A.    Yes, I do.

23      Q.    What is it?

24      A.    It is copies of an apparent desk calendar which I

Linda J. Blozis

366

1   found and submitted to Mr. LaRosa, that he subsequently

2   faxed to your office.

3       Q.   Was this your desk calendar?

4       A.   It was the desk calendar that I found amongst

5   papers at the family home, yes.

6       Q.   In looking at the notations in the desk calendar,

7   is that your handwriting?

8       A.   For the most part, yes, it is.

9       Q.   Is there anything in there that's not your

10  handwriting?

11      A.   At a fast flip, no.  I think this is mine.

12      Q.   I want to turn your attention to what has been

13  Bates stamped as P1025.

14      A.   Yes.

15      Q.   January 3rd notation.

16      A.   Yes.

17      Q.   On it it says "CA," it look like it is "CAPS"?

18      A.   That's correct.

19      Q.   What does that sand for?

20      A.   It is an acronym for a reminder of a job that I

21  can't recall what it stands for.  It was just a brief

22  reminder to check something in files.  And at this time I

23  don't recall what it was for.  But I know that it was

24  done regularly, as is indicated by subsequent notations

Linda J. Blozis

367

1   of the acronym.

2      Q.   Yes, because when I was going through it I saw

3   that that was mentioned a lot.  So you think that that

4   was a particular file that you reviewed?

5      A.   Not a singular file.  Just a particular

6   application of some files.  And once again, I say I can't

7   remember what the acronym stands for, but it was either a

8   weekly or a biweekly check, and they are crossed out.

9      Q.   Also, turning your attention to page stamp P1072.

10     A.   Yes.

11     Q.   Looking down at June 18?

12     A.   Yes.

13     Q.   Where it says "Cindy here"?

14     A.   Yes.

15     Q.   Is that reference to Cindy Chambliss?

16     A.   Yes.

17     Q.   And throughout the calendar at some points of the

18  calendar there is a reference to "Cindy here."  Is that

19  Cindy Chambliss?

20     A.   Yes.

21     Q.   And when there is something that has, for

22  example, sort of a line through it or a check mark, does

23  that just mean that you would check it off at the end of

24  the day?

Linda J. Blozis

368

1    A.    For the most part, yes.  Or when it was

2    completed, yes.

3    Q.    Looking at P1045.

4    A.    1045.  Yes.

5    Q.    There is a reference to "Innovation Council"?

6    A.    Yes.

7    Q.    What is that?

8    A.    A council, a group of fellow Mellon employees,

9    which I was named as an additional responsibility to

10   participate in as far as an exchanging of ideas, to

11   expedite work, sharing of ideas, that sort of thing.

12   Q.    And who was on the council?

13   A.    Me, from Delaware, only.  There were a number of

14   other employees from other teams.  I can't remember their

15   names at this time.

16   Q.    And who selected you to be on the council?

17   A.    I'm not sure if I was -- if I volunteered, I may

18   have volunteered, or I was told that was something I

19   should do.

20   Q.    And this would be sort of brainstorming between

21   different team members?

22   A.    Yes.

23   Q.    And in your diary or your week at-a-time glance,

24   when there is references to "Innovation" or "Innovation

Linda J. Blozis

369

1    Council," that's when you would meet?

2        A.    Yes.

3        Q.    Would it be a telephone call?

4        A.    It could have been at times.  Other times we may

5    have gotten together in Philadelphia or something.

6        Q.    And when were you first a part of the council?

7        A.    I think from its inception, but I can't tell you

8    specifically when that was.  If it might have been the

9    beginning of 2003.  I'm not sure.  I would have to look

10   at the calendar again.

11       Q.    Well, you think that it was created or came into

12   being sometime in 2003?

13       A.    My recollection is thereabouts.  Maybe sooner.

14   Maybe sooner.

15                MS. WILSON:  Thank you.

16                MR. LAROSA:  Okay.  Thanks.

17                THE WITNESS:  Is that all?

18                MS. WILSON:  Yes.

19                (Proceedings conclude at 2:44 p.m.)

20

21

22

23

24

370

```
 1
 2                      I N D E X

 3   DEPONENT:   LINDA BLOZIS                    PAGE

 4       Examination by Ms. Wilson              245

 5
                      E X H I B I T S
 6
     BLOZIS DEPOSITION EXHIBITS                 MARKED
 7
     17 - 5/20/03 Information Questionnaire      265
 8   18 - 5/20/03 Stale Priced Assets Report    267
     19 - E-mail chain, Stale Price Report      270
 9   20 - 5/21/03 LB Things to be Done          275
     21 - 6/4/03 Blozis/Landis e-mail chain     277
10   22 - 6/4/03 Blozis/Landis e-mail chain     280
     23 - 3/13/03 Blozis/Landis e-mail, vacation 302
11   24 - 5/29/03 Landis/Blozis Trading Issues
          memo                                  320
12   25 - The Boston Company Asset Management   322
     26 - 6/11/03 Landis/Blozis e-mail          326
13   27 - Plaintiff's First Supplemental Response 336
     28 - 6/15/04 First National Bank letter    341
14   29 - 1/3/05 Orion Bank letter              345
     30 - 3/18/03 Blozis/Landis e-mail          349
15   31 - 9/15/05 LaRosa to West letter         355
     32 - Week at-a-Glance                      365
16

17   ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 371

18   CERTIFICATE OF REPORTER                PAGE 372

19

20

21

22

23

24
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**B419**

ATTACH TO DEPOSITION OF: _Linda J. Blozis_

DATE TAKEN: _January 13, 2007_

IN THE MATTER OF: _Blozis V Mellon Trust_

### ERRATA SHEET

<u>INSTRUCTIONS</u>: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. <u>Do not make any marks or notations on the transcript itself.</u> Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 259 | 15 | "until it was moved out" (gramatically more correct definition of the ~~word~~ details) |
| 273 | 8 | help for a seconds should be help "from" a second |
| 277 | 23 | hm-hmm. Means "Yes" |
| 305 | 8 | should read: at my level it was a use it or lose it. |
| 365 | 5 | correct spelling of is "Acipher" |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _2/16/07_          _Linda J Blozis_
                               (Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
               1330 King Street
               Wilmington, DE  19801                      **B420**

```
1   State of Delaware )
                      )
2   New Castle County )

3

4              CERTIFICATE OF REPORTER

5
               I, Eleanor J. Schwandt, Registered
6   Professional Reporter and Notary Public, do hereby
    certify that there came before me on the 13th day of
7   January, 2007, the deponent herein, LINDA BLOZIS, who was
    duly sworn by me and thereafter examined by counsel for
8   the respective parties; that the questions asked of said
    deponent and the answers given were taken down by me in
9   Stenotype notes and thereafter transcribed by use of
    computer-aided transcription and computer printer under
10  my direction.

11             I further certify that the foregoing is a
    true and correct transcript of the testimony given at
12  said examination of said witness.

13             I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.

15

16

17             Eleanor J. Schwandt

18             Certification No. 125-RPR

19             (Expires January 31, 2008)

20
    DATED:
21

22

23

24
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LINDA J. BLOZIS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | No. 05-891 SLR |
| | ) | |
| MELLON TRUST OF DELAWARE, NATIONAL | ) | |
| ASSOCIATION, a Pennsylvania | ) | |
| corporation; MELLON BANK, NATIONAL | ) | |
| ASSOCIATION (formerly Mellon Bank | ) | |
| (DE) NATIONAL ASSOCIATION), a | ) | |
| Pennsylvania corporation; and | ) | |
| MELLON FINANCIAL CORPORATION, a | ) | |
| Pennsylvania corporation, | ) | |
| | ) | |
| Defendants. | ) | |

Deposition of BRENDAN MICHAEL GILMORE taken
pursuant to notice at the law offices of John M. LaRosa,
Two East 7th Street, Wilmington, Delaware, beginning at
1:30 p.m., on Tuesday, December 19, 2006, before Eleanor
J. Schwandt, Registered Merit Reporter and Notary Public.

APPEARANCES:

        JOHN M. LAROSA, ESQ.
        LAW OFFICE OF JOHN M. LAROSA
        Two East 7th Street
          Wilmington, Delaware  19801
          for the Plaintiff

        STEPHANIE WILSON, ESQ.
        REED SMITH, LLP
          13 Main Street - Suite 250
          P.O. Box 7839
          Princeton, New Jersey  08543-7839
          for the Defendants


                WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

```
 1                    BRENDAN MICHAEL GILMORE,
 2              the witness herein, having first been
 3              duly sworn on oath, was examined and
 4              testified as follows:
 5                         EXAMINATION
 6  BY MR. LAROSA:
 7      Q.   Good afternoon.  My name is John LaRosa, and I
 8  represent Linda Blozis, who is the plaintiff in this
 9  lawsuit.
10              State your full name for the record, please.
11      A.   Brendan Michael Gilmore.
12      Q.   What is your current home address?
13      A.   15 Eastgate -- one word -- Drive, Phoenixville,
14  Pennsylvania, 19460.
15      Q.   Have you ever had your deposition taken before?
16      A.   No, I have not.
17      Q.   Okay.  Let me go over some ground rules with you.
18  After I ask the questions and you answer them today, you
19  will have the opportunity to review the written
20  transcript to see if the court reporter made any typos or
21  technical mistakes.  Do you understand that?
22      A.   Yes.
23      Q.   And you have taken an oath to tell the truth, and
24  you understand the significance of that, correct?
```

Brendan Michael Gilmore

1    A.    Yes, I do.

2    Q.    Are you under any medications or substances that

3    would prevent you from remembering accurately or

4    testifying truthfully today?

5    A.    No.

6    Q.    Is there any reason why you feel you might not be

7    able to testify truthfully today?

8    A.    No.

9    Q.    Also, if I ask you a question I'm going to assume

10   you understand my question, so if you don't understand a

11   question, please let me know and I'll be glad to rephrase

12   it.  Do you understand that?

13   A.    Yes.

14   Q.    If you don't know the answer to something, we

15   don't want you to guess, so it is an acceptable answer to

16   say I don't know.  If you tell me I don't know, I'll try

17   to move on to another area.  Do you understand that?

18   A.    Yes.

19   Q.    Also, we have to take turns speaking because the

20   court reporter cannot record two voices at once.  So

21   please wait until I finish my question to give me an

22   answer, and I'll let you finish your answer before I move

23   on to the next question.  Do you understand that?

24   A.    Yes.

4

Brendan Michael Gilmore

1    Q.    Also, there is water here.  And if you need any

2    breaks, let me know.  Okay?

3    A.    Thank you.

4    Q.    Have you reviewed any documents in preparation

5    for your deposition today?

6    A.    Yes.

7    Q.    What have you reviewed?

8    A.    I looked at the couple of e-mails and I looked at

9    the -- I'm trying to remember the term we use for putting

10   someone on written notice.  We have an action, a cause to

11   make them aware of the fact that they are, they are not

12   performing up to standards, and that they are -- there is

13   the possibility if things don't change that they could

14   ultimately be terminated.

15   Q.    Is that the final written warning document?

16   A.    That's correct.  I couldn't think of the term.

17   Q.    Other than those documents, did you review any

18   other documents?

19   A.    No.

20   Q.    Will you state your date of birth, please?

21   A.    11/20/46.

22   Q.    Regarding your educational background, did you

23   graduate from high school?

24   A.    Yes.

**B425**

5

Brendan Michael Gilmore

1    Q.    Did you attend college?

2    A.    Yes.

3    Q.    Did you receive an undergraduate degree?

4    A.    Yes.

5    Q.    What degree did you receive?

6    A.    I have a Bachelors Degree in economics.

7    Q.    Did you receive any other degrees?

8    A.    Yes.  I have also a Masters Degree in finance.

9    Q.    Anything else?

10   A.    I've done other postgraduate work but didn't lead

11   to a degree.

12   Q.    Who is your current employer?

13   A.    Mellon Financial.

14   Q.    And when you say "Mellon Financial" or I say

15   "Mellon Financial" we understand that's Mellon Financial

16   Corporation, which is a defendant in this case?

17   A.    That's correct, Mellon Financial Corporation,

18   yes.

19   Q.    We can agree to use your abbreviation, Mellon

20   Financial.

21   A.    Okay.  That's fine.

22   Q.    When did you begin working for Mellon Financial?

23   A.    October 1983.

24   Q.    And at that time did Mellon Financial have a

**B426**

Brendan Michael Gilmore

1    different name?

2        A.    Yes, it was Mellon Bank, I think it was Mellon

3    Bank, NA.  I'm not a hundred percent sure about that.

4        Q.    And at some point in time did Mellon Bank become

5    Mellon Financial?

6        A.    Yes.  There has been a series of mergers and

7    reorganizations.

8        Q.    What was your position when you started at Mellon

9    Bank in October of '83?

10       A.    I was a portfolio manager.

11       Q.    At some point in time did you become promoted?

12       A.    Yes.  I've been promoted several times over the

13   years.

14       Q.    What was your first promotion from portfolio

15   manager?

16       A.    My title when I was hired was Assistant Vice

17   President.  I was hired -- I was promoted to Vice

18   President about two years later.  Do you want me to give

19   you the chronology of my promotions?  Would that be

20   helpful?

21       Q.    Yes.  After you were promoted from Vice President

22   did you receive additional promotion?

23       A.    Yes.  My job responsibilities expanded.  I

24   ultimately became in charge of the investment group for

Brendan Michael Gilmore

1  what was then private trust, and I managed 13 portfolio

2  managers and probably a like amount of assistants.

3      Q.   Where was that?

4      A.   In Pittsburgh.

5      Q.   What was your title when you managed the 13

6  portfolio managers?

7      A.   I was a still a vice president, that was my

8  title, but manager of personal trust.  Personal Trust

9  Investments I guess would be the official title.

10     Q.   Did you receive any other promotions?

11     A.   Yes.  I was, I was promoted to a first vice

12 president.

13     Q.   When was that?

14     A.   I'm trying to think of that.

15     Q.   To the best of your recollection.

16     A.   Oh, I would say sometime in the early nineties,

17 '92, '93.

18     Q.   Were you still working in Pittsburgh at that

19 time?

20     A.   I was, but then I was asked to go to California

21 and start up Mellon -- I think at that time we were now

22 called Mellon Private Asset Management, and that was --

23 and I, technically speaking, I assumed responsibility for

24 the Boston Safe Deposit & Trust Company of California,

**B428**

Brendan Michael Gilmore

1   which was a wholly-owned subsidiary of Mellon, which

2   ultimately changed its name to Mellon Private Asset

3   Management of California.  I'm sorry if there is so many

4   different titles.  And I was responsible for the offices

5   in Los Angeles and Newport Beach, and also, well, San

6   Francisco too.

7       Q.    Approximately how long did you work in

8   California?

9       A.    Three years.

10      Q.    And then did you receive any additional

11  promotions or transfers at that point?

12      A.    I was subsequently -- after that time I was

13  transferred back east, and I managed a group in

14  Philadelphia, the Delaware office and the Washington,

15  D.C. office.

16      Q.    When did you begin managing those three offices?

17      A.    About 19 -- late '97, I believe, early '98.

18      Q.    And is that your current position or have you

19  since been promoted or transferred to another position?

20      A.    My job -- I have received additional -- different

21  responsibilities and promotions.  I'm a senior director.

22  I do not -- I now am -- I'm the Senior Investment Officer

23  for the Mid-Atlantic Region and Director of Alternative

24  Investments.

**B429**

Brendan Michael Gilmore

1              And I have other functional -- I'm on the

2    investment policy committee, Mellon's investment strategy

3    committee.

4        Q.    When did you become a senior director, to the

5    best of your recollection?

6        A.    I guess, let's see, 2003.

7        Q.    When you managed the three offices in

8    Philadelphia, Delaware and Washington, D.C. --

9        A.    Yes.

10       Q.    -- beginning in late '97 or early '98,

11   approximately how long did you do that?

12       A.    Sometime around '93, maybe '92.  Late '92, early

13   '93 I believe is when they asked me to take on different

14   duties.

15       Q.    You mean 2003?

16       A.    Yes.  I'm sorry.  What did I say?

17             MS. WILSON:  1993.

18             THE WITNESS:  I'm sorry, 2003.

19   BY MR. LAROSA:

20       Q.    So some time in the first half of 2003, you think

21   that's when you --

22       A.    I would say it was either the fall of 2002, you

23   know, maybe October -- October/November, or January of

24   2003, right about that time.  This is '06 --

Brendan Michael Gilmore

1    Q.   Well, to the best of your recollection?

2    A.   It was either January '03 or January of '04.  I'm

3    a little unclear about that.

4    Q.   It might be January '04, but you are not

5    positive?

6    A.   Yes, right.

7    Q.   When you managed those three offices in

8    Philadelphia, Delaware and D.C., where were you

9    stationed?

10   A.   Philadelphia.

11   Q.   Prior to that you were in California?

12   A.   I was in Los Angeles.  That's where the office

13   was I worked out of, although I had responsibilities for

14   other regions.

15   Q.   When you became a senior director, you think that

16   was January of 2003 or January of 2004, approximately?

17   A.   Yes.

18   Q.   And where did you work when you became a senior

19   director?

20   A.   Philadelphia.  I've always officially been

21   located in the Philadelphia office since I've come back

22   from California.

23   Q.   During your employment with Mellon were you

24   familiar with a Mellon Trust of Delaware?

**B431**

Brendan Michael Gilmore

1    A.   Yes.

2    Q.   Did you have responsibilities for Mellon Trust of

3    Delaware as well?

4    A.   Yes.

5    Q.   What were your responsibilities in connection

6    with Mellon Trust of Delaware?

7    A.   I managed the group of people in the Delaware

8    office which worked for Mellon Private Asset Management.

9    Q.   What is the relationship between Mellon Private

10   Asset Management and Mellon Trust of Delaware?

11   A.   Mellon Trust of Delaware is a wholly-owned --

12   was -- is a wholly-owned subsidiary of Mellon Bank, NA,

13   and Mellon Private Asset Management was the group that

14   did the, serviced the high -- excuse me -- high-net-worth

15   market, and so serviced the high-net-worth market in the

16   Delaware/Washington region.

17   Q.   Did Linda Blozis ever perform services for Mellon

18   Trust of Delaware?

19   A.   I don't know.  I don't know the -- I don't know

20   the technical answer to that.

21        She was an employee of Mellon Private Asset

22   Management, and I suspect, I assume that within, as an

23   employee in Delaware she was an employee of Mellon Trust

24   of Delaware.

**B432**

Brendan Michael Gilmore

1    Q.    And she also may have worked for Mellon Financial

2    Corporation; is that accurate?

3    A.    Well, Mellon Financial was the parent

4    corporation, so, yes, we all ultimately worked for Mellon

5    Financial Corp.

6              You need a corporate lawyer to answer those

7    questions.

8    Q.    What is your current job title?

9    A.    Senior Director.  Senior Investment Officer,

10   Mid-Atlantic Region, Director of Alternative Investments.

11   Q.    Who is your direct boss?

12   A.    David Kutch, K-U-T-C-H.

13   Q.    What his title?

14   A.    Chairman, Mid-Atlantic -- Chairman Mellon

15   Financial, Mid-Atlantic Region.

16   Q.    Do you have direct reports?

17   A.    Yes, I have three people that report to me.

18   Q.    What are their titles?

19   A.    One is a vice president, and the other two I

20   believe are assistant portfolio officers.

21   Q.    During the time that you were in charge of the

22   three offices in Philadelphia, Delaware and D.C., who

23   were your direct reports?

24   A.    Oh, I probably had eight or nine vice presidents.

Brendan Michael Gilmore

1    Q.    At different times?

2    A.    Well, different times might have been different

3    ones.  But in aggregate -- at one time was probably about

4    eight or nine.  I would have to check that out.  I mean

5    there was one in Washington, and there were two in

6    Delaware, and there were probably another half dozen or

7    so in Philadelphia.

8    Q.    Focusing on Delaware, who were your direct

9    reports who were in Delaware?

10   A.    Bill Becker and Gregg Landis, at the end of my

11   tenure.  There were other people.

12   Q.    Prior -- what was Bill Becker's title?

13   A.    Vice president.  Gregg was also a vice president.

14   Q.    Were they also considered portfolio officers?

15   A.    Yes.

16   Q.    Was there a time when both you and Linda Blozis

17   worked for Mellon?

18   A.    Well, yes.  I'm not sure I understand the

19   question.  Are you asking did she report directly to me?

20   Q.    No, I'm not asking did she report directly to

21   you.  I'm just asking:  Was there a time when you both

22   worked at Mellon?

23   A.    Well, yes.  I mean, I've been employed for 23

24   years and she has -- I don't know, I don't know how long

Brendan Michael Gilmore

1    she worked for Mellon, but, obviously, she worked for

2    several years while I was responsible for the Delaware

3    office.

4        Q.   What was her position at the time her employment

5    ended?

6        A.   I believe her title was Portfolio Assistant.

7        Q.   Is a portfolio assistant also known as a

8    portfolio administrator?

9        A.   Yes.   That may be the actual official title.

10       Q.   And as far as portfolio administrators, can they

11   receive written commendations from clients?

12            MS. WILSON:   Objection to the form.   You can

13   answer.   You can answer the question.

14       Q.   Do you understand my question?

15       A.   You mean can someone write in a letter and say I

16   think so and so did a good job on my account?

17       Q.   Yes.

18       A.   Sure.

19       Q.   Okay.   And can they also receive written

20   commendations from their supervisors?

21            MS. WILSON:   Same objection.   You can

22   answer.

23       A.   Yes.

24       Q.   To the best of your knowledge, with regard to

Brendan Michael Gilmore

1   Linda Blozis, there was never any issues with her

2   tardiness or attendance when she worked for Mellon; is

3   that correct?

4      A.   I don't know.

5      Q.   Do you know what the qualifications of a

6   portfolio assistant or portfolio administrator are?

7      A.   You mean from an education standpoint or just

8   from a --

9      Q.   Education and otherwise, any qualifications.

10      A.   I, I'm not sure what they were at the time she

11   was employed.  I believe that they have changed in

12   subsequent years.  What I mean -- well, should I go on

13   and explain it?

14           MS. WILSON:  If you feel you need to.

15      A.   Never mind.  I'd be speculating.

16      Q.   So at some point the qualifications for portfolio

17   administrator changed?

18      A.   Yes.

19      Q.   Do you remember when that was, approximately?

20      A.   Well, the jobs were upgraded some time in the

21   nineties.  I'm not -- I would say mid-nineties perhaps.

22   And at that time we also, we also gave the portfolio

23   managers additional -- a raise.

24      Q.   A raise and additional responsibilities?

**B436**

Brendan Michael Gilmore

1      A.   Yes, all of them were given additional

2   responsibilities, that's correct.  The job was

3   reclassified.

4      Q.   And this reclassification, you believe that

5   occurred in the mid 1990s?

6      A.   Yes.

7      Q.   I show you a document and ask that it be marked

8   Gilmore 1.

9           (Gilmore Deposition Exhibit 1 was marked for

10   identification.)

11      Q.   Take a minute to read through that document.

12      A.   Mm-hmm.

13      Q.   Have you ever seen this type of form before?

14      A.   Yes, I've seen them.

15      Q.   I'll represent that this is a two-page document,

16   MEL/BLOZ 454 and MEL/BLOZ 455.  They appear to be two

17   different dates, two different versions of the same

18   document, is that fair to say, at two different points in

19   time?

20      A.   It would appear to be the case.

21      Q.   What is this document referred to as or what is

22   it called?

23      A.   It says "Employee Profile/History" on the heading

24   of the document.

Brendan Michael Gilmore

1    Q.   Have you seen these types of documents before?

2    A.   I have seen, yes, these.  Yes.

3    Q.   And what does Mellon use these documents for?

4    A.   It is a history of the employees, salary history,

5  job history.

6    Q.   In your capacity as managing the three offices,

7  including the Delaware office, would you at any point

8  during the year review employee profiles?

9    A.   No.  I can't think of why I would.

10    Q.   You have seen this document for some of your

11  employees?

12    A.   I would assume all employees have this in their

13  personnel file, myself included.  It is a history of a

14  person's employment with the firm.  That's all it is.

15    Q.   So I think you've told us that Mellon records

16  salary history on this form?

17    A.   Yes.

18    Q.   And there is something in the middle of the page

19  says "Job History" and then to the right of that it says

20  "PERF RTG."  Is that performance ratings?

21    A.   Yes.

22    Q.   And does Mellon also keep records of the

23  performance ratings employees receive on their annual

24  evaluations?

18

Brendan Michael Gilmore

1    A.    Not a history on the annual evaluations, no.

2    This would not be included in an annual evaluation.

3    Q.    Right.  Is this a summary of --

4    A.    This is a summary of cumulative valuations, but

5    the employee evaluation would be for a specific period of

6    time only.

7    Q.    And as far as other information on this document,

8    calling your attention to the top right-hand page, does

9    Mellon record the employee's birth date on the document?

10   A.    I don't see a birth date.

11              Oh, yes, I do.  Yes, there is a birth date,

12   yes.

13   Q.    And does Mellon also record an employee's age on

14   the employee profile?

15   A.    On this thing?

16   Q.    Yes.

17   A.    Yes, it does.

18   Q.    Okay.  And does Mellon also record an employee's

19   marital status on this employee profile?

20   A.    It is on this, this form, yes.

21   Q.    And does Mellon also record an employee's race on

22   the employee profile?

23   A.    This one reflects race, yes.

24   Q.    Does Mellon record an employee's gender on an

**B439**

Brendan Michael Gilmore

1    employee profile?

2        A.    This profile also records gender.

3        Q.    To the best of your knowledge, Linda Blozis was

4    never demoted during the time she worked at Mellon; is

5    that accurate?

6        A.    I don't know.

7        Q.    If she were to be demoted, would you have any

8    input into that decision?

9        A.    If I was her manager at that time, yes, obviously

10   I would be involved.

11       Q.    During the time that you oversaw the Delaware

12   office, Linda Blozis was not demoted; is that accurate?

13       A.    That is correct.

14       Q.    And during the time that you oversaw the Delaware

15   office and she worked out of the Delaware office, Linda

16   Blozis was not suspended; is that correct?

17       A.    No, she was not.

18       Q.    You said at some point the portfolio

19   administrator job was upgraded.  Who was responsible for

20   upgrading the portfolio administrator job?

21       A.    That was a company-wide decision, all portfolio

22   administrators nationally be upgraded at the same time.

23   It was done, I would say, I guess by human resources.

24            It was done by senior management, let me say

Brendan Michael Gilmore

1    that.

2        Q.    Was there a portfolio administrator in the

3    Delaware office named Kathleen Agne?

4        A.    Yes.

5        Q.    Was she eventually discharged?

6        A.    Yes.

7        Q.    And who discharged her?

8        A.    You mean who actually did it, or who had the

9    meeting with her, or how was the decision arrived?

10       Q.    Who made the decision?

11       A.    The decision was made ultimately by senior

12   management.

13       Q.    Who was that?

14       A.    Ultimately be my superior.

15       Q.    Who was that?

16       A.    And human resources together would have made

17   that, come to that conclusion.  At that time?

18       Q.    Yes.

19       A.    I believe his name was Doug Kloppenburg.

20       Q.    What was his title?

21       A.    He was the Manager for Private Asset Management

22   in the Mid-Atlantic Region.

23       Q.    Who was the HR person or persons?

24       A.    HR rep in that area is Rosemary Thomas.  But she

Brendan Michael Gilmore

1    would not -- it would have gone to her superiors, as it
2    would have gone to mine.
3         Q.    Who was her superiors at that time?
4         A.    You would have to ask her.
5         Q.    Kathleen Agne, her position was not eliminated;
6    is that correct?
7         A.    That's correct.
8         Q.    Eventually another portfolio administrator was
9    hired to replace her?
10        A.    Yes.
11        Q.    Was that Maria Bannister or Maria Dunlop?
12        A.    I believe it was.
13        Q.    Who made the decisions with regard to hiring
14   employees for your Delaware office?
15        A.    Well, the people who worked with -- who they
16   would be working with would participate in the interview
17   process.  I more likely as not would also interview them.
18   And then based on all of our opinions that they felt they
19   had the skill set, we would then make the recommendation
20   to hire, which would have to be approved by my superior.
21   And -- well, he could or could not ask to interview the
22   person.  He had that latitude.
23        Q.    Was that Doug Kloppenburg?
24        A.    At that time, yes.

**B442**

Brendan Michael Gilmore

1     Q.    And did he wind up interviewing Maria Bannister

2  or Maria Dunlop?

3     A.    I don't believe so.

4     Q.    Did you interview Maria Bannister or Maria

5  Dunlop?

6     A.    Yes.

7     Q.    At some point a decision was made that included

8  you to hire Maria?

9     A.    Yes.

10    Q.    And that decision was approved by senior

11  management?

12    A.    Yes.

13    Q.    Was that in approximately 2002?

14    A.    I believe so.  I don't know.

15    Q.    Was there an individual named Frances Smith who

16  worked for you at Mellon?

17    A.    No, not to my knowledge.

18    Q.    Was there anybody named Smith that worked for you

19  out of the Delaware, Philadelphia or Washington, D.C.

20  office?

21    A.    I don't remember anyone named Smith working for

22  me.  I had a number of employees.  I mean, I, I don't

23  remember anybody by that name.

24    Q.    Do you remember anybody by the name of Martha

B443

Brendan Michael Gilmore

1    Fetters?

2        A.    Yes.

3        Q.    What was her title?

4        A.    She was a vice president.

5        Q.    What was her function?

6        A.    She was, when I came to Philadelphia and took

7    responsibility for Delaware, she was responsible for the

8    Delaware office.  She was in charge of the Delaware

9    office.

10       Q.    At some point did she resign from Mellon?

11       A.    Shortly after I came to the region she resigned,

12   within I think six months.

13       Q.    Did you replace her with someone else to fill the

14   position?

15       A.    Yes, yes.

16       Q.    Who was that?

17       A.    Bill Becker.

18       Q.    Do you remember when that was?

19       A.    1998, thereabouts.

20       Q.    Did Martha Fetters hold any other title other

21   than vice president and being the person responsible for

22   the Delaware office during the time she worked for you?

23       A.    Not -- no.

24       Q.    Did she ever take a step down to a lower

24

Brendan Michael Gilmore

1    position?

2    A.    Not to my knowledge.

3    Q.    Are you familiar with a person named Linda

4    Squirer?

5    A.    Yes.

6    Q.    What was her job title?

7    A.    I think she was an assistant vice president.

8    Q.    Where did she work?

9    A.    In the Delaware office.

10   Q.    Did she eventually resign her position?

11   A.    Yes, she did.

12   Q.    Do you remember when she was?

13   A.    I would be speculating, but I believe it would

14   have been about a year and a half later, after -- well,

15   let me rephrase that.  Perhaps late '99.

16   Q.    Had she previously reported to Martha Fetters?

17   A.    Yes.

18   Q.    At the time her employment ended did she report

19   to Bill Becker?

20   A.    Yes.

21   Q.    Are you familiar with a Robert Bell?

22   A.    Yes.

23   Q.    What was his title?

24   A.    I believe he was assistant vice president also.

**B445**

Brendan Michael Gilmore

1    Q.    Did he work out of the Delaware office?

2    A.    He actually split his time between Philadelphia

3    and Delaware.  I believe officially he was located -- he

4    was attached to the Philadelphia office.

5    Q.    Prior to splitting his time between Delaware and

6    Philadelphia had he just worked solely out of

7    Philadelphia?

8    A.    I don't know.

9    Q.    Functionally, was he a portfolio officer?

10   A.    Functionally, yes, although that probably wasn't

11   the title we were using at that time.

12   Q.    There might have been another title?

13   A.    He might have been a portfolio administrator.

14   These jobs, they have reclassified all of these different

15   jobs.  But, yes, he would be called a portfolio officer

16   today.  He dealt with clients.  He was the professional

17   who dealt with clients.

18   Q.    During the time that Linda Blozis was working on

19   your team out of the Delaware office, my understanding is

20   she was a portfolio administrator, there were portfolio

21   administrators, and then above the portfolio

22   administrators there was portfolio officers?

23   A.    Yes.

24   Q.    Are you telling us that today the portfolio

**B446**

Brendan Michael Gilmore

1  administrators are now called officers?

2      A.   No, I'm not.  I'm just -- the jobs have titles

3  that are at times, can be -- look similar, but they are

4  not.  And I look at jobs from salary grades.  I don't

5  have all the exact titles down.  I look at jobs from

6  salary grades.  Linda Blozis was a salary grade 6.

7  Someone like Bob Bell would be a salary grade 10.  So

8  expectations would be significantly different.

9      Q.   And Linda Squirer, what was her salary grade?

10     A.   She would have been on the same level as Bob

11 Bell.

12     Q.   She would have been a salary grade 10?

13     A.   I assume that was what the titles were -- the job

14 grades were back in those days.

15     Q.   And Martha Fetters, what was her salary grade?

16     A.   She would have been a higher salary grade,

17 probably a 12.

18     Q.   At the time that Linda Blozis' employment ended,

19 were there other portfolio administrators working out of

20 the Delaware office?

21     A.   Yes.

22     Q.   Who were they?

23     A.   Maria Dunlop.

24     Q.   Anyone else?

Brendan Michael Gilmore

1    A.    No.

2    Q.    At the time that Linda Blozis' employment ended

3    were there other portfolio administrators working out of

4    the Philadelphia office?

5    A.    Oh, yes.

6    Q.    Who were they?

7    A.    There would be a dozen or so.  I don't have all

8    their names.  On my team at that time there would have

9    probably been another three or four in Philadelphia.

10   Q.    When you say a dozen or so, three or four in

11   Philadelphia, the two in --

12   A.    Well, there were other teams in Philadelphia.

13   There were other assistants who worked for other people

14   that did not report to me.

15   Q.    So three or four under you in Philadelphia?

16   A.    Yes.

17   Q.    Do you remember who they were?

18   A.    One would be Marion Marano.

19   Q.    Anyone else?

20   A.    Cynthia Chambliss.

21   Q.    Anyone else?

22   A.    Yes.  Tammy Riley.  And I'm sure there are others

23   that I can't think of.

24   Q.    With respect to Maria Dunlop -- well, with

Brendan Michael Gilmore

1   respect to Marion Marano was she in her thirties?

2       A.   No.

3       Q.   Was she in her twenties?

4       A.   No.

5       Q.   With respect to Cindy Chambliss, was she in her

6   thirties?

7       A.   I don't believe so.

8       Q.   Was she in her twenties?

9       A.   No.

10      Q.   Was she in her forties?

11      A.   I don't know.  I would be guessing.

12      Q.   Would she --

13      A.   Close.  She would be close.

14      Q.   Close to 40?

15      A.   I don't know people's ages that work for me.  I

16  mean, I can't speculate.

17           From my conversations with Cindy, she had

18  two teenage children, so when you do the math you

19  probably get to someone close to 40.

20      Q.   So you are able to approximate somebody's age

21  based on different conversations you have with the folks?

22      A.   Well, I think it is -- you can figure it out, I

23  mean, without asking.  I mean reasonably, within a

24  reason.  But it is not relevant.

Brendan Michael Gilmore

1    Q.    Did you hire Maria Dunlop?

2    A.    Indirectly, yes.

3    Q.    Did you hire Bill Becker?

4    A.    Yes.

5    Q.    Did you hire a Dan Merlino?

6    A.    Yes.

7    Q.    What was his title?

8    A.    He again would have been a salary grade 6,

9    Portfolio Assistant.

10   Q.    Did you hire a Kristy Hunt?

11   A.    Technically, no.  She was working shortly before

12   I came to work there.

13   Q.    Was she transferred to your team at some point?

14   A.    She worked for me for several years.

15   Q.    Did you have any input into the decision to have

16   her work under you?

17   A.    Perhaps indirectly.  I was asked to -- I was

18   asked to assume the responsibility for a second team in

19   addition to the one I was currently managing.  She was on

20   that team.  So I agreed to take that responsibility.

21   Q.    So at some point you were responsible for two

22   teams?

23   A.    Yes.

24   Q.    Were they split up as to Delaware and

Brendan Michael Gilmore

1    Philadelphia, or some other distinction?

2        A.    No.    The team, the second team I managed was

3    totally in Philadelphia.

4        Q.    So you were responsible for one team whose

5    members were totally in Philadelphia and one team whose

6    members were in Philadelphia, Delaware and D.C.?

7        A.    Yes.

8        Q.    Did you hire a Tom Galante?

9        A.    No.

10        Q.    Are you familiar with the name Tom Galante,

11    G-A-L-A-N-T-E?

12        A.    Not really.    The name rings a bell, but I --

13        Q.    But you are not sure if he worked for you?

14        A.    I'm pretty sure he didn't.

15        Q.    Okay.    Is it fair to say that Linda Blozis had

16    worked for Mellon for more than five years?

17        A.    Yes.    I believe it says so in the history.

18        Q.    Do you believe she had worked for Mellon for more

19    than ten years?

20        A.    I don't know.    I would have to look at the

21    employee history to tell you that answer.

22        Q.    Well, maybe I can refer your attention to the

23    second page of that employee profile.    If I represent to

24    you Linda Blozis' employment ended some sometime in 2003,

**B451**

Brendan Michael Gilmore

1    do you believe she was employed by Mellon for more than

2    ten years?

3        A.    According to this document, it says she was hired

4    in 1990, so yes.

5        Q.    Did you ever call Linda Blozis a survivor?

6        A.    Did I?

7        Q.    Yes.

8        A.    I don't believe I did.

9        Q.    When the job of portfolio administrator was

10    upgraded was there an expectation that portfolio

11    administrators would have to work faster to get projects

12    completed?

13        A.    There was additional training to make them more

14    proficient.  Faster, I couldn't categorize it as faster.

15    I don't know if that would be the proper way to describe

16    it.

17        Q.    But they were expected to be more efficient?

18        A.    They were expected to be more proficient in

19    performing their jobs.

20        Q.    When you say "proficient" are you talking about

21    more skilled, a higher skill level?

22        A.    Yes, more skilled.

23        Q.    So when you talk about more proficient or more

24    skill we are talking about the quality of work?

Brendan Michael Gilmore

1      A.    Yes.   It is not -- time is not the -- is not a --
2   it is not relevant.  You are not on an assembly line.
3   You are dealing within clients and the client service
4   business.  So it is the quality of the work that's the
5   issue.
6      Q.    Were they ever given increased quantity of work?
7      A.    I don't know.
8      Q.    I mean, is it one of Mellon's business goals to
9   take in as many clients as possible?
10     A.    Well, I think that's everyone's business goal, is
11  to grow their business, so, obviously we grow our
12  business.  But we grow it in a rational manner and we add
13  to staff to meet the growing needs of our client, growing
14  client base.
15     Q.    So if the client base grows then the expectation
16  is that additional staff may be hired?
17     A.    Absolutely.
18     Q.    Are portfolio administrators or portfolio
19  assistants expected to prioritize their projects and
20  their work?
21     A.    They are expected to be able to use judgment as
22  to getting things done.  But they would also -- they had
23  been expected to check with whoever their supervisor is
24  as to what, what should be first.

Brendan Michael Gilmore

1    Q.    Did Linda Blozis ever say that she did not have

2    time to complete all of her work?

3    A.    She said that to me on one occasion.

4    Q.    When was that?

5    A.    I met with Linda because there was a -- she was

6    asked to prepare a presentation booklet for a client, and

7    she didn't do it.

8    Q.    Approximately when was that?

9    A.    That was towards the end of her tenure with

10   Mellon.

11   Q.    Do you think it was in 2003?

12   A.    It was probably, yes, sometime in that time.

13   Q.    You are saying time is not an issue.  Are

14   portfolio administrators paid based on a 37.5 hour

15   workweek?

16   A.    I believe that's the workweek, the official

17   workweek for Mellon.

18   Q.    And portfolio administrators are not paid

19   overtime; is that correct?

20   A.    I don't know.

21   Q.    Did Linda Blozis ever express she was unwilling

22   to work 50 hours when paid for 37.5 hours?

23   A.    Not to me.

24   Q.    Are you aware if she expressed that to anyone

Brendan Michael Gilmore

1   else?

2       A.   No, I'm not.

3               I don't know if she was ever asked to do

4   that either.

5       Q.   Who is responsible for making recommendations,

6   investment decisions to clients regarding the investment

7   of their assets?

8       A.   That would be done by the portfolio officer, in

9   conjunction with our investment recommendations, firm's

10  recommendation.

11      Q.   When you say our firm's recommendations, what are

12  the firm's recommendations?

13      A.   Well, we have a disciplined approach and we have

14  an analyst and a funds management group which makes the

15  recommendations, what stocks are recommended for

16  purchase, what stocks would be recommended for

17  elimination.

18              It is expected of our officers that they

19  work within that framework.

20      Q.   And Rosemary Thomas was talking to us this

21  morning about a group that, I believe she said a group

22  that's physically located in Boston.

23      A.   We have a group in Boston.  We also have a group

24  in Pittsburgh.  So depending on what the particular

Brendan Michael Gilmore

1   investment vehicle was, it would depend on where the

2   basic research emanates from.

3       Q.   And so what type of investment vehicles, as far

4   as with regard to Pittsburgh, what type of research is

5   done on --

6       A.   Primarily equity research.  Domestic equities.

7       Q.   When you say equities you mean stocks?

8       A.   Yes, stocks.

9       Q.   With regard to Boston, what type of research,

10  what type of in --

11      A.   Boston, well, they --

12               MS. WILSON:  One at a time.

13      Q.   With regard to Boston, what type of research is

14  done on what type of investment vehicles and what type of

15  investment vehicles are researched from Boston?

16      A.   Our bond research is directed out of Boston.  And

17  our international equity research, both developed

18  countries and emerging countries, emanates from Boston.

19      Q.   So with regard to recommendations, portfolio

20  administrators, they don't make the recommendations?

21      A.   No.

22      Q.   And with regard to training, is it possible that

23  a portfolio administrator could get training from a

24  fellow portfolio administrator?

**B456**

36

Brendan Michael Gilmore

1    A.    Yes.

2    Q.    And with regard to training, is training a

3    mandatory event at Mellon or is it a discretionary event

4    that one does whenever it is possible?

5    A.    I would say in most cases it is mandatory.

6    Q.    Is there a certain amount of training that needs

7    to be done in terms of hours or credits each year or

8    periodically?

9    A.    No, not -- it is not that kind of training.

10   Q.    Is it on-the-job training?

11   A.    Mostly, yes.

12   Q.    And as far as on-the-job training, where does a

13   portfolio administrator generally get their on-the-job

14   training from?

15   A.    That could come from a variety.  We have a

16   training group, which is I believe -- I don't know where

17   they are, Pittsburgh, Boston, I can't remember.  And

18   depending on the nature of the training, the trainers may

19   come into the location and do the training there.  There

20   may be other instances where they may conduct a class,

21   where people would be asked to go centrally to an area.

22   It varies.

23   Q.    What happens if a class is being scheduled at is

24   central area, say the Philadelphia office?  Would

**B457**

Brendan Michael Gilmore

1   portfolio administrators from Delaware and D.C. and

2   Philadelphia be encouraged to attend a training session

3   say in Philadelphia?

4       A.   Well, they would be asked to, and they would be

5   compensated for their time and travel.

6       Q.   And what would happen if there is a training

7   session on a particular day and a client booklet needs to

8   be produced on a certain day, what takes priority?

9            MS. WILSON:  Objection to form.  You can

10  answer.

11      Q.   Do you understand the question?

12           MS. WILSON:  You can answer the question if

13  you understand.

14      Q.   She is allowed to make an objection for the

15  record, and then you are allowed to answer the question.

16      A.   Well, it is a judgment.  What may occur is we

17  would probably say to that individual, go to the

18  training, and we will get someone else to prepare the

19  booklet, another assistant to prepare the booklet.  That

20  more likely as not would be what I would assume would

21  happen.

22      Q.   And then the other assistant who prepares the

23  booklet, when does that assistant get the training?

24      A.   Generally there would be more than one class

Brendan Michael Gilmore

1    scheduled because of, you know, from a practical

2    standpoint, these scenarios you are raising happen all

3    the time, so it generally doesn't happen that there is

4    only one class at this particular time and there is no

5    other options.

6                   There is usually, people are -- people ask

7    to go to a certain class, but, for whatever reasons,

8    people get sick or have other deaths in the family,

9    whatever, they may not make that.  So there would

10   probably be some provision for a make-up class at a

11   subsequent date.

12        Q.   When the portfolio administrator position was

13   upgraded, was it determined that certain portfolio

14   administrators were no longer qualified for the upgraded

15   position?

16                   MS. WILSON:  Objection to form.  You can

17   answer.

18        A.   I don't know.

19        Q.   Were you aware of any portfolio administrators

20   not being qualified for the position after it was

21   upgraded?

22        A.   Not to my knowledge.

23        Q.   So far as you knew, Linda Blozis was qualified

24   for the portfolio administrator position?

Brendan Michael Gilmore

1     A.    Yes.

2           MS. WILSON:  Objection to form.  You can

3     answer.

4     A.    Yes.

5     Q.    Were you aware of Mellon offering any separation

6     packages to any administrative help that was not

7     qualified for the upgraded position?

8     A.    No.

9     Q.    Did Bill Becker suggest offering a package to

10    Linda Blozis, a separation package?

11    A.    Not to my knowledge.

12    Q.    I'd just like to define what I'm talking about.

13    Did Bill Becker suggest offering any kind of compensation

14    to Linda Blozis in the event that she transitioned out of

15    the company?

16    A.    Not to my knowledge.

17    Q.    How are bonuses determined for portfolio

18    administrators?

19    A.    It is a complicated process for all employees at

20    Mellon.  It is not just portfolio administrators.

21          First of all, it depends on the overall

22    profitability of the firm.  Then, in turn, it would be a

23    function of the profitability of the various departments.

24          Then it would be then broken down as to each

Brendan Michael Gilmore

1    group, as to their contribution, and then just down from

2    there.

3        Q.    And down from there beyond each individual

4    group's --

5        A.    Ultimately, it would get to say my group and I

6    would have -- I would be informed that I had a bonus

7    pack, a bonus pool, and then I would be asked to make

8    recommendations for how to allocate that bonus based on

9    each one's contribution, and that would -- then in turn

10   that would then go back up to my superior and his

11   superior, and to the final level of approval.  And those

12   things could be changed along the way.

13       Q.    So you were able to make recommendations as to

14   how much bonus certain portfolio administrators received?

15       A.    Yes, I would make recommendations.

16       Q.    You could also make a recommendation that a

17   portfolio administrator receive no bonus; is that

18   correct?

19       A.    That's correct.

20       Q.    You recommended Linda Blozis receive no bonus in

21   2003 based on her 2002 performance?

22       A.    I don't remember.

23       Q.    If she did not receive a bonus in 2003, which I

24   think the record will show she did not, is it fair to say

Brendan Michael Gilmore

1    that would be based on your recommendation?

2         A.    It would be recommended -- it would be based

3    first on a recommendation of her immediate supervisors,

4    and then in a discussion, we would have a discussion

5    about it, and then in turn it would still have to go back

6    up to my superiors for them to concur with that.  They

7    could overrule us.  But based -- but it would be based on

8    her prior, her performance in the prior year.  Bonuses in

9    '03 would be based on results of '02, and on and on.

10        Q.    Had you previously indicated to Linda Blozis that

11   she would receive a bonus in 2003 for 2002?

12        A.    No.  I would never say that to any employee

13   unless I knew exactly that it had been approved.

14        Q.    Would employees ever ask you, how does it look

15   for the bonuses for next year?

16        A.    All the time.

17        Q.    What would you tell them?

18        A.    I would tell them that, you know, it is -- you

19   know, "Looks like the year is going well," if I felt that

20   way.  If I felt like the year wasn't going that way I

21   would say, "We are not having a good year."  It is what

22   it is.

23              I wouldn't mislead people.  And if we

24   weren't having a particularly good year, I would let them

42

Brendan Michael Gilmore

1  know that because maybe they could help make it a better

2  year.

3      Q.    Could an employee's bonus increase from one year

4  to the next?

5      A.    Yes.

6      Q.    Would an employee's bonus normally increase

7  gradually or could it double from one year to the next?

8      A.    Yes, it could.  You know, if we had a

9  particularly really good year, the firm did, and an

10  employee made a significant contribution, yes, they could

11  have a particularly good year.

12              An employee can get no bonus in one year and

13  get a bonus in the subsequent year too.

14      Q.    With regard to a portfolio administrator's

15  workload, is there a certain amount of work that is

16  assigned to a particular portfolio administrator versus a

17  group project?

18      A.    We had guidelines in terms of what is an

19  appropriate account load for an officer, and then, in

20  turn, what is the appropriate support level for an

21  officer.

22              The Delaware office had a support level

23  significantly above the normal standard for Mellon Asset

24  Management.

**B463**

43

Brendan Michael Gilmore

1    Q.    And based on that, was Linda Blozis told that she
2    could not ask for help with her workload from other
3    portfolio administrators?

4    A.    I, I don't know.

5    Q.    As far as you know, was Maria Dunlop allowed to
6    get assistance from Linda Blozis if she needed assistance
7    with her workload?

8    A.    I don't know.

9    Q.    Did you and Gregg Landis ever criticize Linda
10   Blozis for leaving a client booklet for Maria Dunlop to
11   bind before Linda Blozis went away on vacation?

12   A.    There was an issue about -- this I think is
13   related to the earlier issue where she was asked to
14   prepare a booklet a month in advance and didn't do it,
15   and hadn't, and when I spoke to her, I think that she was
16   told that she had to finish that, finish that job.

17   Q.    Was it acceptable to have Maria Dunlop assist her
18   with completing that job?

19   A.    That's not the point.  She -- it was her job to
20   do.  She had 30 days to do it.  And when I asked her why
21   she didn't do it, she was slightly below disrespectful,
22   barely respectful.

23   Q.    What do you mean by she was "barely respectful"?

24   A.    She was arrogant.  She was very accusatory.

**B464**

44

Brendan Michael Gilmore

1          When I asked her, you know, about this, she

2   basically told me that she was -- the office was

3   understaffed, and I asked her how did she come up with

4   that, she said, "Well, Becker was gone."  I said that had

5   nothing to do with her job, and she accepted no

6   responsibility at all.

7      Q.   Why was Becker gone at that time?

8      A.   He had been promoted and relocated to

9   Philadelphia.

10     Q.   Had his job in the Delaware office been

11  eliminated?

12     A.   No.

13     Q.   Did someone eventually replace him in the

14  Delaware office?

15     A.   Yes.

16     Q.   When was that?

17     A.   That job didn't get filled for about a year.

18     Q.   So his former position in Delaware, he moved up

19  to a promotion in Philadelphia?

20     A.   Yes.  He was made a team leader.

21     Q.   And his old job in Delaware was vacant for about

22  a year?

23     A.   I filled in on an interim basis, along with my

24  other duties.

**B465**

parseFloatnone

Brendan Michael Gilmore

1    Q.   You've been asked to wear a lot of hats for

2  Mellon, haven't you?

3    A.   That's right.  I haven't always been happy about

4  it.

5    Q.   What were defendants' rules with regard to taking

6  vacation between 2001 and 2003?

7    A.   Well, I think in terms of the company has a

8  policy about vacation.

9    Q.   Okay.  What is their policy?

10    A.   Well, I would prefer you ask that from Rosemary

11  Thomas in terms of what the company policy is.

12    Q.   Well, as an employee of Mellon what is your

13  understanding of the policy?

14    A.   Well, vacation is certainly something you are

15  entitled to, but it is a function, you know, of what is

16  going on in your job at any given time.

17          What I mean by that is, you know, when you

18  take your vacation is something that has to be approved

19  by your manager.  You just don't unilaterally make the

20  decision you are going on vacation.

21    Q.   Subject to this approval by the manager, is there

22  certain allotment of vacation days for portfolio

23  administrators?

24    A.   There is a formula for employment, years of

**B466**

Brendan Michael Gilmore

1   service, salary levels.  That's a human resource issue.

2       Q.   Based on a certain formula, though, portfolio

3   administrators or --

4       A.   It is a company-wide formula, covers all

5   different jobs.

6       Q.   Regardless of your title?

7       A.   Right.  I don't feel comfortable trying to --

8       Q.   Well, I'm not going to ask you to spell out the

9   formula, but just in a general question --

10      A.   Right.  Probably --

11      Q.   -- let me ask you a question, based on a certain

12  formula that might include years of service and salary

13  level, each employee is allotted a certain number of

14  vacation days per year?

15      A.   Yes.

16      Q.   With regard to the portfolio administrators in

17  the Delaware office, particularly, Linda Blozis and Maria

18  Dunlop, who would be responsible for approving or

19  disapproving or denying their vacation days?

20      A.   Their managers, in the case of the Delaware would

21  be Bill Becker and Gregg Landis.  But they would more

22  likely as not inform me of what -- the reason for their

23  decision.

24      Q.   Would you have to, in turn, approve their

47

Brendan Michael Gilmore

1   decision?  Or was that something they had authority to
2   grant or deny on their own?
3        A.    I would, I would more likely -- I would probably
4   want to have some role in deciding, agreeing or
5   disagreeing with that.
6        Q.    So were you active or passive in the
7   determinations of who was granted or denied X amount of
8   vacation days out of the Delaware office?
9        A.    I would say I had -- I would say -- I would say
10  that I had little -- there was very few times the issue
11  every came up.  I wouldn't describe myself as being
12  active or passive at all.  That wasn't the case.
13       Q.    Very few times what issue came up?
14       A.    About whether or not -- the only time it came up
15  was with Linda Blozis on this occasion, that we ever had
16  an issue about whether or not it was appropriate.
17       Q.    Whether or not it was appropriate to grant the
18  individual vacation?
19       A.    For her to leave at the time she wanted to leave.
20  Not to be allowed to take vacation.
21       Q.    So was it a question of whether or not she should
22  be allowed to take vacation starting on a specific date
23  or whether or not she should be allowed to take vacation
24  of a certain length?

**B468**

48

Brendan Michael Gilmore

1    A.    It was, I believe at the time had to do with the

2    time she wanted to leave.

3    Q.    But with regards to the amount of vacation an

4    individual would get for a given year, assuming years of

5    service and salary level and other factors that go into

6    whatever the formula is, assuming those factors are

7    equal, would two portfolio administrators get an equal

8    amount of vacation time for one year?

9    A.    If their length of service was the same?

10    Q.    Yes.

11    A.    I would assume so.

12    Q.    If you have a greater length of service, you

13    might be entitled to more vacation?

14    A.    Yes.  But that's really -- that's made at a

15    senior management level.  That's a company-wide level.

16    It is not made at my level.  And I don't have any, any

17    role to play in that.

18    Q.    I think you told us you had a meeting with Linda

19    Blozis in 2003?

20    A.    Yes.

21    Q.    Was that in approximately April of 2003?

22    A.    I don't remember the exact date.  It may have

23    been.

24    Q.    Was your meeting involving a booklet or client

**B469**

Brendan Michael Gilmore

1   booklet that had not been completed?

2   A.   Yes.

3   Q.   Did you tell her she needed to complete that

4   booklet?

5   A.   Yes.

6   Q.   Did you tell her she needed to complete that

7   booklet or else?

8   A.   No.

9   Q.   With regard to the tone of the meeting, were you

10  speaking in loud tones?

11  A.   No.

12  Q.   Were you whispering to her?

13  A.   No.   I was speaking to her in a normal voice.

14  Frankly, I was shocked at the tone of her voice in

15  response to my discussion.

16  Q.   Do you remember what you said to her at that

17  meeting?

18  A.   I asked her why she hadn't completed it.

19  Q.   Do you remember if you said anything else to her

20  at that meeting?

21  A.   I'm sure I told her that it was expected of her,

22  that was the normal course, part of her job.

23            She brought up this issue about being

24  understaffed, and I asked what she meant by that, and she

Brendan Michael Gilmore

1    said, "Well, Bill Becker is gone." And I said to her,

2    "Well, Linda, I'm the one who is doing double duty, not

3    you. Doesn't affect you or your area at all."

4            At that point she told me that I didn't know

5    what it was like to manage an expansion office.

6        Q.   How did you respond?

7        A.   Well, I pointed out to her that I had started up

8    California for Mellon so that I suspect that I did have

9    some understanding what it took.

10       Q.   And then what happened?

11       A.   The meeting was going nowhere. She was unwilling

12   to acknowledge on any level that she had a

13   responsibility, that this was part of her job and she had

14   a responsibility to do it, and I just basically didn't

15   see any point in continuing going around in circles with

16   her. So I just explained to her that it was part of her

17   job and I expected that it would be done.

18       Q.   Were you talking loud enough so other people

19   outside the door could hear you?

20       A.   No.

21       Q.   You don't think anyone outside the door could

22   hear you?

23       A.   No, I don't. I know she claims that people did.

24       Q.   And you used profanity at this meeting; is that

**B471**

Brendan Michael Gilmore

1    correct?

2        A.    I at one point in frustration said -- I believe

3    either I said, "For Christ's sake," or, "What the hell is

4    going on?"

5              I immediately realized that I had been --

6    that had been inappropriate and I immediately apologized.

7    Subsequent to the meeting I called human resources and

8    informed them of what I had done.  That is the only

9    profanity that I used.

10       Q.    If someone were to apply for employment for the

11   job of a portfolio administrator in the Delaware office

12   who would review their application?

13       A.    Well, first it would be reviewed by our

14   recruiter, and human resources -- and the Human Resource

15   Department, and they would screen them, and then they

16   would, you know, forward on what they thought were the

17   appropriate applicants.

18       Q.    Suppose someone got past that initial screening,

19   who would consider the candidate next?

20       A.    The first person that I would ask to interview

21   would be the person that they would work for and other

22   people at that level.

23       Q.    So you might get the application and say, "I want

24   you, Gregg Landis," or, "you, Bill Becker, to do the

**B472**

Brendan Michael Gilmore

1   initial interview"?

2        A.    Actually, I wouldn't even see -- it would go

3   directly to them in most cases.

4        Q.    Would you even know that there was an applicant

5   that had passed the initial screening?

6        A.    Well, I would know that there was a job opening

7   and that they were pursuing applicants to fill it.  So I

8   would expect them to be having -- you know, reviewing

9   applicants, sure.

10       Q.    After Bill Becker or Gregg Landis has an initial

11  interview with the person what would happen next?

12       A.    We might ask other portfolio assistants to

13  interview them also, people who work at the same level.

14       Q.    Would anybody else interview the candidate?

15       A.    Other team, members of the team would more likely

16  as not interview the person.

17       Q.    Would anyone else interview them?

18       A.    I might ultimately be responsible for

19  interviewing.

20       Q.    And you interviewed Maria Dunlop?

21       A.    I don't remember.

22       Q.    Did you interview Laura Shannon?

23       A.    I don't remember.

24       Q.    Mellon has policies against age discrimination in

Brendan Michael Gilmore

1    employment; is that correct?

2        A.    Absolutely.

3        Q.    And Mellon has policies against sex

4    discrimination in employment; is that correct?

5        A.    Yes, they do.

6        Q.    And Mellon has policies against retaliation for

7    complaining of discrimination; is that correct?

8        A.    Absolutely.

9        Q.    And you are aware that it is illegal to

10   discriminate against someone in their employment based on

11   age?

12       A.    Yes.

13       Q.    And you are aware that it is illegal to

14   discriminate against someone in their employment based on

15   sex?

16       A.    Yes.

17       Q.    And you are aware that it is illegal to

18   discriminate or retaliate against someone based on a

19   discrimination complaint?

20       A.    Yes.

21       Q.    You are aware that Linda Blozis made an age

22   discrimination complaint?

23       A.    I believe Rosemary mentioned it to me.

24       Q.    Do you remember approximately when that was?

54

Brendan Michael Gilmore

1    A.    No.

2    Q.    Was it in '02 or '03?

3    A.    I would be speculating.  I don't remember.

4    Q.    Did Rosemary Thomas tell you that Linda Blozis

5    had accused you of age discrimination?

6    A.    I believe she did say that, yes.

7    Q.    Do you remember if she said anything else?

8    A.    No, I don't.

9    Q.    Do you remember what your response to her was?

10    A.    Sure.  It wasn't true.

11    Q.    To the best of your knowledge, did Rosemary

12    Thomas interview other people regarding this complaint or

13    did she just speak to you?

14    A.    I, I think there were other -- she spoke to

15    others.  I think some -- someone making an accusation of

16    that is taken very seriously at Mellon.  So she, she may

17    have spoken -- I'm sure she spoke to her supervisor about

18    it.  You would have to ask Rosemary.

19    Q.    When you say you are sure she spoke to her

20    supervisor, you mean Rosemary spoke to her own

21    supervisor?

22    A.    Yes.  The company has a very strong policy on

23    this.  If someone made that kind of complaint, it

24    wouldn't just be ignored.  It would at least get a

**B475**

Brendan Michael Gilmore

1    hearing.

2        Q.    So it is your understanding that Linda Blozis

3    would have gotten a hearing if she had made an age

4    discrimination complaint?

5        A.    Well, it would have been discussed with Rosemary,

6    and I'm sure Rosemary would have spoken to her superior

7    and they would have determined whether or not there was

8    any validity to the claim.

9        Q.    And as a result, since this claim involved you,

10   would you be apprised of the outcome of their hearing or

11   investigation?

12       A.    Certainly if they thought it was correct, that it

13   was legitimate, I would have certainly heard about it.  I

14   would probably find myself being terminated for doing

15   that.

16            I don't remember the -- I don't remember the

17   circumstances here, but I think clearly the determination

18   was that there was no validity to the claim.

19       Q.    Mellon has a progressive discipline policy called

20   general corrective action; is that accurate?

21       A.    Yes.

22       Q.    Is that a three-step process that includes an

23   initial warning, a final written warning and ultimately

24   termination?

**B476**

Brendan Michael Gilmore

1    A.    Yes.

2    Q.    And there is also other instances where a person

3    can be terminated immediately for an intolerable offense

4    outside of the three-step process?

5    A.    That's correct.

6    Q.    Ultimately Linda Blozis was terminated by Mellon;

7    is that correct?

8    A.    That's correct.

9    Q.    And your understanding is she was terminated

10   based on this progressive discipline or this general

11   corrective action process?

12   A.    That is the process that was used.

13   Q.    It wasn't based on an intolerable offense that

14   could lead to immediate termination?

15   A.    No, it was not.

16   Q.    Some kind of accelerated progressive discipline

17   that could lead to termination before you go through the

18   steps?

19   A.    No, that did not happen in her case.

20   Q.    As far as written warnings or corrective actions,

21   does Mellon have certain forms that it uses to issue

22   corrective actions?

23   A.    I believe it has a format.  As to whether or not

24   there is a specific form, I don't know.

**B477**

Brendan Michael Gilmore

1    Q.    What do you mean by "it has a format"?

2    A.    Well, there has to be some process of bringing

3    someone to -- first of all, informing someone that they

4    are, say, being put on written warning, and it has to be

5    some discussion and then formulation, there has to be

6    some sort of record as to what the issues are to justify

7    that.

8              I mean, you just can't put someone on

9    written warning just because the mood strikes you.  You

10   have to follow a very closely monitored format of, you

11   know, of unacceptable performance, employee behavior

12   which has to be substantiated in order to get, you know,

13   the Human Resources Department to buy in on this process.

14   Q.    And this would be part of this disciplinary

15   process that we have been talking about?

16   A.    Yes, that's correct.

17   Q.    And this is something that is outside of your

18   annual review?

19   A.    Well, it would -- certainly if you find yourself

20   being on written warning, and it is obviously part of

21   your annual review, but it may not -- you may not wait

22   until the end of the year.

23              I mean, if someone is just not performing up

24   to standards, you wouldn't wait until December to say,

Brendan Michael Gilmore

1    oh, by the way, in March we were very unhappy with your
2    performance.  We would make you aware of it immediately,
3    if the performance was that far below standard.
4        Q.   Okay.  So there is two different things here.  I
5    mean, in terms of types of forms, there is your annual
6    review, which is done once a year; is that correct?
7        A.   All employees are reviewed annually, that's
8    correct.  But they are also reviewed, as part of the
9    annual review there is a semiannual review.  I mean there
10   is a -- you just don't wait a year to be reviewed.  You
11   are reviewed -- but within our framework you have, any
12   manager has the authority, the right, to review someone
13   at any time if there is a significant problem with their
14   performance.
15       Q.   So they could review them at any time, but at a
16   bare minimum, if things are going okay, they could be
17   reviewed every six months?
18       A.   They would be reviewed officially once a year,
19   but they get an interim step to kind of just -- for any
20   course corrections, if you will.  You know, you just kind
21   of say, hey, you are doing a good job here, you better
22   keep it up.  Or you are doing a terrific job on these
23   nine things, let's work a little bit on the tenth thing,
24   that kind of thing.

**B479**

Brendan Michael Gilmore

1    Q.    Aside from that, if there is performance issues

2    then the general corrective action or progressive

3    discipline could be initiated?

4          MS. WILSON:  Objection to form.  You can

5    answer.

6    Q.    The three-step process can be --

7    A.    Right, but my question, my guess would be that

8    under-performance issues would have been spoken to the

9    employee about, discussed with the employee, prior to the

10   actual formal written notice.

11         So it isn't, you know, no one would be kept

12   in the dark and then all of a sudden wake up one day and

13   say, oh, by the way, we are very unhappy with your

14   performance, if you don't change, tomorrow you are going

15   to find yourself being terminated.

16         Performance issues would be addressed as

17   soon as we started to see some issues.

18   Q.    So if an individual has a performance issue they

19   could be given some kind of counseling or written

20   counseling on their semiannual or on their annual --

21   A.    Or on an interim basis.  At any time, that's

22   right.

23   Q.    And then if there is further problems the

24   individual could be given the disciplinary action known

**B480**

Brendan Michael Gilmore

1    as initial written warning?

2        A.    That would ultimately -- that's right.  If the

3    performance issues did not improve, they ultimately would

4    be given a written warning, that is correct.

5        Q.    And then after the initial written warning they

6    could be placed on final written warning?

7        A.    That's correct.  Again, if they do not change the

8    behavior.  The behavior doesn't reach our minimum

9    standards, they would ultimately be put on final written

10   warning.

11       Q.    And after final written warning they can be

12   terminated or their employment can be terminated; is that

13   correct?

14       A.    Yes.  But, again, based on guidelines from our

15   Human Resources Department.  It is not a unilateral

16   decision any manager gets to make.

17       Q.    And as far as corrective action, before they get

18   to the termination they could be given a written

19   corrective action?

20       A.    They could be given training, additional training

21   or other forms of support to help them get back on the

22   beam, right.

23       Q.    So I guess what you are telling us is there is a

24   lot of opportunities here.  There is written counseling

Brendan Michael Gilmore

1    and your interim review or any interview performance

2    evaluation, then there is a semiannual or annual

3    evaluation, and then there is also opportunities for

4    training, correct?

5        A.   Yes.

6        Q.   And then there is also, if problems persist then

7    it can go to initial written warning, final written

8    warning and ultimately to termination?

9               MS. WILSON:  Objection to form.  You can

10   answer.

11       A.   In general, that's correct.

12       Q.   At some point in time did you make the decision

13   to place Linda Blozis on final written warning?

14       A.   I made -- that decision was reached as a

15   consensus of a number of people, not just me.

16       Q.   Okay.  Did that consensus include you?

17       A.   Yes.

18       Q.   Who else was part of that consensus?

19       A.   Well, our human resource professionals were

20   involved, and my superior was involved.

21       Q.   Were any of your subordinate managers involved?

22       A.   Well, yes.  They, obviously, were very

23   disappointed with her performance and brought it to our

24   attention.

**B482**

Brendan Michael Gilmore

1      Q.   With regard to final written warning, the

2   decision to place Linda Blozis on final written warning,

3   did Gregg Landis have any input into that decision?

4      A.   Yes.

5      Q.   Did Bill Becker have any input into that

6   decision?

7      A.   Bill no longer was managing her at that time.

8   Certainly his experience with her contributed to our

9   concern about the performance not getting better.  But at

10  the time of -- I don't believe he was involved at the

11  time.

12     Q.   I'm going to show you a document, ask that be

13  marked Exhibit 2.

14          (Gilmore Deposition Exhibit 2 was marked for

15  identification.)

16     Q.   This is a document marked at the bottom

17  right-hand corner MEL/BLOZ 470 and MEL/BLOZ 471.

18  Speaking with Rosemary Thomas this morning, what she is

19  telling us is that these are two drafts of the same

20  document that was originally prepared and dated for May

21  14th, if you look at the top left-hand corner of the

22  first page, and eventually was finalized and dated May

23  19th, 2003.  Is that accurate?

24     A.   Yes.

Brendan Michael Gilmore

1    Q.    And this is a final written warning --

2    A.    Mm-hmm.

3    Q.    -- issued by you to Linda Blozis?

4    A.    As her ultimate -- as the manager in charge of

5    that region, yes, I reviewed it and concurred.

6    Q.    Okay.  You indicate in here on the first sentence

7    that her performance is not meeting your expectations as

8    a portfolio administrator; is that correct?

9    A.    Yes.

10    Q.    Looking at the bottom, the last two sentences,

11    you again talk about, quote, my expectations, in both of

12    those sentences.

13    A.    Mm-hmm.

14    Q.    I'm sorry?

15    A.    Yes, I am agreeing it says, the word does say

16    "meet my expectations," yes.

17    Q.    So Linda Blozis was given this final written

18    warning for not meeting your expectations; is that

19    correct?

20    A.    Yes.

21    Q.    And did you author this document?

22    A.    Not individually.  It was done with -- done with

23    I believe Rosemary Thomas.

24    Q.    As the VP in HR, she assisted with the wording of

64

Brendan Michael Gilmore

1   this document?

2       A.   Well, again, it is not the sole discretion of the

3   manager to terminate an employee.  It has to be done

4   following a very clearly delineated format.  And so,

5   again, you know, this is ultimately -- I am the manager.

6   Ultimately I assume responsibility for this as the

7   manager.  And so that's why it is addressed as me and

8   mine.

9            But the expectations are the expectations of

10  Mellon Private Asset Management and -- the minimum job

11  expectations.  They are not just my personal

12  expectations.  So in that regard I --

13      Q.   With regard to Linda Blozis not meeting the

14  expectations, Rosemary Thomas wouldn't have any input

15  into whether or not substantively Linda Blozis was doing

16  the job or meeting the expectations?

17      A.   Human resources would have an opportunity to hear

18  her side of the story and to make some judgments.  So it

19  is, again, not done in a vacuum.  But as to whether or

20  not she would have the professional expertise as to judge

21  the quality of the work, that's a different story.

22      Q.   That would be better left to --

23      A.   The professionals.

24      Q.   -- Linda Blozis' bosses?

**B485**

65

Brendan Michael Gilmore

1    A.    The professionals in Wealth Management.

2    Q.    Including you?

3    A.    Including me.

4    Q.    Did you feel there was a problem with Linda

5   Blozis with regard to attention to detail in her work?

6    A.    Yes.

7    Q.    Was that one of the reasons why her employment

8   ultimately was terminated?

9    A.    Among others.

10    Q.    Can you read the last sentence of page 471, the

11   second page?

12    A.    "However, if your performance continues to not

13   meet my expectations you may be subject to further

14   corrective action, up to and including termination of our

15   employment."

16    Q.    Did you mean "her" employment?

17    A.    I, yes, I -- I suppose that's a typo.

18    Q.    Is that a detail that should have been corrected?

19    A.    Well, I would have to ask if -- it is subject to

20   interpretation.  From the firm's standpoint, it may be

21   our employment, meaning that it is a relationship.

22    Q.    Well, were you talking about the termination of

23   her employment?

24    A.    Yes, we are clearly talking about her

Brendan Michael Gilmore

1    termination.  This was -- this was given to her and

2    explained to her, what it meant.  I mean this was -- this

3    was given to her in the course of a meeting.

4        Q.    In the course of a meeting with you?

5        A.    No.  Actually, I believe -- I don't know if I was

6    at that meeting.  But certainly Gregg Landis I believe

7    would have been at it and more likely as not Rosemary

8    Thomas.

9        Q.    Do managers such as managers at Gregg Landis'

10   level, do they do planning for their employees for the

11   upcoming year?  Say we are coming into 2007.

12       A.    They, yes, they would certainly help them in

13   terms of planning for their, you know, not only jobs for

14   the year but also help people along with career

15   development.

16       Q.    And as far as their jobs for the year, does the

17   planning include setting goals for them for the upcoming

18   year, say, for instance, for 2007?

19       A.    In that time I don't know.  I know we do that

20   now.  I don't know if we were doing it back then.

21       Q.    When is that goal planning now done for the

22   upcoming year?

23       A.    Done at the beginning of the year.

24       Q.    What do you mean by the beginning of the year?

67

Brendan Michael Gilmore

1    A.    Well, it would be done in January of '07, to

2    discuss plans for '07.

3    Q.    If you talked about an employee's goals for the

4    upcoming year, would they ever start planning those goals

5    in the middle of the year?

6    A.    It could occur.  Things could change.  Situations

7    could present themselves.  People might be given

8    opportunities to be promoted.

9    Q.    So the goals could be adjusted in the middle of

10   the year?

11   A.    Absolutely.

12   Q.    As things change?

13   A.    Absolutely.

14   Q.    But generally, the planning for the year is done

15   in January?

16   A.    Yes.

17   Q.    Was Linda Blozis told to clean out her desk when

18   she was discharged?

19   A.    I don't know.

20   Q.    Linda Blozis was fired on a Monday; is that

21   correct?

22   A.    I don't remember.

23   Q.    Linda Blozis was paid until the end of the

24   workweek when she was fired; is that correct?

Brendan Michael Gilmore

1      A.    I believe that is correct, yes.

2      Q.    And by the time she had been fired Mellon had

3   decided her performance was unacceptable; is that fair to

4   say?

5      A.    I -- yes, yes.

6      Q.    And why would Mellon pay someone until the end of

7   the week if their performance was unacceptable?

8      A.    Because we are not a Draconian firm.  We are not

9   out to punish people.  We don't like terminating

10  employees.  It is a very unpleasant end result for us.

11  And, you know, we pay them to the end of the week.  What

12  difference does it make?

13     Q.    Eventually you hired a Laura Shannon to be a

14  portfolio administrator in the Delaware office; is that

15  correct?

16     A.    I think that was the person.  I don't -- you

17  know, I don't remember.  I managed a number of people.

18     Q.    To the best of your recollection, that --

19     A.    To the best of my recollection, yes.

20     Q.    -- is the person that replaced Linda Blozis?

21     A.    That's correct.

22     Q.    Laura Shannon was hired in approximately 2003, to

23  the best of your recollection?

24     A.    To the best of my recollection.

Brendan Michael Gilmore

1    Q.    She was hired by you?

2    A.    Ultimately, yes, I was the hiring manager.

3    Q.    Do you remember what her qualifications were?

4    A.    Not, not completely.  I mean, in terms of her

5    academic credentials and the like, I don't remember her

6    education level, but I know she came to us with a number

7    of years experience working in our industry, and I think

8    that was -- you know, we very strongly felt she had a

9    good work ethic, a good attitude and certainly knew what

10    the job entailed, had a lot of experience working with

11    clients, in the client service field that we are in.

12    Q.    When she was hired who did she directly report

13    to?

14    A.    Gregg Landis.

15    Q.    Laura Shannon, she was in her thirties at that

16    time?

17    A.    I think she was a little older than that.

18    Q.    You think she was a little older than 30?

19    A.    Based on her work experience, I -- she might have

20    been late thirties, might have been a little older.

21    Q.    Now, as far as day-to-day duties for a portfolio

22    administrator at the Delaware office, did Laura Shannon

23    have to do any telephone reception or answering phones

24    for anyone?

Brendan Michael Gilmore

1    A.    Well, all our people answer phones.  That's part
2    of the job.
3    Q.    Does everyone have a direct line in an office?
4    A.    I believe so, yes.
5    Q.    And is there also a general line?
6    A.    It depends on the location.  It is not universal.
7    Q.    If I look up Mellon in the Yellow Pages or phone
8    book and I want an adviser, but I don't have a specific
9    person --
10    A.    There probably is -- whether or not that direct
11    line would get you to one of our people is a different
12    thing.  I don't know that.
13    Q.    Who might it get you to?
14    A.    It might get to someone down on the first floor
15    in that office.  There was -- that building, there are
16    two floors.  We were on the second floor.  There were
17    people on the, Mellon employees on the first floor, so
18    that might have been answered by someone there.
19    Q.    When you say "Mellon employees on the first
20    floor," is that with a different branch or different
21    subsidiary?
22    A.    That would have been the banking employees, yes.
23    Q.    Up until what time did Mellon have banking
24    employees?

**B491**

Brendan Michael Gilmore

1     A.    We sold the retail bank I think in '03.  I, I --

2  I don't know exactly.  Don't get old, I'll tell you.

3     Q.    You don't like being old?

4     A.    Oh, I don't, I don't -- I am what I am.  I'm 60

5  and I got a four-year-old daughter and I got a

6  seven-year-old son.  So I wouldn't change it for the

7  world.

8     Q.    So you consider yourself young then?

9     A.    My kids do.  They are the ones that make the

10  decisions around my house.

11     Q.    As far as mail delivery, would Laura Shannon have

12  any responsibility for mail delivery to various employees

13  within the office?

14     A.    Not -- in a kind of vague, general sense, yes.

15  Not any different from any other location.

16           Let me explain what I mean by that.  We

17  have, within our -- let's say in Philadelphia, we would

18  have seven teams we would put together.  Each team would

19  have a mail drop where the people from the mail

20  department would come down and all that mail would be

21  stuck in their slot.

22           Some assistant from the team, and they may

23  change from day to day, each day would take that mail, a

24  couple of times a day, and see that it was passed out to

Brendan Michael Gilmore

1    the appropriate members.  That is a function that all is

2    carried out.

3              In the Delaware office it is a much simpler

4    function because they are all sitting in a space about

5    this large.  So in that sense, yes, if mail -- if she got

6    mail and something was for Bill Becker, she would drop it

7    in his office, if something for Gregg Landis, but they

8    would be within a couple feet of each other.  But that's

9    a normal part of their job.

10   Q.   Was it a normal part of Laura Shannon's job to

11   train new employees?

12   A.   I, I -- no, I don't believe it would be a normal

13   part of her job.  And it would be -- since she was the

14   newest employee it would be kind of unlikely that the

15   newest person would do the training.

16             On the other hand, if she were the -- had

17   been there a period of time and some new employee came in

18   after her, it would -- she would probably be asked to

19   help with kind of bringing the training along, which is,

20   again, a normal part of what we ask all of our assistants

21   to do.  It is a collaborative effort, you know.

22   Q.   Would Laura Shannon ever handle any cash

23   transactions?

24   A.   Unlike -- I doubt it very much.  I don't believe

Brendan Michael Gilmore

1  any of our employees are asked to handle cash

2  transactions.

3      Q.   Was Laura Shannon ever asked to open new

4  accounts?

5      A.   Sure, she would participate in that function,

6  absolutely.

7      Q.   Was Laura Shannon asked to close terminated

8  accounts?

9      A.   She would also, again, if that were the case, she

10  would be involved in -- that's a normal part of her job.

11      Q.   Was Laura Shannon asked to arrange client

12  meetings?

13      A.   She could be.  Again, that's a normal part of

14  that job, that function.

15              MR. LAROSA:  Why don't we take a five-minute

16  break.  I think I'm close to the end for the day.

17              (Recess taken.)

18  BY MR. LAROSA:

19      Q.   Let's go back on the record.  Just a few more

20  questions and then we will be finished for the day.

21      A.   Sure.  Okay.

22      Q.   During the time that Linda Blozis worked in the

23  Delaware office there were no male portfolio

24  administrators in the Delaware office; is that correct?

Brendan Michael Gilmore

1    A.    I believe that's correct.

2    Q.    And there were no younger portfolio

3    administrators in the Delaware office during the time

4    Linda Blozis worked there?

5    A.    I'm not sure.

6    Q.    Kathy Agne may have been a portfolio

7    administrator in the Delaware office who may have been

8    older than Linda Blozis; is that correct?

9    A.    That's a possibility.  That's the reason for me

10   not being sure.

11   Q.    Aside from Kathy Agne, after she left there were

12   no younger portfolio administrators in the Delaware

13   office; is that correct?

14   A.    Well, there were only two.  There was Linda and

15   then there was Marie -- Maria, I guess.  And clearly

16   Maria was younger than her.  I don't know how old Maria

17   was.

18   Q.    Why was that clear or clearly?

19   A.    Well, my guess is Linda would have probably

20   been -- not Linda.  Excuse me.  Maria would probably have

21   been about 30.  I mean she, she wasn't -- she looked

22   young.  I mean, I, I don't know how --

23   Q.    You could tell by looking at her?

24   A.    I mean you could easily tell that one was

75

Brendan Michael Gilmore

1   significantly younger than the other.

2                MR. LAROSA:  Okay.  At this point, as I said

3   this morning, just one caveat, if it should come about in

4   the case that we gain additional documents, then I would

5   leave the deposition open to question about additional

6   documents.  Otherwise, I have no further questions for

7   today.

8                MS. WILSON:  All right.

9                MR. LAROSA:  You have the right to read and

10  sign your deposition to see if the court reporter made

11  any typos, or you may waive that right at this time.

12               MS. WILSON:  We won't waive it.  We will

13  read and sign.  It is best you read it.

14               THE WITNESS:  Okay.

15               MS. WILSON:  I'll give it to you when I get

16  it.

17               THE WITNESS:  Fine.  Very well.

18               MR. LAROSA:  Thank you for coming in.

19               THE WITNESS:  Thank you.

20               (Proceedings conclude at 3:28 p.m.)

21

22

23

24

76

```
 1
 2                    I N D E X
 3
     DEPONENT:   BRENDAN MICHAEL GILMORE           PAGE
 4
         Examination by Mr. LaRosa                  2
 5
 6
                 E X H I B I T S
 7
     GILMORE DEPOSITION EXHIBITS                   MARKED
 8
     1 - 10/23/98 Employee Profile                  16
 9
     2 - 5/19/03 Final Written Warning              62
10
11
12   ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 77
13   CERTIFICATE OF REPORTER                  PAGE 78
14
15
16
17
18
19
20                                                   .
21
22
23
24
```

**B497**

1

2

3

4                REPLACE THIS PAGE

5                WITH THE ERRATA SHEET

6                AFTER IT HAS BEEN

7                COMPLETED AND SIGNED

8                BY THE DEPONENT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**B498**

78

```
 1    State of Delaware )
                        )
 2    New Castle County )

 3

 4                    CERTIFICATE OF REPORTER

 5
                      I, Eleanor J. Schwandt, Registered
 6    Professional Reporter and Notary Public, do hereby
      certify that there came before me on the 19th day of
 7    December, 2006, the deponent herein, BRENDAN MICHAEL
      GILMORE, who was duly sworn by me and thereafter examined
 8    by counsel for the respective parties; that the questions
      asked of said deponent and the answers given were taken
 9    down by me in Stenotype notes and thereafter transcribed
      by use of computer-aided transcription and computer
10    printer under my direction.

11                    I further certify that the foregoing is a
      true and correct transcript of the testimony given at
12    said examination of said witness.

13                    I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
14    interested in the event of this suit.

15

16

17                           Eleanor J. Schwandt

18                           Certification No. 125-RPR

19                           (Expires January 31, 2008)

20
      DATED:
21

22

23

24
```

**B499**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LINDA J. BLOZIS,                        )
                                        )   Civil Action No.
                 Plaintiff,             )      05-891 SLR
                                        )
        v.                              )
                                        )
MELLON TRUST OF DELAWARE,               )
NATIONAL ASSOCIATION, a                 )
Pennsylvania corporation;              )
MELLON BANK, NATIONAL                   )
ASSOCIATION, (formerly                  )
MELLON BANK (DE) NATIONAL               )
ASSOCIATION), a Pennsylvania            )
corporation; and MELLON                 )
FINANCIAL CORPORATION, a                )
Pennsylvania corporation,               )
                                        )
                 Defendants.            )
                                        )

        Deposition of MARIA F. DUNLOP taken pursuant to
notice at the law offices of John M. LaRosa, Two East 7th
Street, Wilmington, Delaware, beginning at 4:07 p.m., on
Thursday, December 21, 2006, before Patricia L. Shelton,
Registered Professional Reporter and Notary Public.

APPEARANCES:

        JOHN M. LaROSA, ESQ.
        LAW OFFICE OF JOHN M. LaROSA
            Two East 7th Street
            Wilmington, Delaware  19801
          For the Plaintiff

        STEPHANIE WILSON, ESQ.
        REED SMITH, LLP
            Princeton Forrestal Village
          136 Main Street - Suite 250
            Princeton, New Jersey  08543-7839
              For the Defendants

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477
                 www.wilfet.com

**B500**

2

Maria F. Dunlop

```
 1                          MARIA F. DUNLOP,
 2            the deponent herein, having first been
 3            duly sworn on oath, was examined and
 4            testified as follows:
 5                          EXAMINATION
 6    BY MR. LaROSA:
 7        Q.   Good afternoon.  My name is John LaRosa.  And I
 8    represent Linda Blozis, who is the plaintiff in this
 9    lawsuit.
10                 Will you state your full name for the
11    record, please?
12        A.   Maria F. Dunlop.
13        Q.   And what is your current home address?
14        A.   308 Cold Water Drive, Clayton, Delaware, 19938.
15        Q.   Have you ever had your deposition taken before?
16        A.   No.
17        Q.   Let me review some ground rules for you.  After I
18    ask the questions and you answer them, you will have the
19    opportunity to review the written transcript to see if
20    the court reporter made any typos or technical mistakes.
21    Do you understand that?
22        A.   Yes.
23        Q.   And you have taken an oath to tell the truth.
24    And you understand the significance of that, correct?
```

**B501**