3

Maria F. Dunlop

```
1      A.   Yes.

2      Q.   Are you under any medications or substances that

3   would prevent you from remembering accurately or

4   testifying truthfully today?

5      A.   No.

6      Q.   Is there any reason why you feel you wouldn't be

7   able to answer truthfully today?

8      A.   No.

9      Q.   If I ask you a question and you don't understand,

10   let me know and I'll be happy to rephrase.  Do you

11   understand that?

12      A.   Yes.

13      Q.   Also, if you don't know the answer to something,

14   we don't want you to guess, so tell us you don't know and

15   I'll try to move on to another area.  Do you understand

16   that?

17      A.   Yes.

18      Q.   Also, we have to take turns speaking.  So please

19   wait until I finish asking the question to give me an

20   answer.  And I'll try to let you finish your answer

21   before I move on to the next question.  Do you understand

22   that?

23      A.   Yes.

24      Q.   Also, if you need any breaks at any time, let me
```

**B502**

4

Maria F. Dunlop

1    know.  There's also water here for you.  Do you

2    understand that?

3        A.   Yes.

4        Q.   Have you reviewed any documents in preparation

5    for your deposition today?

6        A.   No.

7        Q.   Have you done anything to prepare for your

8    deposition today?

9        A.   No.

10       Q.   Will you state your date of birth?

11       A.   2/24/79.

12       Q.   Regarding your educational background, did you

13   graduate from high school?

14       A.   Yes.

15       Q.   Did you attend college?

16       A.   Yes.

17       Q.   Did you graduate from college?

18       A.   Yes.

19       Q.   Did you receive an undergraduate degree?

20       A.   Yes.

21       Q.   What is your undergraduate degree in?

22       A.   Consumer economics.

23       Q.   Is that a bachelor's degree?

24       A.   Yes, bachelors.

B503

5

Maria F. Dunlop

1    Q.    Is that a Bachelor of Arts or Bachelor of

2    Science?

3    A.    Science.

4    Q.    Did you attend graduate school?

5    A.    No.

6    Q.    Do you have any other college degrees?

7    A.    No.

8    Q.    Who is your current employer?

9    A.    Wilmington Trust Company.

10   Q.    And what is your position at Wilmington Trust?

11   A.    Trust officer.

12   Q.    Prior to Wilmington Trust, where did you work?

13   A.    Mellon Private Wealth Management.  That's what

14   it's called, right?

15   Q.    Did you ever do any work or perform any services

16   for Mellon Trust of Delaware, if you know?

17   A.    Yes.  Their names change a lot.  So when I worked

18   there, I believe it was Private Wealth Management.  I

19   think it's also Mellon Trust now or...

20   Q.    At any point in time when you worked there, was

21   it referred to as Mellon Bank?

22   A.    Yes.

23   Q.    And at any time when you worked there, was your

24   employer also referred to as Mellon Financial

**B504**

6

Maria F. Dunlop

1    Corporation, if you can recall that term?

2        A.    I think so, yeah.  Like I said, they've had a lot

3    of names.

4        Q.    Was there --

5        A.    I just call it Mellon.

6        Q.    Was there a time when both you and Linda Blozis

7    worked at Mellon?

8        A.    Yes.

9        Q.    And we'll use your abbreviation Mellon to refer

10   to both those names.

11       A.    Okay.

12       Q.    When did you begin working for Mellon?

13       A.    It was June 2002, yeah.

14       Q.    And when did your employment with Mellon end?

15       A.    May 2004.

16       Q.    And prior to your name becoming Maria Dunlop, did

17   you have a prior name or maiden name?

18       A.    Maria Bannister.

19       Q.    So if we see documents in this case that refer to

20   Maria Bannister or documents that refer to Marie Dunlop,

21   they're all referring to you?

22       A.    Yes.

23       Q.    I'll show you a document and ask that it be

24   marked Dunlop Exhibit 1.

**B505**

Maria F. Dunlop

```
 1              (Dunlop Deposition Exhibit No. 1 was marked
 2    for identification.)
 3    BY MR. LaROSA:
 4       Q.   Have you seen this document before?
 5       A.   Yes.
 6       Q.   For the record, this document is marked
 7    MEL/BLOZ 453 in the bottom right-hand corner.
 8              When you worked at Mellon, what was your job
 9    title at Mellon, if you can recall?
10       A.   Yeah.  I think -- I know when I left I was a
11    trust officer.  I think when I was there, I think it was
12    something portfolio assistant or -- I don't remember the
13    exact title.
14       Q.   Did Mellon have a title called portfolio
15    administrator?
16       A.   Yes.  That was it, portfolio administrator.
17       Q.   Were portfolio administrators also referred to as
18    assistants or as an assistant?
19       A.   Yeah.  Well, I assisted Gregg Landis.
20       Q.   And were portfolio administrators also referred
21    to as administrative help?
22       A.   Yes.
23       Q.   And during the time you worked at Mellon, did
24    Linda Blozis also hold the title of portfolio
```

**B506**

8

Maria F. Dunlop

1    administrator?

2         A.    I'm not sure what her title was.

3         Q.    And with regard to written commendations, did you

4    ever receive any written commendations from clients?

5                    MS. WILSON:  Objection to form.

6                    THE WITNESS:  I'm sorry?

7                    MS. WILSON:  I'm making an objection.  You

8    can answer the question.  I have to put my objection on

9    the record, though.

10                   THE WITNESS:  I don't think I understand

11   your question.

12   BY MR. LaROSA:

13        Q.    Do you understand what I mean by commendations?

14        A.    No.  I'm sorry.

15        Q.    Did clients ever give portfolio administrators or

16   clients ever give you any written words of praise or

17   thanks for a job well done?

18        A.    Yeah.

19        Q.    And did supervisors ever do that for you?

20        A.    Mm-hmm.

21                   THE REPORTER:  Yes?

22                   THE WITNESS:  Yes.

23   BY MR. LaROSA:

24        Q.    Something else I should have said, you need to

9

Maria F. Dunlop

```
 1    give us a verbal response for the record.  The court
 2    reporter can't record nods and shakes of the head.  Do
 3    you understand that?
 4      A.   Yes.
 5      Q.   With regard to this e-mail, do you recall seeing
 6    this document before?
 7      A.   Yes.
 8      Q.   Was this a written commendation for a good job by
 9    you and Linda Blozis?
10      A.   Yes.
11      Q.   This wasn't the only written commendation that
12    Linda Blozis would have received; is that correct?
13           MS. WILSON:  Objection to form.
14      A.   Can I rephrase that?  You're asking if I know if
15    this is the only thing she's ever received?
16      Q.   Yes.
17      A.   Well, I don't know that.  I mean, she could have
18    received other good things, but I don't know of any.  I
19    don't know that she didn't receive any or did receive
20    any.
21      Q.   Okay.  As I said at the beginning, you're allowed
22    to tell us you don't know, and I'll try to move on to
23    another area.  Do you understand that?
24      A.   Okay.  Yes.
```

**B508**

10

Maria F. Dunlop

1    Q.    To the best of your knowledge, Linda Blozis was

2    never reprimanded or disciplined for tardiness or

3    attendance issues; is that correct?

4    A.    Yes.

5    Q.    To the best of your knowledge, Linda Blozis was

6    never reprimanded or disciplined for unprofessionalism;

7    is that correct?

8    A.    Yes.

9    Q.    To the best of your knowledge, Linda Blozis was

10   never reprimanded or disciplined for gross neglect of

11   responsibilities; is that correct?

12            MS. WILSON:    Objection to form.

13   Q.    She's allowed to make an objection for the

14   record.  And if you understand my question, you can

15   answer the question.

16   A.    Yes.

17   Q.    Did Linda Blozis perform her job competently?

18   A.    I think so, yes.

19   Q.    Was Linda Blozis qualified to do her job?

20            MS. WILSON:    Objection.

21   A.    Yes.

22   Q.    Do you know if Mellon records an employee's date

23   of birth on any written records it keeps?

24   A.    I can't remember if I had to give my date of

**B509**

11

Maria F. Dunlop

1    birth or not.  I mean, I know for employee benefits I had
2    to give my date of birth.  But I don't recall if I had
3    to -- I know I filled out an employment application.  I
4    just don't remember if it had my date of birth on there.
5    That was over four years ago.
6        Q.   Do you know if Mellon records an employee's sex
7    or gender on any written records?
8        A.   I don't know.
9        Q.   What are the qualifications of a portfolio
10   administrator?
11              MS. WILSON:  Objection to form.
12       Q.   You told us you were a portfolio administrator;
13   is that correct?
14       A.   Yes.
15       Q.   What were the qualifications for the job during
16   2002 and 2003?
17       A.   You would need to have investment background --
18   investment understanding.
19       Q.   Anything else that you can recall at this time?
20       A.   I think good client correspondence or
21   communication skills, good communication skills.
22       Q.   Any other qualifications that you can recall at
23   this time, if you can recall?
24       A.   No.

12

Maria F. Dunlop

```
 1                I wish I could have prepared for this by
 2     some way.  I didn't know what kind of questions or
 3     anything would have been asked.
 4          Q.   That's fine.
 5                But to the best of your recollection, the
 6     qualifications for a portfolio administrator included
 7     investment understanding and good communication skills?
 8          A.   Yes.
 9          Q.   And at some point, did Mellon change or upgrade
10     the role of portfolio administrator?
11          A.   While I was employed there you mean?
12          Q.   Yes.  While you were employed there.
13          A.   Not that I remember.
14          Q.   Do you remember ever having any meetings with
15     Brendan Gilmore where he informed employees that
16     expectations would be increased for all employees?
17          A.   I remember them saying that we were going to have
18     sales goals.  But that's it.
19          Q.   Who was going to have sales goals?
20          A.   Everyone basically from -- it used to be only
21     higher up people would have sales goals.  But they were
22     starting a new thing where it would trickle down and each
23     person would then have, you know, depending on your
24     level, a smaller and smaller to make everyone feel
```

13

Maria F. Dunlop

1    responsible.

2        Q.    Responsible for obtaining new clients?

3        A.    New business, yes.

4        Q.    New business.

5              Either from new clients or existing clients?

6        A.    Exactly, yes.

7        Q.    Other than that change, you don't recall any

8    other changes with regard to the expectations of

9    portfolio administrator during the time you worked there?

10       A.    No, I don't recall.

11       Q.    Did you work at the Delaware office?

12       A.    Yes.  In Greenville, Delaware.

13       Q.    And in the Greenville, Delaware office, did you

14   have responsibility for telephone reception for the

15   office?

16       A.    Yes.  We both answered the phone.  And I covered

17   when Linda was out to lunch.  And when I was out to

18   lunch, she would cover for me.

19       Q.    And in the Greenville office, did you have

20   responsibility for equipment maintenance?

21       A.    Yes.

22       Q.    And in the Greenville, Delaware office, did you

23   have responsibility for mail delivery?

24       A.    Yes.

14

Maria F. Dunlop

1     Q.    In the Greenville office, did you have any
2     responsibility for training employees?
3     A.    Yes.
4     Q.    Who were you responsible for training?
5     A.    After Linda left -- was fired, Laura -- I don't
6     remember her last name.  I think it was Laura -- Laura --
7     she doesn't work there anymore, I know that.
8     Q.    Was there a Laura Shannon who was hired?
9     A.    Yes.  That's her name.
10    Q.    Did she replace Linda Blozis?
11    A.    Yes.  Not right away.  It was quite some time.  I
12    want to say about six to eight months where I ran the
13    office entirely by myself.
14    Q.    And with regard to portfolio administrators
15    during the time you worked there, there were no male
16    portfolio administrators in the Delaware office; is that
17    correct?
18    A.    That's correct.
19    Q.    There were no male portfolio administrators on
20    Brendan Gilmore's team; is that correct?
21             MS. WILSON:  Objection to the form.
22             You can answer.
23    A.    I don't remember who worked in the Philadelphia
24    office, because I know we were a branch off of them.

**B513**

Maria F. Dunlop

```
 1     Q.    And as far as portfolio administrators in the
 2   Delaware office, was Linda Blozis the oldest portfolio
 3   administrator in the Delaware office during the time you
 4   worked there?
 5     A.    Yes.  It was just her and myself.
 6     Q.    Have you ever heard the name Kathleen Agne?
 7     A.    Yes.
 8     Q.    Do you know who she is?
 9     A.    Yes.  I never met her.  I replaced Kathy Agne.
10     Q.    Do you know approximately how old Kathy Agne was?
11     A.    No.
12     Q.    Was she older than you?
13     A.    Yes.
14     Q.    Was her position eliminated or...
15     A.    No.  I took her position.
16     Q.    And who hired you?
17     A.    Gregg Landis.
18     Q.    Are you familiar with the name Frances Smith?
19     A.    No.
20     Q.    Are you familiar with the name Martha Fetters?
21     A.    That sounds familiar, yes.
22     Q.    Do you know who that person is?
23     A.    I think she worked in Gregg's position or was --
24   I know the office, before they moved to Greenville, was
```

16

Maria F. Dunlop

```
 1    located in the city.  And I think Martha, Kathy Agne,
 2    Linda and Gregg and Bill Becker all worked together.  But
 3    then they moved to the Greenville office, and I think
 4    Martha retired or -- I don't know what happened.
 5        Q.    And you think when her employment with Mellon
 6    ended, she was replaced by Gregg Landis?
 7        A.    I'm not sure.
 8        Q.    Have you ever heard of the name Linda Squier?
 9        A.    I've heard of it, but -- I recognize the names,
10    but I don't know who they are.  I haven't met them
11    before.
12        Q.    Yeah.  I'm just talking about Linda Squier now.
13        A.    Okay.
14        Q.    Have you ever heard the name Robert Bell?
15        A.    Yes.
16        Q.    Do you know who he is?
17        A.    No.
18        Q.    Do you know what his job was?
19        A.    He had a high position.  I don't know what he
20    did, though.
21        Q.    To the best of your knowledge, was Linda Blozis
22    the oldest portfolio administrator on Brendan Gilmore's
23    team during the time you worked there?
24              MS. WILSON:  Objection to form.
```

17

Maria F. Dunlop

1              You can answer.

2       A.    Yes.

3       Q.    Did Brendan Gilmore hire Bill Becker?

4       A.    Bill Becker worked there when I started.  I don't

5   know who hired him.

6       Q.    Do you know who hired Dan Merlino?

7       A.    The name sounds familiar.  But I'm assuming

8   Gregg Landis.  Because I think Dan replaced me.

9       Q.    I don't want you to guess.  I just want you to

10  tell us anything you know.  If you don't know, that's an

11  acceptable answer, too.

12      A.    Okay.

13      Q.    Did Brendan Gilmore hire Tom Galante?

14      A.    I don't know.

15      Q.    Did Brendan Gilmore hire Kristy Hunt?

16      A.    If I know the person worked there, can I say yes

17  or do I --

18      Q.    I'm only asking if you know if Brendan Gilmore

19  hired her.

20      A.    I don't know if he hired her.

21      Q.    With regard to Linda Blozis, had she worked there

22  for a period of years prior to the beginning of your

23  employment?

24      A.    Yes.

**B516**

18

Maria F. Dunlop

| 1 | Q. | Do you know how long she had worked for Mellon? |

1  Q.  Do you know how long she had worked for Mellon?

2  A.  No.

3  Q.  Do you know if she had worked there for more than

4  ten years?

5  A.  I don't know how long.

6  Q.  Did Brendan Gilmore ever call Linda Blozis a

7  survivor?

8  A.  I don't know.

9  Q.  Did you say you began there in 2002 or 2003?

10  A.  2002.

11  Q.  Do you know who were Brendan Gilmore team members

12  in 2002?

13  A.  Yes.  I don't know if I could name them all.  If

14  you told me their names, I would say yes or no.  I don't

15  remember every single one of them off the top of my head,

16  all their names.

17  Q.  Who can you recall that was on Brendan Gilmore's

18  team in 2002?

19  A.  Can you tell me their names and I'll tell you yes

20  or no?

21       I think his assistant's name -- was she

22  Kristy?  No.

23  Q.  You were on Brendan Gilmore's team in 2002?

24  A.  Yes.

**B517**

19

Maria F. Dunlop

1     Q.    And Linda Blozis?

2     A.    Yes.

3     Q.    And the same was true for at least part of 2003,

4     that both you and Linda Blozis were on Brendan Gilmore's

5     team?

6     A.    All of 2003 we were on Brendan's team.

7     Q.    At some point in time, Linda Blozis's employment

8     ended and she was no longer on Gilmore's team?

9     A.    Yes, that did take place in 2003.

10    Q.    As portfolio administrator, were there other

11    roles to whom you reported, other job titles?

12    A.    Can you give me an example?

13    Q.    Other than portfolio administrators, was there

14    some folks who held the role of portfolio officer?

15    A.    Yes.

16    Q.    And who was responsible for making investment

17    recommendations?

18    A.    The portfolio officers.

19    Q.    And with regard to projects, who was responsible

20    for prioritizing the work of portfolio administrators,

21    such as you and Linda Blozis?

22    A.    I think we -- I prioritized my own work.  It was

23    given to me by the portfolio officers, though.

24    Q.    So portfolio administrators were expected to

**B518**

20

Maria F. Dunlop

1    prioritize their own work?

2       A.    Yes.

3       Q.    And portfolio officers did not set priorities for

4    the portfolio administrators; is that correct?

5       A.    Well, if they gave us something that needed to be

6    done right away, they would tell us to do it right away

7    and we would do it.

8       Q.    Other than telling you that something needed to

9    be done right away, would they set any other priorities

10   of one project over another project?

11      A.    Yes.

12      Q.    And were there times when they would not set

13   priorities between two projects?

14      A.    Yes.

15      Q.    I show you a document and ask it be marked

16   Dunlop 2.

17            (Dunlop Deposition Exhibit No. 2 was marked

18   for identification.)

19   BY MR. LaROSA:

20      Q.    Take a minute and read that document.  For the

21   record, this document is marked MEL/BLOZ 593 at the

22   bottom right-hand corner.

23            Let me know when you finish reading that.

24      A.    Okay.

21

Maria F. Dunlop

1               I'm finished.

2       Q.   Do you know who William Becker is?

3       A.   Yes.

4       Q.   Who is he?

5       A.   He's a portfolio officer.

6       Q.   Did he work out of the Delaware office?

7       A.   Yes.

8       Q.   Did he supervise you?

9       A.   No.

10      Q.   Did he supervise Linda Blozis?

11      A.   Yes.

12      Q.   Calling your attention to the second to the last

13   paragraph, the first sentence, can you read that sentence

14   out loud?  It starts with, "I know you've been busy."

15      A.   "I know you've been busy, first with Katie gone

16   and then helping teach Maria.  There needs to be

17   improvement in completing these tasks in a timely manner,

18   however.  As I've said for four years, you don't need my

19   permission to get your job done.  If you need to lock

20   yourself in a room to get things done, do it."

21      Q.   With regard to Katie, do you know who that is

22   referring to?

23      A.   Yes.

24      Q.   Who is that?

**B520**

22

Maria F. Dunlop

1      A.    Kathy Agne.

2      Q.    Who is the Maria that that's referring to?

3      A.    Me.

4      Q.    And was Linda Blozis responsible for training or

5      helping to teach you do your job?

6      A.    Yes.

7      Q.    And calling your attention to the fourth

8      paragraph, the sentence that reads, "I need to get

9      better"... Do you see that?

10     A.    Yes.

11     Q.    Can you read just that sentence for us?

12     A.    "I need to get better at letting you know when

13     things don't happen the way they should."

14     Q.    Was there a problem with Bill Becker not letting

15     portfolio administrators know when things didn't happen

16     the way they should?

17           MS. WILSON:   Object to form.

18     A.    I don't know.

19     Q.    Had you heard anything about any problems with

20     that from Becker?

21     A.    No.  Bill Becker never said anything about this

22     to me.

23     Q.    Had you heard that from any other people in the

24     office, about Becker not letting folks know when things

**B521**

23

Maria F. Dunlop

```
 1    don't happen the way they should?
 2    A.   No.
 3    Q.   As a portfolio administrator, were you given
 4    multiple projects to work on at any one given time?
 5    A.   Yes.
 6    Q.   And were you given multiple deadlines or
 7    different deadlines for different projects that you had
 8    to work on at the same time?
 9    A.   Yes.
10    Q.   And did you ever have any problem with completing
11    assignments within the initial deadline given to you?
12    A.   No.  I would work late and even sometimes on the
13    weekends to get things done.
14    Q.   Was there ever any situations where you were not
15    able to get things done by the initial deadline and
16    management was able to extend the deadline on a project?
17    A.   Are you looking for specifics?
18    Q.   No.  Just in general do you remember that at all?
19    A.   Deadlines can be moved, yes.
20    Q.   Did management ever move deadlines for you if you
21    had multiple projects and were not able to complete a
22    particular project within the particular deadline given
23    by management?
24    A.   Yes.  But I can't remember any specifics.
```

**B522**

24

Maria F. Dunlop

1    Q.   Can you remember who would extend a deadline for
2    you for a particular project?
3    A.   It would be Gregg.  He was my direct supervisor.
4    Q.   Is that Gregg Landis?
5    A.   Gregg Landis, yes.
6    Q.   Did you ever have a time when you felt
7    overwhelmed that you had too much work and not enough
8    time to complete all of the work that you had been given?
9    A.   Yes.
10   Q.   Were you paid based on the 37.5-hour work week,
11   if you can recall?
12   A.   I don't recall.
13   Q.   Were portfolio administrators paid overtime if --
14   A.   No.
15   Q.   -- they worked more than 40 hours per week?
16   A.   No.  I was salary.
17   Q.   Did you ever have to prepare client booklets?
18   A.   Yes.
19   Q.   And are there certain lists that have to go in
20   the client booklets?
21   A.   There's a ton of information that goes into
22   client booklets.
23   Q.   Is any of the information in the form of a list?
24   A.   There's the index, which is listed.

**B523**

Maria F. Dunlop

1     Q.   Let me show you a document and ask that it be
2  marked Exhibit 3.
3              (Dunlop Deposition Exhibit No. 3 was marked
4  for identification.)
5  BY MR. LaROSA:
6     Q.   Take a moment and read through that document.
7              Calling your attention to the bottom of the
8  document, do you recognize the initials at the bottom of
9  that document?
10    A.   Yes.
11    Q.   Whose initials are they?
12    A.   Gregg Landis.
13    Q.   Do you recognize the handwriting on this
14 document?
15    A.   Yes.
16    Q.   Whose handwriting is that?
17    A.   Gregg Landis.
18    Q.   Calling your attention to the third -- there's
19 three numbered paragraphs or sections on this document.
20 Calling your attention to the third paragraph, do you
21 know what book he is referring to there?
22    A.   Yes.
23    Q.   What type of book is he referring to there?
24    A.   When we meet with a client, we prepare

26

Maria F. Dunlop

1    presentation booklets.  And they include usually graphs

2    and charts of the investments, written commentaries about

3    the investments, any activity, things like that.

4        Q.    And do you know what he's referring to there by a

5    list for the book, specifically, what he's referring to

6    by a list?

7        A.    It sounds like he wanted a list of the

8    withdrawals made from the account put together.

9        Q.    Is that the type of instruction that he would

10   give you in putting together a client book?

11       A.    He was usually pretty -- he provided a good

12   explanation of what to do when he requested me to do

13   things.

14       Q.    When he requested you to do things, did he give

15   you a detailed explanation of what particular contents he

16   would want in the client book?

17       A.    Yes.

18       Q.    Did he ever expect you to guess what type of

19   information he wanted in a client book without telling

20   you specifically?

21              MS. WILSON:  Objection to form.

22       A.    Well, after you do so many, you kind of remember

23   what to put into each one.  And he would always review it

24   before I binded it and made the final booklet.  And he

**B525**

27

Maria F. Dunlop

1    would, you know, make changes if necessary.

2        Q.    Did he ever tell you you should have put

3    something in there that he had not expressly asked you to

4    put in there, such as a list of major investments or

5    withdrawals or major withdrawals, if you can recall?

6        A.    I don't remember.

7        Q.    Did he ever tell you you needed to anticipate

8    client needs?

9        A.    No.

10       Q.    Did you know a Cynthia Chambliss when you worked

11   at Mellon?

12       A.    Yes.

13       Q.    And what was her job?

14       A.    She was Brendan's assistant.

15       Q.    When you began working at Mellon, did

16   Cynthia Chambliss provide any training for you on any

17   aspects of your job?

18       A.    No.

19       Q.    Was there ever any time when you needed some help

20   from her on how to do a particular task that you were

21   able to consult with her?

22       A.    I would ask her questions on things, yes.

23       Q.    And was she able to help you with questions you

24   had about how to do your job?

28

Maria F. Dunlop

1      A.   Yes.

2      Q.   And did that occur throughout the time you were

3   employed at Mellon?

4      A.   I wouldn't say that that was frequent at all.

5   Cynthia worked in the Philadelphia office and I worked in

6   Greenville.  And Linda really was the only person that

7   trained me and helped me learn the systems and accounts

8   and how to do things with the accounts.  I don't remember

9   ever getting any sort of training from anyone in

10  Philadelphia.

11          If I had a question on a certain account or

12  something to do and if Linda wasn't there, I would maybe

13  call Philadelphia to ask for help.  But...

14     Q.   And did that happen more often when you were

15  newer to the job or near the end of your time at Mellon,

16  that you would seek help from Cynthia or someone in the

17  Philadelphia office?

18     A.   I think throughout my job when Linda wasn't

19  there.  If I couldn't get the answer from someone in my

20  office, then I would go to the Philadelphia office.

21     Q.   Were you ever aware of administrative help or

22  assistants or portfolio administrators leaving Mellon

23  because the job expectations had been increased?

24     A.   No.

29

Maria F. Dunlop

1    Q.   Were you ever aware of Mellon offering severance

2    or separation packages for employees who were leaving

3    their job?

4    A.   No.

5    Q.   Did you ever receive bonuses at Mellon?

6    A.   Yes.

7    Q.   Who determined your bonus?

8    A.   I think it was Brendan.

9    Q.   Brendan Gilmore?

10   A.   Yes.

11   Q.   Did you receive a bonus in 2002?

12   A.   Yes.

13   Q.   Did you receive a bonus in 2003?

14   A.   Yes.

15   Q.   Was there ever a year when Mellon gave you no

16   bonus?

17   A.   No.

18   Q.   Mellon gave you a bonus every year you worked

19   there?

20   A.   Yes.

21   Q.   That was determined by Brendan Gilmore, to the

22   best of your knowledge?

23   A.   Yes.

24   Q.   Was that bonus based in part on the company's

**B528**

30

Maria F. Dunlop

1    performance as a whole?

2        A.    I don't know.

3        Q.    Aside from yourself, do you know who else

4    received bonuses in the Delaware office in 2002?

5        A.    No.

6        Q.    Aside from yourself, do you know who else

7    received bonuses in the Delaware office in 2003?

8        A.    No.

9        Q.    Was there ever a time when you were able to

10   receive assistance from Linda Blozis in completing your

11   work load?

12       A.    Yes.

13       Q.    Do you remember when that was?

14       A.    The whole time we worked together, we helped each

15   other.

16       Q.    And with regard to your assignments, she was

17   allowed to help you complete your assignments if there

18   was more work than you had time to complete?

19       A.    Yes.

20       Q.    At Mellon with regard to vacation, did you have

21   to request vacation?

22       A.    Yes.

23       Q.    And were you allotted so many days of vacation

24   each year?

**B529**

31

Maria F. Dunlop

1     A.   Yes.

2     Q.   And did you have to make any specific requests in

3     advance of when and how many days you wanted to take

4     vacation?

5     A.   Yes.

6     Q.   Did anyone at Mellon ever deny one of your

7     requests for vacation?

8     A.   No.

9     Q.   Was there ever a point in 2003 when

10    Brendan Gilmore had a closed-door meeting with

11    Linda Blozis?

12              MS. WILSON:   Objection to form.

13    A.   I don't remember that.

14    Q.   Do you ever recall Brendan Gilmore shouting at

15    Linda Blozis behind closed doors?

16    A.   I don't remember.

17    Q.   Do you ever remember Brendan Gilmore using

18    profanity with Linda Blozis?

19    A.   I don't remember.

20    Q.   Did Linda Blozis ever tell you that

21    Brendan Gilmore had used profanity with her?

22    A.   I don't remember.

23    Q.   Do you recall Linda Blozis ever coming to you in

24    tears or upset because of a meeting she had with

**B530**

32

Maria F. Dunlop

1    Brendan Gilmore?

2    A.    Yes.

3    Q.    Do you remember what she said to you?

4    A.    No.

5    Q.    Do you remember what you said to her?

6    A.    No.

7    Q.    Do you remember if she had told you that

8    Brendan Gilmore had swore at her?

9    A.    I don't remember specifics.

10    Q.    You don't remember specific words that she had

11    said he said to her?

12    A.    Correct.   I remember -- I can't think of specific

13    things, but I remember that he did not treat her well.

14    Q.    And did he not treat her well on one occasion or

15    was this something that happened during the course of her

16    employment on more than one occasion?

17    A.    More than one occasion, yes.

18    Q.    How did he not treat her well?

19    A.    I can't think of specific things.   I can't

20    remember specific things.   I just remember in my mind

21    that he wasn't nice to her.

22    Q.    Did you ever have any problems with

23    Brendan Gilmore not being nice to you?

24    A.    Again, I don't remember specifics, but he -- he's

**B531**

33

Maria F. Dunlop

```
 1    not a friendly person.  He makes comments that aren't
 2    always appropriate.  His attitude, his demeanor, his...
 3       Q.   So during the time you worked there,
 4    Brendan Gilmore made inappropriate comments?
 5              MS. WILSON:  Objection to form.
 6       A.   I can remember one specific comment he made about
 7    knee-high boots I wore to work once.
 8       Q.   What did he say?
 9       A.   He just made a comment about them.  And just the
10    way he looked at me I don't feel was appropriate.
11       Q.   Do you remember what he said?
12       A.   I don't remember specifically, no.
13       Q.   Did you feel he made a sexist comment to you?
14              MS. WILSON:  Objection to form.
15       A.   Yes.
16       Q.   Do you feel that he did not treat women in the
17    office as well as he treated the men in the office?
18              MS. WILSON:  Objection to form.
19       A.   Yes.
20       Q.   And to the best of your knowledge, he never made
21    any inappropriate comments to any of the men in the
22    office about their clothing or attire?
23              MS. WILSON:  Objection to form.
24       A.   I don't remember any comments made to them.
```

**B532**

34

Maria F. Dunlop

```
 1      Q.    And were you aware of anyone complaining about
 2   any inappropriate comments by Brendan Gilmore?
 3      A.    I don't remember.
 4      Q.    Were you aware of Linda Blozis ever saying
 5   anything to you about Brendan Gilmore behaving
 6   inappropriately toward her?
 7      A.    I remember her and I talking about him.
 8      Q.    And what did you say?
 9      A.    I remember he wouldn't let her -- she always
10   took, I think, two or three weeks to go to Florida.  And
11   then I remember one year, I don't remember specifically
12   what year it was, but she wasn't allowed to do that.  She
13   was only allowed to take a shortened vacation, not what
14   she normally took in the past.
15      Q.    And was Brendan Gilmore who did not allow her to
16   take what she had taken in the past in terms of vacation?
17      A.    I believe so, yes.
18      Q.    And you and she had a conversation about that?
19      A.    Yes.
20      Q.    Did you and she have any other conversations
21   about Brendan Gilmore behaving inappropriately to either
22   one of you?
23            MS. WILSON:  Objection to form.
24      A.    She was there when he made the boot comment, and
```

35

Maria F. Dunlop

1    then we talked about it.

2        Q.    What did she say?

3        A.    I don't remember specifically.  I just remember

4    us having a conversation about it.

5        Q.    Do you remember what you said?

6        A.    Specifically, no.  I remember just saying, you

7    know, the comment he made about the boots and the way he

8    looked at me and, you know, just that he's an

9    inappropriate -- not a nice person.

10       Q.    Did you feel like he leered at you?

11             MS. WILSON:  Objection to form.

12       A.    He just looked at me and then walked away.

13       Q.    But you felt like the way he looked at you was

14   inappropriate?

15       A.    Yes.

16             MS. WILSON:  Objection to form.

17       Q.    Did Brendan Gilmore ever tell Linda Blozis to

18   complete a client booklet or else?

19       A.    That's a vague memory, yes.

20       Q.    You do remember that vaguely?

21       A.    Yes.

22       Q.    Did he ever tell you to complete a task or else?

23       A.    Brendan didn't really give me things to do.  He

24   didn't assign me work.  My work came from Gregg Landis.

36

Maria F. Dunlop

1    Q.    So you don't recall him saying something like

2    that to you?

3    A.    No.

4    Q.    Did Mellon have policies against age

5    discrimination in employment?

6    A.    Yes.

7    Q.    Did Mellon have policies against sex

8    discrimination in employment?

9    A.    Yes.

10    Q.    Did Mellon have policies against retaliation for

11    complaining of discrimination, if you were a --

12    A.    Yes, I think.

13    Q.    You said, "Yes, I think"?

14    A.    Yes.

15    Q.    Did Mellon have a policy for reporting employment

16    discrimination complaints to human resources?

17    A.    Yes.

18    Q.    Do you know if Linda Blozis ever made a complaint

19    to human resources of discrimination?

20    A.    I don't know.

21    Q.    Do you know if Linda Blozis ever talked to

22    Rosemary Thomas or someone in human resources?

23    A.    I don't know.  I do remember that she rebuttal'd

24    her review.  She didn't agree with the review that was

37

Maria F. Dunlop

1   given to her.

2      Q.   Was that the review in 2003?

3      A.   I don't remember which one.

4      Q.   And the years you worked with her were 2002 and

5   2003?

6      A.   Yes.

7      Q.   So it must have been a review she received in

8   2002 or 2003?

9      A.   Yes.

10     Q.   And it might have been a review of her

11   performance in 2002 or 2001?

12     A.   Yes.

13     Q.   Did anyone from human resources ever contact you

14   to question you about any employment discrimination

15   complaint made by Linda Blozis?

16              MS. WILSON:  Objection to form.

17              You can answer.

18     A.   Rosemary Thomas called me last week -- I'm sorry.

19   I called her.  She asked Gretchen Zierolf to have me call

20   her.  So I called Rosemary back.  And Rosemary Thomas

21   told me that I would most likely be being subpoenaed

22   because there is a, for lack of a better word, a lawsuit

23   against Mellon from her.

24     Q.   Did she tell you anything else?

38

Maria F. Dunlop

```
 1     A.    No.
 2     Q.    Approximately how long was that conversation?
 3     A.    Five minutes.
 4     Q.    What was the purpose of that conversation?
 5     A.    She wanted me to talk to her -- to Mellon's
 6  outside counsel.
 7     Q.    And did you have an opportunity to do that?
 8     A.    I didn't.
 9     Q.    Why didn't you talk to Mellon's outside counsel?
10     A.    I just felt uneasy about the way she wanted me to
11  call the attorney and not have the attorney call me.  I
12  told Rosemary that I would call the attorney.  But after
13  I hung up the phone and thought again about it, I didn't
14  think it would be the best decision to make.
15     Q.    Do you have any opinion as to whether
16  Linda Blozis was discriminated against based on her age
17  at Mellon?
18           MS. WILSON:  Objection to form.
19     A.    I don't know if she was discriminated against
20  because of her age.  In my opinion, I don't think she was
21  treated fairly.
22     Q.    Do you have any opinion whether or not
23  Linda Blozis was not treated fairly because of her sex or
24  gender?
```

39

Maria F. Dunlop

1      A.   No.

2      Q.   But you believe that she was not treated fairly

3  compared to her co-workers?

4      A.   Yes.

5      Q.   And you don't know why?

6      A.   They were just harder on her more than they were

7  on me.

8      Q.   And who do you mean by "they"?

9      A.   Brendan and Bill.

10     Q.   Brendan Gilmore and Bill Becker were harder on

11 Linda Blozis than they were on you?

12     A.   Yes.

13     Q.   Do you know if it was Mellon's policy to open up

14 a confidential file when a human resources complaint is

15 made?

16     A.   I don't know.

17     Q.   Do you know if Mellon had a progressive

18 discipline policy?  Do you know what that term means?

19     A.   A three step -- three strikes and you're out type

20 of rule?

21     Q.   Yes.  Do you know if Mellon had a policy that was

22 like a three-strikes-and-you're-out type of a rule with

23 regard to an employee's performance?

24     A.   I think they did.

40

Maria F. Dunlop

1       Q.   Was it your recollection or understanding that
2   the three strikes included you would be given an initial
3   written warning, a final written warning and then you
4   would be terminated if there were recurring issues with
5   your performance?
6       A.   I think so.
7       Q.   Let me show you a document and ask it be marked
8   Dunlop Exhibit 4.
9                (Dunlop Deposition Exhibit No. 4 was marked
10  for identification.)
11  BY MR. LaROSA:
12      Q.   This is a document -- take a moment to review
13  that.   This is a three-page document marked MEL/BLOZ 516,
14  MEL/BLOZ 517 and MEL/BLOZ 518.
15               Let me know after you've had a chance to
16  review that.
17      A.   Okay.
18      Q.   Does Mellon have various policies made by human
19  resources, employment policies?
20      A.   Yes.
21      Q.   And does Mellon have a policy about corrective
22  action or discipline of employees?
23      A.   Yes.
24      Q.   Does Mellon distribute written copies of those

41

Maria F. Dunlop

1    policies?

2       A.    I don't remember receiving anything like this.

3       Q.    Were you ever informed that those policies would

4    be available to you on an Internet or Intranet website?

5       A.    Probably.

6       Q.    And did you ever have any occasion to look up

7    those policies?

8       A.    I never looked at them, no.

9       Q.    But it was your understanding that there was some

10   kind of a three-strikes-and-you're-out policy?

11      A.    Yes.

12      Q.    And do you recall if after the first strike an

13   employee would receive an initial written warning?  Were

14   you aware of that ever happening?

15            MS. WILSON:   Objection to form.

16      A.    I'm sorry.  Can you repeat the question?

17      Q.    Were you aware of an employee ever -- you told us

18   that you were aware of a three-strikes-and-you're-out

19   policy based on an employee's performance.  Were you

20   aware that the third step was termination of employment?

21   Is that your understanding of what three strikes and

22   you're out meant?

23      A.    Yes.

24      Q.    And were you aware of Mellon having something

**B540**

42

Maria F. Dunlop

1   called a final written warning that would precede the

2   termination of someone's employment?

3       A.   I didn't know about it.  I'm sure it was

4   available.

5       Q.   Do you know if anyone ever received an initial

6   written warning for an issue with performance during the

7   time you worked at Mellon?

8       A.   Say that again.

9       Q.   Do you know if anyone ever received an initial

10  written warning or a write-up or initial written

11  reprimand for a performance issue at Mellon during the

12  time that you worked there?

13      A.   I don't know that.

14      Q.   In your entire experience in the corporate

15  world -- you've known subsequent employers -- have you

16  ever been aware of an employee receiving a written

17  reprimand for a performance issue, whether it be yourself

18  or co-worker?  I'm not going to ask you details about

19  your own record.

20           MS. WILSON:   Objection to form.

21      A.   I've heard of people being written up before,

22  yes.

23      Q.   And during the time you worked at Mellon, did

24  they have annual performance evaluations?

**B541**

43

Maria F. Dunlop

1    A.    Yes.

2    Q.    And did you receive a performance evaluation each

3    year that you worked there?

4    A.    Yes.

5    Q.    And is it your understanding that when folks are

6    written up, that that's something separate from the

7    performance evaluation?

8              MS. WILSON:   Objection to form.

9    A.    I would assume so, yes.

10   Q.    Has it been your experience working at Mellon

11   that everyone receives written criticisms or things that

12   they can improve upon in their annual evaluation?

13             MS. WILSON:   Objection to form.

14   A.    Do you want to know if I received criticisms in

15   my review or people in general?

16   Q.    People in general.

17   A.    I don't know if other people receive criticisms.

18   Q.    Okay.  With regard to your own reviews, has it

19   been your experience that employees aren't given perfect

20   reviews?

21   A.    Yeah.  I mean, they tell you what to improve on

22   or how to do your job better, I guess.

23   Q.    And at Mellon, were there certain ratings for

24   various categories of performance?

**B542**

44

Maria F. Dunlop

```
 1     A.   Yes.
 2     Q.   And within the categories of performance, is
 3   there certain ratings that include the highest rating
 4   that an employee could receive, such as an A or a 1 or
 5   excellent?
 6     A.   You're asking if I remember that?
 7     Q.   Yes.
 8     A.   Yes.
 9     Q.   And has it been your experience that nobody
10   receives the highest rating on each criteria or criterion
11   of performance?
12          MS. WILSON:  Objection to form.
13     A.   Yes.
14     Q.   Has it been your experience that each employee
15   receives additional written feedback on areas in which
16   they could improve their performance?
17          MS. WILSON:  Objection to form.
18     A.   Yes.
19     Q.   And has it been your experience that this is
20   something separate from getting written up?
21     A.   Yes.
22          MS. WILSON:  Objection to form.
23     Q.   Was it your understanding that this Mellon --
24   under the three-strikes-and-you're-out rule, that the
```

45

Maria F. Dunlop

1    strikes -- the first two strikes would come on an

2    employee's evaluation or would they come in separate

3    documentation?

4              MS. WILSON:  Objection to form.

5       A.    I would think they would come separately.

6       Q.    And with regard to the third strike, was it your

7    understanding that termination would come -- you would be

8    notified of it on your performance evaluation or in a

9    separate notice?

10             MS. WILSON:  Objection to form.

11      A.    A separate notice.

12      Q.    Were you aware of Mellon also having a policy

13   whereby an employee could be discharged immediately

14   without getting the benefit of the three strikes if they

15   committed an intolerable offense?

16      A.    I wasn't aware of that.

17      Q.    Were you aware of any policies where if an

18   employee stole from the company or committed a felony on

19   company grounds, they could be terminated immediately

20   without going through the three strikes?

21      A.    I'm sure if you stole money, you would be fired,

22   yes, immediately.

23      Q.    Was it your understanding that Linda Blozis was

24   not fired for an intolerable offense that could result in

46

Maria F. Dunlop

1    immediate termination?

2              MS. WILSON:  Objection to form.

3    Q.   If you know.

4    A.   I don't think she committed an intolerable

5    offense to get her fired.

6    Q.   Did your boss, Gregg Landis, do planning for the

7    year, for the calendar year with regard to your

8    performance or your performance goals?

9    A.   I don't really remember.

10   Q.   Were you given certain goals or performance

11   expectations at the outset of a calendar year by Mellon?

12   A.   I vaguely remember.  I think I had like a

13   semi-annual review or something.

14   Q.   Aside from a semi-annual review and annual

15   review, were you ever told at some point this is what we

16   expect of you for the year going forward or the coming

17   year into the future?

18   A.   I don't remember.

19   Q.   Do you recall if Gregg Landis or anyone ever met

20   with you at the beginning of the year, such as January or

21   February, and saying this is what our expectations are of

22   you or our goals are of you for the new year?

23   A.   I don't remember.

24   Q.   And eventually at some point in time after

**B545**

47

Maria F. Dunlop

1    Linda Blozis's employment ended, Laura Shannon began

2    doing her functions; is that accurate?

3    A.    Yes.

4    Q.    And was Laura Shannon younger than Linda Blozis?

5    A.    Yes.

6    Q.    Was Laura Shannon more than 20 years younger than

7    Linda Blozis?

8    A.    Laura was in her 30's, early 30's.

9    Q.    Do you know how old Linda Blozis was?

10    A.    No.

11          MR. LaROSA:  I have no further questions at

12    this time.  Stephanie Wilson may have some questions for

13    you.

14    BY MS. WILSON:

15    Q.    Good afternoon, Ms. Dunlop.  My name is

16    Stephanie Wilson.  I'm with the law firm of Reed, Smith.

17    And we represent the defendants in the lawsuit that's

18    been brought by Linda Blozis.

19          I understand that you're here today pursuant

20    to a subpoena; is that correct?

21    A.    Yes.

22    Q.    And prior to receiving the subpoena or at any

23    point, did you have any conversation with Mr. LaRosa or

24    anyone from his firm concerning Linda's lawsuit?

**B546**

48

Maria F. Dunlop

1       A.    No.

2       Q.    Have you had any conversations with Linda since

3   she's been gone from Mellon concerning the lawsuit?

4       A.    No.

5       Q.    I'm going to ask you some questions in connection

6   with some of the answers that you gave to some of

7   Mr. LaRosa's questions.

8               Is it fair to say that during the time that

9   both you and Linda worked together, that you were

10  co-workers?

11      A.    Yes.

12      Q.    And that you never supervised Linda Blozis with

13  respect to her work; is that right?

14      A.    That's correct.

15      Q.    You never did any sort of evaluations of Linda,

16  did you?

17      A.    No.

18      Q.    And she never did any evaluations of you, did

19  she?

20      A.    No.

21      Q.    Did you have any input into any corrective action

22  that Linda Blozis was on?

23      A.    No.

24      Q.    And is it fair to say that you were not trained

**B547**

49

Maria F. Dunlop

1    in human resources' policies while you were at Mellon?

2        A.    Yes.

3        Q.    Did you ever administer the corrective action

4    policy while at Mellon?

5        A.    No.

6        Q.    Were you ever on corrective action while you were

7    at Mellon?

8        A.    No.

9        Q.    You were asked a couple of questions by

10   Mr. LaRosa dealing with the corrective action policy.

11   And one of them was whether -- if someone was placed on

12   corrective action, whether notice of a discipline in

13   connection with that corrective action would be on a

14   separate sheet or could be contained in a performance

15   evaluation.  And you said it would be on a separate

16   sheet.  Do you remember that testimony?

17       A.    Yes.

18       Q.    Why do you say that?

19       A.    I remember reviewing my annual review, and I

20   don't remember there being anything on there about

21   warnings.

22       Q.    Well, were you ever warned about performance?

23       A.    No.

24       Q.    Well, why would it be on your sheet then if you

**B548**

50

Maria F. Dunlop

1    weren't warned?

2        A.    Usually there's a lot of things on there, just

3    empty spaces for things that would apply.  Because that

4    didn't apply to me, it was left blank.

5        Q.    So if it, for example, applied to Linda, do you

6    know whether it was in her performance evaluation?

7        A.    I don't know what was on her performance

8    evaluation.

9        Q.    So you've never reviewed any of Linda's

10   performance evaluations?

11       A.    I've never reviewed any of hers.

12       Q.    You've never been called upon to interpret the

13   corrective action process?

14       A.    That's correct.

15       Q.    So when you answered Mr. LaRosa's questions that

16   two separate forms would be appropriate, what were you

17   basing that on?

18       A.    I guess I just didn't think that a write-up for

19   your performance would be on your evaluation.

20       Q.    So it's based on what you thought?

21       A.    Yes.

22       Q.    Did you ever talk to anyone at Mellon on whether

23   that, in fact, is the case?

24       A.    No.

**B549**

51

Maria F. Dunlop

```
 1      Q.   Do you know whether it would be a violation of

 2   Mellon's corrective action policy to include an initial

 3   written warning in an evaluation?

 4      A.   I don't know that.

 5      Q.   Did you ever have any discussions with

 6   Bill Becker concerning Linda's performance?

 7      A.   I don't remember.

 8      Q.   What about with Gregg Landis?

 9      A.   No.

10      Q.   What about Brendan Gilmore?

11      A.   No.

12      Q.   Now, with respect to your own reviews, how many

13   did you get while you were employed at Mellon?

14      A.   I think two.

15      Q.   And what were they?

16      A.   Good.  I don't remember.  They weren't bad.

17      Q.   Did you feel that you were deserving of the good

18   reviews?

19      A.   Yes.

20      Q.   I think you testified that you never reviewed any

21   of Linda's performance evaluations?

22      A.   Correct.

23      Q.   You had mentioned that Linda had written a

24   rebuttal to a review that she had received?
```

**B550**

52

Maria F. Dunlop

1    A.   Yes.

2    Q.   How do you know that?

3    A.   She told me.

4    Q.   Did you read the rebuttal?

5    A.   No.

6    Q.   Did she tell you anything about her review?

7    A.   She told me that Bill Becker wrote that -- she

8 told me that Bill Becker gave her a bad review and that

9 she rebuttal'd it.

10    Q.   And you never read the review?

11    A.   That's correct.

12    Q.   And you never read the rebuttal?

13    A.   That's correct.

14    Q.   And you never had conversations with Bill Becker

15 concerning the review, Linda's review?

16    A.   Yes.

17    Q.   Now, you had also stated that you felt that Linda

18 wasn't treated fairly while she was employed at Mellon.

19    A.   Yes.

20    Q.   Do you remember that testimony?

21    A.   Yes.

22    Q.   And then you went on to say you felt she wasn't

23 treated fairly as compared to her co-workers.

24    A.   Correct.

**B551**

53

Maria F. Dunlop

1      Q.    What co-workers are you talking about?

2      A.    The team members of Brendan Gilmore's team.

3      Q.    Who?

4      A.    I think it was more of an in general statement.

5      Q.    Well, what do you mean by it was more of an in

6    general statement?

7      A.    I think that was just an opinion of mine.

8      Q.    What are you basing your opinion on?

9      A.    Vague memories of -- just vague memories.  Sorry.

10   I mean, this is a long time ago for me.

11     Q.    You made a provocative statement that you felt

12   Linda wasn't treated fairly --

13              MR. LaROSA:   Objection to the

14   characterization of her statement.

15     Q.    -- with respect to co-workers.  And you say, when

16   I ask you who the co-workers are --

17     A.    Did I specifically say co-workers?

18     Q.    Well, is that your testimony?

19     A.    I don't think I said that.  I think I said that I

20   just don't think she was treated fairly.

21     Q.    All right.  Are you now saying that when you said

22   that -- because I have as to co-workers.  So are you

23   saying Linda wasn't treated fairly as it related to other

24   co-workers on the team?

**B552**

54

Maria F. Dunlop

```
 1     A.    I'm just saying in general she wasn't treated
 2  fairly.
 3     Q.    I also have that you said that you felt that
 4  Linda was treated or given a harder time than you.
 5     A.    Yes.
 6     Q.    So let's start with you.  When you say that you
 7  felt -- I have here in my notes that it was
 8  Brendan Gilmore and Bill Becker you felt treated Linda --
 9  or, was harder on Linda than they were on you.  Is that
10  an accurate characterization?
11     A.    Yes.
12     Q.    Did you want to also include Gregg Landis in
13  that?
14     A.    No.
15     Q.    So Brendan and Gilmore?
16     A.    Yes.  Bill Becker and Gilmore.
17     Q.    Bill Becker and Brendan Gilmore?
18     A.    Yes.
19     Q.    Let's start with Bill Becker.  In what ways did
20  you feel Bill Becker was harder on Linda than on you?
21     A.    I made that statement in general based on Linda
22  telling me that she had been given a bad review from
23  Bill Becker.
24     Q.    Linda told you that?
```

**B553**

55

Maria F. Dunlop

1    A.    Linda told me that she was -- received a bad

2    review from Bill.

3        Q.    Why did you then think that Bill was being harder

4    on Linda than you by Linda telling you that she had

5    gotten a bad review?

6        A.    I don't have a specific response.  It's just an

7    opinion.

8        Q.    Something you felt?

9        A.    Yes.

10       Q.    Did you ever hear Bill Becker make any statements

11   that you consider to be anti-age or against older people?

12       A.    No.

13       Q.    What about anti-female statements?

14       A.    No.

15       Q.    What about Gregg Landis with respect to anti-age

16   or anti-female statements?

17       A.    No.

18       Q.    Now, with respect to Bill Becker, other than the

19   review issue, were there any other reasons why you say

20   you felt that Bill Becker was being harder on Linda than

21   you?

22       A.    No.

23       Q.    But you felt you deserved the review that you

24   got, correct?

56
Maria F. Dunlop

1    A.    Yes.  But Gregg Landis did my review.

2    Q.    But, in general, you didn't feel -- you didn't

3    get reviews you didn't deserve?

4    A.    Exactly.

5    Q.    You never reviewed Linda?

6    A.    No.

7    Q.    Now, you also said that Brendan Gilmore was

8    harder on Linda than he was on you.  In what ways?

9    A.    Again, I don't remember specifics.  I know he

10    made comments.  I just don't remember what they were.

11    Q.    When you say "comments," what kind of comments?

12    A.    That's what I'm saying.  I don't remember.

13    Q.    But you remember a boot comment?

14    A.    Yeah.  Well, that's because the comment was made

15    directly to me.

16    Q.    Do you remember Brendan Gilmore making any

17    comments to Linda that you felt were inappropriate?

18    A.    Specifically, no.

19    Q.    Did you ever hear Brendan Gilmore make any

20    comments to Linda that you thought showed anti-age?

21    A.    No.

22          I do remember one specific instance.  When

23    Linda would go on vacation, she would go to Florida.  And

24    she would put a cute tent sign on her desk that said

**B555**

57

Maria F. Dunlop

1    "Gone south," and it had a palm tree.  And he ripped that

2    off, crumpled it up and threw it in the trash.

3        Q.    You thought that showed age discrimination?

4        A.    No.   No.   I think that's why I think he was mean,

5    wasn't nice.

6        Q.    When did he crumple her tent?

7        A.    While she was on vacation.

8        Q.    Do you remember the date?

9        A.    I don't.  I'm sorry.

10       Q.    The year?

11       A.    2002 I think, I guess.

12       Q.    Do you know why he crumpled the tent?

13       A.    Because he didn't like her.

14       Q.    When you say he didn't like her, why do you say

15   that?

16       A.    Why would someone crumple up a piece of paper

17   that's not doing them any harm?

18       Q.    You took that to be evidence that he didn't like

19   Linda?

20       A.    Yes.

21       Q.    Other than crumpling the tent that you described,

22   did he do or say anything else to Linda that you felt

23   showed that he didn't like her?

24       A.    I can't remember.

**B556**

58

Maria F. Dunlop

1      Q.   Did he do or say anything that you took to be age

2    discrimination?

3      A.   I can't remember.

4      Q.   What about gender discrimination?

5      A.   I can't remember.

6      Q.   Let's talk about the incident with the boot.

7      A.   All right.

8      Q.   When did that take place?

9      A.   I don't remember the specific date.

10     Q.   What about the year?

11     A.   I don't remember that either.

12     Q.   But it was at some point that you and Linda were

13   working together?

14     A.   Linda and I were both working, yes.

15     Q.   So it was 2002 or 2003?

16     A.   Yes.

17     Q.   And what did he say about your boots?

18     A.   I don't remember his exact comment.  It was so

19   long ago.  I just remember he made a comment about the

20   boots.  I looked at him.  He looked me up and down -- I

21   was standing right next to the printer -- and he walked

22   away.

23            And I went over to Linda's desk and I said,

24   Can you believe the comment or -- I mean, I don't

Maria F. Dunlop

59

```
 1    remember what he said.  I just remember he made a
 2    comment.
 3        Q.   But you don't remember what it was?
 4        A.   No.
 5        Q.   But there was something about it that made you
 6    uncomfortable?
 7        A.   Yes.
 8        Q.   But, again, you don't remember?
 9        A.   I don't.  I'm sorry.
10        Q.   How long was this sort of interchange?
11        A.   A couple seconds.  It wasn't a lot of time.
12        Q.   Did you go to human resources and complain?
13        A.   No.
14        Q.   Why not?
15        A.   I just didn't.
16        Q.   Other than -- you went to Linda and complained?
17        A.   I didn't complain.  I just said, Can you believe
18    he made that comment.
19        Q.   And what did Linda say?
20        A.   I don't remember.  She probably just shook her
21    head or something, typical Brendan.
22        Q.   She said that?
23        A.   No, she didn't say that.  That's just...
24             This was all so long ago.  I have a very
```

**B558**

60

Maria F. Dunlop

1    vague memory.

2    Q.  Other than the comment about the boots -- and you

3    said that he looked you up and down?

4    A.  Yes.

5    Q.  What was it about him looking at you that made

6    you uncomfortable?

7    A.  The way he looked at me.

8    Q.  What?

9    A.  Because he looked at me from head to toe and then

10    walked.

11    Q.  Oh, and you thought that was inappropriate?

12    A.  Yes.

13    Q.  And other than that -- was that a one-time

14    incident?

15    A.  That only happened once.

16    Q.  And other than that incident, did Brendan ever do

17    anything else that made you feel uncomfortable?

18    A.  I don't remember specifics.

19    Q.  Did Linda ever tell you that she thought that

20    Mellon was trying to get rid of the older people?

21    A.  Yes.

22    Q.  When did she tell you that?

23    A.  I don't remember specifically when.

24    Q.  And when did that come up?

**B559**

61

Maria F. Dunlop

1      A.   I don't remember.

2      Q.   Was it like a conversation over lunch?

3      A.   I'm sure we were probably just chatting there at

4  work and she said something.

5      Q.   Did she give you any examples?

6      A.   No.

7      Q.   Did you do any kind of investigation to see

8  whether there was any truth to it?

9      A.   No.

10     Q.   You said you had a vague memory that

11  Brendan Gilmore had said to Linda to complete a task or

12  else.  Did you hear him say that?

13     A.   I don't remember.

14     Q.   You don't remember whether you heard it or

15  whether Linda told you?

16     A.   Correct.

17     Q.   Do you remember the time frame?

18     A.   No.

19     Q.   Did you ever have any performance issues with

20  respect to failing to complete tasks on time?

21     A.   I don't believe so, no.

22     Q.   You said you don't believe so.  You would know?

23     A.   Do you remember your reviews four years ago?

24     Q.   I do.

62

Maria F. Dunlop

```
 1      A.    That's great.  If I had looked at it, I would
 2   remember.  But...
 3      Q.    You said you reported primarily to Gregg Landis?
 4      A.    Yes.
 5      Q.    I think you had talked a little bit about
 6   deadlines.  And Mr. LaRosa had asked you whether you had
 7   always completed work on time.
 8      A.    Yes.
 9      Q.    I believe you said that.  Do you remember that
10   testimony?
11      A.    Mm-hmm.
12      Q.    What was your practice with respect to completion
13   of work?
14      A.    I did the best I could to get it done on time.
15   And if I couldn't, then I would ask for help or ask to
16   change the deadline, if it was possible.
17      Q.    When you were seeing you were not going to make a
18   deadline, would you go and ask for help or an extension
19   at that point?
20      A.    Yeah.
21      Q.    Or, would you wait until the deadline was already
22   passed and then ask for help?
23      A.    Before the deadline.
24      Q.    Do you remember how many times you went and asked
```

**B561**

63

Maria F. Dunlop

1    for help to complete a project to get it done on time?

2        A.    No.

3        Q.    And do you remember how many times you asked for

4    an extension of a deadline?

5        A.    No.

6        Q.    Do you know if Linda had any issues with respect

7    to completing work on time?

8        A.    No.

9        Q.    You don't know?

10       A.    I don't know.

11       Q.    Did you ever help Linda complete any task?

12       A.    Yes.

13       Q.    I believe you had testified that Brendan Gilmore

14   treated women worse than men?

15       A.    I don't remember saying that.

16       Q.    Well, is it your opinion that Brendan Gilmore

17   treated women worse than men at Mellon?

18       A.    No, that's not my opinion.

19       Q.    What about Bill Becker?

20       A.    No, he did not.

21       Q.    Gregg Landis?

22       A.    No, he did not.

23       Q.    You testified about a point when Linda had asked

24   to take two weeks vacation in Florida, to go to Florida,

**B562**

64

Maria F. Dunlop

1    and that she was allowed to only take a shortened

2    vacation.

3        A.    Yes.

4        Q.    Do you remember how long she was allowed to take?

5        A.    I think it was a week.

6        Q.    And do you know why?

7        A.    I don't know why.

8        Q.    I believe you testified that you had started

9    working at Mellon in June 2003?

10       A.    No.

11       Q.    When?

12       A.    I started in June 2002.

13       Q.    June 2002.

14              Prior to your starting in June of 2002, do

15    you know whether there had ever been any communications

16    by anyone at Mellon about changing or upgrading the

17    expectations with respect to the portfolio administrator

18    position?

19       A.    I don't remember.

20       Q.    You were asked some questions about Ms. Blozis's

21    job performance.  And you've been asked whether

22    Ms. Blozis committed gross negligence with respect to her

23    performance, and you said no.  What do you base that on?

24       A.    In my opinion, Linda always did a good job on

**B563**

65

Maria F. Dunlop

1    things.

2        Q.    So it's your looking at Linda's work habits, so

3    to speak?

4        A.    Yes.    I mean, we worked together.    And I don't

5    remember her ever not doing something.    She was always

6    very willing to help me she trained me on all the

7    systems.    If I had a question on how to do something, she

8    would always help me.

9        Q.    But you never reviewed her, correct?

10       A.    That's correct.

11       Q.    Do you know whether Bill Becker had any concerns

12   about her work?

13       A.    I only know that she told me that he gave her a

14   bad review.

15       Q.    Do you know whether Gregg Landis had any concerns

16   about her work?

17       A.    I don't know about that.

18       Q.    You say that Linda performed her work

19   competently?

20             MR. LaROSA:    Objection.    Mischaracterizes

21   the testimony.

22       A.    I think she did do a good job, yes.

23       Q.    What do you base that on?

24       A.    Because I worked with her and I never had any

**B564**

66

Maria F. Dunlop

1  problems with it.

2      Q.   But, again, you never supervised her?

3      A.   That's correct.

4      Q.   And you didn't review her?

5      A.   We were equal levels.  And we always just helped

6  each other.  She was a very nice person to work with; you

7  know, very good person to work with.  I didn't have any

8  problems working with her at all.

9      Q.   But in terms of whether Bill Becker or

10  Gregg Landis or Brendan Gilmore had problems working with

11  her, do you have any personal knowledge either way?

12      A.   The only knowledge I have is that Bill Becker

13  gave her a bad review.

14      Q.   That's your only knowledge?

15      A.   That's because she told me.

16      Q.   That's the extent of your knowledge?

17      A.   Yes.

18      Q.   Did you ever review her personnel file?

19      A.   No.

20      Q.   You also testified that you felt that Linda was

21  qualified to do the job.  What's that based on?

22      A.   Because when I worked with her, she -- in my

23  opinion, she did her job.

24      Q.   I think you had said something -- I just wrote it

67

Maria F. Dunlop

1    down really quickly.  But that when you were filling out

2    benefit information, that your age was asked for?

3        A.    I can't remember if I put my date of birth on

4    there.  I think I did.  For my benefits information, they

5    need your date of birth, I think.

6        Q.    Do you know whether Mellon is required to keep

7    track of individuals by way of gender or race for any

8    kind of reporting purposes?

9        A.    I don't know that.

10       Q.    What about for age?  Do you know if they're

11   required for any kind of reporting purposes to keep track

12   of that?

13       A.    I don't know.

14       Q.    Kathleen Agne, she was gone prior to your

15   arrival, correct?

16       A.    Correct.

17       Q.    There was some questions about prioritizing work.

18   When you got sort of different assignments, you would

19   have more than one assignment on your plate to do; is

20   that fair to say?

21       A.    Yes.

22       Q.    How would you determine which assignment to do

23   first and second?

24       A.    You just determine how you are -- again, it is

**B566**

68

Maria F. Dunlop

1    based on what the request is.  If it's a request that

2    takes two minutes to complete versus two hours to

3    complete, it just comes with your ability to time manage.

4        Q.    Was that something you did?

5        A.    Yes.

6        Q.    And with respect to anticipating client needs,

7    would that be something that you would try to do?

8        A.    Is there a specific example you're looking of?

9        Q.    Any kinds of example.  If you were giving an

10   assignment, would you say, well, the client may want to

11   see this information, so let me try to get it together?

12   Would there be some sort of mental process you would go

13   through?

14               MR. LaROSA:  Objection.  Calls for

15   speculation.

16       A.    No.  At that level, I don't think I did

17   anticipate any needs.  You know, I kind of did what I was

18   told.  If the client asked for something, I would do it.

19       Q.    You talked about, I guess, books or binders.

20       A.    Yes.

21       Q.    I believe you had used the word there's a ton of

22   information that goes into those books and binders?

23       A.    Yes.

24       Q.    Was there a -- sort of a flow sheet in terms of

**B567**

Maria F. Dunlop

1    what would go in there?

2        A.    Yeah.   Well, you always do the books the same

3    way.   They include information about their current asset

4    holdings, their performance -- the performance is in

5    there.   You know, commentaries by the analysts, things

6    like that.

7        Q.    And when you were putting a book together -- or,

8    I guess that would be for the client to take a look at

9    ultimately?

10       A.    Yes.

11       Q.    If the client had made a number of withdrawals

12   from the account, would that be something that you would

13   want to include in the booklet?

14       A.    If it was included previously, I would include

15   it.

16       Q.    Why would you include it?

17       A.    Because it's something that they've reviewed in

18   previous meetings.   They usually have quarterly meetings

19   with the client or annual meetings with the client.   And

20   you would pull the book that was made before and look at

21   it to see what was in it and do that.

22       Q.    And why would you include it?   If it had been

23   done before, why would you -- I mean, would you just

24   include it in the booklet?

70

Maria F. Dunlop

    1    A.   Yes.

    2    Q.   Would you have any discussions with, I guess, the

    3   portfolio officer about --

    4    A.   The books, yes.  You're making the book for the

    5   portfolio officer for the officer to take to the meeting

    6   and review with the client.  So it needs to have all the

    7   information that the portfolio officer needs or wants.

    8    Q.   And you left in May of 2004?

    9    A.   Yes.

   10    Q.   And why did you leave?

   11    A.   I was offered a position at Wilmington Trust.

   12    Q.   You considered it a better position?

   13    A.   Yes.  The opportunity was there.  I worked in the

   14   Greenville office, which was very small.  There was no

   15   opportunity for growth.  Within the company, there was

   16   opportunity for growth.  But I would have to have gone to

   17   Philadelphia.  And I didn't want to go to Philadelphia.

   18    Q.   And that's the only reason that you left, for

   19   better opportunity?

   20    A.   Yes.  I enjoyed my job at Mellon.  And I enjoyed

   21   the people that I worked with.  I mean, Gregg Landis, I

   22   enjoyed working with Gregg Landis.

   23    Q.   Did you ever work with Brendan Gilmore?

   24    A.   Not really.

Maria F. Dunlop                                    71

1    Q.    Did you ever work with Bill Becker?

2    A.    A little bit.

3    Q.    Did you work with him prior to him going to the

4    Philadelphia office?

5    A.    No.  I think the month that I started in the

6    Greenville office, he moved to the Philadelphia office.

7    And then Bruce Holmquist was kind of the other person.

8    They always had that open spot of Bill Becker.  But they

9    never filled it while I was there.

10   Q.    Did you overlap with Laura Shannon?

11   A.    Yes.  Laura took Linda's place.

12   Q.    When you say she took Linda's place, what do you

13   mean?

14   A.    When Linda left, that created an open position,

15   and Laura was hired to take that open position.

16   Q.    Was Laura there when you left?

17   A.    Yes.

18   Q.    Getting back to the boot comment, Mr. LaRosa had

19   asked you whether you felt that Brendan Gilmore had made

20   a sexist comment towards you.  I guess that was in

21   connection with whatever he said about the boots?

22   A.    Yes.

23   Q.    Can you tell us what it was that he said?

24   A.    I don't remember.  And I'm really sorry about

B570

72

Maria F. Dunlop

1    that.  I just remember the way he looked at me, the event
2    was just not appropriate to me.
3        Q.    But other than that, you can't tell us anything
4    more specific?
5        A.    I'm sorry.  No.
6        Q.    And other than that comment and the event, as you
7    describe it, were there other events that you witnessed
8    or heard about in connection with Brendan Gilmore that
9    you felt to be sexist?
10       A.    Not that I can remember.
11       Q.    Do you know why Linda's employment was
12   terminated?
13       A.    Because they weren't happy with her performance.
14       Q.    Why do you say that?
15       A.    Because she got the bad review from Bill Becker.
16       Q.    Did she tell you this or is this what you're
17   putting together?
18       A.    This is what I'm putting together.
19       Q.    Did Linda talk to you about her termination?
20       A.    Not that I remember.  I think it was a
21   surprise -- I was completely surprised by it.  And I
22   remember Gregg Landis telling me that he was surprised by
23   it as well.
24       Q.    When did he tell you that?

**B571**

Maria F. Dunlop

73

1    A.    The day it happened.

2    Q.    Was this after Linda was still there or had

3    already gone that you and Gregg had this conversation?

4    A.    It was -- she left immediately.

5    Q.    And you didn't talk with her?

6    A.    No.  I wasn't allowed to.  I mean, I don't --

7    Q.    When you say weren't allowed to, did someone say

8    don't talk to her?

9    A.    No.  She just left the office and put everything

10   in a box and walked out.  I wasn't given the opportunity,

11   I guess.  And I think everybody was just in shock that it

12   happened.

13   Q.    Who's everybody?

14   A.    Me and -- well, I think Gregg was.  And then

15   there were two other women that worked there.  They were

16   part of the holding companies.  I don't believe they were

17   employed by Mellon, though.  They were independent

18   contractors.  They shared the space.

19   Q.    When Linda left, you and Gregg talked?

20   A.    Yeah.  I don't remember specifically what we

21   talked about.  I remember I went to the coffee shop right

22   there in the plaza where we worked, because I was pretty

23   upset about it, and then coming back.  And I think we had

24   a brief conversation.  I don't remember specifically what

B572

74

Maria F. Dunlop

1    we talked about.

2        Q.    That's what I was going to ask you.

3        A.    Of course you're going to ask specifically.    But

4    I can't remember.    I'm sorry.

5        Q.    You say that Gregg was surprised.    He said that

6    he was surprised?

7        A.    I do remember that, yes.

8        Q.    Do you know who told Linda that she was being

9    terminated?

10       A.    Gregg did.

11       Q.    Do you know if anybody else was on the phone or

12   in the room?

13       A.    I know that Gregg and Linda were the only two

14   people in the room.    I don't know if there were other

15   people on the phone.

16       Q.    And once Linda left, did you have any further

17   conversations or communications with Linda?

18       A.    Yes.    Not about anything work related, though.

19   Linda and I were -- I mean, she came to my wedding.    We

20   wrote -- when I left Mellon, I wrote a letter and told

21   her I had accepted a position at Wilmington Trust.    You

22   know, nothing work related.    Everything just with life,

23   my husband and my dog and nothing -- nothing work related

24   at all.

Maria F. Dunlop

1    Q.    You didn't talk about her termination?

2    A.    No.  We never talked about that.

3    Q.    But you kept in contact with each other on a

4    social basis?

5    A.    Yes.

6    Q.    And how often do you and she communicate?

7    A.    We did that for maybe a year.  I haven't talked

8    to her in a good -- I've been at Wilmington Trust three

9    years, and I haven't talked to her probably in about two

10   years.

11   Q.    Did she tell you she was going to be suing

12   Mellon?

13   A.    No.  This was a complete surprise.

14   Q.    Did she tell you she was going to be calling you

15   as a witness?

16   A.    No.  I did not know any of this.  The first time

17   I heard about this is when I spoke to Rosemary Thomas a

18   week ago, I think it was.

19   Q.    That was the first time?

20   A.    And that was the first time.  I was completely

21   surprised.

22   Q.    Do you have any knowledge of what Linda's lawsuit

23   is about?

24   A.    All I know is Rosemary Thomas told me, for lack

76

Maria F. Dunlop

1     of a better word, she's suing Mellon for age

2     discrimination.

3        Q.    With respect to -- Ms. Blozis is making an age

4     discrimination complaint.  She's saying, also, she was

5     terminated because of her gender and that she was

6     terminated in retaliation for complaining about age

7     discrimination.

8             Do you know if Linda made any sort of

9     complaints while she was employed by Mellon of age

10    discrimination?

11       A.    I don't know that.

12       Q.    What about gender discrimination?

13       A.    I don't know that either.

14       Q.    And do you feel that Linda was terminated because

15    of her age?

16       A.    I think she was terminated because Brendan didn't

17    like her.

18       Q.    Well, do you think he didn't like her because of

19    her age?

20       A.    I didn't know why he didn't like her.  He just

21    didn't like her.

22       Q.    Do you know if he didn't like her because of her

23    gender?

24       A.    I don't know.

Maria F. Dunlop

1    Q.  Do you know if he didn't like her because she

2  complained about age discrimination?

3    A.  I don't know that.

4    Q.  So you have a feeling that Brendan just didn't

5  like her?

6    A.  Yes.

7    Q.  What about Bill Becker?  Do you have a feeling

8  whether he liked Linda or not?

9    A.  All I know is that he wrote the bad review.  So

10  I'm assuming he wasn't happy with her either, based on

11  that.  He never showed me any actions that he didn't like

12  her.

13    Q.  What about Gregg Landis?

14    A.  I think Gregg liked Linda.

15    Q.  What about Rosemary Thomas?  Do you know her?

16    A.  Yeah.

17        I don't know about her.

18    Q.  When you said you felt that Gregg Landis liked

19  Linda, why do you say that?

20    A.  We all worked well together, I thought.  And he

21  was -- I think he was surprised that she was fired.

22    Q.  When you say he was surprised, why do you say

23  that?

24    A.  Just by the way it all happened, I guess.

**B576**

78

Maria F. Dunlop

1    Q.    Do you know whether Gregg had anything to do with

2    the corrective action process as it related to Linda?

3    A.    I don't know.

4    Q.    Do you know whether he had problems with her

5    performance along the way?

6    A.    I don't know.

7    Q.    Do you know whether he had anything to do with

8    recommending that Linda's employment be terminated?

9    A.    I don't know that.

10         MS. WILSON:  I just want to look at my notes

11   really quickly.

12         THE WITNESS:  Okay.  That's fine.

13         Is it normal process, when you're subpoenaed

14   for something, to be allowed to give background on it so

15   I can try to remember things?  Because that's just like a

16   general -- like I said, I've never been subpoenaed

17   before.  I don't know what the process is.  I had no idea

18   what to expect.  I didn't know you would be asking me all

19   these questions.  This is all completely new to me.

20         Is anyone allowed to answer that?

21   BY MS. WILSON:

22   Q.    While you were at Mellon, did you review anyone's

23   job evaluations other than your own?

24   A.    Not that I remember.  Just mine.

79

Maria F. Dunlop

1    Q.    I believe you had testified that at times, you

2    would work the weekends, work late to complete your work?

3    A.    Yes, that's true.  I do not remember specific

4    dates.

5    Q.    And did anyone ask you to do that?

6    A.    No.

7    Q.    Why did you do it?

8    A.    To get work done.

9              MS. WILSON:   Thank you.

10             MR. LaROSA:   You have the right to review

11   the transcript, as I said in the beginning, and review it

12   to see if the court reporter made any typos or technical

13   mistakes.  You have that option to either do that and

14   sign off on your testimony or waive that right and

15   whatever is recorded will be your testimony.

16             THE WITNESS:   I'll just waive that.

17             (Deposition concluded at 6:08 p.m.)

18

19                      -  -  -  -  -

20

21

22

23

24

80

Maria F. Dunlop

```
1                    I N D E X

2    DEPONENT:  MARIA F. DUNLOP              PAGE

3       Examination by Mr. LaRosa              2
        Examination by Ms. Wilson             47
4

5                    E X H I B I T S

6    DUNLOP DEPOSITION EXHIBITS          MARKED

7    1  E-mail dated 10/18/02 from Richard Olney
            to Paul Kochis, Brendan Gilmore and
8           Rosemary Thomas                    7
     2  E-mail dated 10/8/02 from William Becker
9           to Linda Blozis                   20
     3  One page handwritten document              25
10   4  Three page document entitled, "Corporate
            Policies & Procedures Manual"        40
11

12

13   CERTIFICATE OF REPORTER            PAGE 81

14

15

16

17

18

19

20

21

22

23

24
```

**B579**

Maria F. Dunlop

81

```
 1    State of Delaware    )
                           )
 2    New Castle County    )

 3                    CERTIFICATE OF REPORTER
 4
 5         I, Patricia L. Shelton, Registered Professional
      Reporter and Notary Public, do hereby certify that there
      came before me on Thursday, December 21, 2006, the
 6    deponent herein, MARIA F. DUNLOP, who was duly sworn
      by me and thereafter examined by counsel for the
 7    respective parties; that the questions asked of said
      deponent and the answers given were taken down by me in
 8    Stenotype notes and thereafter transcribed by use of
      computer-aided transcription and computer printer under
 9    my direction.

10         I further certify that the foregoing is a true
      and correct transcript of the testimony given at said
11    examination of said witness.

12         I further certify that reading and signing of the
      deposition were waived by the deponent and counsel.
13
           I further certify that I am not counsel,
14    attorney, or relative of either party, or otherwise
      interested in the event of this suit.
15

16

17

18                        PATRICIA L. SHELTON, RPR

19                        Certification No. 104-RPR

20                        (Expires January 31, 2008)

21

22    DATED:

23

24
```

**B580**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LINDA J. BLOZIS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | No. 05-891 SLR |
| | ) | |
| MELLON TRUST OF DELAWARE, NATIONAL | ) | |
| ASSOCIATION, a Pennsylvania | ) | |
| corporation; MELLON BANK, NATIONAL | ) | |
| ASSOCIATION (formerly Mellon Bank | ) | |
| (DE) NATIONAL ASSOCIATION), a | ) | |
| Pennsylvania corporation; and | ) | |
| MELLON FINANCIAL CORPORATION, a | ) | |
| Pennsylvania corporation, | ) | |
| | ) | |
| Defendants. | ) | |

Deposition of ROSEMARY CURTIS THOMAS taken
pursuant to notice at the law offices of John M. LaRosa,
Two East 7th Street, Wilmington, Delaware, beginning at
9:27 a.m., on Tuesday, December 19, 2006, before Eleanor
J. Schwandt, Registered Merit Reporter and Notary Public.

APPEARANCES:

        JOHN M. LAROSA, ESQ.
        LAW OFFICE OF JOHN M. LAROSA
        Two East 7th Street
          Wilmington, Delaware  19801
          for the Plaintiff

        STEPHANIE WILSON, ESQ.
        REED SMITH, LLP
          13 Main Street - Suite 250
          P.O. Box 7839
          Princeton, New Jersey  08543-7839
          for the Defendants

WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

**B581**

```
 1                    ROSEMARY CURTIS THOMAS,
 2              the witness herein, having first been
 3              duly sworn on oath, was examined and
 4              testified as follows:
 5                          EXAMINATION
 6   BY MR. LAROSA:
 7        Q.   Good morning.  My name is John LaRosa and I
 8   represent Linda Blozis who is the plaintiff in this
 9   lawsuit.  Will you state your full name, please?
10        A.   Rosemary Curtis Thomas.
11        Q.   Will you spell your middle name for us?
12        A.   C-U-R-T-I-S.
13        Q.   What is your current home address?
14        A.   1531 North Hollywood Street -- Hollywood is one
15   word -- Philadelphia, Pennsylvania, 19121.
16        Q.   Have you ever had your deposition taken before?
17        A.   Yes.
18        Q.   Let me review some ground rules for you which you
19   may be familiar with.  After I ask the questions and you
20   answer them today you will have the opportunity to review
21   the answers you gave to see if the court reporter made
22   any typos or technical mistakes.  Do you understand that?
23        A.   Mm-hmm, yes.
24        Q.   And the next instruction is all your answers must
```

Rosemary Curtis Thomas

1    be verbal responses.  No shakes of the heads, nods of the

2    head, and things like that.  Do you understand that?

3         A.   Yes, I do.

4         Q.   And you have taken an oath to tell the truth, and

5    you understand the significance of that, correct?

6         A.   Yes.

7         Q.   Are you under any medications or substances that

8    would prevent you from remembering accurately or

9    testifying truthfully today?

10        A.   No, I am not.

11        Q.   Is there any reason why you feel you might not be

12   able to testify truthfully today?

13        A.   No.

14        Q.   Also, if I ask a question today and you don't

15   understand, please let me know and I'll try to rephrase

16   the question.  Do you understand that?

17        A.   Yes, I do.

18        Q.   Also, if you don't know the answer to something,

19   we don't want you to guess, so it is an acceptable answer

20   to say I don't know.  And if you give me an answer of I

21   don't know, I'll try to move on to another area.  Do you

22   understand that?

23        A.   Yes.

24        Q.   Also, we have to take turns speaking because the

4

Rosemary Curtis Thomas

1    court reporter cannot record two voices at once.  So

2    please wait until I finish the question to give me your

3    answer, and I'll try to let you finish your answer before

4    I move on to my next question.  Do you understand that?

5        A.    Yes.

6        Q.    Also, if you need any breaks let me know, and I

7    think the secretary has the restroom key, and there is

8    water here as well.  Do you understand all that?

9        A.    Yes, I do.

10        Q.    Have you met with any attorneys at any time to

11    discuss the facts of this case?

12        A.    Yes.

13        Q.    Approximately how many times have you met with

14    attorneys?

15        A.    I really don't remember how many times.  The most

16    recent was with Stephanie last week, Stephanie Wilson.

17        Q.    Have you met with anyone else besides Stephanie

18    Wilson?

19        A.    No.

20        Q.    Any other attorneys?

21        A.    No.

22        Q.    Do you think you have met with Stephanie more

23    than five times regarding this case?

24        A.    No.

**B584**

Rosemary Curtis Thomas

```
 1              MS. WILSON:  I'm going to object.  The
 2   number of times that she met with me is subject to work
 3   product as to how long or how often I think I need to
 4   meet with a defense witness.  So I'm not going to allow
 5   her to answer how many times she has met.
 6              MR. LAROSA:  Are you saying it is a work
 7   product privilege, I can't ask her how many times she had
 8   a meeting with you?
 9              MS. WILSON:  Mm-hmm, yes.
10   BY MR. LAROSA:
11      Q.   Was anyone else present in the meeting --
12      A.   No.
13      Q.   -- with Stephanie Wilson?
14      A.   No.
15      Q.   Approximately how long was your meeting last week
16   with Stephanie Wilson?
17              MS. WILSON:  Same objection.  And I'm going
18   to direct her not to answer.
19              MR. LAROSA:  You are claiming this is
20   privileged information?
21              MS. WILSON:  Yes, I am.
22   BY MR. LAROSA:
23      Q.   Do you remember, when was the first time you met
24   with Stephanie regarding this case?
```

Rosemary Curtis Thomas

1            MS. WILSON:  Same objection.  I'm not going
2    to allow her to answer any questions having to do with
3    how often we met, when we met, how long our discussions
4    were.  That's attorney work product privilege as to how
5    long I think I need to meet with a client or how long it
6    takes to go over this case.  I'm going to object to those
7    lines of questions.
8            MR. LAROSA:  The purpose of the questions is
9    to try and determine how prepared the witness is to give
10   detailed answers to my questions, so I'm going to assume
11   she is fully prepared to answer all the questions
12   thoroughly.  And I do disagree with your claim of
13   privilege, but I'm going to move on for the sake of time.
14   BY MR. LAROSA:
15       Q.   Will you state your date of birth, please?
16       A.   February 10th, 1947.
17       Q.   Regarding your educational background, did you
18   graduate from high school?
19       A.   Yes, I did.
20       Q.   Did you attend college?
21       A.   Yes, I did.
22       Q.   Did you receive an under-graduate degree?
23       A.   I have an associates degree.
24       Q.   And what is your associates degree in?

**B586**

Rosemary Curtis Thomas

1     A.    Arts and sciences.

2     Q.    Was there any particular field of study with

3     regard to that?

4     A.    Liberal arts.

5     Q.    And what school was that from?

6     A.    Community College of Philadelphia.

7     Q.    Do you have any other degrees?

8     A.    No, I don't.

9           I'm sorry.  Yes, I do.  I have a degree in

10    medical technology from the Franklin School of Science

11    and Arts.

12    Q.    Any other degrees?

13    A.    That's it.

14    Q.    Who is your current employer?

15    A.    Mellon Financial Corporation.

16    Q.    When did you begin working for Mellon Financial?

17    A.    Approximately 1979.

18    Q.    Have you been continuously employed with Mellon

19    Financial from 1979 to the present?

20    A.    Yes.

21    Q.    Have you ever worked for Mellon Trust of

22    Delaware?

23    A.    No.

24    Q.    Have you ever worked for Mellon Bank, National

Rosemary Curtis Thomas

1    Association?

2        A.    Yes.

3        Q.    When did you begin working for them, for Mellon

4    Bank?

5        A.    Originally I worked for Girard Bank.  We merged

6    with Mellon in approximately 1984.  And that's when I

7    would have worked for Mellon Bank.  Mellon stopped having

8    branches in December of 2001, and then we became Mellon

9    Financial Corporation.

10        Q.    So prior to December of 2001 there was an entity

11    called Mellon Bank that had branches, that consumers

12    could visit the branches to perform banking or do banking

13    business?

14        A.    Yes.

15        Q.    Did you ever work with Linda Blozis when you

16    worked for Mellon Bank?

17        A.    Yes.

18        Q.    And do you remember what time frame that is that

19    you worked with Linda Blozis when you worked at Mellon

20    Bank?

21        A.    Approximately 1999, starting in 1999.

22        Q.    Until what time?

23        A.    Until she was terminated.

24        Q.    And was there a time when you worked with Linda

**B588**

Rosemary Curtis Thomas

1  Blozis when you worked for Mellon Financial Corporation?

2      A.    Yes.

3      Q.    When was that?

4      A.    After 2001.

5      Q.    Would that have been in that same time frame, in

6  December or right after December of 2001?

7      A.    Yes.

8      Q.    And you worked with her up until her termination?

9      A.    Yes.

10     Q.    Have you ever reported to anyone at Mellon Trust

11 of Delaware?

12     A.    No.

13     Q.    Have you ever reported to anyone at Mellon Bank?

14     A.    Yes.

15     Q.    And what was the time frame that you reported to

16 someone who worked at Mellon Bank?

17     A.    From the time of the merger in 1984 until the

18 change of the name in 2001 -- well, the name actually

19 changed in 2002.

20     Q.    What was the name change?

21     A.    From Mellon Bank to Mellon Financial Corporation.

22     Q.    As far as your understanding, why did the name

23 change?

24     A.    Because we stopped running the branches.  We were

Rosemary Curtis Thomas

1   no longer in the retail banking business.

2       Q.   And just before the name change who did you

3   report to at Mellon Bank in 2001?

4       A.   Byron B-Y-R-O-N, Hunter, H-U-N-T-E-R.

5       Q.   And what was Byron Hunter's title?

6       A.   He was Director of Human Resources for the

7   Philadelphia Region.

8       Q.   Prior to Byron Hunter did you report to anyone

9   else at Mellon Bank?

10      A.   Yes.

11      Q.   Who was that?

12      A.   I forget his last name.  His first name was

13  George.  I cannot remember his last name now.  It has

14  been awhile.

15      Q.   Did he have the same title as Byron Hunter?

16      A.   Yes.

17      Q.   Did you have any other direct reports at Mellon

18  Bank between 1984 and December of 2001 other than Byron

19  Hunter and George, that you can recall?

20      A.   I had quite a few, actually, because we were in

21  transition and there was a transition between a reporting

22  structure being in Philadelphia or being from Pittsburgh.

23  I really don't remember the names of the other people.

24  They kind of came and went.

Rosemary Curtis Thomas

1     Q.   As far as Mellon Financial Corporation goes, who

2 do you report to at Mellon Financial?

3     A.   I report to Margaret Driscoll, D-R-I-S-C-O-L-L.

4     Q.   And what is her title?

5     A.   She is a human resources manager.  And she is in

6 Boston.

7     Q.   Is she responsible for a certain region or a

8 portion of the country?

9     A.   She is responsible for all of the human resources

10 business partners -- that's my business title -- that

11 support the Private Wealth Management Group.

12     Q.   So your title is Human Resources Business Partner

13 for the Private Wealth Management Group?

14     A.   Actually, my complete title is Senior Human

15 Resources Business Partner, and I'm a vice president of

16 the Mellon Corporation, and my client area is Private

17 Wealth Management for the Mid-Atlantic Region.

18     Q.   As far as Margaret Driscoll, is she in charge of

19 just the Mid-Atlantic Region or all of the Private Wealth

20 Management Group?

21     A.   She is the manager of all of the business

22 partners for all of Private Wealth Management, not just

23 the Mid-Atlantic Region but also Boston, Pittsburgh,

24 California, New York.

Rosemary Curtis Thomas

1    Q.    What do you mean by business partners?

2    A.    Actually, that is probably a change in name from

3  being a human resources generalist, and with business

4  partner you are a part of human resources, but you are

5  expected to connect with the business and to partner with

6  them in their human resources efforts and initiatives.

7    Q.    Was that a change in title or a change in

8  philosophy or a little change in both?

9    A.    A little change in both.

10    Q.    When did that start?

11    A.    Approximately six years ago.

12    Q.    So approximately the year 2000?

13    A.    Yes.

14    Q.    And you told us you are also Vice President of

15  Mellon Corporation?

16    A.    Yes.

17    Q.    Is that an entity other than Mellon Bank and

18  Mellon Financial Corporation?

19    A.    No, it is the same.  The way it is described, my

20  functional title is Senior Human Resources Business

21  Partner.  My officer title is Vice President.  And you

22  are a vice president of the corporation or an officer of

23  the corporation.

24    Q.    When you say you are an officer and vice

Rosemary Curtis Thomas

1    president of Mellon Corporation, is that a parent company

2    of Mellon Financial?

3        A.   It is the same.  It is Mellon Financial.

4        Q.   So if I use the term "Mellon Financial" or you

5    use the term "Mellon Corporation" we are talking about

6    the same entity?

7        A.   Yes.

8        Q.   And that was the entity that used to be known as

9    Mellon Bank prior to December 2001?

10       A.   Yes.

11       Q.   Does anyone above you in the chain of command

12    report to anyone at Mellon Trust of Delaware?

13       A.   No.

14       Q.   Did Linda Blozis ever report to anyone at Mellon

15    Trust of Delaware, to the best of your knowledge?

16       A.   I don't know.

17       Q.   Did Linda Blozis ever report to anyone at Mellon

18    Bank?

19       A.   Yes.

20       Q.   And did Linda Blozis ever report to anyone at

21    Mellon Financial?

22       A.   Yes.

23       Q.   Who did she report to at Mellon Financial?

24       A.   Brendan Gilmore, B-R-E-N-D A-N, G-I-L-M-O-R-E.

14

Rosemary Curtis Thomas

1    Q.    What was his title?

2    A.    Senior Director, Private Wealth Management.

3    Q.    Did Linda Blozis ever report to anyone else other

4  than Mr. Gilmore at Mellon Financial?

5    A.    There were people that -- there were two managers

6  that report to Brendan Gilmore that she reported directly

7  to, but overall she reported into Brendan.  So you may be

8  referring to the two people or you may want the names of

9  the two people that were in the Delaware office.

10          And just for history here, Brendan Gilmore

11  managed the Delaware office and also managed a group in

12  Philadelphia.  So it was a little bit different for him.

13  He was a manager that managed two offices instead of just

14  one.

15    Q.    Okay.  Who were the two managers in the Delaware

16  office that reported to Mr. Gilmore?

17    A.    Gregg Landis, L-A-N-D-I-S, and Bill Becker.

18    Q.    And Gregg is G-R-E-G-G?

19    A.    Yes.

20    Q.    Okay.  And what was Mr. Landis' title?

21    A.    A portfolio officer.

22    Q.    Was he considered Portfolio Officer for the

23  Delaware office or did he have affiliation with a

24  particular office or part of the company?

Rosemary Curtis Thomas

1    A.    He was for the Delaware office.

2    Q.    And what was Mr. Becker's title?

3    A.    He was a portfolio officer as well.

4    Q.    And he was for the Delaware office?

5    A.    He was for the Delaware office.  And Mr. Landis

6    reported to Mr. Becker.

7    Q.    So Mr. Landis reported to Mr. Becker?

8    A.    Yes.

9    Q.    Who in turn reported to Mr. Gilmore?

10   A.    Yes.

11   Q.    Who handles labor relations for Mellon Financial

12   Corporation?

13   A.    I don't understand the question.

14   Q.    Matters such as employment discrimination

15   lawsuits, who handles those for Mellon Financial

16   Corporation?

17   A.    Okay.  We have a group in Pittsburgh that is

18   called the Employee Relations Group.

19   Q.    When you say "we" who do you mean?

20   A.    The company, the corporation.

21   Q.    When you say "the corporation" you mean Mellon

22   Financial?

23   A.    Mellon Financial, mm-hmm.

24   Q.    Okay.  I'm sorry.

16

Rosemary Curtis Thomas

1    A.    That's okay.

2    Q.    You said, "We have a group in Pittsburgh that is

3    called the" --

4    A.    Employee Relations Group.  We also have an

5    in-house attorney that would be involved in any employee

6    relations issues as well.

7    Q.    And where is the in-house attorney stationed?

8    A.    She is in Pittsburgh.

9    Q.    And as far as other labor relations issues other

10   than employment discrimination lawsuits, such as

11   questions about vacation or benefits, who would handle

12   those more day-to-day labor relations issues?

13   A.    Typically I would.

14   Q.    And where is your office?

15   A.    My office is in Center City Philadelphia, 1735

16   Market Street.

17   Q.    Is that part of a Philadelphia regional office?

18   What is the office referred to?

19   A.    Yes, that is the Philadelphia regional office.

20   That would be the major office in Philadelphia.  The

21   chairman resides in that office as well.

22   Q.    And as far as when an employment discrimination

23   suit is brought against Mellon Bank, who would handle the

24   labor relations with regard to that issue?  Would it

**B596**

Rosemary Curtis Thomas

1   again be the Employee Relations Group and the in-house

2   attorney in Pittsburgh, or would it be someone else?

3       A.   If we were to receive charges in the mail, that

4   letter would go to Barb Ross, who is the in-house legal

5   counsel, and she would then determine if we needed to

6   send it elsewhere.

7       Q.   And there is also an entity called Mellon Trust

8   of Delaware?

9       A.   Yes.

10      Q.   And who handles labor relations for Mellon Trust

11  of Delaware?

12      A.   I do, if it is Private Wealth Management Group.

13  I do as the Human Resources Business Partner.  That same

14  person in Pittsburgh in Employee Relations would also be

15  involved, as would Barb Ross, our legal counsel.

16      Q.   Okay.  I'm not sure I understood the first part

17  of your response.  You said you would handle it if it is

18  part of the Private Wealth Management Group?

19      A.   Yes.

20      Q.   What do you mean by that?

21      A.   That is the department that I support, Private

22  Wealth Management, and actually at this point in Delaware

23  probably everything is Private Wealth Management.  That

24  was not always the case, but at this point it probably

Rosemary Curtis Thomas

1   is.

2       Q.    When you say "everything is Private Wealth

3   Management" --

4       A.    Everything comes under the Private Wealth

5   Management Group.

6       Q.    When you say "everything" are you referring to

7   your clients or their accounts?

8       A.    My clients.  My clients.

9       Q.    And are you telling us that all of the clients in

10  Delaware come under the Private Wealth Management Group

11  or probably do?

12      A.    Yes.

13      Q.    And can you distinguish that from things that

14  would not come under the Private Wealth Management Group?

15      A.    Well, sure.  Private Wealth Management consists

16  of, in the Mid-Atlantic Region, consists of sales,

17  investment management and private banking.  Any of the

18  clients that would be Private Wealth Management clients

19  are individuals that have over a million dollars in

20  investable assets.  And that's what makes them a Private

21  Wealth Management client.

22      Q.    And are those the type of individuals where

23  Mellon Trust of Delaware becomes involved?

24      A.    Yes.  For the position that Linda was doing,

Rosemary Curtis Thomas

1    which was a part of Private Wealth Management.

2              I have to make the distinction because we

3    may have some real estate people there.  I'm not really

4    sure because they would not be under my client area.

5        Q.    There may be some real estate people in the

6    Delaware office?

7        A.    In the Delaware office, yes.

8        Q.    But they wouldn't be in the Private Wealth

9    Management Group?

10       A.    Exactly.  I can only speak for the people that

11   are in the Private Wealth Management Group because those

12   are my clients.

13       Q.    So can you explain the relationship between

14   Mellon Trust of Delaware and Mellon Financial

15   Corporation?

16       A.    Yes.  I would say it is a subsidiary of Mellon

17   Financial Corporation.  There are different laws and

18   rules in terms of handling trusts in Delaware, so the

19   company in Delaware is Delaware Trust, as opposed to

20   Mellon Financial.

21       Q.    And by Delaware Trust you mean Mellon Trust of

22   Delaware?

23       A.    Mellon Trust.  I'm sorry.  Yes.

24       Q.    Your understanding of Mellon Trust of Delaware is

Rosemary Curtis Thomas

1   that is a subsidiary of Mellon Financial?

2   A.   Yes.

3   Q.   And your understanding is that Linda Blozis

4   performed services for Mellon Trust of Delaware, in part?

5   A.   In part.

6   Q.   Okay.

7   A.   Because the office was in Delaware.

8   Q.   And Linda Blozis also performed services in part

9   for Mellon Financial Corporation?

10  A.   Yes.  I would say that what she did rolled up to

11  the Mellon Financial Corporation.

12  Q.   I'm sorry.  You said it rolled up?

13  A.   I would say her responsibilities would eventually

14  roll up and be under the Mellon Financial Corporation.  I

15  may not be explaining this exactly as it is, but we go --

16  we use different names for different entities because of

17  where they are located, because of the state that they

18  are located in, like Delaware as opposed to being in

19  Pennsylvania.  But the businesses are the same.  They

20  just may be regulated a little bit differently because of

21  the state that they are located in.

22  Q.   You said the businesses are or are not?

23  A.   The businesses are the same, the same.

24  Q.   Are the same.  And the ownership is the same as

**B600**

Rosemary Curtis Thomas

1  far as Mellon Financial Corporation owns --

2      A.   Yes.

3      Q.   -- Mellon Trust of Delaware?

4      A.   Yes.

5      Q.   And as far as financial control --

6               MS. WILSON:  Objection to form.  You can

7  answer.

8      Q.   I haven't finished the question.

9               As far as financial control, is it your

10 understanding that Mellon Financial has financial control

11 of Mellon Trust of Delaware?

12              MS. WILSON:  Same objection.  You can

13 answer.

14              THE WITNESS:  Okay.  I don't -- you said I

15 can answer?

16              MS. WILSON:  You can.

17 BY MR. LAROSA:

18     Q.   Just so you know, she is allowed to make an

19 objection for the record.

20     A.   I don't want to get too technical because I'm --

21 because I really don't understand all of it.

22     Q.   Okay.

23     A.   But I just know that, like I said before, it is

24 according to where the entity is located that it may have

Rosemary Curtis Thomas

1    to have a name that's a little bit different.  But all of

2    that rolls up into the Mellon Financial Corporation.

3        Q.    Okay.  As far as management?

4        A.    Management, yes.

5        Q.    So management would be the same at a higher

6    level?

7        A.    Yes.

8              MS. WILSON:  Objection.  Wait.  Objection to

9    form.  You can answer.

10       A.    The chairman is Bob Kelly, Chairman of Mellon

11   Financial Corporation, and he would be the chairman of

12   the people in Delaware and in California and in London

13   and wherever we are.  So that's why I say it rolls up to

14   the same.

15       Q.    When you say "he would be the chairman of the

16   people in Delaware," you are including the people of

17   Mellon Trust of Delaware?

18       A.    Well, that's because they call it Mellon Trust,

19   yes.  Let me say, he would be the person as the chairman

20   of the people in the Delaware office.

21       Q.    But without asking you the legal specifics, in

22   some way Mellon Trust of Delaware's operations are

23   related to Mellon Financial Corporation's, or they are

24   interrelated somehow?

**B602**

Rosemary Curtis Thomas

1           MS. WILSON:  Objection to form.  You can

2    answer.

3        A.   Yes, as far as I know.

4        Q.   Okay.  What is your current job title?

5        A.   Senior Human Resources Business Partner.

6        Q.   You told us your boss was Margaret Driscoll, I

7    believe?

8        A.   Yes.

9        Q.   And do you have direct reports in your roll as

10   Senior Human Resources Business Partner?

11       A.   No, I do not.

12       Q.   Do you have any direct reports as Vice President?

13       A.   No.

14       Q.   Okay.  Are you considered a manager by Mellon

15   Financial?

16       A.   Yes.  I manage a function as opposed to people.

17       Q.   Focusing now on Linda Blozis, there was a time

18   when both you and Linda Blozis worked at Mellon?

19       A.   Yes.

20       Q.   And do you recall what position Miss Blozis held

21   at the time her employment with Mellon ended?

22       A.   Her title was Portfolio Administrator.

23       Q.   And what does a portfolio administrator do at

24   Mellon?

Rosemary Curtis Thomas

1    A.   Portfolio administrator assists the portfolio

2    officers in carrying out their day-to-day

3    responsibilities.  They would be a client interface.

4    They would occasionally do trades and other

5    responsibilities related to investment management, as

6    supervised by the portfolio officer.

7    Q.   And was Linda Blozis qualified to do that job?

8          MS. WILSON:  Objection to form.  You can

9    answer.

10    A.   I don't know if she was qualified.

11    Q.   Do you know what the qualifications are of a

12    portfolio administrator?

13    A.   Yes, I know technically what the qualifications

14    are as described in the job description.

15    Q.   Okay.  What are they?

16    A.   It would be someone with prior experience in

17    investment management, someone with excellent oral and

18    written communication skills, attention to detail,

19    preferably with a degree but not mandatory.

20    Q.   Any other qualifications that you can think of?

21    A.   No.

22    Q.   And these qualifications, you are referencing a

23    job description, when was this job description created,

24    if you know?

Rosemary Curtis Thomas

1    A.    I don't know.

2    Q.    Has it been updated recently, in the past six

3    years?

4    A.    I don't know if it has been updated in the past

5    six years.  It may have been evaluated, but updated --

6    actually updating would mean changing the grade.

7    Q.    Yes.

8    A.    I don't know if that has happened.

9    Q.    But periodically Mellon reviews the job

10   description to see if any changes or updates need to be

11   made?

12   A.    Yes.

13   Q.    So it is your understanding it may have been

14   evaluated, but you are not sure if it has been changed or

15   updated?

16   A.    Yes.

17   Q.    Can portfolio administrators receive written

18   commendations at their job from their bosses?

19              MS. WILSON:  Objection to form.  You can

20   answer.

21   A.    They usually wouldn't receive written

22   commendations from their bosses.  They may receive them

23   from the clients.  Their bosses would do an assessment of

24   them during their performance management review.

**B605**

Rosemary Curtis Thomas

1    Q.    So it would be unusual for their bosses to give a

2    commendation?

3                MS. WILSON:  Objection to form.  You can

4    answer.

5    A.    Yes.

6    Q.    More likely if they are going to get praised or

7    commended it would come from a client?

8    A.    Yes, as far as I know.

9    Q.    Okay.  I'm going to show you a document, ask that

10   it be marked Thomas 1.

11               (Thomas Deposition Exhibit 1 was marked for

12   identification.)

13   Q.    Take a minute to read this and let me know when

14   you are finished.

15   A.    Okay.

16   Q.    Who is Richard Olney?

17   A.    Excuse me?

18   Q.    Who is Richard Olney?

19   A.    I don't know.

20   Q.    Do you know who Paul Kochis, K-O-C-H-I-S, is?

21   A.    Yes.

22   Q.    Who is that?

23   A.    Paul was the President of Private Wealth

24   Management.

Rosemary Curtis Thomas

1    Q.    Is this document an e-mail?

2    A.    Yes.

3    Q.    Have you seen this e-mail before?

4    A.    I don't remember.

5    Q.    Is this e-mail addressed to Paul, as well as

6    Brendan Gilmore and yourself?

7    A.    The one that I have is just addressed to Linda

8    Blozis.

9            MR. LAROSA:  Can I see that?  I'm sorry, I

10   might have given you the wrong thing here.

11           I'm sorry, I'm looking at the wrong thing.

12   Sorry about that.

13           MS. WILSON:  That's okay.

14           MR. LAROSA:  Let's mark this Exhibit 2 then.

15           (Thomas Deposition Exhibit 2 was marked for

16   identification.)

17   BY MR. LAROSA:

18   Q.    Take a minute and read through that and let me

19   know when you are finished.

20   A.    Mm-hmm, okay.  Okay.

21   Q.    I've put a document in front of you, we are

22   calling it Thomas Exhibit 2.  It says MEL/BLOZ, at the

23   bottom right-hand corner, 453.  Is this document an

24   e-mail?

Rosemary Curtis Thomas

1    A.    Yes, it is.

2    Q.    Have you seen this document before?

3    A.    I noticed that I'm cc'd on it, but I don't really

4    remember it.

5    Q.    It looks like the cc is Gregg Landis and Bill

6    Becker; is that correct?

7    A.    Yes.

8    Q.    And then it is addressed to Paul Kochis, Brendan

9    Gilmore and yourself?

10    A.    Yes.

11    Q.    First of all, this e-mail was sent by Richard

12    Olney; is that correct?

13    A.    Yes, that's what I see on the e-mail.

14    Q.    Having reviewed this e-mail, what is your

15    understanding of why he sent this e-mail?

16              MS. WILSON:  Objection to form.  You can

17    answer.

18    A.    It appears that he is commending Linda on how she

19    handled some type of transaction for a charitable trust.

20    Q.    And Mr. Olney is an assistant vice president?

21    A.    According to this, yes.

22    Q.    And aside from this document, Linda Blozis may

23    have received commendations from clients or others during

24    her employment; is that correct?

Rosemary Curtis Thomas

1          MS. WILSON:  Objection to form.  You can

2    answer.

3      A.   I really don't know.

4      Q.   As far as you know, to the best of your

5    knowledge, Miss Blozis was never reprimanded or

6    disciplined for tardiness; is that correct?

7          MS. WILSON:  Objection to form.  You can

8    answer.

9      A.   I really don't remember.

10     Q.   To the best of your memory, Linda Blozis was

11   never disciplined or reprimanded for attendance issues;

12   is that correct?

13         MS. WILSON:  Objection to form.  You can

14   answer.

15     A.   I don't remember.

16     Q.   To the best of your memory, Miss Blozis was never

17   cited for or reprimanded or disciplined for

18   unprofessionalism; is that correct?

19         MS. WILSON:  Objection to form.  You can

20   answer.

21     A.   I don't remember.

22     Q.   And you don't remember Miss Blozis being

23   reprimanded for gross neglect of responsibilities; is

24   that correct?

Rosemary Curtis Thomas

1          MS. WILSON:  Objection to form.  You can

2     answer.

3     A.    Could your repeat that, please?

4     Q.    You don't remember Miss Blozis being disciplined

5     or reprimanded for gross neglect of responsibilities; is

6     that correct?

7          MS. WILSON:  Same objection.  You can

8     answer.

9     A.    Well, the term you are using, "gross neglect," I

10     guess I have a problem with that to some degree.  She was

11     reprimanded or put on corrective action for

12     unsatisfactory performance.

13     Q.    Okay.  We will talk about that.

14          I'm going to show you a document and ask

15     that it be marked Thomas Exhibit 3.

16          (Thomas Deposition Exhibit 3 was marked for

17     identification.)

18     Q.    Take a minute and read through this.

19          What I've handed you, we are calling Thomas

20     Exhibit 3, and it is two pages that have been produced by

21     the defendants in this case.  At the bottom right-hand

22     corner it says MEL/BLOZ 454 and the second page MEL/BLOZ

23     455.  With regard to the first page, have you seen this

24     type of a form before at Mellon?

Rosemary Curtis Thomas

1    A.    Yes.

2    Q.    And what type of a form in this?

3    A.    We refer to it as an employee profile.

4    Q.    What is it used for?

5    A.    This is basically a history of the employee and

6    their employment history with the corporation, which

7    includes their salary and their performance ratings,

8    address, dates of hire.

9    Q.    And in addition to those types of information,

10   Mellon records an employee's date of birth on this form;

11   is that correct?

12   A.    Yes.

13   Q.    And in addition to the information you told us,

14   Mellon also includes the employee's age on this form?

15   A.    Yes.

16   Q.    And in addition to the information you told us,

17   Mellon also includes or records the employee's sex on

18   this form; is that correct?

19   A.    Yes.

20   Q.    And on this form Mellon also records an

21   employee's race; is that correct?

22   A.    Yes.

23   Q.    And on this form Mellon also records an

24   employee's marital status; is that correct?

Rosemary Curtis Thomas

1    A.    Yes.

2    Q.    And there is also a portion in the middle that

3    says "Job History"?

4    A.    Mm-hmm.

5    Q.    And then to the right of that says PERF RTG.    Is

6    that talking about performance ratings?

7    A.    Yes, it is.

8    Q.    Where do those performance ratings first appear?

9    Do they first appear on this employee profile history or

10   is this summarizing or restating performance ratings that

11   were given to the employee in another document?

12   A.    Okay.    This would be restating the ratings that

13   were given to an employee in another document.

14   Q.    So this whole document is sort of a summary of an

15   employee's performance history, in addition to the other

16   types of information you have told us?

17   A.    Yes.

18   Q.    And looking at the first page, it looks like it

19   is indicating a performance rating for Miss Blozis for

20   various years; is that correct?

21   A.    Yes.

22   Q.    And the first page it looks like it has different

23   years starting with 1997 and going into the past, back to

24   1992; is that correct?

Rosemary Curtis Thomas

1      A.    Yes.

2      Q.    And as far as the summary or restatement of

3  performance ratings for Miss Blozis, what was her

4  performance rating from 1993 to 1997?

5      A.    Exceeds expectations.  That's what the number 2

6  would stand for.

7      Q.    So number 2, performance rating of 2 means

8  exceeds expectations?

9      A.    Yes.

10      Q.    So from this form we can glean or learn that Miss

11  Blozis' performance exceeded expectations between 1993

12  and 1997?

13      A.    Yes.

14      Q.    I ask you to flip to the second page.  I put

15  these two together as one exhibit.  It appears they are

16  not one document.  Is that accurate?

17      A.    You are correct.

18      Q.    Are they two different versions of an employee

19  profile history?

20      A.    Two different time frames, mm-hmm.

21      Q.    As far as the time frame now for the second page,

22  the second page also records date of birth and age; is

23  that correct?

24      A.    Yes.

**B613**

Rosemary Curtis Thomas

1     Q.    It also records race, sex and marital status; is
2  that correct?
3     A.    Yes.
4     Q.    And looking at performance ratings, on these
5  employee profile histories do they just go back a certain
6  number of years?
7     A.    Correct.
8     Q.    Approximately how many years do they go back?
9     A.    Approximately six or seven.
10    Q.    Okay.  And what does a performance rating --
11    A.    Actually, I need to correct that.  It is not six
12  or seven years necessarily.  It is the spaces.  If you
13  look at the lines, it is like six lines.  If you look at
14  her job history, we are going from '95 to '99.  So that's
15  only four years.  But she had that many different things
16  happen with her job history.
17    Q.    Okay.  So when you say spaces or things
18  happened--
19    A.    Mm-hmm, so it is actually the spaces that we use
20  in the system.  That's all that would be accommodated on
21  this particular record.  If you wanted something else you
22  would have to go back to another record.
23    Q.    So it might not be the last six or seven years,
24  but it might include the last six or seven evaluations?

Rosemary Curtis Thomas

1    A.    Events.   Or events.

2    Q.    Or other events?   I'm sorry?

3    A.    Events, mm-hmm.

4    Q.    What does a performance rating of 3 mean,

5    generally?

6    A.    On target.

7    Q.    And as far as on target, does that mean the

8    employee's performance is on target?

9    A.    It means that they are meeting the expectations

10   of the job.

11   Q.    And when you talk about meeting expectations and

12   exceeds expectations, are we talking about expectations

13   of the job or expectations of a particular supervisor or

14   something else?

15   A.    Probably be a compilation of the two.   The

16   manager gives you your goals and what he expects.   And

17   then he works with you, you work with him during the

18   course of the year, and at the end of the year you are

19   evaluated on those.   So the manager does provide the

20   goals, also with some input from the employees.

21   Q.    With regard to a performance rating of capital T,

22   what would that refer to?

23   A.    That's on target or meets expectations.

24   Q.    So capital T would be the same as the number 2 as

Rosemary Curtis Thomas

1    far as your performance rating?

2        A.    The number 2 would be -- okay.  I'm sorry.  We

3    changed the way we do the rating.  It was numbers and

4    then we went to letters.  So a 2 would be exceeds.  If

5    you look at that 3, that would equate to a T.

6        Q.    So a 2 is exceeds expectations?

7        A.    Mm-hmm.

8        Q.    A 3 or capital T is --

9        A.    Meets.

10       Q.    -- meets expectations or on target?

11       A.    Mm-hmm.  Yes.

12       Q.    And what would the capital I refer to?

13       A.    Unsatisfactory.

14       Q.    And does unsatisfactory mean that an employee is

15   not meeting the expectations of the --

16       A.    Excuse me.  You know what, I'm wrong.  The I

17   would be needs improvement.

18       Q.    So looking at these two documents, does it appear

19   that Miss Blozis' performance met or exceeded

20   expectations from 1992 to 2002?

21       A.    Yes.

22       Q.    To the best of your knowledge, Linda Blozis was

23   never demoted during her employment at Mellon; is that

24   correct?

**B616**

37

Rosemary Curtis Thomas

1    A.    Not to my knowledge.

2    Q.    And to the best of your knowledge, Linda Blozis

3    was never suspended while she was employed at Mellon; is

4    that correct?

5    A.    Correct.

6    Q.    Did there come a point in time at Mellon where

7    the role of portfolio administrator changed?

8    A.    Yes.

9    Q.    When was that?

10    A.    Excuse me.  I'm trying to think.  It was with the

11    new chairman.

12        I would say approximately 2001.

13    Q.    And how did the role of portfolio administrator

14    change at that time?

15    A.    It was determined that we would like for the

16    portfolio administrators to really start to perform to

17    what was outlined in the job description.  As one of the

18    requirements in the job description it is to have some

19    type of background in investments or knowledge of

20    investments.

21        Now, we realize that we may have had people

22    that were hired that didn't have a knowledge in

23    investments, but at that point in time we were asking

24    them to start to become familiar with the investment

**B617**

Rosemary Curtis Thomas

1    process, you know, realizing that you couldn't become an

2    expert overnight, but this is going to be a part of the

3    job that we are actually paying attention to now, and we

4    want you to understand what you are doing on a day-to-day

5    basis.

6        Q.    So the expectations were taken up a notch or

7    increased; is that fair to say?

8        A.    Yes.

9        Q.    So with this change in role, what was Miss Blozis

10   expected to do beginning around that 2001 time frame that

11   she had not been expected to do previously?

12             MS. WILSON:  Objection to form.  You can

13   answer.

14       A.    I would say that she was expected to start to

15   learn a little bit more about investments.  When she was

16   producing the various documents that we give to clients

17   with our client meetings, to understand what those

18   documents actually meant.

19             When we were putting down your asset

20   allocation or whether you were large cap or small cap, to

21   understand so that as she is producing the documents she

22   could make sure that they are accurate.

23       Q.    You are saying she is producing them, because I

24   think you told us earlier that the portfolio

**B618**

Rosemary Curtis Thomas

1   administrator has a lot of client interface or

2   interaction with the clients?

3       A.   Yes.

4       Q.   So she would be, when you say she is responsible

5   for producing, either handing them to clients or getting

6   them prepared for clients at client meetings, these

7   different documents?

8       A.   She would be responsible for getting them

9   prepared for client meetings.  The portfolio officer

10  would tell her the client that he would be meeting with,

11  what he was looking for, what the client wanted to

12  review.  She would be responsible for going into the

13  system and pulling up that information, and producing it,

14  putting it in a booklet form.

15      Q.   As far as the documents that she was putting in

16  the booklet form, did these documents originate from a

17  portfolio officer?

18      A.   The portfolio officer would have told her what

19  they wanted to review, and there is several different

20  documents in the system, different calculations in the

21  system, that the portfolio administrators are trained to

22  use.  He would tell her what he wanted.  It would be her

23  responsibility to go in and pull the information.

24      Q.   In addition to those types of functions, was

**B619**

Rosemary Curtis Thomas

1   there ever a point in time when Miss Blozis was

2   responsible for telephone reception at the Delaware

3   office?

4       A.    Telephone reception?

5       Q.    Yes.

6       A.    I don't think I understand the question.

7       Q.    Was she ever responsible for answering the

8   telephones?

9       A.    I wouldn't say as a receptionist.  I mean,

10  everyone is responsible for answering the telephone.  We

11  don't have receptionists, so everyone would be

12  responsible for answering the telephone.

13      Q.    As far as incoming mail to the office and

14  distribution of that, was there ever a point in time when

15  she was responsible for that?

16      A.    Again, we don't have a mail person there, so

17  everyone would be responsible for accepting their mail

18  and opening their envelopes.  I do that every day.

19      Q.    Right.  I understand everybody opens up their own

20  mail.

21      A.    Mm-hmm.

22      Q.    But if there is multiple people in a suite or an

23  office, doesn't the mail need to be sorted to different

24  employees working in the office?

Rosemary Curtis Thomas

1    A.    Well, actually in that office the Private Wealth

2    Management Group is four people at max, typically.

3    Q.    Does that mean everybody just flips through the

4    incoming mail and grabs what is theirs and leaves --

5    A.    Well, we have a system that our mail is delivered

6    by AIM number.  Actually the AIM number is on this

7    profile here.  So whatever comes to my office on the

8    eighth floor, I sit in the executive suite, that has my

9    AIM number on it, I'm just kind of handed the package

10   from the mail room with my AIM number, I open it and go

11   through my mail.

12   Q.    So somebody in the AIM room has to make --

13   A.    Somebody in the mail room, yes.  But it comes

14   from the mail room to the offices.

15   Q.    Okay.  You are talking about the mail room in the

16   Philadelphia regional office?

17   A.    Mm-hmm.  And I don't know, I'm not that familiar

18   with the Delaware office, but I'm sure that someone, you

19   know, sorts the mail and takes it to the various offices,

20   even if it comes from Philadelphia and goes to Delaware.

21   Q.    You are sure that somebody within the company

22   does that?

23   A.    Mm-hmm.

24   Q.    Sorry?

Rosemary Curtis Thomas

1    A.    Yes.  I'm sorry.

2    Q.    As far as if there is problems with computers or

3    toner cartridges and things like that, did Miss Blozis

4    have any responsibility with regard to equipment

5    maintenance or issues like that?

6    A.    We have people that repair our equipment for us.

7    Now, if you would need a new cartridge, like if I would

8    need a new one, I would just put it in my computer.  I

9    would get it and put it in.  But if it was a problem, a

10   technical problem and I needed assistance, we have people

11   that do that for us.  We have a staff that does that.

12   Q.    A staff in the Philadelphia office?

13   A.    That's available, we have a staff available to

14   all the offices.

15   Q.    Do they work out of the Delaware office or

16   Philadelphia?

17   A.    They may work out of the Philadelphia office.

18   I'm not sure.

19   Q.    As far as arranging client meetings and

20   scheduling of client meetings, did Linda Blozis ever have

21   responsibility for that?

22   A.    I would assume that she did.

23   Q.    As far as handling cash transactions, would she

24   ever have responsibility for that?

Rosemary Curtis Thomas

1    A.    I'm not aware of that.

2    Q.    As far as opening up new accounts, would she be

3    responsible for that?

4    A.    I don't know.

5    Q.    As far as closing terminated accounts, would she

6    be responsible for that?

7    A.    I believe so.

8    Q.    As far as training new employees, such as new

9    portfolio administrators, would she be responsible for

10   that?

11   A.    Yes.  Typically, if a new person comes to the

12   office, everyone is responsible in taking hand in

13   training them, mm-hmm.

14   Q.    And there was points in time when Linda Blozis

15   was not the only portfolio administrator in the Delaware

16   office; that's true, isn't it?

17   A.    Yes.

18   Q.    Do you know who any of the other portfolio

19   administrators in the Delaware office were that worked

20   with Linda Blozis?

21   A.    Yes.

22   Q.    Who were they?

23   A.    At one point it was Kathy Agne, A-G-N-E.  When

24   Kathy left the office I believe it was Maria Bannister

**B623**

Rosemary Curtis Thomas

1   Dunlop, D-U-N-L-O-P.  Both of them worked with Linda.

2       Q.    So at some point Kathy Agne's employment ended?

3       A.    Yes.

4       Q.    Is Maria Bannister Maria Dunlop?  That's the same

5   person?

6       A.    Yes.

7       Q.    So if we see a document that says Maria

8   Bannister, that's referring to a person who is now known

9   as Maria Dunlop?

10      A.    Yes.

11      Q.    And did Maria Bannister or Maria Dunlop

12  eventually replace Kathy Agne?

13      A.    Yes.

14      Q.    And as far as Kathy Agne is a female, correct?

15      A.    Yes.

16      Q.    And Maria Dunlop is a female, correct?

17      A.    Yes.

18      Q.    And Linda Blozis is a female, correct?

19      A.    Yes.

20             (Discussion off the record.)

21      Q.    There were no male portfolio administrators in

22  the Delaware office during the time Linda Blozis worked

23  there; is that correct?

24      A.    That's correct.

**B624**

Rosemary Curtis Thomas

1    Q.   And as far as Kathy Agne, her employment was

2    eventually terminated?

3    A.   Yes.

4    Q.   She was discharged by Mellon; is that correct?

5    A.   Yes.

6    Q.   And by whom in particular?

7    A.   Bill Becker was the manager of that office at the

8    time that Kathy left.

9    Q.   And why?

10   A.   For unsatisfactory performance.

11   Q.   And was that around the March 2002 time frame?

12   A.   I don't remember the date.  Sorry.

13   Q.   If you don't remember the exact date, as far as

14   an approximate year, do you believe it was some time

15   around 2002?

16   A.   Sounds accurate.

17   Q.   Okay.  Do you believe she was terminated after

18   the role of portfolio administrator had changed?

19   A.   Yes.

20   Q.   And her position was not eliminated?  It was not

21   downsizing, correct?

22   A.   No, it was not.

23   Q.   At some point in that 2002 time frame Maria

24   Dunlop began working at the Delaware office as a

**B625**

Rosemary Curtis Thomas

1    portfolio administrator; is that correct?

2        A.    I know that Maria replaced Kathy.  I'm not quite

3    sure of the date.  But she was her replacement.

4        Q.    As far as a Frances Smith, are you aware of an

5    employee named Frances Smith?

6        A.    Yes.

7        Q.    And what was her title?

8        A.    Portfolio Administrator.

9        Q.    Did she have any other titles at Mellon, during

10   her time at Mellon?

11       A.    I believe she was an assistant portfolio officer

12   at one point, and her title was adjusted to Portfolio

13   Administrator.

14       Q.    As an assistant portfolio officer, is that more

15   or less responsibility than a portfolio administrator?

16       A.    It is more.

17       Q.    So at some point she was given reduced

18   responsibilities and her title changed from Assistant

19   Portfolio Officer to Portfolio Administrator?

20       A.    Yes.

21             MS. WILSON:  Objection to form.  You can

22   answer.

23       A.    Yes.

24       Q.    Who did that?

**B626**