47

Rosemary Curtis Thomas

1    A.    I'm trying to remember who her manager was.  She
2    was not on the same team that Linda Blozis was on.  I'm
3    sorry, I really don't remember.
4    Q.    She was on a team in the Delaware office?
5    A.    No.
6    Q.    Was she in the Philadelphia office?
7    A.    Yes.
8    Q.    I think you told us earlier that Brendan Gilmore
9    was responsible for both the Philadelphia office and the
10   Delaware office?
11   A.    Yes.  But I don't believe that she was on the
12   Gilmore team in the Philadelphia office.  I think she was
13   on a totally different team.
14   Q.    Okay.  Well, you believe she was in Philadelphia.
15   Did Gilmore have some kind of management responsibility
16   for other teams in the Philadelphia office?
17   A.    No.
18   Q.    Just so I understand, did you tell us that
19   Brendan Gilmore managed the Delaware office, as well as
20   the Philadelphia office or part of the Philadelphia
21   office?
22   A.    He managed the Delaware Private Wealth Management
23   investment management team, and he managed an investment
24   management team in Philadelphia, which was unusual.  Most

**B627**

Rosemary Curtis Thomas

1   managers just have one location.  He had two.

2              Now, there are other teams in Philadelphia

3   besides what we were refer to it as the Gilmore team,

4   because he was the manager.  There are other managers of

5   other teams in the Philadelphia office.  That's the

6   largest office.  So there is more than one investment

7   management team there.

8              And I don't believe that Frances Smith had

9   anything to do with Brendan Gilmore on his team.

10     Q.   Other than they both worked in the Philadelphia

11   office?

12     A.   Other than they both worked in the Philadelphia

13   office, that's it.

14     Q.   And was there a Martha Fetters who worked for

15   Mellon?

16     A.   Yes.

17     Q.   What was her title?

18     A.   I don't remember.

19     Q.   Did she work for Brendan Gilmore?

20     A.   Yes, she did.

21     Q.   And did she eventually resign?

22     A.   I don't remember.  I believe she did.

23     Q.   As far as a time frame, was that in approximately

24   2003?

Rosemary Curtis Thomas

1    A.   I really don't remember.

2    Q.   Was there a Linda Squirer who worked at Mellon?

3    A.   Yes.

4    Q.   And did she work for Brendan Gilmore?

5    A.   Yes.

6    Q.   What was her title?

7    A.   I don't remember.

8    Q.   Did she eventually resign?

9    A.   Yes.

10    Q.   Was that recently or was that a few years ago?

11    A.   That would have been a few years ago.

12    Q.   Do you think that was in approximately 2003?

13    A.   I'm sorry, I really don't remember the year.

14    Q.   Was there a Robert Bell who worked at Mellon?

15    A.   Yes.

16    Q.   Was he a senior trust officer?

17    A.   Yes, I believe he was.

18    Q.   Did he work for Brendan Gilmore?

19    A.   Yes, he did.

20    Q.   And did he eventually resign?

21    A.   As I recall, he retired.

22    Q.   Was that a joint decision by him and Mr. Gilmore?

23    A.   As I recall, he retired, and retirement would be

24  solely his decision.  We don't have mandatory retirement.

Rosemary Curtis Thomas

1    Q.   As far as the portfolio administrators on

2   Gilmore's team, during the time Linda Blozis worked

3   there, would that have been Linda Blozis, Maria Bannister

4   Dunlop, and anyone else?

5    A.   The two that you just named were the portfolio

6   administrators in the Delaware office.  He had other

7   portfolio administrators working for him in the

8   Philadelphia office.

9    Q.   Okay.  Who were they?

10    A.   I'm trying to remember at the time.  I believe it

11   was a Marion Marano, M-A-R-A-N-O, and Tammy Riley,

12   R-I-L-E-Y, and Cindy Chambliss, C-H-A-M-B-L-I-S-S.  I

13   believe those were the three portfolio administrators in

14   the Philadelphia office at the time.

15          And there was one male, Dan Marino -- Dan

16   Merlino.  I'm sorry.

17    Q.   M-E?

18    A.   M-E-R-L-I-N-O.

19    Q.   And of all the portfolio administrators that we

20   talked about on Gilmore's team, there was no portfolio

21   administrators on Gilmore's team that were older than

22   Miss Blozis; is that correct?

23    A.   I don't think so.

24    Q.   As far as when Maria Dunlop was hired, was she

Rosemary Curtis Thomas

1   hired by Brendan Gilmore?

2       A.   She was hired by Brendan.  She would have been

3   interviewed by people other than Brendan, so it would

4   have been a decision made between Brendan, Bill Becker

5   and Gregg Landis.

6       Q.   And did Gilmore hire Bill Becker?

7       A.   Yes.

8       Q.   And did Gilmore hire Dan Merlino?

9       A.   Yes.

10      Q.   Did Gilmore hire Kristy Hunt?

11      A.   I don't think so.  I think she transferred to his

12  team, but I don't think he hired her originally.

13      Q.   Would he have been part of the decision to

14  transfer her to his team?

15      A.   Not necessarily.

16      Q.   Would he have to --

17      A.   If there was a restructuring, if the president

18  decided to restructure the groups, which he does from

19  time to time, he could have said that I think she would

20  be a good fit on your team.  So unless he was vehemently

21  opposed, he would not have said no to the president.

22      Q.   So he could vehemently oppose it, but otherwise

23  he would accept the transfer?

24      A.   Mm-hmm.  Yes.  I am sorry.

52

Rosemary Curtis Thomas

1    Q.    As far as what was Kristy Hunt's title?

2    A.    I believe Kristy was a portfolio officer.

3    Q.    And Dan Merlino's title?

4    A.    Portfolio Administrator.

5    Q.    Was there also a Tom Galante, G-A-L-A-N-T-E?

6    A.    Tom Galante is the Employee Relations person in

7    the Pittsburgh office.  When I referred to that other

8    group, Employee Relations in Pittsburgh, he is our

9    Employee Relations person.

10    Q.    Is he considered a subordinate of yours or a peer

11    of yours?

12    A.    He is a peer.

13    Q.    Was he hired by Gilmore?

14    A.    No.

15    Q.    Other than the folks we have talked about, are

16    there any other Gilmore team members in the year 2003

17    that we haven't mentioned?  Let's start with the Delaware

18    office.

19    A.    Yes.  There is a Bruce Holnquist that reports

20    into that Delaware group.  He is physically located in

21    Maryland.  And that's H-O-L-N-Q-U-I-S-T.

22    Q.    Are there any other folks that were on the

23    Gilmore team in 2003 that we haven't mentioned?

24    A.    I think that there are.  I'm trying to remember.

Rosemary Curtis Thomas

1    Because we talk mostly about portfolio administrators,

2    but there were other portfolio officers in Philadelphia.

3    Kristy was one of them, Kristy Hunt, that we just talked

4    about.

5        Q.    Well, let's back up then.  That might help us to

6    outline this.  You said we have talked about portfolio

7    administrators?

8        A.    For the most part, yes.

9        Q.    There is also portfolio officers?

10       A.    Yes.

11       Q.    Can you tell me what all the functions are that

12   would be functions within Gilmore's team?

13       A.    Sure.  He would have had a fully staffed team, so

14   the portfolio administrators would be your entry-level

15   professionals.  They assist the portfolio officers.  The

16   portfolio officers, they are like senior portfolio

17   officers as opposed to entry-level portfolio officers,

18   but they are all portfolio officers.  Okay.

19       Q.    Other than portfolio administrators and portfolio

20   officers, what other functions would be within Gilmore's

21   team, if any?

22       A.    That would be it.

23       Q.    As far as Gregg Landis, did you tell us he was a

24   portfolio officer?

Rosemary Curtis Thomas

1    A.    He is a portfolio officer.  Bill Becker was a

2    portfolio officer.  They reported direct -- well, Bill

3    Becker reported directly into Brendan Gilmore.  Gregg

4    Landis would have had a dotted line reporting structure

5    to Bill Becker.  Bill Becker ran the Philadelphia -- ran

6    the Delaware office for Brendan Gilmore.

7    Q.    And was the reason for that because one was a

8    senior portfolio officer versus --

9    A.    Yes.  And Bill Becker would have been the senior

10   person.

11   Q.    Okay.  So have we talked about all the portfolio

12   officers that were physically stationed in Delaware or

13   reported into Delaware from Maryland?

14   A.    Yes.

15   Q.    Have we talked about all the portfolio

16   administrators that were physically in the Delaware

17   office in 2003?

18   A.    Yes.

19   Q.    And as far as other portfolio officers under the

20   Gilmore team or on Brendan Gilmore's team, would the

21   other ones have been in Philadelphia?

22   A.    Yes.

23   Q.    And other than Kristy Hunt, would there have been

24   others?

**B634**

Rosemary Curtis Thomas

1    A.    I'm trying to think.  I'm sure he probably had

2    another portfolio officer in Philadelphia.  Oh, he did.

3    David Rowe.

4    Q.    Did he have any other portfolio officers in

5    Philadelphia that you can recall at this time?

6    A.    That's all I can recall right now.

7    Q.    I'm sorry, did I interrupt?

8    A.    I was going to say there may have been one more,

9    but I can't remember.

10    Q.    So you believe he had two or three --

11    A.    Yes.

12    Q.    -- portfolio officers in Philadelphia?

13    A.    Mm-hmm, yes.

14    Q.    In addition to the two or three portfolio

15    officers in Delaware, reporting to the Delaware office --

16    A.    Yes.

17    Q.    -- but stationed in Maryland?

18    A.    Yes.

19    Q.    And as far as portfolio administrators in

20    Philadelphia, we talked about Dan Merlino, we talked

21    about Marion Marano, Tammy Riley and Cindy Chambliss?

22    A.    Yes.

23    Q.    Were there any other portfolio administrators on

24    the Gilmore team in the Philadelphia office in 2003 that

**B635**

Rosemary Curtis Thomas

1   you can recall?

2      A.   No.

3      Q.   As far as the new or the change as far as the

4   role of portfolio administrator, I think you said there

5   was a change in job description and philosophy some time

6   in 2002, so does that mean that the expectations would

7   have been increased for Linda Blozis in 2002 or 2003?

8              MS. WILSON:  Objection to form.  You can

9   answer.

10     A.   Yes.

11     Q.   As far as assignment of projects, would portfolio

12  officers assign various projects to their portfolio

13  administrators, such as the client booklets and

14  scheduling client meetings and things that we talked

15  about?

16     A.   Excuse me?  Repeat the question.

17             MR. LAROSA:  Can you read that question

18  back.

19             (Record read.)

20             THE WITNESS:  Yes.

21  BY MR. LAROSA:

22     Q.   And as far as, this is the type of job where a

23  portfolio administrator would have multiple projects at

24  any given time, is that fair to say, as opposed to one

Rosemary Curtis Thomas

1    project?

2        A.    They could.

3        Q.    They could have more than one project at one

4    time?

5        A.    Yes.

6        Q.    And if they had more than one project at one

7    time, were portfolio administrators expected to

8    prioritize their projects?

9        A.    It is my experience that they would expect them

10   to prioritize.

11       Q.    The portfolio officers would expect the portfolio

12   administrators to prioritize their work?

13       A.    Yes.    And if they couldn't do that they would

14   work with them to do that.

15       Q.    So Linda Blozis would have been expected to know

16   what projects needed to be done sooner and what projects

17   could wait for other projects to be completed before they

18   were completed?

19       A.    Yes.

20       Q.    And so portfolio administrators had to set

21   priorities in terms of what they got done first?

22       A.    Yes.    They are entry-level professional

23   positions.    We would expect them to be able to do that.

24       Q.    So portfolio officers wouldn't set the priorities

58

Rosemary Curtis Thomas

1    for them, correct?

2        A.    I wouldn't say that they would never do that, if

3    they felt that they needed some, they being the portfolio

4    administrators needed some assistance with that, yes,

5    they would.

6              Or the portfolio officer may be working on

7    something that is extremely important and he would let

8    the portfolio administrator know that this was a

9    priority.

10       Q.    So under certain circumstances, such as when

11   something is extremely important, a portfolio officer

12   would say, "This is what we need to get done today, this

13   morning"?

14       A.    Yes, I would say that.

15       Q.    Did Linda Blozis ever indicate that she didn't

16   have enough time to complete all of her work?

17       A.    I believe that Linda had a concern about having

18   time to complete her work.  Towards the end of her stay

19   with us she talked about that with me.  But that was the

20   first time I had heard her say that.

21       Q.    Would that have been in '02 or '03 that she

22   talked with you about that?

23       A.    '03.

24       Q.    Were portfolio administrators paid for a certain

**B638**

Rosemary Curtis Thomas

1    number of hours in the workweek, such as 37.5 hours?

2        A.    Okay.    That is, again, an entry-level

3    professional position, so it is an exempt position.  Yes,

4    they would be paid for 37 and a half hours.  That's the

5    workweek that we have.  And they would not be entitled to

6    extra time or overtime in that exempt position.

7        Q.    And why were they considered exempt and not

8    entitled to overtime?

9             MS. WILSON:  Objection to form.  You can

10   answer.

11       A.    There is an exemption test done with our

12   compensation group, and all jobs go through that

13   exemption test.  I believe they look at things like the

14   educational level required for the job, the salary that

15   is paid for the job, the responsibilities that the job

16   entails.

17            I haven't been in compensation for awhile so

18   I can't remember all of that.  But, yes, all of our jobs

19   go through the testing.

20       Q.    And so if Linda Blozis or another portfolio

21   administrator worked more than 37.5 hours in a week, they

22   are not paid overtime?

23       A.    No.

24       Q.    As far as the portfolio officers, what is the

Rosemary Curtis Thomas

1  function of the portfolio officer?

2      A.   The portfolio officer, the portfolio officer

3  manages or oversees a portfolio or the portfolios of a

4  Private Wealth Management client.  So it is their

5  responsibility to make sure that someone is watching over

6  the portfolio, hopefully that it is making money, that

7  the funds are allocated properly.

8           Now, they do not select the stocks or the

9  funds, but they monitor what has been selected.

10     Q.   Okay.  They do not select the stocks or funds.

11  Who selects the stocks or funds?

12     A.   That's a special group in Boston.

13     Q.   What is that group called?

14     A.   Maybe Funds Management.  I'm not really sure.

15  But that's done in Boston.

16           The portfolio officer is like a relationship

17  person to a degree.  They make sure the relationships

18  were going smoothly with the clients, they are having

19  meetings with them, they are talking about their

20  accounts, they are answering their questions.  It is

21  almost like a relationship function.

22     Q.   And if the client at some point in time says,

23  "Well, I've had my assets with Mellon for five years and

24  I think I'm going to shift some things around, sell some

Rosemary Curtis Thomas

1    things, buy some things," who would the client go to?

2         A.    The client would go to the portfolio officer.    In

3    some cases the client may call the portfolio

4    administrator, but the portfolio administrator would need

5    to consult with the portfolio officer.

6         Q.    So portfolio administrators wouldn't make the

7    investment decisions for the client?

8         A.    No.

9         Q.    Or make recommendations for the client's funds?

10        A.    Not with the client they wouldn't.    I mean, you

11   know, we would hope that they would certainly understand

12   what is going on with the funds and maybe even be able to

13   make some recommendations to the portfolio officer after

14   reviewing the funds -- I mean reviewing the accounts and

15   being familiar with them.

16        Q.    But as far as the ultimate investment

17   recommendations, they would be made by the portfolio

18   officer?

19        A.    Yes.

20        Q.    And is the portfolio officer also called an

21   investment adviser, or is that something else?

22        A.    They could be called an investment officer.

23        Q.    An investment officer or portfolio officer?

24        A.    Yes.

Rosemary Curtis Thomas

1    Q.    Have you ever heard a term "investment adviser"?

2    A.    I have, but typically that term is more

3    associated with our private banking group than with the

4    investment managers.

5    Q.    How is the private banking group different from

6    the private wealth group that we have been talking about?

7    A.    The private banking group is a group that is

8    separate from investment management.  They handle the

9    private wealth clients who may possibly want loans for

10   businesses or for mortgages.  And we have people that sit

11   in these places called wealth offices.  They are kind of

12   like branches, but we don't have branches anymore.  And

13   you would typically find an investment adviser in a

14   wealth office and not in one of the main offices.

15   Q.    Can portfolio administrators receive training on

16   things such as product knowledge?

17   A.    Yes.

18   Q.    And is training for portfolio administrators, is

19   that a mandatory event that occurs on a recurring basis?

20   A.    We have training for all the Private Wealth

21   Management employees.  We have certain training that is

22   set up to happen at least once a quarter.  We have ad hoc

23   training as the products change.  And, yes, we would ask

24   everyone to attend those trainings.

63

Rosemary Curtis Thomas

1     Q.    When you say "we would ask everyone," is it like
2    you are required to attend X amount of training or you
3    are required to attend this training event?  Or this is a
4    training event, if you can work it into your schedule we
5    encourage you to attend it?
6     A.    Well, I don't think we would usually say that you
7    are required to attend X amount.  But you would be
8    required or requested to attend any training that was
9    given, because you would need it to be updated on the
10   system and the products.
11    Q.    So it is a mandatory type of a training?
12    A.    Yes, basically.
13    Q.    If your portfolio officer needs you to get a
14   client booklet done and there is a training in the same
15   day, how does that work?  Is there provisions for, is
16   this something that can be rescheduled?
17          MS. WILSON:  Objection to form.  You can
18   answer.
19    A.    Okay.  Hopefully, you would be able to put that
20   booklet together after the training.
21    Q.    When Mellon changed the role of portfolio
22   administrator, did Mellon find that some individuals were
23   not qualified to meet the expectations of the increased
24   role?

**B643**

64

Rosemary Curtis Thomas

1          MS. WILSON:  Objection to form.  You can
2     answer.
3     A.    I don't know if I would use the word "not
4     qualified."  We found that some people did not want to do
5     the job as it was, once it was changed.  We found that
6     others had more of a difficult time doing it.
7          But, you know, we definitely try to work
8     with people who are having a difficult time doing it as
9     opposed to those who just didn't want to do it.  I mean,
10    you know, some people just chose to leave.
11    Q.    And folks who chose to leave because they did not
12    want to do the job or folks who had difficulty doing the
13    job and eventually left, were some folks offered
14    severance packages?
15    A.    We would not offer severance packages if someone
16    decided that they didn't want to do the job and leave,
17    because we were going to replace them, so that didn't
18    mean that -- we would only offer a severance package if
19    the job was going away.  But if we were going to replace
20    that job, we wouldn't offer a severance package.
21         Now, if someone came to us and said, you
22    know, I'm really having a difficult time with this, and I
23    think I need to look on the outside for another job, we
24    would try to work with them and work within their time

**B644**

65

Rosemary Curtis Thomas

1    frame to assist them, to help their transition out of the

2    company.

3        Q.    Okay.   So maybe I'm using the wrong term by using

4    severance, but the folks that Mellon did help transition

5    out of the company into other careers, were they offered

6    any kind of separation package?

7        A.    No.   Just as a courtesy to an employee, we would

8    try to work with them, but that would not be a severance

9    situation.

10       Q.    Was anybody who transitioned out of the company

11   offered any compensation?

12       A.    No, not that I am aware of.

13       Q.    Can portfolio administrators receive bonuses?

14       A.    Yes, they can.

15       Q.    How were bonuses determined for portfolio

16   administrators?

17       A.    Typically the department head or the group head

18   is given a bonus allocation.   Now, that bonus allocation

19   has to cover everyone who is eligible, so not only

20   portfolio administrators but all the portfolio officers.

21              They would look at an individual's

22   performance for the year, as well as other considerations

23   that would be offered by their manager, in determining

24   what that amount, what the amount of the bonus would be.

66

Rosemary Curtis Thomas

1    Q.    And who determines what kind of a bonus

2    allocation the department head is given?

3    A.    That would be done at the top levels of Private

4    Wealth Management so I'm really -- I'm not sure exactly

5    who.

6    Q.    Is there any company policy or rule about

7    determining bonuses?

8    A.    You could be eligible for a bonus, but you do not

9    necessarily have to receive the bonus.  That is at

10   manager's discretion.

11   Q.    And as far as the bonus allocation, would that be

12   based on the overall performance of the company or

13   something else?

14   A.    I believe it would be based on the overall

15   performance of the group, the Private Wealth Management

16   group for us.  We may have another, another group within

17   the company that is doing really well and brought in a

18   lot of money, and Private Wealth Management may not have

19   been doing that well, so, consequently, doesn't have as

20   much for bonuses.

21   Q.    What would be a typical bonus for a portfolio

22   administrator in the Delaware office?

23            MS. WILSON:  Objection to form.  You can

24   answer.

**B646**

Rosemary Curtis Thomas

1    A.   That would really be hard to say.  There, you

2  know, is no just, quote-unquote, typical.  So I really

3  couldn't answer that.

4    Q.   So you told us that at some higher level a

5  decision is made to give a bonus allocation to a

6  department head, such as -- well, in this instance, who

7  is the department head that we are talking about?

8    A.   Okay.  What I'm talking about, the department

9  head I'm talking about all the way up to the vice chair

10  of the Private Wealth Management group, because as the

11  vice chairman of that group he is responsible for all of

12  Private Wealth Management, and he would get an

13  allocation, and that allocation would have to be broken

14  down amongst the various groups that report into him.  So

15  that's about as much as I can tell you about that.  But

16  it is kind of complicated.

17    Q.   And then within Gilmore's team would Gilmore be

18  responsible for divvying up the bonus allocation based on

19  his discretion with regard to the portfolio officers and

20  portfolio administrators' performance?

21    A.   Okay.  Typically at Brendan's level, we would

22  have him, as a manager, make his recommendations.  That

23  would not be the final say so.

24    Q.   Who would have the final say?

**B647**

Rosemary Curtis Thomas

1    A.    The president, the regional president and

2    chairman of Private Wealth Management.  At the time that

3    Linda was here it was Paul Kochis.

4    Q.    As far as the portfolio administrator's workload,

5    in 2002 and 2003, isn't it true that Linda Blozis was

6    instructed not to ask for help with her workload with

7    respect to her fellow portfolio administrators?

8              MS. WILSON:  Objection to form.  You can

9    answer.

10   A.    I'm not aware of that.

11   Q.    Were you aware of Gilmore and Landis criticizing

12   plaintiff for leaving a booklet for Maria Dunlop to bind?

13   A.    I am aware that they were concerned that she did

14   not finish an assignment which entailed finishing a

15   booklet and that Maria ultimately had to end up doing it.

16   Q.    Was that in 2002 or 2003, approximately?

17   A.    I believe it was in 2003.  I'm not sure, though.

18   It could have been the end of 2002 or early 2003.

19   Q.    Was Linda Blozis ever given any disciplinary

20   action for that event?

21   A.    She was given a corrective action document in

22   2003 for unsatisfactory performance.  I do not know if

23   that particular incident was cited in the corrective

24   communication document.

**B648**

69

Rosemary Curtis Thomas

1    Q.    Was that corrective action document something

2    called a final written warning?

3    A.    Yes.

4    Q.    What are the defendant's or what are Mellon's

5    rules or policies with regard to vacation for portfolio

6    administrators?

7    A.    Our vacation policies are the same for all

8    employees, so they wouldn't be special for portfolio

9    administrators.

10    Q.    What are they?

11    A.    We have a schedule in our employee handbook that

12    let's you know how many weeks or days of vacation you are

13    entitled to, and that is based on your salary grade and

14    whether you are exempt or nonexempt, and any vacation has

15    to be approved by your manager.

16          We ask employees to give us as good of a

17    schedule as they can at the beginning of the year,

18    realizing that that could change, but at least so we have

19    an idea, because we always want to make sure that there

20    is adequate coverage in the office.  So we usually ask

21    all employees to give us the schedule, and the manager

22    reviews the schedule.  Sometimes he will see a conflict.

23    Everybody might want to be off for the same holiday.  The

24    manager would go back and talk to the employees and

70

Rosemary Curtis Thomas

1    explain that, you know, there has to be some type of a

2    compromise here because we need adequate coverage.

3         Q.   So a manager can deny a vacation request if there

4    is a scheduling conflict such as multiple employees

5    wanting to take off on the same holiday?

6         A.   Yes.

7         Q.   Who would be responsible for granting or denying

8    Linda Blozis' vacation request?

9         A.   I would assume that it would start with someone

10   in the office and then go up to Brendan.

11        Q.   Would the same be true for the vacation requests

12   of Maria Dunlop?

13        A.   Yes.

14        Q.   Can you describe your duties to us?

15        A.   Yes.  I'm the Human Resources Business Partner

16   for the Private Wealth Management group in the

17   Mid-Atlantic Region.  I should say the Senior Human

18   Resources Business Partner.  And it is my job

19   responsibility to partner with my lines of business, to

20   make sure that all of the HR functions and initiatives

21   are carried out.

22        Q.   And does Mellon have policies against age

23   discrimination in employment?

24        A.   Yes, we do.

**B650**

Rosemary Curtis Thomas

1    Q.    Does Mellon have policies against sex

2    discrimination in employment?

3    A.    Yes.

4    Q.    Does Mellon have policies against retaliation for

5    complaining of discrimination in the work place?

6    A.    Yes.

7    Q.    And you are aware it is illegal to discriminate

8    in employment based on someone's age?

9    A.    Definitely.

10    Q.    And you are aware that it is illegal to

11    discriminate in employment against an employee based on

12    the individual's sex?

13    A.    Yes.

14    Q.    And you are aware that it is illegal to retaliate

15    against an employee based on a discrimination complaint?

16    A.    Yes.

17    Q.    And if an employee feels they have been subject

18    to discrimination, does Mellon have a HR policy or a

19    policy on discrimination complaints?

20    A.    Yes.

21    Q.    Okay.  And what is your understanding of what

22    that policy is?

23    A.    If a person feels that they are being

24    discriminated against, they can go to their manager.  If

72

Rosemary Curtis Thomas

1  they feel that the problem is with their manager, they

2  can go to their human resources person, which would be

3  me.

4          If they want to go to someone else, there is

5  a third forum or a person they can go to which would be

6  Employee Relations.

7     Q.   Okay.  So they can go to their manager, they can

8  go to the Employee Relations or they can go to you?

9     A.   Mm-hmm.  Or, I'm sorry, they can go to their

10  manager's manager.

11    Q.   And did there come a point in time in 2003 when

12  Linda Blozis came to you about an employment

13  discrimination issue?

14    A.   I had a meeting with Linda in 2003, after a

15  meeting that she had had with Brendan Gilmore, and she

16  felt that some of Brendan's comments to her were based on

17  age discrimination.

18    Q.   Okay.  I'm going to show you a document, ask that

19  it be marked as Exhibit, I believe it is Exhibit 4.

20          (Thomas Deposition Exhibit 4 was marked for

21  identification.)

22    Q.   Take a moment to review this two-page document.

23          Have you had a chance to read that?

24    A.   Yes.

Rosemary Curtis Thomas

1    Q.    I'll represent to you that this document says

2    MEL/BLOZ 468, on the second page MEL/BLOZ 469 at the

3    bottom right-hand corner.  Have you seen a copy of this

4    document before?

5    A.    Yes.

6    Q.    And what is this document?

7    A.    These are notes that I took after a phone call or

8    on a phone call with Linda.

9    Q.    Okay.  This is in cursive handwriting?

10   A.    Yes, and not quite good cursive handwriting

11   either.

12   Q.    Okay.  Fair.  Fair enough.  But not the most

13   illegible handwriting either.

14         So can you walk us through and read out loud

15   what you wrote on this, starting with this first page?

16   A.    Yes.  Okay.  I said "Linda's meeting with Brenda

17   Gilmore, tone and timber of voice so disruptive to other

18   staff members, demeaning and degrading."  And she "Said

19   age discrimination."

20         And then I'm quoting what she said Brendan

21   said, "Other assistants are producing a lot more," or "a

22   lot more and a lot faster."  So "Other assistants

23   producing a lot more and a lot faster.

24         "He hollered at Linda.  Linda went to Gregg

**B653**

Rosemary Curtis Thomas

1   to see if Becker's group could do."  That meant do the

2   work that she was assigned to do.

3           "Bill talked to Brendan.  Brendan came to

4   see her."  That means Brendan came down to Delaware to

5   talk with her.

6           She said, "It only occurred last week to her

7   that they could not finish," she could not finish the

8   assignment on time.

9           "Linda and Maria did get the job done."

10          And then she goes on to say, "Brendan can

11  come and go with no one watching him."  And we talk about

12  a "Skills assessment" and "Has not refused," which means

13  she did not refuse to do the skills assessment.

14          And the skills assessment was something that

15  we had asked all of the portfolio administrators to

16  complete, so we could get a handle on where they were

17  with their skills and would be able to assist them where

18  we felt that they were lacking.

19      Q.  So what is the date you have put on the top

20  right-hand corner of this?

21      A.  5/01/03.

22      Q.  Did you make these notes the same day you met

23  with Miss Blozis?

24      A.  I made them the same day.  Might not have been

Rosemary Curtis Thomas

1    when I was on the phone with her, but a lot of times I'll

2    go back and write things down after I've gotten off the

3    phone, because I may get distracted once I get off the

4    phone, I may have another call or something, but I try to

5    write them in the same day.

6        Q.    So to the best of your recollection, these were

7    taken the same day that she came to you?

8        A.    Mm-hmm.

9        Q.    I'm sorry?

10               MS. WILSON:   Yes?

11       A.    Yes.  I'm sorry.

12       Q.    And she had complained about age discrimination

13   by Brendan Gilmore?

14       A.    Yes.

15       Q.    So was Miss Blozis following the proper channels

16   and the proper policy by coming to you with an age

17   discrimination complaint?

18       A.    Yes.  And I think I'm looking at the order of the

19   notes and it says "age discrimination" and typically if

20   someone says that to me, any type of discrimination, I

21   ask them why, why do you feel that way, and that's when

22   she said that Brendan said to her the "Other assistants

23   are producing a lot more and a lot faster."

24       Q.    And what was the next two words?

Rosemary Curtis Thomas

1    A.    Then I have "age discrimination" again, and she

2    felt that that was age discrimination because he referred

3    to the other assistants who she said were younger than

4    her.

5    Q.    I think you have told us too that no one was

6    older, none of the other portfolio administrators were

7    older than her?

8    A.    To my knowledge, none of them were older than

9    her, but there were definitely other portfolio

10    administrators who were over 40.

11    Q.    With regard to Mellon's policies and procedures,

12    what did you do next after recording these notes?

13    A.    Okay.

14    Q.    With regard to this issue?

15    A.    I called Tom Galante.  And Tom Galante is our

16    Employee Relations person.  And I discussed the

17    conversation that I had with Linda with Tom.

18    Q.    What did you do next?

19    A.    Tom said that he would contact Brendan to have a

20    discussion with him about this, and I remember then

21    calling the office in Delaware and talking to Maria

22    Bannister, who is the other portfolio administrator

23    there, and asking her about this incident, did she hear

24    anything, did she hear what Brendan said.

**B656**

Rosemary Curtis Thomas

1           And as I recall, Maria said that there was
2   some noise, louder noise surrounding their conversation,
3   but it appears that they were in an office so she did not
4   hear, you know, what was being said.  She could just hear
5   that they were talking in elevated voices.
6           I talked to Brendan about the age
7   discrimination, and then I circled back around to meet
8   with Tom Galante and to discuss this some more.  And we
9   determined from the conversations that we had with
10  people, in looking at the situation, that we did not see
11  evidence of age discrimination.
12      Q.   Okay.  You said the conversations that we had
13  with people?
14      A.   Yes.
15      Q.   Other than Brendan Gilmore and Maria Bannister --
16      A.   I talked with Gregg Landis and Bill Becker.
17      Q.   Okay.  Other than them, did you interview anyone
18  else?
19      A.   I believe I spoke with Marion Marano, because
20  Marion was the other person in the group that would have
21  been closest to Linda's age.
22      Q.   Was she someone who was stationed in
23  Philadelphia?
24      A.   Yes.

Rosemary Curtis Thomas

1    Q.    After you made a determination about this issue,

2   was it decided that any further action should be taken?

3    A.    We determined that the actions were not based on

4   age discrimination, and I got back to Linda to have a

5   conversation with her about it.

6    Q.    Aside from Maria Dunlop, who that you interviewed

7   indicated that they overheard the conversation between

8   Linda Blozis and Brendan Gilmore?

9    A.    Only Maria.  And like I said, she said she could

10  hear that their voices were elevated, but she didn't hear

11  what they were saying.

12   Q.    Is it Mellon's policy for human resources to open

13  up a confidential file when an HR complaint is made?

14   A.    I don't think I understand what you are saying.

15   Q.    Was any kind of a file, internal file, opened up

16  regarding this complaint?

17   A.    In other words, would I have notes in a file,

18  separate file regarding the complaint?

19   Q.    Yes.

20   A.    It is not our policy to necessarily do that, no.

21   Q.    Did you do that?

22   A.    I -- you know, I am sure that I jotted down

23  something else.  I'm not quite sure what happened to it.

24  Tom would probably have more notes than I would.

**B658**

Rosemary Curtis Thomas

1    Q.    Tom Galante?

2    A.    Yes.

3              MR. LAROSA:  To the extent that there is any

4    other notes by Miss Thomas, we would request those notes.

5              MS. WILSON:  John, if you can just put that

6    in a letter, I would take it under advisement.

7              MR. LAROSA:  Sure.

8              THE WITNESS:  I would say I transitioned

9    offices and, unfortunately, some of my records could have

10   been destroyed in that transition.

11   BY MR. LAROSA:

12   Q.    When did you transition offices?

13   A.    It was right around this time.  I don't remember

14   exactly.  But I was on another floor in the building and

15   I moved up to the eighth floor.

16   Q.    When you moved up to the eighth floor did you

17   find that some of your things were missing or destroyed?

18   A.    I found that as I was putting things back in the

19   file, there were some things that I thought I had that I

20   did not see.

21   Q.    As far as disciplinary action, does Mellon have a

22   form of disciplinary action called a final written

23   warning?

24   A.    Yes, we have a corrective action process.  The

**B659**

80

Rosemary Curtis Thomas

1    process is initial warning, final written warning, and

2    the third stage would be termination.  When we terminate

3    we do not type up the warning to give to the employee at

4    that point.

5        Q.   Because they have already received a final

6    written warning?

7        A.   Yes.

8        Q.   Prior to that?

9        A.   Yes.  And the final written warning states if

10   there is not continued, and some other word they use in

11   there, improvement, sustained -- continued and sustained

12   improvement, that it could lead to the next stage of the

13   corrective action policy, up to and including

14   termination.

15       Q.   So there were no other written reprimands in

16   Linda Blozis' file other than the final written warning?

17       A.   Correct.  And I can explain that.

18       Q.   Okay.  Go ahead.

19       A.   Okay.  In one of Linda's performance reviews, the

20   one that she was rated needs improvement, it is stated if

21   you are rated at that level, that that would be an

22   initial warning to you.  She was given that initial

23   warning in the review, which is not uncommon if you are

24   rated at that level to get an initial warning with your

**B660**

Rosemary Curtis Thomas

1   performance review.

2       Q.   Is there any other way that initial written

3   warning can be given?

4       A.   It could be -- we could write out an initial

5   written warning in a memo like her final written warning.

6   Or if whatever has transpired is so egregious, we can

7   just go right into a final written warning, and that is

8   stated in the employee handbook.

9       Q.   Okay.  And I think on what you have told us about

10  this progressive discipline policy, progressive

11  discipline policy doesn't even always apply if something

12  is so egregious an employee can be terminated

13  immediately?

14      A.   Yes.

15      Q.   Isn't that correct?

16      A.   Yes.

17      Q.   For certain, I believe they are called

18  intolerable offenses?

19      A.   Intolerable offense.  And, again, they are stated

20  in the employee handbook.

21      Q.   Then there is other situations that fall more

22  under this general category of performance management

23  where I think you have told us earlier in the deposition

24  that we try to work with folks, particularly if a

**B661**

Rosemary Curtis Thomas

1   portfolio manager is having difficulty trying to do the

2   job, and we try to counsel them and do performance

3   management, is that accurate?

4        A.   Yes.

5        Q.   And is that where this progressive discipline

6   policy or corrective action policy that includes initial

7   written warning, final written warning, and then

8   ultimately termination comes into play?

9        A.   Yes, you could say that.

10       Q.   Okay.  And so Linda Blozis, the action taken

11  against her came under this progressive discipline

12  policy; is that correct?

13       A.   Yes.

14       Q.   This wasn't a situation where she committed an

15  intolerable offense and was subject to immediate

16  termination; is that correct?

17            MS. WILSON:  Objection to form.  You can

18  answer.

19       A.   Correct.

20       Q.   This wasn't a situation where her performance or

21  conduct was so egregious that Mellon thought let's

22  escalate it immediately to final written warning and then

23  termination later?

24            MS. WILSON:  Objection to form.  You can

**B662**

Rosemary Curtis Thomas

1    answer.

2        A.    That's correct.  And you will notice in her

3    corrective communication document that her manager says

4    if there is any way that I can help you, if I can provide

5    coaching, counseling, something to that effect, please

6    let me know, and we will work with that.

7        Q.    And so I'm just trying to get the scenarios in my

8    mind straight.  There is a progressive discipline policy,

9    then there is intolerable offense, and then there is

10   egregious offense, where it could be escalated up to

11   final written warning immediately?

12       A.    Mm-hmm.

13       Q.    But the track that Linda Blozis was on was on the

14   progressive discipline policy tract, with the three

15   steps?

16       A.    Yes.

17       Q.    As far as the write-up, it was a final written

18   warning from Brendan Gilmore; is that correct?

19       A.    Yes.

20       Q.    And part of the reason why Linda Blozis was

21   written up was for not meeting Brendan Gilmore's

22   expectations; is that accurate?

23       A.    Yes.

24       Q.    And part of the problem, I think some of the

**B663**

Rosemary Curtis Thomas

1    criticism with regard to Linda Blozis, which may be on

2    this final written warning, is attention to detail, they

3    weren't happy with her attention to detail; is that

4    correct?

5        A.    As I recall, I believe that was mentioned, yes.

6        Q.    I'm going to show you a document, ask that it be

7    marked Exhibit 5.

8                  (Thomas Deposition Exhibit 5 was marked for

9    identification.)

10       Q.    Take a minute and read through that.

11       A.    Okay.

12       Q.    I'll represent to you that this is two pages

13   marked in the lower right-hand corner MEL/BLOZ 470 and

14   471.  Have you seen these pages before?

15       A.    Yes.

16       Q.    And are these copies of the final written warning

17   for performance that was given to Linda Blozis?

18       A.    Yes.

19       Q.    These are two different documents, aren't they?

20       A.    Well, I see one is signed.

21       Q.    Aside from one is a signed version, looking,

22   calling your attention to the top left-hand corner of the

23   first page and the top left-hand corner of the second

24   page, is there any other difference in the two documents?

**B664**

85

Rosemary Curtis Thomas

1    A.    Yes, the date.  It looks like it was ultimately

2    delivered on May 19th, and this first copy was sent to

3    the --

4              (Discussion off the record.)

5    A.    -- manager on May 14th for his review.

6    Q.    I'm sorry, you said it was delivered on May 14th?

7    A.    It was, it looks like it was originally sent to

8    the manager on May 14th for his review, but it wasn't

9    delivered to Linda until May 19th, so we changed the date

10   to be consistent with the timing of the meeting with

11   Linda.

12   Q.    Okay.  So the one that was ultimately finalized,

13   dated or updated, and delivered, and eventually signed by

14   Linda Blozis is the second page that's marked MEL/BLOZ

15   471?

16   A.    Yes.

17   Q.    Who authored this document?

18   A.    I prepared this document.  I got the information

19   for the preparation from Gregg Landis and Brendan.

20   Q.    And then who would ultimately review this

21   document to make sure it was finalized and correct, with

22   the correct date and so forth?

23   A.    I have the responsibility of ultimately reviewing

24   this and giving to the managers for their review.

**B665**

Rosemary Curtis Thomas

1    However, this document would have also been reviewed by

2    Tom Galante because of the circumstances, the

3    circumstances being our sensitivity to the fact that she

4    had talked about age discrimination.

5        Q.    And did this document also have to be read,

6    reviewed and approved by Brendan Gilmore?

7        A.    Yes.

8        Q.    Will you read the last sentence of the document

9    before Miss Blozis' signature out loud, on the record for

10   us?

11       A.    Sure.   "However, if your performance continues to

12   not meet my expectations, you may be subject to further

13   corrective action up to and including termination of your

14   employment" -- "of our employment."

15       Q.    When it says "our employment" does that mean her

16   employment?

17       A.    It should have been "your employment."

18       Q.    Is that a detail that should have been corrected

19   by Mr. Gilmore?

20       A.    I guess, unless he interpreted it to mean our

21   employment.

22       Q.    Well, whose employment is being terminated?

23       A.    Linda's employment.

24       Q.    Just to put proper labels on things, the

Rosemary Curtis Thomas

1    three-step process that we talked about that you told us

2    was applicable to Miss Blozis, is that called the general

3    corrective action process?

4        A.    It is called the corrective action process.

5        Q.    Corrective action process?

6        A.    Mm-hmm.

7        Q.    Okay.  And that's different from an accelerated

8    corrective action?

9        A.    Well, there is two different processes.  There is

10   the corrective action process, the three-step process,

11   initial, final and termination.  In the event of an

12   intolerable offense you could go directly to

13   determination.

14              In the event that -- well, I'll just leave

15   it at that, you could go directly to termination.  And

16   again, the whole process is explained in the employee

17   handbook, which is accessible to all employees online.

18       Q.    I'm going to show you a document and ask it be

19   marked Exhibit 6.

20              (Thomas Deposition Exhibit 6 was marked for

21   identification.)

22       Q.    For the record, this is a document marked

23   MEL/BLOZ 761 at the bottom right-hand corner.  Have you

24   seen this e-mail before?

88

Rosemary Curtis Thomas

1    A.    I think I did see it in the files.

2    Q.    And is this an e-mail from Gregg Landis?

3    A.    Mm-hmm.

4    Q.    I'm sorry?

5    A.    Yes.

6    Q.    And was this sent to Linda Blozis?

7    A.    Yes.

8    Q.    And when was this sent?

9    A.    March 5th, 2003.

10    Q.    Are portfolio officers responsible for doing some

11    type of planning for their portfolio administrators?

12    A.    Yes.

13    Q.    What type of planning are they responsible for

14    doing?

15    A.    Planning their goals for the year.

16    Q.    Anything else?

17    A.    In reference to this, it appears that they are

18    talking about performance management, and he says he is

19    going to be 2003 planning, that would be goal planning,

20    as I interpret it.

21    Q.    And as far as the year goes, is it based on an

22    anniversary date or is it based on the calendar year

23    starting on January 1st each year?

24    A.    We start the process of reviewing people -- okay.

89

Rosemary Curtis Thomas

1   For the year 2006, we would start the review process in

2   approximately November.  Okay.  We tell managers, "Start

3   looking at your people, have them do a self assessment.

4   We will take a look at that.  You start to do your

5   assessment.  We want it completed by January of 2007.

6   And we want you to give them their goals for the year no

7   later than March of 2007 for 2007."

8              So it sounds a little convoluted.  We are a

9   little late in doing it, but that's our process right

10  now.

11      Q.   But by March, March 1st they should have goals

12  for their people, portfolio officers?

13      A.   During March -- by the end of March they should

14  have had the goals done.  So this is March 5th, and by

15  the end of March he should have had the goals completed

16  and discuss them with the employee.

17      Q.   When an employee's performance is evaluated on

18  their evaluation say for the year --

19      A.   Mm-hmm.

20      Q.   -- 2003, does that cover the months during which

21  they had these goals in place or does that cover January

22  1st to December 31st?

23      A.   Basically, the months they have the goals in

24  place.  We have to take that into consideration.

Rosemary Curtis Thomas

1      Q.    So if there is performance issues in January or

2   February before the goals are in place, they are not held

3   against the employee because no goals are in place at

4   that time?

5              MS. WILSON:   Objection to form.   You can

6   answer.

7      A.    If there are performance issues they could

8   definitely be held against the employee, because they

9   would not necessarily have to be relevant to the goals.

10             I mean, there could be a performance issue

11  like not completing your assignments on time, no

12  attention to detail, that's just general.   That's not --

13  you know, the goals are the projects that you are going

14  to be working on.

15             In this document he would have been

16  referring -- he would have just been referring to her

17  performance evaluation for 2002, he would have just

18  finished that in January and would have been starting to

19  work on the goals for 2003.   So she would have just been

20  rated for 2002 at this point.

21     Q.    Okay.   Miss Blozis eventually was told that her

22  employment was terminated on a Monday; is that correct?

23     A.    I'm not sure of the date.

24     Q.    When she was terminated she was told she would be

Rosemary Curtis Thomas

1    paid to the end of the week; is that correct?

2        A.    I don't remember.

3        Q.    At some point in time did Mellon hire a Lauren

4    Shannon?

5        A.    Yes, Laura Shannon.

6        Q.    Laura Shannon?

7        A.    Mm-hmm.

8        Q.    Is she a portfolio administrator?

9        A.    She was hired as a portfolio administrator, yes.

10       Q.    Is she currently a portfolio administrator?

11       A.    She no longer works with the company.

12       Q.    When did her employment end?

13       A.    I don't remember exactly.  I would say over a

14   year ago.

15       Q.    So some time in 2005?

16       A.    2005.  It could have been the end of 2004.

17       Q.    Some time in the end of 2004 or 2005,

18   approximately?

19       A.    Yes, mm-hmm.  Yes.

20       Q.    When did she begin working for Mellon?

21       A.    I don't remember exactly.

22       Q.    Do you think it was in 2003 or 2004?

23       A.    2003, perhaps, approximately.

24       Q.    And did she eventually replace Linda Blozis?

Rosemary Curtis Thomas

1    A.    Yes.

2    Q.    Who was Laura Shannon's direct report?

3    A.    She would have reported directly to Gregg Landis.

4    Q.    And she is not responsible for telephone

5    reception; is that accurate?  Or she was not?

6              MS. WILSON:  Objection to form.  You can

7    answer.

8    A.    She would have been responsible for answering her

9    phone, like everybody else in the office.  Again, we

10   don't have a receptionist, so everyone picks up their own

11   phone.

12   Q.    And other than what everyone else did in the

13   office, she had no additional responsibilities with

14   regard to mail delivery?

15             MS. WILSON:  Objection to form.  You can

16   answer.

17   A.    It would have been the same as with Linda.  She

18   would have, you know, picked up her mail.

19   Q.    With regard to equipment maintenance, she would

20   have no additional responsibilities other than what

21   everyone else is responsible for?

22   A.    Again, it would have been the same as with Linda.

23   We have people that fix our equipment and she would have

24   had the phone number.  You can contact them.  We all have

Rosemary Curtis Thomas

1    that number.

2        Q.    With regard to training new employees, to the

3    best of your recollection, did she ever train any new

4    employees, Laura Shannon?

5        A.    I don't know.  I don't know of any new employees

6    being in the office when Linda was there.

7        Q.    When Laura was there?

8        A.    When Laura was there, I mean.  I'm sorry.

9        Q.    With regard to handling cash transactions, would

10   she have had any responsibility for that?

11       A.    I do not know.  I'm not aware of anybody handling

12   cash transactions.

13       Q.    With regard to opening new accounts, would Laura

14   Shannon have had any responsibility for that?

15       A.    I don't know.

16       Q.    With regard to terminating accounts, would Laura

17   Shannon have had any responsibility for that?

18       A.    I believe that's a responsibility of the job.

19       Q.    During the time she worked with Mellon, Laura

20   Shannon was in her thirties; is that correct?

21       A.    I believe so.

22            MR. LAROSA:  I think I would like to take a

23   five-minute break.  I think we are close to wrapping up

24   for the day.

**B673**

Rosemary Curtis Thomas

1          (Recess taken.)

2          MR. LAROSA:  Back on the record.  Just to

3    finish things up, I don't think I have any other

4    questions for you today, Miss Thomas.

5          There is outstanding documentary discovery,

6    and we have received some documentary discovery,

7    responses, some documentary responses we have received

8    objections and no responsive documents.  So we may be

9    doing a motion to compel.  And subject to us doing that

10   type of a motion and gaining new documents, and to the

11   extent I would have additional questions on those new

12   documents only, that's the only other thing I would

13   reserve.  Other than that, we are able to go off the

14   record now today.

15         MS. WILSON:  You are finished with Rosemary

16   per your caveat there?

17         MR. LAROSA:  Yes.

18         MS. WILSON:  All right.

19         (Proceedings conclude at 12:3 p.m.)

20

21

22

23

24

95

```
 1
 2                    I N D E X
 3  DEPONENT:   ROSEMARY CURTIS THOMAS              PAGE
 4      Examination by Mr. LaRosa                    2
 5
 6                  E X H I B I T S
 7  THOMAS DEPOSITION EXHIBITS                      MARKED
 8  1 - 10/8/02 Becker to Blozis e-mail              26
 9  2 - 10/18/02 Olney to Kochis, Gilmore, Thomas
        e-mail                                       27
10
    3 - Employee Profile/History                     30
11
    4 - 5/1/03 Handwritten notes                     72
12
    5 - 5/19/03 Final Written Warning                84
13
    6 - 3/5/03 Landis to Blozis e-mail               87
14
15  ERRATA SHEET/DEPONENT'S SIGNATURE            PAGE 96
16  CERTIFICATE OF REPORTER                      PAGE 97
17
18
19
20
21
22
23
24
```

**B675**

96

```
 1
 2
 3
 4          REPLACE THIS PAGE
 5          WITH THE ERRATA SHEET
 6          AFTER IT HAS BEEN
 7          COMPLETED AND SIGNED
 8          BY THE DEPONENT.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

97

```
 1   State of Delaware )
                      )
 2   New Castle County )

 3

 4                   CERTIFICATE OF REPORTER

 5
                 I, Eleanor J. Schwandt, Registered
 6   Professional Reporter and Notary Public, do hereby
     certify that there came before me on the 19th day of
 7   December, 2006, the deponent herein, ROSEMARY CURTIS
     THOMAS, who was duly sworn by me and thereafter examined
 8   by counsel for the respective parties; that the questions
     asked of said deponent and the answers given were taken
 9   down by me in Stenotype notes and thereafter transcribed
     by use of computer-aided transcription and computer
10   printer under my direction.

11               I further certify that the foregoing is a
     true and correct transcript of the testimony given at
12   said examination of said witness.

13               I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.

15

16

17                         Eleanor J. Schwandt

18                         Certification No. 125-RPR

19                         (Expires January 31, 2008)

20
     DATED:
21

22

23

24
```

**B677**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| | : |
| **LINDA J. BLOZIS** | **: CIVIL ACTION NO. 05-891 (SLR)** |
| **Plaintiff,** | : |
| **vs.** | : **DECLARATION OF** |
| | **ROSEMARY THOMAS** |
| **MELLON TRUST OF DELAWARE,** | : |
| **NATIONAL ASSOCIATION; MELLON** | |
| **BANK, NATIONAL ASSOCIATION;** | : |
| **MELLON FINANCIAL CORPORATION,** | |
| | : |
| **Defendants.** | |
| | : |

I, Rosemary Thomas, of full age, hereby certify and declare as follows based upon my own personal knowledge and information.

1.    I began working for Mellon in approximately 1979. I am currently employed as Senior Human Resources Business Partner for Mellon. My client area is Private Wealth Management for the Mid-Atlantic Region. I provided human resources support to the group in which Ms. Blozis was assigned during the relevant time period. During the relevant time period, Ms. Blozis was assigned to Mr. Gilmore's team. I have been authorized by Mellon to make this Declaration in support of its Motion for Summary Judgment in the above-captioned matter.

2.    Mellon provides a broad range of financial products and services for corporations and institutions such as investment management, trust and custody, foreign exchange, securities lending, performance analytics, fund administration, stock transfer, proxy solicitation, treasury management and banking services to affluent

individuals and trust and custody. One of the Mellon subsidiaries in the Private Wealth Management business is Mellon Trust of Delaware, National Association.

3.      The composition of Mr. Gilmore's Team changed over time in the Delaware and Philadelphia offices. For example, in 1998, the Delaware office consisted of Mr. Robert Bell, Assistant Portfolio Officer, Linda Squier, Portfolio Officer, Kathleen Agne, Portfolio Administrator, and William Becker, Portfolio Officer. Additionally, the other members located in the Philadelphia office were Hilda Ennis, Investment Specialist I, Deanna Coffin, Executive Secretary, Marian Marano, Portfolio Administrator, Bridget Vargo, Portfolio Officer, whose date of birth is November 4, 1969. Cindy Chambliss, Portfolio Administrator, whose date of birth is October 9, 1967 also reported to Mr. Gilmore in 1998. Mr. Bruce Holmquist, Portfolio Officer, whose date of birth is September 6, 1952 worked out of the Washington, D.C. office in 1998.

4.      Changes in personnel continued in the Delaware and Philadelphia offices. As non exclusive examples, Ms. Blozis joined in 1999; Ms. Vargo left in 2002; and Mr. Holmquist, Ms. Chambliss and Ms. Marano were still employed in 2003.

5.      Ms. Blozis, whose date of birth is December 10, 1945, was hired to work at Mellon Trust of Delaware on February 12, 1990 as an administrative secretary. She held several positions in the Mellon Private Asset Management group, located in Delaware with her last position being Portfolio Administrator. She started in this position on October 1, 1999 and remained in this position until her employment was terminated on July 19, 2003. During her tenure of employment with Mellon, Ms. Blozis was assigned only to work in the Delaware office and never worked in the Philadelphia or

- 2 -

Washington, D.C. offices. During the relevant period of time, Mr. Brendan Gilmore was the Team Leader for the Delaware office.

6.      Generally, the Portfolio Administrator is responsible for supporting the Senior Portfolio Officers who are responsible for the management of assigned client relationships. The client relationships include personal trusts, agency, estates, charitable, pensions, and institutional accounts. The Portfolio Administrator assists the Senior Portfolio Officer in articulating investment objectives and review accounts to ensure that they are meeting those objectives. They also help to ensure that the account is administered in accordance with the governing instrument and accepted fiduciary principles.

7.      The Portfolio Administrator's responsibilities grew over time and they were expected to do more, such as being in charge of their own accounts in many instances and being knowledgeable of Mellon's investment process. There was concern that Ms. Blozis could not meet these enhanced requirements because she was not meeting the more elementary ones.

8.      In my human resources role, I was aware of ongoing performance problems that Ms. Blozis had. As an example, her supervisor, Mr. Bill Becker sent me an e-mail on December 4, 2002 expressing concern about Ms. Blozis. After discussion with Mr. Becker and Mr. Becker's supervisor, Mr. Gilmore, it was decided that Ms. Blozis would be placed on corrective action.

9.      As part of its on-going efforts to assist employees with performance issues, Mellon has implemented a corrective action policy entitled Managing Performance Through Corrective Act, that is located in its Employee Handbook as well

- 3 -

as in other Mellon publications. In particular, the Handbook is available on Mellon's intranet and Blozis had access to it. Mellon's corrective action process is described in its Steps in Corrective Action Process and includes generally an Initial Written Warning, a Final Written Warning and Termination. In accordance with Mellon's policy it was decided that Ms. Blozis' 2002 performance review would constitute the Initial Written Warning. This process has been interpreted by Mellon, and in particular Mellon's human resources department whose job it is to interpret and implement Mellon's policies, to satisfy the requirements of providing an Initial Written Warning. A true and complete copy of Mellon's Handbook is attached hereto as **Exhibit 1.**

10.    Ms. Blozis' performance problems continued after she was given the Initial Written Warning in February 2003. One example, was a meeting between Mr. Gilmore and Ms. Blozis on April 30, 2003. After Mr. Gilmore's meeting with Ms. Blozis, he contacted me to discuss his concerns that Ms. Blozis' performance was not improving since, as an example, she had already missed a project deadline in direct contravention to the terms of her February 2003 Initial Written Warning. The Warning had specifically directed that there would be a "zero tolerance standard for lack of timely submission." Mr. Landis, Mr. Gilmore and I discussed Ms. Blozis' overall performance since February 2003 and because there had been no immediate and sustained improvement, it was determined that Ms. Blozis would be placed on a Final Written Warning. That determination was made on April 30, 2003. I took notes of the April 30 meeting, a true and complete copy of which is attached hereto as **Exhibit 2.**

11.    Mellon has a published Equal Employment Opportunity policy in its Handbook that prohibits discrimination on the basis of age, gender and other protected

- 4 -

B681

categories. The Handbook also contains a section prohibiting <u>Sexual And Other</u> <u>Discriminatory Harassment</u> coupled with a complaint procedure. Mellon's Corporate <u>Policy and Procedures Manual</u> also contains policies that prohibit discrimination and retaliation against employees, who among other things, file a complaint of discrimination.

12. The Manual is available to employees through the Company's intranet. True and complete copies of Mellon's Corporate Policy and Procedures Manual that relate to Equal Employment Opportunity, Employee Complaint/Appeal Process, Sexual and other Discriminatory Harassment, and Managing Performance and Conduct Through Corrective Action are attached hereto as **Exhibit 3**. Ms. Blozis availed herself of Mellon's policies on May 1, 2003 when she complained to me about Mr. Gilmore. She complained that Mr. Gilmore's statements were made to her because of age because he used profanity, had raised his voice, and had stated that younger workers did more work than her. However, Ms. Blozis acknowledged that Gilmore never used the term younger. I took notes of my meeting with Ms. Blozis. True and complete copies of my May 1, 2003 notes are attached hereto as **Exhibit 4**.

13. I advised Ms. Blozis that I would speak to Mr. Gilmore, which I did. Mr. Gilmore denied making any age discriminatory comments.

14. I also called Tom Galante in Employee Relations and discussed Ms. Blozis' complaint. I called Maria Dunlop and inquired if she had heard anything. Ms. Dunlop stated that she had heard elevated voices, but had not heard the substance of the conversation.

-5-

PRCLIB-436713.1-SWILSON 2/25/07 12:16 PM

B682

15.  · I also interviewed Mr. Landis, Mr. Becker and Ms. Marano. Although Ms. Marano was in the Philadelphia office, she was closest to Ms. Blozis in age. Ms. Marano's date of birth is January 28, 1953 and is one of the original members of Mr. Gilmore's team as she was on the team in 1998. Ms. Marano did not feel that Mr. Gilmore practiced age discrimination. After completion of the interviews, I conferred with Mr. Galante and it was determined that Mr. Gilmore did not engage in age discriminatory conduct. I then informed Ms. Blozis of the results of the investigation.

16.    While Ms. Blozis was on vacation in early May 2003, additional performance issues were found. Based on Ms. Blozis' historical performance problems and the more recent ones that he characterized as insubordination, Mr. Gilmore's supervisor, Mr. Paul Kochis, wanted to terminate Ms. Blozis' employment upon her return from vacation. However, after I had further discussion with Messrs. Kochis, Gilmore, and Landis, it was determined that Ms. Blozis would be put on a Final Written Warning, as it had been decided initially on April 30, instead of immediate termination. Before the Final Written Warning was given to Ms. Blozis on May 19, Mr. Landis discovered additional examples of performance deficiencies.

17.    In the wake of the continuing performance problems after Ms. Blozis' receipt of the Final Written Warning, Mr. Landis conferred with me and Mr. Gilmore concerning appropriate steps. As part of the decision making process, I, in turn, conferred with Mr. Galante and provided Mr. Galante with the reasons that support Ms. Blozis' termination. The consensus among Messrs. Galante, Gilmore, Landis and me was that Plaintiff's employment should be terminated. Consequently, Ms. Blozis'

- 6 -

PRCLIB-436713.1-SWILSON 2/25/07 12:16 PM

B683

employment was terminated on July 19, 2003 for performance reasons. A true and complete copy of my memorandum to Mr. Galante is attached hereto as **Exhibit 5**.

18.    After Ms. Blozis' employment was terminated, she filed a Charge with the EEOC that is dated May 7, 2004, a true and complete copy of which is attached hereto as **Exhibit 6**. After an investigation, the EEOC dismissed the Charge with a no probable cause finding.

19.    During 2002, no Portfolio Administrator on the Gilmore Team was on corrective action, except Ms. Blozis. Because Ms. Blozis was placed on corrective action for 2002 performance, she was ineligible for a bonus that was paid in 2003.

20.    Mr. Gilmore's date of birth is November 20, 1946 and, therefore, he is approximately one year younger than Blozis, whose date of birth is December 10, 1945.

21.    Other than the May 1 internal age complaint, Ms. Blozis has not made any internal complaints based on age or sex or any other protected categories to me or anyone else in human resources.

- 7 -

PRCLIB-436713.1-SWILSON 2/25/07 2.11 PM

Pursuant to 28 U.S.C. §1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing statements made by me are true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Rosemary Thomas

Dated: February 26, 2007

- 8 -

PRCLIB-436713.1-SWILSON 2/25/07 12:16 PM

A-44

**B685**

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
 2
       LINDA J. BLOZIS,                )
 3                                     )  Civil Action No.
                    Plaintiff,         )     05-891 SLR
 4                                     )
       v.                             )
 5                                     )
       MELLON TRUST OF DELAWARE,       )
 6     NATIONAL ASSOCIATION, a         )
       Pennsylvania corporation;       )
 7     MELLON BANK, NATIONAL           )
       ASSOCIATION, (formerly          )
 8     MELLON BANK (DE) NATIONAL       )
       ASSOCIATION), a Pennsylvania    )
 9     corporation; and MELLON         )
       FINANCIAL CORPORATION, a        )
10     Pennsylvania corporation,       )
                                       )
11                  Defendants.        )
                                       )
12
                Deposition of GREGG L. LANDIS taken pursuant to
13     notice at the law offices of John M. LaRosa, Two East 7th
       Street, Wilmington, Delaware, beginning at 1:05 p.m., on
14     Thursday, December 21, 2006, before Patricia L. Shelton,
       Registered Professional Reporter and Notary Public.
15
       APPEARANCES:
16
                    JOHN M. LaROSA, ESQ.
17             LAW OFFICE OF JOHN M. LaROSA
                    Two East 7th Street
18                  Wilmington, Delaware  19801
                  For the Plaintiff
19
                 STEPHANIE WILSON, ESQ.
20             REED SMITH, LLP
                    Princeton Forrestal Village
21             136 Main Street - Suite 250
                    Princeton, New Jersey  08543-7839
22                  For the Defendants
23                      WILCOX & FETZER
           1330 King Street -  Wilmington, Delaware 19801
24                      (302) 655-0477
                        www.wilfet.com
```

**B686**

Gregg L. Landis

```
 1                      GREGG L. LANDIS,
 2            the deponent herein, having first been
 3            duly sworn on oath, was examined and
 4            testified as follows:
 5                      EXAMINATION
 6   BY MR. LaROSA:
 7      Q.   Good afternoon.  My name is John LaRosa.  And I
 8   represent Linda Blozis in this lawsuit.
 9            Would you state your full name, please?
10      A.   Yes.  My name is Gregg Landis.
11      Q.   And could you spell your first name for us?
12      A.   G-R-E-G-G.
13      Q.   Could you spell your last name?
14      A.   L-A-N-D-I-S.
15      Q.   And other than a brief introduction by myself
16   before we went on the record and I offered you some
17   water, we never met before; is that correct?
18      A.   Yes.
19      Q.   And we never had any conversations about this
20   case; is that correct?
21      A.   Yes.
22      Q.   What is your current home address?
23      A.   23 Glencoe Drive.
24      Q.   Have you ever had your deposition taken before --
```

Gregg L. Landis

```
 1   I'm sorry.  Let me back up.
 2              Can you give me the city?
 3   A.   Yes.  Newark.
 4   Q.   Can you give me the state?
 5   A.   Delaware.
 6   Q.   Zip code?
 7   A.   19702.
 8   Q.   Have you ever had your deposition taken before?
 9   A.   No.
10   Q.   Let me review some ground rules.  After I ask the
11   questions and you answer them, you'll have the
12   opportunity to review the answers you gave to see if the
13   court reporter made any typos or technical mistakes.  Do
14   you understand that?
15   A.   Yes.
16   Q.   You also have taken an oath to tell the truth.
17   And you understand the significance of that, correct?
18   A.   Yes.
19   Q.   Are you under any medications or substances today
20   that would prevent you from remembering accurately or
21   testifying truthfully?
22   A.   No.
23   Q.   Any reason why you might not be able to testify
24   truthfully today?
```

**B688**

Gregg L. Landis

1    A.    No.

2    Q.    If I ask you a question today, I'm going to

3    assume you understand the question if you give me an

4    answer.  So if you do not understand a question, please

5    let me know and I'll be glad to rephrase it.  Do you

6    understand that?

7    A.    Yes.

8    Q.    If you don't know the answer to something, we

9    don't want you to guess.  So it's an acceptable answer to

10   say "I don't know."  And if you give me that type of

11   answer, I'll move on to another area.  Do you understand

12   that?

13   A.    Yes.

14   Q.    Also, we have to take turns speaking because the

15   court reporter cannot record two voices at once.  Please

16   let me finish my question before answering, and I'll try

17   to let you finish answering before I go on to the next

18   question.  Do you understand that?

19   A.    Yes.

20   Q.    Also, there's water here.  And if you need any

21   rest room breaks or any breaks, let me know.

22   A.    Thank you.

23   Q.    Have you reviewed any documents at any time to

24   prepare for this deposition?

Gregg L. Landis

```
 1    A.    Yes.

 2    Q.    What documents have you reviewed?

 3    A.    I met a few days ago with our attorney to review

 4    documents she felt were important to prepare for this

 5    deposition.

 6    Q.    Do you remember what those documents were?

 7          MS. WILSON:  I'm going to object to him

 8    describing the documents I showed him on the basis of

 9    work product.

10    BY MR. LaROSA:

11    Q.    Other than what documents your attorney has shown

12    you, have you reviewed any documents in preparation for

13    your deposition today?

14    A.    No.

15    Q.    Will you state your date of birth?

16    A.    November 20, 1967.

17    Q.    Regarding your educational background, did you

18    graduate from high school?

19    A.    Yes.

20    Q.    Did you attend college?

21    A.    Yes.

22    Q.    Did you receive an undergraduate degree?

23    A.    Yes.

24    Q.    What is your undergraduate degree in?
```

**B690**

6

Gregg L. Landis

1    A.    I have a Bachelor of Arts in communications.

2    Q.    Do you have any other undergraduate degrees?

3    A.    No.

4    Q.    Did you attend graduate school?

5    A.    No.

6    Q.    Other than your Bachelor of Arts in

7    communications, do you have any other college degrees?

8    A.    No.

9    Q.    Who is your current employer?

10   A.    Mellon Financial.

11   Q.    And when you say "Mellon Financial," you're

12   referring to Mellon Financial Corporation, which is one

13   of the defendants in this case?

14   A.    Yes.

15   Q.    So we can agree if we use that term "Mellon

16   Financial," we're talking about Mellon Financial

17   Corporation?

18   A.    Yes.

19   Q.    Have you ever worked for Mellon Bank National

20   Association?

21   A.    Yes.

22   Q.    Have you ever worked for Mellon Trust of

23   Delaware?

24   A.    Yes.

Gregg L. Landis

    1     Q.    If I use the term "Mellon," I may be referring to
    2    the defendants in this case, which would include Mellon
    3    Trust of Delaware, Mellon Bank and Mellon Financial.   Do
    4    you understand that?
    5     A.    Yes.
    6     Q.    When did you begin working for Mellon?
    7     A.    1996.
    8     Q.    What was your position at that time?
    9     A.    Assistant vice president.
    10    Q.    And where were you located?
    11    A.    Philadelphia.
    12    Q.    Did you receive any promotions or transfers from
    13   that original position?
    14    A.    Yes.
    15    Q.    What was your next position?
    16    A.    Vice president.
    17    Q.    Was that in Philadelphia, also?
    18    A.    I believe that was after a transfer to Delaware.
    19    Q.    When were you transferred to Delaware?
    20    A.    1999.
    21    Q.    And when were you promoted to vice president?
    22    A.    1999 or 2000.
    23    Q.    And after you became a vice president, did you
    24   have any other positions?

**B692**

8

Gregg L. Landis

```
 1    A.   Yes.

 2    Q.   What was your next position with Mellon?

 3    A.   Senior director.

 4    Q.   Was that in Delaware, also?

 5    A.   Yes.

 6    Q.   When was that?

 7    A.   January of this year, 2006.

 8    Q.   After you became a senior director, have you had

 9  any further changes in job title?

10    A.   No.

11    Q.   That's your current position?

12    A.   Yes.

13    Q.   And are you still currently located in Delaware?

14    A.   Yes.

15    Q.   And where is the Delaware office?

16    A.   4005 Kennett Pike, Greenville.

17    Q.   What is the zip code?

18    A.   19807.

19    Q.   During the time you've worked in Delaware for

20  Mellon, has the office always been located there?

21    A.   No.

22    Q.   Where was the office prior to the Kennett Pike

23  address?

24    A.   On Rodney Square.
```

**B693**

Gregg L. Landis

```
1    Q.    Do you remember when the office was moved?

2    A.    Approximately 2001.

3    Q.    Other than the Rodney Square office and the

4    Kennett Pike office, have you worked at any other

5    locations for Mellon in Delaware?

6    A.    No.

7    Q.    Do you report to anyone at Mellon Trust of

8    Delaware?

9    A.    Yes.

10   Q.    Who?

11   A.    David Kutch, K-U-T-C-H.

12   Q.    And what is his title?

13   A.    He has several titles.  I believe he is the

14   regional chairman for Mellon in the Mid-Atlantic region.

15   Q.    Do you know of any of his other titles?

16   A.    I believe he may also be president of Mellon

17   Trust of Delaware.

18   Q.    Did you ever work with Linda Blozis when you

19   worked for Mellon Trust of Delaware?

20   A.    Yes.

21   Q.    Do you remember what time period that was?

22   A.    From 1999 until approximately 2003.

23   Q.    And during that time period, did both of you work

24   or perform services for Mellon Bank as well?
```

**B694**

Gregg L. Landis

    1    A.    Yes.

    2    Q.    And during that time period, did both of you work

    3    or perform services for Mellon Financial as well?

    4    A.    Yes.

    5    Q.    Who is your direct boss currently?

    6    A.    David Kutch.

    7    Q.    And during the time period of 1999 to 2003, who

    8    was your direct boss?

    9    A.    Brendan Gilmore.

    10    Q.    What was his title at that time?

    11    A.    I believe it was first vice president.

    12    Q.    Did you ever report to a Bill Becker?

    13    A.    Indirectly.

    14    Q.    What do you mean by that?

    15    A.    For a period of time, I reported directly to

    16    Brendan Gilmore, who generally worked in our Philadelphia

    17    office.  But I also viewed Bill Becker to have some

    18    supervisory role over all of the employees in Delaware.

    19    Q.    Was that just based on your own view or something

    20    you had been told by management?

    21    A.    Based on my view.

    22    Q.    Were you considered a manager of Mellon?

    23    A.    During what time?

    24    Q.    During the 1999 to 2003 time period.

Gregg L. Landis

1    A.    Would you define "manager" more specifically?

2    Q.    Did you have supervisory authority over any

3    employees of Mellon?

4    A.    Yes.

5    Q.    What position did Linda Blozis hold at the time

6    her employment with Mellon ended?

7    A.    She was an assistant.

8    Q.    And when you say "an assistant," does that mean

9    she provides administrative help?

10   A.    That was one of her functions.

11   Q.    Other than that function, did she have other

12   functions?

13   A.    Yes.

14   Q.    What were her other functions?

15   A.    Linda's role was to support the senior officers

16   on our team with respect to the administration and

17   investment functions for our client accounts.

18   Q.    So, in your view, was she support staff?

19   A.    Yes.

20   Q.    Was Linda qualified to do that job?

21         MS. WILSON:  Objection to form.

22         You can answer.

23   A.    Would you repeat the question, please?

24         MR. LaROSA:  She'll read the question back

**B696**

12

Gregg L. Landis

```
 1   for you.
 2               Would you read the question back, please?
 3               (The reporter read back as instructed.)
 4               THE WITNESS:  Linda had qualifications that
 5   allowed her to do portions of that job.
 6   BY MR. LaROSA:
 7   Q.    And what were those qualifications that she had?
 8   A.    Linda had worked in that position for several
 9   years once I joined our Delaware team.  And I would say
10   that through working with clients, she developed
11   qualifications to perform some of her duties.
12   Q.    Did you feel she was not qualified to perform all
13   of the duties she was expected to perform?
14   A.    I came to feel that way.
15   Q.    When did you come to feel that way?
16   A.    Once I started to observe her performance on the
17   job more directly.
18   Q.    Do you remember approximately what year or what
19   time frame that was?
20   A.    I started to observe Linda more directly in the
21   2002 to 2003 time frame.
22   Q.    Did Linda Blozis ever receive written
23   commendations from clients?
24               MS. WILSON:  Objection to form.
```

**B697**

Gregg L. Landis

1                You can answer.

2        A.    How would you define "written commendations"?

3        Q.    Something in writing that commends one's

4    performance on the job.  And by "commend," I mean praises

5    or thanks them for a job well done.

6        A.    She may have.  I don't recall any specific

7    instances.

8        Q.    Did Linda Blozis ever receive any written

9    commendations from supervisors at Mellon?

10       A.    She may have.  But I don't recall any specific

11   instances.

12       Q.    I'm going to show you a document and ask that it

13   be marked Landis 1.

14                (Landis Deposition Exhibit No. 1 was marked

15   for identification.)

16   BY MR. LaROSA:

17       Q.    Take a moment to read through that, and let me

18   know when you're finished.

19       A.    Okay.

20       Q.    Have you ever seen this document before?

21       A.    Yes, I have.

22       Q.    What type of document is this?

23       A.    This is a printout of an e-mail.

24       Q.    And who is the e-mail from?

Gregg L. Landis

| | | |
|---|---|---|
| 1 | A. | Richard Olney. |
| 2 | Q. | What was his position at that time? |
| 3 | A. | Assistant vice president. |
| 4 | Q. | And who was the e-mail sent to? |
| 5 | A. | Paul Kochis, Brendan Gilmore and Rosemary Thomas. |
| 6 | Q. | Did anyone else receive a copy of this e-mail? |
| 7 | A. | Yes. |
| 8 | Q. | Who else? |
| 9 | A. | Gregg Landis, myself, and William Becker. |
| 10 | Q. | Approximately when did you receive this? |
| 11 | A. | The e-mail was sent on Friday, October 18th, |
| 12 | 2002. | |
| 13 | Q. | And what was the purpose of this e-mail from |
| 14 | Mr. Olney? | |
| 15 | A. | I wouldn't know. |
| 16 | Q. | You wouldn't know what the purpose of the e-mail |
| 17 | was? | |
| 18 | A. | That would be a question for Richard Olney. |
| 19 | Q. | So at some point in time, you received this |
| 20 | e-mail; is that correct? | |
| 21 | A. | Yes. |
| 22 | Q. | And did you not know what the purpose was when |
| 23 | you received it? | |
| 24 | A. | I can read what it says. |

B699

Gregg L. Landis

1    Q.    Yeah, I'm not asking you to read it.

2          Was this a commendation by Mr. Olney?

3          MS. WILSON:  Objection to form.

4          You can answer.

5    A.    Mr. Olney states that two people in our office,

6    Linda Blozis and Maria Bannister, performed a service for

7    one of his clients.  And Mr. Olney was letting a group

8    know that he appreciated the work that Linda Blozis and

9    Maria Bannister did.

10   Q.    Do you believe this was the only time a

11   supervisor expressed their appreciation in writing

12   regarding Linda Blozis's performance?

13         MS. WILSON:  Objection to form.

14         You can answer.

15   A.    I wouldn't know if it was the only time.

16   Q.    During the time that Linda Blozis worked in the

17   Delaware office, you were her direct boss; is that fair

18   to say?

19   A.    For some of the time when she worked there, yes.

20   Q.    Approximately what years were you her direct

21   boss?

22   A.    2002 and 2003.

23   Q.    During that time period, Linda Blozis was never

24   disciplined for tardiness or attendance issues; is that

**B700**

Gregg L. Landis

1    correct?

2    A.    Yes.

3    Q.    I'm going to show you another document ask that

4    it be marked Landis Exhibit 2.

5              (Landis Deposition Exhibit No. 2 was marked

6    for identification.)

7    BY MR. LaROSA:

8    Q.    Turning your attention to the first page, the

9    lower right-hand corner says MEL/BLOZ 454.  I'll

10   represent to you this is a document that has been

11   produced by the defendants in this case.

12             Have you ever seen this type of a document

13   before at Mellon?

14   A.    Yes.

15   Q.    And what does Mellon call these type of

16   documents?

17   A.    The title at the top says, "Employee

18   Profile/History."

19   Q.    And Mellon records an employee's date of birth on

20   this form; is that correct?

21   A.    I see that it does.

22   Q.    And Mellon records an employee's age on this

23   form; is that correct?

24   A.    Yes.

Gregg L. Landis

1    Q.    And Mellon records an employee's sex on this
2    form; is that correct?
3    A.    I see the word "gender."
4    Q.    Mellon records an employee's sexual gender on
5    this form; is that correct?
6    A.    Yes.
7    Q.    And Mellon records an employee's marital status
8    on this form; is that correct?
9    A.    Yes.
10    Q.    And Mellon also -- looking at the middle of the
11    document, there's -- on the left side, it says "Job
12    History."  If you look towards the right, it says, "PERF"
13    next word "RTG."  Do you know what that stands for?
14    A.    Performance rating.
15    Q.    And during the time that you worked in the
16    Delaware office, did Mellon issue performance ratings to
17    its employees on an annual basis?
18    A.    Yes.
19    Q.    And were the performance ratings in the form of
20    numbers or letters or something else?
21    A.    Yes.
22    Q.    Were they in the form of numbers?
23    A.    I believe they were at some point.
24    Q.    And what were the range of numbers that an

Gregg L. Landis

1    employee could get for a performance rating?

2    A.    I don't recall.

3    Q.    Did the numbers have certain significance?

4    A.    I suspect there's a key that would help a manager

5    choose which number is most reflective of an employee's

6    performance.

7    Q.    And if an employee received a performance rating

8    of 2, do you know what that would mean?

9    A.    No, I don't.  Not without the key.

10    Q.    You have no recollection of what the performance

11    ratings meant, as far as what the numbers meant?

12    A.    No.

13    Q.    Does Mellon continue to rate employees'

14    performances to that?

15    A.    Yes.

16    Q.    How are their performances rated?

17    A.    Not by numbers, but, rather, words that are

18    descriptive of one's performance.

19    Q.    And what words are used today?

20    A.    Meets requirements or expectations, exceeds

21    requirements or expectations, needs improvement.  There's

22    one level higher than meets expectations.  I don't recall

23    the exact phraseology, but it would be reserved for

24    someone who is doing the most and highest level of

**B703**

19

Gregg L. Landis

1   performance.

2      Q.   As a manager, would you -- when you came to

3   Delaware, did you ever have to review your current

4   employee's performance ratings, see what kind of an

5   employee you had working for you at Delaware?

6      A.   Yes.

7      Q.   And do you recall if Linda Blozis's performance

8   met expectations?

9      A.   No.

10     Q.   You don't remember?

11     A.   Correct.

12     Q.   Let me show you a document and ask that it be

13  marked Exhibit 3, Landis Exhibit 3.

14              (Landis Deposition Exhibit No. 3 was marked

15  for identification.)

16  BY MR. LaROSA:

17     Q.   Have you ever seen this type of form before?

18     A.   Yes.

19     Q.   What is this type of form?

20     A.   It appears to be Mellon's performance management

21  form for exempt employees.

22     Q.   And what does that mean in layman's terms?

23     A.   This is a document that Mellon uses throughout

24  the year with its employees to let an employee know early

**B704**

Gregg L. Landis

1   in the year what our expectations are; sometimes in the

2   middle of a year, let an employee know how Mellon feels

3   he or she is executing against those requirements; and at

4   the end of a year to develop a formal rating of that

5   employee.

6   Q.   Turning your attention to MEL/BLOZ 710, which is

7   the fourth page in the document, does Mellon have

8   something called results-based goals?

9   A.   Yes.

10   Q.   And what was Linda Blozis's overall assessment

11   for results-based goals according to this form?

12   A.   I see an "X" mark in the box which says "meets

13   target."

14   Q.   And turning your attention to the next page --

15   first let me ask you, what are results-based goals at

16   Mellon?

17   A.   I would say Mellon determines results-based goals

18   for its employees in four areas, as indicated on the page

19   marked MEL/BLOZ 709.

20   Q.   What are those four areas?

21   A.   Business and operating contributions,

22   customer-related contributions, employee-related

23   contributions, and other contributions.

24   Q.   And what do the other contributions include?

**B705**

21

Gregg L. Landis

1       A.    Parenthetically they include corporate synergy

2    and project-specific contributions.

3       Q.    To the best of your knowledge, Linda Blozis met

4    her target or met expectations for her results-based

5    goals?

6       A.    I didn't manage Linda for the time period

7    indicated by this document.

8       Q.    Turning your attention to MEL/BLOZ 711, does

9    Mellon also have something called shared values that it

10   evaluates?

11      A.    Yes.

12      Q.    What are the shared values that it evaluates?

13      A.    Integrity, teamwork and excellence.

14      Q.    How was Linda Blozis rated for her year-end

15   overall assessment for shared values according to this

16   form?

17      A.    Highly effective.

18      Q.    And turning your attention to page 709, what is

19   the time period for which this evaluation is based on?

20      A.    The top of the page indicates date of planning,

21   February 2001.

22      Q.    And from that, could you ascertain what time

23   period the employee was being evaluated?

24      A.    Yes.

Gregg L. Landis

1    Q.    So when do you believe she was being evaluated?

2    A.    I believe that would be for the calendar year

3    2001.

4    Q.    So you believe that document was evaluating her

5    performance for January 1st, 2001 through December 31st,

6    2001?

7    A.    Yes.

8    Q.    I show you another document and ask it be marked

9    Landis Exhibit 4.

10            (Landis Deposition Exhibit No. 4 was marked

11    for identification.)

12    BY MR. LaROSA:

13    Q.    Turning your attention to the third page, which

14    is marked MEL/BLOZ 719 on bottom right-hand corner,

15    there's a date of planning at the top right portion of

16    that page.  What is the date of planning for this

17    document?

18    A.    February 27, 2001.

19    Q.    And is this the same type of form, a performance

20    management form, for exempt employees?

21    A.    Yes.

22    Q.    And for what time period was Linda Blozis being

23    evaluated for on this particular form?

24    A.    I believe for the calendar year 2001.

**B707**

Gregg L. Landis

1    Q.    And turning your attention to the fourth page,

2    MEL/BLOZ 720, what was Linda Blozis's rating for year-end

3    overall assessment for results-based goals at that time?

4    A.    As indicated by the form, meets target.

5    Q.    And turning your attention to page 5,

6    MEL/BLOZ 721, what was Linda Blozis's rating for year-end

7    overall assessment for shared values at that time?

8    A.    Highly effective.

9    Q.    And turning your attention to the sixth page,

10    MEL/BLOZ 722, what was Linda Blozis's year-end overall

11    assessment for competencies at that time?

12    A.    Effective.

13    Q.    And turning your attention to page 8, what was

14    Linda Blozis's overall rating at that time?

15    A.    On target performance.

16    Q.    During the time that you were Linda Blozis's

17    boss, she was never demoted; is that correct?

18    A.    Yes.

19    Q.    And during the time that you were Linda Blozis's

20    boss, she was never suspended; is that correct?

21    A.    Yes.

22    Q.    During the time period that Linda Blozis's

23    employment ended, just up until that time, she had the

24    title of portfolio administrator; is that correct?

**B708**

Gregg L. Landis

1    A.   Yes.

2    Q.   And what were the qualifications of a portfolio

3  administrator at that time?

4    A.   The qualifications?

5    Q.   Yes.

6    A.   The qualifications were to have the ability to

7  perform the job responsibilities as outlined by Mellon.

8    Q.   And what were the job responsibilities as

9  outlined by Mellon at that time?

10    A.   I can remember several of them.  Most

11  importantly, a responsibility was to help the senior

12  officers on the team with the administration of trusts

13  where Mellon was trustee and provide services with

14  respect to the investment of accounts where Mellon was

15  investment manager or trustee.

16    Q.   And were those qualifications different than the

17  qualifications of a portfolio administrator at Mellon in

18  1999?

19    A.   I would call that a responsibility, not a

20  qualification.  And, yes, I would say that towards the

21  end of Linda's employment, the responsibilities and

22  actions that were expected of someone in her position had

23  changed since 1999.

24    Q.   Approximately when did the expectations change?

**B709**

Gregg L. Landis

1    A.    Some time between 1999 and 2002.

2    Q.    And how did the expectations change?

3    A.    Mellon expected increased productivity and

4    higher-level functioning of all of its employees between

5    those two periods.

6    Q.    Specifically talking about portfolio

7    administrators, what more was expected of portfolio

8    administrators when that change was made?

9    A.    Mellon expected portfolio administrators to

10   provide a higher level of assistance to the senior

11   managers on the team and to go beyond a secretarial-level

12   function and act more like junior portfolio

13   administrators.

14   Q.    And prior to that, was it acceptable for the

15   portfolio administrators to just perform a

16   secretarial-like function?

17   A.    For a portfolio administrator to be viewed as

18   successful, it was expected that a portfolio

19   administrator perform at a higher level than may have

20   previously been acceptable.

21   Q.    Prior to this change which may have occurred

22   early 1999?

23   A.    I'm sorry.  I don't understand if that's a

24   question.

Gregg L. Landis

1      Q.    You're saying they were expected to perform at a

2    higher level.  And I'm asking you, are you telling us

3    they were expected to perform at a higher level than what

4    had been expected prior to the change in expectation that

5    you told us might have occurred some time around 1999?

6      A.    Yes.

7      Q.    And was there a Kathleen Agne that worked at the

8    Delaware office?

9      A.    Yes.

10     Q.    And what was her title?

11     A.    She was an assistant on our team.

12     Q.    Did some folks have the title of assistant and

13   some folks have the title of portfolio administrator in

14   the Delaware office?

15     A.    I tend to view -- titles are a formality that

16   Mellon uses.  I think it's typical to view people at

17   their functionary level or functional level, whether

18   someone holds an office or a status or assistant level

19   status.

20              So if you're asking if Kathleen Agne was

21   also holding the title of portfolio administrator, I

22   think that's possible.

23     Q.    So she may have had a title called portfolio

24   administrator, but in your view she was functioning as an

Gregg L. Landis

1   assistant?

2      A.   I think the title and that function are

3   synonymous.

4      Q.   During the time that you worked with Linda Blozis

5   in the Delaware office, there were no male assistants or

6   portfolio administrators; is that correct?

7      A.   Yes.

8      Q.   And at some point in time, did Kathleen Agne's

9   employment with Mellon end?

10     A.   Yes.

11     Q.   And after Kathleen Agne's employment ended, there

12  were no portfolio administrators in the Delaware office

13  younger than Linda Blozis; is that correct?

14     A.   I don't think of our employees in terms of age.

15     Q.   At some point in time, was a Maria Bannister or

16  Maria Dunlop hired to replace Kathleen Agne?

17     A.   She was hired to take over the duties that were

18  previously performed by Kathleen.

19     Q.   And during that time, were Linda Blozis and

20  Maria Dunlop the only two portfolio administrators or

21  assistants in the Delaware office?

22     A.   Yes.

23     Q.   And Kathleen Agne was discharged by Mellon; is

24  that correct?

**B712**

Gregg L. Landis

1    A.    Yes.

2    Q.    And did you make that decision?

3    A.    No.

4    Q.    Who made that decision?

5    A.    Mellon makes a decision to terminate an employee.

6    Q.    Who at Mellon makes the decision?

7    A.    We have a human resources staff which guides us

8    on decisions such as hiring and firing.

9    Q.    So did the human resource staff make the decision

10   to fire Kathleen Agne?

11   A.    I would say yes, with input from people who

12   managed Kathleen.

13   Q.    And who of Kathleen Agne's managers gave HR input

14   that it would be an appropriate action to terminate her

15   employment?

16   A.    I know that I did.  I am not aware -- well, I

17   suspect there are others on our team who did as well.

18   Q.    Who else do you suspect gave input that

19   Kathleen Agne should be terminated?

20   A.    The person who would be best in a position to

21   evaluate her performance and give an opinion to HR would

22   be Brenda Gilmore and William Becker.

23   Q.    Is it fair to say, you know, you advised HR that

24   Kathleen Agne should be terminated?

**B713**

Gregg L. Landis

```
 1                    MS. WILSON:  Objection to form.
 2                    You can answer.
 3                    THE WITNESS:  Could I hear the question
 4      back?
 5                    (The reporter read back as instructed.)
 6                    THE WITNESS:  No.  I provided human
 7      resources with information that led Mellon to corporately
 8      decide that Kathleen Agne should be terminated.
 9      BY MR. LaROSA:
10         Q.   Is it Mellon's policy it doesn't want a
11      recommendation or input from its managers regarding the
12      decision whether or not to terminate an employee?
13                    THE WITNESS:  Would you read that one back?
14                    (The reporter read back as instructed.)
15      BY MR. LaROSA:
16         Q.   Do you understand that question?
17         A.   Yes.
18                    I suspect it's Mellon's policy to collect
19      input from managers when making human resources'
20      decisions.
21         Q.   And does that input include a recommendation as
22      to what type of action to take next with regard to an
23      employee?
24         A.   Yes.
```

B714

Gregg L. Landis

1      Q.    So is it fair to say you recommended that

2    Kathleen Agne should be terminated -- or, her employment

3    should be terminated?

4      A.    I was part of a group of people who felt that her

5    performance had not improved, and together we believed

6    she should be terminated.

7      Q.    You're not exactly sure who the other people

8    were?

9      A.    I believe I said the people who were in the best

10    position to monitor her performance and give

11    recommendations about Kathleen were, in addition to

12    myself, Brendan Gilmore and William Becker.

13      Q.    And was her employment terminated in

14    approximately March of 2002?

15      A.    Referring to Kathleen Agne?

16      Q.    Speaking of Kathleen Agne, yes.

17      A.    I don't recall the exact time frame.  That sounds

18    reasonable -- reasonably accurate.

19      Q.    And her position was not eliminated; is that

20    correct?

21      A.    Yes.

22      Q.    Did you know a Frances Smith at Mellon?

23      A.    Yes.

24      Q.    What was her function or title at Mellon?

**B715**

31

Gregg L. Landis

1    A.   I'm not aware of her title.  I believe she was an
2    assistant in our Philadelphia office.
3    Q.   When someone functions as an assistant, could
4    they have any other titles other than portfolio
5    administrator?
6    A.   At some point, we had assistants who had
7    different titles than portfolio administrator.
8    Q.   What were the other titles?
9    A.   I don't recall the title.  I know there was a
10   difference in pay level.  An assistant could have two
11   different pay levels, and one was called portfolio
12   administrator.  I don't know the formal name of the other
13   level.
14   Q.   Was it distinguished between a senior portfolio
15   administrator and just a portfolio administrator?
16   A.   No.
17   Q.   Other than assistant, did Frances Smith do any
18   other jobs at Mellon?
19   A.   I'm not aware.  I knew her only casually.
20   Q.   Frances Smith was eventually demoted by Mellon;
21   is that correct?
22   A.   I'm not aware of that.
23   Q.   Frances Smith eventually resigned from Mellon; is
24   that correct?

32

Gregg L. Landis

1    A.    I'm not aware of that.  I know she no longer

2    works with Mellon.

3    Q.    Do you believe she was fired?

4    A.    I don't have any belief about why she doesn't

5    work for Mellon.

6    Q.    What was Martha Fetters' job at Mellon?

7    A.    Martha was a portfolio manager.

8    Q.    And did she report to you?

9    A.    No.

10    Q.    Did she report to Brendan Gilmore?

11    A.    At some point, yes.

12    Q.    And she's currently no longer employed by Mellon;

13    is that correct?

14    A.    Yes.

15    Q.    And at the time that her employment ended, had

16    she been reporting to Brendan Gilmore?

17    A.    I don't recall.

18          When did her employment end?

19    Q.    Okay.  Just so you know, one other instruction I

20    can give you is I'm not allowed to answer any questions

21    from you.  You're allowed to answer questions from me,

22    but I can't answer questions from you.  And what my

23    knowledge is is not relevant to the case because I'm not

24    a fact witness in the case like you are.  Do you

**B717**

Gregg L. Landis

1   understand that?

2      A.   Yes, I do.

3      Q.   Martha Fetters eventually resigned from Mellon;

4   is that correct?

5      A.   I don't know if she resigned.  I do know she no

6   longer works for Mellon.

7      Q.   What was Linda Squier's job at Mellon?

8      A.   I believe Linda Squier was a portfolio manager

9   for Mellon.

10     Q.   And did she report to Brendan Gilmore?

11     A.   Yes.

12     Q.   And did she eventually resign from Mellon?

13     A.   She no longer works at Mellon.

14     Q.   You don't know if she resigned?

15     A.   No, I don't.

16     Q.   What was Robert Bell's title?

17     A.   I believe it was assistant vice president.

18     Q.   Did Mr. Bell report to you?

19     A.   No.

20     Q.   Did Mr. Bell report to Brendan Gilmore?

21     A.   Yes.

22     Q.   Did Mr. Bell eventually leave?

23     A.   Mr. Bell no longer works for Mellon.

24     Q.   At some point in time, you were hired to work for

Gregg L. Landis

1    Mellon; is that correct?

2      A.    Yes.

3      Q.    Who hired you?

4      A.    Robert Chappelear.

5      Q.    Can you spell his last name?

6      A.    Yes.   C-H-A-P-P-E-L-E-A-R.

7      Q.    What was his job at that time?

8      A.    He was a team leader.

9      Q.    Where did he work?

10     A.    Philadelphia.

11     Q.    Did he have any other titles other than the job

12   of team leader?

13     A.    Vice president.

14     Q.    Do you remember what year that was that he hired

15   you?

16     A.    Yes.

17     Q.    What was that?

18     A.    1996.

19     Q.    At some point in time, was it determined that you

20   would be transferred from Philadelphia to the Delaware

21   office?

22     A.    Yes.

23     Q.    Do you remember who informed you that you would

24   be transferred?

Gregg L. Landis

```
1    A.    Brendan Gilmore.

2    Q.    Did he make the decision to transfer you from

3    Philadelphia to Delaware?

4    A.    With input from me.

5    Q.    Can you explain that?

6    A.    Rather than using the word "transfer," I would

7    further explain that I voluntarily wanted to change the

8    location of my employment from Philadelphia to Delaware.

9    Q.    So did you initiate the relocation of your

10   employment from Philadelphia to Delaware?

11   A.    No.

12   Q.    Did he initiate the discussion?

13   A.    Yes.

14   Q.    Do you remember what he said?

15   A.    He asked if I would be interested in working on

16   his team in Delaware rather than on Bob's team in

17   Philadelphia.

18   Q.    What year was that?

19   A.    I believe it was 1999.

20   Q.    How old were you in 1999?

21   A.    I was born in 1967.  And so in 1999, I was 32.

22   Q.    Did Brendan Gilmore hire Bill Becker for his

23   team?

24   A.    I believe so.
```

**B720**

Gregg L. Landis

1    Q.   Did Brendan Gilmore hire Dan Merlino?

2    A.   I believe so.

3    Q.   What was Dan Merlino's job?

4    A.   I recall very little about Dan.  I believe he

5  functioned at an assistant level for our team.

6    Q.   Did he work in Philadelphia?

7    A.   Yes.

8    Q.   Did Gilmore hire Kristy Hunt?

9    A.   I'm not aware .

10    Q.   Did Gilmore hire Tom Galante?

11    A.   I don't believe that's the name of someone on

12  Gilmore's team.

13    Q.   Do you know of anyone named Tome Galante spelled

14  G-A-L-A-N-T-E?

15    A.   I have a vague recollection of someone with that

16  name who held a position with human resources at Mellon.

17    Q.   Do you know if he worked in Pittsburgh or

18  Philadelphia or some other office?

19    A.   I believe he didn't work in Philadelphia because

20  I was generally familiar with people working in

21  Philadelphia.  So I suspect he worked in an office other

22  than Philadelphia.

23    Q.   Did employees in the Delaware office ever have

24  nicknames?

B721

Gregg L. Landis

1    A.    None that I can think of.

2    Q.    Did Brendan Gilmore ever call Linda Blozis a

3    survivor?

4    A.    I read that in Linda's allegations for this

5    lawsuit.

6    Q.    Other than having read it in Linda's allegations

7    for this lawsuit, do you have any knowledge or

8    recollection of Brendan Gilmore ever referring to Linda

9    as a survivor?

10   A.    No.

11   Q.    In the year 2003, who were Brendan Gilmore's team

12   members in Delaware?

13   A.    I know that I was one of Brendan Gilmore's team

14   members in Delaware in 2003.  I believe Linda Blozis

15   worked for us in Delaware for a portion in 2003.  And I

16   believe that Maria Bannister, whose married name is

17   Maria Dunlop, worked for Mellon's Delaware office in

18   2003.

19          It could be that Bill Becker also worked in

20   Delaware for a portion of 2003, although my memory is

21   less clear on Bill's whereabouts in 2003.

22   Q.    I'm going to show you a document and ask that it

23   be marked Landis Exhibit 5.

24

**B722**

Gregg L. Landis

1                    (Landis Deposition Exhibit No. 5 was marked

2        for identification.)

3        BY MR. LaROSA:

4        Q.    Have you seen this document before?

5        A.    I'm sorry.  I'm not quite done reading it.

6        Q.    Okay.  Let me know when you're finished.

7        A.    I'm finished.

8        Q.    Have you seen this document before?

9        A.    Yes.

10       Q.    This is a document that we marked Landis

11       Exhibit 5.  At the bottom right-hand corner, it says

12       MEL/BLOZ 678.  And the second page is MEL/BLOZ 679.  Is

13       this document an e-mail chain?

14       A.    Yes.

15       Q.    Does this document refer to a May 2003 price

16       report?

17       A.    Yes.

18       Q.    And was this an assignment or project that had

19       been assigned to Linda Blozis?

20       A.    Yes.

21       Q.    And I'm calling your attention to the portion on

22       the first page which is the e-mail from Linda Blozis to

23       you of June 26th, 2003, 3:06 p.m.

24                    Linda Blozis was not able to fit this

39

Gregg L. Landis

1    project in with her other projects; is that correct?

2    A.    That's what it says.

3    Q.    Linda Blozis was expected to prioritize her work

4    and her projects; is that correct?

5    A.    Yes.

6    Q.    So she was expected to know what projects needed

7    to be done first; is that correct?

8    A.    Yes.

9    Q.    So Mellon's management did not set priorities for

10   her; is that correct?

11   A.    No.   I would say that Linda was responsible

12   generally for knowing which of her items of work were

13   more important than others, as all employees are.   But

14   certainly Linda was also -- would also receive from time

15   to time suggestions of priority, just as any employee

16   would from his or her supervisor.

17   Q.    Turning your attention to the first portion of

18   the document, which is the e-mail from you to Rosemary

19   Thomas of June 26, 2003, 3:48 p.m., there's mention of a

20   Cindy here.  Do you know who that is referring to?

21   A.    Yes, I do.

22   Q.    Who is that?

23   A.    Cindy Chambliss.

24   Q.    What was her job?

**B724**

Gregg L. Landis

1    A.    She worked with Brendan on our team in

2    Philadelphia, and was also accessible to other team

3    members as a resource.

4    Q.    Was she a portfolio administrator?

5    A.    I'm not aware of her title.

6    Q.    Did she function as an assistant?

7    A.    I believe she functioned at times as an

8    assistant, yes.

9    Q.    Did she have any other functions?

10    A.    She may have taken over the management of some

11    accounts at some point, as well as being an

12    assistant-level employee.

13    Q.    And during this time period, did you notice a bit

14    more focus and energy from Linda Blozis?

15    A.    That's what my e-mail says, yes.

16    Q.    Linda Blozis had informed management that she

17    didn't have enough time to complete all of her work; is

18    that correct?

19    A.    With respect to this particular exhibit?

20    Q.    Either in this exhibit or at other points in

21    time.

22    A.    I recall Linda telling me that she was not able

23    to complete her work in the 37-1/2 hours for which she

24    was paid each week, and that she was unwilling to use

Gregg L. Landis

1    additional time, I suspect unpaid time, to complete the

2    tasks.

3    Q.    And was that common, portfolio administrators

4    were paid for a 37.5-hour week?

5    A.    That was common of how Linda viewed her

6    compensation.

7    Q.    Didn't you just tell us she was paid based on

8    37.5 hours per week?

9            MS. WILSON:  Objection to form.

10           You can answer.

11   A.    I believe I said that Linda indicated she was

12   only paid for 37-1/2 hours per week and she was not

13   willing to work more than that.

14   Q.    And with regard to her position, people in her

15   position or in her role, they were not paid overtime for

16   hours worked in excess of 37.5 hours per week; is that

17   correct?

18   A.    I believe that Linda's position is an exempt

19   position, as contrasted with a nonexempt person who would

20   keep closer track of his or her time and expect to be

21   paid for time in excess of the standard number of working

22   hours per week.

23   Q.    So as an exempt position, by virtue of the fact

24   she held an exempt position, Mellon doesn't pay exempt

Gregg L. Landis

1    employees overtime; is that correct?

2    A.    Yes.

3    Q.    So Linda Blozis was expected to work as many

4    hours as it took to get her job done per week?

5    A.    My belief is all exempt employees are expected to

6    do what's necessary to complete their tasks in exchange

7    for the compensation they receive from Mellon, myself

8    included.

9    Q.    And in the case of Linda Blozis, that

10   compensation was based on a 37.5-hour work week; is that

11   correct?

12   A.    I think Linda received a base salary commensurate

13   with the job requirements.  And a nonexempt employee,

14   unlike Linda, might keep closer track of his or her hours

15   in relation to performance of job functions.

16   Q.    And Linda Blozis expressed to you she was

17   unwilling to work for 50 hours --

18   A.    Yes.

19   Q.    -- per week?

20   A.    Yes.

21   Q.    I'm going to show you a document and ask that it

22   be marked Exhibit 6.

23            (Landis Deposition Exhibit No. 6 was marked

24   for identification.)

43

Gregg L. Landis

1    BY MR. LaROSA:

2        Q.    Do you recognize the handwriting on this

3    document?

4        A.    Yes.

5        Q.    Whose handwriting is that?

6        A.    That's my handwriting.

7        Q.    Have you ever seen this document before?

8        A.    I wrote the document.

9        Q.    And for the record, this is a document we've

10   marked Landis Exhibit 6.  It says MEL/BLOZ 684 at the

11   bottom.

12              Calling your attention to the last two lines

13   there of the document, it says, "We decided to place

14   Linda on final written warning."  Do you see that?

15       A.    Yes, I do.

16       Q.    And were you one of the people who made a

17   decision to place Linda Blozis on a final written

18   warning?

19       A.    Yes.

20       Q.    And when you say "we," who are you referring to?

21       A.    The document refers to a meeting I had with

22   Rosemary Thomas of human resources.  And while it's been

23   more than three years since I authored the document, I

24   suspect the word "we" refers to myself and Rosemary and

Gregg L. Landis

1    perhaps other members of our management team.

2      Q.    What other members of your management team do you

3    suspect the document refers to?

4      A.    I was reporting to Brendan Gilmore at the time I

5    wrote this.

6      Q.    Based on that, do you suspect it refers to

7    yourself, Rosemary Thomas and Brendan Gilmore?

8      A.    At a minimum, it certainly refers to Rosemary

9    Thomas and myself.  I said I suspect it might also

10   include Brendan Gilmore.

11     Q.    Do you suspect it might have also included

12   Bill Becker?

13     A.    I don't believe at the time I wrote this document

14   that Bill was on Brendan's team.  And so I would think

15   that Bill was no longer involved in decisions regarding

16   Linda's employment.

17     Q.    Calling your attention to the first line, it

18   indicates, "I met with Rosemary Thomas of HR on 5/12/03."

19   Do you see that?

20     A.    Yes.

21     Q.    Do you believe you had a meeting with

22   Rosemary Thomas on 5/12/03?

23     A.    I do.

24     Q.    And do you believe you made this document or

45

Gregg L. Landis

1   these notes after that meeting?

2   A.   Yes.

3   Q.   Do you believe you made these notes that same

4   day?

5   A.   I don't see that I placed a date indicating when

6   the document was written.  My suspicion is I wrote it

7   shortly after my meeting with Rosemary Thomas on 5/12/03.

8   Q.   Would it be your normal practice to write this

9   type of note to the file on the same day of a meeting?

10   A.   On the same day or shortly thereafter.

11   Q.   I'm going to show you a document and ask it be

12   marked Landis Exhibit 7.

13            (Landis Deposition Exhibit No. 7 was marked

14   for identification.)

15   BY MR. LaROSA:

16   Q.   Let me know when you finish reviewing that

17   document.

18   A.   Okay.

19   Q.   Do you recognize the handwriting on this

20   document?

21   A.   Yes.

22   Q.   Whose handwriting is that?

23   A.   That's my handwriting.

24   Q.   Have you seen this document before?

**B730**

Gregg L. Landis

1   A.   I wrote this document.

2   Q.   Do you recall when you wrote this document?

3   A.   Yes.

4   Q.   When did you write this document?

5   A.   Shortly before meeting with Linda Blozis to give

6   her a final written warning with respect to her

7   employment.

8   Q.   Calling your attention to the third line of text,

9   it says, "Prelim," P-R-E-L-I-M.  Do you see that?

10  A.   Yes.

11  Q.   Do you see the next line below that?

12  A.   Yes.

13  Q.   Can you read that aloud?

14  A.   Yes.  "Jobs changing, fast paced, do more with

15  less, learning, client satisfaction, errors."

16  Q.   And the next line down looks like a series of

17  four different sets of initials; is that accurate?

18  A.   Yes.

19  Q.   Whose initials are you writing there?

20  A.   Brendan Gilmore, Doug Kloppenberg, Paul Kochis,

21  Craig Sutherland.

22  Q.   Can you spell Kloppenberg for us?

23  A.   K-L-O-P-P-E-N-B-E-R-G.

24  Q.   What was Mr. Kloppenberg's job at that time?

Gregg L. Landis

1    A.    He was Brendan's direct supervisor and, thus, the

2    regional director for Mellon's private wealth management

3    group in Philadelphia.

4    Q.    What was Paul's job at that time?

5    A.    When you say "at that time," I should back up and

6    say in response that when I wrote this document, Doug

7    Kloppenberg was no longer in that position.  But I

8    believe I've accurately described a position he held at

9    one point.

10          I would continue by saying Paul Kochis held

11   that position of regional president after Doug no longer

12   held that position.

13   Q.    Paul was Doug's successor in that role?

14   A.    Yes.

15   Q.    And Mr. Sutherland, what was his role at that

16   time?

17   A.    Mr. Sutherland is -- Mr. Sutherland at that time

18   held a national role where he would manage people in the

19   level of Paul Kochis and others throughout our firm

20   nationally.

21   Q.    And what was your purpose in writing these notes

22   before the meeting with Linda Blozis?

23   A.    My purpose was to remind myself of the things

24   that I wanted to say to Linda and to organize the meeting

48

Gregg L. Landis

1   in an orderly fashion.

2      Q.    And why did you write these sets of initials on

3   the document?

4      A.    That was to prompt me to remind Linda that a

5   series of people had told everyone in our department that

6   all of our jobs were changing in certain ways.  And those

7   initials refer to the four individuals who said those

8   things to us at various times.

9      Q.    When did they say those things to you?

10     A.    Well, it's hard to recall exactly.  I would

11  believe that it was in the 2002 to 2003 time frame.

12  Perhaps earlier.

13     Q.    And in what format did these folks say that to

14  you, that all of the jobs were changing?

15     A.    Various formats.  I believe that Brendan met with

16  his entire team to relay that message.  I suspect that

17  Doug and Paul and Craig, having a more broad function,

18  met with our entire region, all of the teams, to deliver

19  that message.

20     Q.    Calling your attention to a portion down at the

21  bottom, it says, "Examples."  And then about three lines

22  down, it says, "MB."  Do you see that line?

23     A.    Yes.

24     Q.    Can you read that line aloud?

**B733**

Gregg L. Landis

1     A.    "MB doing significant portions of the books...

2     assign?"

3     Q.    Who were you referring to when you wrote MB?

4     A.    Maria Bannister.

5     Q.    Is that the person that has become Maria Dunlop?

6     A.    Yes.

7     Q.    Was she a portfolio administrator in the Delaware

8     office?

9     A.    Yes.

10    Q.    And why did you write this note, this line?

11    A.    To remind me that this was something important

12    that I wanted to relay to Linda as part of her final

13    written warning meeting.

14    Q.    What did you say to her with regard to this line?

15    A.    While I don't recall exactly, I suspect, thinking

16    about it today, that this note would have prompted me to

17    say something along the lines of Brendan is aware that

18    Maria was doing significant portions of the books, and it

19    may be his belief that you assigned that task away from

20    yourself and to Maria.

21    Q.    So you wanted to communicate a belief that

22    Brendan Gilmore had at that time?

23    A.    Yes.

24    Q.    And that was not your belief ?

**B734**

Gregg L. Landis

```
 1    A.    I communicated it as Brendan's belief.

 2    Q.    So you believe that Linda Blozis was assigning

 3    portions of her jobs to Maria Dunlop?

 4    A.    The note would seem to indicate that Brendan had

 5    expressed to me a belief that Linda had assigned a

 6    portion of her work to Maria.  And I felt at the time

 7    that was an important piece of information that needed to

 8    be conveyed to Linda.

 9    Q.    But you yourself didn't think that Linda had done

10    that?

11    A.    I don't recall what I thought.

12    Q.    You don't recall any particular performance

13    issues that you felt Linda Blozis had in the 2003 time

14    frame?

15              THE WITNESS:  Would you read back that

16    question?

17              (The reporter read back as instructed.)

18              THE WITNESS:  I do recall performance issues

19    that Linda Blozis had in the 2003 time frame.

20    BY MR. LaROSA:

21    Q.    To the best of your recollection, you don't

22    recall holding your own belief that she was assigning

23    work to Maria Dunlop or Maria Bannister; is that correct?

24    A.    I don't believe I have a separate belief on that
```

**B735**

Gregg L. Landis

1    point which is different from Brendan's belief.

2        Q.    Are you telling us you agreed with Brendan?

3        A.    I'm telling you that I relayed Brendan's belief

4    as he explained it to me.  And looking backwards today,

5    three years later, I suspect if I disagreed with that

6    belief, I would not have made this note and conveyed that

7    to Linda.

8        Q.    But didn't you tell us it was important -- you

9    felt it was important for you to share that piece of

10   information with Linda, that Brendan Gilmore had held

11   that belief?

12       A.    That's the way the note is written.

13       Q.    What is the way the note is written?

14       A.    Reading directly from the note, "BMG aware that

15   MB doing significant portions of the books... assigned?"

16       Q.    Have you ever had a situation where you disagreed

17   with your boss?

18       A.    Yes.

19       Q.    And if you had a different opinion than your boss

20   with regard to a performance issue with one of your

21   subordinates, would you have relayed that information on

22   to your subordinate?

23       A.    Yes.

24       Q.    I'm going to show you a document and ask it be

**B736**

Gregg L. Landis

1    marked Landis Exhibit 8.

2              (Landis Deposition Exhibit No. 8 was marked

3    for identification.)

4    BY MR. LaROSA:

5    Q.    Have you seen this document before?

6    A.    Yes.

7    Q.    Are these handwritten notes by you?

8    A.    Yes.

9    Q.    Do you believe you wrote them on April 29th,

10   2003?

11   A.    Yes.

12   Q.    This is a document we've marked Landis Exhibit 8.

13   The bottom right-hand corner says MEL/BLOZ 616.

14             Calling your attention to the paragraph that

15   starts with the number "3," can you read that paragraph

16   to us?

17   A.    Yes.  "She knows the client has made major

18   withdrawals, but did not put together a list for the

19   book.  Should have anticipated this need."

20   Q.    What kind of list are you referring to there?

21   A.    We produce a review book when we meet with

22   clients to discuss how their account is being managed and

23   performed.  One of the sheets that we tend to show our

24   clients is the change in market value of their account

Gregg L. Landis

1    from time to time.

2         Looking back at this document, I believe

3    that such a page was put together for a client that would

4    have showed a significant negative difference in market

5    values from time to time that would be attributable not

6    to investment performance, but to cash withdraws by the

7    client from his or her account.  And the note indicates

8    my belief that Linda should have anticipated the need to

9    report to the client that he or she made significant

10    withdraws as a way to explain the negative change in

11    market value.

12    Q.   This was something that you needed her to

13    anticipate and create?

14    A.   Yes.

15    Q.   And she should have anticipated your need; is

16    that correct?

17    A.   Yes.

18    Q.   And this was not a specific instruction that you

19    had expressly given to her?

20    A.   It's hard to recall the expressly-given

21    instruction.  But I would say that in putting together

22    the pages for a booklet, we would hope that if a

23    portfolio administrator noticed a significant decline in

24    market value, some additional investigation would take

Gregg L. Landis

1    place prior to the final preparation of the book for

2    presentation to the client.

3        Q.    But you didn't tell her to do the additional

4    preparation on this particular instance, correct?

5        A.    I can't recall what I may have told her in 2003

6    with respect to this particular item.  My note indicates

7    a belief that it should have been done and was not.

8        Q.    It was something she should have anticipated

9    needed to be done without being told to do it, correct?

10       A.    Yes.

11       Q.    I'm going to show you another document and ask

12   that it be marked Landis Exhibit 9.

13              (Landis Deposition Exhibit No. 9 was marked

14   for identification.)

15   BY MR. LaROSA:

16       Q.    Let me know when you've finished reading that

17   document.

18       A.    Okay.

19       Q.    Have you seen this document before?

20       A.    Yes.

21       Q.    What is this document?

22       A.    The document is partially a series of two e-mails

23   with some handwritten notes placed on the bottom.

24       Q.    Who is the Bruce that's referred to in this

Gregg L. Landis

1    document?

2       A.    Bruce Holmquist is an employee of Mellon working

3    in Bethesda, Maryland.

4       Q.    What was his job at this time?

5       A.    He was a portfolio manager.

6       Q.    Functionally, did he report into the Delaware

7    office?

8       A.    Yes.

9       Q.    Were there other folks that reported into the

10   Delaware office but were physically located in

11   Washington, D.C.?

12      A.    Bruce would be the only person that fits that

13   description.

14      Q.    And where was he located?

15      A.    In Bethesda, Maryland or Washington, D.C., Metro

16   area.

17      Q.    And did Linda report to you something that Bruce

18   had told her with regard to this question that you had

19   asked?

20      A.    Yes.

21      Q.    And you weren't satisfied with this answer from

22   her?

23      A.    Correct.

24      Q.    What was the question that you had asked?

Gregg L. Landis

1    A.   My original question to Bruce was if a large

2    amount of money had come into this particular account

3    and, if not, how shall we approach this.

4    Q.   And with regard to that first question, did she

5    answer that first question?

6    A.   She, Linda?

7    Q.   Yes.

8    A.   She answered the question of whether additional

9    cash had come in at that particular time.

10   Q.   And did that answer your first question?

11   A.   Yes.

12   Q.   And when you had directed this question to

13   Mr. Holmquist of, if not, how shall we approach this on

14   your e-mail of January 15th, 2003, was that a question

15   you wanted Mr. Holmquist to answer?

16   A.   Yes.

17   Q.   And did she report to you what he said with

18   regard to that?

19   A.   She wrote some words on this page, which I

20   suspect are reflective of the conversation she had with

21   Bruce.

22   Q.   Did you feel that from her conversation with

23   Bruce that Bruce did not answer that question?

24   A.   I felt from the words that she wrote on the page

Gregg L. Landis

1    that an answer to the question was not complete.

2        Q.   And this incomplete answer, this was an answer

3    she had gotten from Bruce?

4        A.   When I wrote "Linda, please follow up with Bruce

5    next week.  Thanks," I was asking Linda to review the

6    background and the question as posed on the piece of

7    paper and speak with Bruce, perhaps prompting him to

8    understand and address the question and help Bruce

9    deliver back a complete response.

10       Q.   Well, you didn't tell her to prompt him in your

11   handwritten note; is that correct?

12       A.   I think the use of the phrase "please follow up"

13   is a prompting to review the issue and come back with a

14   solution.

15       Q.   And that solution was supposed to come from

16   someone at Bruce Holmquist's level?

17       A.   Yes.

18       Q.   But based on these communications, do you feel

19   that he did not come back with a solution or an adequate

20   solution?

21       A.   I feel two things: I feel that he did not come

22   back with an adequate response and Linda did not follow

23   up completely enough to help Bruce formulate a response.

24       Q.   Do you feel Linda should have pushed the

Gregg L. Landis

1    portfolio manager for more information?

2        A.    I think "push" is a strong word.  I was asking

3    Linda to work with one of her teammates to consider an

4    issue which was important to the success of our team and,

5    working jointly with him, to come back with a solution.

6        Q.    But you didn't want that solution to come from

7    her, correct?

8        A.    I see I wrote at the bottom, "Am trying to

9    involve her in things."  And I think that's reflective of

10   asking a lower-level employee to work at a higher level

11   and think about the revenue implications and client

12   servicing and satisfaction implications beyond a

13   perfunctory level.

14       Q.    At this time, Linda Blozis was an assistant,

15   correct?

16       A.    Yes.

17       Q.    I'm going to show you a document and ask it be

18   marked Landis 10.

19               (Landis Deposition Exhibit No. 10 was marked

20   for identification.)

21   BY MR. LaROSA:

22       Q.    For the record, this document indicates

23   MEL/BLOZ 646 at the bottom.  We marked it as Landis

24   Exhibit 10.  Let me know when you've finished reviewing

Gregg L. Landis

```
 1    that.
 2    A.    Okay.
 3    Q.    Have you seen this document before?
 4    A.    Yes.
 5    Q.    Is this an e-mail chain?
 6    A.    Yes.
 7    Q.    And can you read the first line of the e-mail
 8    sent by William Becker to you on February 24, 2003 at
 9    9:33 a.m.?
10    A.    Yes.  It says, "Not LB's fault."
11    Q.    LB, is that referring to Linda Blozis?
12    A.    Although Bill wrote the e-mail, I would suspect
13    it does refer to Linda Blozis.
14    Q.    Was this an issue that you had thought that
15    Linda Blozis was at fault for?
16    A.    I don't think the e-mail conveys my opinion about
17    anything.
18    Q.    Was there an issue with regard to 30-day
19    consecutive overdrafts?
20    A.    Yes.
21    Q.    Understanding that your opinion is not written in
22    this e-mail, did you have an issue or a problem with
23    30-day consecutive overdrafts?
24    A.    Yes.  I think Mellon as a whole was continuing an
```

Gregg L. Landis

1   effort to eliminate overdrafts between 10,000 and

2   $249,999 for 30 consecutive days.

3       Q.   Can you explain what that refers to?  Does that

4   refer to client accounts receiving multiple overdrafts or

5   being charged for multiple overdrafts?

6       A.   A client's account is overdrawn when the cash

7   balance is negative or not larger than zero.  Because

8   that is a compliance matter for Mellon, Mellon is trying

9   to eliminate overdrafts which are larger than $10,000 and

10  which occur for more than 30 consecutive days to

11  eliminate the risk associated with a negative cash

12  balance.

13      Q.   Did you believe at some point that Linda Blozis

14  had stopped running OD reports?

15      A.   I can read in this exhibit that William Becker

16  wrote a sentence fairly similar to your question.

17      Q.   That's not my question.  I'm saying, did you have

18  that belief?

19              THE WITNESS:  Would you repeat his question,

20  please?

21              (The reporter read back as instructed.)

22              THE WITNESS:  I don't recall having an

23  independent belief that Linda stopped running overdraft

24  reports, although I see that question was asked by

**B745**