Gregg L. Landis

 1   Bill Becker.

 2   BY MR. LaROSA:

 3       Q.    Do you recall having any conversations with

 4   Bill Becker about OD reports not being run that should

 5   have been run?

 6       A.    No.

 7       Q.    Do you recall having any conversations with Bill

 8   Becker about Linda Blozis not running OD reports or

 9   having stopped running OD reports?

10       A.    No.   Although, sending me this e-mail would be a

11   way for Bill to let me know his belief that Linda may

12   have stopped running OD reports.

13       Q.    And do you think you shared that belief with him?

14       A.    I don't recall.

15       Q.    To the best of your recollection, you don't

16   recall having any problems with Linda Blozis with regard

17   to running OD reports?

18       A.    I don't recall any problems with Linda Blozis not

19   running OD reports.   Although, I think this document is

20   indicative of Bill's belief that there may have been a

21   problem.

22       Q.    But you don't recall sharing that belief with

23   him?

24       A.    I recall sharing his belief that Linda's response

**B746**

Gregg L. Landis

1    to the question was an example of Linda displacing blame

2    away from herself on this particular matter.

3    Q.   And on this particular matter, do you think she

4    should have been blamed for this particular matter?

5    A.   I don't have an opinion on that.

6    Q.   Do you think that she was being confronted by

7    Mr. Becker in these e-mails about why this had not gotten

8    done?

9    A.   I think "confronted" is a strong word.  I believe

10    that Bill is asking her a question about overdraft

11    reports.

12            THE WITNESS:  I'd like to take a five-minute

13    break when that's possible.

14            MR. LaROSA:  Now would be a good time

15    because we're finished with that document.  So why don't

16    we do that now?

17            THE WITNESS:  Thank you.

18            (A short recess was taken.)

19    BY MR. LaROSA:

20    Q.   I'd like to show you a document and ask that it

21    be marked Landis Exhibit 11.

22            (Landis Deposition Exhibit No. 11 was marked

23    for identification.)

24

63

Gregg L. Landis

1    BY MR. LaROSA:

2    Q.    Take a moment and read through that document, and

3    let me know when you're finished.

4    A.    Okay.

5    Q.    Have you seen this document before?

6    A.    Yes.

7    Q.    Is this an e-mail chain?

8    A.    Yes.

9    Q.    And calling your attention to the first e-mail at

10    the top of the page, was this an e-mail that you had sent

11    on Sunday, February 23rd, 2003 to Linda Blozis?

12    A.    Yes.

13    Q.    And can you read the text of your e-mail?

14    A.    "Can you look into this while I am away, and

15    discuss when I get back?  Thanks."

16    Q.    When you said "while I'm away," what were you

17    referring to there?

18    A.    Well, I don't recall specifically.  I may have

19    been headed on a vacation or a business trip that would

20    keep me out of the office for several days.

21    Q.    And with regard to your handwritten note, can you

22    read your handwritten note at the top of the page?

23    A.    Yes.  "I'm here on Sunday.  Where is her

24    commitment?"

**B748**

Gregg L. Landis

1    Q.   And were you able to send e-mails from your home

2  or only from your office during this time period?

3    A.   During this time period, I was only able to send

4  e-mails from my office.

5    Q.   And did you feel that the fact that you had sent

6  an e-mail from your office on a Sunday indicated a lack

7  of commitment by Linda?

8    A.   I felt sending an e-mail from my office on Sunday

9  demonstrated my commitment.  And I believe that I wrote

10  these words to indicate a frustration that Linda might

11  not have a similar level of commitment.

12    Q.   What was your pay grade at Mellon at that time?

13    A.   Probably 11 or 12.

14    Q.   What was Linda Blozis's pay grade at that time?

15    A.   Probably 6.

16    Q.   Who makes recommendations with regard to what

17  funds clients should invest in at Mellon?

18    A.   Well, typically a final decision is made by a

19  portfolio manager.  Sometimes those recommendations are

20  made by people at the assistant level, as well as part of

21  a learning tool to try to transition an assistant to

22  higher functioning.

23    Q.   I'm going to show you a document and ask that it

24  be marked Landis Exhibit 12.

Gregg L. Landis

1                    (Landis Deposition Exhibit No. 12 was marked

2        for identification.)

3        BY MR. LaROSA:

4        Q.    Have you seen this document before?

5        A.    I can't recall.

6        Q.    What was Cynthia Chambliss's job at Mellon?

7        A.    Cynthia worked with Brendan to assist him in the

8        management of relationships for which he was ultimately

9        responsible.  And she also helped him with other tasks on

10       the team, such as report gathering and training when

11       appropriate.

12       Q.    Did she function as a portfolio administrator or

13       assistant?

14       A.    I'm not aware of what Cynthia's level was.

15       Q.    Not asking about level or job title, did she do

16       those functions of a portfolio administrator or

17       assistant?

18       A.    She did.  And I believe that she also at some

19       point had accounts assigned directly to her or was

20       performing at a level which was higher than the simple

21       assistant level.

22       Q.    The assistant level is sort of a simple level?

23       A.    I meant "simply" as a modifier, saying just the

24       assistant level.

Gregg L. Landis

1      Q.   And is this document talking about some training

2    that Cynthia Chambliss provided to Linda Blozis?

3      A.   As I read it, yes.

4      Q.   And who determined that Cynthia Chambliss should

5    provide Linda Blozis with some training?

6      A.   I'm not aware.

7      Q.   Was that a suggestion or recommendation by you?

8      A.   If it was, I don't recall it directly today.

9      Q.   So the best of your recollection, you did not

10   initiate this training by Cynthia Chambliss for

11   Linda Blozis?

12     A.   It's difficult for me to remember today, some

13   three years later, who initiated the training.  I can say

14   that reading this document today, it's apparent that

15   someone initiated training that took place.

16     Q.   When was it determined that Cynthia Chambliss

17   should provide training to Linda Blozis?

18     A.   This document doesn't indicate that.

19     Q.   From your own -- the answer is not necessarily on

20   the four corners of the document.  From your

21   recollection, when was it determined that

22   Cynthia Chambliss could help Linda or provide some

23   training to her?

24     A.   I don't recall.  Clearly prior to the creation of

**B751**

Gregg L. Landis

1    this document.

2        Q.    Was part of the training to show Linda how to

3    review an account that needs investment recommendations?

4        A.    This document written by Cynthia says that

5    Cynthia showed Linda how to review an account that needs

6    investment recommendations.

7        Q.    So prior to Thursday, June 12th, did Linda not

8    know how to review an account that needed investment

9    recommendations?

10       A.    It's hard for me to recall what -- or, comment

11   what Linda knows or doesn't know.

12       Q.    You don't recall?

13       A.    I'm responding to your specific question and

14   saying I can't testify or comment on what Linda might

15   know or might not know.

16       Q.    Well, that wasn't my specific question.  I think

17   that's a more general comment.  That's why I'm trying to

18   give you an opportunity to be responsive to the question.

19             Can portfolio administrators receive

20   training on product knowledge?

21       A.    Yes.

22       Q.    After Mellon had upgraded the expectations for

23   administrative help, was there talk of offering packages

24   to administrative help that were unable to perform at the

**B752**

Gregg L. Landis

1    upgraded level?

2    A.    Not that I recall.

3    Q.    Isn't it true that Bill Becker had suggested

4    offering Linda Blozis a package?

5    A.    I have seen a document that would suggest that's

6    correct.

7    Q.    Other than your preparation for this deposition

8    and for this lawsuit, is that recollection based on you

9    having seen something before this lawsuit or before your

10   preparation for this deposition?

11   A.    That recollection is based on a document I

12   reviewed in preparation for this deposition.

13   Q.    Does Mellon have a company policy about the

14   determination of bonuses for its employees?

15   A.    I suspect, yes.

16   Q.    Do you have any understanding of how bonuses are

17   determined for Mellon's employees?

18   A.    Yes, I do.

19   Q.    Can you tell us how?

20   A.    Yes.    I believe that bonuses are awarded to

21   employees at the discretion of management.    And the

22   awarding or not awarding of bonuses and size of bonus

23   takes several factors into consideration.

24             Starting at what I view the top of the

Gregg L. Landis

1    house, it would be based on Mellon's performance as a
2    company for a given time period against financial
3    measures.   Then it would be based on our particular
4    group, private wealth management, and how our group
5    performed versus benchmarks.   Then how a particular team
6    or region within private wealth management did.   And
7    those factors determine a pot of bonus dollars, which are
8    then given to specific employees based on a manager's
9    impression of how that employee executed against his or
10   her goals for the year.
11        Q.   Who determined whether or not an employee would
12   receive a bonus in the Delaware office in 2002 and 2003?
13        A.   I could tell you I was not involved in that
14   determination.
15        Q.   Do you know who made that determination?
16        A.   Not without speculating, no.
17        Q.   Did you receive bonuses in 2002 or 2003?
18        A.   I believe I did.
19        Q.   Do you know who determined the amount of your
20   bonus?
21        A.   I know that Brendan Gilmore communicated to me
22   the amount of the bonus.   I would suspect that he was
23   involved in the determination of the amount, perhaps with
24   other team leaders and his managers.

Gregg L. Landis

1    Q.    When you say "other team leaders," what team
2    leaders are you referring to?
3    A.    Within our region, Brendan was not the only team
4    leader.  And I'm stating a supposition that, perhaps,
5    there was a group decision made on the way bonuses are
6    handed out to employees.
7    Q.    Do you think team leaders from teams other than
8    the team that you were on would have input into your
9    bonus?
10   A.    I believe that last year, as I come to learn more
11   about the process, yes.
12   Q.    Was Linda Blozis instructed not to ask for help
13   from Maria Dunlop with tasks that she had been assigned?
14   A.    I don't believe that to be true.
15   Q.    Was Linda Blozis allowed to receive help from
16   Maria Dunlop with tasks that she had been assigned?
17   A.    Mellon as an organization certainly believes in
18   teamwork and people working with each other to complete
19   tasks.  But I think that Mellon also believes in the duty
20   of an individual to complete most of his or her tasks
21   with little help so that each of us focuses on the job
22   that's assigned to us.
23   Q.    Did you ever criticize Linda Blozis for leaving a
24   booklet for Maria Dunlop to bind?

**B755**

Gregg L. Landis

1      A.    I'm aware of an incident where Linda was

2    criticized for failure to complete a booklet and Maria

3    having to finish that task.

4                   And what is the question?

5                   (The reporter read back as instructed.)

6                   THE WITNESS:   I may have been involved in

7    the criticism of Linda for that aspect.

8    BY MR. LaROSA:

9      Q.    In addition to you, did Brendan Gilmore criticize

10   her for this?

11     A.    I believe that Linda has alleged in paperwork for

12   this lawsuit that Brendan had that belief.

13     Q.    Well, aside from what you've seen in papers

14   dealing with the lawsuit, do you have any independent

15   recollection of Brendan Gilmore criticizing Linda Blozis

16   for leaving the booklet for Maria Dunlop to bind?

17     A.    Yes.

18     Q.    Aside from yourself and Brendan Gilmore, did

19   anyone else criticize Linda Blozis for doing this?

20     A.    I don't believe so.

21     Q.    And based on Mellon's teamwork philosophy, was

22   Maria Dunlop allowed to receive assistance from

23   Linda Blozis in completing some of her work?

24     A.    Under our philosophy of teamwork, Maria was

Gregg L. Landis

1    expected to do most of her work on her own, but certainly

2    was encouraged to come to Linda and other members of our

3    team for help when necessary.

4        Q.    Was Linda Blozis discouraged from asking

5    Maria Dunlop to help her bind a booklet ?

6                MS. WILSON:  Objection to form.

7                You can answer.

8        A.    My recollection is she was criticized after the

9    fact for doing that.

10       Q.    Was she told not to do that in the future?

11       A.    I don't recall the specifics of that

12   conversation.

13       Q.    What was Mellon's policy with regard to vacation

14   in the years 2001 to 2003?

15       A.    My recollection and impression is that Mellon's

16   policy is employees are entitled to a certain number of

17   vacation days based on a variety of factors, including

18   their position within the company, pay grade, their

19   number of years that they have been with the firm.  And

20   so it -- there is a fixed number of vacation days to

21   which each employee is allowed.

22                Under the policy, the taking of vacation

23   days is approved at the discretion of an employee's

24   manager based on a variety of factors, probably including

73

Gregg L. Landis

1    work load, the number of other people in an office to

2    cover that office, particularly when it's a satellite

3    office away from a large and fully staffed hub office.

4    And that's my recollection of Mellon's vacation policy.

5        Q.    If Linda Blozis were to request vacation during

6    the time period of 2001 to 2003, who would be responsible

7    for granting or denying her request?

8        A.    I think ultimately the team leader is responsible

9    for managing vacation policy and how it's carried out.

10   You asked about 2001 to 2003.  I believe that in 2001

11   Linda was reporting directly to Bill, and so he would be

12   involved.

13       Q.    You mean Bill Becker?

14       A.    I do.  Thank you.

15             And towards the end of that time frame, 2003

16   when Linda was reporting directly to me, I would have had

17   input on her ability to take vacation at a given time.

18       Q.    Aside from Bill Becker and you, would anyone else

19   have any input as to whether or not she would be granted

20   or denied vacation or any specific vacation requests?

21       A.    No.  That decision could be sufficiently handled

22   by the parties you mentioned.

23       Q.    If there was an issue, could that decision also

24   be reviewed by Brendan Gilmore as team leader?

**B758**

Gregg L. Landis

1    A.    Certainly.

2    Q.    Aside from papers that you've seen from this

3    lawsuit, were you aware of a meeting between

4    Brendan Gilmore and Linda Blozis, a closed-door meeting

5    in April of 2003?

6    A.    I'm aware of a closed-door meeting.  I don't

7    recall the time frame.  But I have some knowledge that a

8    meeting as you're describing took place.

9    Q.    To the best of your recollection, when was that?

10    A.    I couldn't fix a date.

11    Q.    Other than a specific date, could you approximate

12    what year that was?

13    A.    I believe it would have been in 2003.  Because at

14    that point, Bill Becker had transitioned to Philadelphia

15    and Brendan was taking a more active role and helping us

16    in Delaware.

17    Q.    When in 2003 did Brendan Gilmore take a more

18    active role in Delaware?

19    A.    In Delaware, it was important that we had a

20    senior portfolio manager with a strong level of

21    investment knowledge to work with accounts.  Bill

22    fulfilled that role for a period of time.  And I would

23    suspect that concurrent with Bill's transition to

24    Philadelphia, Brendan became more active in performing

75

Gregg L. Landis

1    investment duties with respect to accounts in Delaware.

2        Q.    Do you recall approximately when in 2003 that

3    occurred?

4        A.    No.  Probably earlier in the year than later.

5        Q.    Were you in the office when this closed-door

6    meeting between Brendan Gilmore and Linda Blozis

7    occurred?

8        A.    Yes.

9        Q.    What was the proximity of your office to

10    Brendan Gilmore's office?

11        A.    There is a conference room between the office

12    that Brendan was using and my office.  So I was two doors

13    removed from Brendan.

14        Q.    Can you approximate the distance between your

15    doors?

16        A.    Not with any mathematical accuracy.

17               Your pause indicates you'd like me to try

18    harder.  So I would guess somewhere between 20 feet and

19    50 feet.

20        Q.    Were you aware that this meeting between

21    Brendan Gilmore and Linda Blozis was occurring at the

22    time it was occurring?

23        A.    No.

24        Q.    Did you find out that this meeting had occurred

**B760**

Gregg L. Landis

1   after it had been completed?

2   A.   Yes.

3   Q.   And from whom did you learn that this meeting had

4  occurred?

5   A.   Linda Blozis.

6   Q.   And had you heard any noise or conversation in

7  Brendan Gilmore's office on the day of that meeting?

8   A.   No.

9   Q.   And what did Linda Blozis tell you?

10   A.   Again, recalling back three years, I believe that

11  Linda told me another employee or two in our -- on our

12  floor came to her after a meeting to see if she was okay,

13  because it seemed like there were raised voices in a

14  meeting.

15   Q.   In a meeting between Linda Blozis and

16  Brendan Gilmore?

17   A.   I believe that's what she was referring to.

18   Q.   And how did you respond?

19   A.   I didn't view that Linda was upset visibly about

20  the meeting, nor did she ask me to respond.  And so I

21  acknowledged what she said, and I don't recall doing

22  anything beyond that.

23   Q.   So you didn't take any action as a result of your

24  conversation with Linda Blozis about this meeting?

**B761**

77

Gregg L. Landis

1     A.    Linda didn't ask me to take any action.

2     Q.    But you didn't do anything on your own initiative

3     either, correct?

4     A.    Correct.

5     Q.    You became aware that Brendan Gilmore had used

6     profanity with Linda Blozis; is that correct?

7     A.    I'm aware of that based on the review of the

8     documents in this lawsuit.

9     Q.    Was that the first time you became aware of that?

10    A.    I know -- I recall Linda telling me a voice was

11    raised.  I don't recall whether Linda told me profanity

12    was used when she was speaking to me about the incident.

13    Q.    She might have told that to you, but you don't

14    recall?

15    A.    I don't recall whether or not she told that to

16    me.

17    Q.    Who made the decision with regard to hiring new

18    employees in the Delaware office?

19    A.    At what time?

20    Q.    In the 2002, 2003 time frame.

21    A.    After Bill Becker left the Delaware office to go

22    to Philadelphia, I was involved in making hiring

23    decisions for the Delaware office.  Brendan Gilmore as my

24    team leader was involved in hiring decisions.  We

**B762**

Gregg L. Landis

1   utilized the services of the human resources department

2   to help with those decisions.  And we sometimes allow

3   other people on the team to, in a more broad interview

4   process, be involved, to the extent that a junior person

5   might let me know as a deciding person what he or she

6   thinks about applicants that he or she has interviewed.

7       Q.   Does Mellon have policies against age

8   discrimination in employment?

9       A.   I believe they do.

10      Q.   Does Mellon have policies against sex

11  discrimination in employment?

12      A.   I believe they do.

13      Q.   Does Mellon have policies against retaliation for

14  complaining of employment discrimination?

15      A.   I'm not aware of that.

16               (Whereupon, the proceedings were

17  interrupted.)

18               (A short recess was taken.)

19  BY MR. LaROSA:

20      Q.   With regard to age discrimination, you're aware

21  it is illegal to discriminate against an employee based

22  on someone's age, correct?

23      A.   Yes.

24      Q.   You're aware it is illegal to discriminate

**B763**

Gregg L. Landis

```
 1    against an employee based on the employee's sex; is that

 2    correct?

 3    A.    Yes.

 4    Q.    You're aware it is illegal to retaliate against

 5    someone based on an employment discrimination complaint

 6    that they make; is that correct?

 7    A.    I'm less directly aware of that.  But it

 8    certainly seems like a good policy to have.

 9    Q.    And with regard to dates of birth, Mellon tracks

10    employees' dates of birth; is that correct?

11            MS. WILSON:  Objection to form.

12            You can answer.

13    A.    You showed me an exhibit earlier that would

14    indicate that's true.

15    Q.    And Mellon tracks employees' sex; is that

16    correct?

17            MS. WILSON:  Objection to form.

18            You can answer.

19    A.    You showed me an exhibit earlier that would

20    indicate that's also true.

21    Q.    Mellon tracks employees' ages; is that correct?

22            MS. WILSON:  Objection to form.

23            You can answer.

24    A.    You showed me an exhibit earlier that would
```

Gregg L. Landis

1    indicate that's true.

2        Q.    Did there come a point in time in 2003 when

3    Linda Blozis made an employment discrimination complaint

4    to human resources?

5        A.    I'm only aware of that as a result of this

6    lawsuit.

7        Q.    Prior to this lawsuit, were you aware that

8    Linda Blozis accused Mellon of age discrimination?

9        A.    I don't recall being aware of that until this

10   lawsuit.

11       Q.    Prior to this lawsuit, were you aware that

12   Linda Blozis accused Brendan Gilmore of age

13   discrimination?

14       A.    I don't have an awareness of that prior to this

15   lawsuit.

16       Q.    Had you ever been contacted by Rosemary Thomas or

17   anyone else from Mellon in connection with an

18   investigation into an employment discrimination complaint

19   by Linda Blozis?

20       A.    It's possible that that occurred.  I don't have a

21   specific recollection of it.

22       Q.    To the best of your recollection, you were not

23   contacted regarding an employment discrimination

24   complaint by Linda Blozis?

Gregg L. Landis

1                MS. WILSON:  Objection to form.

2                You can answer.

3     A.    It's hard to remember everything that happened

4     three years ago.  If it's proven that Rosemary Thomas

5     spoke with me about the issue you're discussing, then I'm

6     sure that that's correct.

7     Q.    Do you recall talking to anyone in connection

8     with an employment discrimination complaint by

9     Linda Blozis?

10    A.    No.

11    Q.    Is it Mellon's policy for human resources to open

12    up a confidential file when a complaint is made to human

13    resources?

14               MS. WILSON:  Objection to form.

15               You can answer.

16    A.    I'm not aware of the human resources policy with

17    respect to documenting complaints.

18    Q.    Are you aware of any Mellon policy with respect

19    to documenting complaints of employment discrimination?

20    A.    No.

21    Q.    Eventually Linda Blozis received written

22    disciplinary action prior to her termination of

23    employment; is that correct?

24    A.    Yes.

**B766**

Gregg L. Landis

1    Q.   And she was issued a final written warning; is

2    that correct?

3    A.   Yes.

4    Q.   And prior to the final written warning, she never

5    received any other written reprimands in her personnel

6    file; is that correct?

7              MS. WILSON:  Objection to form.

8              You can answer.

9    A.   No.  I believe there was an annual review which

10   Linda was given that indicated dissatisfaction with her

11   performance.  That would be construed as written notice

12   that Mellon was dissatisfied with her performance.

13   Q.   Mellon also has a form of discipline called a

14   corrective action; is that correct?

15   A.   Yes.

16   Q.   And prior to her final written warning, she had

17   never received any other corrective action; is that

18   correct?

19   A.   No --

20             MS. WILSON:  Objection to form.

21             You can answer.

22   A.   No.  I believe that's incorrect.

23   Q.   You believe she had received other corrective

24   action?

Gregg L. Landis

```
 1      A.    I believe she received a notice that her

 2      performance was deficient and that that notice served as

 3      written notice under our corrective action policy.

 4      Q.    And aside from the final written warning and any

 5      communication on a performance evaluation, Linda Blozis

 6      never received any other written discipline prior to her

 7      termination; is that correct?

 8                   MS. WILSON:  Objection to form.

 9                   You can answer.

10      A.    Linda certainly received indication in writing

11      that her performance on specific tasks was not

12      sufficient.  I don't fully understand the use of the word

13      "discipline" in your question.

14      Q.    Are you aware that Mellon has a progressive

15      discipline policy?

16      A.    Yes.

17      Q.    And are you aware that in certain situations, an

18      employee can be terminated for an intolerable offense --

19      A.    Yes.

20      Q.    -- immediately?

21      A.    Yes.

22      Q.    And Linda Blozis was not discharged for an

23      intolerable offense that could result in immediate

24      termination; is that accurate?
```

Gregg L. Landis

```
 1                MS. WILSON:  Objection to form.

 2                You can answer.

 3     A.    I guess I would be comfortable answering that

 4     after a review of the papers that she was given with

 5     respect to her termination.

 6     Q.    Well, without a review of any papers, is it your

 7     understanding that she was disciplined for an intolerable

 8     offense that results in immediate termination?

 9     A.    I think she was terminated for a series of

10     deficiencies in her job performance, none of which

11     singularly rose to the level of an intolerable offense,

12     but all of which contributed to the feeling that her

13     performance was not adequate.

14     Q.    And if an employee is not guilty of an

15     intolerable offense, is there a progressive discipline

16     policy whereby an employee is given initial written

17     warning, final written warning and eventually a

18     termination?

19                MS. WILSON:  Objection to form.

20                You can answer.

21     A.    I think there's a policy that includes those

22     steps.  I don't believe that the policy is exhaustive in

23     listing only those steps.

24     Q.    You think there's additional steps that can be
```

**B769**

Gregg L. Landis

1   taken between the initial written warning and the
2   termination other than the final written warning?
3       A.   I think there are a variety of steps that can be
4   taken all along the corrective action process.
5       Q.   Between May and July of 2003, did you admit that
6   there was a smooth transition of files by Linda Blozis
7   for her replacement?
8       A.   I don't recall that specifically.
9       Q.   During the time period between May and July of
10  2003, did you feel that Linda Blozis was making a smooth
11  transition of files for her successor?
12              MS. WILSON:  Objection to form.
13              You can answer.
14      A.   I'm confused by the concept of Linda preparing
15  files for her successor.  Because during that time
16  period, it wasn't anticipated that Linda would have a
17  successor.  She was working in our office on a set of
18  tasks.
19      Q.   At what time was it anticipated that Linda Blozis
20  would have a successor?
21              MS. WILSON:  Objection to form.
22              You can answer.
23      A.   At no time.  When Linda's employment was
24  terminated, we needed to hire a successor to fill the

**B770**

Gregg L. Landis

    1    position.

    2        Q.    And did Laura Shannon replace Linda Blozis in

    3    that position?

    4                MS. WILSON:  Objection to form.

    5                You can answer.

    6        A.    She succeeded Linda Blozis in that position.

    7        Q.    In your role, do you do planning for employees

    8    with respect to their goals for the calendar year?

    9        A.    Yes.

   10        Q.    When do you do that planning?

   11        A.    Typically that planning is done in the first

   12    several -- first month or two of the year.

   13        Q.    I'll show you a document and ask that it be

   14    marked Landis Exhibit 13.

   15                (Landis Deposition Exhibit No. 13 was marked

   16    for identification.)

   17    BY MR. LaROSA:

   18        Q.    This is a document that is marked MEL/BLOZ 761 at

   19    the bottom right-hand corner.

   20                Have you seen this document before?

   21        A.    Yes.

   22        Q.    What is this document?

   23        A.    It's an e-mail from Linda to me and then a

   24    response from me to Linda.

Gregg L. Landis

1    Q.    Can you read that first line in your message of

2    March 5th, 2003?

3    A.    Yes.    It says, "Thank you.    I will be doing 2003

4    planning for MB, LB and GL in the next week or so.    Will

5    meet with you on this shortly."

6    Q.    When you use the initials MB, who are you

7    referring to?

8    A.    Maria Bannister.

9    Q.    Who did you mean by LB?

10    A.    Linda Blozis.

11    Q.    Who did you mean by GL?

12    A.    Myself, Gregg Landis.

13    Q.    So as of March 5th, 2003, you had not done 2003

14    planning for Linda Blozis or these other folks?

15    A.    I think the formal documentation, written

16    documentation of planning was something that I did,

17    according to this e-mail, in early March of 2003.

18    Q.    So it had not been completed in the first two

19    months of 2003; is that correct?

20    A.    Yes.

21    Q.    Linda Blozis, when she was discharged, was told

22    to clean out her desk; is that correct?

23    A.    I recall telling Linda in a very polite and

24    respectful way that she needed to remove her personal

**B772**

Gregg L. Landis

1    belongings from the office and take them home with her,

2    and that she would be provided a box to use to transport

3    those items.

4        Q.    And with regard to informing her her employment

5    had been terminated, who did that?

6        A.    I informed Linda in person with Rosemary Thomas

7    on the telephone.

8        Q.    You were with Linda Blozis in person and

9    Rosemary Thomas was on the telephone?

10       A.    Yes.

11       Q.    And this occurred on a Monday; is that correct?

12       A.    I don't recall which day of the week it occurred.

13       Q.    Did it occur some time in the beginning or middle

14   of the week?

15       A.    I don't recall which day during the week it took

16   place.

17       Q.    And Linda Blozis was paid until the end of the

18   week; is that correct?

19       A.    I do recall, as a gesture of kindness, not

20   stopping her pay on the date of termination, but

21   continuing it through to some longer period.

22       Q.    And she was being terminated for unsatisfactory

23   performance, is that accurate, in general terms?

24       A.    Yes.

Gregg L. Landis

1      Q.    And why would you pay someone until the end of

2    the week if their performance was unsatisfactory?

3      A.    Cessation of employment creates a financial

4    burden for someone.  And so, as I recall, we were near

5    the end of a week or a pay period.  And so, as a gesture

6    of kindness, I allowed or recommended that the firm pay

7    her for some additional number of days.

8      Q.    I'll show you a document and ask that it be

9    marked Landis Exhibit 14.

10            (Landis Deposition Exhibit No. 14 was marked

11    for identification.)

12    BY MR. LaROSA:

13      Q.    Have you seen this document before?

14      A.    Yes, I have.

15      Q.    What is this document?

16      A.    This is an e-mail that I sent to Linda asking for

17    help with certain tasks regarding a particular account

18    that we managed.

19      Q.    And did you write the note at the bottom of the

20    page?

21      A.    Yes.

22      Q.    Can you read that first sentence of your note at

23    the bottom of the page?  It starts with the word

24    "discovered."

Gregg L. Landis

1      A.    Yes.    "Discovered this after Linda was fired.

2    She said we had not sold GE, when in fact we sold 1600

3    shares on January 16, 2003.    See attached. "

4      Q.    And this was not an issue that had been used in

5    deciding to terminate Linda Blozis's employment; is that

6    correct?

7      A.    Yes, that's correct.

8      Q.    I'm going to show you one last document and ask

9    it be marked Landis Exhibit 15.

10               (Landis Deposition Exhibit No. 15 was marked

11   for identification.)

12   BY MR. LaROSA:

13     Q.    This document is marked MEL/BLOZ 668 at the

14   bottom right-hand corner.

15               The prior document we discussed, Landis

16   Exhibit 14, was marked MEL/BLOZ 659 at the bottom

17   right-hand corner, for the record.

18               Let me know when you've had a chance to

19   review that.

20     A.    Okay.

21     Q.    What is this document?

22     A.    This appears to be a report that was sent to

23   Bill Becker of accounts that were coded to him with an

24   investment objective code of 01.

Gregg L. Landis

1    Q.    What does that code refer to 01?

2    A.    While I don't recall specifically, I have to

3    suspect it's a code that needs to be changed either

4    because it refers to an unknown investment objective or

5    one that requires to be more fully described.

6    Q.    And did you make a handwritten note on here, on

7    the copy of this document?

8    A.    Yes, I did.

9    Q.    And are those your initials, GL?

10    A.    Yes.

11    Q.    And when did you make that note?

12    A.    I placed a date on that note of January 7, 2004.

13    Q.    So with regard to this document and any issue

14    about coding being wrong, this issue was not used in

15    deciding to terminate Linda Blozis's employment; is that

16    correct?

17    A.    Yes, that's correct.

18    Q.    After Linda Blozis was discharged, was a

19    Laura Shannon hired?

20    A.    Yes.

21    Q.    And did she become a portfolio administrator in

22    the Delaware office?

23    A.    Yes.

24    Q.    And she is younger than Linda Blozis; is that

Gregg L. Landis

1   correct?

2      A.    I'm not aware of Laura's age.

3      Q.    Well, is Laura Shannon responsible for telephone

4   reception in the Delaware office?

5      A.    Yes.

6      Q.    Was Laura Shannon responsible for mail delivery

7   in the Delaware office?

8      A.    Yes.

9      Q.    Was Laura Shannon responsible for arranging

10  client meetings in the Delaware office?

11     A.    Yes.

12     Q.    Was Laura Shannon responsible for handling all

13  cash transactions in the Delaware office?

14     A.    I wouldn't use the word "all."  She was certainly

15  responsible for handling cash transactions.  I suspect

16  other people in the firm were jointly responsible for

17  that.

18     Q.    Was Laura Shannon responsible for opening new

19  accounts?

20     A.    Yes.

21     Q.    Was she responsible for closing terminated

22  accounts?

23     A.    Yes.

24     Q.    Approximately how long did Laura Shannon work for

93

Gregg L. Landis

1    Mellon?

2    A.    I would say longer than one year, less than two

3    years.

4    Q.    So between one and two years?

5    A.    Yes.

6    Q.    Was Laura Shannon eventually fired?

7    A.    No.

8    Q.    Did Laura Shannon voluntarily resign her

9    employment?

10   A.    Yes.

11   Q.    I'd ask you to turn back to Landis Exhibit 5.

12   And I call your attention to the first sentence of the

13   first e-mail there.

14           Having read this e-mail, I ask if you recall

15   if you took any vacation in June of 2003?

16   A.    Yes.

17   Q.    Do you recall where you went on vacation in June

18   of 2003?

19   A.    It's been my family's practice to go on vacation

20   to Bethany Beach, Delaware around the 4th of July

21   holiday.

22   Q.    You believe that's where you went in June of 2003

23   or June and July of 2003?

24   A.    I do.

94

Gregg L. Landis

1    Q.   Do you recall how long you were on vacation in

2   that time period?

3    A.   I suspect it was for one week.

4         MR. LaROSA:  No further questions.

5         At this point, you have the right, as I said

6   at the beginning, to review the transcript.  You can read

7   it and review it for any typographical errors and sign

8   it, or you can waive that right at this time.

9         MS. WILSON:  We'll review.

10        (Deposition concluded at 4:01 p.m.)

11

12           -  -  -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

**B779**

95

```
 1                     I N D E X

 2    DEPONENT:  GREGG L. LANDIS              PAGE

 3        Examination by Mr. LaRosa              2

 4
                      E X H I B I T S
 5
      LANDIS DEPOSITION EXHIBITS              MARKED
 6
      1  E-mail dated 10/18/02 from Richard Olney
 7         to Paul Kochis, Brendan Gilmore and
           Rosemary Thomas                     13
 8    2  Employee Profile History for Linda Blozis  16
      3  Performance Management Exempt form     19
 9    4  Performance Management Exempt form     22
      5  Two-paged document containing various
10        e-mails                              38
      6  One page of handwritten notes         42
11    7  One page of handwritten notes         45
      8  One page of handwritten notes         52
12    9  E-mail dated 3/8/03 from Gregg Landis to
           Bruce Holmquist and various handwritten
13        notes                                54
      10 One page document with various e-mails  58
14    11 One page document with various e-mails  62
      12 E-mail dated 6/19/03 from Cynthia Chambliss
15        to Rosemary Thomas                   65
      13 Two e-mails dated 3/5/03: One from Gregg
16        Landis to Linda Blozis and one from Linda
           Blozis to Gregg Landis               86
17    14 E-mail dated 6/6/03 from Gregg Landis to
           Linda Blozis with various handwriting  89
18    15 Document entitled, "Investment Objective 01
           Accounts"                           90
19

20
      ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 96
21

22
      CERTIFICATE OF REPORTER               PAGE 97
23

24
```

**B780**

ATTACH TO DEPOSITION OF: _Gregg L. Landis_

DATE TAKEN: _December 21, 2006_

IN THE MATTER OF: _Blozis V Mellon Trust_

### ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. **Do not make any marks or notations on the transcript itself.** Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below  Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|----------------------------------|
| 26 | 18 | The three words " office  or  a " |
|    |    | should instead be the word " officer. " |
|    |    | |
|    |    | |
|    |    | |
|    |    | |
|    |    | |
|    |    | |
|    |    | |
|    |    | |
|    |    | |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _2/7/07_          _(signature)_

(Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
            1330 King Street
            Wilmington, DE  19801

**B781**

97

```
 1   State of Delaware          )

 2                              )

 3   New Castle County          )

 4

 5                    CERTIFICATE OF REPORTER

 6
            I, Patricia L. Shelton, Registered Professional
 7   Reporter and Notary Public, do hereby certify that there
     came before me on Thursday, December 21, 2006, the
 8   deponent herein, GREGG L. LANDIS, who was duly sworn by
     me and thereafter examined by counsel for the respective
 9   parties; that the questions asked of said deponent and
     the answers given were taken down by me in Stenotype
10   notes and thereafter transcribed by use of computer-aided
     transcription and computer printer under my direction.
11
            I further certify that the foregoing is a true
12   and correct transcript of the testimony given at said
     examination of said witness.
13
            I further certify that I am not counsel,
14   attorney, or relative of either party, or otherwise
     interested in the event of this suit.
15

16

17
                        PATRICIA L. SHELTON, RPR
18                      Certification No. 104-RPR
                        (Expires January 31, 2008)
19

20   DATED:

21

22

23

24
```

**B782**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| **LINDA J. BLOZIS** | : | **CIVIL ACTION NO. 05-891 (SLR)** |
| **Plaintiff,** | : | |
| **vs.** | : | **DECLARATION OF** |
| | | **GREGG L. LANDIS** |
| **MELLON TRUST OF DELAWARE,** | : | |
| **NATIONAL ASSOCIATION; MELLON** | | |
| **BANK, NATIONAL ASSOCIATION;** | : | |
| **MELLON FINANCIAL CORPORATION,** | | |
| | : | |
| **Defendants.** | | |
| | : | |

I, Gregg L. Landis, of full age, hereby certify and declare as follows based upon my own personal knowledge and information.

1.     I began working for Mellon in its Private Asset Management group in 1996 as an Assistant Vice President. At that time, I worked out of Philadelphia. In or about 1999, I was promoted to Vice President and transferred to the Delaware office. I am currently employed as Senior Director for Mellon, and have worked in this position since approximately January 2006. I have been authorized by Mellon to make this Declaration in support of its Motion for Summary Judgment in the above-captioned matter.

2.     In my capacity as Vice President or Senior Portfolio Manager, as my position was also described, from approximately January 2003 to the time that Ms. Blozis' employment was terminated in July of 2003, I supervised Ms. Blozis' work. As Portfolio Administrator, her job was to provide support to me, which, in turn, enabled me

to service the clients' portfolios that were assigned to me. We serviced individual clients with portfolios of generally at least one million dollars in value.

3.    During the time that Ms. Blozis reported to me, I was aware of certain performance issues. I was also aware that Ms. Blozis' previous supervisor, Mr. William Becker, had placed her on an Initial Written Warning for performance problems in her February 2003 performance review and that immediate and sustained improvement in her performance was required.

4.    As her supervisor, it was my responsibility to review regularly Ms. Blozis' work. I reviewed her work product and would keep proper track of it, so that it could be used as a teaching or training device with Ms. Blozis. In this way, I was personally aware of Ms. Blozis' performance issues.

**Problems With Ms. Blozis' Work**

5.    On January 30, 2003, I reviewed an Investment Review that Ms. Blozis completed for one of our clients. I noted that Ms. Blozis had stated that the client had a "tax exempt" stock model where the correct description was "tax efficient." Additionally, she had supplied information incorrectly using a taxable index incorrectly where she should have used a tax free index for the benchmark because this client had a municipal bond fund in trust. Ms. Blozis' errors on this document showed that she was inattentive to detail and lacked sufficient knowledge of Mellon's products and how they interacted with the client's account. As a Portfolio Administrator, she should have been aware of this. A true and correct copy of the Investment Review with my notes is attached hereto as **Exhibit 1**.

- 2 -

PRCLIB-436194.1-SWILSON 2/25/07 1:14 PM

B784

6.    · On January 31, 2003, Ms. Blozis had printed an Agenda for a meeting with a client. The Agenda had glaring numbering errors that Ms. Blozis should have caught. Each category was numbered "I" instead of being numbered consecutively. The error was caught by Mr. Becker who reprinted it himself. A true and complete copy of the Agenda with my notes is attached hereto as **Exhibit 2**.

7.    Ms. Blozis failed to timely complete projects. As an example, I had asked Ms. Blozis for information on a particular client on February 5, 2003. As of February 23, 2003, it still was not completed. It was finally completed four days later on February 27, 2003. I felt this was too long of a delay in providing the information. I also felt that Ms. Blozis did not show the same type of commitment toward completing her assignment, since I was working on Sunday to get client information completed. True and complete copies of the e-mail chain concerning this client and containing my notes is attached hereto as **Exhibit 3**.

8.    Ms. Blozis compounded her errors by failure to attend to details. She drafted a letter dated March 19, 2003 where the client's assets failed to total 100%. This was a basic math error. Similarly, on another Statement of Investment Policy that I reviewed on March 17, 2003 Ms. Blozis' calculation of the asset allocations totaled 110% instead of 100%. True and complete copies of the March 19 letter and Policy with my notes are attached hereto as **Exhibit 4**.

9.    I reviewed an email that Ms. Blozis sent me on March 21, 2003. After reviewing the e-mail, I noted that Ms. Blozis had improperly sent proxy material in 2002 to the same client and the client was still erroneously receiving the reports in 2003, after

- 3 -

PRCLIB 436194.1-SWILSON 2/25/07 1:14 PM

Ms. Blozis was told previously about this mistake. A true and complete copy of the March 21 e-mail with my notes is attached hereto as **Exhibit 5.**

10.    On March 31, 2003, I reviewed Asset Allocation Risk Profile Questionnaires that Ms. Blozis had completed for four clients. I noticed that they had unusually high cash percentages and no allocations to international and emerging markets. I questioned Ms. Blozis about this and told her that she had to do further research. Again, this was an example of Ms. Blozis' failure to understand her job, Mellon's products, and proper servicing of the clients' accounts. True and complete copies of my notes and the Questionnaires are attached hereto as **Exhibit 6.**

11.    On April 21, 2003, I asked Ms. Blozis about the status of the April 2003 stale price report. Its completion had been on her March "to do" list and we had discussed this at our meeting on March 12, 2003. On April 25, 2003, Ms. Blozis stated that she had been working on other matters and that it was not a priority. However, I felt that it should have been completed and that she was not managing her time in order to complete her projects in a timely manner. A true and complete copy of the April 2003 e-mail chain and my notes is attached hereto as **Exhibit 7.**

12.    On April 24, 2003, I corrected another Investment Review that Ms. Blozis had prepared. She had described the Portfolio Objectives as "balanced" when in fact the Portfolio was not balanced because it consisted of 93% stocks. It was instead, correctly described as aggressive. The mistakes were similar to mistakes that I had corrected and had discussed with her in the past. Because Ms. Blozis kept making the same types of mistakes, it showed a lack of understanding of basic investment concepts

- 4 -

and words. A true and complete copy of the Investment Review with my notes is attached hereto as **Exhibit 8**.

13.    On April 29, 2003, I noticed three problems with an Investment Review that Ms. Blozis had prepared for a client. She had stated that the account was balanced, although it was not. Her characterization of the account as balanced showed a lack of understanding. I had corrected this type of mistake previously and brought this to her attention, yet she made the same mistake. The Review contained other errors. She used a taxable bond index for an account with municipal bonds. I had brought this to her attention before as evidenced by my notes on Exhibit 1. Again, this type of error showed a lack of understanding. Moreover, the client had made major withdrawals from his account and she should have compiled a list showing the major withdrawals because the client might inquire why his account balance was declining. True and complete copies of my notes and the Review are attached hereto as **Exhibit 9**.

14.    Ms. Blozis continued to show a lack of understanding of her work as reflected by a Statement of Investment Policy that she completed. As an example, the Risk Tolerance was not "moderate to high" as she described; it was "low to moderate." Similar to other mistakes, she failed to understand that a portfolio containing 30% in stocks is not a moderate to high risk. A true and complete copy of the Policy with my notes is attached hereto as **Exhibit 10**.

15.    On March 31, 2003, Ms. Blozis was assigned the task of completing client booklets. On April 24, 2003 she acknowledged that she would prepare the booklets. However, on April 30, 2003, she had not completed them and left for vacation without completing them. I understand that this was a subject of a meeting between Mr.

- 5 -

Brendan Gilmore, my supervisor and Team Leader, with Ms. Blozis on April 30.
Because of this and other continuing performance problems since she was placed on
Initial Written Warning in February 2003, a discussion was held on April 30 with
Rosemary Thomas, our human resources manager, and Mr. Gilmore about placing Ms.
Blozis on Final Written Warning and it was determined that Ms. Blozis would be placed
on Final Written Warning. A true and complete copy of the April 24, 2003 e-mail
exchange between Plaintiff and me along with my handwritten notes is attached as
**Exhibit 11.**

16.    On May 7, 2003, I e-mailed Mr. Gilmore about the status of the client
booklets. Mr. Gilmore told Ms. Blozis that she had to complete the booklets before
leaving for her vacation. Ms. Blozis left for vacation on May 1, 2003 without completing
the booklets. Her co-worker, Ms. Dunlop, completed the booklets. In addition, upon
review of the booklets, it was discovered that Ms. Blozis had run a market value history
for only two years for a long term account and that the history should have been run
from 1990. We had previous discussions about providing long term clients with
sufficient historical account information. However, this was not done and the booklets
had not been completed as we had instructed. A true and complete copy of my e-mail
to Mr. Gilmore is attached hereto as **Exhibit 12.**

17.    On May 9, 2003, I sent Mr. Gilmore an e-mail describing the problems I
had found with Ms. Blozis' performance while she was on vacation. I copied Mr. Paul
Kochis, Mr. Gilmore's supervisor, and Ms. Thomas. Upon review, I found that Ms.
Blozis had sent an incomplete recommendation to a client that made Mellon look very
unsophisticated to an important client. Additionally, Ms. Blozis had failed to complete

- 6 -

yet another assignment that I gave her. Specifically, on April 7, 2003, I gave Ms. Blozis a draft Investment Recommendation for a client along with three directions on the recommendation. Upon my review, no work had been done. A true and complete copy of the May 9 e-mail is attached hereto as **Exhibit 13**.

18.     A goal for Portfolio Assistants was for them is to ultimately make first draft Investment Recommendations, but Ms. Blozis had proven incapable of even basic follow up and time management. In response to the May 9 e-mail, Mr. Kochis stated that Ms. Blozis' conduct was "gross negligence or insubordination" and he recommended her immediate termination upon her return from vacation. Id.

19.     On May 13, 2003, upon reviewing an Investment Review, Ms. Blozis provided only one year of account performance. Since the accounts had been with Mellon since 1998, it was the practice to show the clients as much history and performance as possible. Ms. Blozis should have known this. A true and complete copy of the Investment Review with my notes is attached hereto as **Exhibit 14.**

20.     Still another example of Ms. Blozis' failure to understand her job is reflected by my May 13, 2003 review of a Combined Investment Form that Ms. Blozis completed. I noted that Ms. Blozis reported 2002 gains/losses where she should have reported 2003 information. A true and correct copy of the Form with my notes is attached hereto as **Exhibit 15.**

21.     On May 13, 2003, I reviewed a Combined Equity Diversification form that Ms. Blozis had completed for a client's account. The information concerning Producer Goods and Services was wrong. Ms. Blozis stated that the client's portfolio contained 25.03% of this type of stock, but based on the graph it should have been approximately

- 7 -

6%. I asked her to correct this information. A true and complete copy of the Diversification form with my notes is attached hereto as **Exhibit 16**.

### Ms. Blozis is Given a Final Written Warning

22.     Although Mr. Kochis recommended Ms. Blozis' immediate termination, after further discussion among Mr. Kochis, Mr. Gilmore, Ms. Thomas, and me, it was decided to remain with our April 30 decision to place Ms. Blozis on a Final Written Warning, which I delivered to her on May 19, 2003. Prior to meeting with Ms. Blozis, I met with Ms. Thomas who offered the following observations about Ms. Blozis: (1) Ms. Thomas detected a strong resistance to change on the part of Ms. Blozis; (2) Ms. Blozis said that she didn't have time to complete all of her work; (3) Ms. Blozis stated that she might not want to continue working at this level. A true and complete copy of the notes of my meeting with Ms. Thomas is attached hereto as **Exhibit 17**.

23.     On May 19, 2003, I met with Ms. Blozis to deliver the Final Written Warning and made notes of the meeting. During the meeting, Ms. Blozis asked if we could just fire her or if she resigned whether she could get unemployment. She expressed frustration and stated, among other things, that she was not willing to work fifty hours when she was getting paid 37.5 hours. A true and complete copy of the notes that I took at the May 19 meeting are attached hereto as **Exhibit 18**.

24.     During my meeting with Ms. Blozis, I stated, among other things, that the Portfolio Administrator position was changing and becoming more fast paced. I told Ms. Blozis that she had to do more with less. I also described examples of performance issues which had triggered her receipt of a Final Written Warning. A true and complete copy of my notes is attached hereto as **Exhibit 19**.

- 8 -

25.   On May 21, 2003 Ms. Blozis gave me her "to do" list. One of the items that was on her list was to finish the May stale pricing sheet by June 20, 2003. However, Ms. Blozis failed to complete the May 2003 stale price report by June 20, 2003. True and complete copies of Ms. Blozis' To Do List and an e-mail exchange between Ms. Blozis and me with my notes are attached hereto as **Exhibit 20.**

## The Decision Is Made To Terminate Ms. Blozis' Employment

26.    In addition to missing deadlines, Ms. Blozis continued to fail to understand the information that she was required to obtain for clients, although she had received assistance from Cindy Chambliss, a Portfolio Officer in the Philadelphia office. On or about July 10, 2003, the decision was made to terminate Ms. Blozis' employment. A true and complete copy of my July 10 e-mail to Mr. Gilmore is attached hereto as **Exhibit 21.**

27.    I met with Ms. Blozis on July 14, 2003 and Ms. Thomas was present by telephone. Ms. Blozis' employment was terminated because she failed to show immediate and sustained improvement in her performance as was set forth in the Final Written Warning from May. A true and complete copy of my notes concerning the termination meeting are attached as **Exhibit 22.**

## Other Portfolio Administrators That I Have Supervised

28.    I also supervised Maria Dunlop, who held the position of Portfolio Administrator. Ms. Dunlop was never placed on corrective action. She was overall a good employee and she never had performance issues like Ms. Blozis had.

29.    I also supervised Laura Shannon, who was hired after Ms. Blozis' employment was terminated and held the position of Portfolio Administrator. Ms.

- 9 -

PRCLIB-436194.1-SWILSON 2/25/07 1:14 PM

Shannon was never placed on corrective action.  She was overall a good employee and she never had performance issues like Ms. Blozis had.

    30.    I have never made any inappropriate age-related or sex-related comments to any employees inclusive of Ms. Blozis.

- 10 -

Pursuant to 28 U.S.C. §1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing statements made by me are true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Gregg L. Landis

Dated: February 26, 2007

- 11 -

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LINDA J. BLOZIS,                    )
                                    )
            Plaintiff,              )
                                    )    Civil Action
v.                                  )    No. 05-891 SLR
                                    )
MELLON TRUST OF DELAWARE, NATIONAL) 
ASSOCIATION, a Pennsylvania cor-   )
poration; MELLON BANK, NATIONAL    )
ASSOCIATION, (formerly MELLON BANK)
(DE) NATIONAL ASSOICATION), a      )
Pennsylvania corporation; and      )
MELLON FINANCIAL CORPORATION, a    )
Pennsylvania corporation,          )
                                    )
            Defendants.             )

              Deposition of WILLIAM S. BECKER taken
pursuant to notice at the law offices of John M.
LaRosa, Esq., Two East 7th Street, Wilmington,
Delaware, beginning at 10:20 a.m., Friday, January 5,
2007, before Christina M. Vitale, Certified Shorthand
Reporter and Notary Public.

APPEARANCES:

            JOHN M. LaROSA, ESQ.
            LAW OFFICES OF JOHN M. LaROSA
              Two East 7th Street
              Wilmington, Delaware  19801
              For the Plaintiff

            STEPHANIE WILSON, ESQ.
            REED SMITH, LLP
              Princeton Forrestal Village
              136 Main Street - Suite 250
              Princeton, New Jersey   08543-7839
              For the Defendants


              WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
              (302) 655-0477
              Www.wilfet.com

William S. Becker                 2

1              WILLIAM S. BECKER, the deponent herein,

2     having first been duly sworn on oath, was examined and

3     testified as follows:

4     BY MR. LaROSA:

5        Q.   Good morning.

6        A.   Good morning.

7        Q.   My name is John LaRosa and I represent Linda

8     Blozis who is the plaintiff in this lawsuit.  Will you

9     state your full name for the record, please.

10       A.   Yes, William Scott Becker.

11       Q.   What is your current home address?

12       A.   554 Canterbury Lane, C-A-N-T-E-R-B-U-R-Y,

13    Berwyn, Pennsylvania, 19312.

14       Q.   Have you ever had your deposition taken before?

15       A.   Yes, I have.

16       Q.   Let me review some ground rules for you.  After

17    I ask the questions and you answer them today you will

18    have the opportunity to review the written transcript

19    to see if the court reporter made any typos or

20    technical mistakes.  Do you understand that?

21       A.   Yes.

22       Q.   And you have taken an oath to tell the truth

23    and you understand the significance of that, correct?

24       A.   Yes.

William S. Becker          3

1     Q.    Are you under any medications or substances

2     that would prevent you from remembering accurately or

3     testifying truthfully today?

4     A.    No.

5     Q.    Is there any reason why you feel you might not

6     be able to testify truthfully today?

7     A.    No.

8     Q.    If I ask you a question and you don't

9     understand, please let me know and I'll be glad to

10    rephrase the question.  Do you understand that?

11    A.    Yes.

12    Q.    If you don't know the answer to something, we

13    don't want you to guess or speculate.  So, it's an

14    acceptable answer to say I don't know.  I'll try to

15    move on to another area.  Do you understand that?

16    A.    Yes.

17    Q.    Also, we have to take turns speaking because

18    the court reporter cannot record two voices at once.

19    So, please wait until I finish my question to give me

20    an answer and I'll try to let you finish your answer

21    before I move on to the next question.  Do you

22    understand that?

23    A.    Yes.

24    Q.    Also, the court reporter cannot record

**B796**

William S. Becker              4

1    non-verbal responses such as shakes of the heads and

2    things like that.  So, please give me a verbal

3    response.  Do you understand that?

4    A.    Yes, I do.

5    Q.    Also, there is water in the room and if you

6    need any restroom breaks or any other breaks at any

7    time, please let me know.

8    A.    Okay.

9    Q.    Have you reviewed any documentation in

10   preparation for your deposition today?

11   A.    Yes.

12   Q.    What have you reviewed?

13   A.    I've reviewed several notes that I had made

14   with respect to Linda's reviews, Linda's review for

15   year--end that I had given her in 2002, several

16   E-mails that were directed to Linda or to other people

17   that were in the office.  There might have been some

18   other things.  I don't remember specifically.

19   Q.    Approximately how long did you spend preparing

20   for the deposition?

21   A.    I believe around four hours.

22   Q.    Can you state your date of birth.

23   A.    Yes, October 28, 1966.

24   Q.    Regarding your educational background did you

William S. Becker          5

1    graduate from high school?

2    A.   Yes, I did.

3    Q.   Did you graduate from college?

4    A.   Yes.

5    Q.   Did you receive an undergraduate degree?

6    A.   Yes.

7    Q.   What is your undergraduate degree in?

8    A.   BS in finance.

9    Q.   Did you attend graduate school?

10   A.   I did not.

11   Q.   Who is your current employer?

12   A.   Mellon.

13   Q.   Have you ever reported to anyone at Mellon

14   Trust of Delaware?

15   A.   I reported to Brendan Gilmore, who is my team

16   leader.  I'm unsure whether he was an employee of

17   Mellon Trust of Delaware or what entity he was

18   employed by.

19   Q.   Did Linda Blozis ever report to you when you

20   worked at Mellon?

21   A.   Yes, she did.

22   Q.   What time frame did she report to you?

23   A.   Beginning in September of 1998 until year-end

24   2002.

B798

William S. Becker        6

1    Q.   Let me jump back.  When did you begin working

2   for Mellon?

3    A.   September of 1998.

4    Q.   And prior to that where did you work?

5    A.   I worked at a couple places.  Do you want it

6   chronologically from school or backwards from there?

7    Q.   The job prior to Mellon.

8    A.   Merrill Lynch.

9    Q.   When did you begin working for Merrill Lynch?

10    A.   I believe it was November of 1993.

11    Q.   And when did you cease to work at Merrill

12   Lynch?

13    A.   Prior to starting at Mellon, probably about six

14   months, so the beginning of 1998.  I might have the

15   months off a bit on that.  I would have to look at my

16   resume, but that's approximate.

17    Q.   You started at Mellon approximately September

18   of 1998?

19    A.   That's definite.  Prior to that the months I

20   don't remember exactly.

21    Q.   Merrill Lynch approximately November of '93 to

22   sometime in early 1998?

23    A.   Yes.

24    Q.   Approximately?

William S. Becker                 7

```
 1    A.    Yes.

 2    Q.    And what was your position at Merrill Lynch?

 3    A.    Financial consultant.

 4    Q.    And were you a manager at Merrill Lynch?

 5    A.    No.

 6    Q.    Prior to Merrill Lynch where did you work?

 7    A.    I worked at PNC.

 8    Q.    When did you begin at PNC?

 9    A.    I started at PNC May of 1992.  The predecessor

10    bank was Bank of Delaware, which was acquired by PNC

11    in 1988 or 1989, and I was there from that time until

12    I went to Merrill Lynch.

13    Q.    You think you worked at Bank of Delaware and

14    its successor, PNC, up until approximately November of

15    1993?

16    A.    Yes.

17    Q.    What was your job for Bank of Delaware?

18    A.    My initial job was as a commercial lending

19    analyst and after a year and a half or so I believe in

20    1990 I moved over to the investment and brokerage side

21    and that's where I remained until I moved to Merrill

22    Lynch.

23    Q.    And as a commercial lending analyst were you a

24    manager?
```

William S. Becker                8

```
 1     A.   No.
 2     Q.   And when you moved to the investment and
 3   brokerage side what was your position?
 4     A.   My position was a financial consultant.
 5     Q.   And when you became a financial consultant were
 6   you a manager at the time?
 7     A.   I had supervisory responsibility for the
 8   assistants in the office.
 9     Q.   Approximately how many assistants?
10     A.   Two.
11     Q.   Approximately what years were you in that
12   supervisory role?
13     A.   '91 through '93 probably.
14     Q.   To the best of your recollection?
15     A.   That's the best of my recollection, yes.
16     Q.   Prior to PNC where did you work?
17     A.   I was in college.
18     Q.   When you started at Mellon, what was your
19   position when you were hired at Mellon?
20     A.   Portfolio manager.
21     Q.   And where were you stationed or assigned to
22   work?
23     A.   We were located at Rodney Square in Wilmington
24   on the corner of I believe it's Tenth and Market.
```

William S. Becker            9

1   Q.   At some point in time did your work site
2   change?
3   A.   Yes, we moved to Greenville, Delaware when that
4   facility was built.  I believe we moved out there in
5   2000 -- the end of 2001 or the beginning of 2002
6   somewhere.
7   Q.   Other than portfolio manager did you have any
8   other titles between the start of your employment with
9   Mellon in 1998 and the year 2003?
10  A.   I had the title of vice-president.
11  Q.   Was that a title that came along with the
12  function of portfolio manager?
13  A.   It can and in my case it did.
14  Q.   Have you held any other titles during your time
15  at Mellon up to the present?
16  A.   Up to present?  Now I'm a senior director,
17  first vice-president.
18  Q.   When did you become a senior director and first
19  vice-president?
20  A.   This past June.
21  Q.   June of 2006?
22  A.   June of 2006, yes.
23  Q.   In your role as portfolio manager did you have
24  supervisory responsibilities for employees?

**B802**

William S. Becker          10

 1    A.    Yes.
 2    Q.    Approximately how many employees did you
 3  supervise in your role of portfolio manager?
 4    A.    Two.
 5    Q.    Who were they?
 6    A.    Linda Blozis and Katie Agne.
 7    Q.    Is that the Kathleen Agne --
 8    A.    Kathleen Agne, correct.
 9    Q.    What was Kathleen Agne's title?
10    A.    I don't remember what her title was.
11    Q.    Do you remember what Linda Blozis' title was?
12    A.    She was an assistant, I believe portfolio
13  assistant.
14    Q.    You told us earlier that you supervised or
15  managed Linda Blozis between September of 1998 and
16  December of 2002 or the end of I think you said the
17  end of 2002?
18    A.    Yes.
19    Q.    During that same time did you supervise
20  Kathleen Agne?
21    A.    Yes.
22    Q.    Did Kathleen Agne leave Mellon at some point in
23  that time frame?
24    A.    Yes, she did.

William S. Becker        11

1    Q.    Do you remember when that was?

2    A.    I do not recall when that was.

3    Q.    Did Kathleen Agne resign her employment?

4    A.    Kathleen Agne was -- her employment was

5    terminated.

6    Q.    And who made the decision to terminate her

7    employment?

8    A.    That was a joint decision between or among Greg

9    Landis, Brendan Gilmore and me.

10    Q.    Approximately how old was Kathleen Agne at the

11    time her employment ended?

12    A.    I don't know.

13    Q.    Was she over the age of 40?

14    A.    I believe so.

15    Q.    Do you recall what the stated reason was she

16    was told her employment was being terminated?

17    A.    As I remember she had many errors and she

18    wasn't completing her work that was assigned in a

19    timely manner.

20    Q.    Do you remember approximately what year her

21    employment was terminated?

22    A.    Either 2000 or 2001.

23    Q.    Did Mellon eventually hire someone to replace

24    Kathleen Agne?

**B804**

William S. Becker          12

1     A.   Yes.

2     Q.   Who replaced Kathleen Agne?

3     A.   Maria Bannister.

4     Q.   Is that the person that eventually became Maria

5   Dunlop?

6     A.   Yes, I'm sorry, yes.

7     Q.   When she was hired first she was Maria

8   Bannister?

9     A.   Yes.

10    Q.   Prior to you supervising Linda Blozis who was

11   her direct supervisor?

12    A.   I believe Martha -- it was a woman that was no

13   longer at Mellon when I was hired.  I'm trying to

14   remember her name.

15    Q.   Was that Martha Fetters?

16    A.   Martha Fetters I think it was.

17    Q.   Did Martha Fetters retire or resign from

18   Mellon?

19    A.   I don't know.

20    Q.   You just know that at some point her employment

21   ended?

22    A.   Yes.

23    Q.   Do you remember approximately what year that

24   was?

William S. Becker          13

1      A.    I was hired in 1998 and she wasn't there.

2   That's really all I know.  It was prior to me

3   starting, so --

4      Q.    Sometime prior to September of --

5      A.    Sometime prior to September of 1998, correct.

6      Q.    When you became a supervisor for Ms. Agne and

7   Linda Blozis, did you have a chance to review their

8   personnel files before you began working with them?

9      A.    Not before I was working with them.  At some

10  point while they were -- while they were employed I'm

11  certain I looked at their files that were kept in the

12  office or kept at the team leader office.

13     Q.    And under her prior supervisor, Martha Fetters,

14  Linda Blozis did not have any final warnings in her

15  file, is that correct?

16            MS. WILSON:  Objection to form.  You can

17  answer.

18     A.    I don't remember seeing any.

19     Q.    To the best of your recollection she didn't

20  have any disciplinary actions in her personnel file?

21     A.    As I remember I don't remember anything like

22  that in there.

23     Q.    What was your working relationship with Greg

24  Landis when you came to the -- is it called the

William S. Becker          14

1    Delaware office?

2         A.    Delaware office.

3         Q.    That was first at Rodney Square and eventually

4    in Greenville?

5         A.    Yes, yes.

6         Q.    What was your working relationship with Greg

7    Landis when you came to the Delaware office?

8         A.    When I started at the Delaware office, Greg

9    came to the Delaware office subsequent to my starting

10   there and the way Mellon separates its business at

11   that point they had a portfolio manager and an

12   assistant.  I was a portfolio manager and a fiduciary

13   expert and that was Greg's role.  As an assistant

14   Kathleen Agne reported to Greg, Linda reported to me,

15   but I was the office manager.  I don't believe that

16   was a specific designated title, but I was the senior

17   officer in that Delaware office.  So, I considered

18   Greg a colleague.

19        Q.    So, did you have overall control over the

20   Delaware office or were you joint managers of the

21   Delaware office?

22        A.    With respect to people we each -- Katie

23   reported to Greg and then Linda reported to me and

24   then we both reported to Brendan Gilmore.  We were

William S. Becker          15

1    part of Brendan Gilmore team, which was based in

2    Philadelphia, and he had authority over the teams.  We

3    didn't -- the authority we had was just over those

4    people, not the entire office.  That was still

5    Brendan's responsibility.

6       Q.   Aside from yourself, Greg Landis, Kathleen Agne

7    and Linda Blozis was anyone else working at the

8    Delaware office?

9       A.   When I started in 1998, Linda Squier was an

10   administrative officer and Greg was not in the office

11   when I started.

12      Q.   You told us to the best of your recollection

13   Linda Blozis was an assistant.  Can you tell me the

14   difference between an assistant and administrative

15   officer?

16      A.   Well, an officer has responsibility for

17   specific claim accounts.  There is a designation

18   within the system that identifies that person as being

19   responsible for the fiduciary administration of the

20   accounts and an assistant would have responsibility to

21   assist that officer in fulfilling those roles.

22      Q.   An administrative officer would have more

23   responsibility than an assistant?

24      A.   Yes.

1      Q.    And would an administrative officer have less

2   responsibility than a portfolio manager?

3      A.    No, they were equivalent in different

4   disciplines.

5      Q.    What discipline did an administrative officer

6   handle?

7      A.    That would be the discretionary payments from

8   trusts, getting the accounts established, following

9   whatever distribution -- whatever the clauses were in

10  the particular trust document.  It would be the

11  fiduciary officer's responsibility to make sure that

12  we followed the terms of the trusts and the portfolio

13  manager's role was to handle the investment management

14  within the trust.

15     Q.    The discipline for the portfolio managers

16  related more to the specific investments that fund the

17  trust of the client?

18     A.    That's how in 1998, yes, that's how the

19  workload was divided.

20     Q.    Who did Linda Squier report to?

21     A.    In 1998 Linda Squier reported directly to me

22  and she did so until I left at the end of 2002.

23     Q.    Aside from Linda Squier, Linda Blozis, Kathleen

24  Agne and yourself and Greg Landis was anyone else

William S. Becker          17

1    working at the Delaware office during your time with
2    the Delaware office?
3        A.    Not in the trust department.
4        Q.    Were there other departments in the Delaware
5    office?
6        A.    Yes.
7        Q.    What were the other departments?
8        A.    At that time we still had a retail branch
9    system.  So, the president and CEO of Mellon Delaware
10   was there.  The retail branch system was whatever the
11   30-some branches in Delaware.  We had a small business
12   lending group and we might have had a commercial
13   lender or two.  I don't remember specifically anything
14   more than that.
15       Q.    Did you have any day-to-day interactions with
16   folks from the retail branch system or department?
17       A.    Not necessarily day-to-day, but periodically if
18   we had a client with a need for a deposit account or a
19   loan we would interact to make an introduction on
20   behalf of a client to the relevant officer, whether it
21   was someone to set up a deposit account or if they
22   were in need of a small business loan or any type of
23   credit facility we would introduce them to the
24   appropriate party.

**B810**

William S. Becker                18

1     Q.    Is that in essence sort of the portfolio

2     manager kind of cross-marketing to their clients --

3     A.    Yes.

4     Q.    -- or something to that effect?

5     A.    Yes.

6     Q.    And as far as assistants such as Linda Blozis

7     would she have interaction with the retail branch

8     system or would that be more something that a

9     portfolio manager would do in terms of making those

10    referrals for those other needs?

11    A.    I don't believe we had any specific referral

12    goals for assistants at that time, but certainly

13    anyone in the office if they identified a need for --

14    on behalf of a client we would try to figure out the

15    best way to get that done.  So, really that could be

16    either an assistant or portfolio manager or Greg in

17    his capacity could make a referral to another part of

18    the institution to try to help the client.

19    Q.    If Linda as an assistant saw that need, would

20    she interface with you to say I think we should

21    recommend this client work with our retail branch

22    system or would she refer the client directly over to

23    someone in the retail branch system?

24    A.    It could be either depending on the case, the

William S. Becker          19

1    sensitivity of the client.

2        Q.   When you came to the Delaware office and had

3    two subordinates, Kathleen Agne and Linda Blozis, was

4    Linda Blozis qualified to do her job?

5               MS. WILSON:  Objection to form.  You can

6    answer.

7        A.   I had no way of knowing whether she was

8    qualified or not prior to me arriving.

9        Q.   Once you arrived and began to work with her did

10   you find that she was qualified to do her job?

11              MS. WILSON:  Same objection.  You can

12   answer.

13       A.   In some areas she did fine and others she did

14   not.

15       Q.   What areas did she do fine in?

16       A.   Client service, being emphathetic to client

17   needs, various support roles in the office, answering

18   the phone, helping with correspondence.

19       Q.   Did she have responsibilities for answering the

20   phone?

21       A.   Yes.

22       Q.   And did she have responsibilities for delivery

23   of mail or sorting mail?

24       A.   If she was in the office she did that.  We all

William S. Becker        20

```
 1    kind of did that depending on who was in the office.

 2    It was a small office so those sort of things needed

 3    to get done.  So, we all pitched in whenever we needed

 4    to.

 5        Q.    Did she have responsibility for arranging

 6    client meetings?

 7        A.    I believe so, yes.

 8        Q.    Did she have responsibility for handling cash

 9    transactions?

10        A.    Moving cash among accounts, yes.

11        Q.    Did she have responsibility for opening new

12    accounts?

13        A.    Yes.

14        Q.    Did she have responsibility for closing

15    terminated accounts?

16        A.    In certain cases, yes.

17        Q.    And did she have responsibility for training an

18    employee such as when Maria Bannister or when Maria

19    Dunlop arrived?

20        A.    Yes.

21        Q.    And aside from her were those functions of

22    telephone, a telephone receptionist or answering

23    phones, arranging client meetings, handling cash

24    transactions, opening and closing accounts and
```

William S. Becker        21

1    training new employees, were those functions that were

2    handled by the assistants, Linda Blozis and Kathleen

3    Agne?

4        A.    With the exception of training.  I don't

5    believe I ever asked Kathleen Agne nor did Greg to

6    train anyone.

7        Q.    Other than the training the answering the

8    phones, arranging client meetings, handling cash

9    transactions, opening and closing accounts were those

10   functions that would be handled by the assistants,

11   Kathleen Agne and Linda Blozis?

12       A.    Yes.

13       Q.    And once Kathleen Agne left was there a period

14   of time where Kathleen Agne was no longer with Mellon

15   and Maria Bannister had not yet been hired?

16       A.    Yes, there was.

17       Q.    And in that period after Kathleen Agne's

18   employment ended and before Maria Bannister or

19   Dunlop's employment began was Linda Blozis the one

20   responsible for those functions?

21       A.    She was responsible for those functions with

22   Greg's and my help.  We all pitched in to get the work

23   done.

24       Q.    As far as assistant there were no male

William S. Becker        22

1    assistants in the office, in the Delaware office,

2    during the time that Linda Blozis worked there, is

3    that correct?

4        A.    Not since I had arrived in 1998.  Prior to that

5    I have no knowledge.

6        Q.    From 1998 until the point that Linda Blozis'

7    employment ended there were no male portfolio managers

8    or male assistants in the Delaware office?

9        A.    No.

10       Q.    During the time that you were her supervisor

11   you never cited Linda Blozis for tardiness or

12   attendance issues, is that accurate?

13       A.    That's correct.

14       Q.    During the time that you were her supervisor

15   you never cited Linda Blozis for unprofessionalism, is

16   that correct?

17       A.    Yes.

18             MS. WILSON:  Objection to form.  You can

19   answer.

20       A.    I'm sorry, what was the question?

21             (The pending question was read back by the

22   court reporter.)

23       A.    That is correct.

24       Q.    During the time that you were her supervisor

William S. Becker            23

1     you never cited Linda Blozis for gross neglect of

2     responsibilities, is that correct?

3              MS. WILSON:  Objection to form.  You can

4     answer.

5     A.   That is correct.

6     Q.   And you never fired Linda Blozis, is that

7     correct?

8     A.   That's correct.  May I go back and clarify

9     something?

10    Q.   Yes.

11    A.   Okay, when we were discussing Linda's

12    responsibilities subsequent to Katie Agne leaving we

13    were also supported by the assistants of the Gilmore

14    team up in Philadelphia.  So, with respect to the

15    tasks, many of which were not location sensitive, like

16    answering the phone, handling face-to-face customer

17    inquiries, we were also supported by assistants on the

18    Gilmore team in Philadelphia.

19    Q.   Answering the phone and face-to-face customers

20    was location sensitive?

21    A.   Absolutely, sure, but as far as terminating

22    accounts and helping with reports and other work that

23    needed to get done we did rely on the assistants in

24    Philadelphia as well.

**B816**

William S. Becker          24

1    Q.    So, at some point there you were a man down or
2    person down when Kathleen Agne's employment had ended
3    and before a new assistant was hired?
4    A.    Yes.
5    Q.    So, the Delaware office was short-staffed and
6    was helped by the Philadelphia office?
7    A.    That's correct.
8    Q.    Let me show you a document and I ask that it be
9    marked Becker Exhibit 1.
10            (Becker Deposition Exhibit No. 1 was marked
11    for identification.)
12    Q.    Take a moment to look at this document.  This
13    is a two-page document for the record marked Mel/Bloz
14    454 and Mel/Bloz 455.
15    A.    (Witness complies.)
16    Q.    Let me know when you have reviewed that.
17    A.    Okay.
18    Q.    Have you ever seen this type of document
19    before?
20    A.    I reviewed this document with Stephanie.
21    Q.    And I don't want you to tell me anything that
22    you said to your lawyer or that your lawyer has said
23    to you, but aside from preparing for the case or
24    preparing for this deposition today during your time

William S. Becker          25

1    working at Mellon have you ever seen this type of a

2    document?

3         A.   I've seen documents similar to this.  I don't

4    remember whether it was this specific document or not.

5         Q.   What type of form does Mellon call this

6    document?

7         A.   What type of -- I'm sorry?

8         Q.   Form.

9         A.   Form?  This is called an Employee Profile

10   History.

11        Q.   And Mellon records an employee's date of birth

12   on this form, is that correct?

13        A.   That is correct.

14        Q.   And Mellon records an employee's age on this

15   form, is that correct?

16        A.   That is correct.

17        Q.   And Mellon records an employee's sex or gender

18   on this form, is that correct?

19        A.   That is correct.

20        Q.   And Mellon records an employee's marital status

21   on this form, is that correct?

22        A.   That is correct.

23        Q.   And during the time that you were Linda Blozis'

24   supervisor did employees receive an annual performance

William S. Becker          26

1    rating or -- first of all, did employees receive an
2    annual performance review or evaluation?
3        A.    Yes.
4        Q.    Did they receive an overall rating on their
5    annual review or evaluation?
6        A.    Yes.
7        Q.    And was it a numeric rating or letter grade or
8    something else?
9        A.    It wasn't a numeric grade.  It was a
10   performance review -- I'm sorry, I don't understand
11   what you are asking.
12       Q.    Okay.  Calling your attention to the middle of
13   this form, Mellon Blozis 454, do you see a spot that
14   says "Job History"?
15       A.    Yes.
16       Q.    It says "PERF RTG" to the right, do you see
17   that?
18       A.    Yes, I do.
19       Q.    Does this form also summarize an employee's
20   performance evaluations throughout their career at
21   Mellon?
22       A.    It appears that it does, yes.
23       Q.    And I see there is a column that says "EFF
24   Date" and there is a column that says "RTG" under the

William S. Becker                27

1    box that is titled "PERF RTG"?

2    A.    I see that box.

3    Q.    Are those performance ratings, those numbers,

4    under RTG?

5    A.    It appears as if they are.  When I started at

6    Mellon in '98, we used -- I see, okay.  Apparently,

7    there was in the past a rating system which was a

8    numeric rating system.  When I arrived in 1998, they

9    had apparently changing the ranking system to reflect

10   not a numeric rating, but a rating based on whether

11   you meet goals, whether you need improvement.  I don't

12   remember the specific categories at that time, but I'm

13   just noting that from 1998 on they were letters and

14   prior to that they were numbers, but I don't know

15   anything about the numeric system.

16   Q.    If you flip to the second page of Mellon/Blozis

17   455 it looks like at some point they moved away from

18   the numbers and moved to some letters, do you see

19   that?

20   A.    Yes.

21   Q.    You don't know what the numbers -- the

22   significance of the numbers because that wasn't used

23   during your time there, is that what you are telling

24   us?

William S. Becker          28

1     A.    No, now that I'm looking at the second page it

2     appears that we did use numbers.  I just don't

3     remember specifically the form of the reviews that

4     were done.

5     Q.    And you don't remember what the meaning of the

6     numbers are or were?

7     A.    No, I do not.

8     Q.    And at some point you recalled that they

9     switched to some letters for a rating or some kind of

10    verbal rating?

11    A.    A verbal rating system, yes.

12    Q.    And do you know what the significance of these

13    letters are, capital T or capital I, for ratings?

14    A.    I do not know what they mean.

15    Q.    I'm going to show you a document and ask that

16    it be marked Becker 2.

17          (Becker Deposition Exhibit No. 2 was marked

18    for identification.)

19    Q.    Take a moment to flip through that and review

20    that and let me know when you are finished.

21    A.    Okay, (witness complies).  Okay, I'm done

22    reading it.

23    Q.    Turning your attention to -- first turn your

24    attention to the first page, Mel/Bloz 709.  At the top

William S. Becker          29

1    right corner is that your name under "Manager's Name"?

2    A.    Yes, it is.

3    Q.    And the employee name is Linda Blozis to the

4    left of that?

5    A.    That's correct.

6    Q.    Was this Linda Blozis' performance evaluation

7    or annual review?

8    A.    It looks like a mid-year review.

9    Q.    Mid-year review?

10   A.    According to the dates of the signature on the

11   last page.

12   Q.    In addition to an annual review Mellon would

13   give sometimes -- or give a mid-year review to an

14   employee?

15   A.    Sometimes.  It wasn't always done.

16   Q.    And was this a mid-year review that you gave to

17   Linda Blozis?

18   A.    My signature is on the back so I would say yes.

19   Q.    And you gave Linda Blozis this mid-year review

20   in what year?

21   A.    It's signed July of 2001.

22   Q.    To the best of your recollection do you think

23   this is a review that you gave her in July of 2001, a

24   mid-year review?

**B822**

1      A.    It looks like that.  It's kind of lacking in

2  substance.  I don't know how formal it was, but I

3  signed it, so.

4      Q.    And looking at that Page 709, Mel/Bloz 709,

5  there is a title there that says "Section I:

6  Results-Based Goals," do you see that, right below the

7  box --

8      A.    Oh, results -- yes, I do, yes.

9      Q.    Flipping to the next page there is a title

10  there that says "Year-end Overall Assessment for

11  Results-Based Goals," do you see that?

12      A.    Yes.

13      Q.    Was this a form that you would have completed

14  for Linda Blozis?

15      A.    I could have completed it or Linda could have

16  completed it and I reviewed it.

17      Q.    And you would have had to sign off on it

18  eventually?

19      A.    Yes.

20      Q.    Regardless of who filled in the boxes?

21      A.    Yes.

22      Q.    And I'm at Page 710 as far as "Year-End Overall

23  Assessment for Results-Based Goals" what was Linda

24  Blozis' rating at that time?

William S. Becker          31

1    A.    The rating is "Meets Target."  Since this was

2    signed in July I would seem to think we used this form

3    as a mid-year.  So, it was not necessarily a year-end

4    review.  It was an assessment of where she was in the

5    middle of the year, mid-year, but it says on the form

6    it's year-end.

7    Q.    Turning your attention to Page Mel/Bloz 711

8    there is an another category that is rated on this

9    form, "Shared Values"?

10   A.    Yes.

11   Q.    And there is a box there that says "Year-End

12   Overall Assessment for Shared Values."  Understanding

13   that this may be -- this is a mid-year review what was

14   Linda Blozis' rating for shared values at that time?

15   A.    "Highly Effective."

16   Q.    Flipping to Page 714, Mel/Bloz 714, there is a

17   box at the top that indicates "Result-Based Goals,

18   Shared Values, Competencies, Overall Rating," do you

19   see that?

20   A.    Yes.

21   Q.    There is a box on the far right that says

22   "Action Needed" with an asterisk, do you see that?

23   A.    Yes.

24   Q.    What does that mean if action is needed for an

William S. Becker          32

1     employee?  What kind of action is that referring to?

2     A.    It refers to what we call a corrective action

3     that the employee is not fulfilling the responsibili-

4     ties of the role that he or she has and that we need

5     to put in place as managers a plan to have that

6     employee follow whether it's specific jobs or specific

7     things that they need to learn and we put a time frame

8     on those things that we expect that person to do to

9     continue employment.

10    Q.    And as far as corrective action is that some

11    kind of disciplinary action that Mellon uses for an

12    employee if their performance needs to be improved?

13    A.    Yes.

14    Q.    And can an employee be told that action is

15    needed in a mid-year review or is that only something

16    that is done at the end of the year during the annual

17    review?

18    A.    They can be told at any time that there is

19    improvement needed either verbally or communicated in

20    writing.  An E-mail telling people -- or telling

21    someone that they didn't do a good job could be

22    considered I guess a written notification that there

23    is something that they're not doing properly.

24    Q.    And looking at this overall rating and the box

William S. Becker          33

1    for action needed you didn't check off for action
2    needed -- the box for action needed was not checked
3    off at that time, is that correct?
4       A.    That is correct.  I would clarify, though, that
5    this page was only signed at the bottom and that
6    nothing else was checked off because this was in the
7    planning phase.  So, the beginning of the year we
8    would identify in the prior pages what the goals were
9    and it wasn't the time to rate.  So, that box wasn't
10   utilized.  It was just Linda's signature and my
11   signature and the date acknowledging that that's what
12   the goal would be for the upcoming year.  So, there
13   would be no reason for action needed on this document
14   because it was a planning document as it indicates at
15   the bottom, performance planning.
16      Q.    Are you telling us that on this type of a form
17   it's not an appropriate place to say this is where
18   action is needed or --
19      A.    On this particular page, on this particular
20   review, because the signatures are only on planning.
21   Then, if it's not reflected anywhere else in the top
22   you could at a mid-year or a year-end choose to use
23   these types -- this box system, especially at
24   year-end, but for the planning phase you generally

**B826**

1    wouldn't -- I wouldn't use that for planning purposes
2    because that action needed is identifying something
3    that happened in the past.  This was just acknowledg-
4    ing what was in the prior pages is what the goals were
5    for the year, general goals.
6        Q.    Are you telling us a mid-year review is for
7    planning for the future or the latter half of the year
8    or is the purpose of a mid-year review to review the
9    performance of the first half of the year or both?
10       A.    What I'm saying is this particular page was
11   dated in February so it's not mid-year.  It's for
12   planning purposes.  A mid-year review can be backward
13   looking or forward looking because you evaluate what
14   has happened and then you also have the opportunity if
15   you want to change the plan due to circumstances,
16   identify things that need improvement.
17       Q.    And even though it's the beginning of a
18   calendar year or fiscal year -- when does Mellon's
19   fiscal year begin, does it begin January 1st like the
20   calendar year or some other point?
21       A.    I believe the fiscal year is the calendar year.
22   If I could just clarify, though.  The rating system
23   hasn't always necessarily been on a calendar rating.
24   I believe when I first started it was more in sync

William S. Becker          35

1    with when the employees --

2       Q.    Anniversary date?

3       A.    Anniversary date and when it was done.  So, it

4    wasn't necessarily a calendar year, but in this case

5    we switched over to a calendar year for performance

6    appraisals.

7       Q.    If an employee had poor performance in 2001,

8    would it be inappropriate to reflect performance

9    criticism of 2001 on this 2002 document?

10            MS. WILSON:  Objection to form.  You can

11   answer it.

12      A.    Okay, this document is 2001.

13      Q.    I'm sorry, let me rephrase my question.  If an

14   employee had poor performance in 2000, would it be

15   inappropriate to evaluate that poor performance or

16   give criticism of poor performance in 2000 on this

17   2001 form which you are telling us is a planning

18   document?

19      A.    That would have been -- it wouldn't necessarily

20   be inappropriate, but the appraisal for 2000 would

21   have been I believe at year-end 2000.  That's where it

22   would be reflected.  On this page, Mel/Bloz 714, just

23   refers to plans for the future.  It doesn't go

24   backward.  It just acknowledges what we talked about

**B828**

William S. Becker          36

 1    we need to do in 2001.

 2        Q.    If there were performance issues with Linda

 3    Blozis in 2000, she would have received a review that

 4    reflected that at the end of 2000?

 5            MS. WILSON:  Objection to form.  You can

 6    answer.

 7        A.    Can you repeat the question, please.

 8            (The pending question was read back by the

 9    court reporter.)

10        A.    Yes.  That could be in two forms.  It could be

11    in the formal year-end review.  It could be during the

12    discussion of the review.

13        Q.    It could either be in a written review or

14    discussion that accompanied the review?

15        A.    Right, or throughout the course of the year if

16    there are things that need to be changed or corrected,

17    that can be discussed at any point.

18        Q.    I'm going to show you another document and it

19    will be marked Becker 3.

20            (Becker Deposition Exhibit No. 3 was marked

21    for identification.)

22        Q.    Let me know when you have had a chance to flip

23    through that document.

24        A.    Okay.

William S. Becker          37

1    Q.    You have a document in front of you and we have

2    marked it Becker Exhibit 3 and it begins with Mel/Bloz

3    717 at the bottom right-hand corner.  There is some

4    handwriting at the top right of that first page.  Can

5    you read that?

6    A.    Yes, "Assessment Year-End 2001, Blozis."

7    Q.    Does this document appear to be Linda Blozis'

8    year-end assessment for 2001?

9    A.    Yes, it does.

10   Q.    Turning your attention to Page 719 it again

11   lists you as the manager's name, you were Linda

12   Blozis' direct supervisor in 2001, is that correct?

13   A.    That's correct.

14   Q.    And flipping to the next page, 720, again we

15   see "Year-End Overall Assessment For Results-Based

16   Goals," do you see that?

17   A.    Yes, I do.

18   Q.    How was Linda Blozis rated on results-based

19   goals in 2001?

20   A.    Linda is rated "Meets Target."

21   Q.    Flipping to the next page down three-quarters

22   of the way there is a heading "Year-End Overall

23   Assessment for Shared Values," do you see that?

24   A.    Yes, I do.

B830

William S. Becker                38

1    Q.    And how was Linda Blozis rated for shared

2    values for 2001?

3    A.    "Highly Effective."

4    Q.    And the next page, 722, at the bottom there is

5    a heading "Year-End Overall Assessment for

6    Competencies," do you see that?

7    A.    Yes, I do.

8    Q.    How was Linda Blozis rated for competencies for

9    2001?

10   A.    "Effective."

11   Q.    Flipping to 724 at the top it says "Section IV:

12   Summary and Final Performance Rating - To Be Completed

13   During Year-End Assessment," do you see that?

14   A.    Yes, I do.

15   Q.    On this one the boxes are checked off on this

16   one, there is an overall rating, do you see that?

17   A.    Yes, I do.

18   Q.    What was Linda Blozis' overall rating for 2001?

19   A.    "On Target."

20   Q.    And that's referring to her performance was on

21   target?

22   A.    On target performance, yes.

23   Q.    And you signed off on this document in February

24   of 2002?

William S. Becker          39

1    A.    Yes, I did.

2    Q.    At that time you didn't think any action was

3    needed or corrective action was needed for Linda

4    Blozis?

5              MS. WILSON:  Objection to form.  You can

6    answer.

7    A.    Could you repeat the question?  I'm sorry.

8              (The pending question was read back by the

9    court reporter.)

10   A.    As far as a formal action needed, no.

11   Q.    When you say "a formal action," are you

12   referring to corrective action?

13   A.    I'm referring to the box marked "Action

14   Needed."  There certainly may have been things that I

15   needed to correct in her work throughout the course of

16   the year, but nothing that had escalated to her formal

17   review.

18   Q.    If something had escalated and you would need

19   to check off Action Needed, what types of action

20   needed would that -- what does that box imply or refer

21   to?

22   A.    It refers to what needs to be done to improve

23   either the quality of work or if it's in the case of

24   -- if it's in the case of not fulfilling or

William S. Becker          40

1     demonstrating shared values, whether it's attitude or

2     some other things that needed to be addressed that

3     aren't specifically task-oriented, they would be

4     outlined as far as what needed to be done.

5     Q.   So, at the time that you completed this review

6     you didn't feel that any action was needed with regard

7     to Linda Blozis and her performance?

8            MS. WILSON:  Objection to form.  You can

9     answer.

10    Q.   Is that correct?

11    A.   Could you read the question?  Is that the same

12    question as before?

13           MR. LaROSA:  No.

14           (The pending question was read back by the

15    court reporter.)

16    A.   Nothing that I formalized on this year-end

17    review document.

18    Q.   If you felt that action was needed, you would

19    have formalized it and put it in this document, is

20    that fair to say?

21    A.   That's fair to say, yes.

22    Q.   During the time that you were her supervisor

23    Linda Blozis was never demoted by Mellon, is that

24    correct?

William S. Becker          41

1     A.    I believe that's correct.

2     Q.    From the time that you were her supervisor

3    Linda Blozis was never suspended by Mellon, is that

4    correct?

5     A.    That is correct.

6     Q.    We have been using the term "assistant," are

7    assistants also referred to as portfolio administra-

8    tors during the time that you were Linda Blozis'

9    direct supervisor?

10     A.    I would need to review the specific title

11    because they have changed since 1998 varying degrees.

12     Q.    But the title of portfolio administrator

13    doesn't ring a bell?

14     A.    Portfolio administrator could refer to a senior

15    position -- okay, I need to think for a moment before

16    I speak.  Portfolio administrator generally was an

17    assistant role.  Yes, I'm using that interchangeably.

18     Q.    During the time that Linda Blozis worked for

19    you what were the qualifications of a portfolio

20    administrator or assistant?

21     A.    When I started in 1998 I don't know that I was

22    given a list of what the qualifications were.  Are you

23    talking about with respect to educational background

24    or --

B834

1     Q.   Educational or other qualifications for the

2     job, any qualifications.  First of all, are there

3     educational qualifications for the job?

4     A.   In 1998 I do not believe that there were

5     educational requirements for that job.

6     Q.   At some point was an educational qualification

7     for that job created or imposed by Mellon?

8     A.   I don't believe that it's formally imposed, but

9     as the job changed Mellon changed what the responsi-

10    bilities were within that job.  So, I guess you could

11    say the qualifications -- what you needed to be able

12    to do were increased, but I don't know that it was

13    necessarily that you needed to be -- have a degree,

14    for example, in order to do that work.  You needed to

15    just be able to do that work as it changed because

16    that role did change from 1998 to present, but I'm not

17    aware of any formal Mellon-imposed educational

18    requirement.

19    Q.   At some point I think some of the other folks

20    we have deposed in this case have told us that the

21    responsibilities for the assistant or portfolio

22    administrator position were increased, is that

23    correct?

24    A.   That's correct.

William S. Becker          43

1    Q.    I think Brenda Gilmore told us he believed it

2    was sometime in the mid-1990's, does that sound

3    accurate to you?

4              MS. WILSON:   Objection to form.   You can

5    answer.

6    A.    Since I started in 1998 I know that the role

7    had already begun to change for that particular

8    position.   What happened prior to that I'm not aware

9    of.

10   Q.    It was your understanding when you came to

11   Mellon in 1998 that a change and increase in

12   responsibilities for the assistant position had begun

13   at some point before 1998?

14   A.    Or during 1998, yes, that's accurate.

15   Q.    In your role today do you have any interaction

16   with assistants or portfolio managers or equivalent

17   positions or functions today?

18   A.    Yes.

19   Q.    And has Mellon continued to increase the

20   responsibilities or the responsibilities of that role

21   today?

22   A.    I would say that the roles have been -- are

23   pretty much the same as they were a couple years ago.

24   Q.    At some point there ceased to be an increase in

William S. Becker            44

1    the responsibilities in the role of portfolio manager

2    or assistant?

3    A.    I think that's fair to say, yes.

4    Q.    And approximately what year do you think that

5    they stopped increasing the responsibilities for that

6    role?

7            MS. WILSON:  Objection to form.  You can

8    answer.

9    A.    I don't know what year it was.  I would clarify

10   just my employment since I started at Mellon I worked

11   at Mellon from 1998 to 2004.  In 2004 I left Mellon

12   for about a year and a half.  I worked at another

13   trust company and I just started again at Mellon June

14   of 2006.  So, if something with respect to those

15   responsibilities leveled off during my absence I can't

16   speak to that.  I just wanted to clarify that.

17   Q.    So, your initial period of employment with

18   Mellon was between 1998 and 2004?

19   A.    That's correct.

20   Q.    And then at some point in 2004 you began

21   working for another company?

22   A.    Yes.

23   Q.    What was that company?

24   A.    September of 2004 I began working for Nova

William S. Becker          45

```
 1   Savings Bank.
 2      Q.   And what was your position at Nova Savings
 3   Bank?
 4      A.   President and CEO of Nova Trust Company.  It
 5   was a de novo trust company that we started for the
 6   bank.
 7      Q.   Was that bank affiliated with Mellon in any
 8   way?
 9      A.   No.
10      Q.   And when did your employment with Nova end?
11      A.   February of 2006.
12      Q.   Why did your employment with Nova end?
13      A.   Nova Savings Bank encountered financial
14   distress and could no longer fund the operation.
15      Q.   The operation, is that referring to the trust
16   operation?
17      A.   The trust operation, yes.
18      Q.   Was your job eliminated?
19      A.   Yes.
20      Q.   And prior to going to Nova did you voluntarily
21   resign from Mellon?
22      A.   Yes, I did.
23      Q.   At some point in 2006 did you re-apply for your
24   old job or re-apply for a position in general with
```

William S. Becker          46

1    Mellon?

2        A.    I was contacted by I forget whom at Mellon

3    asking if I was interested in coming back.

4        Q.    Is that Brendan Gilmore?

5        A.    I believe the first contact was from Ron Clark

6    and then subsequent to that Brendan did call.  Then,

7    Rosemary Thomas called and then that's enough detail

8    maybe.

9        Q.    What was Ron Clark's position at the time?

10       A.    He was -- he is the managing director for

11   sales.

12       Q.    And at some point were you hired back by

13   Mellon?

14       A.    Yes, I began working for Mellon again June 6,

15   2006.

16       Q.    When you started back on 6-6-06 where were you

17   assigned to work?

18       A.    The Philadelphia office.

19       Q.    And were you assigned to Brendan Gilmore's team

20   again?

21       A.    No.  I have my own team.  I'm a team leader.  I

22   guess that's another title.

23       Q.    Are you in a role that was previously filled by

24   Brendan Gilmore?

**B839**

William S. Becker          47

1    A.    There are five team leaders in the Philadelphia

2    office.  So, my current role is the same as Brendan

3    Gilmore's role currently, but also back in 1998 when I

4    started.  So, it's an equivalent role to what Brendan

5    has.

6    Q.    You are filling an equivalent role as one of

7    the five team leaders?

8    A.    Yes.

9    Q.    Do you have responsibility for any other

10   offices other than Philadelphia?

11   A.    No, just the Becker team in Philadelphia.

12   Q.    Who has responsibility for the Delaware office

13   today?

14   A.    Greg Landis.

15   Q.    Is he a team leader?

16   A.    I believe he is, yes.

17   Q.    Is he stationed in Philadelphia?

18   A.    Greg is stationed in Greenville, Delaware.

19   Q.    During the time that Linda Blozis was in the

20   Delaware office working and reporting to you there

21   were no younger assistants than her, is that correct?

22   A.    No.  Maria Bannister appeared younger than me.

23   So, I assume that she was younger than Linda.

24   Q.    Did you know a Frances Smith at Mellon?

**B840**

William S. Becker          48

1    A.   Yes.

2    Q.   What was her title?

3    A.   I don't remember what her title was.  I believe

4    she had an assistant title.  Whatever that was, there

5    were several different variations, but it would be

6    considered similar to what Linda's title was.

7    Q.   Prior to being an assistant did she have

8    another position?

9    A.   Did Fran Smith?

10   Q.   Frances Smith, yes.

11   A.   I don't know.

12   Q.   Was Frances Smith ever demoted?

13   A.   I don't know whether or not she was demoted.

14   Q.   Did Frances Smith eventually resign from

15   Mellon?

16   A.   I believe she did, yes.

17   Q.   Do you know why she resigned from Mellon, if

18   you know?

19   A.   Do I know -- I'm sorry?

20   Q.   Why she resigned from Mellon, if you know?

21   A.   I don't know why she resigned.

22   Q.   Had Martha Fetters reported to Brendan Gilmore?

23   A.   I believe so.  I'm assuming that since she had

24   -- when I took over the -- her role I reported to

**B841**

William S. Becker          49

1    Brendan, so I assume that she did.

2       Q.   You were hired by Brendan Gilmore --

3       A.   Yes.

4       Q.   -- the first time you were working at Mellon?

5       A.   Yes, I was.

6       Q.   He hired you to replace Martha Fetters, is that

7    correct?

8       A.   I believe so.

9       Q.   And Linda Squier eventually resigned from

10   Mellon, is that correct?

11      A.   That's correct.

12      Q.   Did she submit a resignation to Brendan

13   Gilmore?

14      A.   I don't remember.  I believe she would have

15   either submitted that to Brendan or to me, but to

16   someone.  I don't know.

17      Q.   You don't recall receiving a resignation from

18   her?

19      A.   I don't remember that, no.

20      Q.   So, she may have submitted a resignation to

21   Brendan Gilmore?

22      A.   She may have, yes.

23      Q.   Did you know a Robert Bell at Mellon?

24      A.   Yes.

B842

William S. Becker          50

1    Q.    What was Mr. Bell's title?

2    A.    I believe Bob was -- he was a fiduciary

3  officer.  I don't know whether he was an assistant,

4  but an officer, I believe he was an officer.  He had

5  been there a long time.

6    Q.    Did he report to Brendan Gilmore?

7    A.    I do not know that specifically.  I assume he

8  did because he was on that team.

9    Q.    He had been at Mellon a long time, you said?

10    A.    I believe so.

11    Q.    Was he over the age of 40?

12    A.    I believe so.

13    Q.    And did he eventually resign?

14    A.    I don't know if he resigned or retired.  I know

15  he had health problems.  I never worked with Bob.

16    Q.    Was Brendan Gilmore concerned about Robert

17  Bell's health problems?

18          MS. WILSON:  Objection to form.

19    A.    I don't know.

20    Q.    Was anyone at Mellon concerned about Robert

21  Bell's health problems?

22          MS. WILSON:  Same objection.

23    A.    I don't know.

24    Q.    You weren't concerned about Robert Bell's

1     health problems?

2              MS. WILSON:  Objection to form.

3     A.    I don't know that I ever met Bob Bell before he

4     retired.

5     Q.    There were no assistants on Gilmore's team, no

6     assistants or portfolio administrators on Gilmore's

7     team, that were older than Linda Blozis, correct?

8              MS. WILSON:  Objection to form.  You can

9     answer.

10    A.    I don't know.

11    Q.    You told us that Brendan Gilmore hired you,

12    correct?

13    A.    That's correct.

14    Q.    And Brendan Gilmore also hired Maria Dunlop, is

15    that correct, or Maria Bannister?

16    A.    I believe Brendan would have approved the hire.

17    Greg Landis did the interview for that position.  If

18    Brendan approved it, I'm certain it was at Greg's

19    recommendation.

20    Q.    To the extent of your knowledge Greg Landis did

21    not have the hiring authority at that point and he

22    would do the interview?

23             MS. WILSON:  Objection to form.  You can

24    answer.

William S. Becker          52

1    A.    Team leaders have the authority to hire.  They

2    need to approve requisition for the new hire.  I'm

3    sorry, I forgot the question.

4    Q.    At that point Greg Landis wasn't a team leader?

5    A.    That's correct.

6    Q.    So, he wouldn't have had the authority to

7    approve the hiring of Maria Dunlop or Maria Bannister,

8    correct?

9    A.    No, the team leader is the only person that can

10   approve a hire for the team.

11   Q.    Brendan Gilmore would have had to hire Maria

12   Bannister or Maria Dunlop?

13   A.    At Greg's recommendation or mine if it was

14   appropriate.

15   Q.    Did Brendan Gilmore hire a Dan Merlino?

16   A.    I'm sorry, what is the name?

17   Q.    Dan Merlino, M-E-R-L-I-N-O?

18   A.    Yes, yes, I believe he did.

19   Q.    What was Dan Merlino's position?

20   A.    I believe he was an assistant.

21   Q.    Was he in his 30's?

22   A.    I don't know.

23   Q.    Was he under the age of 40?

24   A.    I believe he was.

William S. Becker          53

1      Q.    And did Brendan Gilmore hire a Kristy Hunt,

2   K-R-I-S-T-Y, Hunt, H-U-N-T?

3      A.    I don't know whether Brendan hired Kristy or

4   not.

5      Q.    What was Kristy Hunt's position, if you know?

6      A.    I believe she was a portfolio officer on the

7   investment side.

8      Q.    Did she work out of the Philadelphia office?

9      A.    Yes, she did.

10     Q.    Did she work on Brendan Gilmore's team?

11     A.    I believe she did at one point, yes.

12     Q.    Did Brendan Gilmore hire a Tom Galante?

13     A.    Tom Galante?

14     Q.    Yes, G-A-L-A-N-T-E?

15     A.    I don't recognize that name as someone that

16   worked for Brendan.

17     Q.    Do you know any Tom G, Tom with the last

18   initial G?

19     A.    There is -- well, I believe Tom Galante works

20   in our HR department.  I might have the first name

21   wrong.  There is a Tom G currently at Mellon whose

22   name is Tom Grugan.  He works for a different team

23   than Brendan and he was just recently hired.

24     Q.    As far as Linda Blozis' employment with Mellon

William S. Becker          54

1    she had been there more than ten years, is that your
2    understanding?
3        A.    I could review this.  I believe so, yes.
4        Q.    And Brendan Gilmore had called Linda Blozis a
5    survivor, is that correct?
6        A.    I don't know.
7        Q.    Do you recall any someone ever calling Linda
8    Blozis a survivor?
9        A.    Not that I ever heard.
10       Q.    At some point did Brendan Gilmore decide that
11   he was going to take over supervisory responsibility
12   for Linda Blozis?
13       A.    Could you repeat that?  I'm sorry.
14             (The pending question was read back by the
15   court reporter.)
16       A.    I don't remember any formal discussion or
17   announcement that Brendan was going to take over that
18   responsibility.  The team leader's job is ultimately
19   to be responsible for every team member regardless of
20   the reporting structure or to whom the assistant
21   reported, but I don't recall any announcement or
22   proclamation that he was going to do that.
23       Q.    At some point you came to Mellon around 1998,
24   is that correct?

B847

William S. Becker                55

1    A.    That's correct.

2    Q.    And Linda Blozis reported directly to you?

3    A.    That's correct.

4    Q.    And then at some point at the end of 2002 or

5    the beginning of 2003 you were going to transfer to a

6    different position within Mellon?

7    A.    That's correct.

8    Q.    And so you were no longer going to be on the

9    Gilmore team, is that correct?

10   A.    That's correct.

11   Q.    And so were you given an option of taking your

12   assistant or any personnel with you to your new role?

13   A.    No.

14   Q.    And was there an issue of -- was there a

15   possibility that Linda Blozis could report to you in

16   your new role while she remained in Delaware?

17   A.    No.  I was given the responsibility of a team

18   leader for a different team up in Philadelphia at that

19   point at the end of 2002 to begin at the beginning of

20   2003.

21   Q.    That's when you began as one of the five -- you

22   became one of the five team leaders working out of

23   Philadelphia?

24   A.    Yes, I believe there were five at the time, I

1    don't remember.

2        Q.    But approximately five?

3        A.    Yes.

4        Q.    And so Linda Blozis would stay on the Gilmore

5    team?

6        A.    That's correct.

7        Q.    And was there any mention or conversation or

8    E-mail between you and communication or other

9    communication between you and Brendan Gilmore about

10   who Linda Blozis would report to after you moved to

11   your team leader role in Philadelphia?

12       A.    I don't remember any specific communication in

13   that regard.  It was a different group of people that

14   was already in place in Philadelphia that needed a

15   manager.  So, I don't remember any specific

16   conversation with Brendan about having Linda come work

17   with me or -- there was still an office to run in

18   Delaware and he needed the support there, so I don't

19   remember it being a conversation.

20       Q.    Her job was not being eliminated in Delaware,

21   correct?

22       A.    Correct, right.

23       Q.    And your job wasn't being eliminated, you were

24   being promoted to a team leader?

William S. Becker                57

1    A.    Right, that's correct.

2    Q.    And at that point was it determined that Greg

3    Landis would be the senior officer working out of

4    Delaware?

5    A.    By default he was the only officer, so, yes, he

6    became a senior officer.

7    Q.    And was it determined at some point there at

8    the end of 2002 or early 2003 that Linda Blozis would

9    report to Brendan Gilmore?

10   A.    I'm not aware of that decision if that decision

11   was made.

12   Q.    Are you aware of any conversations,

13   communications, indicating that Linda Blozis would

14   report to Greg Landis beginning in 2003?

15   A.    I don't remember any specific communications,

16   but as the senior officer it would make sense that the

17   subordinates would report to that officer.

18   Q.    You also told us that the team leader would

19   have overall responsibility for every member of the

20   team, correct?

21   A.    Ultimately, yes, right.

22   Q.    When you left the Delaware office, what was

23   your understanding as to whom your former assistant,

24   Linda Blozis, would be reporting?

**B850**

William S. Becker          58

1    A.    I didn't have any understanding.  Not to sound
2    callus, that it wasn't my responsibility.  I was
3    moving to another team and that's where my responsi-
4    bilities were.  How Brendan and Greg decided to --
5    whatever reporting structure they determined I was not
6    in the conversations as I remember about any of them.
7    Q.    At that point you hadn't recommended Linda
8    Blozis be fired, correct?
9    A.    Pardon me?
10    Q.    At the end of 2002 when you moved on to
11    Philadelphia to become a team leader you hadn't
12    recommended to Brendan Gilmore or Greg Landis that
13    Linda Blozis be fired, correct?
14    A.    I had not recommended that she be fired.
15    Q.    You never made that recommendation, is that
16    accurate?
17    A.    I had concerns about her performance and
18    whether she would continue in the job, but I don't
19    remember ever recommending that she should be fired.
20    Q.    During the time you were there it never got to
21    that point where it looked like Linda Blozis should be
22    terminated for performance?
23          MS. WILSON:  Objection to form.  You can
24    answer.

**B851**

William S. Becker          59

1    A.    I never specifically made the recommendation to

2    fire Linda.  I did give her a review at the end of

3    2002 that reflected problems with her work during that

4    year, but I never remember specifically stating that

5    it was my recommendation that she should be fired.

6    Q.    In your view at that time when you gave her the

7    last evaluation that you gave her you didn't feel that

8    that was an action that was needed at that time,

9    termination of her employment was not an action that

10   was needed at that time?

11         MS. WILSON:  Objection to form.  You can

12   answer.

13   A.    I had deep concerns about what her performance

14   was, but because we had just during the course of 2002

15   -- there were a lot of problems during 2002 I didn't

16   think it would be appropriate to fire her on the spot

17   for things she may have the opportunity to improve on

18   going forward, but the going forward part wasn't

19   within my realm of responsibility on her.

20   Q.    I'm going to show you a document and ask that

21   it be marked Becker 4.

22         (Becker Deposition Exhibit No. 4 was marked

23   for identification.)

24   Q.    Take a moment and flip through that and let me

William S. Becker          60

1    know when you are finished.

2    A.    Thank you.    (Witness complies.)    Okay.

3    Q.    Have you seen this document before today?

4    A.    Yes, I have.

5    Q.    Is this Linda Blozis' year-end review for 2002?

6    A.    Yes, it is.

7    Q.    And it was signed off by you?

8    A.    Yes, it was.

9    Q.    And during the year 2002 -- you told us

10   eventually at the end of 2002 or early 2003 you were

11   promoted to become a team leader and work in

12   Philadelphia on one of the approximately five teams in

13   Philadelphia, equivalent position to Brendan Gilmore?

14   A.    That's correct.

15   Q.    So, this was a promotion for you?

16   A.    Yes.

17   Q.    And was there a transition period in 2002 where

18   you were at some points were working in Philadelphia

19   and other days working in the Delaware office?

20   A.    I wouldn't identify that as a transition

21   period.    While I was on the Gilmore team working in

22   Delaware a senior portfolio manager who was in

23   Philadelphia left the organization and they needed

24   people to cover the accounts.    So, during the course

William S. Becker          61

1    of 2002 and perhaps even in part of 2001 I was

2    spending some of the week up in Philadelphia to help

3    cover those accounts.  It wasn't a specific transition

4    period to the team leader job.  It was just that I was

5    up there working on other accounts with different --

6    with the rest of the Gilmore team.

7        Q.    And in 2002 you spent more of your time in

8    Philadelphia than you had spent there before that?

9        A.    With the exception of maybe some time in 2001.

10   I don't remember the specific date, but it's fair to

11   say in 2002 I spent more time in Philadelphia than I

12   had from '98 to 2000.

13       Q.    And as a consequence of that you spent less

14   time in the Delaware office in 2002, is that correct?

15       A.    That's correct.

16       Q.    Do you think you spent about three to four days

17   a week in Philadelphia during 2002?

18       A.    I was also spending time in Washington so I

19   couldn't say.  I would have to look at my calendar to

20   know how many days a week I was in different places.

21   I just don't remember.

22       Q.    Were you living in Delaware or living in the

23   Pennsylvania, Philadelphia area?

24       A.    I was living in Delaware.

William S. Becker          62

1      Q.    Approximately how many days a week do you think
2   you were on the road to either Philadelphia or
3   Washington, DC in '02?
4      A.    Maybe 50/50.  I think that's a good rough
5   estimate.  Maybe it was a little more, maybe it was a
6   little less.
7      Q.    Turning your attention to Mel/Bloz 456, first
8   page talks about customer-related contributions, do
9   you see that?
10     A.    Yes.
11     Q.    You wrote here, "Linda did a good job covering
12  for me during 2002, not only when I was out of town on
13  client meetings, but also when working in
14  Philadelphia."  Was that your comment there?
15     A.    Yes.
16     Q.    So, she was covering for you during 2002?
17     A.    Yes, covering for phone calls and basic
18  inquiries, yes.
19     Q.    And flipping to the next page, there is, again,
20  "Year-End Overall Assessment for Results-Based Goals,"
21  do you see that?
22     A.    Yes, I do.
23     Q.    And how did you rate Linda Blozis for results-
24  based goals in 2002?

William S. Becker          63

1     A.    That was "Meets Target."

2     Q.    At the bottom of the page it says "Year-End

3    Overall Assessment For Shared Values" and flipping to

4    the next page there is a rating there, Mel/Bloz 458.

5    How did you rate Linda Blozis for shared values in

6    2002?

7     A.    "Highly Effective."

8     Q.    Turning your attention to 459 there is a

9    portion there at the bottom that says "Comments on

10   Year-End Assessment" and you wrote in the box here,

11   "Linda understands that the role of portfolio

12   administrator is changing at Mellon and that more will

13   be expected of her in the future."  Is that your

14   comment there?

15    A.    Yes, I believe it is.

16    Q.    How was the role of portfolio administrator

17   changing at Mellon when you made that comment?

18    A.    Well, I believe that it's just an evolution of

19   what the position had been when I joined in '98 and

20   that was continuing.  Just asking the assistant to

21   take on more responsibility within the client base to

22   be able to assist the officers better.  That required

23   learning more about Mellon's investment management and

24   doing higher level tasks.

William S. Becker          64

1    Q.   And I think my understanding is from talking

2    with Mr. Gilmore and Mr. Landis that this learning

3    more that was expected this would come through

4    on-the-job experience as opposed to formal training

5    sessions?

6              MS. WILSON:  Objection to form.  You can

7    answer.

8    A.   There were a combination of on-the-job

9    training, internal seminars -- I'm sorry, could you

10   repeat the question.

11   Q.   Well, you have answered the question.  Maybe it

12   wasn't a clear question.

13             MS. WILSON:  Were you comfortable with your

14   answer?

15   A.   I'm confused with whether Brendan and Greg --

16             MS. WILSON:  Let's read it back.

17             (The pending question was read back by the

18   court reporter.)

19   A.   There was a combination of those things, but

20   there was also an expectation that I believe I

21   outlined in one of her reviews that the level of

22   knowledge needed to be increased and if that couldn't

23   happen on-the-job, then it was expected that it would

24   be done outside of the job.

William S. Becker                65

1    Q.    On an employee's own time?

2    A.    On the employee's own time to get up to speed

3    with what the job was becoming, yes, to be qualified

4    to do that job.

5    Q.    Did you tell her she would need to get up to

6    speed on the weekends or nights or something to that

7    effect?

8    A.    I would have to go back and look at the review

9    to see specifically what I said, but.

10   Q.    Turning your attention to 459, "Job Specific

11   Competencies, Product Knowledge/Work Quality," there

12   is a comment, "There was little progress made in this

13   area during 2002.  This role requires study outside of

14   normal business hours."  Is that your comment there?

15   A.    Yes.

16   Q.    And did you have a conversation with her

17   telling her she should be studying outside of normal

18   business hours?

19   A.    I don't remember whether I specifically talked

20   about that with her or not.  I remember that product

21   knowledge was an area that we had documented on prior

22   reviews and prior planning that the expectation was

23   that that would improve and at this point there was

24   still no improvement despite having it on the planning

William S. Becker        66

1    goal for a couple years.

2        Q.    This evaluation, this is not considered

3    corrective action, is that accurate?

4        A.    No, I don't think that's accurate.  Whenever

5    you tell someone that they're not fulfilling the role

6    that the job requires that it's a form of corrective

7    action.

8        Q.    And flipping to Page 461 Linda Blozis wrote a

9    rebuttal to your review, is that correct?

10       A.    That is correct.

11       Q.    Linda Blozis didn't agree with the criticism in

12   the review, is that correct?

13       A.    I think that's fair to say, yes.

14       Q.    I'm going to show you another document that we

15   will mark as Becker -- let me just ask you.  In

16   connection with this 2002 review you didn't issue

17   Linda Blozis a final written warning with this in

18   connection with this review, is that correct?

19       A.    No, that is correct.

20       Q.    And you didn't issue her any kind of a written

21   warning --

22            MS. WILSON:  Objection to form.  You can

23   answer.

24       Q.    -- at the time you administered this review to

1   her?

2       A.   Well, this is a written warning by virtue of

3   the rating and the comments made in the text that I

4   wrote.

5       Q.   I'm going to show you another document and ask

6   that it be marked Becker Exhibit 5.

7                (Becker Deposition Exhibit No. 5 was marked

8   for identification.)

9       Q.   One more question about Exhibit 4 or a couple

10  more questions about Exhibit 4.  Is it fair to say

11  that virtually all evaluations have criticisms in them

12  or areas of improvement for the employee?

13               MS. WILSON:  Objection to form.  You can

14  answer.

15      A.   Unless the employee is exemplary, yes.

16      Q.   I mean, beyond exemplary an employee would need

17  to be perfect in order to not have some kind of

18  feedback or criticism on the review, is that accurate?

19               MS. WILSON:  Objection to form.  You can

20  answer.

21      A.   There would be varying degrees of criticism and

22  the ranking would reflect the degree to which the

23  performance was not to standard.

24      Q.   Okay.

William S. Becker                68

1    A.    Okay.

2    Q.    Is there a point where the degree of criticism

3    is such that it's considered a written warning or is

4    any criticism on a review considered a written warning

5    or corrective action in your mind?

6              MS. WILSON:    Objection to form.    You can

7    answer.

8    A.    Well, as far as I'm concerned when I checked

9    off Action Needed and then wrote in my comments at the

10   third line from the bottom of my comments on 460, "If

11   a deadline is missed, further corrective action will

12   follow," seems to me that that would mean that this is

13   a corrective action.    I don't remember during the time

14   --

15   Q.    Where are you reading that comment?

16   A.    Under Manager's Comments For Assessment

17   Period," the third sentence from the end, "If a

18   deadline is missed, further corrective action will

19   follow."

20   Q.    Okay.

21   A.    To me that would indicate that this is a

22   corrective action and the fact that the Action Needed

23   box is checked on the top as far as an overall

24   rating.

**B861**

William S. Becker            69

1   Q.   If an evaluation doesn't have the Action Needed
2   box checked, you would not consider that corrective
3   action?
4           MS. WILSON:  Objection to form.  You can
5   answer.
6   A.   It would make sense that unless the Action
7   Needed box is checked, that the performance is such
8   that there is no need for corrective action.
9   Q.   But the box talks about Action Needed, correct?
10  A.   Action needed, yes.
11  Q.   It doesn't say corrective action, is that
12  correct?
13  A.   That is correct.
14  Q.   Let's turn to Becker Exhibit 5 and take a
15  moment and review that.
16  A.   (Witness complies.)  Okay.
17  Q.   Was this an E-mail that you sent to Linda
18  Blozis?
19  A.   Yes.
20  Q.   And did you send this in October of 2002?
21  A.   That's the date.
22  Q.   Turning your attention to the last paragraph in
23  October of 2002 did you need Linda Blozis to help you
24  increase the level of service offered to your clients?

**B862**

William S. Becker          70

1     A.   Yes, appears by that sentence.

2     Q.   And turning your attention to the fourth

3     paragraph did you need to get better at letting Linda

4     Blozis know when things don't happen the way they

5     should?

6     A.   Yes, that's what the sentence indicates.

7     Q.   When things don't happen the way they should,

8     is that a negative reflection on her expertise?

9          MS. WILSON:   Objection to form.   You can

10    answer.

11    A.   I would think that that's what that means

12    within this context, yes.

13    Q.   You talk at the end about the training Mellon

14    is offering, does training come -- I think you told us

15    training comes formally and informally, is that fair

16    to say?

17    A.   Yes.

18    Q.   As far as informal training does would that

19    have come from Linda Blozis' supervisors?

20    A.   It could have come from supervisors or

21    sometimes training was set up in Philadelphia and we

22    would go up there and it was, again, done by someone

23    else on a different team or someone on our team.   That

24    would be more informal training.

**B863**