William S. Becker        71

1    Q.    That would be more informal if you go up to

2    Philadelphia for a special session?

3    A.    I'll separate formal from informal in this way

4    with respect to internal training.  Formal training is

5    something that is mandated for the entire private

6    wealth management group, for example.  It could be a

7    wealth management conference call where there is an

8    expert in Boston or Philadelphia or Pittsburgh and

9    everyone dials in and we have a formal presentation

10   book and we follow along, everyone does that.  In

11   addition to that -- and there are many different

12   topics, could be wealth management, could be

13   investment management, whatever you would expect in a

14   large business like we are in.

15            Less formal training can be either at the

16   -- from your direct portfolio on an ongoing basis,

17   let's sit and talk about why this fund is doing what

18   it's doing and the current economic environment.  It

19   could be a training that would require maybe a trip to

20   Philadelphia, for example, because there is someone in

21   Philadelphia that is really good on a particular

22   computer system or knows how to navigate through our

23   operations area to get specific tasks done.  So, it

24   would be done for the Midlantic region.  It wouldn't

B864

1    be a nationally advertised teleconference, but anyone

2    that was in a role that had to do with that could go

3    and listen to that person who is the expert or who has

4    managed to develop some expertise in a specific area

5    and participate in that.

6           I believe at some point we started on-line

7    training.  I don't remember whether it was this early,

8    though.  That's how I am separating formal from

9    informal.

10   Q.    To the best of your recollection at this time

11   there was no on-line training available yet?

12   A.    I don't remember whether there was or not.  I

13   don't remember how much we used Web X and that thing

14   at that point.

15   Q.    That may have come later?

16   A.    It might have been.

17   Q.    Aside from the things you have talked about,

18   formal and informal, I think you have hinted on this

19   too, though, there can also be an informal day-to-day

20   training where your direct report tells you this is

21   the way you need to do this task the next time or you

22   didn't do a task completely correctly and you need to

23   do certain things differently the next time?

24   A.    Yes.

```
 1    Q.   And that would have been your responsibility to
 2    do that type of training?
 3    A.   Yes.
 4    Q.   And did you have a problem with the speed of
 5    Linda Blozis' work, how quickly she worked?
 6    A.   I don't remember specifically how fast she
 7    worked.  I remember missing deadlines being
 8    frustrating.
 9    Q.   I show you a document and ask that it be marked
10    Exhibit 6.
11              (Becker Deposition Exhibit No. 6 was marked
12    for identification.)
13    A.   Okay.
14    Q.   Have you ever seen this document before?
15    A.   I don't remember seeing this.
16    Q.   Calling your attention to Number Two in that
17    list there, do you ever recall Linda Blozis saying she
18    didn't have time to complete all of her work aside
19    from what you are seeing in this document?
20    A.   I don't ever remember her telling me that with
21    respect to a specific job during the time that I had
22    assigned it to her.
23    Q.   How about with respect to her job in general,
24    not a specific task or project or client, but just her
```

William S. Becker          74

1    job in general?

2    A.    I don't remember that specifically.  We were

3    always busy.  It's a small office.  I don't remember

4    her specifically saying I just can't get all my work

5    done.

6    Q.    And Linda Blozis was expected to prioritize her

7    projects, is that correct?

8    A.    I would say with certain projects, yes, that's

9    accurate.

10   Q.    And so certain projects would take priority

11   based on certain deadlines for client meetings or

12   other deadlines?

13   A.    Yes.

14   Q.    And so Linda Blozis would have to know which

15   project needed to be done first?

16   A.    Yes.

17   Q.    And Linda Blozis worked -- she was paid based

18   on a 37.5 hour work week, is that correct?

19   A.    I believe that was the operating hours at that

20   time.

21   Q.    And her pay was based on 37.5 hours, is that

22   correct?

23   A.    I don't know the -- she was -- she wasn't paid

24   by the hour if that's what you are asking.

B867

William S. Becker          75

1    Q.   I'm not asking if she is an hourly employee,
2    but her compensation was based on a 37.5 hour work
3    week, is that accurate?
4              MS. WILSON:  Objection to form.  You can
5    answer.
6    A.   That was the standard number of hours in the
7    work week.
8    Q.   So, that was the expectation as far as how many
9    hours an employee would work?
10             MS. WILSON:  Objection to form.  You can
11   answer.
12   A.   Well, the expectation was always to get the
13   work done.
14   Q.   And in her position you told us she was not an
15   hourly employee, correct?
16   A.   Correct.
17   Q.   She wasn't paid by the hour?
18   A.   Right.
19   Q.   And she wasn't paid for overtime, is that
20   correct?
21   A.   That is correct.
22   Q.   And did she ever make a statement that you
23   recall indicating that she was unwilling to work 50
24   hours when paid 37.5, paid for 37.5 hours?

B868

1    A.    I don't remember that specifically.

2    Q.    Do you remember anything along those lines?

3    A.    At various times I think we were all -- when

4  there is a lot of work to get done and you can't get

5  it done in a period of time, I don't know that she

6  didn't make that comment, similar to that.  I don't

7  remember anything specific that this is a 60-hour a

8  week job, I can't do it in 37 and a half, I just don't

9  remember that specifically.

10   Q.    You were saying something about we all felt --

11   A.    I think any employee of a corporation at some

12  point is frustrated on what they can get done in a

13  particular day.  So, at some point maybe she mentioned

14  something like that, maybe she didn't, I don't

15  remember specifically.

16   Q.    And being slightly more specific than any

17  corporation with regard to Mellon in the Delaware

18  office did you feel like there was more work than

19  could be done in a standard work week?

20   A.    No, no.  Not on balance.

21   Q.    What do you mean "not on balance"?

22   A.    If you look at the workload throughout the

23  course of the year there was adequate time to get

24  those jobs done.  Sometimes you can't control the flow

1   of work.  You can control when you have a client

2   meeting, you can't control when the phone rings and

3   unusual circumstances come up.  So, to the extent that

4   we had things to accomplish there was time to do that

5   on the balance of the entire year.  At certain times,

6   week-to-week, day-to-day, perhaps we were a little

7   overworked and some weeks we were underworked.

8       Q.    What happens on weeks when an employee is

9   underworked, are they sent home early?  Does that ever

10  happen at Mellon?

11      A.    It happens on holidays or some slow days during

12  the summer we could let people go a little earlier

13  here, head to the beach for the weekend if there is

14  not -- that has happened.

15      Q.    Did you ever do that with Linda Blozis?

16      A.    I don't remember specifically.  I'm sure that

17  there was a lot of latitude given in a small office

18  when we could.

19      Q.    Did Mellon's portfolio officers make the

20  investment decisions and recommendations for clients?

21      A.    Generally speaking for specific investments,

22  yes.

23      Q.    And as far as making the recommendations the

24  assistants or portfolio administrators they don't make

1    the recommendations, is that correct?

2        A.    In more complex accounts I would agree with

3    that.    A statement for some of the simpler accounts

4    where there is an investment policy guideline to

5    follow then certainly it's within the -- or should be

6    within the ability of the assistant to be able to do

7    the math necessary to align an account that is not in

8    policy to a policy.

9        Q.    When you say "align an account that is not in

10   policy," can you explain what you mean by that?

11       A.    Yes.    When -- many times when assets come into

12   our organization they are not consistent with the way

13   we would like to see them with respect to matching the

14   client's objectives of what they want that money to do

15   with how Mellon would recommend that they diversify

16   those assets with respect to stocks and bonds and then

17   other asset classes within that allocation.    So, what

18   needs to be done is to put a plan in place that will

19   allow the account to transition from the assets that

20   it has when it comes in the door to more closely

21   reflect the way Mellon recommends because that's what

22   clients pay us for, they pay us for that advice.

23       Q.    For the most part that advice comes from

24   portfolio officers?

```
 1      A.    In more complex cases where there are a lot of
 2   individual securities where a judgment needs to be
 3   made as far as what particular stock to sell or when
 4   it gets into more complex investing.  In the simpler
 5   matters it's really a function of we recommend that
 6   you have 40 per cent in CAP stocks and we recommend a
 7   different allocation and you basically put a dollar
 8   in.  I created a spread sheet that you put in a dollar
 9   amount and it will then list what Mellon's
10   recommendations would be.
11           So, it's a calculation as opposed to a
12   judgement based on a more thorough analysis or more
13   thorough understanding of the economic circumstances
14   or the microeconomics of a particular company versus
15   another.
16      Q.    If there is a less complex situation where
17   Mellon has a formula in place, a portfolio administra-
18   tor might be able to balance an account in that
19   situation?
20      A.    Yes.
21      Q.    But if there is some discretion with an invest-
22   ment situation and a recommendation needs to be made,
23   a portfolio officer would make the recommendation?
24      A.    With respect to individual investments as
```

William S. Becker          80

1    opposed to mutual funds, yes.

2    Q.    I'm going to show you a document and ask that

3    it be marked Becker 7.

4              (Becker Deposition Exhibit No. 7 was marked

5    for identification.)

6    Q.    Have you seen this document before?

7    A.    Yes, I have.

8    Q.    Is this an E-mail chain that includes some

9    E-mails sent by you?

10   A.    Yes.

11   Q.    And the E-mail at the top did you send that on

12   February 4, 2003?

13   A.    Appears I did, yes.

14   Q.    At that time were you working in the Delaware

15   office or had you moved on to the Philadelphia office

16   and your promotion to team leader?

17   A.    I had moved to Philadelphia.

18   Q.    At this point you were no longer Linda Blozis'

19   supervisor, is that correct?

20   A.    That's correct.

21   Q.    And did an issue arise regarding something that

22   refers to 30-day consecutive overdrafts?

23   A.    Yes.

24   Q.    And you wrote in here, "Not LB's fault," is

1    that correct?

2    A.    Yes.

3    Q.    Were you referring to Linda Blozis there?

4    A.    Yes, I was.

5    Q.    And that this issue was not her fault, is that

6    correct?

7    A.    No.    I would tend to think from the chain and

8    her response that it was with the three dots at the

9    end a frustration that I was sharing with Greg that

10   she wasn't taking responsibility for this report.

11   Q.    Okay, but you wrote in here "Not LB's fault"?

12   A.    I would say with three periods on the end that

13   would indicate that there could be more written there

14   than -- and I chose not to because it was indeed her

15   fault.

16   Q.    Were you being sarcastic?

17   A.    That would be sarcastic, yes.

18   Q.    Do you know who officer number 201 refers to?

19   A.    That was my officer number at the time.

20   Q.    And if it was LB's fault, what did you think

21   that LB should have done to resolve this issue?

22   A.    Well, my recollection is that overdrafts are

23   run daily.    They have a weekly tickler.    She refers to

24   a weekly tickler here.    A lot of what her response is

1    has nothing to do with identifying an error.  It has

2    nothing to do with the fact that the files weren't in

3    Delaware.

4        Q.   That's not what I'm asking you.  I'm asking you

5    what should she have done to resolve the issue?

6        A.   Well, daily check the overdraft report and

7    identify what is overdrawn so that the overdraft can

8    be covered.

9        Q.   And you didn't write that here, correct?

10       A.   I didn't write that here because at that point

11   I let Greg know about what was going on because I was

12   no longer her supervisor.  This was during the

13   transition period when obviously I was in Philadelphia

14   and she was down there.

15       Q.   And you didn't tell Greg that's what needed to

16   be done by her or someone in the Delaware office?

17       A.   This report is very basic and it should be done

18   on a regular basis more so than it had been done and

19   the overdraft would have been detected.  I didn't

20   require any further explanation.  That's one of the

21   most important reports that is run every day.

22       Q.   And you didn't give any explanation here about

23   that to your colleague and former portfolio officer,

24   Greg Landis, or former co-worker or current co-worker?

1    A.    I didn't need to give that.  That's a basic

2    understanding.  It's a responsibility that we have to

3    cover overdrafts in trust accounts.

4              MS. WILSON:  Do you mind if we take a few

5    minutes break?

6              (Brief recess.)

7    Q.    Were you familiar with a Cynthia Chambliss?

8    A.    Yes.

9    Q.    Was she an assistant in the Philadelphia

10   office?

11   A.    Yes, she was Brendan's assistant.

12   Q.    Did she ever provide training to Linda Blozis

13   at any point?

14   A.    I believe she did.  She generally provided

15   training for the team in that informal setting since

16   she was pretty good with the systems.

17   Q.    When you say "the systems," are you referring

18   to computer systems or programs?

19   A.    The systems, yes.

20   Q.    Did you ever make a recommendation that Linda

21   Blozis go up to Philadelphia and have a session with

22   Cynthia Chambliss on training on computer systems or

23   any other areas where she needed further knowledge or

24   training?

William S. Becker          84

1    A.    I don't remember specifically making that

2    recommendation.  I may have.

3    Q.    At some point when you were working up in

4    Philadelphia did you see Linda Blozis in the

5    Philadelphia office working with Cynthia Chambliss or

6    receiving training from her?

7    A.    After I took the new job in 2003?

8    Q.    Yes, at any point in 2002.

9    A.    I don't remember.  I may have.  I was in a

10   different part of the building -- another part of the

11   floor, rather.

12   Q.    Were you aware that Brendan Gilmore had asked

13   Cynthia Chambliss to train Linda Blozis?

14   A.    I believe I reviewed an E-mail that suggested

15   that.  I believe it was after I had left that

16   position, though, left Delaware to take my other

17   position.

18   Q.    Are you saying you received an E-mail in

19   preparation for the case or you reviewed an E-mail

20   while you were working at Mellon?

21   A.    In preparation for the case.

22   Q.    Did Cynthia Chambliss know how to review an

23   account that needs investment recommendations?

24   A.    I believe so, yes.

William S. Becker          85

1    Q.    Can portfolio administrators receive training
2  on product knowledge?
3    A.    From internally?
4    Q.    Yes, internal training.
5    A.    Yes.
6    Q.    All the training we are talking about I thought
7  we were making a distinction between formal and
8  informal and you have used that term "internal
9  training" before, are you distinguishing internal from
10  the national teleconference to something else?
11    A.    Internal refers to those formal and informal as
12  I mentioned before.  There is also additional training
13  courses that are not sponsored by Mellon, it's a third
14  company provider that could sponsor training.
15    Q.    Does Mellon ever pay for any of its employees
16  to take any of these courses with the third company?
17    A.    There are certain courses that are offered that
18  Mellon will pay for.  I don't recall specifically what
19  they are.
20    Q.    And you never recommended that Linda Blozis
21  take any of those courses with the third party, is
22  that correct?
23    A.    I don't remember if I did or didn't.
24    Q.    Let me show you a document and ask that it be

**B878**

1    marked Becker Exhibit 8.

2              (Becker Deposition Exhibit No. 8 was marked

3    for identification.)

4    Q.    Take a moment to review that.

5    A.    (Witness complies.)  Okay.

6    Q.    Calling your attention to the third paragraph

7    from the bottom, "I like," do you see that paragraph?

8    A.    Yes, I do.

9    Q.    Is it fair to say you liked Linda Blozis

10   personally?

11   A.    Yes, that's very fair.

12   Q.    And is it fair to say that you thought her

13   attitude overall was okay?

14   A.    Yes, overall that's what I indicated from this.

15   Q.    You make a reference to a former employee in

16   Delaware, do you see that?

17   A.    Yes.

18   Q.    Who were you referring to there?

19   A.    I was referring to Katie Agne.

20   Q.    And you were indicating Linda Blozis is

21   stressed out with the workload?

22   A.    That's what I wrote.

23   Q.    Do you agree with that?

24   A.    Yeah.

William S. Becker          87

1    Q.    You weren't lying when you said that?

2              MS. WILSON:  Objection to form.  You can

3    answer.

4    A.    I know that there was a lot of work to do and

5    that it stressed Linda out so I acknowledged I

6    stressed her out by giving her that workload.

7    Q.    And you make a recommendation here in the last

8    sentence of the paragraph, you talk about a package,

9    do you see that word "package"?

10   A.    Yes.

11   Q.    Are you referring to a severance package or

12   separation package?

13   A.    Yes.

14   Q.    Does Mellon in certain circumstances offer --

15   which is it, is it severance or separation, what does

16   Mellon call the package so I use the Mellon

17   terminology?

18   A.    Well, there are different packages for

19   different circumstances so I'm just referring

20   generally to a package, but not understanding the

21   specifics.  As my first paragraph indicates I just

22   remember when I refer to package I was referring to

23   something that I didn't know the details of.

24   Q.    But you have been with Mellon since 1998, two

William S. Becker          88

1    different points now, and here we are eight years

2    later, so almost eight years minus a year and a half

3    or two years with another bank and you have been a

4    manager for that time.  What types of packages are

5    there that you have seen at Mellon?

6         A.   For people whose -- if it's a corporate-wide

7    layoff that we reduce staff and I believe that was the

8    late '90s, then people would be offered a certain

9    dollar amount for whatever their salary was for a

10   certain number of years of service if their job was

11   being eliminated.

12        Q.   A job elimination or reduction in force or

13   downsizing?

14        A.   Right, and they may or may not be offered.

15        Q.   And that could be some kind of separation

16   package?

17        A.   A separation or severance, yes.

18        Q.   Are there any other situations where a package

19   could be offered?

20        A.   There are -- if -- I'm just trying to think of

21   things that I have had direct experience with.

22        Q.   Right.

23        A.   That's really the only case that we dealt

24   specifically with.

B881

William S. Becker          89

1    Q.   And and you wrote this E-mail in December of

2    2002, the E-mail at the bottom to Rosemary Thomas that

3    we are talking about now, is that accurate?

4    A.   Yes.

5    Q.   And at that point you were suggesting that

6    Mellon offer Linda Blozis some kind of a separation

7    package, is that accurate?

8    A.   Yes.  I wanted to find out what that package

9    was and whether or not she would qualify for something

10   like that.

11   Q.   And you thought that would have been a more

12   prudent course of action as opposed to continued

13   written criticism that she doesn't have product

14   knowledge and doesn't have the competencies to do the

15   job?

16         MS. WILSON:  Objection to form.  You can

17   answer.

18   A.   I thought that would be a nice thing to do

19   because I liked Linda.  The prudent part of it, I

20   didn't know the details of the package at the time so

21   I wanted if there was one to know what it meant, but I

22   liked Linda and it was a difficult time to -- because

23   she wasn't doing what we needed her to do.

24   Q.   And had there been other talk of offering

1    packages to administrative help that were not

2    qualified for the position?

3        A.    I believe there was when I had spoken to Paul

4    Kochis, but I didn't know the specifics about it.

5        Q.    I think we have talked about at some point in

6    the 1990's that the portfolio administrator or the

7    assistant position the responsibilities were increased

8    by Mellon?

9        A.    Yes, that's correct.

10       Q.    And at that point was there a situation where

11   there were multiple employees in the job who were no

12   longer qualified for the job under the increased

13   responsibilities or increased requirements of the job?

14              MS. WILSON:   Objection to form.  You can

15   answer it.

16       A.    I don't remember that there were a number of

17   people.  I had my little Delaware universe to be

18   concerned about.

19       Q.    Were you aware of anybody within the Delaware

20   universe that no longer was qualified for the job and

21   was offered a package?

22       A.    No one was specifically offered a package, but

23   with respect to identifying whether someone was

24   qualified in doing a good job we certainly had to do

1    that.

2        Q.    And outside of the Delaware office were you

3    aware of anybody else in the Philadelphia or elsewhere

4    or within Delaware that was administrative help that

5    was no longer qualified for the job once the

6    requirements were increased or the responsibilities

7    were increased?

8        A.    No.

9        Q.    But you heard some kind of talk about offering

10    packages for administrative help not qualified for the

11    position?

12        A.    Yes.

13        Q.    And it was your understanding from -- I'm

14    sorry, who did you say you spoke with?

15        A.    I referred to Paul Kochis.

16        Q.    From your conversation with him it was your

17    understanding that some folks were offered packages,

18    is that correct?

19                MS. WILSON:    Objection to form.    You can

20    answer.

21        A.    No, it was not my understanding that they were

22    offered.    My recollection is that he mentioned

23    something about it and that we may be able to offer

24    it.    I don't know at that time whatever happened to

B884

1    that thought or that program.

2        Q.    So, you suggested that that could be a possible

3    way of dealing with Linda Blozis, a possible way to

4    treat Linda Blozis?

5        A.    Right, if it were some type of thing that I

6    could offer her.

7        Q.    And ultimately she was not offered a package

8    for whatever reason, correct?

9        A.    I don't know that specifically, but certainly I

10   never offered her a package while I was down there.

11       Q.    And it's your understanding now that Mellon

12   eventually terminated her employment, correct?

13       A.    Yes.

14       Q.    How were bonuses determined for portfolio

15   administrators?

16       A.    It's a subjective bonus based on the manager's

17   -- how the manager sees that person as contributing to

18   the office.

19       Q.    And when you say "the manager," are you

20   referring to the team leader?

21       A.    No, the direct report gives the input, but team

22   leader is the final arbitrator of the distribution of

23   bonus pool.

24       Q.    Who in the Delaware office received bonuses in

William S. Becker            93

1   2002?

2   A.   I don't remember.

3   Q.   Did you receive a bonus in 2002?

4   A.   I would think I did.  Yes, I'll say yes.  I

5   don't remember the amount.

6   Q.   Without asking you the amount or asking you to

7   recall the amount why do you think you remember that

8   you did?

9   A.   It was an important part of compensation for

10  officers, we were incented to do the activities that

11  would lead to receiving a bonus.

12  Q.   Was it an important part of compensation for

13  all members on the team?

14  A.   No.  I would say it was primarily geared

15  towards officers and periodically if the bonus pool

16  was sufficient or someone did an activity that was

17  deemed appropriate of a bonus, then assistants would

18  be paid bonuses.

19  Q.   But if there was a year where Linda Blozis

20  didn't receive a bonus that would be due to the fact

21  that the bonuses were paid to the portfolio officers,

22  it's an important of their compensation?

23  A.   No.  I'm sorry if I characterized it that way.

24  Depending on the profitability of the company then it

1    rolls down to regions and then teams and then

2    individuals.  I don't remember discussions that we

3    said, Well, this person is an assistant, let's not

4    give them anything because we have to give it to the

5    portfolio officers.  There were certainly years where

6    the portfolio officer got very little and the

7    administrators got very little or the administrators

8    didn't get anything or portfolio officers didn't get

9    anything.  It was based on individual merit if there

10   was money in the pool.

11       Q.    Did Maria Dunlop receive a bonus in 2002?

12       A.    I don't remember.

13       Q.    At some point was Linda Blozis told not to ask

14   for help from her peers with her workload?

15       A.    I'm not aware of that.

16       Q.    Was Linda Blozis expected to complete her

17   workload on her own?

18       A.    That would be fair to say generally.

19       Q.    Was Maria Dunlop allowed to get assistance from

20   Linda Blozis with work?

21       A.    I would think if something needed to get done

22   we took a team approach on certain large projects.

23       Q.    Did Brendan Gilmore and Greg Landis criticize

24   Linda Blozis for leaving a booklet for Maria Dunlop to

1    bind?

2        A.    I don't know.

3        Q.    What was Mellon's vacation policy for portfolio

4    administrators in 2001 and 2002?

5        A.    I don't remember specifically.  Are you asking

6    number of days or --

7        Q.    To the best of your recollection generally how

8    did vacation work?

9        A.    A request was made by the assistant to their

10   direct report and then that person would determine

11   whether it was okay to grant the request or not based

12   on workload, what was going on in the office and that

13   sort of thing.

14       Q.    Were you aware that Brendan Gilmore issued

15   Linda Blozis a final written warning in April of 2003?

16       A.    I have seen the final written warning, yes.

17       Q.    Is that something you have seen in preparation

18   for your deposition today or have you seen that

19   previously during the time that it occurred?

20       A.    I did not see it at the time it occurred, no.

21   I did see it in preparation for the deposition.

22       Q.    Did Mellon have policies against age

23   discrimination in employment?

24       A.    Yes, I believe they do.

William S. Becker          96

1    Q.    Did Mellon have policies against sex

2    discrimination in employment?

3    A.    I believe they did, yes.

4    Q.    Did Mellon have a policy against retaliation

5    for complaining of employment discrimination?

6    A.    I believe they do, yes.

7    Q.    You are aware that it is illegal to

8    discriminate in employment based on an employee's age?

9    A.    Yes.

10   Q.    During the time you were Linda Blozis' super-

11   visor you were aware it is illegal to discriminate

12   against an employee based on the employee's sex or

13   gender?

14   A.    Yes.

15   Q.    During the time that you were Linda Blozis'

16   direct supervisor you were aware it is illegal to

17   retaliate based on a discrimination complaint?

18   A.    Yes.

19   Q.    Were you aware that Linda Blozis made a

20   complaint to human resources in May of 2003?

21   A.    No.

22   Q.    Were you ever aware that Linda Blozis made a

23   complaint against Brendan Gilmore?

24   A.    I'm sorry, what time period?

William S. Becker          97

1      Q.    At any time period while you were working at
2    Mellon and Linda Blozis was working at Mellon.
3      A.    I believe I do remember that she made a
4    complaint against Brendan.  It was after the fact.  It
5    was after the complaint had been lodged.
6      Q.    That you became aware?
7      A.    That I became aware of it, yes.  I'm sorry.
8      Q.    Who did you become aware of it from?
9      A.    I don't remember.
10     Q.    And were you contacted by human resources or
11   Rosemary Thomas regarding the complaint?
12     A.    Actually, I do remember when I became aware of
13   that complaint.  It was the beginning of this year
14   when I found out that there was some litigation
15   occurring.
16     Q.    And prior to that you were never contacted by
17   Rosemary Thomas or human resources in connection with
18   that complaint by Linda Blozis?
19     A.    No, not that I remember.
20     Q.    Were you ever aware that Linda Blozis accused
21   Brendan Gilmore of age discrimination?
22     A.    I am aware of it now.
23     Q.    Prior to the filing of this lawsuit were you
24   aware of it?

**B890**

William S. Becker          98

1    A.    No.

2    Q.    Does Mellon have a progressive discipline

3    policy, if you understand what that means?

4    A.    Yes.  I do understand and, yes, they do.

5    Q.    Under that progressive discipline policy are

6    there three steps that can be given to an employee for

7    a performance issue such as a written warning, a final

8    written warning and then ultimately termination?

9    A.    Yes.

10   Q.    And are there other instances that don't fall

11   under the progressive discipline policy that can lead

12   to immediate termination such as stealing from the

13   company?

14   A.    Yes.

15   Q.    And Linda Blozis wasn't terminated for an

16   intolerable offense that could lead to immediate

17   termination such as stealing from the company, is that

18   correct?

19            MS. WILSON:  Objection to form.  You can

20   answer.

21   A.    My understanding is that's not the reason she

22   was terminated.

23   Q.    And she was terminated under the progressive

24   discipline policy for poor performance?

William S. Becker          99

1    A.    That's my understanding.

2    Q.    And under that progressive discipline policy

3    she couldn't be terminated before she received a final

4    written warning, is that correct?

5              MS. WILSON:  Objection to form.  You can

6    answer.

7    A.    I'm not certain whether the final written

8    warning has to be given.  Was that the question?  I'm

9    sorry, could you read me the question?

10   Q.    That's the question.

11   A.    Okay.  That a final written warning needs to be

12   given if someone is in a corrective action?

13             MS. WILSON:  Why don't you repeat the

14   question.

15             (The last question was read back by the

16   court reporter.)

17   A.    I don't know whether that's correct or not.

18   Q.    Is it your understanding that under the

19   progressive discipline policy it's possible for an

20   employee to be terminated without any warnings?

21             MS. WILSON:  Objection to form.  You can

22   answer.

23   A.    I agree with what you just said, that there are

24   warnings given -- a person can still be terminated

**B892**

1    for, for example, insubordination or stealing if

2    they're in that progressive discipline.

3        Q.   Earlier we made a distinction between a

4    progressive discipline policy based on performance

5    that includes three steps of written warning, final

6    written warning and termination and then other things

7    outside of the progressive discipline policy or

8    outside of the progressive progression that are called

9    intolerable offenses, are you aware of that?

10       A.   Yes, yes.

11       Q.   And if there is an intolerable offense such as

12   stealing from a company that an employee could be

13   terminated without receiving the three steps?

14       A.   That's correct.

15       Q.   I think you told us earlier that at some point

16   during the outset of the calendar year, fiscal year,

17   certain planning and goal setting is done for an

18   employee, is that accurate?

19       A.   Yes.

20       Q.   And when would that be done, would that be done

21   in the first month or two of the year?

22       A.   Generally the first couple months, yes.

23       Q.   An employee would then receive a intermediary

24   review based on an evaluation of how the employee had

William S. Becker          101

1    performed in terms of meeting those goals or expecta-
2    tions that were set in the first couple months of the
3    year?
4        A.    Yes, sometimes that happens, sometimes it
5    didn't.
6        Q.    It wasn't mandatory to have a mid-year review,
7    correct?
8        A.    That is correct.
9        Q.    But if a mid-year review was done, it would be
10    based on how well the employee had met the expecta-
11    tions or the planning that had been done in the first
12    couple months of the year?
13        A.    That's correct.
14        Q.    And I think you have told us that the annual
15    evaluation is always done for the most part?
16        A.    Yes.
17        Q.    And the annual evaluation is also based on how
18    the employee has done in terms of the planning in the
19    first couple months of the year?
20        A.    Yes, the planning and then whatever other
21    performance there is throughout the year, whether it
22    specifically relates to a plan or not.
23        Q.    Aside from Linda Blozis have you ever seen any
24    employees at Mellon discharged?

William S. Becker          102

1      A.    Have I seen, personally been in the room when
2   that happens?
3      Q.    Yes.
4      A.    Yes.
5      Q.    Have you ever known Mellon to pay the
6   discharged employee through the end of the week even
7   though the discharged employee did not work the
8   remainder of the work?
9      A.    I don't know specifically the pay arrangements.
10   No, I can't speak to that one way or the other.  I'm
11   not aware whether they would pay someone through the
12   end of a time period or not.
13      Q.    But have you had to deliver the news to other
14   people other than Linda Blozis that their employment
15   is being terminated by Mellon?
16            MS. WILSON:   Objection to form.
17      A.    Because I didn't -- I didn't deliver the news
18   to Linda.
19      Q.    I'm not saying you have delivered the news to
20   Linda.  I think there has been testimony in the case
21   that someone else delivered the news, Brendan Gilmore
22   or someone else or Greg Landis, I believe.
23      A.    Okay.
24      Q.    Have you ever had to deliver that news to

B895

William S. Becker          103

1    employees that Mellon is terminating their employment?

2    A.    I've not personally said the words.  I have

3    been in the room when that has happened and when other

4    people have been notified.

5    Q.    And during those types of meetings you have

6    never seen anyone notified they would be paid through

7    the end of the week?

8            MS. WILSON:  Objection to form.  You can

9    answer.

10   A.    I was never in for a prolonged period of time

11   in those meetings.  Generally the HR representative

12   would be there.  I would be there, maybe another

13   officer and then the particulars would be discussed

14   once I left the room.  So, I'm not aware of whether

15   that is standard operating procedure or not.

16   Q.    Have you yourself had to fire anybody in the

17   Philadelphia office?

18   A.    No.

19   Q.    At some point was a Laura Shannon hired in the

20   Delaware office?

21   A.    Yes.

22   Q.    And did she eventually replace Linda Blozis?

23           MS. WILSON:  Objection to form.  You can

24   answer.

William S. Becker        104

1    A.    I believe she did.

2    Q.    And was Laura Shannon younger than Linda

3    Blozis?

4    A.    I believe so.  I don't know.

5    Q.    Did you have any conversations with Brendan

6    Gilmore prior to the termination of Linda Blozis'

7    employment with respect to Linda Blozis or what action

8    should be taken against her?

9    A.    I didn't discuss anything with Brendan

10   subsequent to my review, which he needed to approve

11   for the end of 2002.

12   Q.    Did you have any conversations with Greg Landis

13   about Linda Blozis' performance and what action should

14   be taken towards her or against her?

15   A.    No.

16   Q.    Is it fair to say you did not make the decision

17   to terminate Linda Blozis' employment?

18   A.    That's fair.

19   Q.    I mean, is that accurate?

20   A.    That's accurate.  I'm sorry.

21   Q.    That's a better question.  During the time that

22   you were her direct supervisor you had authority to

23   fire her, is that accurate?

24   A.    That's correct.

105

1                Mr. LaROSA:  No further questions.

2            (The deposition was concluded at 1:25 p.m.)

3                    I N D E X

4
DEPONENT:  William S. Becker                PAGE

5      Examination by Mr. LaRosa                 2

6

7                E X H I B I T S

8
BECKER DEPOSITION EXHIBITS                MARKED

9

10   1   Document Bates stamped Mel/Bloz 454-455     24

11   2   Document Bates stamped Mel/Bloz 707-716     28

12   3   Document Bates stamped Mel/Bloz 717-726     36

13   4   Document Bates stapmed Mel/Bloz 456-466     59

14   5   Document Bates stamped Mel/Bloz 593         67

15   6   Document Bates stamped Mel/Bloz 684         73

16   7   Document Bates stamped Mel/Bloz 646         80

17   8   Document Bates stamped Mel/Bloz 682         86

18   ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 106

19   CERTIFICATE OF REPORTER               PAGE 107

20

21

22

23

24

**B898**

106

```
 1
 2
 3              REPLACE THIS PAGE
 4              WITH THE ERRATA SHEET
 5              AFTER IT HAS BEEN
 6              COMPLETED AND SIGNED
 7              BY THE DEPONENT.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1    State of Delaware   )
                          )
 2    New Castle County   )

 3

 4                    CERTIFICATE OF REPORTER

 5
              I, Christina M. Vitale, Certified Shorthand
 6    Reporter and Notary Public, do hereby certify that
      there came before me on Friday, January 5, 2007, the
 7    deponent herein, WILLIAM S. BECKER, who was duly sworn
      by me and thereafter examined by counsel for the
 8    respective parties; that the questions asked of said
      deponent and the answers given were taken down by me
 9    in Stenotype notes and thereafter transcribed by use
      of computer-aided transcription and computer printer
10    under my direction.

11            I further certify that the foregoing is a true
      and correct transcript of the testimony given at said
12    examination of said witness.

13            I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
14    interested in the event of this suit.

15

16

17                    Christina M. Vitale, CSR
                      Certification No. 261-RPR
18                    (Expires January 31, 2008)

19
      DATED:
20

21

22

23

24
```

B900

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **LINDA J. BLOZIS** | : | **CIVIL ACTION NO. 05-891 (SLR)** |
| **Plaintiff,** | : |  |
| **vs.** | : | **DECLARATION OF**<br>**WILLIAM S. BECKER** |
| **MELLON TRUST OF DELAWARE,** | : |  |
| **NATIONAL ASSOCIATION; MELLON** |  |  |
| **BANK, NATIONAL ASSOCIATION;** | : |  |
| **MELLON FINANCIAL CORPORATION,** |  |  |
|  | : |  |
| **Defendants.** |  |  |
|  | : |  |

I, William S. Becker, of full age, hereby certify and declare as follows based upon my own personal knowledge and information.

1.  I began working for Mellon in September 1998 as a Portfolio Manager/Vice President in the Private Asset Management Group in Delaware. I am currently employed as Senior Director, First Vice President for Mellon and have worked in this position since approximately June 2006. I have been authorized by Mellon to make this declaration in support of its Motion for Summary judgment above-captioned matter.

2.  From approximately September 1998 through December 2002, Ms. Blozis reported to me. Ms. Blozis held the position of Portfolio Administrator.

3.  Ms. Blozis' duties were to assist me with my client accounts. However, during the late 1990s or early 2000s, Portfolio Administrators were expected to do more sophisticated type of work than had been required previously. It was my overall

impression that Ms. Blozis would be unable to satisfy the heightened requirements for the position because she was frequently making basic and elementary mistakes.

4.    As her supervisor, I reviewed Ms. Blozis' work and make comments on the work she prepared for me so that I could keep track of her performance as well as use it as a teaching tool. In my role, I was personally aware of Ms. Blozis' performance and I made her aware of my concerns.

## Performance Issues

5.    One of the performance problems that Ms. Blozis had was failure to complete projects on a timely basis. As an example, on an e-mail that Ms. Blozis sent to another employee dated November 19, 2002 I noted that Ms. Blozis had this assignment since mid October and that the assignment still had not been completed. A true and complete copy of the November 19, 2002 e-mail with my notes is attached hereto as **Exhibit 1**.

6.    Ms. Blozis' job also included imputing information on the Automated Investment Review System forms. Ms. Blozis would often put improper information on these forms. I would note the problems on the forms and ask her to revise. Ms. Blozis' mistakes on the forms showed a lack of understanding of the work that she was doing. True and complete copies of the Forms with my notes are attached hereto as **Exhibit 2**.

7.    I had similar problems with Ms. Blozis' completion of a Security Risk of Holders form where she took a significant amount of time to finish the work, but it had been done incorrectly. A true and complete copy of the Form with my notes are attached hereto as **Exhibit 3**.

- 2 -

PRCLIB-436275.1-SWILSON 2/25/07 1:33 PM

A-108

**B902**

8.    · Additionally, there were issues with Ms. Blozis' inattentiveness to detail and failure to follow instructions. For example, on a Single Bond Buy form, Ms. Blozis entered $800,000.00 par value when it should have been $400,000.00 and on a Notification of Account overdraft dated December 9, 2002 Ms. Blozis would have noticed her error if she had double checked the information. True and complete copies of the Single Bond Pay Form with my notes are attached hereto as **Exhibit 4.**

9.    There were numerous times where I had to revise information that Ms. Blozis placed on a client Asset Risk Profile Questionnaires. This information was basic to her job functions and should have been performed correctly. True and complete copies of the Questionnaires with my revisions are attached hereto as **Exhibit 5.**

10.    Similarly, Ms. Blozis would improperly complete the Single Equity Sell Sheets and I would have to correct them. Again, proper completion of these sheets were basic to her job duties. True and complete copies of the sheets are attached hereto as **Exhibit 6.**

11.    Ms. Blozis would not anticipate client information that I would need to properly service an account. For example, on an e-mail dated December 6, 2002 Ms. Blozis did not provide me with the proper information and I had to inquire about proper follow-up. A true and complete copy of the December 6 e-mail with my notes is attached hereto as **Exhibit 7.**

12.    Ms. Blozis would also provide inaccurate information on the Automated Investment Review System forms. The errors on the forms reflected an inattentiveness to detail and a lack of understanding of her job. True and complete copies of the forms with my notes are attached as **Exhibit 8.**

- 3 -

13.   On October 8, 2002, I had an e-mail exchange with Ms. Blozis concerning her failure to provide information in a timely manner. In her response to me on October 9, 2002, Ms. Blozis stated, "I apologize for my own delay in completing it in a more timely manner." A true and complete copy of the e-mail chain is attached hereto as **Exhibit 9.**

14.   Ms. Blozis continued with her untimely completion of projects. On November 19, 2002, Ms. Blozis still had not completed a project I had given her in mid-October. A true and complete copy of the November 19 e-mail with my notes is attached hereto as **Exhibit 10.**

15.   I would consistently have to provide Ms. Blozis with guidance on how to properly provide certain information, such as a summary of assets, for customer accounts. This is something that she should have been able to do on her own. A true and complete copy of the Summary of Assets form that was priced as of November 11, 2002 with my revisions is attached hereto as **Exhibit 11.**

16.   Additionally, Ms. Blozis failed to follow my instructions and would send information to the wrong person as reflected on an e-mail dated December 6, 2002 with my notes. A true and complete copy of the e-mail with my notes is attached hereto as **Exhibit 12.**

17.   Because of the continuous nature of Ms. Blozis' performance issues, on December 4, 2002, I sought assistance from Ms. Rosemary Thomas, the human resources coordinator assigned to our group. In my December 4 e-mail, I stated that I had to start a file on Ms. Blozis because she had been consistently missing deadlines and projects over the past year and the quality of her work was poor. I felt that

- 4 -

commencing corrective action was necessary because I had been doing Ms. Blozis' job

for the past four years. A true and complete copy of my December 4 e-mail is attached

hereto as **Exhibit 13**.

18.    Ms. Thomas and I talked about Ms. Blozis' continuing performance

problems that persisted despite my counseling. We decided that Ms. Blozis should be

placed on a corrective action plan. We discussed the process and timing of placing Ms.

Blozis on a corrective action plan and decided since Ms. Blozis' 2002 performance

evaluation was scheduled to be performed in early 2003, we would place Ms. Blozis on

a corrective action plan during her 2002 appraisal. Her 2002 appraisal would constitute

her Initial Written Warning.

19.    Ms. Blozis received an Action Needed on her 2002 performance

evaluation, which was given in February 2003.

20.    During the time that I have been employed by Mellon, I have not made

any inappropriate remarks to any employees, including Ms. Blozis, relating to age or

sex.

- 5 -

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury of the laws of the United States of America that the foregoing statements made by me are true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

William S. Becker

Dated: February 21, 2007

- 6 -

A-112

B906

## EMPLOYEE PROFILE/HISTORY

**ID:** 221300199     **NAME:** )lozis,Linda J                     10/23/1998 03:13PM

### DEMOGRAPHICS

| | | | |
|---|---|---|---|
| ADDRESS: | 525 Langham Road | STATUS: | Active |
| | | BEN PROGRAM: | BEN |
| CITY: | Wilmington, DE 19809 | BEN EFF DT: | 02/12/1990 |
| HOME PHONE: | 302/764-3019 | BIRTHDATE: | 12/10/1945 |
| WORK PHONE: | | AGE: | 52.8 |
| MGR PHONE: | | MAR STATUS: | Single |
| LOCATION: | 00030          Tenth And Market Hq Building | RACE: | White |
| AIM #: | 012-0270 | GENDER: | Female |
| MGMT UNIT: | 633210          Trust Management | VAC/DIS/SEV DT: | 02/12/1990 |
| MANAGER: | 106345096          Gilmore,Brendan M | RETIRE DT: | |
| B U D: | PC          Private Asset Management | HIRE DT: | 02/12/1990 |
| EMPL CO: | 630          Mellon Bank Delaware | ACQUISITION: | NA |
| GL CO: | 630          Mellon Bank Delaware | | |

### CURRENT JOB DATA

| | | | | | |
|---|---|---|---|---|---|
| JOB CD: | 3074 | | | OFFICER CD: | |
| JOB TITLE: | Trust Spec Sr | | | OFFICER DATE: | |
| GRADE: | N | SHIFT: | 1 | PAY GROUP: | SMS    Semi Saly |
| FLSA: | N | SHIFT RATE: | 0 | EMPL TYPE: | S      Salaried |
| EEO CODE: | E 01 | DEDUCT: | Y | FT/PT: | F      Full-Time |

### CURRENT SALARY DATA

| | | | | | |
|---|---|---|---|---|---|
| SALARY: | $28,780.00 | LOC STD WEEKLY HRS: | 37.5 | LOC STD ANN HRS: | 1950 |
| BEN BASE RT: | | EMP STD WEEKLY HRS: | 37.5 | EMP STD ANN HRS: | 1950 |
| SAL PLAN: | 237 | COMP-RATIO: | .83 | | |

### JOB HISTORY

| EFF DATE | JOB CD | JOB TITLE | SG | FLSA |
|---|---|---|---|---|
| 05/23/1998 | 3074 | Trust Spec Sr | N | N |
| 12/01/1995 | 091160 | SR TRUST SPCLST | N | N |
| 11/01/1992 | C26030 | EXECUTIVE SECRETARY | F | N |
| 12/21/1990 | 910030 | ADMIN SECRETARY | F | N |
| 02/12/1990 | 910030 | ADMIN SECRETARY | 13 | N |

### PERF RTG

| EFF DATE | RTG |
|---|---|
| 01/03/1997 | 2 |
| 01/05/1996 | 2 |
| 02/05/1995 | 2 |
| 02/01/1995 | 2 |
| 09/15/1993 | 2 |
| 01/15/1992 | 3 |

### EMPLOYEE STATUS

| EFF DATE | STS | ACTN | RSN |
|---|---|---|---|
| 02/12/1990 | A | HIR | HIR |

### SALARY HISTORY

| EFF DATE | SALARY | INCR AMT | PCNT | TYPE |
|---|---|---|---|---|
| 01/01/1998 | $28,780.00 | $1,400.00 | 5.11 | MER |
| 01/01/1997 | $27,380.00 | $1,560.00 | 6.04 | MER |
| 01/01/1996 | $25,820.00 | $1,250.00 | 5.09 | MER |
| 10/01/1994 | $24,570.00 | $1,170.00 | 5.00 | MER |
| 05/01/1993 | $23,400.00 | $1,700.00 | 7.83 | MER |
| 05/01/1992 | $21,700.00 | $900.00 | 4.33 | MER |

### MGMT UNIT HISTORY

| EFF DATE | MGMT UNIT | BUD | CMPY |
|---|---|---|---|
| 05/23/1998 | 633210 | PC | 630 |
| 09/28/1993 | PC3210 | PC | 630 |
| 10/31/1990 | TI3210 | TI | 630 |
| 05/08/1990 | TI3510 | TI | 630 |
| 02/16/1990 | 993310 | 99 | 630 |
| 02/12/1990 | 9999 | 99 | 630 |

### OFFICER HISTORY

| EFF DATE | OFF CD |
|---|---|
| | |

### PENDING ACTIONS

SALARY INCREASES:                    PERF RTGS:                    OFFICER TITLES:

| EFF DATE | INCREASE AMT | TYPE | EFF DATE | RTG | EFF DATE | OFFICER CD |
|---|---|---|---|---|---|---|
| | | | | | | |

### RATINGS, AWARDS AND OTHER PAY

INCENT IND:          PLAN ID:

| INCENTIVE AWARDS | | | PREMIER ACHIEVEMENT | | EXTRA TIME AND OVERTIME | |
|---|---|---|---|---|---|---|
| DATE: | RTG: | AWARD AMT: | DATE: | AWARD AMT: | CURRENT YTD ET: | |
| 1997 | | | 1998 | | PRIOR YTD ET: | |
| 1996 | | | 1997 | | CURRENT YTD OT: | |
| 1995 | | | 1996 | | PRIOR YTD OT: | |

DEPOSITION
EXHIBIT

Landis 2
12-21-06  PS

PENGAD 800-631-6989

B907

EMPLOYEE PROFILE/HISTORY

ID:  000142775    NAME: Blozis,Linda J                    30-AUG-2004 03:44PM

**DEMOGRAPHICS**

| | | | |
|---|---|---|---|
| ADDRESS: | 525 Langham Road | STATUS: | Terminated |
| | | BEN PROGRAM: | BEN |
| CITY: | Wilmington, DE 198092113 | BEN EFF DT: | 12-FEB-1990 |
| HOME PHONE: | 302/764-3019 | BIRTHDATE: | 10-DEC-1945 |
| WORK PHONE: | | AGE: | 58.7 |
| MGR PHONE: | 215-553-3032 | MAR STATUS: | Single |
| LOCATION: | 00875    Mellon Bank (DE) | RACE: | White |
| AIM #: | 19G-0201 | GENDER: | Female |
| MGMT UNIT: | 623210    Trust Management | VAC/DIS/SEV DT: | 12-FEB-1990 |
| MANAGER: | 000115100  Gilmore,Brendan M | REHIRE DT: | |
| B U D: | PC    Private Wealth Management | HIRE DT: | 12-FEB-1990 |
| EMPL CO: | 622    Mellon Trust of Delaware NA | ACQUISITION: | NA |
| GL CO: | 622    Mellon Trust of Delaware NA | | |

**CURRENT JOB DATA**

| | | | | |
|---|---|---|---|---|
| JOB CD: | 2292 | | OFFICER CD: | |
| JOB TITLE: | Port Admin | | OFFICER DATE: | |
| GRADE: | 06 | SHIFT:    1 | PAY GROUP: | SMS    Semi Saly |
| FLSA: | E | SHIFT RATE:    0 | EMPL TYPE: | S    Salaried |
| EEO CODE: | B 07 | DEDUCT:    Y | FT/PT: | P    Full-Time |

**CURRENT SALARY DATA**

| | | | |
|---|---|---|---|
| SALARY: | 39,800.00    USD | LOC STD WEEKLY HRS:  37.5 | LOC STD ANN HRS:  1950 |
| BEN BASE RT: | | EMP STD WEEKLY HRS:  37.5 | EMP STD ANN HRS:  1950 |
| SAL PLAN: | 237 | COMP-RATIO:    0.87 | |

**JOB HISTORY**

| EFF DATE | JOB CD | JOB TITLE | SG | FLSA |
|---|---|---|---|---|
| 01-OCT-1999 | 2292 | Port Admin | 06 | E |
| 06-JUL-1999 | 3074 | Invest Spec I | I | N |
| 15-MAR-1999 | 3074 | Trust Spec I | I | N |
| 23-MAY-1998 | 3074 | Trust Spec Sr | H | N |
| 01-JAN-1997 | 09116D | Sr Trust Spclst | H | N |
| 01-DEC-1995 | 09116D | SR TRUST SPCLST | H | N |

**PERF RTG**

| EFF DATE | RTG |
|---|---|
| 01-JAN-2003 | I |
| 01-FEB-2002 | T |
| 01-JUN-2001 | 3 |
| 01-NOV-1999 | 2 |
| 01-OCT-1998 | 3 |
| 03-JAN-1997 | 2 |

**EMPLOYEE STATUS**

| EFF DATE | STS | ACTN | RSN |
|---|---|---|---|
| 19-JUL-2003 | T | TER | UNS |
| 12-FEB-1990 | A | HIR | HIR |

**SALARY HISTORY**

| EFF DATE | CURR | SALARY | INCR AMT | PCNT | TYPE |
|---|---|---|---|---|---|
| 01-OCT-2002 | USD | 39,800.00 | 1,900.00 | 5.01 | MER |
| 01-APR-2001 | USD | 37,900.00 | 1,800.00 | 4.99 | MER |
| 01-APR-2000 | USD | 36,100.00 | 4,370.00 | 13.77 | NMN |
| 01-JAN-2000 | USD | 31,730.00 | 1,800.00 | 6.01 | MER |
| 01-JAN-1999 | USD | 29,930.00 | 1,150.00 | 4.00 | MER |
| 01-JAN-1998 | USD | 28,780.00 | 1,400.00 | 5.11 | MER |

**MGMT UNIT HISTORY**

| EFF DATE | MGMT UNIT | BUD | CMPY |
|---|---|---|---|
| 01-APR-2003 | 623210 | PC | 622 |
| 01-APR-2003 | 633210 | PC | 622 |
| 23-MAY-1998 | 633210 | PC | 630 |
| 28-SEP-1993 | PC3210 | PC | 630 |
| 31-OCT-1990 | TI3210 | | 630 |
| 08-MAY-1990 | TI3510 | | 630 |

**OFFICER HISTORY**

| EFF DATE | OFF CD |
|---|---|
| | |

**PENDING ACTIONS**

SALARY INCREASES:                  PERF RTGS:                     OFFICER TITLES:
EFF DATE   INCREASE AMT   CURR   TYPE      EFF DATE      RTG          EFF DATE      OFFICER CD

**RATINGS, AWARDS AND OTHER PAY**

INCENT IND:    I    PLAN ID:    EPCO TOTAL DIRECT COMPENSATION:    39,800.00    USD

| INCENTIVE AWARDS | | | PREMIER ACHIEVEMENT | | | EXTRA TIME AND OVERTIME |
|---|---|---|---|---|---|---|
| DATE: RTG: | AWARD AMT: | CURR: | DATE: | AWARD AMT: | CURR: | CURRENT YTD ET: |
| 2003 | | USD | 2004 | | | PRIOR YTD ET: |
| 2002 | | USD | 2003 | | | CURRENT YTD OT: |
| 2001 | 2,000.00 | USD | 2002 | | | PRIOR YTD OT: |

| PROFIT BONUS AWARDS | | | STOCK INFORMATION | | | | LONG TERM INCENTIVE |
|---|---|---|---|---|---|---|---|
| DATE: RTG: | AWARD AMT: | CURR: | DATE: RTG: | SHARES: | STOCK MPV: | CURR: | DATE: AWARD AMT:    CURR: |
| 2003 | | | 2004 | | | | 2004 |
| 2002 | | | 2003 | | | | 2003 |
| 2001 | | | 2002 | | | | 2002 |

End of Report

MEL/BLOZ 455

 **Mellon**

Douglas O. Kloppenburg
*Senior Vice President*

February 20, 2002

Linda J. Blozis
193-0329

Dear Linda:

I am pleased to inform you that you have been awarded $2,000 under the terms of Mellon's Private Wealth Management 2001 Portfolio Team Incentive Plan. This award, which will be included in your February month-end pay, recognizes your contributions to our performance during 2001.

Thank you for your contribution to our success and your extra efforts in a very challenging year.

Sincerely,

Douglas O. Kloppenburg

*Private Wealth Management*
Third Floor • 1735 Market Street • Philadelphia, PA 19103
(215) 553-8998 Office • (215) 553-1795 Fax

*A Mellon Financial Company℠*

P173

B909

**Becker William S**

| | |
|---|---|
| From: | Becker William S |
| Sent: | Tuesday, October 08, 2002 6:31 PM |
| To: | Blozis Linda J |
| Subject: | Projects |

Gregg mentioned that ⬛⬛⬛ was looking for some tax cost info last week. I remembered that he asked me for that info this spring, so I just pulled out the file. In there I found my original request dated 4/10/02, and many emails from you requesting info from other departments to obtain the cost basis.

Also was an email I sent to you dated 6/4/02. I suggested that you should look in the file for any purchase info first. For whatever reason, you didn't follow up on this, and all the emails were filed, including the ticklers.

I just took 10 minutes and reviewed the investment file this evening and there are a bunch of trade tickets for the purchase of different Dreyfus Funds, including the International and the Mid Cap Fund from 1994 and 1995. There was also the paperwork showing the conversion from the MidCap to the current cusip for the Dreyfus Premier Small Stock Fund. 95% of what is needed to reconstruct a very accurate cost basis, including dates, has been in the file all along.

I need to get better at letting you know when things don't happen the way they should. This project has been an embarrassing disaster. It's not OK to just stop working on something and forget about it. What makes this worse is that ⬛⬛⬛ has come back to us again requesting the same info. This is a fragile relationship as it is. They are considering moving the plan out to a 401k provider, so Gregg and I are struggling to retain ⬛⬛s money. Mistakes like this don't help our chances.

There are a few other projects that I've given you that have yielded similar results. ⬛⬛⬛⬛⬛⬛'s savings bonds are worth over $1 million. Over a year passed without that project getting finished. I lost my credibility with her, and she went elsewhere to get her planning done. An opportunity to get a substantial addition was lost because of the lack of follow-through. Not OK.

The mutual fund coding project has to be close to a year by now, and you've not come to me to say that it is completed.

I know you've been busy, first with Katie gone and then helping teach Maria. There needs to be improvement in completing these tasks in a timely manner, however. As I've said for four years, you don't need my permission to get your job done. If you need to lock yourself in a room to get things done, do it.

I know you'll work hard to try and improve on things like this. I hope the training Mellon is offering provides some tips and techniques for organizing your day and prioritizing projects like these. I need you to help me increase the level of service we offer our clients. Improving in these areas will be a step in the right direction.



DEPOSITION
EXHIBIT
BECKER-5
1/5/07-CMV

1

MEL BLOZ 593

B910

## Gilmore Brendan M

| | | |
|---|---|---|
| **From:** | - | Olney Richard D |
| **Sent:** | | Friday, October 18, 2002 4:55 PM |
| **To:** | | Kochis Paul M; Gilmore Brendan M; Thomas Rosemary C |
| **Cc:** | | Landis Gregg L; Becker William S |

Paul, Brendan, and Rosemary - I just wanted you all to know about a situation where Linda Blozis & Maria Bannister went above and beyond the call of duty to help one of our clients fund a new trust. This client (a non-profit organization) has about 90 charitable remainder trusts totalling $40 million in assets that PWM is currently managing. They had a new donor who had established a new trust, and was going to fund it with a stock certificate for 50,000 shares of Sara Lee (around $1 million +). Normally, stock certficiates are sent to our office here in Boston, and we forward them to NYC for processing. The donor did not feel comfortable putting them in the mail himself, and wanted to drop them off personally. My client called and asked if there was a Mellon office in Delaware. As it turned out, he lived a mile down the road from the Greenville office. I called the office and spoke with Linda & Maria, who agreed to take in the certificate from the donor. This was conveyed to the donor, who delivered the certificate, and received a receipt for the gift. The securities were sent up to NYC and eventually deposited into the new trust. Everything went very smoothly. The donor was very pleased at how smoothly everything went, and conveyed this to the charitable organization. The organization (our client) called me and were very complimentary. They recognized that this gift went outside normal procedures, and appreciated the extra effort that was made to accomodate this gift as this donor is very important to their institution.

Linda & Maria were instrumental in making this gift happen, and their effort lent further support the decision of our client to choose Mellon to handle their Charitable Gifts Program.

I just thought that you should know how much we appreciate the time and effort they put into this, especially when every one is so busy these days.

Thank you!

Rick

Rick Olney
Assistant Vice President
Charitable Gift Services
Mellon - Private Wealth Management
Tel: (617) 722-3834/Fax: (617) 248-4456
Email: olney.rd@mellon.com

1

**B911**



# PERFORMANCE MANAGEMENT

⑩ **Mellon**

Exempt Form

## Performance Management Form

### Employee Information

| | | | |
|---|---|---|---|
| Employee Name: | Linda J. Blozis | Manager's Name: | William S. Becker |
| Job Title: | Portfolio Administrator | Next Level Manager: | Brendan M. Gilmore |
| Salary Grade: | 06 | Date of Planning: | 2/25/02 |
| Department: | PWM - DE | Date of Mid-Year Review: | |
| Length of Service: | 12 | Date of Final Assessment: | 1/27/03 |
| Time in Current Position: | 2 | Date of Prior Assessment: | 2/22/02 |

### Section I: Results-Based Goals

Individuals must have at least one goal in each area and we suggest an overall total of six to eight goals for this section. Examples of goals can be found in the Performance Management toolkit.

| Goals/Plans for the Year | Year-End Assessment | | | | Year-End Accomplishments |
|---|---|---|---|---|---|
| **Business & Operating Contributions** | | | | | |
| Become technically proficient with Trust and Investment Operational systems | ☒ | ☐ | ☐ | ☐ | |
| Grow fee revenue by accurately tracing enrichments to accounts | ☒ | ☐ | ☐ | ☐ | |
| Analyze Corporate Actions; monitoring sale or acquisition of stock that will compliment the client's account; reduce # of overdrafts by daily tracking | ☒ | ☐ | ☐ | ☐ | |
| **Customer-Related Contributions** | | | | | |
| Reduce number of callbacks by providing appropriate assistance to clients when Port. Off is not available | ☐ | ☒ | ☐ | ☐ | Linda did a good job covering for me during 2002, not only when I was out of town on client meetings but also when working in Philadelphia |
| Preparing meeting packets in a timely and efficient manner | ☒ | ☐ | ☐ | ☐ | The goal for next year is to have them ready 2-3 days before each meeting |
| | ☐ | ☐ | ☐ | ☐ | |
| **Employee-Related Contributions** | | | | | |
| ltend training sessions as appropriate | ☒ | ☐ | ☐ | ☐ | |
| Initiated sweep vehicle conference call for team | ☐ | ☒ | ☐ | ☐ | |
| Increase familiarity of cross-over responsibilities within the team | ☒ | ☐ | ☐ | ☐ | |

**B912**

MEL/BLOZ 456

| ...al Plans for the Year | | Year-End Assessments | | Year-End Accomplishments |
|---|---|---|---|---|
| **Other Contributions (includes corporate, synergy, project-specific)** | | | | |
| Monitor account diversification and recommend changes to conform w/ policy | ☒ | ☐ ☐ | ☐ | After training, Linda began doing this for accounts during the reg 9 review process towards the end of the year |
| | ☐ | ☐ ☐ | ☐ | |
| | ☐ | ☐ ☐ | ☐ | |

＊Requires a comment/explanation

## Year-End Overall Assessment for Results-Based Goals:

☒Meets Target          ☐Exceeds Target          ☐Outstanding          ☐Below Target

Comments on Year-End Assessment (add pages if necessary):

Linda covered basic client inquiries for me last year. Going forward, more complex issues relative to account management for clients will need to be learned, including asset allocation strategies and Mellon investment management capabilities.

## Section II: Shared Values

During the planning process, managers and employees should agree on specific behaviors for the year that would demonstrate Mellon's Shared Values. Definitions are given in the directions document.

| Shared Value | Action Plan (Planning Process) | Year-End Assessment | | | |
|---|---|---|---|---|---|
| Integrity | Respects others opinions and encourages communications among teams | ☐ | ☒ | ☐ | ☐ |
| Teamwork | Develops contacts in operations areas with the purpose of improving client problem resolution; frequently communicates with fellow employees to accept and generate feedback that contributes to the group | ☐ | ☒ | ☐ | ☐ |
| Excellence | Listen and address problems as soon as possible; be flexible and adaptable to the changing focus of Mellon | ☐ | ☒ | ☐ | ☐ |

＊Checkmarks on "Needs Improvement" require a specific goal on the development plan

**B913**

Year-End Overall Assessment for Shared Values:

MEL/BLOZ 457

☐Effective        ☒Highly Eff  ive        ☐Role Model/        )        ☐Needs Improvement
                                              Outstanding

C   ments on Year-End Assessment (add pages if necessary):

L_ _a provides a high level of service to our clients.  She is always willing to help  teammates whenever possible, and makes it a point to get along with support personnel.

B914

MEL/BLOZ 458

## Section III: Competencies

Employees will be assessed on core, people management (those holding managerial responsibilities) and job/role-specific competencies. The Competency Guide in the performance management toolkit provides a behavioral description of each competency.

| Competencies | Year-End Assessment | | | | Comments and Examples (Year-End Assessment) |
|---|---|---|---|---|---|
| **Core Competencies** | | | | | |
| Adaptability | ☐ | ☒ | ☐ | ☐ | |
| Communication | ☒ | ☐ | ☐ | ☐ | |
| Customer Service Orientation | ☐ | ☐ | ☒ | ☐ | Linda knows our clients come first and they deserve excellent service |
| Interpersonal Skills | ☐ | ☒ | ☐ | ☐ | |
| Judgement | ☐ | ☐ | ☐ | ☒ | With respect to determining the importance of finishing a specific project on time |
| Personal Accountability/Ownership | ☐ | ☐ | ☐ | ☒ | Taking ownership of projects without constant monitoring |
| **People Management Competencies (only for those who manage people)** | | | | | |
| Attracting and Retaining Organizational Talent | ☐ | ☐ | ☐ | ☐ | N/A |
| Developing and Coaching Others | ☐ | ☐ | ☐ | ☐ | N/A |
| Managing for Results | ☐ | ☐ | ☐ | ☐ | N/A |
| **Job Specific Competencies (all exempt employees must have 1-3)** | | | | | |
| Dependability | ☐ | ☒ | ☐ | ☐ | |
| Initiative/Sense of Urgency/Organizational Skills | ☐ | ☐ | ☐ | ☒ | Missing Deadlines |
| Product knowledge/work quality | ☐ | ☐ | ☐ | ☒ | There was little progress made in this area during 2002 - this will require study outside of normal business hours |

\*Requires a comment/explanation
\*\*Please use the Competency Guide in the performance management toolkit to review behavioral descriptors

**Year-End Overall Assessment for Competencies:**

☐Effective        ☐Highly Effective        ☐Outstanding        ☒Needs Improvement

**Comments on Year-End Assessment (checkmarks on "Needs Improvement" require a specific goal in the development plan):**

Linda understands that the role of Portfolio Administrator is changing at Mellon, and that more will be expected of her in the future.

**B915**

MEL/BLOZ 459

Section IV: Summary and Final Performance Rating – To Be Completed Dur. Year-End Assessment

| Results-Based Goals | ☒ Meets Target | ☐ Exceeds Target | ☐ Outstanding | ☐ Below Target |
|---|---|---|---|---|
| **Shared Values** | ☐ Effective | ☒ Highly Effective | ☐ Role Model/ Outstanding | ☐ Needs Improvement |
| **Competencies** | ☐ Effective | ☐ Highly Effective | ☐ Outstanding | ☒ Needs Improvement |

**Overall Rating (Check One):**

☐ On-Target Performance    ☐ Strong Performance    ☐ Outstanding Performance    ☒ Action Needed*

✱ Requires the rater to check one of the boxes below & to provide a comment/explanation

**Action Needed:** Check one of the following boxes.

☐ **Too New to Rate:** Employee is new in the organization or unit. Manager and employee need to establish an interim date for assessment.

☒ **Needs Improvement:** Employee occasionally, but not regularly, met expectations in selected areas and requires improvement in specific job areas.

☐ **Unsatisfactory:** Employee performance did not meet the minimum requirements.

**Manager's Comments for Assessment Period – required if "Action Needed" was selected on final performance rating (add pages if necessary):**

There are two main areas that Linda needs to improve. First, there were several special projects during the year that Linda did not complete in a timely manner. These include identification of accounts on a model with restrictions, gathering and calculating cost basis for clients, ▮▮▮▮▮▮▮▮▮E-Bonds valuation, changing ▮al fund distribution options for clients, and identifying funds transfer agreements that are on file and setting the clients up to receive wires. Linda is aware that ultimately the responsibility falls on her to complete tasks when assigned. If she can't find the time, she needs to let her supervisors know. Linda also needs to develop a better understanding of investments in general and Mellon's Invesment Policies and procedures specifically. Time needs to be made for this in order to move towards eventually handling accounts on her own. There should be an immediate and sustained improvement in the timeliness of completing all projects. Linda should identify all outstanding projects by February 15th, and each should have a deadline assigned, with a zero tolerance standard for lack of timely completion. If a deadline is missed, further corrective action will follow. New goals will be established for Linda by Brendan and Gregg. An interim performance evaluation should be done to determine if goals are being met and to assure that performnce returns to On-Target or better.

**Employee's Comments for Assessment Period (add pages if necessary):**

```
Employee Response is attached and signed.
```

**Signatures and Dates**

| Performance Planning | Mid-Year Progress Review Completed (Optional) | Year-End Assessment |
|---|---|---|
| | ☒ No  ☐ Yes | B916 |
| Employee Signature/Date | Employee Signature/Date | Employee Signature/Date _Linda J. Blozis_ 2/1/03 |
| Manager Signature/Date | Manager Signature/Date | Manager Signature/Date 1/31/03 |
| Next-level Manager Signature/Date | Next-level Manager Signature/Date | Next-level Manager Signature/Date |

MEL/BLOZ 460

Linda Blozis
Response to Manager Review dated 1/27/03

My understanding of the Mellon review process is that it is incumbent upon the supervising officer to set goals and deadlines for their direct reports. That notwithstanding, I will address comments made in my review dated 1/27/03.

The reviewing officer completely neglected to state that from March 3, 2002 until July 7, 2002, four months, I was entirely responsible for all the support of the Greenville Private Wealth Management (P.W.M.) office accounts as a result of the dismissal of Kathleen Agne. Upon hiring a replacement portfolio administrator, I devoted major portions of my workday to training and answering questions while continuing with my own workload as planned vacations were taken and officers were on client calls. During this same period the supervising officer spent 3-4 days per week in the Mellon Philadelphia offices and was subsequently promoted/transferred to another position in December 2002.

Over these four months I prepared all materials for client meetings; handled all monthly reviews and trades as instructed; monitored all in-coming cash additions and out-going disbursement requests; opened a number of new accounts; started termination of some accounts; and devoted as much time as possible to special corporate projects. I was also responsible for office mail; equipment maintenance; supply ordering and coverage of all department phone lines.

As of this writing:

Identification of accounts with restrictions on Mellon models has been completed. Substantiating paperwork is available.

Calculating cost basis for clients' assets has previously been identified as an administrating officer job requirement. Since a particular account was not specified, I cannot provide more explanation.

Identifying funds transfer agreements on file had a deadline for early **June 2002**. I was instructed to do the best I could at that time and updated some 50-60 accounts of the total office portfolio.

Mrs. ███████████ is an 85 year old widow. Her e-bonds valuation should have been completed when the account was opened in 1995 by the sales officer or the then administrating officer. As previously detailed in an email to my supervisor, I made two personal trips to Mrs. ███████'s home to try to get her to release the bonds and complete the addition to the account. She refused on both occasions to fully disclose the information to me. I refrained from any additional contact with the client when I learned from her accountant that she was not totally forth-coming with him about a her assets, thus causing a large estimated tax payment requirement. Because of her age and confusion in paying estimated taxes, I made two personal trips to the IRS in downtown

**B917**

MEL/BLOZ 461

Wilmington on her behalf and resolved the problem for her. The account has since been transferred to the Walker Team.

At this time I see my responsibilities as follows:

To update the Greenville ████████████████ with current staff changes.

To correct and update stale-dated assets for all accounts assigned officer #201 including many accounts that have always been serviced in Philadelphia, with the files remaining there and for which I had no prior working knowledge.

To continue to service our clients to the best of my ability and as defined by those supervisors who will be directing the course of the Greenville, DE wealth center.

It is important to note for this record – during my tenure of service at Mellon there has never been a situation that has placed Mellon Private Wealth Management in legal jeopardy either by client initiation; regulatory compliance or negligence on my part.

I therefore disagree with these review criticisms both in tone and substance.

*Linda J. Blozis*

Linda J. Blozis
February 11, 2003

B918

MEL/BLOZ 462

## Section V: Self-Appraisal Questionnaire

The employee initiates the assessment process by conducting a qualitative self-assessment of his/her performance that is given to the manager prior to the performance discussion.

### Results-Based Goals

1) Describe in qualitative terms how you would assess your performance against the results-based goals that were established during the planning process.

> Continued to demonstrate initiative & willingness to accept each challenge and assignment and make every attempt to complete in a atimely manner. Even in the current stressful economic environment, I have been dedicated to even more client service and satisfaction.

2) What are the factors that enabled or hindered your ability to meet expectations?

> Short notice given on major corporate projects.
>
> Because of our small office, accountability falls on entire staff.

### Shared Values

3) List specific examples/occasions where you have demonstrated our Shared Values.

| Shared Values | Examples/Occasions |
|---|---|
| Integrity | ■ Continue to serve all clients and offer solutions.<br>■ Respond to all clients' requests regardless of status of account (active or terminating). |
| Teamwork | ■ Suggested client teleconference when personal meeting not possible.<br>■ Helped arrange client meetings on short notice. |
| Excellence | ■ Accepts accountability.<br>■ Adaptable to changing corporate policies. |

B919

MEL/BLOZ 463

mpetencies
What are your two strongest areas?  Explain.

Very client service oriented.

Wo.    .ard on client relationships.

5)  What are your two areas for improvement?  Explain.

More in-depth investment training and knowledge.

Adanced computer skills/proficiencies.

## Competency Development Plan

During the assessment period, managers identify strengths that contribute to job effectiveness and areas that need to be improved, enhanced or developed.  As a result, employees and managers establish a development plan (on-the-job assignments, task force committee, coaching, etc.).  Each employee must have at least *one* developmental goal for the year.

| ngths - Identify Areas of Strength | | |
|---|---|---|
| **Competency to Be Developed** | **Strategies** | **Target Date** |
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |

**Comments (add pages if necessary):**

**Items for consideration at future Performance Planning Meeting (add pages if necessary):**

**B920**

MEL/BLOZ 464

8

Performance Management Toolkit

Tom, I would like for you to review my decision to terminate a Portfolio Administrator in our Delaware Office.

History of Events:

**2/11/03**      Given a **Needs Improvement on her Performance Review for 2002.** Manager (Bill Becker) stressed the importance of completing projects on time and taking ownership of projects without constant monitoring.
              Emphasized that Linda needs a better understanding of the product; self-study encouraged. Manager noted in the PR there would be a zero tolerance standard for lack of timely completion of projects. If any further deadlines were missed further corrective action would follow.

**4/07/03**      Failed to follow-up on request from manager (new manager, Gregg Landis) to review a file and run a porch. Linda did not feel that this was a priority because of other work that needed to be completed.

**5/07/03**      Gregg met with Linda to discuss the fact that meeting booklets that he had requested from a future meeting had not been completed. Notice had been given to Linda on 4/30/03 that managers would need these books for an upcoming meeting. They knew that she was scheduled to go on vacation and specifically wanted the books completed before she left.

**5/09/03**      Linda did not properly prepare an investment proposal after being given explicit instructions. The incomplete package was sent to a client.

**5/19/03**      Placed on **Final Written Warning for Performance**, specific issues:

              Failure to determine the importance of finishing projects in a timely

manner.

              Lack of ownership of projects without constant monitoring

              Product Knowledge and Work quality.

**5/21/03**      Manager requested that Linda provide updated pricing data re: 2003 Stale Price Report. Asked that this be completed by 6/20/03.

**6/26/03**      Manager followed up with Linda about his request from 5/21/03. Her response was that she had not had time to complete this project because she was just catching up on some others. Linda failed to notify manager prior to due date that she would not have project completed. Numerous requests have been made to Linda to notify management if a report would not be completed on time and she continues to fail to do this.

At this point, we would like to term Linda for Performance.

**B921**

MEL'BLOZ 695

**Landis Gregg L**

| | |
|---|---|
| From: | Blozis Linda J |
| Sent: | Thursday, March 13, 2003 11:14 AM |
| To: | Landis Gregg L |
| Subject: | Vacation dates |

As directed, I would like the following dates, please:

Monday, May 5, 2003 thru and including Friday May 16, 2003.

Linda J. Blozis
Mellon Portfolio Administrator
(800) 842-5922
(302) 421-2208
blozis.lj@mellon.com

Brendan advised Linda on 3/18/03 that her request was partially approved. She may take 1 week of vacation at this time. We are short-staffed in the office due to Bill's promotion and the delay in replacing him. Linda had a 2-week vacation in December 2002. It was felt that she should take just 1 week at this time to maintain office coverage.  G—

4/8 - Linda asked for 6 days, and we agreed. She will be out 5/2, 5/5, 5/6, 5/7, 5/8 & 5/9.



EXHIBIT
Blozis '23
arp 1/13/07
PENGAD 800-631-6989

1

B922

**Blozis Linda J.**

| | |
|---|---|
| **From:** | Blozis Linda J |
| **Sent:** | Tuesday, March 18, 2003 2:47 PM |
| **To:** | Landis Gregg L |
| **Subject:** | Brendan |

Because of my meeting with him regarding the personal aspect of his news, I was overcome with such a horrible pressure headache I can't concentrate very well this afternoon. I need to leave and regain my composure. I'll make up the 2 hrs ASAP in the near future.

Linda J. Blozis
Mellon Portfolio Administrator
(800) 842-5922
(302) 421-2208
blozis.lj@mellon.com

*Informed by B Filmore of was not getting a bonus + Maria was. Also informed by B Filmore that Maria was told this info.*

*Time (2 Hrs) was made up.*

EXHIBIT
Blozis ·30
AP  1/13/07

P031

1

B923

## Landis Gregg L

| | |
|---|---|
| m: | Landis Gregg L |
| Sent: | Friday, May 09, 2003 5:07 PM |
| To: | Gilmore Brendan M |
| Cc: | Kochis Paul M; Thomas Rosemary C |
| Subject: | Linda Blozis |

You asked me to report the following issues regarding Linda's job performance that were uncovered this week while she was on vacation. You also asked me to copy Paul Kochis and Rosemary Thomas on this e-mail.

1. Following a teleconference with ▆▆▆▆ to discuss the ▆▆▆▆ family trusts (relationship paid $300,000 in 2002) you sketched out an investment proposal and asked Linda to type it up send it to the client. The client called this week, having received only the purchases and not the sales. We found the file copy of the recommendation, and only the purchases were sent. On the computer system, we found the cover letter and the purchases, but not the sales. Thus, our recommendation was incomplete. The whole idea of the proposal was to recommend selling overweight positions as a risk reduction tool. In your handwritten notes, the sales and purchases were on the same page. This is typically how an investment recommendation is made. It is troubling that Linda does not know how to prepare an appropriate recommendation, especially when you gave her all of the information. All she needed to do was type it and put it in the envelope. Needless to say, this made Mellon look very unsophisticated to an important client who has much more money at other institutions, ties to the community, etc.

2. On Monday 4/7/03, I gave Linda a draft investment recommendation for the ▆▆▆▆ners account. This is something I worked on at home the previous weekend because I was concerned the co-trustee has not been getting sufficient attention. When I gave the program to Linda, I wrote three directions at the bottom and dated my comments. She was asked to: (a) read the file to make sure my recommendations were in line with the stated objectives, (b) run a porch analysis on the stocks, and (c) present the information to Bruce so that he could turn my work into a formal recommendation to the co-trustee. This week, when we were looking through Linda's pending work to see if we could find the ▆▆▆ program mentioned above, I came across my 4/7/03 draft investment recommendation for the ▆▆▆▆s account. It appeared as if no work was done. I called Bruce to see if Linda had spoken with him about the project, and she had not. A full month has passed since I did the preparatory work and gave it to Linda, and she has not followed through. This is a relatively small account and not one of the "A" or "B" level relationships in our office. But it is not Linda's job to decide that assigned work should be put off. I was concerned enough about the account to take time at home over a weekend to prepare the recommendation. Linda was simply asked to review the file, run a porch, and send the work to Bruce. Our goal for assistants is ultimately to have them making first-draft investment recommendations, but Linda has proven incapable of even basic follow-up and time management. Her response will be that she has been busy with more important clients, but I find it inexcusable that this job did not get done in the past month.

I understand you will be placing Linda on final written warning next week, and will be asking Rosemary to help in the communication of this decision.

B924

**Landis Gregg L**

| | |
|---|---|
| **From:** | Kochis Paul M |
| **Sent:** | Friday, May 09, 2003 5:15 PM |
| **To:** | Landis Gregg L; Gilmore Brendan M |
| **Cc:** | Thomas Rosemary C |
| **Subject:** | RE: Linda Blozis |

Rosemary, this is gross negligence or insubordination in my view. I do not understand why she can not be immediately terminated if she has no adequate answer to these serious errors, on top of what occurred last week. I think Gregg should call her and ask about these two items with Rosemary on the phone. Absent adequate explanation, I recommend that she be terminated next week upon her return.

-----Original Message-----

| | |
|---|---|
| **From:** | Landis Gregg L |
| **Sent:** | Friday, May 09, 2003 5:07 PM |
| **To:** | Gilmore Brendan M |
| **Cc:** | Kochis Paul M; Thomas Rosemary C |
| **Subject:** | Linda Blozis |

You asked me to report the following issues regarding Linda's job performance that were uncovered this week while she was on vacation. You also asked me to copy Paul Kochis and Rosemary Thomas on this e-mail.

1.  Following a teleconference with ███ ████ to discuss the ████████ family trusts (relationship paid $300,000 in 2002) you sketched out an investment proposal and asked Linda to type it up send it to the client. The client called this week, having received only the purchases and not the sales. We found the file copy of the recommendation, and only the purchases were sent. On the computer system, we found the cover letter and the purchases, but not the sales. Thus, our recommendation was incomplete. The whole idea of the proposal was to recommend selling overweight positions as a risk reduction tool. In your handwritten notes, the sales and purchases were on the same page. This is typically how an investment recommendation is made. It is troubling that Linda does not know how to prepare an appropriate recommendation, especially when you gave her all of the information. All she needed to do was type it and put it in the envelope. Needless to say, this made Mellon look very unsophisticated to an important client who has much more money at other institutions, ties to the community, etc.

2.  On Monday 4/7/03, I gave Linda a draft investment recommendation for the ████ ████████s account. This is something I worked on at home the previous weekend because I was concerned the co-trustee has not been getting sufficient attention. When I gave the program to Linda, I wrote three directions at the bottom and dated my comments. She was asked to: (a) read the file to make sure my recommendations were in line with the stated objectives, (b) run a porch analysis on the stocks, and (c) present the information to Bruce so that he could turn my work into a formal recommendation to the co-trustee. This week, when we were looking through Linda's pending work to see if we could find the ████ program mentioned above, I came across my 4/7/03 draft investment recommendation for the ████████████'s account. It appeared as if no work was done. I called Bruce to see if Linda had spoken with him about the project, and she had not. A full month has passed since I did the preparatory work and gave it to Linda, and she has not followed through. This is a relatively small account and not one of the "A" or "B" level relationships in our office. But it is not Linda's job to decide that assigned work should be put off. I was concerned enough about the account to take time at home over a weekend to prepare the recommendation. Linda was simply asked to review the file, run a porch, and send the work to Bruce. Our goal for assistants is ultimately to have them making first-draft investment recommendations, but Linda has proven

**B925**

MEL/BLOZ 689

incapable of even basic follow-up and time management. Her response will be that she has been busy with more important clients, but I find it inexcusable that this job did not get done in the past month.

I understand you will be placing Linda on final written warning next week, and will be asking Rosemary to help in the communication of this decision.

B926

MEL/BLOZ 690

JUN 23 '05 12:31 FR MELLON BNK LEGAL DEPT215 553 3415 TO 14122366054    P.02/08

4/30/03

Mar 31st
Apr 13  } Instruction to L. Blozis
Apr 24  }
Contacted Gregg Ealy the 4th. Cp. 4 do Jooks  First Written Warning
Not reget wk        May 17th

Give Linda a Call

Borderline Insubordinate

B927

A-69

MEL BLOZ 683



5/01/03

Leslie's mtg w/ Brenda Gilmore

Tone - + Timber of voice
- So disruptive to other mtg
members
Demeaning / degrading

said age discrimination

"Other assistant producing a lot more a
lot faster." Age discrimina

He hollered at Linda

- Linda went to Gregg to see if
Peeler's group could do.

- Bill talked to Brenda, Brenda
came to her.

- It only occurred last week to
her that they could not finish

B928

JUN 23 '05 12:31 FR MELLON BNK LEGAL DEPT215 553 3415 TO 14122366054    P.04/08



5/06/63

Linda and Maria did
get the job done today
(!)

Brendan car, come & go with us
be watching him.

Shells Ornament - Has n't refused

B929

MEL/BLOZ 469

**LINDA BLOZIS FILE**

I met with Rosemary Thomas of HR on 5/12/03.
She has been speaking with Linda and offered
the following observations:

1) Rosemary detects a strong resistence to change
on the part of Linda.

2) Linda said she just doesn't have the time to
complete all of her work.

3) Linda said she might not want to continue
working at this pace / level.

Based on recent problems -- which show the
lack of improvement from her year-end
review -- we decided to place Linda
on final written warning.


DEPOSITION
EXHIBIT
Landis 6
12·21·04

MEL/BLOZ 684

B930

**Landis Gregg L**

| | |
|---|---|
| .n: | Thomas Rosemary C |
| Sent: | Friday, May 16, 2003 3:55 PM |
| To: | Landis Gregg L |
| Cc: | Gilmore Brendan M |
| Subject: | Linda Blozis |

Gregg, I spoke with Brendan and he suggested that you and I meet with Linda on Monday.  Please let me know what time you would like to meet.  Thanks.

1

**B931**

MEL/BLOZ 687

LINDA BLOZIS

Gregg's notes re: final written warning meeting

1753

* Format
* Agenda: prelim, document, examples, time to talk

Prelim
jobs changing: fast paced; to more w/ less; looming; sat; errors
BMG ... DOX ... PK ... CS
2002 perf. review = needs improvement ... a written warning
discussion w/ BMG ... attitude ... too defensive and abrasive
follow up w/ RT: ① detected a strong resistance to change,
        ② said don't have the time to get all of your work done,
        ③ said might not want to continue @ this pace/level.
* disc w/ me, BG + PK ... RT developed final writ. warn.

Examples
• books
- not done ... push off ... still not completed ... BMG aware that
  MB doing significant portions of the books ... resign?
- 2 errors: ① bar chart equity div ② label on YTD gains
•
•
• manually priced

⇒ MEET TO SET DEADLINES


DEPOSITION
EXHIBIT
Landis 7
12-21-06   P5
PENGAD 800-631-6989

B932

MEL/BLOZ 686



**Mellon**

*originals*
Interoffice Memo

| | | | |
|---|---|---|---|
| Date: | May 19, 2003 | From: | Brendan Gilmore |
| To: | Linda Blozis | Dept: | Private Wealth Management |
| | | AIM: | |
| | | Phone: | |
| AIM: | | Fax: | *BMG* |

RE: Final Written Warning for Performance

Linda, we have discussed on previous occasions that your performance is not meeting my expectations as a Portfolio Administrator. These concerns were discussed in your most recent Performance Review. Unfortunately, your lack of detail and timeliness continues to need improvement. Specifically, I have concerns in the following areas:

- ❏ Failure to determine the importance of finishing projects in a timely manner.

- ❏ Lack of ownership of projects without constant monitoring.

- ❏ Product Knowledge and Work Quality. Developing a better understanding of investments in general and Mellon's investment policies and procedures, specifically, to ensure that accounts are handled appropriately.

As a result, you are being placed on Final Written Warning. You must demonstrate immediate and sustained improvement in your overall performance with special focus on the issues outlined above. If there are specific areas in which I can provide assistance in your meeting of my expectations, please let me know so that we can discuss and determine an appropriate course of action. However, if your performance continues to not meet my expectations, you may be subject to further corrective action up to and including termination of our employment.

*Linda Blozis*    5/19/03
Copy received – Linda Blozis



**Mellon Financial Corporation**

Asset Management
Institutional Asset Management
Mutual Funds
Private Wealth Management

**Corporate and Institutional Services**
Asset Servicing
Human Resources Services
Treasury Services

**B933**

For internal use only.

**Landis Gregg L**

| | |
|---|---|
| **From:** | Thomas Rosemary C |
| **Sent:** | Wednesday, July 02, 2003 5:49 PM |
| **To:** | Gilmore Brendan M |
| **Cc:** | Landis Gregg L |
| **Subject:** | L. Blozis |

I have approval to move on this issue. I am out of the office tomorrow and Monday and Tuesday of next week. I would like for you to wait until Wednesday when I return.

**B934**