# EXHIBIT A

| Blozis | v. | Mellon Trust of Delaware, et al. |
|---|---|---|
| Linda J. Blozis, Volume 1 | C.A. # 05-891 (SLR) | July 26, 2006 |

Page 130

1   Q. When you say, "time in," you mean years of
2  service with the company?
3   A. Yes.
4   Q. Why do you feel that's indicative of age
5  discrimination?
6   A. We were all on the same team.
7   Q. So by "more jovial," you mean joking around?
8   A. Friendlier, more outgoing.
9   Q. You felt that with the older workers he didn't
10  have that same level of being friendly and outgoing?
11  A. No, I did not think that he had that same
12  level.
13  Q. Was he like nasty to the older workers in the
14  meeting?
15  A. I wouldn't use the term "nasty."
16  Q. But wouldn't you say that he wasn't as jovial
17  or outgoing? I'm just trying to get a sense of how he
18  was appearing with the younger workers as opposed to
19  the older ones.
20  A. If he was friendly and jovial with the younger
21  ones, it seemed apparent that he was aloof and distant
22  and borderline rude to the older workers.
23  Q. And when you say, "borderline rude," what would
24  he do?

Page 131

1   A. Just if they asked questions he would be abrupt
2  in his answers or not have time for them then.
3   Q. You felt with the younger workers he would
4  answer their questions and have time to discuss
5  whatever they were bringing up?
6   A. Yes.
7   Q. Did you ever approach him on this?
8   A. No.
9   Q. Did you ever speak with Rosemary or anybody
10  from HR about how you felt the meetings were going?
11  A. Not that I recall at this time.
12  Q. Would it be at all of the meetings that you
13  felt that way or some of them?
14  A. For the most part it would be at the
15  predominance of the meetings. Not all of the team
16  members were always included. It would depend on what
17  the particular situation required, whether it be
18  officers or officers and assistants.
19  Q. Would you be included on all of the meetings?
20  A. I was an assistant.
21  Q. So there would be meetings that you would not
22  be included on?
23  A. There were at times, yes.
24  Q. In terms of when the meetings were and who

Page 132

1  would be included on the meetings, would there be an
2  e-mail coming out from Brendan saying we're going to
3  have a meeting on X date and A, B and C should be
4  there at the meeting?
5   A. As I recollect, there could have been over the
6  time frame that he was the team leader, yes.
7   Q. So you would get some advanced word of a
8  meeting date and who was to attend the meeting?
9   A. For the most part, yes, there would be advanced
10  notice.
11  Q. Then I think you testified that some meetings
12  were done on the phone?
13  A. Yes.
14  Q. And some in person?
15  A. Yes.
16  Q. Any other examples of instances where you
17  thought Gilmore was being discriminatory on the basis
18  of age?
19  A. At this time I don't recall any.
20  Q. You also --
21  A. That's my phone.
22      MR. LaROSA: Let's go off the record for a
23  second.
24      (Discussion off the record.)

Page 133

1  BY MS. WILSON:
2   Q. Now, with respect to your complaint you also
3  have a gender discrimination allegation. And focusing
4  in on Gilmore --
5   A. Excuse me. I'm going to shut my phone off.
6   Q. Oh, sure.
7   A. I'm sorry. Would you repeat the question?
8   Q. Sure. Ready?
9   A. Yes.
10  Q. Going back to Gilmore.
11  A. Yes.
12  Q. And focusing now on your gender discrimination
13  claim.
14  A. Yes.
15  Q. Can you provide me with instances where you
16  feel that Gilmore either by word or conduct was
17  discriminating against you on the basis of gender?
18  A. To the best of my recollection, when I might be
19  in the Philadelphia offices and working alongside a
20  teammate for whatever purpose on an account I noticed
21  that Dan Merlino would not seem to be as busy as we
22  women might have been.
23  Q. And Dan Merlino was a portfolio administrator?
24  A. To the best of my recollection, that's how he

Page 134

1  started on the team.
2  Q.  When you say that Dan wasn't as busy as the
3  women, what women?
4  A.  It would have been while she was still under
5  the employ Kathleen Agne, Marion whose name I don't
6  recall.
7  Q.  I think I might have her name.
8      Is it Marion --
9  A.  Marano.
10 Q.  -- Marano?
11 A.  It just came to me. Marano, Marion Marano.
12 Q.  M-a-r-a-n-o.
13 A.  Even Brendan's personal assistant, Cindy
14 Chambliss.
15 Q.  Was Cindy a portfolio administrator?
16 A.  I don't know what her correct title was at this
17 time since she was Brendan's personal assistant.
18 Q.  And Marion, she was a portfolio administrator?
19 A.  Yes, as I recall.
20 Q.  So when you say that you visited the
21 Philadelphia office and Dan didn't seem to be as busy
22 as the rest of the women, why did you take that to be
23 gender related?
24 A.  Because I recollect there were instances in

Page 135

1  which Marion and Cindy would intimate to me that we
2  have these tasks to complete and Dan did not have
3  comparable tasks. He was not giving comparable tasks
4  in a comparable work position.
5  Q.  And who would be the person in charge of giving
6  Dan tasks?
7  A.  It would be Brendan Gilmore.
8  Q.  And did you ever do sort of your own
9  investigation as to what task Dan was being given?
10 A.  I don't understand your question.
11 Q.  Did you know what task that Dan was being given
12 to do?
13 A.  There were specific job duties listed that the
14 portfolio administrators were responsible for and
15 sometimes we might have to work in conjunction with
16 one another or ask questions. It seems sometimes when
17 I would call Dan he wouldn't have the answers. He
18 would defer me to Marion or Cindy or one of the women.
19 Q.  And you took from there, from his deferment to
20 the females that he didn't have the same work, the
21 comparable work that you had to do?
22 A.  I took from there that he should have that
23 answer as part of his job and he didn't have it.
24 Q.  So in terms of whether he had comparable work

Page 136

1  to do, do you know that?
2  A.  As I recollect, if he was given the title of
3  portfolio administrator he would be given similar
4  duties as we women would be given.
5  Q.  And you took that something was amiss when you
6  would call and ask for information and he wouldn't
7  know the answer?
8  A.  Yes.
9  Q.  Did that lead you to believe that either -- I
10 mean, what I took from your answer is you would ask
11 him a question, he didn't know the answer and you
12 thought he should have known the answer?
13 A.  On some occasions, yes. On other times if I
14 asked could you check on something for me, he would
15 defer to I'll have Marion call you back or I'll have
16 Cindy call you back.
17 Q.  And did you think there was something wrong
18 with him --
19 A.  I thought that --
20 Q.  -- doing that?
21 A.  Yeah. I thought that he was very capable of
22 getting the answers or being able to work as a team
23 player and not defer to the women.
24 Q.  So it sounds like you were thinking that he

Page 137

1  wasn't pulling his weight?
2  A.  Yes.
3  Q.  And instead of saying I'll have so-and-so get
4  you the answer that he should have gotten the answer
5  himself and given it to you?
6  A.  Yes.
7  Q.  Did you ever have any conversations with
8  Brendan Gilmore or Becker that Dan wasn't pulling his
9  weight?
10 A.  You asked about the two of them.
11 Q.  Well, with either one of them did you ever have
12 any conversations that Dan wasn't pulling his weight?
13 A.  I don't recall specifically at this time, no.
14 Q.  Do you know whether Kathleen or Marion or Cindy
15 ever complained to Brendan or, and I'll use his last
16 name, Becker, Bill Becker that Dan wasn't pulling his
17 weight?
18 A.  I have no way of knowing that at this time.
19 Q.  Do you know whether Brendan or Bill had any
20 knowledge that Dan wasn't pulling his weight?
21 A.  Do I have any knowledge? I don't know for sure
22 that they would at this time.
23 Q.  Are there other examples of gender
24 discrimination in connection with Gilmore?

35 (Pages 134 to 137)

Blozis v. Mellon Trust of Delaware, et al.
Linda J. Blozis, Volume 1   C.A. # 05-891 (SLR)   July 26, 2006

Page 138

1  A. None that I can recall at this time.
2  Q. If you would look at your complaint, paragraphs
3  56a through d.
4  A. Yes.
5  Q. Just look at that because my question is
6  earlier when we were talking about Brendan Gilmore you
7  had stated that he wanted to eliminate older workers
8  off the team and replace them with younger people.
9  That's probably not a direct quote, but that was the
10  gist of the testimony.
11       Are these the younger people that you were
12  referring, to 56a through d?
13  A. Yes.
14  Q. Now, with respect to looking at 56a, we have
15  got Investment Officer Bill Becker. Is it your
16  testimony that Bill replaced an older worker?
17  A. Bill Becker was ultimately put in place as the
18  senior trust officer in Delaware. At the time of my
19  first employment, that position was held by Mr. Robert
20  Bell.
21  Q. So is it your testimony that Bill replaced
22  Robert?
23  A. Considering the succession, Martha Fetters had
24  served as senior officer of Delaware in the interim

Page 139

1  between Mr. Bell and Bill Becker.
2  Q. So Bill replaced Martha?
3  A. Yes.
4  Q. Do you know whether there were any jobs, do you
5  know whether there were any advertisements for the
6  senior trust officer position?
7  A. At this time I don't recall if there were
8  advertisements.
9  Q. Do you know whether there were any individuals
10  who applied for the senior trust officer position?
11  A. To the best of my recollection -- when are you
12  referring to? What time frame? I'm sorry.
13  Q. I was just following up on your testimony that
14  Bill replaced Martha Fetters as the senior trust
15  officer.
16       So my question was whether you knew
17  whether there were people who applied for the position
18  of senior trust officer around the period that Martha
19  Fetters left.
20  A. To the best of my recollection, I believe Bill
21  said he was in competition with two other people, but
22  I don't recall who they were.
23  Q. Looking at b, Dan Merlino, is that the same
24  person we have been talking about, Masucci?

Page 140

1  A. No. Ray Masucci was an officer. Dan Merlino
2  was the portfolio administrator that I've been
3  referring to.
4  Q. And he was in the Philadelphia office?
5  A. Yes.
6  Q. And did he replace an older worker?
7  A. Yes, I believe he did. And I can't remember
8  her name at this time.
9  Q. In your complaint you have him as an investment
10  assistant?
11  A. Yes.
12  Q. Is that the same thing as portfolio
13  administrator?
14  A. To the best of my understanding, it's
15  synonymous with portfolio.
16  Q. Do you know whether other individuals applied
17  for the portfolio administrator/investment assistant
18  position that Dan got?
19  A. I have no way of knowing at this time.
20  Q. You have Assistant Maria Dunlop. That's the
21  Maria that we have been talking about in the Delaware
22  office?
23  A. Yes.
24  Q. And she came in as the portfolio administrator,

Page 141

1  correct?
2  A. Yes.
3  Q. And did she replace anybody?
4  A. I don't know if it's correct to say she
5  replaced, but Kathleen Agne was fired. There was the
6  time lapse between March and then Maria was hired in
7  July.
8  Q. Do you know whether others applied for the
9  position that Maria ultimately got?
10  A. To my recollection, I think others did. There
11  were other interviews conducted.
12  Q. Do you know who was being interviewed?
13  A. The names, I was not told who they were.
14  Q. Who was doing the interviewing for Maria's
15  position?
16  A. Initially it would have been Greg Landis and
17  then I'm under the understanding that Brendan Gilmore
18  made the ultimate decision.
19  Q. And do you know whether any advertisements were
20  placed for the position?
21  A. I'm not sure at this time.
22  Q. The next one, Investment Officer Kristy Hunt.
23  A. Yes.
24  Q. Was she in the Philadelphia office?

36 (Pages 138 to 141)